UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30061-MAP

| | | |
|---|---|---|
| MARK A. RICHARDS, | ) | |
| Plaintiff | ) | |
| | ) | OPPOSITION OF DEFENDANT |
| vs. | ) | RIVER VALLEY COUNSELING |
| | ) | CENTER, INC. TO PLAINTIFF'S |
| RIVER VALLEY COUNSELING | ) | MOTION TO COMPEL FURTHER |
| CENTER, INC., VALLEY HEALTH | ) | DESIGNATION OF RULE 30(b)(6) |
| SYSTEMS, INC., DAVID G. MATTOCKS, | ) | DEPONENT |
| AND DONNA VIENS, | ) | |
| Defendants | ) | |

## I. Introduction

The defendant, River Valley Counseling Center, Inc. ("RVCC"), hereby opposes

Plaintiff's Motion to Compel Further Designation of Rule 30(b)(6) Deponent ("Plaintiff's

Motion to Compel"). In summary, and as more fully set forth below, RVCC opposes

Plaintiff's Motion to Compel on the grounds that RVCC satisfied its duties under Rule

30(b)(6) ("30(b)(6)") by appropriately preparing its designees as to matters known or

reasonably available to RVCC. In addition, Plaintiff's Motion to Compel should be

denied because plaintiff has not adequately conferred in compliance with Local Rules 7.1

and 37.1.

## II. Summary of Claims

The five-count complaint brought by Mark A. Richards ("Plaintiff") arises out of

the termination of his employment and the elimination of his position as the Director of

RVCC's Psychiatric Day Treatment Program on November 4, 2004. Plaintiff's

complaint asserts claims of violation of the Family and Medical Leave Act (Count I),

disability discrimination under the Americans With Disabilities Act (Count II) and

Chapter 151B (Count III), and age discrimination under the Age Discrimination in

Employment Act (Count IV) and Chapter 151B (Count V).  Plaintiff brought these

discrimination claims against four defendants:  his employer, RVCC; the sole member of

RVCC, Valley Health Systems, Inc. (VHS); the former Executive Director of RVCC,

David Mattocks ("Mr. Mattocks"); and RVCC's Director of Human Resources, Donna

Viens ("Ms. Viens").

III.  <u>Relevant Factual and Procedural Background</u>

RVCC employed the Plaintiff as the Program Director of its Psychiatric Day

Treatment Program.  (Complaint, ¶ 8; excerpts of RVCC's answers to interrogatories,

attached hereto as Exhibit A at pp. 4-5).  Mr. Mattocks was RVCC's Executive Director

for approximately one year.  (See excerpts of the deposition of Hank Porten, copies of

which are attached hereto as Exhibit B, at p. 35).  His employment ended in late 2005

after an expiration of a leave of absence.  Mr. Mattocks made the decision to terminate

Mr. Richard's employment.  (Exhibit A at p. 7).  Ms. Viens participated in the meeting

with the Plaintiff informing him of his termination of employment.  (See excerpts of the

deposition of Ms. Viens, copies of which are attached hereto as Exhibit C at p. 22).

When Mr. Mattocks was RVCC's Executive Director, he was employed by H-C

Management Services, Inc. ("H-C Management").  (See Exhibit B at p. 17).

Prior to the date of the 30(b)(6) deposition of RVCC, Plaintiff took three

depositions.  On December 9, 2005, Plaintiff took the deposition of Hank Porten,

individually and as the 30(b)(6) designee of VHS.  Plaintiff took Ms. Viens' deposition

2

on December 14, 2005.  (See Affidavit of Mary J. Kennedy, attached hereto as Exhibit D, ¶¶ 3 and 4).

On January 17, 2006, Plaintiff served the 30(b)(6) deposition notice of RVCC, which contained the following seven subject areas:  (1) David Mattocks; (2) relationship between H-C Management and VHS; (3) relationship between H-C Management and RVCC; (4) work provided by Jeffrey Eagle and/or Health Enhancement Services, Inc. ("Health Enhancement") concerning David Mattocks; (5) Donna Viens; (6) Mark Richards; and (7) RVCC's defenses to Plaintiff's claims.  (See Re-Notice of Taking Deposition, attached hereto as Exhibit E at p. 3).[1]

On the same day of the 30(b)(6) deposition of RVCC, January 31, 2006, Plaintiff took the deposition of Jeffrey Kassis ("Mr. Kassis") in his individual capacity before taking Mr. Kassis' deposition as one of the 30(b)(6) designees of RVCC.  On that same day, Plaintiff also took the deposition of Mary Kelleher, Vice President of Human Resources at H-C Management.  (Exhibit D, ¶ 5).

With respect to RVCC's 30(b)(6) deposition, RVCC produced Jeffrey Kassis, Clinical Director or RVCC, to testify as to topics 1, 4 and 6 in RVCC's deposition notice. (See Deposition Transcript of Mr. Kassis as 30(b)(6) designee, at p. 5, a copy of which is attached hereto as Exhibit G).   Mr. Kassis, Clinical Director of RVCC, was Plaintiff's supervisor and was part of Mr. Mattocks' Executive Team at RVCC.  (See excerpts of the deposition of Jeffrey Kassis, individually, copies of which are attached hereto as Exhibit

---

[1] Except for the name of the defendant corporation in topic 7, the seven subject areas identified in RVCC's 30(b)(6) deposition notice (Exhibit E at p. 3) were identical to the seven subject areas identified in VHS's deposition notice.  (See Notice of Taking Deposition, attached hereto as Exhibit F at p. 3).

H, at pp. 6, 25, 53).  Mr. Kassis oversaw all managed care components of RVCC (Exhibit H at p. 10).  Mr. Kassis testified that, in preparation for his testimony as a 30(b)(6) designee, he met with counsel and reviewed Plaintiff's performance evaluations and his evaluation from Mr. Mattocks.  (Exhibit G at p. 8).  Mr. Kassis also testified that before his deposition, he had reviewed records relating to the financial performance of the psychiatric day treatment program for which Plaintiff was the Program Director.  (Exhibit G at p. 9).  As the 30(b)(6) designee for RVCC, Mr. Kassis was asked, among other questions, about Plaintiff's job performance as the Program Director and the reasons for Plaintiff's termination of employment.  (Exhibit G at p. 10, 11).  At the end of the deposition, Plaintiff's counsel suspended the deposition.  (Exhibit G at p. 26).

As to topics 2, 3, 5 and 7 in RVCC's deposition notice, RVCC designated Matthew Haas, its current Executive Director.  (See Deposition Transcript of Matthew Haas as 30(b)(6) designee, a copy of which is attached hereto as Exhibit I at p. 5).  Mr. Haas testified that, in preparation for his testimony, he met with counsel and reviewed the Management Oversight Agreement between H-C Management and RVCC.[2]  (Exhibit I at p. 5-6).  During discovery, Mr. Haas also signed RVCC's answers to interrogatories and assisted in RVCC's production of documents.  (Exhibit I at p. 6).  (Exhibit A at p. 13).  Mr. Haas responded to Plaintiff's questions relating to topics 2, 3 and 7.[3]  At the end of the deposition, Plaintiff's counsel concluded the deposition.  (Exhibit I at p. 21).

---

[2] The Management Oversight Agreement had previously been produced to plaintiff. (Exhibit D, ¶ 2).

[3] Mr. Haas was not asked any questions about Donna Viens' employment (Topic 5).

Pursuant to the Court's Revised Scheduling Order, non-expert depositions were to be completed by February 10, 2006.

On March 17, 2006, this Court held a status conference in this case. For the first time since the deposition of RVCC, Plaintiff's counsel stated that he was considering filing a motion to compel regarding RVCC's deposition. Counsel for RVCC objected to Plaintiff's argument. (Exhibit D, ¶ 6). This Court gave Plaintiff's counsel until March 31, 2006 to file a motion to compel. At no time after March 17, 2006 did Plaintiff contact RVCC to confer regarding narrowing the areas of disagreement of the discovery dispute concerning RVCC's deposition. (See Exhibit D, ¶ 7). On March 31, 2006, Plaintiff filed Plaintiff's Motion to Compel.

IV.   <u>Argument</u>

A.    <u>Plaintiff's Counsel's Failure to Fully Comply With Local Rules 7.1 and 37.1 is grounds for denial of Plaintiff's Motion to Compel.</u>

Rule 37.1 requires that "[before filing any discovery motion . . . counsel for each of the parties shall confer in good faith to narrow the areas of disagreement to the greatest possible extent. It shall be the responsibility of counsel for the moving party to arrange for the conference." L.R. 37.1. The purposes of the conferences mandated by Local Rules 7.1 and 37.1 are "to avoid premature motions" and "to enable the parties to narrow, if not resolve, their dispute." <u>Hasbro, Inc. v. Serafino</u>, 168 F.R.D. 99, 101 (D. Mass. 1996). In this case, statements made at the status conference from Plaintiff's counsel regarding his contemplation of filing a motion and from RVCC's counsel regarding its objection to any such motion does not satisfy Plaintiff's obligations under Local Rules 7.1 or 37.1 to confer. It is unclear from Plaintiff's Motion to Compel in what subject

areas Plaintiff claims RVCC was deficient in its responses to the questions asked at the deposition. Prior to filing Plaintiff's Motion to Compel, Plaintiff failed to present to RVCC's counsel his objections stating which of the seven subject matters the witnesses lacked knowledge. If Plaintiff's counsel had conferred in good faith with counsel for RVCC, the issue raised by the Plaintiff may have been presented to this Court with more clarity and specificity. For this reason, Plaintiff's Motion to Compel should be denied without prejudice subject to its renewal as to those issues about which a real controversy exists. Hasbro at 102.

     B.    RVCC Satisfied its Obligations under Rule 30(b)(6) and Produced Designees who were Knowledgeable on Matters Known or Reasonable Available to RVCC.

Rule 30(b)(6) requires a company to designate one or more persons to testify on its behalf "as to matters known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). RVCC recognizes that the law "is well-established that a 30(b)(6) deponent does have an affirmative obligation to educate himself as to the matters regarding corporation." Calzaturficio v. Fabiano Shoe Company, Inc., 201 F.R.D. 33, 36 (D. Mass. 2001).

Once a 30(b)(6) deposition is noticed, a number of duties are required of the organization: designate a deponent knowledgeable on the subject matter identified as the area of inquiry, designate more than one deponent if it would be necessary; prepare the witness to testify on matters known or reasonably available to the organization; and substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry. Alexander v. FBI, 186 F.R.D. 137, 141 (D. D.C. 1998).

Rule 30(b)(6) also requires the party noticing the deposition to "describe with reasonable particularity the matters on which examination is requested." Fed. R. Civ. P. 30(b)(6). In this case the first six subject matters in RVCC's deposition notice were general and not described with reasonable particularity.

Plaintiff appears to argue that RVCC did not fulfill some or all of its duties because of what the designees did or did not do to prepare for the deposition. However, Plaintiff's Motion to Compel fails to state which subject areas require a new designation or that the failure of the designees to review certain documents caused them to be unprepared on the designated subject matter. Therefore, each subject area will be addressed separately below.

    1.   <u>David Mattocks</u>

Plaintiff's first subject matter to be inquired upon was:

> David Mattocks (Address: Vernon, VT) including, but not limited to, his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associates or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, David Mattocks to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with David Mattocks' application for employment, employment compensation, job performance, discipline, termination, and/or resignation. (Exhibit E at p. 3).

RVCC designated Mr. Kassis to testify as to this topic. (Exhibit G at p. 5). In the 30(b)(6) deposition, Mr. Kassis responded to questions regarding Mr. Mattocks and testified as to his decision to terminate Plaintiff's employment and other managers' interactions with him. (Exhibit G at pp. 11-14, 21-22). Mr. Kassis was deposed

individually and, in response to questions, testified regarding additional issues relating to Mr. Mattocks. (Exhibit H at pp. 27-38, 45-46, 56, 57).

Plaintiff knew prior to service of the deposition notice that, when Mr. Mattocks was the Executive Director of RVCC, H-C Management was Mr. Mattocks' employer. (Exhibit B at p.17). Accordingly, Plaintiff's counsel knew before RVCC's deposition that any information regarding Mr. Mattocks' application for employment, job performance, discipline, termination or resignation was <u>not</u> information known to RVCC, but rather information known to H-C Management.

Plaintiff appears to be critical of Mr. Kassis' failure to contact Mr. Mattocks and his employer, H-C Management, in preparation for the deposition. Plaintiff also appears to be critical of Mr. Kassis' failure to know the circumstances of Mr. Mattocks' termination of employment from H-C Management. However, contacting Mr. Mattocks, who is no longer RVCC's Executive Director, a defendant in this case, and represented by separate counsel, would be inappropriate. Moreover, confidential personnel information of one of H-C Management's employees is not information readily available to RVCC. Since the information requested was not known or readily available to the 30(b)(6) deponent, RVCC satisfied its duties as to topic 1 in the deposition notice.

2.    Relationship between H-C Management and VHS

Plaintiff's second subject matter to be inquired upon was:

The relationship, affiliation, and/or association with or between H-C Management Services, Inc. and Valley Health Systems, Inc. (Exhibit E at p. 3).

This topic seeks information on what RVCC knows of two separate corporations - VHS, the sole member of RVCC and H-C Management, a corporation that employed,

among others, RVCC's Executive Director.  RVCC designated Mr. Haas to testify as to

this topic.  (Exhibit I at p. 5).  Mr. Haas responded to Plaintiff's one question describing

the relationship between H-C Management and VHS.  (Exhibit I at p. 8-9).  Accordingly,

RVCC satisfied its duties as to topic 2 in the deposition notice.

       3.      <u>Relationship between H-C Management and RVCC</u>

Plaintiff's third subject matter to be inquired upon was:

> The relationship, affiliation, and/or association with or between H-C
> Management Services, Inc. and River Valley Counseling Center.
> (Exhibit E at p. 3).

RVCC designated Mr. Haas to testify as to this topic.  (Exhibit I at p. 5).  Mr.

Haas testified that he reviewed the Management Oversight Agreement between H-C

Management and RVCC, a document that had been produced to the Plaintiff prior to

RVCC's deposition.  (Exhibit D, ¶ 2).  Mr. Haas responded to Plaintiff's questions

describing the relationship between H-C Management and RVCC.  (Exhibit I at pp. 9-10,

19-20).  RVCC satisfied its duties as to topic 3 in the deposition notice.

       4.      <u>Any work provided by Jeff Eagle and/or Health Enhancement Services,</u>
              <u>Inc. concerning or related to David Mattocks</u>

Plaintiff's fourth subject matter to be inquired upon was:

> Any work, inquires, or other assistance provided by Jeffrey Eagle and/or Health
> Enhancement Services, Inc., concerning or related to David Mattocks.[4]  (Exhibit E
> at p. 3).

RVCC designated Mr. Kassis to testify as to this subject area.  (Exhibit G at p. 5).

---

[4] Plaintiff's Motion to Compel does not explain the relevance of this topic to the heart of
this case – whether the decision to terminate Mr. Richards's employment was in violation
of age and disability discrimination laws or a violation of FMLA.

In the deposition of Mr. Kassis taken in his individual capacity, he testified that Jeffrey Eagle is a consultant with Health Enhancements and that VHS hired Health Enhancements to right or correct the financial difficulties of RVCC during the tenure of two Executive Directors before Mr. Mattocks was the Executive Director of RVCC. (Exhibit H at pp. 51-52).

In the 30(b)(6) deposition, in response to questions asked regarding topic 4, Mr. Kassis testified that he heard indirectly "that there was a phone conversation in which something was verified." (Exhibit G at p. 16-17). In the deposition of Ms. Kelleher, an employee of H-C Management, she testified that during the hiring process for Mr. Mattocks for RVCC's Executive Director position, she sent to Mr. Eagle by fax, a written request for Mr. Eagle to conduct a telephone interview with Mr. Mattocks. She also testified that Mr. Eagle gave a verbal report to her. (See excerpts of the deposition of Mary Kelleher, copies of which are attached hereto as Exhibit J, at pp. 18-20). The only assistance Mr. Eagle or Health Enhancements provided regarding Mr. Mattocks was to H-C Management in the interview process of Mr. Mattocks. Given that this work was not done for RVCC, it is reasonable that RVCC's designee had limited knowledge on topic 4.

"If [RVCC] does not possess such knowledge as to so prepare [Mr. Kassis] or another designate [as to topic 4], then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'" Dravo Corp. v. Liberty Mut. Ins. Co., 164 F.R.D. 70, 76 (D.Neb. 1995) (quoting Fed.R.Civ.P. 30(b)(6)). RVCC's obligations under Rule 30(b)(6), accordingly, do not require it to prepare its 30(b)(6) designee with information not known

to RVCC and in the control of another entity.   RVCC, therefore, fully discharged its 30(b)(6) duties by preparing Mr. Kassis to answer questions within the scope of topic 4 that were "matters known or reasonably available to [RVCC]."

RVCC disagrees that Mr. Kassis' inability to fully testify on this topic was tantamount to a complete failure of RVCC to appear.  See <u>United States v. Massachusetts Industrial Finance Agency</u>, 162 F.R.D. 410, 412 (D. Mass. 1999) (disagreeing that the "inability to fully testify on all the topics set forth in the notice was tantamount to a complete failure of the [Rule 30(b)(6) deponent] to appear").  Given this situation, and RVCC's good faith designation of Mr. Kasiss to answer topic 4, the only relief, if deemed necessary by this Court, is to require RVCC to clarify this point in an interrogatory on the subject.  See <u>Id.</u>  (inability of a 30(b)(6) deposition witness to testify on topics did <u>not</u> require the entity to produce another 30(b)(6) deposition witness).  See <u>Alexander</u>, 186 F.R.D. at 143 (fact that designee was an inadequate witness in certain narrow respects does not lead to the conclusion that plaintiff was entitled to take new depositions).  "Deponents under Rule 30(b)(6) must be prepared and knowledgeable, but they need not be subjected to a 'memory contest.'"  <u>Id.</u> (citation omitted).  Ordering RVCC to produce another Rule 30(b)(6) deposition witness is not necessary in this situation, particularly since the subject is not relevant to the "heart of this case." "Obviously a rule of reason applies.  There is no obligation to produce witnesses who know every single fact, only those that are relevant and material to the incident or incidents that underlie the suit."  <u>Wilson v. Lakner</u>, 228 F.R.D. 524, 529 (D.Md. 2005).

Accordingly, Plaintiff's Motion to Compel should be denied as to topic 4.

5.    Donna Viens

Plaintiff's fifth subject matter was:

Donna Viens including, but not limited to, her employment with H-C
Management Services, River Valley Counseling Center, Valley Health
Systems, or any corporation or entity associated or affiliated with any of
the aforementioned entities, all documents submitted by, or on behalf of,
Donna Viens to H-C Management Services, River Valley Counseling
Center, Valley Health Systems, or any corporation or entity associates or
affiliated with any of the aforementioned entities in connection with
Donna Viens' application for employment, employment compensation,
job performance, and/or discipline.  (Exhibit E at p. 3).

RVCC designated Mr. Haas to testify as to this subject area.  Plaintiff's counsel

did not ask Mr. Haas any questions about topic 5 and concluded the deposition.

Accordingly, RVCC satisfied its duties as to topic 5 in the deposition notice.

6.    Mark Richards

Plaintiff's sixth subject matter was:

Mark Richards (Address:  19 Lyman Rd., Chester, MA) including, but not
limited to, his employment with H-C Management Services, River Valley
Counseling Center, Valley Health Systems, or any corporation or entity
associates or affiliated with any of the aforementioned entities, all
documents submitted by, or on behalf of, Mark Richards to H-C
Management Services, River Valley Counseling Center, Valley Health
Systems, or any corporation or entity associated or affiliated with any of
the aforementioned entities in connection with Mark Richards' application
for employment, employment compensation, job performance, discipline,
and/or termination.  (Exhibit E at p. 3).

RVCC designated Mr. Kassis, Plaintiff's supervisor, to testify as to topic 6.  Mr.

Kassis testified that, prior to the deposition, he reviewed his evaluations of the Plaintiff

and the records relating to the financial performance of the Psychiatric Day Treatment

Program of which Plaintiff was the Program Director.  (Exhibit G at pp. 8-9).  Mr. Kassis

responded to questions regarding Plaintiff's performance as the Program Director and the circumstances surrounding the termination of his employment at RVCC. (Exhibit G at pp. 10-14, 18).

Plaintiff appears critical that Mr. Kassis did not contact H-C Management or VHS, two separate corporations, regarding the Plaintiff's employment at RVCC. However, RVCC is not required by Rule 30(b)(6) to educate its designee about matters that are only known or reasonably available to another entity. RVCC satisfied its duties as to topic 6 in the deposition notice. See Dravo Corp., 164 F.R.D. at 76.

7.    RVCC's Defenses

Plaintiff's final subject matter was:

The defenses of River Valley Counseling Center to the claims of Mr. Richards. (Exhibit E at p. 3).

RVCC designated Mr. Haas to testify as to this topic. (Exhibit I at p. 5). Mr. Haas responded to Plaintiff's questions regarding RVCC's defenses to Plaintiff's claim. (Exhibit I at pp. 13-14). RVCC satisfied its duties as to topic 7 in the deposition notice. Accordingly, Plaintiff's Motion to Compel should be denied.

V.  Conclusion

For all the foregoing reasons, Plaintiff's Motion to Compel Further Designation of

Rule 30(b)(6) Deponent should be denied.


Dated:  April 14, 2006                    The Defendant
                                          RIVER VALLEY COUNSELING CENTER, INC.
                                          By Its Attorney:

                                          /s/ Mary J. Kennedy
                                          Francis D. Dibble, Jr.
                                            BBO No. 123220
                                          Mary J. Kennedy
                                            BBO No. 552345
                                          Bulkley, Richardson and Gelinas, LLP
                                          1500 Main Street, Suite 2700
                                          Springfield, MA  01115-5507
                                          Tel: (413) 272-6242
                                          Fax: (413) 272-6803


                            Certificate of Service

I hereby certify that a true copy of the above document was served upon the
attorney of record for each party, by electronic filing, on April 14, 2006.

                                          /s/ Mary J. Kennedy
                                          Mary J. Kennedy

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.  05-30061-MAP

MARK A. RICHARDS,                                )
            Plaintiff                                  )        DEFENDANT RIVER VALLEY
                               )        COUNSELING CENTER, INC.'S
vs.                                              )        ANSWERS TO
                               )        INTERROGATORIES
RIVER VALLEY COUNSELING                          )        PROPOUNDED BY PLAINTIFF
CENTER, INC., VALLEY HEALTH                       )
SYSTEMS, INC., DAVID G. MATTOCKS )
AND DONNA VIENS,                                 )
            Defendants                               )

The defendant, River Valley Counseling Center, Inc. ("River Valley"), responds to Interrogatories Propounded on Behalf of the Plaintiff, Mark A. Richards, to be Answered by the Defendant, River Valley Counseling Center, Inc., as follows:

INTERROGATORY NO. 1:  Please state your name, residential address, date of birth, social security number, business address, occupation and position you hold with the defendant corporation, River Valley Counseling Center, Inc.

OBJECTION:  To the extent that the foregoing request seeks the residential address and social security number of River Valley's Executive Director, River Valley objects on the grounds that such residential address and social security number are confidential.

Without waiving this objection, River Valley answers as follows:

ANSWER:  Matthew Haas; 49; 319 Beech Street, Holyoke, Massachusetts; Executive Director.

INTERROGATORY NO. 2:  Please identify and give the last known address of all persons having knowledge of discoverable material to this action.

OBJECTION:  River Valley objects to the foregoing interrogatory on the grounds that the phrase "discoverable material to this action" is unclear and vague.

Without waiving this objection, River Valley answers as follows:

ANSWER:

David Mattocks, Vernon, VT

David Avakian, 99 Chesterfield Road, Westhampton, MA

Jeffrey Kassis, Director of Clinical Services, River Valley

Donna Viens, Director of Human Resources, River Valley


INTERROGATORY NO. 3:  If there are any persons who work for the defendant corporation who have as much or more knowledge about the facts concerning this case, please state their names, addresses and positions they hold with the defendant corporation.

OBJECTION:  River Valley objects to the foregoing interrogatory on the grounds that the phrase "facts concerning this case" is unclear and vague.

Without waiving this objection, River Valley answers as follows:

ANSWER:  Please refer to River Valley's answer to interrogatory no. 2, above.

INTERROGATORY NO. 4:  Please state in full and complete detail the nature of River Valley Counseling Center's relationship with the co-defendant, Valley Health Systems, Inc.

OBJECTION:  River Valley objects to the foregoing interrogatory on the grounds that it is overly broad such that a response thereto would be unduly burdensome.  In addition, River Valley objects to the foregoing interrogatory on the grounds that it seeks information which is not relevant to the subject matter involved in the pending action or to the claim or defense of any party to this action and which is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving these objections, River Valley answers as follows:

ANSWER:  Since 1986, Valley Health Systems, Inc. ("Valley Health"), and its predecessor corporation, have been the sole member of River Valley. Over the years, Valley Health has provided financial assistance to River Valley. Valley Health approves River Valley's budget and reviews its financial statements and operations.  Valley Health, through an affiliated corporation, has provided some human resource assistance to River Valley, reviews financial documents of River Valley, and oversees River Valley's expenditures.  From in or about April 2003 to in or about May 2005, Valley Health, through an affiliated corporation, employed River Valley's Director of Business Operations.  Valley Health, through an affiliated corporation, employs River Valley's Controller.  Valley Health, through an affiliated corporation, employed River Valley's previous Executive Director, David Mattocks.

INTERROGATORY NO. 5:  What were the terms and conditions of the plaintiff,
Mark A. Richards', employment when he first started with River Valley Counseling
Center, Inc., and if they changed while he worked for River Valley Counseling Center,
describe in full detail how they changed.

OBJECTION:  River Valley objects to the foregoing interrogatory on the
grounds that it is overly broad such that a response thereto would be unduly
burdensome.  In addition, River Valley objects to the foregoing interrogatory on
the grounds that it seeks information which is not relevant to the subject matter
involved in the pending action or to the claim or defense of any party to this
action and which is not reasonably calculated to lead to the discovery of
admissible evidence.

Without waiving these objections, River Valley answers as follows:

ANSWER:  Based on a review of the personnel file, when River Valley
first employed Mr. Richards, he was Director of the Highland Day Treatment
Program in Springfield.  In 1997, Mr. Richards was the Program Director for the
Crossroads Day Treatment Program in Holyoke.  Initially, Mr. Richards' position
was a forty-hour work week.  In 1997, at Mr. Richards' request, his position was
reduced to a thirty-hour work week.  In 2002, Mr. Richards' position was
increased to a thirty-two-hour work week.  In 2003, the position was increased to
a thirty-four-hour work week.

INTERROGATORY NO. 6:  Please state in full and complete detail the reason or
reasons for terminating the plaintiff, Mark A. Richards, from employment with the

4

defendant corporation, including in your answer each and every aspect of his work conduct that you relied on as justification for his termination.

> ANSWER:  River Valley terminated Mr. Richards' employment because it eliminated his position as Director of Psychiatric Day Treatment Program.  River Valley eliminated the Director position because a full-time Assistant Director position had recently been created and the duties of the Director could be divided between the Director of Clinical Services and the Assistant Director of the Psychiatric Day Treatment Program.  The elimination of the Director position was a cost savings for River Valley.

INTERROGATORY NO. 7:  Please state the name, date of birth, residential address and qualifications of the person who replaced the plaintiff, Mark A. Richards, and whether or not that person currently holds this position.

> OBJECTION:  River Valley objects to the foregoing interrogatory on the grounds that it presumes that a person replaced the plaintiff.

> Without waiving these objections, River Valley answers as follows:

> ANSWER:  With the elimination of the position of Director of the Psychiatric Day Treatment Program, Jeffrey Kassis, Director of Clinical Services, (54 years old) re-assumed the fiscal responsibility for the Day Treatment Program.  As Director of Clinical Services, Mr. Kassis had and continues to have overall responsibility both fiscally and clinically for all River Valley's third-party reimbursable programs (including the Psychiatric Day Treatment Program).  Mr. Kassis holds a LICSW at the master's level.  With the elimination of the position

ANSWER:  Mr. Mattocks, former Executive Director, made the decision to terminate Mr. Richards' employment.


INTERROGATORY NO. 10:  Please state the name, residential address, and position held with the defendant corporation, of each individual who drafted, or participated in the drafting of, the separation agreement presented to the plaintiff, Mark A. Richards.

OBJECTION:  To the extent that the foregoing interrogatory seeks information protected by the attorney-client privilege, River Valley objects to the interrogatory.

Without waiving this objection, River Valley answers as follows:

ANSWER:     David Mattocks and Donna Viens.


INTERROGATORY NO. 11:  Have any other EEOC or MCAD violations or complaints been filed against the defendant corporation, River Valley Counseling Center, during the years 1995 to the present date?

ANSWER:  Yes.


INTERROGATORY NO. 12:  If your answer to the previous interrogatory is in the affirmative, please state:

a)     the person who filed said complaint;

b)     the substance of said complaint;

c)     the disposition of said complaint.

In addition, River Valley objects to the foregoing interrogatory on the grounds that it seeks confidential personnel information of its employees which is irrelevant to a claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving these objections, River Valley answers as follows:

ANSWER:   Attached hereto as Exhibit 1 is a list by position of River Valley hires from July 1, 2004 to September 9, 2005.  Attached hereto as Exhibit 2 is a list by position of terminations from July 1, 2004 to September 9, 2005.

The undersigned states and says that he signs the foregoing answers to interrogatories for and on behalf of River Valley Counseling Center, Inc. ("River Valley") and is authorized to do so; that the matters stated in the above answers are not all within his personal knowledge; that such facts as are stated in said answers which are not within his personal knowledge have been assembled by authorized agents, employees and counsel of River Valley; and that he is informed and believes that the facts stated in said responses are true and so states under the pains and penalties of perjury on this _3rd_ day of ~~September~~, 2005.
    _October_

_/Matthew Haas_
Matthew Haas, Solely in his capacity as
Executive Director of
River Valley Counseling Center, Inc.

AS TO OBJECTIONS:

_Mary J. Kennedy_
Francis D. Dibble, Jr.
BBO No. 123220
Mary J. Kennedy
BBO No. 552345
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
P. O. Box 15507
Springfield, MA 01115-5507
Tel:  (413) 272-6242
Fax:  (413) 272-6803

Certificate of Service

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by ~~mail~~ on _hand_
_October 4_      , 2005.

_Mary J. Kennedy_
Mary J. Kennedy

13

# EXHIBIT B

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,          )
            Plaintiff      )
VS.                        )
                           )
RIVER VALLEY COUNSELING CENTER, )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
            Defendants     )


        DEPOSITION OF HANK PORTEN, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on December 9,

2005, commencing at 10:00 a.m.


APPEARANCES:  (See Page 2)


            Debra A. Vance
        Notary Public Stenographer

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
    BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
    BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
    BY:  MARY LOU FABBO, ESQ.

---

3

I N D E X

WITNESS        DIRECT    CROSS    REDIRECT  RECROSS

Hank Porten    *4


*  By Mr. Sikorski


EXHIBITS:                                    PAGE:

Exhibit 1, notice of deposition..............30

Exhibit A, copy of protective order.........41

---

4

        HANK PORTEN, Deponent, having been

satisfactorily identified and duly sworn, deposes

and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI:

    Q.    Mr. Porten, could you please state

your name and spell your last name for the

record?

    A.    Hank Porten, P-O-R-T-E-N.

    Q.    And what's your residential address?

    A.    23 Diesal, D-I-C-S-A-L, Lane,

Holyoke, Massachusetts 01040.

    Q.    Do you know a David Mattocks?

    A.    Yes, I do.

    Q.    Did you have any role in hiring David

Mattocks?

    A.    Yes, I did.

    Q.    What role did you have in hiring

David Mattocks?

    A.    He was presented as a recommended

candidate, and I interviewed him at that time.

    Q.    And for what position, sir?

    A.    For the executive director of River

Valley Counseling.

17

1    MS. KENNEDY:   Is that the question?
2    MR. SIKORSKI:   Yes.
3    MS. KENNEDY:   Objection to form.  Go
4  ahead.
5         THE WITNESS:   I did not know it was
6  a highly suspect university.
7         Q.    (By Mr. Sikorski)  Were you ever
8  informed that he had a Ph.D. from a highly
9  suspect university?
10        A.    No, I was not.
11        Q.    Even today do you understand that he
12  had a Ph.D. from a highly suspect university?
13        MS. KENNEDY:   Objection to form.
14        THE WITNESS:   No, I don't.
15        Q.    (By Mr. Sikorski)  So as you come in
16  here today, you don't know that?
17        A.    No.
18        Q.    Is Mr. Mattocks still working for --
19  strike that.
20             What entity actually employed
21  Mr. Mattocks?
22        A.    H-C Management.
23        Q.    Does H-C stands for anything?
24        A.    I believe it was short for Holyoke,

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

18

1  dash, Chicopee, but that's an assumption.
2        Q.    Does Mr. Mattocks currently work for
3  H-C Management?
4        A.    No, he does not.
5        Q.    Does he work for any other entity
6  affiliated in any way with Holyoke Medical
7  Center?
8        A.    No, he does not.
9        Q.    When did he last work for any entity
10  associated with Holyoke Medical Center?
11        A.    I don't know the last day of his
12  resignation. I'm not familiar with that.
13        Q.    Approximately?
14        A.    Approximately I think it would have
15  been in the summer of 2005.
16        Q.    What were the circumstances under
17  which Mr. Mattocks left the employment of H-C
18  Management?
19        A.    He was absent from work for sickness,
20  and he called and said he'd be away for a while.
21  That's the last I saw him.
22        Q.    Did you consider that he voluntarily
23  quit his position?
24        MS. KENNEDY:   Objection to the form.

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

19

1         THE WITNESS:   No. I think he asked
2  for a brief leave and would be returning
3  and then he didn't.  And then I would
4  assume that he voluntarily resigned, yes.
5        Q.    (By Mr. Sikorski)  What is your
6  understanding of the nature of his illness?
7         MS. KENNEDY:   Objection. I'm going
8  to instruct the witness not to answer.  It
9  involves private confidential medical
10  information of a party to this case, and
11  employee of H-C Management.  That is
12  privileged and is not subject to disclosure
13  under Federal Rules of Civil Procedure,
14  Rule 26.
15        MR. SIKORSKI:   How is it privileged?
16  We have a confidentiality order.  You can
17  say this is confidential.
18        MS. KENNEDY:   Although we have a
19  confidentiality order, this is private
20  confidential medical information that's not
21  subject to disclosure.  It's privileged and
22  I'm instructing him not to answer despite
23  the confidentiality order.
24        MR. SIKORSKI:   We'll take this up

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

20

1  later.
2        Q.    (By Mr. Sikorski)  Did Mr. Mattocks
3  supply you with any resignation letter?
4        A.    I don't recall seeing a letter.
5        Q.    Did Mr. Mattocks receive any type of
6  severance agreement; do you know?
7        A.    Not off the top of my head.
8        Q.    Who would know that?
9        A.    I think it would have been Mary
10  Kelleher.
11        Q.    Who was hired to replace Mr. Mattocks
12  as the executive director of River Valley
13  Counseling Center?
14        A.    An individual by the name of Matt
15  Hass.
16        Q.    And you announced that appointment;
17  did you not?
18        A.    Not personally, but we had an
19  announcement.
20        Q.    Right.  And then you are the person
21  making that announcement, correct?
22        A.    I'd have to see the articles.  Is my
23  name in there?  That's correct.
24        Q.    So when the organization puts out a

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

33

1  A.  They do offer a team to come in to
2  fill vacant positions from time to time.
3  Q.  And did they, in fact, loan an
4  executive to River Valley?
5  A.  Yes, they did.
6  Q.  What executive did they loan?
7  A.  He was the acting senior management,
8  and I don't recall his name.
9  Q.  During what period of time?
10  A.  I'm going to say in the late '90s,
11  early 2000.
12  Q.  And what type of financial services
13  did it provide to River Valley Counseling?
14  A.  Strictly advisory, consulting.
15  Q.  And how about on behavior management?
16  A.  Well, they advised and consulted, but
17  they also had a loaned executive for us at that
18  time.
19  Q.  Again, during what time frame were
20  these consulting services provided?
21  A.  I would say late '90s, early 2000,
22  and I do remember the first name of the guy. I
23  think his name was Gale.
24  Q.  I'm sorry?

34

1  A.  Gale. His last name began with "H."
2  Q.  Were consulting services provided at
3  one time or more than one time?
4  A.  More than one time.
5  Q.  Do you know approximately how many
6  times?
7  A.  I believe it was twice that they
8  actually came and did some work. From time to
9  time I think another one or two times we've asked
10  them to come back and audit that work.
11  Q.  When was the most recent time that
12  they came and actually did substantive
13  consulting?
14  A.  Consulting, I would say it's been
15  years, three or four years. From an audit
16  perspective, probably the last couple of years.
17  Q.  Who would have custody of the records
18  relating to the work that Jeffrey Eagle and
19  Health Enhancement Services, Inc. provided to
20  River Valley Counseling?
21  A.  It would be under H-C Management. It
22  would probably be Tony Correia, but it would be
23  under H-C Management files and other people have
24  access to those.

35

1  Q.  What person would have the most
2  knowledge of the consulting services and auditing
3  services provided by Jeffrey Eagle and Health
4  Enhancement Services, Inc.?
5  A.  It would be myself and Tony Correia
6  and the senior managers of River Valley. They
7  would have, obviously, knowledge as well.
8  Q.  How long did Dave Mattocks serve as
9  the executive director of River Valley
10  Counseling?
11  A.  Approximately a year.
12  Q.  What is your evaluation of the
13  quality of the job that he performed for River
14  Valley?
15  A.  The official evaluation I did on him
16  was in the neighborhood of February, March, maybe
17  April, that time frame, and that was a positive
18  evaluation.
19  Q.  What did you identify as his
20  strengths?
21  A.  He was addressing some of the
22  economic issues. He was trying to stabilize the
23  company's economic situation.
24  Q.  What did you identify as his

36

1  weaknesses?
2  A.  In the time period that he was
3  working, he had a lot of development curve or
4  learning curve that was relatively short. There
5  were a lot of things that he had to learn about
6  the community and things that he had to learn
7  about the organization and things of that nature.
8  I don't know that I'd call it a negative. It was
9  kind of a learning curve kind of process.
10  Q.  Did you believe that his learning
11  curve should have been shorter?
12  A.  Not at that time.
13  MR. SIKORSKI:  I'd like to take a
14  short break.
15  (A recess was taken)
16  Q.  (By Mr. Sikorski) Mr. Porten, did you
17  meet on a weekly basis with the executive
18  director of River Valley?
19  A.  Not every week but it was common in a
20  month.
21  Q.  Did River Valley have to supply you
22  with monthly reports?
23  A.  That was the goal. It wasn't always
24  achieved.

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

MARK A. RICHARDS )
                                        )
                            Plaintiff )
                                        )
v.                                      )
                                        )
RIVER VALLEY COUNSELING CENTER, INC.,   )
VALLEY HEALTH SYSTEMS, INC.,            )
DAVID G. MATTOCKS AND DONNA VIENS,      )
                                        )
                            Defendants )

DEPOSITION OF: DONNA VIENS, taken before

Sharon R. Roy, Notary Public Stenographer, pursuant

to Rule 30 of the Massachusetts Rules of Civil

Procedure, at the law offices of ROBINSON DONOVAN,

P.C., 1500 Main Street, Suite 1600, Springfield,

Massachusetts on December 14, 2005 commencing at

10:09 a.m.

A P P E A R A N C E S :

(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

---

2

A P P E A R A N C E S :

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
413-732-2301
  BY: JOHN C. SIKORSKI, ESQ.

FOR THE DEFENDANTS RIVER VALLEY COUNSELING CENTER,
INC., VALLEY HEALTH SYSTEMS, INC. and DONNA VIENS

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115
413-272-2820
  BY: MARY JO KENNEDY, ESQ.

FOR THE DEFENDANT DAVID G. MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
One Monarch Place,
Springfield, MA 01144
413-737-4753
  BY: MARY LOU FABBO, ESQ.

Also Present:

Mark Richards

---

3

I N D E X

WITNESS          EXAMINATION                    PAGE

Donna Viens      Direct by Mr. Sikorski           4

EXHIBITS:                                       PAGE:

Exhibit 1: Notice of Taking Deposition ......... 55

Exhibit 2: Answers to Interrogatories ........... 57

MARKED TESTIMONY:

Page 8, Line 22

-*-

---

4

1
2              S T I P U L A T I O N S
3          It is agreed by and between the
4    parties that all objections, except
5    objections as to the form of the questions,
6    and all motions to strike unresponsive
7    answers are reserved and may be raised at the
8    time of trial for the first time.
9          It is further agreed by and between
10   the parties that the sealing of the original
11   deposition transcript and notification to all
12   parties of the receipt of the original
13   deposition transcript is hereby waived.
14
15         DONNA VIENS, Deponent, having been
16   satisfactorily identified by the production
17   of her driver's license and having first been
18   duly sworn by the Notary Public, deposes and
19   states as follows:
20
21   DIRECT EXAMINATION BY MR. SIKORSKI:
22        Q.   Ms. Viens, will you please state your name
23   and spell your last name, for the record?
24        A.   Donna Viens. V as in Victor, I-E-N-S.

21

1  A.  I don't recall. I did have conversations
2  and shared e-mails with Mr. Richards about creating
3  an advertisement for the position, what level it
4  would be replaced at, so it was before he left the
5  organization.
6  Q.  Now, regarding the severance package that
7  was offered to Mr. Richards, did you in fact contact
8  Skoler Abbott?
9  A.  Yes, I did.
10  Q.  I don't want to ask you about any
11  conversations with attorneys from Skoler Abbott, do
12  you understand that?
13  A.  Yes.
14  Q.  After you contacted Skolar Abbott, did
15  you -- at any point before terminating Mr. Richards
16  did you discuss again the severance package with Mr.
17  Mattocks?
18  A.  It was mostly with the attorneys. We did
19  it as a conference call.
20  Q.  And how about with Ms. Kelleher?
21  A.  Once it was completed, yes.
22  Q.  You discussed it with her?
23  A.  Yes.
24  Q.  Outside the presence of attorneys?

22

1  A.  I don't recall.
2  Q.  Did you understand that Ms. Kelleher had to
3  sign off and approve on the agreement?
4  A.  No, that was not my understanding.
5  Q.  How was Mr. Richards told that his position
6  was going to be eliminated?
7  A.  In a meeting with Mr. Mattocks and myself.
8  Q.  When was that meeting?
9  A.  On November 4.
10  Q.  What time of the day was it, approximately?
11  A.  About 10:00 in the morning.
12  Q.  And where was it?
13  A.  In Mr. Mattocks' office.
14  Q.  Was it just the three of you?
15  A.  Yes.
16  Q.  Who arranged the meeting?
17  A.  Mr. Mattocks.
18  Q.  Did you make any notes of the meeting?
19  A.  No, I did not.
20  Q.  Did you send an e-mail to anyone about the
21  meeting?
22  A.  No, I did not.
23  Q.  Do you know if there was any document
24  either in paper or electronic form relating to the

23

1  substance of that meeting?
2  A.  No, there was not.
3  Q.  Just to be clear, Mr. Mattocks didn't make
4  a memorandum of the meeting?
5  A.  Not to my knowledge.
6  Q.  You've never seen a memorandum that he
7  wrote about the meeting?
8  A.  No, I did not.
9  Q.  And are you aware of whether Mr. Mattocks
10  created any electronic document or e-mail or anything
11  like that relating to the meeting?
12  A.  I'm not aware of any such document.
13  Q.  Now, before the 10 a.m. meeting did you
14  discuss how the meeting was going to be conducted
15  with Mr. Mattocks?
16  A.  Yes.
17  Q.  When did you do that?
18  A.  Probably 9:00.
19  Q.  Did you do that in person or over the
20  phone?
21  A.  In person.
22  Q.  What did you say to him and what did he say
23  to you?
24  A.  To the best of my recollection, I asked him

24

1  how he wanted the meeting to go. He said that he
2  would start the conversation, explain to Mark why the
3  position was being eliminated, and then he asked me
4  if I would go over the separation agreement and
5  benefit issues.
6  Q.  Did you have any notes with you when you
7  went into the meeting?
8  A.  No, I did not.
9  Q.  Did Mr. Mattocks have any notes when he
10  went into the meeting?
11  A.  I don't believe he had notes. He had the
12  separation agreement.
13  Q.  Did either one of you have any electronic
14  document, an e-mail or anything else, in front of you
15  or with you when you went to the meeting?
16  A.  No.
17  Q.  Who summoned Mr. Richards to the meeting?
18  A.  Mr. Mattocks.
19  Q.  Were you and Mr. Mattocks waiting for Mr.
20  Richards?
21  A.  I believe that Mr. Richards was in the room
22  prior to me going in.
23  Q.  So who started off the conversation?
24  A.  To the best of my knowledge, Mr. Mattocks.

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30061-MAP

| | | |
|---|---|---|
| MARK R. RICHARDS, | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | AFFIDAVIT OF |
| | ) | MARY J. KENNEDY |
| RIVER VALLEY COUNSELING | ) | |
| CENTER, INC., VALLEY HEALTH | ) | |
| SYSTEMS, INC., DAVID G. MATTOCKS | ) | |
| AND DONNA VIENS, | ) | |
| Defendants | ) | |

I, Mary J. Kennedy, depose and state as follows:

1.    I am counsel of record for the defendants, River Valley Counseling Center, Inc. ("RVCC"), Valley Health Systems, Inc. ("VHS"), and Donna Viens ("Ms. Viens"), in the captioned matter.

2.    On November 30, 2005, in response to a Keeper of Records Subpoena issued to H-C Management Services, Inc. and pursuant to a protective order, a copy of the Management Oversight Agreement between RVCC and H-C Management was produced to the Plaintiff.

3.    On December 9, 2005, Plaintiff took the deposition of Hank Porten, individually and as the 30(b)(6) designee of VHS.

4.    On December 14, 2005, Plaintiff took Ms. Viens' deposition.

5.    On January 31, 2006, Plaintiff took the depositions of Jeffrey Kassis, individually; Mary Kelleher, Vice President of Human Resources at H-C Management Services, Inc.; and the 30(b)(6) deposition of RVCC.

6.    On March 17, 2006, Court held a status conference in this case.  For the first time since the deposition of RVCC, Plaintiff's counsel stated that he was considering filing a motion to compel regarding RVCC's deposition.  I objected to any such motion.

7.    At no time after the March 17, 2006 status conference did Plaintiff contact me to confer regarding narrowing the areas of disagreement regarding RVCC's deposition.

Signed under the penalties of perjury this _____ day of April, 2006.

/s/ Mary J. Kennedy

_____
Mary J. Kennedy
BBO No. 552345
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115
Tel:  (413) 272-6242
Fax:  (413) 272-6803

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 05-30061-MAP

MARK A. RICHARDS,                          )
    Plaintiff                          )
                                           )
vs.                                        )
                                           )
RIVER VALLEY COUNSELING CENTER, INC., )
VALLEY HEALTH SYSTEMS, INC.,               )
DAVID G. MATTOCKS AND DONNA VIENS,   )
    Defendants                         )


## RE-NOTICE OF TAKING DEPOSITION

To:    Mary Jo Kennedy, Esq.
       Bulkley, Richardson, & Gelinas, LLP
       1500 Main Street, Suite 2700
       Springfield, MA 01115

       Marylou Fabbo, Esq.
       Skoler, Abbott & Presser, P.C.
       One Monarch Place, Suite 2000
       Springfield, MA 01144

PLEASE TAKE NOTICE  that commencing at **1:30 p.m.** on **January 31, 2006**, at the offices of Robinson Donovan, PC, 1500 Main Street, Suite 1600, Springfield, MA 01115, the plaintiff in this action by his attorney will take the deposition upon oral examination of the defendant, **River Valley Counseling Center,** pursuant to Fed. R. Civ. P. 30(b)(6) before Accurate Court Reporting, Notary Public in and for the Commonwealth of Massachusetts, or some other officer authorized by law to administer oaths.  The oral examination will continue from day to day until completed.

The deponent is respectfully advised of its duty, under Rule 30(b)(6) of the Rules of Civil Procedure, to designate one or more persons to testify on its behalf in connection with any deposition which calls for the person  **"with the most knowledge"** about any topic.

The deposition is to be by and through **River Valley Counseling Center's** designated representative with the most knowledge as to each of the following topics:    **See Schedule A attached hereto.**

418175

The deponent is further required to bring the following records: **See Schedule B attached hereto.**

You are invited to attend and cross examine.

THE PLAINTIFF
MARK A. RICHARDS

By _John C. Sikorski_

John C. Sikorski, Esq.
Robinson Donovan, P.C.
1500 Main Street - Suite 1600
Springfield, MA 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO # 461970

## CERTIFICATE OF SERVICE

I, John C. Sikorski, Esq., hereby certify that on this ⟨l⟩ day of January, 2006, I served a copy of the above upon the parties in the action By Hand, to counsel, Mary Jo Kennedy, Esq., Bulkley, Richardson, & Gelinas, LLP, 1500 Main Street, Suite 2700, Springfield, MA 01115, and Marylou Fabbo, Esq., Skoler, Abbott & Presser, P.C., One Monarch Place, Suite 2000, Springfield, MA 01144.

Subscribed under the penalties of perjury.

_John C. Sikorski_
John C. Sikorski, Esq.

cc:  Accurate Court Reporting

418175

## EXHIBIT A

The persons with the most knowledge concerning:

1.  David Mattocks (Address:  Vernon, VT) including, but not limited to, his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, David Mattocks to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with David Mattocks' application for employment, employment compensation, job performance, discipline, termination, and/or resignation.

2.  The relationship, affiliation, and/or association with or between H-C Management Services, Inc. and Valley Health Systems, Inc.

3.  The relationship, affiliation, and/or association with or between H-C Management Services, Inc. and River Valley Counseling Center.

4.  Any work, inquiries, or other assistance provided by Jeffrey Eagle and/or Health Enhancement Services, Inc., concerning or related to David Mattocks.

5.  Donna Viens including, but not limited to, her employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Donna Viens to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Donna Viens' application for employment, employment compensation, job performance, and/or discipline.

6.  Mark Richards (Address: 19 Lyman Rd., Chester, MA) including, but not limited to, his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Mark Richards to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Mark Richards' application for employment, employment compensation, job performance, discipline, and/or termination.

7.  The defense of River Valley Counseling Center to the claims of Mr. Richards.

## EXHIBIT B

## DEFINITIONS

A.    "Documents" means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notations made on such copies or otherwise (including without limitation, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, logs, tapes, agreements, files, books, prospectuses, interoffice and intra-office communications, bulletins, printed matter, computer printouts, teletypes, telefaxes, invoices, worksheets and all drafts, alterations, modifications, changes and amendments of any kind, including without limitation, tapes, cassettes, disks and recordings) and all e-mail communications.

B.    "Document" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during the normal operation of a computer [RAM slack] or residual data left on the hard drive after new data has overwritten some but not all of previously stored data).

## DOCUMENTS/ITEMS REQUESTED

You are required to bring with you the original documents and things set forth below:

1.  All records concerning David Mattocks (Address:  Vernon, VT) including, but not limited to, a complete copy of his personnel file, all records concerning his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, David Mattocks to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with David Mattocks' application for employment, employment compensation, job performance, discipline, termination, and/or resignation; all documents concerning David Mattocks not specifically referred to herein.

414204

2. All documents evidencing, stating, or otherwise indicating the relationship, affiliation, and/or association with or between H-C Management Services, Inc. and Valley Health Systems, Inc. including, but not limited to, any documentation filed with the Massachusetts Secretary of State and/or Commonwealth of Massachusetts.

3. All documents evidencing, stating, or otherwise indicating the relationship, affiliation, and/or association with or between H-C Management Services, Inc. and River Valley Counseling Center including, but not limited to, any documentation filed with the Massachusetts Secretary of State and/or Commonwealth of Massachusetts.

4. All documents received by, or sent to or exchanged with, Jeffrey Eagle and/or Health Enhancement Services, Inc., concerning or related to David Mattocks.

5. All records concerning Donna Viens including, but not limited to, a complete copy of her personnel file, all records concerning her employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Donna Viens to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Donna Viens' application for employment, employment compensation, job performance, and/or discipline; all documents concerning Donna Viens not specifically referred to herein.

6. All records concerning Mark Richards (Address: 19 Lyman Rd., Chester, MA) including, but not limited to, a complete copy of his personnel file, all records concerning his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Mark Richards to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Mark Richards' application for employment, employment compensation, job performance, discipline, and/or termination; all documents concerning Mark Richards not specifically referred to herein.

414204

# EXHIBIT F

DEPOSITION SUBPOENA:  DUCES TECUM
**WITH OFFICER'S RETURN OF SERVICE**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 05-30061-MAP

| | |
|---|---|
| MARK A. RICHARDS, | ) |
|     Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| RIVER VALLEY COUNSELING CENTER, INC., | ) |
| VALLEY HEALTH SYSTEMS, INC., | ) |
| DAVID G. MATTOCKS AND DONNA VIENS, | ) |
|     Defendants | ) |

NOTICE OF TAKING DEPOSITION

To:    Mary Jo Kennedy, Esq.
        Bulkley, Richardson, & Gelinas, LLP
        1500 Main Street, Suite 2700
        Springfield, MA 01115

        Marylou Fabbo, Esq.
        Skoler, Abbott & Presser, P.C.
        One Monarch Place, Suite 2000
        Springfield, MA 01144

      PLEASE TAKE NOTICE  that commencing at **10:00 a.m. on December 9, 2005**, at the offices of Robinson Donovan, PC, 1500 Main Street, Suite 1600, Springfield, MA 01115, the plaintiff in this action by his attorney will take the deposition upon oral examination of the defendant, Valley Health Systems, Inc., pursuant to Fed. R. Civ. P. 30(b)(6) before Accurate Court Reporting, Notary Public in and for the Commonwealth of Massachusetts, or some other officer authorized by law to administer oaths.  The oral examination will continue from day to day until completed.

      The deponent is respectfully advised of its duty, under Rule 30(b)(6) of the Rules of Civil Procedure, to designate one or more persons to testify on its behalf in connection with any deposition which calls for the person  **"with the most knowledge"** about any topic.

      The deposition is to be by and through **Valley Health Systems, Inc.'s** designated representative with the most knowledge as to each of the following topics:  **See Schedule A attached hereto.**

      The deponent is further required to bring the following records:  **See Schedule B attached hereto.**

414212

You are invited to attend and cross examine.

THE PLAINTIFF
MARK A. RICHARDS

By _John C. Sikorski_____

John C. Sikorski, Esq.
Robinson Donovan, P.C.
1500 Main Street - Suite 1600
Springfield, MA 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO # 461970

## CERTIFICATE OF SERVICE

I, John C. Sikorski, Esq., hereby certify that on this 5th day of December, 2005, I served a copy of the above upon the parties in the action By Hand, to counsel, Mary Jo Kennedy, Esq., Bulkley, Richardson, & Gelinas, LLP, 1500 Main Street, Suite 2700, Springfield, MA 01115, and Marylou Fabbo, Esq. Skoler, Abbott & Presser, P.C., One Monarch Place, Suite 2000, Springfield, MA 01144.

Subscribed under the penalties of perjury.

_____
John C. Sikorski, Esq.

414212

## EXHIBIT A

The persons with the most knowledge concerning:

1.  David Mattocks (Address:  Vernon, VT) including, but not limited to, his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, David Mattocks to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with David Mattocks' application for employment, employment compensation, job performance, discipline, termination, and/or resignation.

2.  The relationship, affiliation, and/or association with or between H-C Management Services, Inc. and Valley Health Systems, Inc.

3.  The relationship, affiliation, and/or association with or between H-C Management Services, Inc. and River Valley Counseling Center.

4.  Any work, inquiries, or other assistance provided by Jeffrey Eagle and/or Health Enhancement Services, Inc., concerning or related to David Mattocks.

5.  Donna Viens including, but not limited to, her employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Donna Viens to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Donna Viens' application for employment, employment compensation, job performance, and/or discipline.

6.  Mark Richards (Address: 19 Lyman Rd., Chester, MA) including, but not limited to, his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Mark Richards to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Mark Richards' application for employment, employment compensation, job performance, discipline, and/or termination.

7.  The defense of Valley Health Systems, Inc. to the claims of Mr. Richards.

414418

<u>EXHIBIT B</u>

## DEFINITIONS

A.  "Documents" means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notations made on such copies or otherwise (including without limitation, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, logs, tapes, agreements, files, books, prospectuses, interoffice and intra-office communications, bulletins, printed matter, computer printouts, teletypes, telefaxes, invoices, worksheets and all drafts, alterations, modifications, changes and amendments of any kind, including without limitation, tapes, cassettes, disks and recordings) and all e-mail communications.

B.  "Document" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during the normal operation of a computer [RAM slack] or residual data left on the hard drive after new data has overwritten some but not all of previously stored data).

## DOCUMENTS/ITEMS REQUESTED

You are required to bring with you the original documents and things set forth below:

1.  All records concerning David Mattocks (Address:  Vernon, VT) including, but not limited to, a complete copy of his personnel file, all records concerning his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, David Mattocks to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with David Mattocks' application for employment, employment compensation, job performance, discipline, termination, and/or resignation; all documents concerning David Mattocks not specifically referred to herein.

414204

2. All documents evidencing, stating, or otherwise indicating the relationship, affiliation, and/or association with or between H-C Management Services, Inc. and Valley Health Systems, Inc. including, but not limited to, any documentation filed with the Massachusetts Secretary of State and/or Commonwealth of Massachusetts.

3. All documents evidencing, stating, or otherwise indicating the relationship, affiliation, and/or association with or between H-C Management Services, Inc. and River Valley Counseling Center including, but not limited to, any documentation filed with the Massachusetts Secretary of State and/or Commonwealth of Massachusetts.

4. All documents received by, or sent to or exchanged with, Jeffrey Eagle and/or Health Enhancement Services, Inc., concerning or related to David Mattocks.

5. All records concerning Donna Viens including, but not limited to, a complete copy of her personnel file, all records concerning her employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Donna Viens to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Donna Viens' application for employment, employment compensation, job performance, and/or discipline; all documents concerning Donna Viens not specifically referred to herein.

6. All records concerning Mark Richards (Address: 19 Lyman Rd., Chester, MA) including, but not limited to, a complete copy of his personnel file, all records concerning his employment with H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities, all documents submitted by, or on behalf of, Mark Richards to H-C Management Services, River Valley Counseling Center, Valley Health Systems, or any corporation or entity associated or affiliated with any of the aforementioned entities in connection with Mark Richards' application for employment, employment compensation, job performance, discipline, and/or termination; all documents concerning Mark Richards not specifically referred to herein.

414204

# EXHIBIT G

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


C.A. No. 05-30061-MAP

MARK A. RICHARDS,                          )
                    Plaintiff              )
VS.                                        )
                                           )
RIVER VALLEY COUNSELING CENTER,            )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
                    Defendants             )

        DEPOSITION OF JEFFREY KASSIS, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Massachusetts Rules

of Civil Procedure 30(b)(6), at the offices of

ROBINSON DONOVAN, P.C., 1500 Main Street,

Springfield, Massachusetts on January 31, 2006,

commencing at 12:00 p.m.


APPEARANCES:  (See Page 2)



                Debra A. Vance
            Notary Public Stenographer

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
          BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
          BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
          BY:  MARY LOU FABBO, ESQ.

---

3

1            I N D E X

2

3

4  WITNESS          DIRECT  CROSS  REDIRECT  RECROSS

5  Jeffrey Kassis    *4

6

7  *  By Mr. Sikorski

8

9

10

11  EXHIBITS:                          PAGE:

12  Exhibit 1, re-notice of taking deposition....5

13  Exhibit 2, memo to Mr. Eagle 4/29/04.........15

14

15

16

17

18

19

20

21

22

23

24

---

4

1            STIPULATIONS

2

3            It is agreed by and between the

4  parties that all objections, except objections as

5  to the form of the questions, and all motions to

6  strike unresponsive answers are reserved and may

7  be raised at the time of trial for the first

8  time.

9

10           It is further agreed by and between

11  the parties that the sealing and the notification

12  to all parties of the receipt of the original

13  deposition transcript is hereby waived.

14

15           JEFFREY KASSIS, Deponent, having

16  been satisfactorily identified and duly sworn,

17  deposes and states as follows:

18

19  DIRECT EXAMINATION BY MR. SIKORSKI:

20       Q.    This is the 30(b)(6) deposition of

21  Defendant, River Valley Counseling Center, and

22  the first person who's been designated as a

23  deponent is Mr. Kassis.

24       I ask, Mr. Kassis, please state your

5

1   name, spell your last name for the record,
2   please, sir.
3        A.    It's Jeffrey Paul Kassis, last name
4   is K-A-S-S-I-S.
5        Q.    And were you just deposed in your
6   individual capacity, sir?
7        A.    I'm confused by the question.
8        Q.    Did you just finish your deposition?
9        A.    Yes.
10       MR. SIKORSKI:    And I'm going to have
11   this marked as Exhibit 1.
12            (Exhibit 1 marked)
13       Q.    (By Mr. Sikorski) I'm going to
14   represent to you, Mr. Kassis, that Exhibit 1 is
15   the re-notice of taking a 30(b)(6) deposition of
16   River Valley Counseling Center and ask you or
17   your counsel to indicate which items on Exhibit A
18   you are being designated to testify about.
19            MS. KENNEDY:    For the record,
20       Mr. Kassis has been designated with respect
21       to subject areas on Exhibit A 1, 4, and 6.
22       Q.    (By Mr. Sikorski) And, Mr. Kassis,
23   Exhibit B of Exhibit 1 calls for you to bring
24   additional documents with you.  Have you brought

6

1   any?
2        A.    I haven't.
3            MS. KENNEDY:    For the record again,
4       I believe I sent you a letter earlier this
5       week addressing the document production in
6       Exhibit B to the re-notice of the
7       deposition of River Valley Counseling
8       Center.
9            MR. SIKORSKI:    Yes, you did.  I did
10      receive that, thank you.
11           I assume that this deponent will
12      want to read and sign this portion of the
13      deposition?
14           MS. KENNEDY:    Yes, please.
15           MR. SIKORSKI:    Otherwise, usual
16      stipulations, Counsel?
17           MS. FABBO:    Yes.
18           MS. KENNEDY:    Yes.
19       Q.    (By Mr. Sikorski) Mr. Kassis, what did
20   you do to prepare yourself to be a 30(b)(6)
21   deponent on Items 1, 4, and 6?
22       A.    I met with the lawyer, Mary Jo
23   Kennedy.
24       Q.    And I don't want to hear anything

7

1   about what Ms. Kennedy and you discussed.  I
2   understand you met with Ms. Kennedy.  Did you do
3   anything else to prepare yourself to be a
4   30(b)(6) deponent?
5        A.    No.
6        Q.    Did you interview anyone?
7        A.    No, I didn't.
8        Q.    Did you review any documents?
9        A.    Just this document itself.
10       Q.    The notice.  Did you review
11   Ms. Viens' deposition transcript, for example?
12       A.    No.
13       Q.    Did you talk to Mr. Brian Duke?
14       A.    No.
15       Q.    Did you talk to David Mattocks?
16       A.    No.
17       Q.    Did you talk to Jeffrey Eagle?
18       A.    No.
19       Q.    Did you review any documents of
20   Health Enhancement Services, Inc.?
21       A.    I didn't.
22       Q.    Did you review any documents created
23   by Jeff Eagle or anyone else associated with
24   Health Enhancement Services, Inc.?

8

1        A.    No, I didn't.
2        Q.    Did you review Mr. Mattocks' resume?
3        A.    No, I didn't.
4              You said any documents, right, was
5   the question?
6        Q.    Yes.
7        A.    I did review Mark's performance eval.
8   and my own.
9        Q.    And was that your performance
10  evaluation that Mr. Mattocks did for you?
11       A.    Yes.  I reviewed that and I reviewed
12  Mark's, the ones I gave Mark.
13       Q.    When was the last time you gave one
14  to Mark?
15       A.    I think it was 1991.
16       Q.    And did you review the --
17           MS. KENNEDY:    '91 you said?
18           THE WITNESS:    I'm sorry, 2001.
19       Q.    (By Mr. Sikorski) The review that
20  Mr. Mattocks gave you just a couple days after
21  terminating Mr. Richards?
22       A.    Yes.  I believe it was the 8th.
23       Q.    Did you sit down with Mr. Mattocks
24  and review the evaluation he gave you on

9

1   November 8?
2           MS. KENNEDY:   Again, objection to
3       the extent that it is outside of the scope
4       of the areas he's designated.  Go ahead and
5       answer, but I'm objecting just for the
6       record.
7           THE WITNESS:   Yes, I did.
8       Q.   (By Mr. Sikorski) Did you review
9   records relating to the financial performance of
10  the psychiatric day treatment program under
11  Mr. Richards' supervision prior to today?
12      A.   Yes, I did.  I did that with -- can I
13  say this?
14          MS. KENNEDY:   He asked you whether
15      you reviewed them.
16          THE WITNESS:   Yes, I did.
17      Q.   (By Mr. Sikorski) What financial
18  records did you review?
19      A.   Basically the -- how the program did
20  over the last three or four years.
21      Q.   When you say "program," that's the
22  psychiatric day treatment program?
23      A.   Yes.
24      Q.   Under Mr. Richards' supervision,

10

1   correct?
2       A.   Yes.  I looked at that and for the
3   whole year because it was continued after Mark
4   left.
5       Q.   And that's the fiscal year.  It goes
6   from 7/1 to 6/30, correct?
7       A.   Yes.
8       Q.   So the fiscal year 2005 financial
9   records would reflect financial performance from
10  7/1/04 to 6/30/05, correct?
11      A.   For that fiscal year 2004, 2005, yes.
12      Q.   And Mr. Richards' last day of
13  employment was about November 5, 2004, correct?
14      A.   Approximately, yes.
15      Q.   How did the psychiatric day treatment
16  program perform financially under Mr. Richards'
17  leadership?
18          MS. KENNEDY:   Objection.  I'm just
19      objecting on the grounds that it's outside
20      of the designated scope of the 30(b)(b)
21      designation, but go ahead and answer.
22          MR. SIKORSKI:   That's part of the
23      job performance of Mr. Richards.
24          MS. KENNEDY:   That's my objection.

11

1           Go ahead and answer.
2           THE WITNESS:   It performed well.
3       Q.   (By Mr. Sikorski) How did it perform
4   vis-a-vis other programs operated by River Valley
5   Counseling Center?
6           MS. KENNEDY:   Same objection.
7           THE WITNESS:   It was a high
8       performer, a very high performer.
9       Q.   (By Mr. Sikorski) In the three years
10  before Mr. Richards' termination, were there any
11  issues noted with Mr. Richards' job performance?
12      A.   There were none noted.
13      Q.   And any disciplinary issues?
14      A.   There were none.
15      Q.   What was the reason why River Valley
16  Counseling Center terminated Mark Richards?
17      A.   There was a financial analysis that
18  the basic structure of the agency, the rate
19  structure could be sustained with a savings of
20  his position, the amount of money that was paid
21  to him, that would contribute to the overall
22  financial benefit of the agency.
23      Q.   When you say "financial analysis," is
24  that a financial analysis done by someone --

12

1       A.   David Mattocks --
2           MS. KENNEDY:   Let him finish his
3       question.
4       Q.   (By Mr. Sikorski) -- on behalf of
5   River Valley Counseling Center?
6       A.   Yes.
7       Q.   Who did that financial analysis?
8       A.   David Mattocks.
9       Q.   Was it one analysis or more than one
10  analysis, to your knowledge?
11      A.   I'm unclear.
12      Q.   Was the financial analysis in
13  writing?
14      A.   I never saw anything anywhere in
15  writing.
16      Q.   Any documents at all referring to or
17  supporting or consisting of this financial
18  analysis?
19      A.   I never saw it.
20      Q.   As the 30(b)(6) deponent, do you
21  know --
22      A.   I don't believe --
23          MS. KENNEDY:   Let him ask his
24      question.

13

1    Q.    (By Mr. Sikorski) -- if there was any
2    financial analysis in writing or any document
3    relating to the financial analysis?
4    A.    I, as a representative of River
5    Valley Counseling Center, know of no documents
6    that exist.
7    Q.    You used the term "rate structure
8    sustained." What do you mean by that?
9    A.    Rate structure sustained is that
10   there is rates from the payers that is a very
11   favorable rate structure in terms of what the
12   agency pulls in for its services. And it
13   contributes to the success of the program.
14   Q.    What do you mean when you say rate
15   structure could be sustained?
16   A.    That means that the rate structure
17   was going to be kept because these are existing
18   contracts we have with the existing payers.
19   Q.    And did River Valley Counseling
20   Center terminate Mr. Richards as part of a group
21   of terminations designed to save money?
22   A.    There was a group of terminations
23   that existed over a two-year period that began
24   back in 2002. So if your time frame is over

14

1    those 24 months, there was a series of people in
2    sites and exchanges that were all made to
3    consolidate to improve the financial position.
4    Q.    Who made the decision to terminate
5    Mr. Richards?
6    A.    David Mattocks did.
7    Q.    And did David Mattocks do a financial
8    analysis of other terminations that could be done
9    to improve the finances of River Valley
10   Counseling Center?
11   A.    There is internally within 319, there
12   was a -- they looked at that structure within 319
13   which is a -- it contributes to the overhead
14   expenses. They were looking at that
15   simultaneously, David Mattocks was.
16   Q.    Did David Mattocks do a financial
17   analysis of any other termination while he was
18   executive director?
19   A.    There was an analysis of that, of the
20   319. I don't remember anything in writing.
21   Q.    Do you remember any specific figures
22   that were tracked?
23   A.    No, I don't remember.
24   Q.    Prior to Mark Richards' termination,

15

1    did David Mattocks terminate anyone else for
2    financial reasons?
3    A.    I'm unclear whether that happened. I
4    don't remember.
5    Q.    After Mr. Richards' termination, was
6    anyone else terminated by Mr. Mattocks for
7    financial reasons?
8    A.    Not that I know of. I don't believe
9    so under any clinical programs.
10   Q.    What work or other assistance did
11   Jeff Eagle supply concerning or related to David
12   Mattocks?
13   A.    I don't know directly what work he
14   provided.
15   MR. SIKORSKI:    May I have this
16   marked as Exhibit 2.
17   (Exhibit 2 marked)
18   Q.    (By Mr. Sikorski) Have you had a
19   chance to review Exhibit 2?
20   A.    I have.
21   Q.    Have you seen it before today?
22   A.    I haven't.
23   Q.    Have not?
24   A.    I have not seen this.

16

1    Q.    Do you know if River Valley
2    Counseling Center ever received an assessment of
3    Mr. Mattocks' ability to develop a strategic
4    business plan and implement the same from Jeff
5    Eagle?
6    A.    I don't remember any such assessment.
7    Q.    I'm asking as the 30(b)(6) deponent.
8    Do you know if River Valley Counseling Center
9    ever received assessment of Mr. Mattocks' ability
10   to develop a strategic business plan and
11   implement the same from Jeff Eagle?
12   A.    I'm unclear.
13   Q.    Do you know if Jeff Eagle ever
14   assessed Mr. Mattocks' energy level?
15   A.    Again, I'm unclear.
16   Q.    Do you know if anyone associated with
17   the Health Enhancement Services, Inc. did any
18   work concerning or related to David Mattocks?
19   MS. KENNEDY:    Objection to the form.
20   Go ahead and answer.
21   THE WITNESS:    The only thing I knew
22   is that there was -- and I heard this
23   indirectly, not directly -- that there was
24   a phone conversation, something was

**17**

1  verified. But I never knew any specifics
2  about what that was.
3  Q.  (By Mr. Sikorski) As a 30(b)(6)
4  deponent, did you make any inquiries as to topic
5  No. 4 before today, other than meeting with your
6  counsel?
7  A.  No, I haven't.
8  Q.  So you didn't call Mr. Eagle and ask
9  him what he did?
10  A.  No, I didn't.
11  Q.  You didn't call anybody at Health
12  Enhancement Services, Inc. and ask them what they
13  did?
14  A.  No, I didn't.
15  Q.  Did you make any efforts to determine
16  if anyone at River Valley Counseling Center knew
17  that Mark Richards had treatment for skin cancer
18  prior to his termination?
19      MS. KENNEDY:  Objection to the form
20  of the question in that it's outside the
21  scope of a 30(b)(6), but go ahead and
22  answer.
23      THE WITNESS:  I didn't know that
24  Mark had skin cancer. Consequently I never

**18**

1  made inquiries.
2  Q.  (By Mr. Sikorski) After Mark Richards
3  was terminated, who replaced him as the director
4  of the psychiatric day treatment program?
5  A.  I did.
6  Q.  And after Mark Richards was
7  terminated, who took over his responsibilities
8  that he had formerly done as the director of the
9  psychiatric day treatment program?
10  A.  Those responsibilities were mine.
11  Q.  Did anyone other than you take over
12  those responsibilities?
13  A.  The responsibilities were delegated
14  to other people in leadership positions within
15  the program.
16  Q.  Who were those other people?
17  A.  David Avakian.
18  Q.  Anyone else?
19  A.  And Susan informally.
20  Q.  Just for the record, Susan's last
21  name?
22  A.  Levitt.
23  Q.  Can you spell it?
24  A.  L-E-V-I-T-T.

**19**

1  Q.  Prior to Mr. Richards' termination,
2  what was Ms. Levitt's position at River Valley
3  Counseling Center?
4  A.  She was an ongoing -- she was a
5  counselor within the program and she remained a
6  counselor. I'm talking about an informal
7  leadership not a formal leadership.
8  Q.  Did she receive any compensation for
9  this leadership role?
10  A.  No.
11  Q.  Prior to today, did you review
12  Mr. Mattocks' personnel file?
13  A.  No, I haven't.
14  Q.  Did you review his application for
15  employment?
16  A.  No, I haven't.
17  Q.  Did you review any records related to
18  his compensation?
19  A.  No, I haven't.
20  Q.  Did you review any records related to
21  his job performance?
22  A.  No, I haven't.
23  Q.  Did you review any records related to
24  discipline, termination, or resignation?

**20**

1  A.  No, I haven't.
2  Q.  Who employed David Mattocks?
3  A.  I refer to it as Valley Health
4  Systems.
5  Q.  Other than Mark Richards, did anyone
6  complain to River Valley Counseling Center that
7  Mr. Mattocks had discriminated against them?
8      MS. KENNEDY:  Objection to the form.
9  Go ahead and answer. And again, the second
10  objection is that it's outside the scope of
11  the 30(b)(6) deposition notice and what
12  Mr. Kassis has been designated to testify
13  on. Go ahead and answer.
14      THE WITNESS:  Could you give your
15  definition of discrimination? I'm unclear.
16      MS. KENNEDY:  Can you rephrase the
17  question?
18      THE WITNESS:  I'm still unclear of
19  what he means. I understand the question.
20  I just don't know what he means by
21  discrimination. It's a broad term. I
22  don't know what it means.
23  Q.  (By Mr. Sikorski) You're aware that
24  Mr. Richards has brought a claim of

21

1  discrimination on the basis of age and disability
2  against Mr. Mattocks, correct?
3          A.    Yes.
4          Q.    Are you aware of any other employee
5  that has brought a claim of illegal
6  discrimination either formally or informally
7  against Mr. Mattocks?
8          A.    I'm not aware of any.
9          Q.    Are you aware of anyone who has
10 complained informally that David Mattocks
11 discriminated against them?
12         MS. KENNEDY:    Again, same objection,
13    outside the scope of the 30(b)(6) but go
14    ahead and answer.
15         THE WITNESS:    Um, there was no
16    person -- no discrimination, there was no
17    discrimination.  But at times, certainly
18    him being a new person, some tension.
19         Q.    (By Mr. Sikorski) And what do you mean
20 by "some tension"?
21         A.    Um, program directors, you know,
22 going through ups and downs about where do I --
23 where do I stand with the person, the CEO.  There
24 was -- in my role as being the clinical director

*Accurate Court Reporting*                    1500 Main Street, Suite 1412
                                              Springfield, MA 01115
                                              413-747-1806

22

1  there was some other managers who went through
2  some personal issues around he's new, where do I
3  stand, and am I being accepted and all that.
4          Q.    What is River Valley Counseling
5  Center's understanding of the reason why David
6  Mattocks resigned?
7          MS. KENNEDY:    Objection to the form
8     of the question.
9          Q.    (By Mr. Sikorski) Let me rephrase it.
10         Was Mr. Mattocks terminated from
11 employment?
12         MS. KENNEDY:    Objection to the form
13    of the question.
14         THE WITNESS:    I'm not clear about
15    that.  I'm unclear.
16         Q.    (By Mr. Sikorski) Did Mr. Mattocks
17 resign?
18         A.    I'm unclear about that.
19         Q.    What steps did you take to ascertain
20 the circumstances surrounding Mr. Mattocks'
21 termination and/or resignation?
22         A.    Could you repeat the question again?
23         Q.    What steps did you take to ascertain
24 the circumstances surrounding David Mattocks'

*Accurate Court Reporting*                    1500 Main Street, Suite 1412
                                              Springfield, MA 01115
                                              413-747-1806

23

1  termination and/or resignation, other than
2  meeting with Ms. Kennedy and what she told you?
3  I don't want to know that.
4          A.    Can I have a minute?
5          MR. SIKORSKI:    Sure.  Off the
6     record.
7          (Off record discussion)
8          MR. SIKORSKI:    Back on the record.
9          (The last question was read.)
10         THE WITNESS:    Other than meeting
11    with Ms. Kennedy, I did nothing to
12    ascertain.
13         Q.    (By Mr. Sikorski) So you can't tell us
14 today whether Mr. Mattocks was terminated or
15 resigned, correct?
16         A.    I'm unclear.
17         Q.    Did you speak with anyone at H-C
18 Management Services about Mr. Mattocks's
19 application for employment, employment
20 compensation, job performance, discipline,
21 termination, and/or resignation before today?
22         A.    No.
23         Q.    Did you speak with anyone at Valley
24 Health Systems or any corporation or entity

*Accurate Court Reporting*                    1500 Main Street, Suite 1412
                                              Springfield, MA 01115
                                              413-747-1806

24

1  associated or affiliated with it regarding
2  Mr. Mattocks' application for employment,
3  employment compensation, job performance,
4  discipline, termination, and/or resignation?
5          A.    Just say that again.
6          MR. SIKORSKI:    Would you read that
7     back.
8          (The last question was read.)
9          THE WITNESS:    No, I didn't.
10         Q.    (By Mr. Sikorski) Did you speak with
11 anyone at H-C Management Services before today
12 regarding Mark Richards' application for
13 employment, employment compensation, job
14 performance, discipline, and/or termination?
15         MS. KENNEDY:    Yes or no.
16         THE WITNESS:    Yes.  Job performance
17    like 2001 I talked to people about his job
18    performance.  The job performance area,
19    yes, definitely.
20         Q.    (By Mr. Sikorski) In order to prepare
21 for your deposition today?
22         A.    No.  I'm confused.
23         MS. KENNEDY:    Would you read that
24    question back to Mr. Kassis.

*Accurate Court Reporting*                    1500 Main Street, Suite 1412
                                              Springfield, MA 01115
                                              413-747-1806

25

1        (The last question was read.)

2        THE WITNESS:   As applied to what?

3       Your question is confusing.

4       Q.   (By Mr. Sikorski) That's fine.  I'll

5 rephrase it.

6        In order to prepare for your

7 deposition -- strike that. Let me rephrase it.

8        In order to prepare for your role as

9 30(b)(6) deponent, did you speak with anyone at

10 H-C Management Services regarding Mark Richards'

11 application for employment, employment

12 compensation, job performance, discipline, and/or

13 termination?

14       A.   No, I didn't.

15       Q.   In order to prepare for your role as

16 a 30(b)(6) deponent today, did you speak with

17 anyone at Valley Health Systems or any

18 corporation or entity associated with it

19 regarding Mark Richards' application for

20 employment, employment compensation, job

21 performance, discipline, and/or termination?

22       A.   No, I didn't.

23       Q.   Did you review Mr. Porten's

24 deposition transcript before today?

*Accurate Court Reporting*        *1500 Main Street, Suite 1413*
*Springfield, MA 01115*
*413-747-1806*

26

1       A.   No, I didn't.

2       Q.   Did you review Donna Viens'

3 transcript prior to today?

4       A.   No.

5       Q.   Did you review the Answers to

6 Interrogatories of Mr. Mattocks before today?

7       A.   No, I didn't.

8       Q.   Or the Answers to Interrogatories of

9 Ms. Viens?

10       A.   No, I didn't.

11       Q.   Or the Answers to Interrogatories of

12 Valley Health Systems?

13       A.   No, I didn't.

14       Q.   Or River Valley Counseling Center,

15 Inc.?

16       A.   No, I didn't.

17       Q.   Or the response to request for

18 production of documents issued to those entities

19 by Mr. Richards and his counsel?

20       A.   No, I didn't.

21       MR. SIKORSKI:   I have no further

22 questions of this witness at this time.

23 I'm going to suspend the deposition because

24 it's unclear to me whether this deponent

*Accurate Court Reporting*        *1500 Main Street, Suite 1413*
*Springfield, MA 01115*
*413-747-1806*

27

1 took the steps necessary to be an

2 appropriate 30(b)(6) deponent as to Items

3 1, 4, and 6 of Exhibit 1.

4       MS. KENNEDY:   I'm going to object.

5 The deponent was asked questions of him,

6 what he did to prepare. It's not the

7 requirement here. We are here to designate

8 someone with knowledge according to the

9 30(b)(6) deposition rule. That has been

10 done.

11       Mr. Sikorski has asked questions of

12 that witness, and I think we have satisfied

13 our obligation as River Valley Counseling

14 Center, Inc. to produce people with

15 knowledge regarding the subject areas of 1,

16 4, and 6. We know there's other areas to

17 be going into by other witnesses.

18       MR. SIKORSKI:   Do you have any

19 questions?

20       MS. FABBO:   I have no questions.

21       (Deposition concluded at 12:32 p.m.)

22

23

24

*Accurate Court Reporting*        *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

28

1     I, Debra A. Vance, a Notary Public within

2 and for the Commonwealth of Massachusetts at large,

3 do certify that pursuant to notice, there came

4 before me on January 31, 2006, at the offices of

5 ROBINSON DONOVAN, P.C., 1500 Main Street,

6 Springfield, Massachusetts, 01115, the following

7 person, to wit:  JEFFREY KASSIS, who was duly sworn

8 to testify to the truth and nothing but the truth as

9 to his knowledge touching and concerning the matters

10 in controversy in this case; that he was thereupon

11 examined upon his oath and said examination reduced

12 to writing by me; and that the deposition is a true

13 record of the testimony given by the witness, to the

14 best of my knowledge and ability.

15     I further certify that I am not a relative

16 or employee of counsel or attorney for any of the

17 parties, nor a relative or employee of such parties,

18 nor am I financially interested in the outcome of

19 the action.

20   WITNESS MY HAND, this 31st day of January, 2006.

21

22           _____

              Debra A. Vance

23 My Commission Expires:

   April 26, 2007

24

*Accurate Court Reporting*        *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

# EXHIBIT H

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                        )
                    Plaintiff            )
VS.                                      )
                                         )
RIVER VALLEY COUNSELING CENTER,          )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
                    Defendants           )

        DEPOSITION OF JEFFREY KASSIS, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on January 31,

2006, commencing at 10:00 a.m.


APPEARANCES:  (See Page 2)



            Debra A. Vance
        Notary Public Stenographer

---

3

            I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |

Jeffrey Kassis        *4


*  By Mr. Sikorski


EXHIBITS:                                        PAGE:

Exhibit 1, Subpoena.........................5

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
        BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
        BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
        BY:  MARY LOU FABBO, ESQ.

---

4

1              STIPULATIONS

2

3        It is agreed by and between the

4   parties that all objections, except objections as

5   to the form of the questions, and all motions to

6   strike unresponsive answers are reserved and may

7   be raised at the time of trial for the first

8   time.

9

10        It is further agreed by and between

11   the parties that the sealing and the notification

12   to all parties of the receipt of the original

13   deposition transcript is hereby waived.

14

15        JEFFREY KASSIS, Deponent, having

16   been satisfactorily identified and duly sworn,

17   deposes and states as follows:

18

19   DIRECT EXAMINATION BY MR. SIKORSKI:

20        Q.    Would you please state your name for

21   the record and spell your last name?

22        A.    It's Jeffrey Paul Kassis.  The last

23   name is Kassis.

24              MS. KENNEDY:  If you could just

1    speak up, because there's a fan there and

2    the stenographer needs to hear you.

3             THE WITNESS:    The last name is

4    Kassis, K-A-S-S, as in Sam, S, so it's

5    K-A-S-S-I-S, three S's.

6             MR. SIKORSKI:    I assume Mr. Kassis

7    wants to read and sign this deposition?

8             MS. KENNEDY:    Yes.  Thank you.

9             MR. SIKORSKI:    And other than that,

10   usual stipulations, is that acceptable?

11            MS. FABBO:    That's fine.

12            MS. KENNEDY:    That's fine.

13            MS. KENNEDY:    I'd like to have this

14   marked as Exhibit 1.

15            (Exhibit 1 marked)

16        Q.    (By Mr. Sikorski) Mr. Kassis, I'm

17   going to show you what's been marked as Exhibit

18   1, the subpoena in this case.  Do you understand

19   the subpoena asks that you bring certain records

20   with you today?

21        A.    Yes.

22        Q.    Do you have any of those records?

23        A.    I don't have any of those records.

24        Q.    Have you consulted with your attorney

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

1    you have responsibility for that program?

2        A.    Um, to the best of my memory from '88

3    when I was hired as clinic director all the way

4    through to when the CRS program left the Elm

5    Street site and I was briefly reassigned.  I

6    moved out of the Elm Street building and there

7    was about seven months, eight months where my

8    oversight of that was limited and Andy Phillips

9    was going to be taking over.  But he left in

10   November of 2003, I believe.

11            And then Maryann Pomaltier was the

12   temporary CEO, and I was given oversight of that

13   again under her.  So there was a brief time where

14   they wanted to change my span of control with the

15   oversight of that program.

16        Q.    Did you receive any additional

17   responsibilities for that program when

18   Mr. Richards was terminated?

19        A.    Yes, I did.

20        Q.    What were those additional

21   responsibilities, sir?

22        A.    Additional responsibilities were that

23   I became the director of that program.

24        Q.    Do you know approximately how many

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

1    about whether you have any records responsive to

2    that?

3        A.    I have.

4             MS. KENNEDY:    For the record, if you

5    could just rephrase the question so that it

6    doesn't ask for attorney-client privilege.

7             MR. SIKORSKI:    It's just a yes or no

8    whether he consulted or not.

9        Q.    (By Mr. Sikorski) Mr. Kassis, how are

10   you currently employed?

11        A.    I'm employed as the clinic director

12   at River Valley Counseling Center.

13        Q.    And how long have you had that

14   position, sir?

15        A.    I've had that position since 1988

16   with a brief redefinition of the position between

17   approximately '92 and '95 where I was the site

18   director of two different sites, the Beech Street

19   site and the Elm Street site.

20        Q.    Have you had responsibility for the

21   psychiatric day treatment program at River

22   Valley?

23        A.    Yes.

24        Q.    And during what periods of time did

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

1    people that program served at the time you became

2    director?

3             MS. KENNEDY:    You can answer.  Just

4    keep your voice up so everyone can hear.

5             THE WITNESS:    I apologize.

6             MS. KENNEDY:    I'm sorry, I

7    interrupted.  Let Mr. Sikorski put a

8    question before you.

9        Q.    (By Mr. Sikorski) Let me repeat it

10   then.  At the time that Mr. Richards was

11   terminated, did you then assume some additional

12   responsibilities for the psychiatric day

13   treatment program, sir?

14        A.    I did.

15        Q.    What additional responsibilities did

16   you receive?

17        A.    I needed to be much -- I needed to be

18   directly responsible not only for the quality of

19   the clinical care, which was already there, but I

20   had to have the financial piece.  But I had to be

21   much more hands on in terms of the operations of

22   the program.

23        Q.    So did you become the director of the

24   psychiatric day treatment program at that time?

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

9

```
1        A.      I did, yes.
2        Q.      And for how long did you hold that
3   position of director of the psychiatric day
4   treatment program?
5        A.      I'm still currently in that position.
6        Q.      Now, I'd like you to focus on that
7   time.  Do you remember what day specifically you
8   became director of the psychiatric day treatment
9   program?
10       A.      It's unclear to me exactly the date,
11  but it was pretty soon after Mark left.
12       Q.      And who gave you these additional
13  responsibilities?
14       A.      David Mattocks.
15       Q.      What did he say to you when he gave
16  you these responsibilities?
17       A.      Basically I need you to be in this
18  position.  I need you to be responsible and
19  you're going to be working with a coordinator of
20  that program.  And I expect you to work with the
21  coordinator and manage the program well.
22       Q.      Did you receive any documents
23  designating you as the director of the
24  psychiatric day treatment program?
```

11

```
1   provides utilization review.  There's supervisory
2   structure that supports all the clinicians in
3   sites and I oversee that.
4        Q.      And you described school-based
5   programs?
6        A.      Yes.
7        Q.      And one was in the Chicopee schools
8   and one was in the Holyoke schools?
9        A.      Yes.
10       Q.      And how many people worked in the
11  Chicopee school program?
12       A.      There's approximately, to go back,
13  probably ten people, but they're not all
14  full-time equivalence.  They share positions in
15  the clinic, and then they go out to the different
16  schools.
17       Q.      And that's ten people in Chicopee?
18       A.      Approximately.
19       Q.      And about how many full-time
20  equivalence does that come out to?
21       A.      Approximately five.
22       Q.      How many in the Holyoke School
23  System?
24       A.      Back at that point about five
```

10

```
1        A.      I received none that I can remember.
2        Q.      At the time that you became the
3   director of the psychiatric day treatment
4   program, did you have other responsibilities
5   within River Valley Counseling Center?
6        A.      I did.
7        Q.      And what other responsibilities did
8   you have at that time?
9        A.      I was overseeing all the managed care
10  components of River Valley Counseling Center, the
11  outpatient component, which was housed at the
12  Beech Street site, the Grape Street site.  We
13  have a school-based program.  We were in the
14  Chicopee schools.  We're also in the Holyoke
15  schools.
16       Q.      When you say you had responsibility
17  for overseeing all the managed care; is that your
18  term?
19       A.      Yes.
20       Q.      And what did that entail, sir?
21       A.      That means budget program
22  development, utilization review.  There's
23  utilization review teams, multi-disciplinary
24  review teams.  We have a psychologist who
```

12

```
1   therapists.
2        Q.      And a nurse practitioner ran the
3   program?
4        A.      There's two different components to
5   the program.  The nurse practitioner ran the
6   medical components called the teen clinic, and
7   the psychiatric or the mental health component
8   reported through me.
9        Q.      How many people in the Holyoke School
10  System?
11       A.      Again five and approximately three
12  FTs would be in the system.  And, again, that's a
13  little tricky because it's a ten-month conversion
14  to figure out the exact FTs.
15       Q.      And you also oversaw the provision of
16  mental health services at two physically
17  different locations; is that correct?
18       A.      Yes, the two major sites.
19       Q.      And what were they again?
20       A.      Beech Street in Holyoke and 147 Grape
21  Street Chicopee.
22       Q.      It's Grape?
23       A.      Grape.
24       Q.      How many people did you oversee at
```

25

1    MR. SIKORSKI:   Could you read that
2    back.
3         (The last question was read.)
4    THE WITNESS:   Yes, I have.
5    Q.   (By Mr. Sikorski) Did you have an
6    opportunity to observe Mr. Richards as a
7    clinician?
8    A.   I have. I mean, um, as a supervisor
9    and administrator, not directly as a clinician.
10   I was not in any of his private sessions with
11   clients, but I did have an opportunity to observe
12   him as an administrator and supervisor.
13        Q.   So did you have an opportunity to
14   observe him as a manager of the program?
15        A.   Yes.
16        Q.   What was your opinion of
17   Mr. Richards' performance as a manager of the
18   psychiatric day treatment program?
19        A.   I thought he was competent and did a
20   good job.
21        Q.   What was your opinion of his clinical
22   skills?
23        A.   I thought Mark was very knowledgeable
24   about the practices that were appropriate to his

26

1    programming. I think he kept abreast of all of
2    the new techniques that would be interventions,
3    strategies that would be important for his
4    program.
5         Q.   What was Mr. Richards' reputation in
6    the field of this type of clinical mental health
7    programs?
8              MS. KENNEDY:   Objection to the form.
9    Go ahead and answer.
10             MR. SIKORSKI:   Off the record.
11             (Off record discussion)
12             MR. SIKORSKI:   Back on the record.
13   Could you read the last question.
14             (The last question was read.)
15             THE WITNESS:   There weren't a lot of
16   people that talked to me about his
17   reputation, so this is my opinion. There
18   were people -- I think he had a good
19   reputation in the community.
20        Q.   (By Mr. Sikorski) Prior to
21   Mr. Richards' termination, did you regularly
22   review financial reports of the various programs
23   under the RVCC umbrella?
24        A.   I did.

27

1         Q.   Did Mr. Richards provide accurate and
2    timely financial information to you about his
3    program?
4         A.   Yes, he did.
5         Q.   Did he provide more financial
6    information than the directors of other programs
7    under River Valley?
8         A.   Um, I would say he was in the upper
9    percentile of people who presented financials.
10   So I would say he was in the top 20 percent.
11        Q.   Financially, how did Mr. Richards'
12   program do in the two years prior to his
13   termination?
14             MS. KENNEDY:   Objection to the form.
15   You can answer.
16             THE WITNESS:   The financial reports
17   were very positive, and he had a profitable
18   program.
19        Q.   (By Mr. Sikorski) Did you interview
20   David Mattocks prior to him becoming the
21   executive director of River Valley?
22        A.   I was part of a group of four people
23   who interviewed him as representatives of RVCC.
24        Q.   And who were those four people, sir?

28

1         A.   Let's see, Maryann Pomaltier, Brian
2    Duke, who was the former comptroller and
3    financial officer, and -- this is a little
4    unclear -- Sean Munster, who is now our
5    operations director. I believe he was also part
6    of that.
7         Q.   Did you interview other candidates
8    for the position?
9         A.   There were two other candidates and I
10   interviewed one of those other two. The other
11   one, I was in some meeting or some kind of place
12   where I couldn't interview that other person.
13        Q.   Do you remember the name of the other
14   candidate?
15        A.   No, I don't remember the other two
16   candidates.
17        Q.   Do you remember if you made a
18   recommendation as to which of the two candidates
19   should be hired?
20        A.   There was a fellow from Connecticut
21   that I thought was a good candidate. I can't
22   remember his name. I can see his face, but I'd
23   have to pull out all of the records for me to
24   recover the name for you.

**29**

1  Q.  When you interviewed David Mattocks,
2  did he tell you he had a Ph.D.?
3  A.  He didn't tell me that, no.
4  Q.  Did you learn that from his resume or
5  otherwise?
6  A.  I saw it on his resume, yes.
7  Q.  Did you ask him about the Ph.D.?
8  A.  I didn't ask him about the Ph.D.
9  Q.  Did he tell you anything about the
10  Ph.D.?
11  A.  No.  In my portion of the interview,
12  I was more focused on his clinical experience.
13  Because that was the piece I was most willing to
14  ask.
15  Q.  What was his clinical -- strike that.
16  What did he tell you was his clinical
17  experience?
18  A.  Well, clinical experience is
19  clinical, slash, management.  And we discussed
20  mostly his experience at Duke.  He had earlier
21  experience.  He had worked at Duke doing --
22  working with physician practices, and we spent a
23  lot of time on that.
24  Q.  Is Duke affiliated with the Medical

**30**

1  College of Eastern Virginia?
2  A.  I don't know.  I don't know.
3  Q.  Do you remember him telling you about
4  work that he did at Duke University?
5  A.  I believe that's my memory at this
6  moment.
7  Q.  That's Duke as in the Blue Devils?
8  A.  As in that there's a facility -- when
9  I say that, a facility associated with that,
10  whatever complex they have.  That's my memory of
11  it.  I'd have to take a look at the resume to be
12  more specific.
13  Q.  Was there a delay in Mr. Mattocks
14  assuming the position of executive director
15  because of some health issues that he had?
16  A.  Um, that's not my memory.  I remember
17  him having some health issues directly after he
18  was hired that kept him out a week or two, but I
19  don't remember a delay being a factor.
20  Q.  And just in general terms, do you
21  know what those health issues were?
22  A.  Can I ask you, is that privileged?
23  MS. KENNEDY:  Sure.  Why don't we go
24  off record.

**31**

1  (Off record discussion)
2  MR. SIKORSKI:  Back on the record.
3  Q.  (By Mr. Sikorski)  What is your
4  understanding of why River Valley terminated Mark
5  Richards?
6  A.  The reason he was terminated was as
7  part of a financial analysis to save money.
8  That's my answer.
9  Q.  What financial analysis are you
10  referring to?
11  A.  The statement by David Mattocks that
12  we could sustain favorable rate structure,
13  eliminate Mark's position, move me into that
14  position, and have a coordinator that supports me
15  in that position.
16  Q.  Was this a verbal statement or a
17  written statement?
18  A.  There was no written statement.
19  Q.  So it was a one-on-one conversation
20  you had with Mr. Mattocks?
21  A.  Um, I had -- he relayed his analysis
22  to me.  Whether he had other -- I believe he had
23  other conversations with other people.  I don't
24  know that for sure, but I believe he had other

**32**

1  conversations.
2  Q.  Was there an in-person conversation?
3  A.  Yes.
4  Q.  One on one?
5  A.  I talked with him, yes.
6  Q.  And where did this take place?
7  A.  In his office, at his office.
8  Q.  Did he have any document in front of
9  him that he was referring to?
10  A.  I don't remember any document.
11  Q.  Did he give you any specific dollar
12  figures as to the amount that could be saved?
13  A.  The specific figures were
14  approximately $50,000.
15  Q.  How did he put that $50,000 figure to
16  you, what did he say?
17  A.  I'm not clear.
18  Q.  Let me withdraw the question.
19  What did he say to you about the
20  amount of money that could be saved from this
21  move?
22  A.  That he was looking for opportunities
23  financially, that the $50,000 was a statement
24  from Mark's leaving, his salary plus the fringes

33

1  plus a small no change in my salary, a small
2  increase for the coordinator position.
3      Q.    Did you receive an increase in
4  salary?
5      A.    I didn't. I'm just trying to think
6  if there was an increase. I did receive an
7  increase. I'd have to take a look at the dates
8  of that. I did receive an increase.
9      Q.    An increase from what to what?
10     A.    It was -- there were two things. It
11 was an increase that was a regular increase that
12 was -- I'm going to go back there. It was the
13 regular salary raise that everyone was getting.
14 It was two-and-a-half percent. So everyone was
15 going to get that raise. But the agency waited
16 and didn't give it at the beginning of the year.
17 They gave it about October.
18     Q.    So did you receive a two-and-a-half
19 percent increase or more than two-and-a-half
20 percent?
21     A.    At that point, around 11/8, I believe
22 around that time I received a two-and-a-half
23 percent raise that was the raise that was the
24 agency raise.

*Accurate Court Reporting*                1500 Main Street, Suite 1412
                                          Springfield, MA 01115
                                          413-747-1806

34

1      Q.    And what did it do to your salary,
2  raised it from what to what?
3      A.    Oh, golly, um, it raised it
4  approximately $2,500, $2,400. I'd have to go
5  back and take a look at the exact amount.
6      Q.    So what were you making before the
7  raise?
8      A.    Approximately 62,000, I think. This,
9  again, these are approximates because....
10     Q.    In the conversation in which
11 Mr. Mattocks mentioned $50,000 as a savings, did
12 he mention any other cost savings that he was
13 looking to make?
14     A.    As related to what, costs savings
15 regarding the program, costs savings regarding --
16 you're unclear. The statement is unclear. The
17 question is unclear, to me it is.
18     Q.    You learned that Mr. Mattocks wanted
19 to terminate Mr. Richards' position and save
20 money in a face-to-face conversation with
21 Mr. Mattocks, correct?
22     A.    Yes.
23     Q.    Please tell me everything else you
24 recall about that conversation with Mr. Mattocks.

*Accurate Court Reporting*                1500 Main Street, Suite 1412
                                          Springfield, MA 01115
                                          413-747-1806

35

1      A.    Everything else? Um, let's see. I
2  don't clearly remember everything else related to
3  it. It's such a global statement. There was so
4  many different conversations. It's too global
5  for me.
6      Q.    I want you to focus on that
7  conversation in which Mr. Mattocks mentioned to
8  you potentially saving $50,000 by terminating
9  Mark Richards. Do you have that conversation in
10 your mind?
11     A.    Again, I don't have that specific
12 conversation. I remember hearing it, but that
13 specific conversation is not in my mind.
14     Q.    Before Mr. Richards was terminated,
15 did Mr. Mattocks discuss with you terminating any
16 other employees to save money?
17     A.    Um, no one in the clinical programs.
18 There was discussions around people within the
19 building, and I don't remember exactly who that
20 would be.
21     Q.    What do you mean by "people around
22 the building"?
23     A.    There was some people leaving. There
24 was discussions about infrastructure around

*Accurate Court Reporting*                1500 Main Street, Suite 1412
                                          Springfield, MA 01115
                                          413-747-1806

36

1  there. When I meant the building, I meant the
2  administrative office, 319. But there was
3  nothing about anybody else clinically at that
4  point under my clinical management. But they
5  were looking at the infrastructure with 319.
6      Q.    Did he mention any specific names or
7  positions that he wanted to eliminate?
8      A.    There was some positions, but I can't
9  remember exactly who the people were that were
10 leaving and they weren't going to fill in the
11 positions. I can't remember.
12     Q.    Three months before Mr. Richards was
13 terminated, was anybody else on the clinical side
14 terminated?
15     A.    No.
16     Q.    And three months after Mr. Richards
17 was terminated, was anybody on the clinical side
18 terminated for cost purposes?
19     A.    Not for cost purposes. There were
20 people -- about four months two people were asked
21 to leave for clinical reasons.
22     Q.    What do you mean by "clinical
23 reasons"?
24     A.    Issues around paperwork performance.

*Accurate Court Reporting*                1500 Main Street, Suite 1412
                                          Springfield, MA 01115
                                          413-747-1806

37

1    Q.    Do you remember Mr. Mattocks ever
2  telling you that the decision to eliminate
3  Mr. Richards' employment was made with
4  consideration of his years of service to the
5  organization?
6    A.    Could you repeat that again?
7         MR. SIKORSKI:    Please read that
8  back.
9         (The last question was read.)
10        THE WITNESS:    I don't remember that
11 occurring.
12   Q.    (By Mr. Sikorski) When Mr. Mattocks
13 told you he was thinking of terminating
14 Mr. Richards as a cost-savings measure, did you
15 say anything back to him about that?
16   A.    Um, I was -- there was a positive
17 ledger and there was a negative ledger for it.
18 The positive ledger is that indeed it was a
19 cost-savings measure.  The negative side was the
20 continuity of the connections that Mark had in
21 the community, like bringing in referrals and
22 that kind of thing.
23   Q.    Did you tell that to Mr. Mattocks?
24   A.    My memory is that I discussed that

38

1  with him.
2    Q.    And what did he say in response to
3  that?
4    A.    I think that he just took it in as
5  part of his information to make a decision.
6    Q.    Did you ever discuss what impact that
7  termination might have on Mark?
8    A.    I don't believe so, not thoroughly.
9    Q.    Who's Anthony Correia?
10   A.    I don't remember Anthony Correia.
11   Q.    Tony Correia?
12   A.    Tony Correia.  Thank you.  Tony is
13 the chief financial officer -- I believe that's
14 his title -- for Valley Health Systems.
15   Q.    Had you had interaction with Tony
16 Correia over the years?
17   A.    Not separately but within the context
18 of the executive team was beginning to be invited
19 to meet with Hank Porten and him in a weekly
20 meeting.  So I began to see him in meetings
21 there.
22   Q.    When did you start attending these
23 meetings with Mr. Porten and Mr. Correia?
24        MS. KENNEDY:    Objection to the form

39

1  of the question.
2         THE WITNESS:    The answer is that
3  there was different sequences in which I
4  became involved.  I first became involved
5  going to those meetings after Andy Phillips
6  left and Maryann Pomaltier was the acting
7  director.  So in some ways I became a part
8  of the team that had to keep the agency
9  afloat.  And in that format, that's when I
10 began going to meetings.
11   Q.    (By Mr. Sikorski) Did Mr. Mattocks
12 ever tell you that he was sending a report to
13 Tony Correia about cost savings that he was
14 trying to implement?
15   A.    I have no memory of that.
16   Q.    I'd like to go back for a minute to
17 your work in psychiatric day treatment programs
18 before the termination of Mr. Richards.  Before
19 the termination of Mr. Richards, did you ever
20 work with clients in a psychiatric day treatment
21 program?
22   A.    I never worked with clients in a
23 psychiatric day treatment program.
24   Q.    Did you ever lead a group in a

40

1  psychiatric day treatment program?
2    A.    Yes, I've led groups in psychiatric
3  day treatment programs.
4    Q.    How many had you done before
5  Mr. Richards was terminated?
6    A.    Two or three different times.
7    Q.    Two or three total?
8    A.    Different groups, yes.
9    Q.    Did you ever manage the day-to-day
10 operations of a psychiatric day treatment program
11 prior to Mr. Richards' termination?
12   A.    I oversaw but did not directly
13 manage.
14   Q.    Did you ever work day-to-day inside a
15 psychiatric day treatment program before
16 Mr. Richards' termination?
17   A.    No, I did not.
18   Q.    Once you became the director of the
19 psychiatric day treatment program, how many
20 people did you supervise?
21   A.    Supervise where?
22   Q.    In the psychiatric day treatment
23 program.  Let me withdraw the question and ask
24 you again.

45

1  once. But he had returned into the partial
2  program that's run by Valley Health Systems. I'm
3  not sure exactly the timing of that.
4      Q.    So, again, tell me all the reasons
5  why Mr. Avakian told you he was leaving the
6  psychiatric day treatment program.
7      A.    I think that the main reason was
8  family. I think he also had difficulties setting
9  boundaries between the pressures of work and his
10  home life and that was really a big deal. He
11  kind of took worries back with him. And so I
12  think that that was a piece for him.
13      Q.    At some point in time, did you learn
14  that Mr. Mattocks' Ph.D. was not from an
15  accredited institution?
16      A.    I've never learned that positively,
17  but I did hear after he left rumors that were
18  floating around the agency about that being a
19  fact. After he left, there was some rumors that
20  people kind of floated to me. But I still
21  haven't seen anything in writing to say whether
22  it's documented or not documented. I really
23  don't know. I've heard.
24      Q.    I just want you to focus on not what

46

1  you may have heard from attorneys but from what
2  you've heard others in the agency regarding
3  Mr. Mattocks' Ph.D. Can you tell me what rumors
4  you heard?
5      A.    Basically there was a rumor floating
6  that his Ph.D. was not a -- what's the term --
7  licensed or -- I can't think of the term.
8      Q.    Accredited?
9      A.    Accredited, that it wasn't
10  accredited.
11      Q.    Did anyone at the agency express
12  concern to you about the fact that it might be
13  from a nonaccredited institution?
14      A.    Again, this was after the fact. And
15  at that point, it wasn't a concern. It was just
16  more like what's going on here, you know. It
17  wasn't like a concern. It's just like what's
18  going on.
19      Q.    In the area of the clinical provision
20  of mental health services, is integrity in
21  credentialing important?
22      A.    In my area it's very important.
23      Q.    So it would be important as to
24  whether someone had claimed to have a Ph.D. from

47

1  an accredited or nonaccredited institute?
2      A.    From my clinical side?
3      Q.    Yes.
4      A.    It's important to me.
5          MR. SIKORSKI:    What I'd like to do
6  is take five or ten minutes.
7          (A recess was taken)
8      Q.    (By Mr. Sikorski) Mr. Kassis, you've
9  mentioned a Mr. Duke. Who is Brian Duke?
10      A.    He was the financial officer of River
11  Valley Counseling Center.
12      Q.    And how long did he have that
13  position, sir?
14      A.    I'm unclear.
15      Q.    In relation to the termination of
16  Mr. Richards, how long before that time,
17  approximately, did he have that position?
18      A.    I think approximately three years.
19      Q.    And how long after Mr. Richards'
20  termination did he hold that position?
21      A.    Um, there was another -- he left, and
22  I can't remember the sequence, and then there was
23  another chief financial officer there. I can't
24  remember the sequence. I'd have to refer to some

48

1  notes. There was another financial officer.
2      Q.    Then did Mr. Duke come back to work
3  for River Valley?
4      A.    He left the agency and there was
5  another financial officer hired, and I can't
6  remember when he left.
7      Q.    Would it have been not in 2006?
8      A.    No.
9          MS. KENNEDY:    Objection to form.
10      Q.    (By Mr. Sikorski) Would it have been
11  sometime in 2005?
12          MS. KENNEDY:    As to who left?
13          MR. SIKORSKI:    As to Mr. Duke
14  leaving.
15          THE WITNESS:    Yes. I can't remember
16  the exact time.
17      Q.    (By Mr. Sikorski) And what were the
18  circumstances under which Mr. Brian Duke left
19  River Valley?
20          MS. KENNEDY:    Objection to the form.
21          THE WITNESS:    I'm unclear about --
22  what I am clear about is that he had a
23  change in his daughter's school. So his
24  commute was already about an hour and 15

49

```
1      minutes and the school that they were going
2      to send their kid to was another 20 minutes
3      in the wrong direction.  And it was just
4      his commute was killing him.  It was just
5      basically not working for him.  That's what
6      I know.
7      Q.    (By Mr. Sikorski)  Where did Mr. Duke
8  live?
9      A.    Up near Athol, that area.
10     Q.    When is the last time you spoke to
11 Mr. Duke?
12     A.    Close to when he left, and I can't
13 remember the exact date.  But I haven't spoken to
14 him since.
15          MR. SIKORSKI:   Off the record.
16          (Off record discussion)
17     Q.    (By Mr. Sikorski)  Mr. Kassis, do you
18 remember when the program was applying for
19 Medicaid certification back in the late '80s?
20          MS. KENNEDY:   Object to the form of
21     the question.  Go ahead and answer.
22          THE WITNESS:   It's very fuzzy to me.
23     Q.    (By Mr. Sikorski)  Do you remember a
24 woman by the name of Renee Cochrin,
```

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

51

```
1      Q.    And the issue was whether the
2  splitting of authority would violate Medicaid
3  regulations?
4          MS. KENNEDY:   Objection to the form.
5          THE WITNESS:   I think he was
6      reporting under me and at times there was
7      tension between he and I regarding that the
8      agency was clear that he reports to me.
9      And he had some feelings at times where he
10     would question that.
11     Q.    (By Mr. Sikorski)  Who is Jeffrey
12 Eagle?
13     A.    Jeffrey Eagle is a consultant, one of
14 the lead consultants of a firm called Health
15 Enhancements.
16     Q.    Did you ever work with Jeff Eagle?
17     A.    On several occasions.
18          Are we doing the corporate piece?
19          MS. KENNEDY:   No.
20     Q.    (By Mr. Sikorski)  On what projects did
21 you work with Mr. Eagle?
22     A.    Basically he came in on one occasion
23 because we had problems financially.  And the
24 Health Enhancements was hired by Valley Health
```

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

50

```
1  C-O-C-H-R-I-N?
2      A.    I don't remember.
3      Q.    Do you remember any interaction with
4  the Commonwealth's Medicaid auditor who was
5  auditing the program to certify it with Medicaid?
6      A.    I don't remember.
7      Q.    Do you remember the Commonwealth ever
8  raising an issue about the extent of the program,
9  the director's authority being shifted to you as
10 the clinical director?
11     A.    I don't remember.
12     Q.    Do you remember that as ever being an
13 issue while you worked at River Valley?
14     A.    I remember it being an issue with
15 Mark but not with the agency.
16     Q.    What do you mean "being an issue with
17 Mark"?
18     A.    Mark, we had some conversations when
19 he brought that up as a concern he had.
20     Q.    What did he say to you that leads you
21 to conclude it was a concern of Mr. Richards'?
22     A.    It's very vague.  It's just that he
23 was -- my memory is that that was an issue around
24 his, quote, "authority," vis-a-vis me.
```

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

52

```
1  Systems to write or correct the financial
2  difficulties.  And I became a person that was
3  interacting with him regarding maintaining the
4  viability of the clinical programs.  That was the
5  first occasion.
6      Q.    And who was the director of River
7  Valley at that time?
8      A.    The first occasion Joyce Toth was.
9  She left and Jeff Eagle's group created a
10 temporary CEO from their group named Gale -- I
11 can't remember his last name.  But it was a CEO
12 right from that group that reported to the
13 hospital, to the Valley Health Systems.
14     Q.    What other occasions did you work
15 with Mr. Eagle?
16     A.    The next time that he came in was
17 again around financial difficulties.  Valley
18 Health Systems asked him to come in, and I worked
19 with him in conjunction with Andy Phillips, who
20 was the CEO.
21     Q.    Did you work with him at any other
22 time?
23     A.    No.  It was all around the business
24 of the agency.
```

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

53

1  Q.   While Mr. Mattocks was the executive
2  director of River Valley Counseling Center, were
3  you a part of his management team?
4  A.   Yes, I was part of the executive
5  team.
6  Q.   And who else was on that executive
7  team?
8  A.   Myself; Maryann Pomaltier, who was
9  the director of the agency services; Sean
10  Munster, who was the director of MIS and
11  operations; and Donna Viens, the human resources
12  director; and the comptroller. Again, there was
13  a sequence of -- I can't remember if -- I think
14  it was Brian Duke. And there was another gal --
15  whose name is escaping my memory -- who took over
16  from Brian. That was the group.
17  Q.   Did this management group have
18  regular meetings?
19  A.   Yes.
20  Q.   And when were those meetings held?
21  A.   It varied, sometimes once a week,
22  sometimes every other week, sometimes twice a
23  week.
24  Q.   And what time of the day?

54

1  A.   Morning.
2  Q.   And when in the morning?
3  A.   Approximately 8:30 to 9:30.
4  Q.   Was there a larger management group
5  also that met?
6  A.   Yeah. It was called the leadership
7  group, and that met once a month, once every two
8  weeks depending.
9  Q.   When were those meetings held?
10  A.   My memory is Thursday mornings, again
11  about eight-thirty to ten o'clock.
12  Q.   Was Mr. Richards a part of that
13  group?
14  A.   He was.
15  Q.   Do you recall his termination coming
16  following one of those meetings?
17  A.   I don't have a clear memory of that
18  sequence.
19  MR. SIKORSKI:   If I could just have
20  one more moment.
21  (A recess was taken)
22  Q.   (By Mr. Sikorski) The Commonwealth of
23  Massachusetts Division of Medical Assistance have
24  certain regulations, do they not, governing

55

1  psychiatric day treatment programs?
2  A.   Yes. There are regulations for that.
3  Q.   And before today, did you review the
4  regulations regarding staffing requirements?
5  A.   Yes, I have.
6  Q.   And do you believe that you met all
7  the requirements for the program director of a
8  psychiatric day treatment program as of
9  November 2004 when you took over Mr. Richards'
10  position?
11  A.   I believe that I met those
12  requirements.
13  Q.   In what way do you meet the
14  experience requirements of those regulations?
15  A.   I was a member of the
16  multi-disciplinary team for five years. I have
17  experience overseeing and knowing what the
18  program is composed of. I have experience with
19  the psychiatric population.
20  Q.   Do you believe the regulations allow
21  you to be a part-time program director?
22  MS. KENNEDY:   Objection to the form.
23  THE WITNESS:   What do you mean by
24  part time? What's your definition of part

56

1  time?
2  Q.   (By Mr. Sikorski) You testified you
3  spent approximately 10 or 15 percent of your time
4  as the director of the psychiatric day treatment
5  program, did you not, sir?
6  A.   That's true. But I oversee the
7  program and that's a responsibility that I carry
8  with me all the time. That's just a definition
9  of time, not the responsibility.
10  Q.   Around the time that you took over
11  the position as director of the psychiatric day
12  treatment program, did you review the
13  requirements of the Division of Medical
14  Assistance?
15  A.   I was given those requirements and
16  reviewed them, yes.
17  Q.   Who gave you those?
18  A.   David Mattocks.
19  Q.   When did he give you those?
20  A.   Again, this is a memory of
21  approximately the second two weeks of October.
22  Q.   Did he give those to you in a meeting
23  face to face?
24  A.   Yes.

0aaaa

**57**

1   Q.   And what did he say to you when he
2   gave you the regulations?
3   A.   He said review them and in a sense do
4   you believe that you meet the regulations in
5   terms of who you are.  He clearly said that he
6   believed that I did and that I looked at him and
7   said I said I believe that I meet those
8   requirements.
9   Q.   What was the context of this
10  exchange?
11  A.   The context was post the issue around
12  moving towards that decision, towards having Mark
13  potentially not be the program director.  It was
14  all in that context.
15  Q.   Was anyone else at that meeting?
16  A.   I don't remember clearly.  I just
17  remember myself being there.
18  Q.   Do you remember ever discussing with
19  Donna Viens of whether or not you met the
20  requirements?
21  A.   My memory is unclear.
22  Q.   Did Mr. Mattocks ever tell you that
23  Mr. Richards had challenged your qualifications
24  to be the program director?

**58**

1   A.   I don't remember him doing that.
2   Q.   And do you understand that the
3   regulations require that a psychiatric day
4   treatment program was designated a full-time
5   professional as overall administrator and
6   clinical director?
7   A.   I'm a full-time professional.  I
8   understand that.
9   Q.   So you understand full-time
10  professional to be someone who could only spend
11  10 or 15 percent of their time on a program?
12         MS. KENNEDY:   Objection to the form.
13         THE WITNESS:   I think I'd like you
14         to restate that.
15  Q.   (By Mr. Sikorski) What is your
16  understanding of the requirements that a
17  psychiatric day treatment program must designate
18  a full-time professional as overall administrator
19  and clinical director full-time responsible for
20  the program in charge of day-to-day
21  responsibility over it?
22  A.   My understanding was that I was a
23  person that was employed fully full time at the
24  agency.  That was my understanding.

**59**

1   Q.   At that time, you had at least five
2   programs that you oversaw, is that correct, from
3   a clinical point of view?
4   A.   Yes.
5   Q.   So according to your definition, what
6   if you had 15 programs to oversee, would you
7   still meet the requirements there?
8         MS. KENNEDY:   Objection to the form.
9         THE WITNESS:   Within the frame of my
10        position I met the requirements.  If it was
11        five, six, seven, I met the requirements.
12        This was my belief.
13        MS. KENNEDY:   You answered the
14        question.
15  Q.   (By Mr. Sikorski) Did you seek anyone
16  else's opinion as to whether or not you met the
17  requirements?
18  A.   No, I didn't.
19  Q.   What is the Crossroads Day Treatment
20  Program?
21  A.   Currently there is no Crossroads Day
22  Treatment Program.
23  Q.   Was that a predecessor type of
24  program to programs currently being run by River

**60**

1   Valley?
2   A.   What I meant by that is that it was
3   simply transferred to the name of River Valley
4   Counseling Center.
5   Q.   Okay.  When you and Mr. Mattocks
6   discussed the termination of Mr. Richards, wasn't
7   the original plan to have Mr. Avakian take over
8   some of the responsibilities and you take over
9   other responsibilities?
10  A.   When you're a director, you always
11  delegate so there was delegation of
12  responsibilities.  There's cooperation.
13  Q.   My question is, wasn't it originally
14  the responsibilities were going to be split up
15  between you and Mr. Avakian?
16  A.   The question is unclear.  They're
17  always split up.
18  Q.   To your memory, was there any change
19  in the allocation of responsibilities between you
20  and Mr. Avakian at any time after Mr. Richards'
21  termination?
22  A.   A change from when to when?  I'm
23  unclear what you mean.  A change from before?
24  Q.   An change from before Mr. Richards'

# EXHIBIT I

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


C.A. No. 05-30061-MAP

MARK A. RICHARDS,                        )
                Plaintiff               )
VS.                                      )
                                         )
RIVER VALLEY COUNSELING CENTER,          )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
                Defendants               )

        DEPOSITION OF MATTHEW HAAS, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Massachusetts Rules

of Civil Procedure 30(b)(6), at the offices of

ROBINSON DONOVAN, P.C., 1500 Main Street,

Springfield, Massachusetts on January 31, 2006,

commencing at 2:00 p.m.


APPEARANCES:  (See Page 2)


                Debra A. Vance
            Notary Public Stenographer

---

3

| 1 | | | I N D E X |
| 2 | | |
| 3 | | |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Matthew Haas | *4 | | | |

*  By Mr. Sikorski


EXHIBITS:                                    PAGE:

Exhibit 3, Interrogatories...................12

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
        BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
        BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
        BY:  MARY LOU FABBO, ESQ.

---

4

1           STIPULATIONS
2
3           It is agreed by and between the
4   parties that all objections, except objections as
5   to the form of the questions, and all motions to
6   strike unresponsive answers are reserved and may
7   be raised at the time of trial for the first
8   time.
9
10          It is further agreed by and between
11  the parties that the sealing and the notification
12  to all parties of the receipt of the original
13  deposition transcript is hereby waived.
14
15          MATTHEW HAAS, Deponent, having been
16  satisfactorily identified and duly sworn, deposes
17  and states as follows:
18
19  DIRECT EXAMINATION BY MR. SIKORSKI:
20      Q.   Mr. Haas, will you please state your
21  name and spell your last name for the record?
22      A.   Matthew Haas, H-A-A-S.
23          MR. SIKORSKI:   I assume that
24      Mr. Haas will want to read and sign his

5

1    deposition?
2         MS. KENNEDY:   Yes, please.
3         MR. SIKORSKI:   And otherwise the
4    usual stipulations, Counsel?
5         MS. FABBO:   Yes.
6         MS. KENNEDY:   Yes.
7         Q.   (By Mr. Sikorski) Mr. Haas, I'm going
8    to show you what's already been marked as Exhibit
9    1 in the 30(b)(6) deposition and ask if you've
10   been designated as representative of River Valley
11   Counseling Center to respond to some of the
12   topics of Exhibit A in Exhibit 1?
13        A.   Yes, I have.
14        Q.   And what topics have you been so
15   designated?
16        A.   You can remind me. I believe it was
17   2, 3, 6.
18        MS. KENNEDY:   Actually, 2, 3, 5, and
19   7.
20        THE WITNESS:   2, 3, 5, and 7.
21        Q.   (By Mr. Sikorski) And, Mr. Haas, what
22   have you done today to prepare for your role as a
23   30(b)(6) deponent?
24        A.   I have made a review of the H-C

*Accurate Court Reporting*          1500 Main Street, Suite 1412
                                    Springfield, MA 01115
                                    413-747-1806

7

1    Medical Center and also executive director of
2    River Valley Counseling Center.
3         Q.   And when did you become the executive
4    director of River Valley?
5         A.   Officially July 11, '05. And in
6    terms of really taking on the duties, it was
7    really more the beginning of September.
8         Q.   And before you took over those duties
9    in the beginning of September, who was carrying
10   out the responsibilities as the executive
11   director of River Valley?
12        A.   The acting director was Maryann
13   Pomaltier while Mr. Mattocks was on his leave.
14        Q.   And then after Mr. Mattocks didn't
15   return, she continued until you took over the
16   responsibilities?
17        A.   That happened pretty quickly. I was
18   asked whether this was something I would consider
19   sometime earlier in the summer, maybe it was June
20   or something, when Mr. Mattocks went on leave and
21   was told there was a chance he may not come back,
22   that that wasn't known. And if he decided not to
23   come back or if that is what ended up happening,
24   you know, would I be willing to consider this.

*Accurate Court Reporting*          1500 Main Street, Suite 1412
                                    Springfield, MA 01115
                                    413-747-1806

6

1    Management agreement and also had a meeting with
2    my attorney last week.
3         Q.   I don't want to know what you spoke
4    to your attorney about. But other than reviewing
5    the H-C Management agreement and the meeting with
6    counsel, have you done anything else?
7         A.   Not apart from the duties of my job.
8         Q.   Did you review any documents other
9    than the H-C Management agreement?
10        A.   Um, documents that I would have come
11   across in the course of my work. I'm trying to
12   think here. When we were asked to produce
13   documents, I was part of looking those over
14   briefly. I didn't keep copies or study them in
15   great length, for instance, the personnel records
16   that were asked for some of the people, that kind
17   of thing.
18        Q.   Did you review the deposition
19   transcript of Mr. Porten?
20        A.   No, I did not. I haven't see any
21   deposition transcripts.
22        Q.   What is your current position?
23        A.   I am -- I have a dual role. I'm
24   director of Behavioral Health Services at Holyoke

*Accurate Court Reporting*          1500 Main Street, Suite 1412
                                    Springfield, MA 01115
                                    413-747-1806

8

1         So I gave it some thought and made
2    some recommendations about some extra help that
3    might be needed at the hospital to manage things
4    there. And so I think I'm not privy to all what
5    happened on the other end of it, but my
6    impression was that very shortly after David
7    Mattocks said he was not coming back or after
8    that was learned I was asked and named in this
9    new role.
10        Q.   And who hired you into this role?
11        MS. KENNEDY:   I'm going to object to
12   this line of questioning because it's
13   outside of the 30(b)(6) scope, but go ahead
14   and answer the question.
15        THE WITNESS:   I don't know if hire
16   is quite the right word, but Hank Porten is
17   the person I was talking with.
18        Q.   (By Mr. Sikorski) How long have you
19   been the director of Behavioral Health?
20        A.   For about two years. I've been an
21   employee of the hospital for 13 years but
22   director of Behavioral Health for about two
23   years.
24        Q.   And what is the relationship between

*Accurate Court Reporting*          1500 Main Street, Suite 1412
                                    Springfield, MA 01115
                                    413-747-1806

9

```
1    H-C Management Services, Inc. and Valley Health
2    Systems?
3            A.      H-C Management is, as I understand
4    it, one of the subsidiaries or affiliate
5    companies of Valley Health Systems along with
6    several other companies, including the hospital
7    and River Valley.
8            Q.      What is the relationship between H-C
9    Management Services, Inc. and River Valley
10   Counseling Center?
11           A.      There is a management agreement
12   between River Valley Counseling Center and H-C
13   Management that, as I understand it, in
14   consideration of some loans that Valley Health
15   Systems made to River Valley Counseling Center
16   some years ago H-C Management has a sort of
17   independent contractor relationship with River
18   Valley Counseling Center that involves providing
19   management consultation and direction and some
20   staffing.
21           So the executive director and
22   controller are employees of H-C Management.  And
23   the -- I would have to look at -- I don't have
24   this all memorized, but my general understanding
```

10

```
1    of the relationship is that the president and CEO
2    of Valley Health Systems, you know, has an
3    interest in naming these two positions with the
4    approval of the Board of River Valley Counseling
5    Center.  So the board has essentially contracted
6    with H-C Management to help provide management
7    expertise for the agency.
8            Q.      And does River Valley Counseling
9    Center pay for that management experience?
10           A.      Yes, it does.
11           Q.      And how does it do so?
12           A.      There is a monthly management fee
13   that is paid to H-C Management, the salary of the
14   controller and my own salary as well as money to
15   cover some of the consultation time by staff of
16   H-C Management which is primarily Mr. Porten,
17   Tony Correia, the CFO, and Mary Kelleher to a
18   lesser extent.
19           Q.      Is that billed monthly?
20           A.      Yeah, there's a monthly payment that
21   we make.
22           Q.      Have you reviewed the amended
23   complaint to this case?
24           A.      I have, yes.
```

11

```
1            Q.      And have you reviewed the answer of
2    defendant, River Valley Counseling Center, Inc.,
3    to the amended complaints?
4            A.      I have, yeah.
5            Q.      Do you understand the defenses of
6    River Valley Counseling Center to the claims of
7    Mr. Richards?
8            A.      To the best of my ability, yes.
9            Q.      What do you understand to be the
10   defenses of River Valley Counseling Center to the
11   claims of Mr. Richards?
12           MS. KENNEDY:   Again, if it requires
13   you to reveal attorney-client
14   communications I'd instruct you not to
15   answer.  If you can answer it without
16   revealing attorney-client communication,
17   please do so.
18           THE WITNESS:   I would actually not
19   feel comfortable answering it without
20   looking at it.  There's been so many
21   documents that have been produced by this
22   lawsuit it's hard for me to recall
23   specifics of a single document.
24           MR. SIKORSKI:   Let's mark a copy
```

12

```
1    here.
2            (Exhibit 3 marked)
3            MR. SIKORSKI:   Could you read the
4    last question.
5            (The last question was read.)
6            THE WITNESS:   And do you have a copy
7    of the claims?  Because some of these
8    answers just say, for instance, we don't
9    have sufficient information to form an
10   opinion about that.  Okay.
11           I did review, without looking at
12   these in detail now, I do recall that I
13   reviewed these answers and had no objection
14   to them or problem with them to the extent
15   of my knowledge.
16       Q.  (By Mr. Sikorski)  That's the answer in
17   Exhibit 3?
18           A.      Yes.
19           Q.      What is your understanding of the
20   defense of River Valley Counseling Center to the
21   claim of Mr. Richards that he was fired in
22   violation of the Family Medical Leave Act?
23           MS. KENNEDY:   Again, to the extent
24   that your answer requires you to reveal
```

**13**

1      attorney-client communications I would
2      instruct you not to answer. If you can
3      answer it without revealing attorney-client
4      privilege and information, please go ahead
5      and do so.
6          THE WITNESS:  Um, I would like to be
7      able to refer to the written response to
8      that particular allegation if you can
9      direct me to which one that is.
10      Q.  (By Mr. Sikorski) Do you just have a
11 layperson's understanding of what the defense is
12 to the Family Medical Leave Act claim?
13      A.  I may want to confer with you about
14 what the distinction is between my layperson's
15 understanding and what's attorney-client
16 privilege. Because virtually all of my
17 discussions about this have been with counsel.
18      Q.  Fine.
19      (A recess was taken)
20      MR. SIKORSKI:  Can you read the last
21 question.
22      (The last question was read.)
23      THE WITNESS:  My understanding is
24      that, as it was laid out in the

*Accurate Court Reporting*      *1500 Main Street, Suite 1412 / Springfield, MA 01115 / 413-747-1806*

**14**

1 interrogatories, the reason for the
2      termination was due to the elimination of
3      the position and that Mr. Richards' status
4      under the Family Medical Leave Act was not
5      a consideration in the decision to
6      terminate the position.
7      Q.  (By Mr. Sikorski) Do you have an
8 understanding of the defense of the age
9 discrimination complaint?
10      A.  The same essentially, that his age
11 was not a consideration in the decision to
12 eliminate the position, that it was a business
13 decision that was made.
14      Q.  And do you have an understanding of
15 the defense to the claims of disability
16 discrimination?
17      A.  The same, that actually, and this is
18 my sense, that as I recall -- because I was not
19 there. I can't obviously speak to any decision I
20 made. As I recall from conversation with Donna
21 Viens, that she was not aware of the disability
22 in terms of the skin cancer that is something
23 that I've heard spoken about.
24      Q.  Did you have a conversation with

*Accurate Court Reporting*      *1500 Main Street, Suite 1412 / Springfield, MA 01115 / 413-747-1806*

**15**

1 Donna Viens about the issue of the skin cancer?
2      A.  When the question was raised I did,
3 and she said that was something she didn't know
4 about.
5      Q.  Did you ever discuss Mr. Richards'
6 claims of Mr. Mattocks?
7      A.  No.
8      Q.  So in order to prepare to be a
9 30(b)(6) deponent today, you didn't call
10 Mr. Mattocks and discuss this matter with him?
11      A.  No. Actually, to be more accurate, I
12 did have, before Mr. Mattocks left, when I had
13 gotten Mr. Richards' resignation letter I had
14 maybe two or three conversations, I think one,
15 maybe two meetings with Mr. Mattocks while he was
16 in his position.
17      And after I got the letter that Mark
18 wrote resigning from his position, I had a
19 conversation with Mr. Mattocks about something
20 else. I didn't call him about this, but I
21 mentioned to him that I had gotten that. And he
22 said something -- I didn't even know at that
23 point if he said anything about the position
24 being eliminated.

*Accurate Court Reporting*      *1500 Main Street, Suite 1412 / Springfield, MA 01115 / 413-747-1806*

**16**

1      But when I saw in the paper that a
2 lawsuit had been filed, I think I might have
3 called him. I don't remember if I called him
4 about that or if we were talking about something
5 else. And he made a comment about, yeah, I
6 thought that might happen. It was like, you
7 know, a ten-second conversation. I have not had
8 any conversation with Mr. Mattocks actually since
9 I've been in my position at River Valley.
10      Q.  But to prepare for --
11      A.  Not to prepare for today or for any
12 other reason.
13      Q.  And this conversation about, yeah, I
14 thought this might have happened, that was after
15 there was an article in the paper about the
16 lawsuit?
17      A.  There was an article in the paper
18 about the lawsuit.
19      Q.  Did you say anything more to him in
20 that conversation?
21      A.  No.
22      Q.  Did you ask him why he thought this
23 might happen?
24      A.  No.

*Accurate Court Reporting*      *1500 Main Street, Suite 1412 / Springfield, MA 01115 / 413-747-1806*

17

1    Q.    When you were answering
2  interrogatories on behalf of River Valley
3  Counseling, was Mr. Mattocks part of that
4  process?
5    A.    Not that I was aware of, you know.  I
6  did not consult with him.
7    Q.    Who was part of that process, you and
8  Ms. Viens?
9    A.    Um, me and Ms. Viens and counsel.
10    Q.    And as part of your testimony here
11  today, you've had some background -- strike
12  that -- you've worked with Mr. Richards in
13  separate entities, though, for several years?
14    A.    Correct.  There was a period of time
15  where we worked --
16    MS. KENNEDY:    I'm just going to
17    interrupt your question, I apologize --
18    your answer.  I'm again going to object.
19    That's beyond the scope of what he's been
20    designated for on behalf of River Valley,
21    but, please, go ahead.
22    MR. SIKORSKI:    Just to the extent of
23    his knowledge.
24    THE WITNESS:    When I became the

18

1    director of the partial hospitalization
2    program at Holyoke Medical Center in 1996,
3    I again don't recall if Mr. Richards
4    contacted me or I contacted him.
5    But we had some contact just as
6    colleagues, and I visited his program in
7    Springfield.  And we were both members of
8    the Mass Association for Day Treatment and
9    Partial Hospitalization and would carpool
10    to monthly meetings with Phyllis -- I'm
11    forgetting her last name -- who was the
12    director of the program in Holyoke at the
13    time.
14    And we did that for maybe two or
15    three years.  I ended up -- there was a
16    period of a year or two when we were both
17    on the executive committee of that
18    organization.  So we would carpool a little
19    earlier and we would have a meeting prior
20    to the regular meeting.
21    And then after maybe three years or
22    so in that organization, I ended up sort of
23    dropping out because the topics were less
24    relevant to partial hospitalization.  We

19

1    also didn't have the insurance contract
2    that they were spending most of the time
3    talking about.
4    And after that, we would have phone
5    conversations once in a while.  I might --
6    I spoke to Mark making a referral to his
7    program once in a while, but we didn't have
8    a lot of contact beyond that.
9    Q.    (By Mr. Sikorski)  And didn't he
10  supervise an MSW student who worked in your
11  program for a while?
12    MS. KENNEDY:    Again, same objection,
13    beyond the scope, go ahead and answer.
14    THE WITNESS:    I'm not remembering
15    who it was.  If you'll give me the name I
16    could confirm that.  I don't recall right
17    now.
18    MR. SIKORSKI:    Mr. Haas, give me a
19    moment and I'll be through.
20    (A recess was taken)
21    Q.    (By Mr. Sikorski)  Mr. Haas, you had
22  mentioned a loan that River Valley Counseling
23  Center had received from Valley Health Systems.
24    A.    Yes.

20

1    Q.    Is that loan still in the process of
2  being repaid?
3    A.    Yes, it is.
4    Q.    Is it ever going to be repaid?
5    A.    We are making payments on it.  Yeah,
6  it's -- my commitment would be to answer that
7  yes, we do intend to repay it.
8    Q.    And was it essentially in exchange
9  for the loan that River Valley Counseling Center
10  gave up some control in the organization, that
11  is, giving up the right to appoint the CEO and
12  CFO?
13    MS. KENNEDY:    Objection to the form.
14    You can answer.
15    THE WITNESS:    My understanding from
16    reading the agreement was that in the
17    agreement, actually, the language is in
18    consideration of the loan.  So because of
19    the amount of money that Valley Health
20    Systems has extended to River Valley, they
21    wanted to have some assurance that the
22    company was being managed in a way they
23    considered to be prudent and responsible.
24    Q.    (By Mr. Sikorski)  So they wanted some

21

```
1   direct control over those two key position, CEO
2   and CFO, correct?
3       A.   Yes.
4           MR. SIKORSKI:   I have no further
5   questions of this witness at this time.
6           MS. FABBO:   I don't have any
7   questions.
8           MS. KENNEDY:   I have nothing.
9           (Deposition concluded at 2:36 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

---

```
1          SIGNATURE/ERRATA SHEET
2
3          To be signed by deponent and
   returned to counsel.
4          I, the undersigned, MATTHEW HAAS,
5   do hereby certify that I have read the foregoing
6   transcript of my testimony given in the matter of
7   MARK A. RICHARDS v. RIVER VALLEY COUNSELING
8   CENTER, INC. VALLEY HEALTH SYSTEMS, INC, DAVID G.
9   MATTOCKS AND DONNA VIENS and to the best of my
10  knowledge, said transcript is true and accurate
11  with the exception of the corrections listed
12  below:
13  PAGE/LINE/CORRECTION_____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22
23  DEPONENT'S SIGNATURE _____
24  DATE OF SIGNING      _____
```

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

---

22

```
1          I, Debra A. Vance, a Notary Public within
2   and for the Commonwealth of Massachusetts at large,
3   do certify that pursuant to notice, there came
4   before me on January 31, 2006, at the offices of
5   ROBINSON DONOVAN, P.C., 1500 Main Street,
6   Springfield, Massachusetts, 01115, the following
7   person, to wit:  MATTHEW HAAS, who was duly sworn to
8   testify to the truth and nothing but the truth as to
9   his knowledge touching and concerning the matters in
10  controversy in this case; that he was thereupon
11  examined upon his oath and said examination reduced
12  to writing by me; and that the deposition is a true
13  record of the testimony given by the witness, to the
14  best of my knowledge and ability.
15          I further certify that I am not a relative
16  or employee of counsel or attorney for any of the
17  parties, nor a relative or employee of such parties,
18  nor am I financially interested in the outcome of
19  the action.
20      WITNESS MY HAND, this 31st day of January, 2006.
21
22          _____
             Debra A. Vance
23  My Commission Expires:
    April 26, 2007
24
```

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

---

February 16, 2006

MARY J. KENNEDY
BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115

Dear Attorney Kennedy:

            RE:  MARK A. RICHARDS V. RIVER
                 VALLEY COUNSELING CENTER,
                 INC., ET ALS

            The deposition transcript of
MATTHEW HAAS taken January 31, 2006, in the above
captioned case is now ready for signature.

            According to the Massachusetts
Rules of Civil Procedure, the witness has 30 days
to read and sign the deposition transcript.

            If the witness has not read and
signed the original signature page within 30 days
from the above date, it will be deemed signed.

            Please return errata sheet to
Attorney Sikorski.  Thank you in advance for your
cooperation in this matter.

Sincerely,

Debra A. Vance
Stenographer, Notary Public

Accurate Court Reporting                    1500 Main Street, Suite 1412
                                            Springfield, MA 01115
                                            413-747-1806

# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                    )
                   Plaintiff        )
VS.                                  )
                                     )
RIVER VALLEY COUNSELING CENTER,      )
INC., VALLEY HEALTH SYSTEMS, INC.,   )
DAVID G. MATTOCKS AND DONNA VIENS,   )
                   Defendants        )

DEPOSITION OF MARY KELLEHER, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on January 31,

2006, commencing at 1:15 p.m.

APPEARANCES:  (See Page 2)

Debra A. Vance
Notary Public Stenographer

---

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |

Mary Kelleher *4

*  By Mr. Sikorski

EXHIBITS:                                    PAGE:

Exhibit 1, subpoena........................25

---

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
       BY:   JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
       BY:   MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
       BY:   MARY LOU FABBO, ESQ.

---

STIPULATIONS

It is agreed by and between the

parties that all objections, except objections as

to the form of the questions, and all motions to

strike unresponsive answers are reserved and may

be raised at the time of trial for the first

time.

It is further agreed by and between

the parties that the sealing and the notification

to all parties of the receipt of the original

deposition transcript is hereby waived.

MARY KELLEHER, Deponent, having

been satisfactorily identified and duly sworn,

deposes and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI:

Q.     Would you please state your name,

spell your last name for the record, and give us

your address please?

A.     My name is Mary E. Kelleher,

K-E-L-L-E-H-E-R, and my home address is 60 Lindor

```
 1    A.   I don't know what you're speaking of.
 2    Q.   Let me back up.
 3         What is your formal title?
 4    A.   Vice president of human resources.
 5    Q.   Are you the top HR person in all the
 6 entities affiliated with Holyoke Hospital?
 7    A.   I am.
 8    Q.   And you have been for quite some
 9 time?
10    A.   Yes.
11    Q.   You're basically Hank Porten's people
12 person, if you want to use the colloquial?
13    MS. KENNEDY:   Objection.
14    THE WITNESS:   Okay.
15    Q.   (By Mr. Sikorski) And as part of your
16 responsibilities as vice president of human
17 resources, do you conduct training and compliance
18 with discrimination and other employment laws for
19 managers of the various programs and entities
20 affiliated with Holyoke Hospital?
21    A.   Do I personally?
22    Q.   First of all, do you personally?
23    A.   No.
24    Q.   Did you arrange to have others do
```

```
 1    A.   Jeff brought -- yes, I did.
 2    Q.   I'm going to show you what was marked
 3 as Exhibit 2 in the 30(b)(6) deposition of
 4 Mr. Kassis. Do you recognize that?
 5    A.   I believe it's a fax cover sheet.
 6    Q.   Is that from you to Jeff Eagle?
 7    A.   It is.
 8    Q.   And in that, did you ask Mr. Eagle
 9 for certain assistance in hiring the executive
10 director of River Valley Counseling Center?
11    A.   No, he wasn't executive director at
12 the time.
13    Q.   Let me rephrase my question.
14         In Exhibit 2, what are you asking
15 Mr. Eagle to do?
16    A.   I'm asking him to conduct a phone
17 interview with an applicant for the position of
18 executive director.
19    Q.   And did he do so?
20    A.   Yes, he did.
21    Q.   And did he report to you?
22    A.   Yes, he did.
23    Q.   And did he give you a report in
24 writing?
```

```
 1 that sort of training?
 2    A.   At times.
 3    Q.   And did you ever encourage or request
 4 that Mr. Mattocks receive such training?
 5    A.   No.
 6    Q.   Are you aware of whether Mr. Mattocks
 7 ever received any training in compliance with the
 8 discrimination laws?
 9    A.   I don't know that.
10    Q.   Do you know if Mr. Mattocks ever
11 received training in compliance with other
12 employment laws such as the Family Medical Leave
13 Act?
14    A.   I don't know if he did.
15    Q.   Were you involved in hiring
16 Mr. Mattocks?
17    A.   I was.
18    Q.   What was your involvement in hiring
19 Mr. Mattocks?
20    A.   I participated in the recruitment
21 process for the position of executive director,
22 and I participated in the interview process.
23    Q.   And did you ask Mr. Eagle to
24 participate in some way?
```

```
 1    A.   No, just over the phone.
 2    Q.   What did he tell you about
 3 Mr. Mattocks?
 4    A.   He told me that he did not have the
 5 direct community-based mental health background
 6 that the other applicants had. He assessed that
 7 his financial skills were not at the same level
 8 as the other candidates but he felt that he could
 9 do the job.
10    Q.   How did you weigh Mr. Eagle's input?
11    A.   How did I weigh it? I think I wanted
12 validation that he felt that David Mattocks could
13 do the job but that he certainly was not going to
14 be a deciding vote, if you will, in the process.
15 But that if he had come back and said that he
16 didn't feel that he had had the credentials or
17 that he was capable of leading the agency, that
18 would have been something that I would have
19 brought back.
20    Q.   Who had the votes to select
21 Mr. Mattocks?
22    A.   Perhaps my term "vote" isn't the
23 right term. But the people who interviewed all
24 weighed in or gave input into the process.
```