UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.  05-30061-MAP

| | | |
|---|---|---|
| MARK A. RICHARDS, | ) | |
| Plaintiff | ) | |
| | ) | MOTION FOR SUMMARY |
| vs. | ) | JUDGMENT OF DEFENDANTS, |
| | ) | RIVER VALLEY COUNSELING |
| RIVER VALLEY COUNSELING | ) | CENTER, INC., VALLEY HEALTH |
| CENTER, INC., VALLEY HEALTH | ) | SYSTEMS, INC., AND DONNA VIENS |
| SYSTEMS, INC., DAVID G. | ) | |
| MATTOCKS AND DONNA VIENS, | ) | |
| Defendants | ) | |

The defendants, River Valley Counseling Center, Inc. ("RVCC"), Valley Health

Systems, Inc. ("VHS"), and Donna Viens ("Ms. Viens"), pursuant to Federal Rule of

Civil Procedure 56(b), move for summary judgment as to all remaining claims brought by

the Plaintiff, Mark A. Richards ("Plaintiff").  The grounds for this motion are that there is

no genuine issue as to any material fact and that RVCC, VHS and Ms. Viens are entitled

to summary judgment as a matter of law.

In his amended complaint, Plaintiff alleges that RVCC, VHS and Ms. Viens

terminated his employment because of his use of intermittent Family and Medical Leave

Act ("FMLA") leave (Count I), terminated his employment because of his association

with his daughter who has a disability under the Americans With Disabilities Act

("ADA") (Counts II and III), and terminated his employment because of his age under

the Age Discrimination in Employment Act; ("AEDA") (Count IV) and under Chapter

151B (Count V).  Plaintiff has voluntarily stipulated to the dismissal of a portion of

Counts II and III (handicap discrimination).

RVCC, VHS and Ms. Viens have moved for summary judgment on all remaining counts in the amended complaint on the following grounds:

- As to the claim of violation of FMLA (Count I) against RVCC, VHS and Ms. Viens, Plaintiff cannot prove a prima facie case of discrimination or that his termination of employment was because of his use of intermittent FMLA leave.

- As to the claim of violation of FMLA (Count I) against VHS and Ms. Viens, Plaintiff cannot prove that they are employers within the meaning of FMLA.

- As to the claim of handicap association discrimination under the ADA (Count II) against RVCC, VHS and Ms. Viens, Plaintiff cannot make out a prima facie case of discrimination or that his termination of employment was because of his daughter's disability.

- As to the claim of handicap association discrimination under the ADA (Count II) and the claim of age discrimination under the ADEA (Count V), Plaintiff's claims against VHS and Ms. Viens fail as a matter of law because under the ADA and ADEA there is no individual liability.

- As to the claim of handicap association discrimination under the Chapter 151B (Count III) against RVCC, VHS and Ms. Viens, Plaintiff's claims fail to state a recognized cause of action under state law.

- As to the claim of age discrimination under ADEA and Chapter 151B (Counts IV and V) against RVCC, VHS and Ms. Viens, Plaintiff cannot show that he was terminated because of his age.

- As to the claim of aiding and abetting under Chapter 151B (Count V), any action or inaction by VHS or Ms. Viens did not constitute aiding and abetting.

In support of their Motion for Summary Judgment, RVCC, VHS and Ms. Viens rely on the following materials:

1.    Statement of Material Facts Not in Dispute of Defendants, River Valley Counseling Center, Inc., Valley Health Systems, Inc., and Donna Viens, filed herewith.

2.    The following Exhibits attached hereto:

Exhibit A –    Relevant portions of the deposition of Mark A. Richards, and relevant exhibits thereto;

Exhibit B –    Relevant portions of the deposition of David Avakian;

Exhibit C –    Relevant portions of the deposition of David Mattocks;

Exhibit D –    Relevant portions of the deposition of Hank Porten, Individually;

Exhibit E –    Relevant portions of the deposition of Hank Porten as 30(b)(6) representative of VHS;

Exhibit F –    Relevant portions of the deposition of Matthew Haas as 30(b)(6) representative of RVCC;

Exhibit G –    Relevant portions of the deposition of Donna Viens;

Exhibit H –    Relevant portions of the deposition of Mary Kelleher;

Exhibit I –    Excerpts of Defendant, David G. Mattocks' Answers to Interrogatories Propounded by the Plaintiff;

Exhibit J –    Relevant portions of the deposition of Jeffrey Kassis.

3.     Memorandum of Law in Support of Motion for Summary Judgment of

Defendants, River Valley Counseling Center, Inc., Valley Health Systems, Inc., and

Donna Viens, filed herewith.

                                        The Defendants
                                        RIVER VALLEY COUNSELING CENTER, INC.,
                                        VALLEY HEALTH SYSTEMS, INC.,
                                        AND DONNA VIENS
                                        By Their Attorney:


Dated:  May 12, 2006                    _____/s/ Mary J. Kennedy_____
                                        Francis D. Dibble, Jr.
                                        BBO No. 123220
                                        Mary J. Kennedy
                                        BBO No. 552345
                                        Bulkley, Richardson and Gelinas, LLP
                                        1500 Main Street, Suite 2700
                                        Springfield, MA 01115-5507
                                        Tel:    (413) 272-6242
                                        Fax:    (413) 272-6803

<u>Certificate of Compliance With Local Rule 7.1</u>

    Pursuant to Local Rule 7.1(A)(2), I hereby certify that on April 28, 2006, I
conferred with counsel for plaintiff by telephone and attempted in good faith to resolve or
narrow the issues presented in this motion.


                                /s/ Mary J. Kennedy_____
                                Mary J. Kennedy


<u>Certificate of Service</u>

    I hereby certify that a true copy of the above document was served upon the
attorney of record for each party, by electronic filing, on May 12, 2006.

                                /s/ Mary J. Kennedy_____
                                Mary J. Kennedy

# EXHIBIT A
# Part 1 of 3



Page 1

1   VOLUME 1         PAGES 1 - 136
2                 EXHS. 1 - 18
3     UNITED STATES DISTRICT COURT
4    FOR THE DISTRICT OF MASSACHUSETTS
5   * * * * * * * * * * * * * * * * * * *
6   Mark A. Richards       *
7   v.           * Civil Action
8   River Valley Counseling Center,  * No. 05-30061
9   Inc., Valley Health Systems, Inc.,  *   MAP
10  David G. Mattocks, and Donna Viens *
11  * * * * * * * * * * * * * * * * * * *
12
13
14      Deposition of Mark A. Richards
15      Thursday, February 2, 2006
16    Bulkley Richardson and Gelinas, LLP
17     1500 Main Street - Suite 2700
18     Springfield, Massachusetts 01115
19
20
21  -------- J. EDWARD VARALLO, RMR, CRR --------
22        COURT REPORTER
23  PERLIK and COYLE REPORTING, SPRINGFIELD, MASS.
24         413.731.7931

Page 2

1
2  Counsel for Plaintiff:
3    John C. Sikorski, Esq.
    Robinson Donovan, P.C.
     1500 Main Street - Suite 1600
4     Springfield, Massachusetts 01115
     413.732.2301  Fax 413.785.4658
5     jsikorski@robinson-donovan.com
6
7  Counsel for Defendants River Valley Counseling
   Center, Inc., Valley Health Systems, Inc., and
8  Donna Viens:
    Mary J. Kennedy, Esq.
9    Bulkley Richardson and Gelinas, LLP
     1500 Main Street - Suite 2700
10    Springfield, Massachusetts 01115-15507
    413.781.2820  Fax 413.785.5060
11    mkennedy@bulkley.com
12
13  Counsel for Defendant David G. Mattocks:
    Marylou Varao Fabbo, Esq.
14    Skoler Abbott & Presser, P.C.
    One Monarch Place
15    1414 Main Street - Suite 2000
    Springfield, Massachusetts 01144
16    413.737.4753  Fax 413.787.1941
    mfabbo@skoler-abbott.com
17
18
19
20
21
22
23
24

Page 3

1 ---------------------------------------------------
2        MORNING SESSION
3         10:12 a.m.
4 ---------------------------------------------------
5       MARK A. RICHARDS,
6   having been first duly sworn on oath,
7   was examined and testified as follows:
8        EXAMINATION
9  BY MS. KENNEDY:
10   Q.  Could you please state your full name for
11 the record.
12   A.  Mark, M-a-r-k, Richards, R-i-c-h-a-r-d-s.
13   Q.  Mr. Richards, my name, as you know, is
14 Mary Kennedy and I represent the defendants River
15 Valley Counseling Center, Inc., Valley Health
16 Systems, Inc. and Donna Viens. I'm going to be
17 asking you some questions today about your
18 employment at River Valley Counseling Center; and if
19 at any time you don't understand my question, please
20 let me know and I would be happy to rephrase the
21 question.
22   A.  Mm-hmm.
23   Q.  Also if at any time you would like to take
24 a break for any reason, to get something to drink,

Page 4

1 to use the restroom or to confer with your counsel,
2 just let us know and we can accommodate you there as
3 well.
4   A.  ( Witness nodded.)
5      MR. SIKORSKI: You have to answer yes or
6 no.
7   A.  Yes.
8   Q.  And that moves right to the next
9 suggestion, which is that since we have a
10 stenographer here, you need to let me complete my
11 question before you attempt to answer the question
12 so that the stenographer can accurately take down my
13 question and then your answer to the question.
14   A.  All right.
15   Q.  And the second suggestion is that you need
16 to respond verbally to the questions because the
17 stenographer cannot take down a shake or nod of the
18 head. Do you understand that?
19   A.  Yes.
20   Q.  Okay, great. Where do you live,
21 Mr. Richards?
22   A.  19 Lyman Road, Chester, Massachusetts.
23   Q.  And with whom do you live there?
24   A.  With my wife and periodically with my

Page 5

1  daughter.  She's away at college during the school
2  year mostly.
3    Q.    What college is she attending?
4    A.    Westfield State College.
5    Q.    And what year is she in at Westfield State
6  College?
7    A.    Freshman.
8    Q.    And what is your date of birth?
9    A.    July 6, 1950.
10    Q.    And your Social Security number?
11    A.    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.
12    Q.    And I take it you're married?
13    A.    Yes.
14    Q.    And to whom are you married?
15    A.    To Karen Richards.
16    Q.    And how long have you been married to
17  Karen?
18    A.    Thirty-two years.
19        MS. KENNEDY:  Just for the record now, I'm
20  going to mark the protective order.
21        ( Richards Deposition Exhibit 1 marked for
22  identification.)
23  BY MS. KENNEDY:
24    Q.    Mr. Richards, I'm just going to show you

Page 6

1  what's been marked as Exhibit 1.  I can represent to
2  you that that's a copy of the protective order
3  entered into in this case.
4    A.    Yes, this concerns the confidential nature
5  of the case.
6    Q.    Yes, thank you.
7        Can you tell us a little bit about your
8  background, where you were born and raised?
9    A.    I was born in Syracuse, New York, raised
10  in Syracuse, attended schools there, including
11  undergraduate school at Syracuse University.
12    Q.    When did you attend Syracuse University?
13    A.    I attended the beginning of my junior
14  year, 1971, and graduated 1973.
15    Q.    What did you receive when you graduated in
16  1973?
17    A.    A dual B.A. degree in journalism and
18  history.
19    Q.    Where did you attend your freshman and
20  sophomore years of college?
21    A.    Onondaga Community College in Syracuse.
22    Q.    Could you spell the name of the college,
23  please?
24    A.    O-n-o-n-d-a-g-a.

Page 7

1    Q.    And could you say that again?
2    A.    Onondaga.
3    Q.    Thank you.
4        And where is that college located?
5    A.    In Syracuse.
6        MR. SIKORSKI:  That's the county too,
7  Onondaga?
8        THE WITNESS:  That's the county, yes.
9  That's the county that Syracuse is located in.
10  BY MS. KENNEDY:
11    Q.    Have you continued on with your education
12  at any time after receiving your dual degree back in
13  1973?
14    A.    Yes, I have.
15    Q.    And where did you attend?
16    A.    I went to the University of Connecticut
17  School of Social Work in West Hartford, Connecticut.
18    Q.    What years did you attend the University
19  of Connecticut School of Social Work?
20    A.    I started around 1983, perhaps late 1982,
21  going part time and I finished up in 1986.
22    Q.    And what degree did you receive when you
23  completed that program?
24    A.    Master of social work.

Page 8

1    Q.    Do you hold a license as a social worker?
2    A.    Yes, I do.
3    Q.    And from what states do you hold a
4  license?
5    A.    Massachusetts.
6    Q.    How long have you held a license as a
7  social worker?
8    A.    I'd have to look that up, but it was
9  around the late '80s that I got my license.  Well, I
10  originally was licensed as an LCSW, a licensed
11  certified social worker, and I held that from about
12  1987.  And about two years after that I obtained my
13  licensed independent clinical social worker license,
14  which I continue to hold.
15    Q.    Can you explain the difference between an
16  LCSW and an LISW?
17    A.    LCSW means you have graduated from your
18  social work program and have accomplished two years
19  of internship but are not qualified for your LICSW
20  until you have two years' postgraduate experience
21  under proper supervision and have successfully
22  completed the licensing exam.
23    Q.    Is there a separate exam for an LCSW?
24    A.    Yes, there is.

Mark A. Richards

Page 17

1  were out of work between leaving the Key Program and
2  going to the Johnson Life Center?
3     A.  No.
4     Q.  And what did you do for the Johnson Life
5  Center?
6     A.  I worked in the day treatment program
7  there, at first as the clinical director and then
8  later as the program director.
9     Q.  And how long did you work at the Johnson
10  Life Center?
11     A.  The Johnson Life Center day treatment
12  program became Crossroads and I would have to check
13  but it was about the late '80s that that happened to
14  early '90s.
15     Q.  I'll put your resume that's been marked as
16  Exhibit 2 back in front of you.  Perhaps that can
17  assist you as to how long you were at the Johnson
18  Life Center day treatment program.
19     A.  Well, this doesn't mention -- This resume
20  doesn't mention the Johnson Life Center.
21     Q.  Perhaps on the second page?
22     A.  Okay, I'm sorry.  (Pause)  Well, '88 to
23  June '89 I was the clinical director.  It was after
24  '89 that the Johnson Life Center became Crossroads

Page 18

1  Community Growth Center.
2     Q.  Where was the Johnson Life Center day
3  treatment program located?
4     A.  It was on State Street in Springfield.
5     Q.  And just so I understand your testimony,
6  at some point the Johnson Life Center day treatment
7  program became part of another agency?
8     A.  Yes, it did.
9     Q.  And was that agency called Crossroads
10  Community Growth Center?
11     A.  Yes.
12     Q.  And did the name of the day treatment
13  program or the center change from Johnson Life
14  Center's day treatment program to something else?
15     A.  Yes, it was changed to Highland Center.
16     Q.  And it still remained located at what
17  location in Springfield?
18     A.  At the same location on State Street.
19     Q.  And what position did you hold at the
20  Highland Day Treatment Center?
21     A.  I was the director of the program.
22     Q.  And what was the program that you were the
23  director of?
24     A.  It was the psychiatric day treatment and

Page 19

1  outpatient counseling services.  There was a
2  medication clinic and we had partial
3  hospitalization.
4     Q.  Could you explain what partial
5  hospitalization is?
6     A.  Partial hospitalization is a program for
7  adults, in this case, who have a serious mental
8  illness, are at risk of going in the hospital or
9  have been in the hospital for a psychiatric illness
10  and are in this program to prevent them from going
11  into the hospital.
12     Q.  And how long were you the director of the
13  Highland day treatment program?
14     A.  That program closed in about 1997, I
15  believe.
16     Q.  Was the program still with Crossroads
17  Community Growth Center?
18     A.  No, because Crossroads Community Growth
19  Center became River Valley Counseling Center.
20     Q.  Do you recall when Crossroads Community
21  Growth Center became River Valley Counseling Center?
22     A.  I don't recall the exact date.  It was in
23  the early '90s, I believe.
24     Q.  You may have answered this question; I

Page 20

1  apologize.  But at some point did you stop being the
2  director of the Highland day treatment program?
3     A.  No.  I remained in the position through
4  the transition to the River Valley Counseling
5  Center.
6     Q.  And River Valley Counseling Center, Inc.
7  then became your employer at some point in the early
8  '90s?
9     A.  Yes.
10     Q.  And at that point in time you were still
11  the director of the Highland day treatment program.
12  Is that correct?
13     A.  That's correct.
14     Q.  Okay.  At some point did your position
15  change at River Valley Counseling Center?
16     A.  Yes.  I was asked to take over the
17  director's position of the Crossroads day treatment
18  program, which was at the time with River Valley
19  Counseling Center.
20     Q.  And where was that day treatment program
21  located?
22     A.  That was on Elm Street in Holyoke.
23     Q.  Had that been an existing day treatment
24  program at Holyoke?

Page 21

1    A.    Yes.
2    Q.    And was there a prior program director
3    before you?
4    A.    Yes.
5    Q.    Who was that?
6    A.    That was Phyllis Boothroyd.
7    Q.    And what happened to Phyllis Boothroyd
8    when you took over the position as director of the
9    day treatment program?
10    A.    Her position was eliminated and I took
11    over her position.
12    Q.    Did her employment end with River Valley?
13    A.    Yes.
14    Q.    Do you recall what year it was that you
15    took over as the director of the day treatment
16    program in Holyoke?
17    A.    I believe it was 1998.
18    Q.    Did you have at that time any
19    understanding as to why -- Strike that.  What
20    happened to the Highland day treatment program?
21    A.    It continued for a year.
22    Q.    And then what happened after a year?
23    A.    It was closed.
24    Q.    When you --

Page 22

1    A.    Well, River Valley closed it for their
2    agency but it continued under another organization.
3    Q.    So at some point River Valley Counseling
4    Center, Inc. stopped having the day treatment
5    program in Springfield?
6    A.    Yes.
7    Q.    And what organization then took that day
8    treatment program over?
9    A.    That was the Center for Human Development.
10    Q.    And is that an entity that is unrelated to
11    River Valley Counseling Center?
12    A.    Yes.
13    Q.    And when you moved over from the director
14    of the Highland day treatment program to the
15    director of the day treatment program at Holyoke,
16    had the decision been made about River Valley no
17    longer operating that program in the upcoming year?
18    A.    No.
19    Q.    Why was it that you moved at that point,
20    in approximately 1988, from the Springfield day
21    treatment program to the Holyoke day treatment
22    program?
23    A.    River Valley was having financial
24    difficulties; it wasn't clear whether they would be

Page 23

1    able to survive the financial difficulties and they
2    were looking for ways to cut their costs in order to
3    survive.
4    Q.    Did River Valley Counseling Center have
5    financial difficulties prior to 1998 while you were
6    employed at River Valley?  That's a terrible
7    question.  Strike that.
8        You testified a few moments ago that you
9    started working for River Valley in the early '90s.
10    Is that correct?
11    A.    Yes.
12    Q.    And then I believe you just testified that
13    you believe you moved from the director of the
14    Springfield day treatment program in approximately
15    1998, from Springfield to Holyoke.  Is that correct?
16    A.    No, '97 I moved.
17    Q.    Pardon me.
18    A.    So I was directing both programs for a
19    year.
20    Q.    Using that time frame now of the early
21    '90s up until approximately 1997, what was your
22    understanding about River Valley having any
23    financial difficulties during that time?
24    A.    River Valley had gone through many periods

Page 24

1    of financial difficulties; there were several, some
2    more severe than other times.  I remember my own
3    program was always doing very well, always making a
4    profit, and most of that time I remember that River
5    Valley was doing well financially through those
6    years up till '97.
7    Q.    When were the financial difficulties that
8    you recall that River Valley had, what years?  You
9    said they had them at various times, some more
10    severe than others.  Can you tell us with more
11    specifics as to the years when your memory is of the
12    financial problems of River Valley?
13    A.    That time that I took over the program at
14    Crossroads in Holyoke, about 1998, that was a very
15    difficult time financially for the agency.
16    Q.    Any other periods of time during your
17    years of employment at River Valley that you had an
18    understanding that River Valley had financial
19    difficulties?
20    A.    From that time on it was fairly regular,
21    up until about the early 2000s.
22    Q.    So for a period of time you were the
23    director of both the Springfield and the Holyoke day
24    treatment programs.  Is that correct?

Page 25

1    A.   Yes, for about a year.
2    Q.   And was that in 1998 or 1997?
3    A.   It would have started -- I believe it was
4   up till 1997.  I think 1997 was when the program in
5   Springfield closed.
6    Q.   Just so I understand your testimony, it
7   was in 1996 approximately --
8    A.   Yes.
9    Q.   -- you were the director of both programs,
10  Springfield and Holyoke?
11   A.   Yes, should have been about 1996, yes.
12   Q.   What was your understanding, if you had
13  one, why you were the director of both of those day
14  treatment programs?
15   A.   Because there would be a cost savings by
16  eliminating the redundancy of having two program
17  directors in the agency for day treatment and that
18  under the regulations they could have one director
19  to manage both programs.
20   Q.   What regulations are you referring to?
21   A.   Commonwealth of Massachusetts Medicaid
22  regulations.
23   Q.   And then, if I understand your testimony
24  correctly, sometime around 1997 you became the

Page 26

1   director of just the Holyoke day treatment program?
2    A.   Yes.
3    Q.   And that was located on Elm Street?
4    A.   Yes.
5    Q.   How long did you hold that position?
6    A.   Until November 2004.
7    Q.   Just focusing on the late '90s,
8   approximately 1997, do you recall who the executive
9   director or the CEO of River Valley Counseling
10  Center was?
11   A.   Jim Siemianowski.
12   Q.   How long was Mr. Siemianowski, if I've
13  pronounced that correctly, the CEO or executive
14  director of River Valley?
15   A.   Several years.
16   Q.   And then who became the next, if you could
17  just move me up until 2004, who was the next CEO or
18  executive director after Mr. Siemianowski?
19   A.   I believe it was Joyce Toth.
20   Q.   And do you recall how long Ms. Toth -- Do
21  you know how to spell her last name?
22   A.   T-o-t-h.
23   Q.   Do you know how long Ms. Toth was the CEO
24  or executive director?

Page 27

1    A.   For I believe about a year.
2    Q.   And after her, who was the next CEO or
3   executive director?
4    A.   Probably less than a year for Joyce Toth.
5   There was a group of consultants that came in and
6   one of the consultants acted as the executive
7   director from HES.
8    Q.   What does HES stand for?
9    A.   Health Enhancement Services, I believe.
10   Q.   And do you recall the name of the
11  consultant who was acting as the CEO at that time?
12   A.   Dale Harkness.
13   Q.   And after Mr. Harkness, who was next?
14   A.   It would have been Andy Phillips.
15   Q.   And do you know how long Mr. Phillips was
16  the CEO?
17   A.   For several years.
18   Q.   And after Mr. Phillips, who was the next
19  CEO or executive director?
20   A.   There was an acting director, Mary Ann
21  Palmetier; P-o-l-m-i-t-i-e-r, although I think
22  that's wrong.
23   Q.   Can't help you with that one.  And how
24  long was Ms. Palmetier the acting director?

Page 28

1    A.   She was there until Mr. Mattocks began.
2    Q.   When did Mr. Mattocks become the executive
3   director or CEO?
4    A.   In the spring of '04.  Or, he was around,
5   becoming familiar with the place, meeting people.
6   I'm not sure the exact time that he became the
7   official director.  Probably late spring or summer.
8    Q.   When you were director of the day
9   treatment program in Holyoke, who was your immediate
10  supervisor?
11   A.   Well, I had different ones.  When I first
12  became the director it was Jeff Kassis.  That's when
13  the State Street program in Springfield went under
14  the Crossroads organization.
15   Q.   And then at some point Mr. Kassis no
16  longer was your supervisor?
17   A.   Yes.  About a year or two after that when
18  the organization became part of River Valley
19  Counseling I reported directly to the CEO of River
20  Valley, who was John -- it'll come to me.
21   Q.   And I understand that the CEO changed
22  throughout the years while you were the director of
23  the day treatment program, as you've just testified
24  to.

Mark A. Richards

# CONFIDENTIAL

## Pages Supplied to Court and All Counsel

# CONFIDENTIAL

## Pages Supplied to Court and All Counsel

Mark A. Richards

# CONFIDENTIAL

## Pages Supplied to Court and All Counsel

16 (Pages 71 to 74)
Mark A. Richards                                                          February 2, 2006

Page 71

1   next exhibit.
2       ( Richards Deposition Exhibit 9 marked for
3   identification.)
4   BY MS. KENNEDY:
5       Q.   I've put another document which is marked
6   as Exhibit 9 in front of you.  Can you identify
7   that, please?
8       A.   It's the United States District Court for
9   the District of Massachusetts, Mark Richards,
10  plaintiff, versus River Valley Counseling Center,
11  Valley Health Systems, David G. Mattocks and Donna
12  Viens, the plaintiff's answer to defendant River
13  Valley Counseling Center's interrogatories.
14      Q.   Excuse me for reaching, Mr. Richards.  Is
15  that your signature on the ninth page of this
16  document?  A copy of your signature.
17      A.   Yes.
18      Q.   And that is signed on the 16th day of
19  October of 2005?
20      A.   Yes.
21      Q.   On page 6 of your answers to
22  interrogatories of River Valley Counseling Center,
23  I'm going to read upside down so please bear with
24  me --

Page 72

1       MR. SIKORSKI:  I have a copy here for him.
2       MS. KENNEDY:  Okay.
3       MR. SIKORSKI:  What page are we on?
4       MS. KENNEDY:  Page 6.
5   BY MS. KENNEDY:
6       Q.   In the second paragraph it refers to a new
7   early-morning meeting every day.
8       A.   Yes, I see that.
9       Q.   When was it that you had to attend a new
10  early-morning meeting every day?
11      A.   Mr. Mattocks asked me if I could attend
12  that in September, I believe.
13      Q.   What meeting was he referring to?
14      A.   He was referring to the executive team
15  meeting that met with a small group of managers
16  from the agency, an existing meeting.
17      Q.   And what's your understanding of who were
18  members of the executive team?
19      A.   In that meeting I would have been Brian
20  Duke, Mary Ann Palmetier, Jeff Kassis, Sean Munster
21  I believe was in that, and Mr. Mattocks.
22      Q.   Was Donna Viens part of this executive
23  team?
24      A.   I believe she was.

Page 73

1       Q.   And in your answers to interrogatories it
2   was in September that David Mattocks asked you to
3   attend a new early-morning meeting every day?
4       A.   That meeting didn't happen every day; it
5   would happen most days of the week.
6       Q.   So it's your understanding that the
7   executive team met at River Valley more than one day
8   a week?
9       A.   Yes.
10      Q.   And you said most days?
11      A.   I believe it was about three days a week
12  at one point, yes.
13      Q.   And just so I understand your testimony,
14  David Mattocks asked you in September to attend
15  those executive team meetings?
16      MR. SIKORSKI:  Objection.  You can go
17  ahead and answer.
18      A.   It was sometime, I believe sometime in
19  September.
20      Q.   Prior to September had you gone to the
21  executive team meetings?
22      A.   I went to -- Well, the names of the
23  meetings can be confusing because the meetings
24  didn't seem to have a standard name.  There were two

Page 74

1   of them that managers would go to.  One was a large
2   group meeting, one was a small group meeting.  I
3   went to the large group meeting.  I believe the
4   executive team might have been interchangeably used
5   for both of those meetings.
6       Q.   Okay.  How often did the large group
7   meeting meet in the fall of 2004?
8       A.   That met every other week as a rule.
9       Q.   And is it your understanding that there
10  was a smaller group meeting?
11      A.   Yes.
12      Q.   And did you ever attend that smaller group
13  meeting?
14      A.   I believe I might have attended it once or
15  twice for some kind of a special occasion or topic.
16      Q.   And that's a smaller group of managers at
17  River Valley Counseling Center?
18      A.   Yes.
19      Q.   Did David Mattocks in the fall of 2004 ask
20  you to attend that smaller group meeting of
21  managers?
22      A.   Yes.
23      Q.   And is that the meeting that you're
24  referring to on page 6 of your answers to

Mark A. Richards



Page 75

1    interrogatories?
2        A.    Yes, it is.
3        Q.    And what did you tell him when he asked
4    you to attend that smaller group meeting of
5    managers?
6        A.    Well, I told him that I had another
7    meeting that was happening at that time or that
8    would have overlapped with that, and that's a daily
9    meeting that I had at my own program.  I mentioned
10    that sometimes it might be difficult for me to
11    attend due to my personal circumstances, but mostly
12    I focused on asking him how I would be able to
13    contribute to that meeting, what the goals of that
14    meeting were compared to the goals of the other
15    meeting, what kind of role I would play in the
16    smaller group meeting, the more frequent meeting.
17        Q.    I'm sorry.  Are you done with your answer?
18        A.    Yes.
19        Q.    Okay.  Did you tell Mr. Mattocks what
20    personal circumstances -- Strike that.  You just in
21    your answer referred to personal circumstances that
22    made it difficult for you to attend the meeting.  Is
23    that your testimony?
24        A.    Yes.

Page 76

1        Q.    Did you tell Mr. Mattocks what were the
2    personal circumstances?
3        A.    I might have mentioned to him due to my
4    daughter.
5        Q.    Did you say anything more specific other
6    than due to your daughter?
7        A.    I don't remember going into detail.
8        Q.    Going back to the answers to
9    interrogatories, it said attending new early-morning
10    meeting every day.  Now, is that accurate?
11        A.    No, that's not accurate.
12        Q.    But it was more than one day a week.  Is
13    that your testimony?
14        A.    It was most days of the week, yes.
15        Q.    Can you be any more specific than most
16    days of the week?
17        A.    I don't believe it happened on Friday.
18        Q.    And in addition to this group --
19        A.    And also did not happen on the days of the
20    large group meeting.
21        Q.    Okay.  And in addition to this group
22    meeting that you just described, did you also meet
23    one on one with Mr. Mattocks on a regular basis?
24        A.    Yes.

Page 77

1        Q.    Now, in 2004 did you request a family
2    medical leave of absence?
3        A.    Yes.
4        Q.    Why?
5        A.    Because of my daughter's illness and she
6    had recently been, well, was about to be placed on a
7    new treatment.

Page 82

1        MR. SIKORSKI:  Is this a good time to
2    break for lunch?
3        MS. KENNEDY:  Sure.
4        ( Luncheon recess at 12:37 p.m.)
5    -------------------------------------------------
6        AFTERNOON SESSION
7        1:38 p.m.
8    -------------------------------------------------
9    BY MS. KENNEDY:
10        Q.    Mr. Richards, during the break did you
11    have an opportunity to look at the original
12    calendar, a portion of which has been marked as
13    Exhibit 7?
14        A.    Yes.
15        MS. KENNEDY:  And, Attorney Sikorski, are
16    portions of the copy that has been produced in this
17    case blacked out?
18        MR. SIKORSKI:  That was blacked out by
19    persons in our office in order to protect the
20    identity of patients or clients of the organization.
21        MS. KENNEDY:  Okay, thank you.
22    BY MS. KENNEDY:
23        Q.    And, Mr. Richards, before the break I
24    believe you volunteered to look at the original to

Mark A. Richards

# CONFIDENTIAL

## Pages Supplied to Court and All Counsel

Mark A. Richards

Page 87

1  leave other than what you just testified to?
2      A.  No, just making reference to the
3  paperwork.
4      Q.  And did you fill out the paperwork that
5  was requested?
6      A.  Yes, I did.
7          MS. KENNEDY:  Off the record a moment.
8          ( Discussion off the record.)
9          ( Richards Deposition Exhibit 12 marked for
10  identification.)
11         MS. KENNEDY:  We're back on the record.
12         Just to clarify, earlier we had marked as
13  Exhibit Number 1 the protective order that has been
14  entered in this case.  My reading of the protective
15  order entered by Magistrate Neiman is that it
16  related to keeping confidential documents that were
17  produced by River Valley, Valley Health Systems,
18  David Mattocks, Donna Viens, or H-C Management
19  Services, Inc. and does not go to addressing any
20  confidentiality of documents produced on behalf of
21  the plaintiff.
22         So that what we have marked as
23  confidential for the purposes of this deposition, I
24  just want to clarify on behalf of my defendants that

Page 88

1  I represent wouldn't be subject to the protective
2  order but that we will maintain the confidentiality
3  of that private medical information that was
4  disclosed during that testimony, and that there will
5  be a second exhibit that is stamped confidential
6  that it's my understanding would not technically be
7  subject to this protective order but we will
8  maintain it as a confidential document in this case.
9          Any objections?
10         MS. FABBO:  I'll agree to that on behalf
11  of Defendant Mattocks as well.
12         MR. SIKORSKI:  That's fine.
13         MS. KENNEDY:  So we'll mark this as the
14  next exhibit.
15         ( Richards Deposition Exhibit 13 marked for
16  identification.)
17  BY MS. KENNEDY:
18     Q.  Mr. Richards, I am going to put in front
19  of you what's been marked as Exhibits 12 and 13 in
20  this case.  And are those copies of the forms that
21  you filled out in regard to your leave of absence
22  request under the Family Medical Leave?
23     A.  Yes.
24     Q.  And actually you didn't fill out all of

Page 89

1  them.  Did your daughter's physician fill out what's
2  been marked as Exhibit 13?
3      A.  This is from the physician and what he
4  told me to write down.
5      Q.  Is that your handwriting on the form that
6  has been marked as Exhibit 13?
7      A.  Some of it is.
8      Q.  And where is the physician's handwriting?
9  Strike that.  Is part of the handwriting the
10  physician's?
11     A.  Yes.
12     Q.  And where is that?
13     A.  That's here on the second page under C and
14  on the third page under B and I think C too also.
15  That's a signature and I don't know whose writing
16  that is underneath the signature.
17     Q.  Which physician filled out the U.S.
18  Department of Labor form that is what's been marked
19  as Exhibit 13?
20     A.  This is Dr. Arthur Blake.
21         ( Richards Deposition Exhibit 14 marked for
22  identification.)
23  BY MS. KENNEDY:
24     Q.  I've put in front of you what's been

Page 90

1  marked as Exhibit 14, ask if you can identify that,
2  please.
3      A.  It's a memo from Donna Viens to me dated
4  September 17, 2004, and it's the approval for my
5  intermittent leave.
6      Q.  I am just going to bring to your attention
7  the third paragraph, if you could read that for the
8  record, please.
9      A.  "It is crucial to your continued
10  eligibility for this leave status to notify David
11  Mattocks of your need to be away from work for FMLA
12  needs at least 24 hours in advance," and that's
13  underlined, "when foreseeable.  In the event that
14  the time away is not foreseeable, please notify him
15  of your absence as soon as possible.  Failure to
16  keep David informed of your absence may result in
17  revoking of the leave or disciplinary action."
18     Q.  Did you keep Mr. Mattocks informed of the
19  times that you were taking a leave of absence under
20  the Family Medical Leave Act?
21     A.  In general I did and on specific occasions
22  I did.
23     Q.  What do you mean by in general you did?
24     A.  In our meetings when I'd speak with him,

Page 91

1    he would frequently ask me how my daughter was doing
2    and I would give him an update.  And -- Well, I
3    would give him the updates.
4        Q.    Did you tell him in your meetings which
5    days or hours you were out on intermittent leave?
6        A.    I didn't give him every appointment and
7    every time I was out.  I would give that to my
8    supervisor in the program who was affected by my
9    being out and the staff in that program.
10       Q.    When you say you gave it to the
11   supervisor, who was that?
12       A.    David Avakian.
13       Q.    Just so I understand your testimony,
14   Mr. Richards, when you were out to care for your
15   daughter on intermittent leave, did you tell David
16   Avakian that that time you were out was for FMLA
17   leave?
18       MR. SIKORSKI:  Objection.  Go ahead and
19   answer.
20       A.    I told him it was for my daughter and what
21   the appointment was about and he was already aware
22   that I was out on family medical leave.
23       Q.    Was that for the times when there was a
24   scheduled doctor's appointment?

Page 92

1        A.    That was for the times -- Oftentimes it
2    was for times that I wasn't aware I wasn't going to
3    be in, so I would call him just before I was
4    supposed to be there, a day I was supposed to be
5    there.  But he was also aware of when I was going to
6    be out for doctor's appointments if I was scheduled
7    to be there.
8        Q.    I am going to put back in front of you
9    what's been marked as Exhibit 8.  I can represent to
10   you that these are your time sheets for pay periods
11   ending July 11, '04, through October 31, '04.
12   Please look at them and then let me know if any of
13   the time sheets indicate when you used intermittent
14   FMLA leave?
15       A.    There's nothing specifically about
16   intermittent family leave on the time sheets.  There
17   are indications of my coming in late in the day, and
18   that would be usually because of my being out with
19   my daughter.  There were also times of personal
20   leave.
21       Q.    Just so I understand your testimony, when
22   you say there's times that indicated that you were
23   late, did you mark that as personal time?
24       A.    Not always.  Because of the flexibility in

Page 93

1    my schedule being 34 hours, I was not there the full
2    40 hours that the program ran.
3        Q.    Did you have a set time frame that you
4    were typically in the office at the day treatment
5    program Monday through Friday?
6        A.    I was there by 8:45 because we had a
7    morning meeting in our program at 8:45 that I wanted
8    to be at and would always try to get to; and I would
9    be there until the end of the day, till 5:00 o'clock
10   or later, all days, usually all days.
11       Q.    Was your position as the program director
12   of the day treatment program subject to overtime
13   pay?
14       A.    No.
15       Q.    But your salary was based on an hourly
16   basis?
17       A.    It was broken down into an hourly basis
18   but it was a yearly salary.
19       Q.    And the time sheets that you filled out
20   were just to record the 34 hours a week or was it
21   for the purpose of paying you on an hourly basis?
22       A.    I'm sorry.  Could you repeat that?
23       Q.    Sure.  That was a double question.
24       What was the reason you needed to fill out

Page 94

1    a time sheet?
2        A.    The personnel department required it.  It
3    was a way for the supervisor to check a person's
4    hours, an employee's hours.
5        Q.    Was it to track also your vacation time?
6        A.    There was the function also of, yes,
7    tracking vacation time, holiday time, sick time.
8        Q.    Did you also have personal time?
9        A.    And personal time.
10       Q.    But in the weeks that you worked more than
11   34 hours, you were still considered a salaried
12   employee not subject to any additional pay.  Is that
13   your understanding?
14       A.    That's my understanding.
15       Q.    And these time sheets were submitted by
16   you to whom?
17       A.    They went with the group of time sheets
18   from the program, of all the staff in the program,
19   to the human resource department.
20       Q.    And is there a manager who signed the time
21   sheet?
22       A.    Yes.
23       Q.    And whose signature is that, if you can
24   identify it?

Mark A. Richards

Page 95

1    A.   David Mattocks, I believe.
2    Q.   Is there any written document that you
3  gave Mr. Mattocks or the HR department indicating
4  the hours that you took intermittent FMLA leave?
5    A.   No.
6    Q.   I believe you testified a few minutes ago
7  that sometimes there's some time out of work and
8  that may be for your own personal time.  Is that
9  true?
10   A.   Yes.
11   Q.   So if a time sheet indicates personal
12  time, there was a P?  Is that what you used?
13   A.   It could be P, it could be holiday or it
14  could be vacation, or even sick time if it was
15  related to a sick issue.
16   Q.   And that personal time could have been for
17  your own personal time to take care of things.  Is
18  that correct?
19   A.   It could have been for that, yes.
20   Q.   It could have been for your own doctor's
21  appointments.  Is that true?
22   A.   It could have been.
23   Q.   Or it could have been to care for your
24  daughter?

Page 96

1    A.   It could have been.
2    Q.   Do you have any other children other than
3  your daughter Leigh?
4    A.   No.
5    Q.   And what grade was she in in 2004?
6    A.   She was a senior in high school.
7    Q.   Now, as of the fall of 2004, when do you
8  recall last receiving a raise?
9    A.   It was under Andy Phillips'
10  administration, so a few years before.
11   Q.   Was it your understanding that in 2004
12  there was some discussion about the staff at River
13  Valley receiving raises?
14   A.   Yes, there was.
15   Q.   And what is your understanding of the
16  staff receiving a raise in 2004?
17   A.   That there was to be an across-the-board
18  raise to be determined by Mr. Mattocks and those he
19  consulted with and there was a change at one point
20  where it was going into effect for some but not for
21  the managers.
22   Q.   When did it go into effect, to your
23  knowledge, for the lower level of employees at River
24  Valley?

Page 97

1    A.   I believe it was October.
2    Q.   And what was your understanding of when
3  managers were going to get the across-the-board
4  raise?
5    A.   There wasn't a set time that I understood.
6    Q.   And what was your understanding of what
7  percentage increase that would be?
8    A.   I believe it was 2-1/2 percent.
9    Q.   Did you have any discussions with David
10  Mattocks about the across-the-board increase?
11   A.   Yes.
12   Q.   And when were those discussions?
13   A.   Well, he had spoken to the group in
14  general in the managers meeting, the large meeting,
15  and he had also spoken with me individually.
16   Q.   Which was first, the group or the
17  individual?
18   A.   I'm not sure.
19   Q.   What do you recall being said at the group
20  meeting about the raises?
21   A.   That there was a process of determining
22  how much the raises will be and then there was the
23  announcement that it would be at 2-1/2 percent given
24  to the staff, and then at some point it was

Page 98

1  announced that it would be given to the staff first
2  and then to the managers.  They wanted to go
3  through, make sure that the managers approved each
4  and every individual to get the raise, and that the
5  individuals had merit.  We had a lot of discussion
6  about how much merit the individual needed to have,
7  the employee, before they would receive the raise or
8  be nominated for the raise.
9    Q.   Anything else you recall of those
10  discussions?
11   A.   In general at the large group meetings?
12   Q.   In general at the large group meetings.
13   A.   Well, not at this time, but I haven't
14  thought about that since then.
15   Q.   What about the individual meeting with
16  Mr. Mattocks?  What do you recall of him telling you
17  about the raises?
18   A.   He said that he wanted a list of all my
19  staff and he wanted me to write down that I
20  nominated them for the raise and submit it to him.
21   Q.   Did he talk to you about a raise going to
22  you?
23   A.   He said that he had postponed the raises
24  to the managers and that they would be going into

22 (Pages 99 to 102)
Mark A. Richards                                                    February 2, 2006

Page 99

1  effect at some later time but he had decisions to
2  make first or a process to go through; he wasn't
3  specific about it.
4      Q.    Did he say what decisions he had to make
5  or what process he had to go through?
6      A.    No, he didn't.
7      Q.    Now, who is David Avakian?
8      A.    He is the supervisor that worked in the
9  program I directed, the day treatment program.
10     Q.    How long had you worked with David
11 Avakian?
12     A.    Since I became director in '96.
13     Q.    Was David Avakian a counselor at the Elm
14 Street day treatment program before you arrived as
15 the program director?
16     A.    He was one of the clinicians, yes.
17     Q.    And what was David Avakian's position in
18 the summer of 2004 in the day treatment program?
19     A.    He was the supervisor of the program.
20     Q.    Did you have any discussions with anyone
21 at River Valley Counseling Center regarding changing
22 Mr. Avakian's position in the summer and fall of
23 2004?
24     A.    I spoke with Mr. Mattocks about increasing

Page 100

1  David's salary because he was looking for other
2  employment as a result of higher wages elsewhere,
3  being able to earn higher wages elsewhere, and I
4  advocated for David Avakian to receive a raise in
5  salary.
6      Q.    Above the across-the-board living increase
7  that was due?
8      A.    Oh, yes.  I don't remember whether that
9  had even come up yet, the across-the-board increase.
10     Q.    What were you advocating for a raise for
11 Mr. Avakian at that time?
12     A.    How much money?
13     Q.    Yes.
14     A.    I believe it was in the neighborhood of
15 $4,000, three or four thousand dollars.
16     Q.    And why were you advocating for a raise
17 for Mr. Avakian?
18     A.    Mr. Avakian was a very valuable employee.
19 He'd been at the program for eighteen years.  He had
20 actually lost wealth or amounts of money that he
21 earned at the agency as a result of having to pay a
22 lot more towards his insurance because the agency
23 had changed their policy about how much people with
24 a family plan had to pay.  He was the supervisor and

Page 101

1  the only person who could step in for me, which made
2  him valuable not only as a clinician but also as a
3  leader in the program, and I didn't want to lose
4  him.
5      Q.    What did Mr. Mattocks say when you
6  advocated an increase in Mr. Avakian's salary?
7      A.    He asked me to put down the reasons and to
8  come up with figures to justify it, and I put
9  together figures.  Since the program had made such a
10 tremendous amount of profit, there was plenty of
11 room in the budget for what looked like a nominal
12 increase, and I did that.
13     Q.    You gave him a written document indicating
14 the reasons for increasing David Avakian's salary?
15     A.    I remember writing it out.  I don't know
16 if I gave it to him or had it in front of me in our
17 face-to-face meeting, but it was in an organized way
18 like that.
19     Q.    Do you recall when you had this
20 conversation with David Mattocks?
21     A.    It would have been late summer.
22     Q.    Would it have been at one of those
23 scheduled meetings that you read off from your
24 calendar?

Page 102

1      A.    Probably was.
2      Q.    And you believe it was late summer?
3      A.    I believe so.  The -- Yes, I believe so.
4  It was delayed.
5      Q.    Do you have any written documentation of
6  the reasons for increasing David Avakian's salary?
7      A.    It might have been in an e-mail.  I don't
8  know if I have any documentation still around.
9      Q.    I may have interrupted you and you may
10 have already answered this but I apologize.  What
11 did Mr. Mattocks say other than put it in a
12 document, create a document or give me the reasons
13 why?
14     A.    Right, come up with something and give it
15 to me.
16     Q.    And you did that, I take it?
17     A.    Yes, I did.
18     Q.    And when you presented that to
19 Mr. Mattocks, what do you recall of what he said to
20 you?
21     A.    He said that at first he had not been in
22 favor of an increase in pay but when he heard my
23 reasons and the way I presented them, and a specific
24 part of them, I'm trying to remember what that was,

Mark A. Richards

Page 103

1   that I had sold it to him during the course of our
2   meeting essentially.
3       MR. SIKORSKI: Let's go off the record for
4   a second.
5       ( Discussion off the record.)
6   BY MS. KENNEDY:
7       Q.   Was there any discussion about any other
8   changes in Mr. Avakian's duties or responsibilities
9   or title at that time?
10      A.   Later on Mr. Mattocks called me and gave
11  me the news that he was going to go ahead with the
12  raise and thought that a good way to do it was to
13  also give it to Mr. Avakian with a new title,
14  because Mr. Avakian wanted to take on more
15  leadership responsibility, and he suggested that he
16  be given the raise along with the title of assistant
17  director of the program.
18      Q.   And what did you say in response to that,
19  if anything?
20      A.   Well, I was pleased that he had agreed on
21  the raise and said that the title would be something
22  I would pass along to David Avakian.  He probably
23  would -- It probably would be a way of justifying it
24  to the rest of the staff because it would sound like

Page 104

1   a type of promotion even though I mentioned that I
2   didn't see how his job duties would really change.
3       Q.   Did David Avakian receive any increased
4   job duties after getting the increase in pay and
5   change in title?
6       A.   I don't believe so.
7       ( Richards Deposition Exhibit 15 marked for
8   identification.)
9       A.   There might have been something -- Can I
10  finish?
11      Q.   Sure.  If you would like to add to your
12  answer, please do.
13      A.   Well, I'm trying to remember back; this is
14  the first time I've thought about anything like
15  that.  So, could I return to it if I think of
16  something?
17      Q.   Sure.  In this deposition if you want to
18  add to that answer or any other answer --
19      A.   Or any of my answers, yes, because some of
20  these things, a lot of things I've thought of,
21  but....
22      MR. SIKORSKI:  You will have an
23  opportunity later in the deposition to clarify
24  anything you need to.  Just wait for a question from

Page 105

1   Attorney Kennedy.
2   BY MS. KENNEDY:
3       Q.   Mr. Richards, I am going to put in front
4   of you what has been marked as Exhibit 15, if you
5   could identify what that is a copy of.
6       A.   This is an internal form at River Valley
7   Counseling Center called employee status notice.
8   It's regarding David Avakian and it's the
9   notification going to the human resources department
10  that he is getting a raise in salary to $22.50 per
11  hour and a change in his job title to assistant
12  program director, from supervisor to assistant
13  program director.  And it's signed by me and David
14  Mattocks.
15      Q.   What is the date on that?
16      A.   And dated, well, the date is 9/12 but
17  that's apparently when -- Oh, 9/15 is when I dated
18  it and David Mattocks dated 9/17, I think.
19      Q.   So were the discussions that you just
20  testified to a few moments ago with David Mattocks
21  about requesting an increase in pay, did those all
22  occur before September 15th of 2004?
23      A.   Yes.  Well, I'm trying to remember all the
24  discussions we just talked about, but the ones about

Page 106

1   his getting the increase in pay and so forth, that
2   all happened before that, yes.
3       ( Richards Deposition Exhibit 16 marked for
4   identification.)
5   BY MS. KENNEDY:
6       Q.   I have put in front of you what has now
7   been marked as Exhibit 16, ask if you can please
8   identify what that is a copy of.
9       A.   This is a memo dated September 16, 2004,
10  to David Avakian from David Mattocks and a cc to
11  myself and human resources.  And it is notification
12  that he is being formally offered a promotion to the
13  new position of assistant director of psychiatric
14  day treatment program and it talks about his salary
15  and hours.
16      Q.   Now, is it your understanding that -- You
17  still were Mr. Avakian's supervisor.  Is that
18  correct?  That did not change?
19      A.   That did not change.
20      Q.   Was Mr. Avakian entitled to overtime pay
21  in either his prior position as supervisor or in his
22  assistant director position?
23      A.   I'm not aware of his getting overtime pay,
24  although there's something about overtime pay that

PERLIK and COYLE
413.731.7931

Page 107

1   happened that I was unclear about or I didn't have
2   all the answers to.
3        Q.   Going back again before September 15th,
4   had David Avakian told you that he was looking for a
5   new job or that he actually had a job offer?
6        A.   He first told me he was looking and that's
7   when I approached Mr. Mattocks and he later said
8   that he had the job offer.
9        Q.   And who did he have the job offer from?
10       A.   From the partial hospitalization program
11   at Holyoke Hospital.
12       Q.   And what if anything did you say to David
13   Avakian about that job offer, if anything?
14       A.   Well, I spoke with him about the money
15   that he would be making how much more it
16   was than where he was in the day treatment program,
17   and discussed with him that, you know, I wanted to
18   advocate for his getting more money, and he said
19   that he didn't want to leave the program but that it
20   was a matter of money.
21       MR. SIKORSKI:   Excuse me. I need to take
22   a quick break, if you don't mind.
23       MS. KENNEDY:   Oh, sure.
24       ( In recess 2:30 p.m. to 2:35 p.m.)

Page 108

1   BY MS. KENNEDY:
2        Q.   Other than talking with Mr. Mattocks and
3   Mr. Avakian, did you speak with anyone else about
4   David Avakian's position as assistant director?
5        A.   I told the whole team.
6        Q.   Before the decision was actually made.
7        A.   Oh. I don't remember.
8        Q.   Now, who is Donna Viens?
9        A.   Donna Viens is the human resource director
10   for River Valley.
11       Q.   And when do you recall she started?
12       A.   She started about a month after
13   Mr. Mattocks, so in the late summer/early fall.
14       Q.   And what interactions would you have with
15   Donna Viens?
16       A.   She would come to the meetings, the large
17   group meetings that I was involved in. She would be
18   a person for me to go to to coordinate an ad for a
19   position in the paper. She was a person to contact
20   if there were any kind of problems with paychecks,
21   questions about personnel policy. Kind of the all-
22   around personnel person to go to.
23       Q.   What ads did you go to Donna Viens for to
24   help coordinate?

Page 109

1        A.   A position for a full-time clinician,
2   preferably one that spoke Spanish.
3        Q.   When were you looking for a full-time
4   clinician in 2004?
5        A.   Soon after she came. It was right in that
6   time frame.
7        Q.   And while you were there in 2004, did you
8   fill that position of full-time clinician?
9        A.   No.
10       Q.   How would you describe your working
11   relationship with Donna Viens?
12       A.   Professional. It was -- I found her
13   helpful in advertising for the position. I thought
14   we got along well for the most part.
15       Q.   What do you mean, for the most part?
16       A.   Well, there was one instance in a large
17   group meeting where she kind of snapped at me, I
18   mean snap in terms of kind of spoke in a brusque
19   manner about something that I was repeating,
20   information I received from the Department of Labor
21   one time that she took issue with and made some
22   comments about it. Well, I don't know if I should
23   go into it, but....
24       Q.   Please do.

Page 110

1        A.   Well, it was just something where I had
2   mentioned that I was told by the Department of Labor
3   that employees were eligible for a break within a
4   four-hour period and she came back and said no,
5   that's not accurate, something to that effect. And
6   I just said, well, I heard it from this person I
7   spoke with at the Department of Labor who I had
8   called to ask about it, knows regulations, and she
9   got defensive about it by saying that she would bet
10   her children's lives on the information she was
11   giving.
12       Q.   What else do you recall of the incident?
13       MR. SIKORSKI:   Objection. Go ahead.
14       A.   I was just shocked that she replied in
15   that way and said nothing more. I didn't want that
16   to continue, so I -- I was okay with what she said.
17   I said I thought she should have a good
18   understanding of whatever the issues were.
19       Q.   Did you have any other -- I'm sorry.
20       MR. SIKORSKI:   Wait for a question.
21       A.   Well, I think there's a second part to
22   your question that I was answering.
23       MR. SIKORSKI:   Let her ask you a question.
24   Okay? Unless you haven't answered it.

Mark A. Richards

Page 111

1       THE WITNESS: Well, I felt I didn't answer
2   it fully.
3       MR. SIKORSKI: Okay.
4   BY MS. KENNEDY:
5       Q.    Are you finished with your answer to my
6   question?
7       A.    By now I've forgotten what it was I was
8   going to say. Perhaps I should ask you to repeat
9   it.
10       ( The reporter read back as follows:
11       "Question: What else do you recall of the
12   incident?")
13       A.    Okay, I was asking about the original
14   question, that's the one I was answering. That's
15   all I recall of that incident.
16       Q.    I believe my original question was how
17   would you describe your working relationship with
18   Ms. Viens.
19       A.    And I guess I -- Well, the other piece was
20   when Ms. Viens was at my termination meeting, she --
21       Q.    Actually, I'll get to that in a minute,
22   Mr. Richards. I was focusing on before November
23   4th. I apologize.
24       A.    Okay. But, yes, I thought we had a good

Page 112

1   working relationship.
2       Q.    Did Ms. Viens ever speak to you about
3   family medical leave other than your family medical
4   leave, family medical leave in general?
5       A.    She did.
6       Q.    And what do you recall of that
7   conversation?
8       A.    She mentioned that in her other job with
9   the ambulance company, which I understood to be the
10   ambulance company that she worked for in the human
11   resource department, that she had a gentleman who
12   was on intermittent family leave and was according
13   to knowledge that she had about to go out on full-
14   time family leave and she had found a way to prevent
15   that from happening.
16       Q.    And what was the context that this
17   conversation took place in?
18       A.    It was in her office; I had stopped by.
19   It was, I guess, an impromptu meeting. We were
20   talking about other things as well, about employees
21   and personnel issues in general, a variety of them.
22   And I'm not sure why the issue around personnel
23   taking family leave came up, other than we did speak
24   about my daughter.

Page 113

1       Q.    The conversation about the gentleman not
2   employed by River Valley who was going out on family
3   medical leave that she was describing, was that in
4   the same conversation that she spoke about your
5   family medical leave with your daughter?
6       A.    We didn't speak about my family medical
7   leave specifically; we just spoke about my daughter
8   being ill.
9       Q.    And what did you say about your daughter
10   being ill?
11       A.    I kind of spoke in generalities about her
12   being a high school student and not being able to
13   fulfill or hoping that she would be able to fulfill
14   the things she wanted to in her high school life.
15       Q.    And what do you recall, if anything, that
16   Ms. Viens said in response?
17       A.    I don't know what she said in response.
18   It seemed like she listened, you know.
19       Q.    Did she seem concerned about your
20   daughter?
21       A.    Seemed concerned.
22       Q.    She seemed sympathetic about your
23   daughter's situation?
24       A.    I don't remember her sympathy.

Page 114

1       Q.    And just so I understand your testimony,
2   you don't recall the context of her bringing up this
3   other person's issue with family medical leave
4   involving another employer, you just recall her
5   saying it?
6       A.    Well, I did explain what the context was,
7   being in her office, talking about personnel issues,
8   talking about my daughter. But verbatim how we got
9   to that, I don't know verbatim how the conversation
10   went.
11       Q.    Did you have any conversations with David
12   Mattocks from the time that he started as executive
13   director up until the end of October about cutting
14   costs in the day treatment program?
15       A.    Not specifically in the day treatment
16   program.
17       Q.    Did you have conversations with David
18   Mattocks about cutting costs at River Valley
19   Counseling Center?
20       A.    I heard him say that to other program
21   directors in the large group meeting.
22       Q.    And what did you hear him saying about
23   cutting costs to other program directors?
24       A.    That there were certain programs that he

Mark A. Richards

---

Page 119

1    week; a nurse practitioner there about six hours a
2    week. Then there was a half-time van driver and
3    maintenance persons and a full-time administrative
4    assistant.
5        Q.   Who was the psychiatrist that worked there
6    four hours a week?
7        A.   Abraham Linn.
8        Q.   When David Avakian was the supervisor or
9    the assistant program director, what job duties did
10   he have?
11       A.   He was mostly a clinician and he would
12   fill in for me when I wasn't there, so he was the
13   second in command and the person to go to in my
14   absence for day-to-day operations. He was -- Well,
15   the job he had as supervisor and the job he had as
16   assistant director were the same. There was no
17   filling of a supervisor's job when he was given the
18   title of assistant director. He did scheduling
19   tasks as well as billing, double-checking that the
20   billing was -- that notes for the billing were done
21   in a timely way and according to the regulations.
22       Q.   Anything else that he did either as the
23   supervisor or the assistant program director?
24       A.   He would supervise some interns, graduate

---

Page 120

1    usually interns. And I think I mentioned that he
2    was a person to provide impromptu supervision when
3    clinicians thought they needed it and I was not
4    available.
5        Q.   Now, I believe you testified right before
6    we came back from the lunch break that you had a
7    meeting with David Mattocks on November 4th at 9:30?
8        A.   Mm-hmm, yes.
9        Q.   Do you have a memory of that meeting as
10   you sit here today?
11       A.   Yes.
12       Q.   Do you recall when that meeting was
13   scheduled, the November 4th meeting?
14       A.   Do I recall that it was scheduled on
15   November 4th at 9:30?
16       Q.   No, I'm sorry, I wasn't very clear in my
17   question.
18            Was that a standing meeting that you
19   always had every set day or had that meeting been
20   scheduled earlier?
21       A.   That meeting I believe had been scheduled
22   earlier and was moved to that time. I did have
23   meetings where I would just kind of touch base with
24   David Mattocks right after the large group meeting

---

Page 121

1    if there was an issue I wanted to bring up to him.
2        Q.   Do you have any memory of the meeting that
3    you had with David Mattocks on October 26th at 1:00
4    o'clock?
5        A.   In that list of meetings, I'm not sure
6    which ones I actually met with him and which ones
7    might have been moved. Usually they happened when
8    they were first scheduled, but there was a meeting I
9    remember that he did not make and I was not aware he
10   wasn't going to be there so I showed up at his
11   office and he wasn't there. And that was towards
12   the end of my tenure, so I don't even remember
13   whether that meeting happened.
14       Q.   Did you have a meeting before your 9:30
15   meeting with David Mattocks?
16       A.   There was an executive team or a large
17   group meeting before it.
18       Q.   And did you attend that meeting?
19       A.   Yes.
20       Q.   What do you recall being said at that
21   large group meeting?
22       A.   I recall that Mr. Mattocks said that he'd
23   had a meeting, just recently had a meeting with
24   Mr. Porten -- that's Hank Porten -- and that in that

---

Page 122

1    meeting he felt very good about it, he thought it
2    went well; that Mr. Porten had agreed with him on
3    topics pertaining to the agency and some changes
4    that he wanted to make. He said that he had just
5    finished his three months, I believe it was three
6    months of probation and that now he was no longer in
7    that status and that he had been looking at the
8    agency and had decided to implement some changes.
9    He implied that there were going to be cuts and that
10   -- Well, the implication was that there were going
11   to be cuts somewhere or changes that might be
12   difficult for people.
13       Q.   Your memory is that Mr. Mattocks used the
14   words that he had just ended his three months'
15   probation?
16       A.   He said something about that, that this
17   was why this was the moment he was enacting these
18   changes.
19       Q.   What else do you recall Mr. Mattocks
20   saying at the large group meeting that morning?
21       A.   Nothing that I can attribute to that
22   meeting. Could be from another meeting.
23       Q.   Do you recall how long that meeting was?
24       A.   I believe it was about the same length as

---

PERLIK and COYLE
413.731.7931

# EXHIBIT A
# Part 2 of 3

Page 123

1    the usual large group meetings, about an hour.
2    Sometimes it would go over.  Usually it would go
3    over a little bit.
4        Q.    Do you recall anything else about the
5    meeting, anything anyone else said?
6        A.    Yes.
7        Q.    What do you recall?
8        A.    I recall Sean Munster saying something to
9    the effect that changes were going to come but
10   everybody needed to be on board and kind of gave me
11   the impression that he was aware of some of the
12   changes and that he was trying to build cohesion in
13   the group to weather the changes.
14       Q.    Anything else you recall about that
15   meeting?
16       A.    The meeting was well-attended, a lot of my
17   colleagues, I would say about all my colleagues were
18   there.  Well, I don't remember who said what
19   specifically.
20       Q.    Where did the meeting take place?
21       A.    It was in Mr. Mattocks's office where the
22   large group meetings happened.
23       Q.    How many people would be at this large
24   group meeting?

Page 124

1        A.    It was a table about this size; maybe
2    close to a dozen.  And that's packing them in.  They
3    would be packed in pretty well.
4        Q.    And did you have the individual meeting
5    with Dave Mattocks?
6        A.    I had that 9:30 meeting, yes.
7        Q.    And where did that meeting take place?
8        A.    Right there at the same table.
9        Q.    And what was your understanding about what
10   that meeting was for?
11       A.    A make-up meeting that didn't happen.  I
12   believe it was the one that was scheduled before or
13   one that was scheduled a little bit before that.
14       Q.    And did you just stay in the room with
15   David Mattocks until people left or how did it
16   happen that --
17       A.    Yes.  The people left; and right after
18   they had left, this meeting started.
19       Q.    Was Donna Viens in the large group meeting
20   at 8:30?
21       A.    I don't remember if she was there the
22   whole time or in and out.  I'm not sure what her
23   attendance was at that meeting.
24       Q.    What do you recall happening at that

Page 125

1    meeting with David Mattocks at 9:30?  What's the
2    first thing that you recall?
3        A.    That Donna Viens came into the meeting.
4        Q.    And what happened next?
5        A.    That she sat down next to Mr. Mattocks and
6    Mr. Mattocks said that one of the changes he was
7    making was to terminate my job.
8        Q.    Is that the words he used?
9        A.    I don't remember the specific words that
10   he used.
11       Q.    What's the next thing you recall him
12   saying or happening?
13       A.    He said that it was not because of my
14   performance, that that had nothing to do with it.
15   And I took some notes during the meeting; you've
16   probably reviewed them.
17             MR. SIKORSKI:  Do you want to show him the
18   notes?
19             MS. KENNEDY:  I didn't know if he was done
20   with this answer.
21       A.    I could go on with what I remember or I
22   could look at the notes, either one.  Would you like
23   me to go on?
24       Q.    Sure.  What do you recall?

Page 126

1        A.    I recall that we got into specifics about
2    a severance agreement.  He gave me a copy of the
3    severance agreement.  Also talked about how this
4    process was going to proceed; that when I was done
5    that day, I would be leaving immediately.  And
6    Ms. Viens just described the unemployment insurance
7    particulars.  I remember saying to Mr. Mattocks, or
8    I asked who was going to be replacing me.
9    Mr. Mattocks said that it would be Jeff Kassis; and
10   also he might have mentioned at that time that David
11   Avakian would have a role.  He did mention it later
12   in a meeting that happened just after this one with
13   my staff.
14             I mentioned to him that I knew of
15   Mr. Kassis's qualifications and he wasn't qualified
16   for that position because he had not worked a year
17   in the day treatment program.  I remember Ms. Viens
18   saying something when I was trying to talk with
19   Mr. Mattocks and I said to her that I was talking to
20   Mr. Mattocks and not to her, because she doesn't
21   know about the regulations, you know, at which point
22   she said "I do too know about the regulations.  It's
23   my job to know about these regulations."
24             I asked Mr. Mattocks if I could meet with

Page 127

1  my staff or say good-bye to them, say good-bye to
2  the clients. I mentioned that I would rather have a
3  way to save face in this, present it in a way that
4  would sound like I was leaving to take care of my
5  daughter rather than I was being fired. He asked
6  "Well, would you like to resign?" I said "No, I'm
7  not resigning."
8       He said that Ms. Viens wouldn't like what
9  he was about to say but that he would allow me to go
10 back and visit staff. And I had asked too if I
11 could come back on the weekend and clean up my
12 office, and he said that he was going to allow me to
13 do that; and that he would participate in the
14 meeting with my staff and would arrange that. And
15 at some point, I don't know if in this meeting or
16 the next, we talked about my saying good-bye to the
17 clients.
18    Q.  Do you recall anything else that you said
19 during the meeting with Donna Viens, David Mattocks
20 and yourself present?
21    A.  Well, there's a lot of things that I
22 recall that come and go. You know, if you have
23 something particular to ask me, I could possibly lay
24 my finger on it or refresh my memory with the notes.

Page 128

1       MS. KENNEDY: Let me mark that, please.
2       ( Richards Deposition Exhibit 17 marked for
3  identification.)
4  BY MS. KENNEDY:
5    Q.  Mr. Richards, I am going to put in front
6  of you what's been marked as Exhibit 17. Can you
7  please tell me what that is a copy of?
8    A.  This is a copy of the notes I took during
9  my termination meeting with Mr. Mattocks and
10 Ms. Viens.
11   Q.  If you could just for the record read into
12 the record slowly your notes.
13   A.  Okay. I've got these just kind of listed
14 with a space or two in between and I've written "not
15 performance-related"; skip a space, then I wrote
16 "21 days." Then I skipped a space and I wrote
17 "recommends attorney" and I skipped a couple of
18 spaces, "seven-day revocation period if I agree to
19 terms." Skip a space, "does not preclude
20 unemployment during severance." Skip a space, "four
21 months severance." Skip two spaces, "agreement in
22 force after eighth day after signing." Then under
23 that I wrote "then six-week clock begins." Skip a
24 space, "can't start my own business within 25 miles

Page 129

1  for one year." Skip a space, "can't recruit
2  actively within one year." Skipped a space,
3  "continue the dental for full period."
4       Then on the next page "will be paid for
5  remainder of week." Skip a space, "at most will be
6  December 1st latest or we will not take any stance
7  against your filing for unemployment." Then I've
8  skipped a space and wrote "unemployment $507 per
9  week plus $25 per dependent, maximum 29 weeks with
10 three weeks extension," then skipped a space and
11 wrote "life insurance" with a question mark.
12   Q.  Thank you.
13       When David Mattocks said that you were
14 terminated in your position, how did you feel about
15 that?
16   A.  Surprised; confused.
17   Q.  Why were you confused?
18   A.  About the cause, why I was singled out.
19 Probably that -- Well, I remember that's what would
20 have been confusing to me.
21       ( Richards Deposition Exhibit 18 marked for
22 identification.)
23 BY MS. KENNEDY:
24   Q.  Other than telling you it was not

Page 130

1  performance-related, did he tell you any other
2  reason why your employment was being terminated?
3    A.  He said it was for financial reasons.
4    Q.  And was he any more specific than
5  financial reasons?
6    A.  No.
7    Q.  Was your understanding that financial
8  reasons meant for cost savings?
9    A.  That's what I understood.
10   Q.  Let me put in front of you what's been
11 marked as Exhibit 18 and if you could identify what
12 that is a copy of.
13   A.  This is a severance agreement and general
14 release between River Valley Counseling Center and
15 Mark Richards. This appears to be the severance
16 agreement that they presented me with at that
17 meeting.
18   Q.  And did someone go over this severance
19 agreement with you at that meeting?
20   A.  Yes, we talked about the particulars of
21 what I could do/what I couldn't do, what I would be
22 paid. I think in my notes I wrote down things about
23 how that might take place and what the schedule was.
24 He said that I should see a lawyer. That was said

## VOLUME II - 137

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061MAP
Volume II
Pages 137-249

MARK A. RICHARDS

vs.

RIVER VALLEY COUNSELING
CENTER, INC., VALLEY HEALTH
SYSTEMS, INC., DAVID G.
MATTOCKS, and DONNA VIENS

-----------------------------------------------
DEPOSITION OF:  MARK A. RICHARDS
-----------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Bulkley, Richardson and
Gelinas, LLP, 1500 Main Street, Springfield,
Massachusetts on MARCH 17, 2006, commencing
at 1:30 p.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

PERLIK and COYLE REPORTING
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931   Fax (413) 731-7451

## VOLUME II - 138

APPEARANCES:

FOR THE PLAINTIFF:

ROBINSON DONOVAN
1500 Main Street
Springfield, Massachusetts 01115
BY: JOHN C. SIKORSKI

FOR THE DEFENDANTS RIVER VALLEY
COUNSELING CENTER, INC., VALLEY
HEALTH SYSTEMS, INC., and DONNA VIENS:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street
Springfield, Massachusetts 01115
BY: MARY J. KENNEDY, ESQUIRE and
FRANCIS D. DIBBLE, ESQUIRE

FOR THE DEFENDANT DAVID G. MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
One Monarch Place
Springfield, Massachusetts 01144
BY: MARYLOU VARAO FABBO, ESQUIRE

## VOLUME II - 139

I N D E X

WITNESS        DIRECT CROSS REDIRECT RECROSS

MARK A. RICHARDS      141*   216**   241*
                                     241***

* Ms. Kennedy
** Ms. Fabbo
***Mr. Sikorski

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 19 | Revenue Report | 145 |
| 20 | Various Memos | 146 |
| 21 | November 4, 2004 Memo | 163 |
| 22 | Plaintiff's Answers to Valley Health Systems Interrogatories | 184 |
| 23 | Business Plan | 193 |
| 24 | Compensation Analysis | 195 |
| 25 | Financial Projection | 196 |
| 26 | Copies of Newspaper Ads | 209 |

## VOLUME II - 140

S T I P U L A T I O N S

It is agreed by and between the parties
that all objections, except objections as to the
form of the question, are reserved to be raised at
the time of trial for the first time.

It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the time
of trial for the first time.

It is further agreed that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

                    *****

## VOLUME II - 145

1    A.   I'm not clear on the question.

2    Q.   Sure.

3              (Defendant's Deposition Exhibit
            No. 19-20 offered and marked.)

4

5    Q.   (BY MS. KENNEDY)  Mr. Richards, I'm

6  going to put in front of you two sets of exhibits,

7  one marked Defendant's Deposition Exhibit

8  Number 19 and the other marked Defendant's

9  Deposition Exhibit 20.

10          I can represent to you that those are

11 the documents that were produced by your attorney

12 today. (Indicating.)

13   A.   (Witness examining document.)

14   Q.   Did you have a chance to review what's

15 been marked as Exhibits Number 19 and 20?

16   A.   Yes.

17   Q.   Just so I understand your testimony a

18 few minutes ago, did you bring to your attorney's

19 office other documents that are not here today --

20 that are not part of Exhibits 19 or 20?

21   A.   Yes.

22   Q.   Do you know whether the memo to

23 Mr. Mattocks regarding David Avakian was a part of

24 that?

## VOLUME II - 146

1    A.   I don't know whether it was part of that

2  or not; no.

3    Q.   Just sticking with these exhibits, I'll

4  start with Number 20 and take them out of order,

5  what is that a copy of?

6    A.   This is a copy of a revenue report that

7  I produced for the Day Treatment Program and the

8  partial hospitalization programs and would share

9  with Mr. Mattocks and other interested

10 administrators as a way of indicating the

11 financial progress of my programs.

12   Q.   You say you shared them with

13 Mr. Mattocks and others.  How would you share them

14 with them?

15   A.   I would give them a copy and I would sit

16 down with them at a meeting face to face and go

17 over it.

18   Q.   That's a document that you took with you

19 when you left River Valley back in November of

20 2004?

21   A.   That's right.

22   Q.   Why did you take those productivity

23 reports back in November of 2004 when you left

24 River Valley?

## VOLUME II - 147

1    A.   I was rather proud of my financial

2  reporting and also had problems in the past with

3  River Valley and its predecessor agencies and

4  their inaccuracies in their budgetary process and

5  I would keep these things -- always keep copies

6  with me so that if ever there were questions, I

7  could refer to my own figures.

8    Q.   Is that something you took when you left

9  your employment or something you had at your home

10 before you left your employment in November of

11 2004?

12   A.   I would keep these in my office, so I

13 took them.

14   Q.   Why did you take them when you left your

15 employment in November of 2004?

16   A.   I was taking a variety of things in my

17 office and this was something that I saw as --

18 that I was proud of -- and I wasn't too proud the

19 day I left.

20   Q.   What do you mean by that?

21   A.   I meant I had been terminated

22 unexpectedly, singled out, feeling that it was

23 being done because I had an ill daughter.

24          I was feeling pretty ashamed of my

## VOLUME II - 148

1  situation, that I had these things occurring, and

2  I wasn't feeling very good about myself, I guess.

3    Q.   What was the basis of your thinking that

4  you were being terminated because you had an ill

5  daughter?

6    A.   Various things that Mr. Mattocks said to

7  me leading up to that day; and that my program --

8  there was no financial reasons since my program

9  had earned over three hundred thousand dollars

10 profit the year before and was on track to earn

11 even more this year, so it was my opinion that

12 this was being done for other reasons.

13   Q.   What were the various things that

14 Mr. Mattocks told you that led you to believe that

15 you were being terminated because you had an ill

16 daughter?

17   A.   He had made comments that I wasn't

18 around very much, that I was -- he believed that

19 it was hard for me to make meetings and hard to --

20 for him to set meetings with me because of my

21 being home to take care of my daughter.

22          There was a comment that Ms. Viens had

23 made about being proud that she prevented someone

24 from going out on Family Medical Leave at another

VOLUME II - 149

1  place that she was employed.
2      Q.   Did she use the word that she was
3  "proud"?
4      A.   No; it was my sense that she was proud
5  of it.
6      Q.   What other comments were made by David
7  Mattocks that led you to believe that you were
8  being terminated because you had an ill daughter?
9      A.   When he asked me to participate in an
10  ongoing meeting of managers that would meet a few
11  times a week and balked at that, our relationship
12  changed after that.
13          I sensed a change in our relationship
14  and he was withdrawing from our relationship.
15      Q.   How would you describe your relationship
16  before that with David Mattocks?
17      A.   It was good.  It was one of looking
18  towards the future and increasing the day
19  treatment hospitalization programs, using that as
20  a way to bolster the rest of the agency.
21      Q.   How was it that your relationship
22  changed with David Mattocks?
23      A.   He would, before, come around to the
24  building and drop in and we'd have talks about

VOLUME II - 150

1  various things that was going on in the agency and
2  that had slowed down.
3          I noticed that he wanted -- one of our
4  meetings that he had set up, he didn't show up for
5  and apparently left a voicemail for me but I don't
6  think that was left in a way where I would have
7  picked it up prior to the meeting happening.
8          Those things did not happen before.  He
9  was diligent about meeting times and being
10  respectful to my time.
11      Q.   It's your testimony that the manner in
12  which he left you the voice message and not making
13  a meeting led you to believe that your
14  relationship had changed?
15      A.   That was a part of it in context of the
16  other things I was picking up on.
17      Q.   When did this occur -- the change that
18  you observed in the relationship you had?
19      A.   Well, I believe --
20      Q.   (Interposing) Strike that.  Let me just
21  get the question out so the record is clear.
22          When is it that you recall that there
23  was a change in the work relationship you had with
24  David Mattocks?

VOLUME II - 151

1      A.   I noticed after he asked me to attend
2  the managers' meeting that occurred a few times a
3  week.
4      Q.   When did he ask you to attend the
5  managers' meeting?
6      A.   It was about a month -- somewhere in the
7  area of a month before I was terminated.
8      Q.   That would be in approximately October?
9      A.   Early October.
10      Q.   I'll put in front of you what's been
11  marked as Exhibit 19.
12          I'll just ask, skipping over the first
13  few pages, I'll ask you to look at the memo from
14  you to Mr. Mattocks dated September 2nd, 2004?
15  (Indicating.)
16      A.   (Witness examining document.)
17      Q.   Did you have a chance to look over that
18  page of what's been marked as Exhibit 19?
19      A.   Yes.
20      Q.   Did you disagree with Mr. Mattocks'
21  opinion that billings were not being received by
22  the River Valley business office in a timely
23  manner?
24      A.   Yes; I wrote him a memo explaining that,

VOLUME II - 152

1  and I later had a meeting with him which involved
2  Sean Munster, who is someone that brought this
3  issue to his attention, and we sat down and
4  discussed this topic.
5      Q.   Is the first part of this page a typed
6  memo, the first half of the page?
7      A.   The entire thing is typed except for my
8  notes at the bottom.
9      Q.   Could you read into the record what
10  your -- strike that.  Is that handwritten notes on
11  the bottom?
12      A.   Yes.
13      Q.   Could you -- is all of the handwriting
14  on there, halfway down the page, is that all your
15  writing?
16      A.   Yes.
17      Q.   Could you read into the record just your
18  handwritten notes, please?
19      A.   "David, hyphen, Med A billing has
20  historically been every four weeks" -- the word
21  four is underlined -- "and must be begun after a
22  three-day, parenthesis, such as Labor Day, close
23  parenthesis, weekend for optimum revenue
24  recovery" -- and "optimum revenue recovery" is

MARK A. RICHARDS vs.  RIVER VALLEY COUNSELING CENTER, INC. ET AL
MARK A. RICHARDS     VOLUME II     MARCH 17, 2006

VOLUME II - 153

1  underlined.  "I'd be happy to discuss this
2  procedure with you.  Mark.  P.S., all non, hyphen,
3  Med A billing is done weekly and is always
4  timely."
5       Q.   The next page that's in Exhibit 19 is a
6  copy of an e-mail, is that correct?
7       A.   Yes.
8       Q.   Is that an e-mail from you to
9  Mr. Mattocks?
10      A.   Yes.
11      Q.   Regarding that same subject?
12      A.   Yes.
13      Q.   Was that e-mail written after the
14  handwritten note?
15      A.   It is dated September 3rd.  I'm not sure
16  whether I sent that handwritten note -- I probably
17  wrote out the e-mail and sent that instead and
18  used the handwritten note as a way of organizing
19  my thoughts.
20      Q.   The last page, which has been marked --
21  of the document that's been marked as Exhibit 19,
22  can you identify that document, please?
23      A.   This is a memo from me to David Mattocks
24  dated October 26, 2004 regarding job performance,

VOLUME II - 154

1  goals, and objectives.
2       Q.   Did you send that to Mr. Mattocks?
3       A.   Yes -- I believe I handed it to him in
4  one of our supervision sessions.
5       Q.   How was it that -- strike that.  Why did
6  you create that memo?
7       A.   It was at his request.  He was asking
8  for managers' job performance and goals and
9  objectives.
10      Q.   Do you recall when he asked you for that
11  information?
12      A.   I don't think it was more than a week
13  before I gave it to him.
14      Q.   Did you have an opportunity to speak to
15  Mr. Mattocks about your goals and objectives
16  outlined in your memo dated October 26, 2004?
17      A.   I don't remember doing so.
18      Q.   Going back to the November 4th meeting
19  with David Mattocks and Donna Viens, I believe you
20  testified that you wanted an opportunity to say
21  good-bye to your staff.  Do you recall that
22  testimony?
23      A.   Yes; I do.
24      Q.   Did you have an opportunity to do that?

VOLUME II - 155

1       A.   Yes; I did.
2       Q.   How did that come about?  What happened?
3       A.   There was a meeting with my staff that
4  included Mr. Mattocks in the building where I
5  worked.
6       Q.   Was that a scheduled meeting with your
7  staff that day?
8       A.   No; that was an impromptu meeting.
9       Q.   Do you recall what time of day that was?
10      A.   It was close to lunchtime.
11      Q.   How did that meeting get coordinated?
12      A.   Mr. Mattocks called over, I believe, to
13  Mr. Avakian to set that meeting up.
14      Q.   Who attended that meeting?
15      A.   The employees from the agency who
16  reported to me who were present at the time, and
17  Mr. Mattocks.
18      Q.   You said the employees from the agency
19  who reported to you.
20           Are those the clinicians that you
21  testified to earlier?
22      A.   Yes, for the most part.
23      Q.   But not all of them were present?
24      A.   I don't believe so; no.

VOLUME II - 156

1       Q.   You said Mr. Avakian was also at that
2  meeting?
3       A.   Yes.
4       Q.   Who, outside of your staff, attended
5  that meeting?
6       A.   Mr. Mattocks.
7       Q.   What was said at that meeting?  Who
8  started the conversation?
9       A.   I don't remember whether Mr. Mattocks
10 did or I did.
11      Q.   Did you say anything at that meeting?
12      A.   Oh, yes.
13      Q.   What did you say?
14      A.   I told the staff that I was leaving,
15 that it was my last day, that they had meant a lot
16 to me and I was going to miss them.
17           I told them that the reason I was
18 leaving was because of my daughter being ill and I
19 was going to be home to take care of her and
20 Administration decided I should leave right away.
21      Q.   Do you recall anything else you said to
22 your staff at that meeting?
23      A.   I told them I was proud of them and the
24 work they had done and asked them to continue

MARK A. RICHARDS vs. RIVER VALLEY COUNSELING CENTER, INC. ET AL
MARK A. RICHARDS     VOLUME II     MARCH 17, 2006

VOLUME II - 161

1    Q.  Who is missing from the program that was
2  employed there in November of 2004?
3    A.  We had a Spanish-speaking clinician who
4  is not on this list who came in part time.  She
5  was also a manager of another Spanish-speaking
6  program.  We had a psychiatrist.
7    Q.  Is that Mr. Lee?
8    A.  Doctor Linn.
9    Q.  Doctor Linn, pardon me.
10    A.  Yes.
11    Q.  Anybody else?
12    A.  I don't remember anybody else.
13    Q.  Thank you.  What happened after the
14  meeting with the staff?  What did you do?
15    A.  After the meeting with the staff, I went
16  to my office and then I later met with the
17  clients.
18    Q.  You met with clients later in the day?
19    A.  Yes.
20    Q.  How many?
21    A.  Just the ones that were there during the
22  lunch hour or soon after.  Maybe fifteen.
23    Q.  What did you tell the fifteen clients?
24    A.  I mentioned to them that I was

VOLUME II - 162

1  resigning, it was my last day.  I was going to be
2  caring for my daughter and talked with them about
3  how the staff and the program would be staying
4  there and they weren't to worry about people
5  leaving.
6        I reviewed how long everybody had been
7  there so they would not worry that there was going
8  to be some kind of exodus of staff that would hurt
9  the integrity of the program as well as the
10  relationships that they had built.
11        I mentioned to them how important they
12  had been to me and how I would miss them.
13    Q.  These fifteen -- approximately fifteen
14  clients that you met with, were they clients that
15  you saw one-on-one?
16    A.  Not on a regular basis.  I'd see them
17  one-on-one if something special was needed.
18    Q.  Did they treat with other clinicians on
19  your staff?
20    A.  They were assigned to the caseloads of
21  other clinicians on the staff.
22    Q.  Did you discuss with David Mattocks
23  speaking with the clients about your departure?
24    A.  Yes.

VOLUME II - 163

1    Q.  Was that at the meeting that you were
2  informed that your employment was being
3  terminated?
4    A.  Yes.
5    Q.  What did Mr. Mattocks say about you
6  speaking with the clients about leaving?
7    A.  He thought that would be fine, and even
8  talked about maybe a more formal get-together
9  later on where I could say good-bye and also meet
10  with those people that weren't able to be there on
11  that day.
12    Q.  Did that formal meeting ever take place?
13    A.  No.
14    Q.  You went back to your office, I believe
15  you testified, and you met with approximately
16  fifteen clients.
17        What's the next thing you recall doing
18  on that day?
19    A.  I wrote out a memo to go to other
20  providers to announce that I was leaving the
21  agency.
22        (Defendant's Deposition Exhibit
            No. 21 offered and marked.)
23
24        THE WITNESS:  And I started

VOLUME II - 164

1  organizing my office to pack up.
2        I met with my secretary to tell her what
3  was happening and to discuss who should get the
4  memo.
5    Q.  (BY MS. KENNEDY)  Mr. Richards, I'm
6  going to put in front of you what's been marked as
7  Defendant's Exhibit Number 21 and ask if you could
8  identify that, please? (Indicating.)
9    A.  (Witness examining document.)  That's
10  the memo that I wrote to distribute to other
11  providers notifying them of my leaving the agency.
12    Q.  Did you tell your secretary who to send
13  that memo to?
14    A.  Yes.
15    Q.  Do you know approximately how many
16  people it was sent to?
17    A.  About fifteen.
18    Q.  Did you return back to River Valley
19  another day to pack your belongings?
20    A.  Yes.
21    Q.  Was anyone there with you?
22    A.  Yes; David Avakian.
23    Q.  Did you have any conversations with
24  David Avakian as you were packing your things?

MARK A. RICHARDS vs. RIVER VALLEY COUNSELING CENTER, INC. ET AL
MARK A. RICHARDS    VOLUME II    MARCH 17, 2006

VOLUME II - 169

1  least two hours that I was there.
2          He was with me just about all of that
3  time as I remember and there were many things that
4  we talked about. I can't remember them all.
5      Q. Were you mad at David Avakian for not
6  telling you that your employment was going to be
7  ending?
8      A. No; I wasn't mad at him. I felt that he
9  was caught in the middle.
10     Q. Did you talk to David Avakian about
11 whether the requirements for Medicare would be in
12 compliance with you not being the program
13 director?
14     A. I don't remember if I talked with him
15 about that. I know I passed information to him
16 about the regulations, some documents that
17 pertained to the regulations and he had recently
18 been reviewing them. It is possible but I don't
19 remember.
20     Q. Did you have an opinion back then
21 whether David Avakian would be a good assistant
22 director of the program without you being there?
23         MR. SIKORSKI: Objection.
24         THE WITNESS: He was already the

VOLUME II - 170

1  assistant director. Mr. Mattocks made him the
2  assistant director prior to my leaving.
3      Q. (BY MS. KENNEDY) At your request, is
4  that correct?
5      A. My request was to give him a promotion
6  and salary.
7          It was Mr. Mattocks' decision that he
8  should be made assistant program director.
9      Q. Did you disagree with that decision?
10     A. No; I did not disagree.
11     Q. Did you have any concerns about David
12 Avakian working in the program without you being
13 there?
14     A. I didn't have any concerns about his
15 competence. I just felt it was going to be a
16 shock for him to have to take all this up at once
17 and go through many changes.
18         I like David a lot and I felt that he
19 should be treated fairly.
20     Q. During this long period of time that you
21 were packing up your office, did you tell David
22 Avakian that it was not your choice to leave River
23 Valley and to care for your daughter?
24     A. I believe it was more of a continuation

VOLUME II - 171

1  of a conversation that we had earlier that week,
2  that it was understood between the two of us that
3  it was not my decision to be leaving.
4          I was not as emotionally upset as I was
5  on the previous day -- the Thursday before.
6      Q. Did you discuss with David Avakian
7  during the time period that you were packing up
8  about the reasons why David Mattocks chose to
9  eliminate your position?
10     A. No; I don't believe so. I wasn't clear
11 on the reasons, myself.
12     Q. Did you have any conversations with any
13 of your other co-workers about your termination of
14 employment, other than David Mattocks and the
15 people you said good-bye to on November 4th?
16         MR. SIKORSKI: Objection; at any
17 time?
18         MS. KENNEDY: I'll rephrase the
19 question; thank you.
20     Q. (BY MS. KENNEDY) Since leaving River
21 Valley on the fourth, other than the conversation
22 you had with David Avakian when you were packing
23 up, have you spoken with any of your co-workers at
24 River Valley?

VOLUME II - 172

1      A. Yes.
2      Q. Have you spoken to those co-workers
3  about your termination of employment?
4      A. Yes.
5      Q. Who?
6      A. I spoke with Doctor Linn, Rorry
7  Zahourek -- Doctor Rorry Zahourek -- and Doctor
8  Abraham Linn, both on the day -- on November 4th,
9  I spoke with them, as well as later on.
10     Q. What did you tell them on November 4th?
11     A. I told them that I was terminated by
12 Mr. Mattocks.
13     Q. Why did you tell them that and not the
14 other story of leaving to care for your daughter?
15         MR. SIKORSKI: Objection; go ahead.
16         THE WITNESS: I felt that their
17 having that information would not be as burdensome
18 to them as it would to the other staff.
19         I felt closer to them to share my own
20 personal situation without having to -- because
21 they were more peers of mine -- that I would have
22 felt passing boundaries of people that I was
23 supervising.
24     Q. (BY MS. KENNEDY) Did you tell Doctor

MARK A. RICHARDS vs.  RIVER VALLEY COUNSELING CENTER, INC. ET AL
MARK A. RICHARDS    VOLUME II    MARCH 17, 2006

VOLUME II - 173

1   Zahourek and Abraham Linn about your termination
2   of employment?
3       A.   Yes.
4       Q.   What did you tell them?
5       A.   I told them that Mr. Mattocks had
6   terminated me and I did not expect it.
7       Q.   I believe that's what you told them on
8   November 4th, is that correct?
9       A.   That's correct.
10      Q.   You had a conversation sometime after
11  November 4th?
12      A.   Yes.
13      Q.   What else did you tell them about your
14  termination of employment?
15      A.   I don't remember.
16      Q.   Any other colleagues that you worked
17  with that you spoke to since leaving River Valley
18  on November 4th regarding -- and you spoke to them
19  regarding the termination of your employment?
20      A.   No.
21      Q.   Other than any conversations you may
22  have had with your lawyer, has anyone told you
23  that River Valley Counseling Center had terminated
24  your employment because of your age?

VOLUME II - 174

1       A.   No.
2       Q.   Other than any conversations you may
3   have had with your lawyer, has anyone told you
4   that River Valley Counseling Center terminated
5   your employment because you have skin cancer?
6       A.   No.
7       Q.   Other than any conversations you had
8   with your lawyer, did anyone tell you that River
9   Valley terminated your employment because of your
10  daughter's illness?
11      A.   No.
12      Q.   Other than any conversations you may
13  have had with your lawyer, has anyone told you
14  River Valley Counseling Center terminated your
15  employment because you had been approved for
16  intermittent Family Medical Leave?
17      A.   No.
18      Q.   Mr. Richards, you have brought an age
19  discrimination claim against your former employer,
20  River Valley Counseling Center, and the other
21  defendants in this case.  Are you aware of that?
22      A.   Yes.
23      Q.   What facts do you rely on that form the
24  basis of your belief that River Valley Counseling

VOLUME II - 175

1   Center terminated your employment because of your
2   age?
3               MR. SIKORSKI:  Objection; you can go
4   ahead.
5               THE WITNESS:  Mr. Avakian, who was
6   the primary leader in the position after I left --
7   in the program after I left -- is about ten years
8   younger than I am.
9       Q.   (BY MS. KENNEDY)  Any other fact that
10  you rely on that forms the basis of your belief
11  that River Valley Counseling Center terminated
12  your employment because of your age?
13      A.   No.
14      Q.   You also understand that you brought a
15  claim of disability discrimination, is that
16  correct?
17      A.   Yes.
18      Q.   Against all of the defendants in this
19  case, is that your understanding?
20      A.   Yes.
21      Q.   What facts do you rely on that form the
22  basis of your belief that River Valley Counseling
23  Center terminated your employment because you have
24  skin cancer?

VOLUME II - 176

1       A.   I believe it's something that is added
2   to the other factors and made it -- or weighted
3   the decision against me.  It was -- my skin cancer
4   is something that had been ongoing for years and
5   people were aware of.
6           I did have a most serious procedure that
7   was done about a year before my termination.
8       Q.   That was in 2003?
9       A.   2003; and I continued to have many marks
10  and blotches on my face that were not improving.
11      Q.   What facts do you rely on that form the
12  basis of your belief that your skin cancer may
13  have been a factor in the termination of your
14  employment at River Valley?
15      A.   That Mr. Mattocks and others were aware
16  that I had skin cancer.
17      Q.   Who were the others that were aware that
18  you had skin cancer?
19      A.   People who I worked with at the agency.
20  It was easy to see and I did speak with some
21  people about it.
22      Q.   Other than those individuals' awareness
23  that you had skin cancer, is there any other fact
24  that you rely on that forms the basis of your

VOLUME II - 177

1  belief that skin cancer was a factor in the
2  termination of your employment?
3      A.   No.
4      Q.   What facts do you rely on that form the
5  basis of your belief that River Valley Counseling
6  Center terminated your employment because your
7  daughter has an illness?
8      A.   My daughter's illness was well-known by
9  people in the management part of the agency.
10 Mr. Mattocks was aware of it, Ms. Viens was aware
11 of it.
12          They were also aware that it interfered
13 with my being able to be at work in the mornings,
14 especially. They knew that I was a primary
15 caretaker to help her with her illness when
16 Mr. Mattocks would make mention of my not being
17 there in the mornings because of my daughter --
18 because I was taking care of my daughter.
19          Ms. Viens made mention that she had
20 prevented a person at another -- at her other job
21 from going out on Family Medical Leave.
22          My staff knew that I was not coming in
23 on some mornings because of my daughter's illness
24 and my staff, even though they never said anything

VOLUME II - 178

1  about that directly, would make mention of my not
2  being around enough.
3      Q.   Are you done with your answer?
4      A.   Yes.
5      Q.   Is there any other fact that you rely on
6  that forms the basis of your belief that River
7  Valley terminated your employment because you have
8  a daughter with an illness?
9          MR. SIKORSKI:  Objection; go ahead
10 and answer.
11     Q.   (BY MS. KENNEDY) Other than what you've
12 already testified to?
13     A.   The only things are a process of
14 elimination. There were no other reasons to
15 terminate me. It made sense to me.
16     Q.   Did it make sense to you that your
17 position was being eliminated for a cost savings
18 reason?
19     A.   No.
20     Q.   Why not?
21     A.   Because by eliminating me, the agency
22 put itself in jeopardy of being out of compliance
23 with the regulations and having the finances from
24 that point forward being taken back by the

VOLUME II - 179

1  payers -- Medicaid and Medicare -- which would
2  have been extraordinarily costly; and instead of
3  making money, they would have lost money with the
4  program.
5      Q.   Is it your belief that since
6  November 4th, 2004, the agency has been in
7  jeopardy because they don't have a program
8  director that meets the requirements of the
9  Medicaid regulations?
10     A.   That's my belief.
11     Q.   Have you -- other than contacting --
12 strike that.
13          Other than speaking with your attorney,
14 have you spoken with anyone else outside of River
15 Valley Counseling Center regarding your belief?
16          MR. SIKORSKI:  You mean, for
17 example, has he filed a Quit Am action?
18     Q.   (BY MS. KENNEDY) No; my question is
19 other than contacting -- my question specifically
20 is other than speaking with your attorney, have
21 you spoken with anyone outside of River Valley
22 Counseling Center regarding your belief that the
23 agency is in jeopardy because they are not in
24 compliance with the Medicare regulations?

VOLUME II - 180

1      A.   Yes.
2      Q.   Who have you spoken with?
3      A.   I've spoken with my wife.
4      Q.   Who else besides your wife?
5      A.   I don't remember if there was anyone
6  else besides my wife that I've spoken with about
7  that.
8      Q.   Thank you. I just want to make sure --
9  and I may have already asked you this -- but other
10 than what you have already told us, is there any
11 other facts that you rely on that form the basis
12 of your belief that River Valley terminated your
13 employment because of your age, other than what
14 you've already told us -- so anything else?
15     A.   No.
16     Q.   The same thing for your claim regarding
17 skin cancer.
18          Other than what you've already testified
19 to, is there any other fact that you rely on that
20 forms the basis of your belief that River Valley
21 terminated your employment because of your skin
22 cancer?
23     A.   I can't think of anything now.
24     Q.   You've also brought a claim,

VOLUME II - 181

1    Mr. Richards, under the Family Medical Leave Act,
2    do you understand that?
3       A.   Yes.
4       Q.   What facts are you relying on that form
5    the basis of your belief that River Valley
6    Counseling Center terminated your employment
7    because you went out on intermittent family leave?
8           MR. SIKORSKI:  Objection.
9           THE WITNESS:  I think I'd be
10   restating what I've already said.
11      Q.   (BY MS. KENNEDY) Please do, to make it
12   clear for the record.
13      A.   Okay.  That --
14          MR. SIKORSKI:  (Interposing)
15   Objection.
16          THE WITNESS:  That Mr. Mattocks
17   seemed to be upset with my being out in the
18   mornings; not being able to attend certain
19   meetings; not being able to give more time to the
20   management team; to my not being available when he
21   called sometimes in the morning; to his belief
22   that I was not billing in a timely way because of
23   my daughter's illness.
24          Also, Ms. Viens spoke in a way that led

VOLUME II - 182

1    me to believe that she was proud that she had
2    prevented an employee at her other work site from
3    going out on Family Medical Leave.  I believe that
4    sums up the reasons.
5       Q.   Any other reasons other than what you've
6    just testified to?
7       A.   I can't think of them currently.
8       Q.   Do you believe that Valley Health
9    Systems, Inc. played any role in the termination
10   of your employment at River Valley Counseling
11   Center?
12      A.   I'm under the understanding from
13   Mr. Mattocks that he discussed my termination with
14   people at Holyoke Medical Center, including
15   Mr. Porten and Ms. Kelleher.
16          It was my understanding from
17   Mr. Mattocks that on the morning of November 4th,
18   in a meeting, that he had received approval from
19   Mr. Porten to make the changes that he was about
20   to make.
21          Right after that meeting, he told me I
22   was being terminated.
23      Q.   Is there any other fact that you rely on
24   other than what you've just testified to that

VOLUME II - 183

1    forms the basis of your belief that Valley Health
2    Systems played any role in the decision to
3    terminate your employment?
4       A.   I also remember Mr. Mattocks speaking
5    about needing to pay back Valley Health Systems
6    money that River Valley owed as quickly as
7    possible, even if it meant moving faster than the
8    schedule of pay-backs, so it was my opinion that
9    he was motivated by Valley Health Systems to save
10   money and make money as quickly as he could.
11      Q.   What is your understanding of the fact
12   that River Valley was motivated to save money and
13   make money as quickly as it could had to do with a
14   decision to eliminate your position?
15          MR. SIKORSKI:  Objection.
16          THE WITNESS:  I believe that in the
17   short term, Mr. Mattocks believed that my
18   getting -- by terminating me he would be saving my
19   salary to use as a way of speeding up the loan
20   payments back to Valley Health Systems.
21      Q.   (BY MS. KENNEDY) Just so I understand
22   your testimony, it's your understanding that
23   Mr. Mattocks believed by eliminating your
24   position, it could save money?

VOLUME II - 184

1           MR. SIKORSKI:  Objection.
2       Q.   (BY MS. KENNEDY) For River Valley?
3           MR. SIKORSKI:  Objection.
4           THE WITNESS:  This is a belief I
5    have.
6       Q.   (BY MS. KENNEDY) But that was your
7    belief, is that correct?
8       A.   In hindsight, yes, it's my belief.
9           MR. SIKORSKI:  Would this be a good
10   time to take a break?
11          MS. KENNEDY:  Sure.
12          (A recess was taken.)
13          MS. KENNEDY:  Can you mark this,
14   please?
15          (Defendant's Deposition Exhibit
16          No. 22 offered and marked.)
17      Q.   (BY MS. KENNEDY) Mr. Richards, I'm
18   going to put in front of you what's been marked as
19   Defendant's Exhibit Number 22 and ask if you can
20   identify that, please? (Indicating.)
21      A.   (Witness examining document.)  It says
22   "Plaintiff's Answers to Defendant Valley Health
23   Systems, Incorporated Interrogatories."  This is
24   a --

MARK A. RICHARDS vs. RIVER VALLEY COUNSELING CENTER, INC. ET AL
MARK A. RICHARDS    VOLUME II    MARCH 17, 2006

VOLUME II - 197

1    record? (Indicating.)
2        A.    (Witness examining document.)  I believe
3    this looks like the projection -- financial
4    projection that I made when I wrote out my
5    business plan.
6        Q.    Is that financial projection that you
7    did as part of your entrepreneurial training
8    course?
9        A.    Yes; that's right -- this is page one,
10   actually.
11       Q.    So what's been marked with the sticky on
12   it as Exhibit 25 is actually the second page of
13   the document?
14       A.    Yes; year 2 -- year 1 and year 2.
15       Q.    Where is Berkshire Counseling Associates
16   located?
17       A.    In my home, currently.
18       Q.    Approximately how many clients do you
19   currently have?
20       A.    I don't have any clients.
21       Q.    I believe you testified a few moments
22   ago that you have -- that Berkshire Counseling
23   Associates has generated some income?
24       A.    Yes.

VOLUME II - 198

1        Q.    How is that income generated?
2        A.    Through work that I did through a
3    consulting firm, contracting with the Substance
4    Abuse and Mental Health Services Administration
5    providing mental health services in southeast
6    Louisiana.
7        Q.    Is that part of the Red Cross trip that
8    you went down on?
9        A.    No; the Red Cross trip was back in
10   September.  That was two weeks of unpaid voluntary
11   service.
12           This is with a different organization.
13   This is with SAMHSA -- Substance Abuse Mental
14   Health Service Administration -- that's the mental
15   health arm of the federal government.  It comes
16   under the Department of Health and Human Services.
17           I did work with Westover Consultants who
18   was being contracted with SAMHSA to provide mental
19   health services is New Orleans.  It's called the
20   Hurricane Katrina Project.
21       Q.    Have you had any clients as part of your
22   mental health counseling private practice with
23   Berkshire Counseling Associates?
24       A.    No.

VOLUME II - 199

1        Q.    What have you done to market your
2    private practice of Berkshire Counseling
3    Associates?
4        A.    Well, I haven't -- I've gone out and
5    spoken with doctors and referring sources --
6    mental health agencies, other mental health
7    providers in the area -- but I haven't, yet, told
8    them that I'm open for business and asked for
9    referrals.
10       Q.    What is your -- strike that.  When do
11   you anticipate opening for business and being open
12   for referrals?
13       A.    I'm hoping to do that this spring, now
14   that my daughter has been feeling better and I
15   don't believe I'm going -- I'm hoping I won't have
16   to interrupt my business to care for her.
17       Q.    Why was it you had not been open for
18   business before December of 2005?
19       A.    Well, I was taking the course and doing
20   the preliminary work up to the summer.
21           Then my daughter became ill in the
22   fall -- had a relapse -- and she was -- she
23   became -- got back on treatments and was better
24   around the time, just before the semester ended.

VOLUME II - 200

1    She became ill again at the beginning of the
2    second semester for a few weeks and has been
3    feeling better since then.  That's why I felt I
4    could go to -- to be away for a month in
5    Louisiana.
6           She still is doing well and I'm hoping
7    that this second -- or actually third round of
8    treatments has done the trick.
9        Q.    She's doing better now, Mr. Richards?
10       A.    Yes.
11       Q.    I'm glad to hear that.
12       A.    Thank you.
13       Q.    Just so I understand your testimony,
14   when you ended your program in the summer of 2005,
15   you did not start your business at that time
16   because of your daughter's illness?
17       A.    I was reticent to jump in to be
18   responsible for a caseload of clients, not being
19   sure how the next few months would go for my
20   daughter.
21           I did take time out, though -- two
22   weeks, though -- to go to Louisiana.  She was
23   doing well in September and I knew I would not
24   have any ongoing responsibilities at the end of

VOLUME II - 217

1    Q.    Were you paid on an hourly or a salary
2    basis?
3    A.    I was paid on a salary basis and was
4    recorded by the hours.
5    Q.    So you received a set amount each week,
6    even if your hours varied a little bit, is that
7    correct?
8    A.    As long as the hours didn't dip below a
9    minimum.
10    Q.    What was that minimum?
11    A.    Thirty-four hours a week.
12    Q.    So if you worked, for example,
13    thirty-six hours, you would not get extra pay, is
14    that right?
15    A.    That's correct.
16    Q.    But if you dipped below thirty-four --
17    A.    (Interposing) Actually at points I
18    would. I'm not sure exactly why that happened but
19    that was not common.
20        Usually or almost always, if it dipped
21    below, I would have to take vacation time or
22    personal time or if I had accumulated holiday
23    time, holiday time.
24        There was no Family Leave time. That

VOLUME II - 218

1    was not a category on the time sheet.
2    Q.    Did you record on your time sheets any
3    time that was taken for Family Leave by indicating
4    it was for Family Leave?
5    A.    No; there's no place to indicate that on
6    the time sheets.
7    Q.    Was your pay at all docked for your
8    leave that was attributed to Family Medical Leave?
9    A.    It would be taken as personal time or
10    vacation time or holiday time. I have quite a bit
11    of that usually stored up.
12    Q.    Do you know for a fact whether
13    Mr. Mattocks saw the marks on your face which was
14    treatment for skin cancer or are you just
15    speculating that he must have known?
16    A.    I never had a conversation with him
17    about it so I don't know what he saw.
18    Q.    Do you know whether Mr. Mattocks has
19    skin cancer?
20    A.    I don't know.
21    Q.    Did you ever see any lesions on his face
22    that you suspected might be cancerous lesions or
23    any marks that might have been cancerous lesions?
24    A.    I never saw anything that looked like my

VOLUME II - 219

1    marks; no.
2    Q.    Aside from what might have looked like
3    your marks but what might have been cancerous
4    lesions?
5    A.    I wouldn't know how to recognize it
6    since even my dermatologist doesn't know if it's
7    cancer until he puts it under a microscope.
8    Q.    Did you see anything that looked like
9    Mr. Mattocks had had any surgery or portions of
10    skin frozen off on his face?
11    A.    I don't remember.
12    Q.    Do you know whether Mr. Kassis has any
13    mental or physical impairment?
14    A.    He has a back problem.
15    Q.    Do you know the nature of that back
16    problem?
17    A.    At times he needs to stand because it
18    bothers him to sit. That's about as much as I
19    know about it.
20    Q.    What about Mr. Avakian? Do you know
21    whether he has any mental or physical impairments?
22    A.    He had some problems with his intestines
23    while he reported to me.
24    Q.    Do you know when that was?

VOLUME II - 220

1    A.    I think I knew it for the last few years
2    that he was working for me.
3    Q.    Up until the time of your separation,
4    was it ongoing?
5    A.    I believe it was. He also was having a
6    leakage in his bowel of blood. That was towards
7    the time when I was terminated.
8        That was something that he had gone
9    through tests for and they couldn't locate the
10    problem or what the leakage -- where the blood was
11    coming from.
12    Q.    Did he ever take any time off in
13    connection with his condition?
14    A.    Yes.
15    Q.    What about Mr. Kassis? Do you know
16    whether he ever took any time off in connection
17    with his back problem?
18    A.    I never knew when Mr. Kassis was working
19    or not working unless we had a meeting together.
20    Q.    Do you know whether Mr. Mattocks had any
21    physical or mental impairments when he was working
22    with you?
23    A.    I had heard that he had a problem with
24    phlebitis.

VOLUME II - 221

1    Q.  Do you know when that was?
2    A.  He was out for a period of time during
3  the summer and I heard that he was out -- it
4  seemed like it was an extended time.  I heard that
5  it was because of phlebitis.
6    Q.  What is phlebitis?
7    A.  My understanding is it's a possibility
8  of blood clots in the leg that could move to the
9  other parts of the body, including the lungs.
10    Q.  Who did you hear this from, that
11  Mr. Mattocks may have phlebitis?
12    A.  I heard it from a doctor who worked at
13  the agency.
14    Q.  Who was that?
15    A.  Doctor Linn.
16    Q.  You had referenced a few times that
17  Mr. Mattocks wanted you to attend some morning
18  meetings that were to take place, is that correct?
19    A.  That's correct.
20    Q.  I believe you said that at some point
21  after that, his attitude towards you changed, is
22  that correct as well?
23    A.  Yes.
24    Q.  Did you ever complain to anyone --

VOLUME II - 222

1  formally or informally -- that you thought
2  Mr. Mattocks was treating you differently or
3  inappropriately when you were still employed at
4  River Valley?
5    A.  I think only to my wife.
6    Q.  No one ever at River Valley?
7    A.  I don't believe so.
8    Q.  Did you ever ask Mr. Mattocks to
9  schedule the meetings at some time other than in
10  the morning if you felt you could not attend?
11    A.  No; that was a meeting that seemed to be
12  locked into that time slot.
13         I instead asked him to -- the purpose of
14  the meeting and my role -- what my role would be
15  in it and if there was some other way I could be
16  of assistance in that role.
17    Q.  What did he tell you the purpose of the
18  meeting was to be?
19    A.  He said he wasn't clear himself.  He was
20  still working out the purposes of the various
21  meetings and that was something that was in
22  process.
23    Q.  What did he tell you your role was to be
24  in this meeting?

VOLUME II - 223

1    A.  He didn't say anything other than what
2  my role was in the larger meetings that I already
3  attended.
4    Q.  Did you give him any specific
5  suggestions as to how you could -- if you couldn't
6  be at the meetings -- how you could fulfill
7  whatever role it was going to be that you would
8  play at these meetings?
9    A.  No.  I asked him to give me direction
10  rather than my volunteering any ideas.
11    Q.  Did he have any suggestions for you?
12    A.  Well, that's when he said he was still
13  working out what the roles of the meetings -- what
14  the purposes of the meetings would be and that he
15  hadn't worked that out yet.
16    Q.  Did these meetings that you say he
17  wanted you to attend, did they actually begin
18  taking place at some point, to your knowledge?
19    A.  They were already in existence.
20    Q.  Did you attend any of them?
21    A.  On occasion, I think maybe once or twice
22  because of something -- a special topic that was
23  being addressed in the meeting.
24    Q.  Were you to only attend when there were

VOLUME II - 224

1  certain topics you were going to address or were
2  you supposed to be attending all of the meetings?
3    A.  To be attending all of the meetings.
4    Q.  Are you saying that you weren't able to
5  attend any other than those where there were
6  special topics addressed?
7    A.  That was the only time that I came in to
8  those meetings, and that was, I believe, prior to
9  his asking me anyway.
10    Q.  Once he asked you to attend the
11  meetings, did you, in fact, attend any of them?
12    A.  No.
13    Q.  Why was that?
14    A.  That was because I asked him what the
15  purposes of those meetings would be because I did
16  not feel that it was going to work out for me to
17  be in regular attendance at those meetings because
18  of my daughter, so I dropped it.
19    Q.  He didn't tell you that you had to
20  attend those meetings?
21    A.  No.
22    Q.  And he did not -- did he identify any
23  critical role you would play in those meetings?
24    A.  No; that's when we had the conversation

VOLUME II - 229

1  abilities of Mr. Mattocks as a director, from your
2  perspective.
3      A.  Which particular parts of the
4  administration?
5      Q.  What did you consider, if anything, to
6  be his strengths?
7      A.  There was an instance where an employee
8  notified me that an employee in another program
9  was acting inappropriately and I determined that
10  there was a potential for workplace violence.  I
11  called Mr. Mattocks up and gave him the
12  information.
13      He responded quickly, took the
14  information from me and addressed the situation
15  quickly and decisively and I appreciated that and
16  so did my employees who brought the issue to me.
17      Q.  Can you think of any other strengths you
18  perceived in Mr. Mattocks?
19      A.  He gave a vision of growing the program
20  and met with my team when I asked him if he could
21  to answer their questions.
22      He improved their morale because they
23  felt very positively about his vision and his
24  desire to grow the program and treat it with

VOLUME II - 230

1  respect.
2      Q.  Can you identify anything you saw as
3  Mr. Mattocks' weaknesses as the executive
4  director?
5      MR. SIKORSKI:  Objection; go ahead
6  and answer.
7      THE WITNESS:  There were times that
8  it seemed he repeated himself and did not remember
9  stories that he had told in a group setting and
10  privately and repeated them a few times.
11      I got along well with him and I saw our
12  relationship as being an orientation kind of
13  phase.
14      MR. SIKORSKI:  The question is
15  weakness.  Are you still answering that question?
16      Q.  (BY MS. FABBO)  Are you done answering
17  the question regarding his weaknesses?
18      A.  I'm done.
19      Q.  You started to say, Mr. Richards, that
20  you got along well with Mr. Mattocks.  Could you
21  tell me what you mean by "well"?
22      A.  As I mentioned, when I would call him up
23  and ask him to respond to something, he responded
24  to it.  He sought out my opinion.  He respected my

VOLUME II - 231

1  role.
2      We felt good about each other's
3  competencies and the joint vision that we had for
4  the program.
5      Q.  When did you first become aware that
6  Mr. Mattocks had a degree from Parkwood
7  University?
8      A.  I saw it online where he had an
9  announcement of his taking the job at River Valley
10  Counselling.
11      Q.  Did you see this prior to the time that
12  he started at River Valley Counselling?
13      A.  No.
14      Q.  Did you see it prior to the end of your
15  employment at River Valley?
16      A.  No.
17      Q.  Do you believe the fact that
18  Mr. Mattocks had a degree from Parkwood University
19  played any role in any decision affecting you?
20      A.  I don't know how to answer that.
21      Q.  I'm asking you what your belief is?
22      A.  I believe that he did not have the
23  training that was necessary to be in the job that
24  he was in.

VOLUME II - 232

1      Q.  Are you on any medications today,
2  Mr. Richards?
3      A.  No.
4      Q.  Have you taken any medications for your
5  mental health situation?
6      A.  No.
7      Q.  Have you ever had any formal counseling?
8      A.  Yes.
9      Q.  When was that?
10      A.  Seven years ago, eight years ago.
11      Q.  Can you just very generally tell me what
12  prompted that counseling?
13      MR. SIKORSKI:  Very generally.
14      THE WITNESS:  It was a transitional
15  phase in my life and I wanted to get an objective
16  opinion for some changes that were happening in my
17  life.
18      Q.  (BY MS. FABBO)  Personal or
19  professional?
20      A.  Personal.
21      Q.  Other than seven or eight years ago,
22  have you ever had any other counseling -- formal
23  counseling?
24      A.  With my daughter and my wife.

# EXHIBIT A
# Part 3 of 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION
CIVIL ACTION NO. 05-30061-MAP

MARK A. RICHARDS,                              )
    Plaintiff                               )
                                            )
vs.                                            )
                                            )
RIVER VALLEY COUNSELING CENTER, INC., )
VALLEY HEALTH SYSTEMS, INC.,                   )
DAVID G. MATTOCKS AND DONNA VIENS,             )
    Defendants                              )

**EXHIBIT**
Richards
9
3-2-06 6v

## PLAINTIFF'S ANSWER TO DEFENDANT, RIVER VALLEY COUNSELING CENTER'S, INTERROGATORIES

QUESTION
1.    Please identify yourself and your date of birth and social security number.

ANSWER
    Mark A. Richards;

    Date of Birth:  July 6, 1950

    Social Security No.:  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

QUESTION
2.    Please identify each person you claim has knowledge of facts pertinent to the allegations in the Amended Complaint, and state the substance of the knowledge you claim they have.

ANSWER
    1.  David G. Mattocks, Vernon, VT.   Mr. Mattocks has knowledge as to my job performance, my job duties, my request for FMLA, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.  He also has knowledge as to the reasons for my termination.

    2.  Donna Viens, Director of Human Resources for River Valley Counseling Center, 319 Beech Street, Holyoke, MA.  Ms. Vienes has knowledge as to my job performance, my job duties, my request for FMLA, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.   She also has knowledge as to the reasons for my termination.

    3.  Leigh Richards, 19 Lyman Road, Chester, MA.  (413) 667-3157.  My daughter has knowledge concerning her illness, and the care I provided her resulting there from.  She

also has knowledge as to damages (more specifically, how the loss of my job has affected me personally).

4.  Karen Richards, 19 Lyman Road, Chester, MA.  (413) 667-3157.  My wife has knowledge as to my use of FMLA, our daughter's illness, and the care I provided to our daughter.  She also has knowledge as to damages (more specifically, how the loss of my job has affected me personally).

5.  Hank Porten, CEO, Valley Health Systems, 20 Hospital Drive, Holyoke, MA.  Mr. Porten has knowledge as to my job performance, my job duties, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.   He also has knowledge as to the reasons for my termination, and the relationship among the defendants.

6.  David Avakian, River Valley Counseling, Center, 319 Beech Street, Holyoke, MA.  Mr. Avakian has knowledge as to my job performance, my request for FMLA, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.  Mr. Avakian also has knowledge as to the requirements and duties of the job he performed at River Valley Counseling Center following my termination.

7.  Jeff Kassis, River Valley Counseling Center, 319 Beech Street, Holyoke, MA.  Mr. Kassis has knowledge as to the requirements and duties of the job he performed at River Valley Counseling Center following my termination.

8.  Jeff Eagle, Health Enhancement Services, Inc., 42 Natka Drive, Centerville, MA 02631.  Mr. Eagle has knowledge as to the background, qualifications, and education of David Mattocks, Mr. Mattocks search for employment, and his being hired at River Valley Counseling Center.

9.  Matthew Haas, 319 Beech Street, Holyoke, MA.  Mr. Haas is the Executive Director of River Valley Counseling Center.   Mr. Haas has knowledge as to my professional qualifications and stature in the mental health community.

10. Abraham Linn, MD, 319 Beech Street, Holyoke, MA.  Dr. Linn is the Medical Director of River Valley Counseling Center's Psychiatric Day Treatment Program.  Dr. Linn has knowledge as to my skill, experience, and success in running the programs at River Valley.  He also has knowledge as to my clinical expertise.

11. Nenita Shea, MD .  Dr. Shea has knowledge as to my skill, experience, and success in running the programs at River Valley.  He also has knowledge as to my clinical expertise.

I reserve my right to supplement this answer at a later date, pending further discovery.

<u>QUESTION</u>
3.     Please identify each person whom you expect to call as an expert witness at the trial of this matter, and state the subject matter on which each expert is expected to testify, the substance of the facts and opinions to which each expert is expected to testify, and a summary of the grounds for each opinion.

408595

ANSWER

> My attorney has informed me that, as of this date, no determination has been made concerning expert trial witnesses. I understand my obligation to supplement this answer when, and if, such a decision is made.

QUESTION

4.    Please identify each person other than expert witnesses whom you intend to call as a witness at trial of this matter and the substance of each witness's expected testimony.

ANSWER

> My attorney has informed me that, as of this date, no determination has been made concerning trial witnesses. I understand my obligation to supplement this answer when, and if, such a decision is made.

QUESTION

5.    Please state the basis for your claim that you have worked for RVCC numerous hours uncompensated, as alleged in paragraph 8 of the Amended Complaint.

ANSWER

> I worked for RVCC for numerous hours, uncompensated, covering the agency's after-hours emergencies. Every 6 – 8 weeks, for a one week period at a time, I worked these extra hours. This began in about 1997 or 1998, during CEO Jim Siemianowski's administration.

QUESTION

6.    Please state the basis for your claim that your daughter has a disability, as alleged in paragraphs 10 and 13 of the Amended Complaint.

ANSWER

# CONFIDENTIAL

QUESTION

7.    Please identify all communications between you and RVCC concerning your taking intermittent leave in 2000-2001 and identify all documents reflecting or comprising such communications. Please include in your description:

> (a)    the date and place of each such communication with RVCC;

408595

(b)      each person who was present at, involved in, connected with, or participated in such communication;

(c)      the type of communication in which this information was provided to you and;

(d)      the substance of each communication.

ANSWER

On April 10, 2000, I filled out a River Valley Counseling Center, Inc. LOA Request Form, indicating I would need to take intermittent/ongoing leave, and submitted it to the Human Resources Department (please see LOA Request Form, attached hereto as Exhibit 7A). On April 17, 2000, I received the Employer Response to Employee Request for Family Medical Leave (copy attached hereto as Exhibit 7B). This response form indicated that RVCC had received my request to take family medical leave due to a serious health condition affecting our child. The response form also indicated that my request was approved. I also advised my entire staff at the time of my situation and that I would be taking intermittent leave under FMLA.

QUESTION

8.     Please identify all communications between you and RVCC concerning your taking intermittent family leave in 2004 and identify all documents reflecting or comprising such communications. Please include in your description:

(a)      the date and place of each such communication;

(b)      each person who was present at, involved in, connected with, or participated in such communication;

(c)      the type of communication in which this information was provided to you; and

(d)      the substance of each such communication.

ANSWER

On August 30, 2004, I forwarded a memorandum to David Mattocks, CEO, concerning my request for leave under the Family Medical Leave Act, in order to attend to the medical needs of my seriously ill daughter (copy attached hereto as Exhibit 8A). Mr. Mattocks said he understood, and that he had been though a similar experience. He also told me that I should fill out the FMLA paperwork obtained from Donna Viens. On September 3, 2004, I received correspondence from Donna Viens, Director of Human Resources, indicating that my request had been received and providing forms for me to fill out (copy attached hereto as Exhibit 8B). I had the paperwork signed by my daughter's doctor, Arthur Blake, MD. On September 17, 2004, I received correspondence from Donna Viens, indicating that my application had been reviewed and approved for intermittent family leave to care for my ill child (copy attached hereto as Exhibit 8C). I then advised my entire staff to expect my periodically being out on FMLA intermittently.

QUESTION

9.  Please identify all communications between you and RVCC concerning your being away from work for intermittent FMLA leave in 2004 and identify all documents reflecting or comprising such communications. Please include in your description:

 (a)  the date and place of such communication;

 (b)  each person who was present at, involved in, connected with, or participated in such communication;

 (c)  the type of communication in which this information was provided to RVCC; and

 (d)  the substance of each such communication.

ANSWER

When I was out on FMLA, I would advise different personnel, depending on who I was scheduled to meet with that particular day. If my absence was unexpected, usually first thing in the morning, I would inform Mr. Mattocks if I had a meeting with him. I would always inform the program supervisor, David Avakian, know and he would pass it along to my staff at the daily morning meeting. If I knew beforehand that I would need to be out, I would notify the necessary individuals, as well as my staff, in advance. As much as possible, I would try to make up my missed time during each two-week pay period. I tried very hard to minimize any impact my personal situation might have on my staff and the other agency personnel by attempting to make up as much time as possible. In addition, please see Answer # 8.

QUESTION

10.  Please state the basis of your claim that RVCC terminated your employment because of your intermittent FMLA leave, as alleged in paragraph 13 of the Amended Complaint.

ANSWER

OBJECTION. The plaintiff objects to this interrogatory on the grounds that it seeks a legal opinion and analysis from a lay person and requests a lay person to render an opinion on a legal term which is more properly a question of fact to be determined by the trier of fact and/or jury. Without waiving the foregoing objections, a few days before I was terminated, Ms. Donna Viens relayed a story to me in which an employee at her other employer's business was on intermittent FMLA. Ms. Viens informed me that, in this other case, the employee was about to take an increased amount of leave under FMLA, and she was able to intervene in her human resources position and prevent the employee from going out on leave.

My daughter's symptoms increased due to her diagnosis of  **CONFIDENTIAL**  and the resulting treatments. Mr. Mattocks did not like that I needed to take intermittent leave under FMLA to care for my daughter. I believe he may have been concerned that I would not have the time available to perform my duties as he envisioned them. He saw my assistant, David Avakian, as being more readily available for work.

408595

Ms. Viens also did not approve of the fact that I was taking intermittent family leave to care for my seriously ill daughter. A few days before I was terminated, Ms. Donna Viens relayed a story to me in which an employee at her other employer's business was on intermittent FMLA. Ms. Viens informed me that, in this other case, the employee was about to take an increased amount of leave under FMLA, and she was able to intervene in her human resources position and prevent the employee from going out on leave. It was my impression that she was proud of her intervention to limit FMLA leave in this instance.

Furthermore, despite his knowledge of my daughter's illness and my need to care for her, David Mattocks informed me that he wanted me to attend a new early-morning meeting every day. Up to this point, I had not been required to attend this meeting. I was worried that daughter's morning symptoms would cause me to be absent from this meeting to frequently, and I informed Mr. Mattocks of my reservations in this regard. Following this exchange, Mr. Mattocks and my relationship changed, as he treated me differently than he used to.

Valley Health Systems, and Hank Porten as CEO of Valley Health Systems, failed to protect my rights under FMLA and, in addition, failed to intervene on my behalf when David Mattocks, Donna Viens, and River Valley Counseling Center unlawfully terminated me due to my lawful use of FMLA.

QUESTION
11.    Please state the basis of your claim that you suffered from a disability, as alleged in paragraph 14 of the Amended Complaint.

ANSWER
       I suffered from skin cancer. In addition, I had the need to care for my seriously ill daughter.

QUESTION
12.    Please state the basis of your claim that RVCC regarded you as having a disability, as alleged in paragraph 14 of the Amended Complaint.

ANSWER
       Please see Answer # 11 and Answer # 13.

QUESTION
13.    Please identify all communications between you and RVCC concerning your disability and identify all documents reflecting or comprising such communications. Please include in your description:

       (a)    the date and place of each such communication with RVCC;

       (b)    each person who was present at, involved in, connected with, or participated in such communication;

       (c)    the type of communication in which this information was provided to you and;

408595

(d)    the substance of each communication.

ANSWER

I suffered from skin cancer, and informed my staff of my intention to be out of work for a day or two in order to undergo minor surgery in this regard. It was obvious to everyone that I had a problem with my skin. I would periodically receive treatments by my dermatologist, wherein small spots on my face were "burned" with liquid nitrogen. This had been going on for many years and, following these treatments, the spots were quite visible. Oftentimes, clients would notice and comment on it. A year earlier, I had surgery on my face which was slow in healing and left a significant scar.

I was scheduled to have additional skin cancer surgery performed the week I was terminated. Prior to my termination, I had informed Mr. Mattocks and Mr. Avakian of my need to be out a day or two for this surgery.

In addition, please see Answer #'s 7, 8, & 9.

QUESTION

14.    Please state the basis of your claim that RVCC terminated your employment because of your disability or because it regarded you as disabled, as alleged in paragraphs 20 and 22 of the Amended Complaint.

ANSWER

Please see Answer # 13.

QUESTION

15.    Please state the basis of your claim that RVCC terminated your employment because of your association with a disabled person, your daughter, as alleged in paragraphs 20 and 22 of the Amended Complaint.

ANSWER

My daughter's symptoms increased due to her diagnosis of **CONFIDENTIAL**   and the resulting treatments. Mr. Mattocks did not like that I needed to take intermittent leave under FMLA to care for her. I believe he may have been concerned that I would not have the time available to perform my duties as he envisioned them. He saw my assistant, David Avakian, as being more readily available for work. In addition, please see Answer # 10.

QUESTION

16.    Please state the basis of your claim that RVCC terminated your employment because of your age, as alleged in paragraphs 24 and 26 of the Amended Complaint.

ANSWER

I was the most expert clinician in my program and, in fact, supervised the clinicians. I was the most experienced administrator and supervisor in the type of treatment delivery program I directed. I was also the most financially successful program director and, at the time of my termination, was on-target to once again exceed my revenue target. After

my termination, my director's job was allegedly split up between my second-in-charge, David Avakian, and Jeff Kassis. Mr. Kassis is not qualified to hold this position according to the Department of Public Health Regulations, as he has not worked in a psychiatric day treatment program for at least one year, and this position is to be held by a single person (not divided up amongst two or more individuals). My assistant, David Avakian, is approximately 11 years younger than me. He has no obvious health conditions.

QUESTION

17.     Please identify each and every treating physician, therapist, psychiatrist, psychotherapist, counselor, or other health care provider consulted by you from November 2000 to the present, stating the details and results of any tests performed on you or treatments prescribed for you by each practitioner, the diagnosis and prognosis given by each practitioner, and identify all documents concerning such consultations or visits.

ANSWER

OBJECTION. The plaintiff objects to this interrogatory on the grounds that it seeks information neither relevant nor material to this legal action nor reasonably calculated to lead to the discovery of admissible evidence; and is vague, overly broad, and undefined.

QUESTION

18.     Please itemize and describe with particularity each and every damage, loss, injury, or harm which you claim you have suffered or will suffer as a result of the offenses alleged in the Amended Complaint, describing the manner in which each such damage, loss, injury, or harm was calculated and identifying all documents concerning such damage, loss, injury, or harm.

ANSWER

Please see Compensation Analysis, attached hereto as Exhibit # 18.

QUESTION

19.     Please identify all measures taken by you to attempt to mitigate the alleged damages that you lost or suffered as a result of the offenses or claims alleged in the Amended Complaint, describing the results of all such measure taken and identifying all documents concerning such measures.

ANSWER

I have started a business, Berkshire Counseling Associates. Please see my business plan, included with my document response. In addition, please see Answer # 18.

QUESTION

20.     Please itemize each and every source of income you have received since November 2004, including but not limited to the person or entity which paid you the income, the amount of the income, and the services rendered in exchange for the income.

ANSWER

Please see Answer # 18.

QUESTION

21.    Please describe with particularity in what ways, if any, you sustained emotional distress
       as a result of the offenses or claims alleged in the Amended Complaint, describing all
       physical, mental, and emotional manifestations resulting from that alleged emotional
       distress, identifying the name and address of any medical, social, or psychiatric health
       care provider or counselor you consulted as a result of this alleged emotional distress; and
       identifying all documents concerning such consultations.

ANSWER

       I suffered from emotion distress following my termination from River Valley Counseling
       Center.  I did not treat with a paid professional.  Many of my friends are mental health
       clinicians, and I used them for support.  My wife has also been very supportive
       concerning my emotional distress.  In addition, I am a mental health professional and
       have treated many people who have experienced a loss similar to what I experienced.  My
       self-esteem has suffered, as has the esteem I was once held in by my family, friends, and
       co-workers.

QUESTION

22.    Please identify the "new venture" referred to in the document entitled "Mark Richards
       Compensation Analysis August 12, 2005," a copy of which is attached hereto as Tab 1.

ANSWER

       I have started a business, Berkshire Counseling Associates.  Please see my business plan,
       included with my document response.

       Signed under the pains and penalties of perjury this ____ day of October, 2005.

                                                       _____
                                                       Mark A. Richards


AS TO OBJECTIONS

By_____
John C. Sikorski, Esq., of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO No.:  461970

CERTIFICATE OF SERVICE

I, John C. Sikorski, Esq., hereby certify that on this $19$ day of October, 2005, I served a copy of the above upon the parties in the action by mailing, postage prepaid, to counsel, Mary J. Kennedy, Esq., Francis D. Dibble, Jr., Esq. and Katherine A. Robertson, Esq., Bulkley Richardson & Gelinas, LLP, 1500 Main Street, P.O. Box 15507, Springfield, MA 01115.

Subscribed under the penalties of perjury.

John C. Sikorski

408595



RIVER VALLEY
COUNSELING
C • E • N • T • E • R

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 • 536 • 8221
FAX 413 • 536 • 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 534 • 7158

AIDS Project
207 Elm Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 538 • 9126

Chicopee Clinic
147 Grape Street
Chicopee, MA 01013
413 • 594 • 2141

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 • 534 • 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 • 534 • 2625

AIDS Project
120 Maple Street
Springfield, MA 01103
413 • 737 • 2437

Crossroads
207 Elm St.

## MEMO

Aug. 30, 2004

To:   David Mattocks, CEO

From: Mark Richards, Program Director

Re:   Request for Leave -  Family Medical Leave Act (FMLA)

I would like to request using family medical leave (FMLA) in order to attend to the medical needs of my daughter. She has a serious medical illness and is about to commence intensive treatments which the doctors are telling me may last between six months and two years.

I expect that the time I would require would mostly be comprised of intermittent periods away from work lasting from a portion of a day to a day at a time. I hope that this will cause minimal disruption to my duties here at River Valley Counseling Center.

Thank you for your consideration. I am familiar with the agency policy concerning this type of leave and understand that I need to complete the FMLA Form.

cc: Donna Viens,  Human Resource

EXHIBIT
Richards
10
2-2-06 EV

MR000019



A United Way Agency
An Affiliate of Holyoke Hospital



**RIVER VALLEY COUNSELING C·E·N·T·E·R**

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 • 536 • 8221
FAX 413 • 536 • 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 • 534 • 3361

Crossroads Clinic
207 Elm Street
Holyoke, MA 01040
413 • 536 • 4240

Chicopee Clinics
99 Church Street
413 • 592 • 4632
147 Grape Street
413 • 594 • 2141
Chicopee, MA 01013

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 • 534 • 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 • 534 • 2625

AIDS Project
397 Appleton Street
Holyoke, MA 01040
413 • 532 • 3334

AIDS Project
120 Maple Street
Springfield, MA 01103
413 • 737 • 2437

September 3, 2004

Mr. Mark Richards
Lyman Road
Chester, MA  01011

Dear Mark:

I am writing this letter to you regarding your request for an Intermittent Family leave to care for your ill child.

Enclosed please find the Request for Leave of Absence form and the Federal Certification of Health Care Provider form for your and your daughter's physician to complete.

Please return the forms to me within the next 15 days for review and approval.

As stated on the Request for Leave of Absence form, you may be required to exhaust your accrued Holiday, Vacation and Personal time during the leave.

If approved, you should notify David Mattocks of your need to be away from work for FMLA needs at least 24 hours in advance whenever foreseeable.  In the event that the time away is not foreseeable, please notify him of your absence as soon as possible.

We understand this is a difficult time for you and your family.  Please let us know if there is anything we can do for you.

Sincerely,

Donna Viens, PHR
Director, Human Resources

EXHIBIT
Richards
11
2-2-06 EV

Enclosures

CC:    D. Mattocks
       File

MR000018



## LOA — Form 1: Request for Leave(s) of Absence

### I. EMPLOYEE INFORMATION                          (To be completed by employee)

EMPLOYEE NAME: Mark Richards   SSN# 067 92 1296   DATE: 9-8-04

REGION:   DEPARTMENT: Crossroads   LOCATION: 267 E/m St.

POSITION TITLE: Director   HIRE DATE & PRIOR DATES: July 1986   STATUS: FULL-TIME / PART-TIME 34 Hrs-Wk

### II. PURPOSE OF LEAVE(S)                          (To be completed by employee)

I wish to apply for a:   Disability Leave of Absence
(check all that apply)   Workers' Compensation Leave of Absence
Personal Leave of Absence (attach a letter describing the reason for the leave of absence)
Military Leave of Absence (attach a copy of your military orders)
Family/Medical Leave of to care for my:   ill spouse   ill child   Newborn/ adopted/new foster child
Because I am unable to perform my job functions due to my own serious health condition

### III. DURATION OF LEAVE(S)                          (To be completed by employee)

a) I request a Leave of Absence from 9-8-04 to 9-8-05
b) Is the leave(s) request a block of time ___ or intermittent ___ (only eligible under FMLA).
If intermittent, please explain As needed
c) I request an extension of prior: _____ Leave of Absence from _____ to _____
   Prior dates of leave approved _____ to _____

### IV. REQUIREMENTS OF THE LEAVE(S)                          (To be completed by employee)

d) I understand that the Certification of Health Care Provider will be required concerning the medical necessity for care to be provided.  You may also be requested to obtain a second opinion from a physician of RVCC's choice and expense.  **Medical Certification must be received within fifteen (15) days from this request or the LOA may be denied.**  I understand that re-certification may be required.  I understand that while on leave periodic status reports may be required.
e) I have taken a total of _____ ( Days•  Weeks•  Hours) of leave to care for a parent, newborn, newly adopted/new foster child, or myself for medical reasons in the last 12 months from this request.  I understand that documentation to verify family relationship may required.
EMPLOYEE SIGNATURE _____Mark Richards_____ DATE 9-8-04

### V. INTENT TO WORK                          (To be completed by employee)

f) I anticipate the leave to continue through Intermittent _____.  I understand that I need to inform the RVCC Human Resources Department at least fourteen (14) days before I plan to return to work.

### VI. BENEFITS                          (To be completed by employee)

• I have _____ sick/vacation/holiday/personal hours available.  I understand that depending upon the type of leave my accrued hours will be exhausted and the remainder of the leave will be unpaid.
• I understand that my health insurance coverage will be automatically continued during the leave if I pay the same portion I am paying as an active employee by the 1st of every month.  I understand that I must contact the Human Resources Department to discuss continuation of my other benefits during the leave period.  I understand that I must pay the entire cost of any other benefits while on leave.
• I understand that I must return to work the first business day after my leave ends.  If I do not, my employment may be terminated in accordance with the company policy.  Depending on my reason for not returning, I may have to reimburse RVCC for the cost of my health care premiums during the leave.

### VII. ELIGIBILITY                          (To be completed by Supervisor/Manager)

1.   Number of months actually worked by employee 19 ___
2.   Number of hours worked in the rolling 12 month period prior to start of leave _____

*Employees are hired by RVCC for an indefinite and unspecified duration and as such, none of our employment classifications can guarantee employment for any specific length of time.  Employment is at the mutual consent of both the employee and RVCC, and can be discontinued, at any time, by either the employee or RVCC, at will and with or without cause or advance notice.*

EMPLOYEE NAME (PRINT) Mark Richards   EMPLOYEE SIGNATURE M.Richards   DAY TELEPHONE 540 1220   DATE 9-8-04

SUPERVISOR/MANAGER NAME (PRINT)   SUPERVISOR/MANAGER SIGNATURE   DAY TELEPHONE   DATE

EXHIBIT
Richards
12
2-2-06 ev

# CONFIDENTIAL

## Exhibit 13 to Plaintiff's Deposition



RIVER VALLEY
COUNSELING
C · E · N · T · E · R

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 • 536 • 8221
FAX 413 • 536 • 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 534 • 7158

AIDS Project
207 Elm Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 538 • 9126

Chicopee Clinic
147 Grape Street
Chicopee, MA 01013
413 • 594 • 2141

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 • 534 • 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 • 534 • 2625

AIDS Project
120 Maple Street
Springfield, MA 01103
413 • 737 • 2437

September 17, 2004

Mr. Mark Richards
Lyman Road
Chester, MA 01011

Dear Mark:

I am writing this letter to you regarding your request for an Intermittent Family leave to care for your ill child.

Your application has been reviewed and approved for intermittent leave.

It is crucial to your continued eligibility for this leave status to notify David Mattocks of your need to be away from work for FMLA needs **at least 24 hours in advance** whenever foreseeable. In the event that the time away is not foreseeable, please notify him of your absence as soon as possible. Failure to keep David informed of your absence may result in revoking of the leave or disciplinary action.

When you do take full days of leave from work, you will be required to use vacation, personal or any remaining holiday accruals you have.

Please let us know if you have any remaining questions.

Sincerely,

Donna Viens, PHR
Director, Human Resources

CC:    D. Mattocks
       File

EXHIBIT
Richards
14
2-2-06 EV

MR000011

A United Way Agency
An Affiliate of Holyoke Hospital



**RIVER VALLEY COUNSELING CENTER**

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 • 536 • 8221
FAX 413 • 536 • 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 534 • 7158

AIDS Project
207 Elm Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 538 • 9126

Chicopee Clinic
147 Grape Street
Chicopee, MA 01013
413 • 594 • 2141

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 • 534 • 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 • 534 • 2625

AIDS Project
120 Maple Street
Springfield, MA 01103
413 • 737 • 2437

September 16, 2004

David P. Avakian
99 Chesterfield Road
Westhampton, MA 01027-9633

Dear David:

On behalf of River Valley Counseling Center, Inc., I am pleased to formally offer you a promotion to the new position of Assistant Director in our Psychiatric Day Treatment Program. You will report directly to Mark Richards for this position; however, I would like to meet with you on a regular basis as well to further promote our shared vision of moving our programs and services forward.

Your position is salaried at an hourly rate of $22.50, and you are scheduled to work forty (40) hours weekly; your bi-weekly pay will therefore be $1,800, less any mandated or elected deductions. This increase also includes the general 2½ % increase. Your start date has been set for Monday, October 4, 2004.

Please sign and return this letter in the enclosed, postage-paid envelope as an indication of your acceptance of this employment offer; please keep a copy of this letter for your records. Again, on behalf of the agency and the individuals we serve, congratulations on your promotion!

Cordially,

David G. Mattocks, Ph.D.
Chief Executive Officer

EXHIBIT
Richards
16
2-2-06 EV

c:    Mark Richards, Program Director
      RVCC Human Resources

I accept the terms of employment as outlined in this letter.

_____        _____
David P. Avakian                         Date

Enclosure

DGM



November 4, 2004

Dear Mental Health Colleague,

Due to family illness, I am leaving my position as director of River Valley Counseling Center's  Crossroads Psychiatric Day Treatment/ Partial Hospitalization  and the DBT Programs.  This was a difficult decision for me to make.  I am gratified that David Avakian has accepted the Crossroads director responsibilities.  I am confident that under Dave's leadership, the most experienced  Day Treatment team in the Commonwealth will continue to deliver excellent care for some of our most afflicted consumers.

Thank you for the support you have given me during the past 16 years.  Thank you especially for the care you continue to give our friends and neighbors with mental illness.


Sincerely,



Mark Richards


DEFENDANT'S EXHIBIT
2) Richards
3/17/06
PENGAD 800-631-6989

# EXHIBIT B

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
 2                   Western Division

 3              C.A. No. 05-30061-MAP

 4

 5    MARK A. RICHARDS            )
                    Plaintiff     )
 6    v.                          )
                                  )
 7    RIVER VALLEY COUNSELING CENTER, INC.,)
      VALLEY HEALTH SYSTEMS, INC.,     )
 8    DAVID G. MATTOCKS and DONNA VIENS  )
                    Defendants     )
 9

10

11

12          DEPOSITION OF:  DAVID AVAKIAN taken

13    before Jessica R. Stasio, Notary Public-Stenographer,

14    pursuant to Rule 30 of the Federal Rules of Civil

15    Procedure, at the law offices of ROBINSON DONOVAN,

16    P.C., 1500 Main Street, Springfield, Massachusetts

17    on February 16, 2006.

18

19

20    Appearances: (see page 2)

21

22

23              Jessica R. Stasio
                Registered Professional Reporter
24
```

**Page 3**

```
 1              I N D E X

 2

 3    WITNESS    DIRECT   CROSS   REDIRECT   RECROSS

 4    DAVID AVAKIAN  4

 5

 6

 7

 8

 9    EXHIBITS:                   PAGE

10

11    Exhibit 1, deposition notice          32

12    Exhibit 2, letter of resignation      33

13    Exhibit 3, description of regulations  36

14

15

16

17

18

19

20

21

22

23

24
```

**Page 2**

```
 1    APPEARANCES

 2
      FOR THE PLAINTIFF:
 3    ROBINSON DONOVAN, P.C.
      1500 Main Street
 4    Springfield, MA 01115
      413-732-2301
 5      BY: JOHN C. SIKORSKI, ESQ.

 6    FOR RIVER VALLEY COUNSELING CENTER, INC.:
      BULKLEY RICHARDSON & GELINAS, LLC
 7    1500 Main Street
      Springfield, MA 01115
 8    413-781-2820
        BY: MARY J. KENNEDY, ESQ.
 9
      FOR VALLEY HEALTH SYSTEMS, INC.:
10    SKOLER ABBOT & PRESSER
      One Monarch Place
11    Springfield, MA 01144
      413-737-4753
12      BY: MARYLOU VARAO FABBO, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 4**

```
 1          STIPULATIONS
 2      It was stipulated and agreed by and
 3  between counsel for the respective parties that the
 4  witness will read and sign the deposition
 5  transcript, and the sealing, filing and
 6  certification thereof are waived.
 7      It was further stipulated and agreed that
 8  all objections, except as to the form of the
 9  question, shall be reserved until the time of trial.
10  All motions to strike shall be reserved until the
11  time of trial.
12
13      DAVID AVAKIAN, Deponent, having first
14  been duly sworn, deposes and states as follows:
15
16  DIRECT EXAMINATION BY MR. SIKORSKI:
17      Q. Will you please state your name and spell
18  your last name for the record, sir?
19      A. David Avakian.  A-V-A-K-I-A-N.
20      Q. And where do you live?
21      A. In 99 Chesterfield Road, Westhampton,
22  Mass.
23      Q. And what is your date of birth, sir?
24      A. 10/6/59.
```

DAVID AVAKIAN                               CondenseIt™

## Page 5

1  Q. And where do you currently work?
2  A. Holyoke Hospital.
3  Q. And what do you do at Holyoke Hospital?
4  A. I am the Patient Care Coordinator.
5  Q. And what does that entail?
6  A. That entails being in charge of quality of
7  care and utilization review for patients in the
8  partial hospitalization program.
9  Q. What entity actually pays you?
10  A. Holyoke Hospital is -- my paycheck says
11  Holyoke Medical Center, --
12  Q. Okay.
13  A. -- and -- yeah.
14  Q. Who do you report to?
15  A. Baxter Chandler.
16  Q. And who does Mr. Chandler report to?
17  A. Matt Haas.
18  Q. That is H-A-A-S?
19  A. Yes.
20  Q. Is Mr. Haas the current CEO of River
21  Valley Counseling Center?
22  A. Yes.
23  Q. At some point in time did you work for
24  River Valley Counseling Center?

## Page 6

1  A. I did.
2  Q. And when did you do that, sir?
3  A. From October '80 -- 1986 to June of 2005.
4  Q. What is your educational background
5  starting with high school?
6  A. I went to Doherty High in Worcester,
7  Mass., and then I went to Assumption College for one
8  year and then transferred to the University of
9  Massachusetts where I got my Bachelor's degree in
10  Education with a concentration in counseling and
11  graduated in 1981, and then I went back to school
12  for my graduate degree, and I got my Master's degree
13  in Education with a concentration in counseling,
14  psychology in 1989.
15  Q. And where was that from?
16  A. University of Massachusetts, also.
17  Q. And are you licensed in Massachusetts?
18  A. I am.
19  Q. And what licenses do you hold?
20  A. I hold one license, licensed Mental Health
21  Counselor, and I got that in 1991.
22  Q. How does that differ from LICSW?
23  A. LICSW is -- you get that if you majored in
24  social work, and I majored in counseling/psychology,

## Page 7

1  and the license for that is LMHC.
2  Q. Have you held that license continuously --
3  A. Yes.
4  Q. -- since you got it?
5      MR. SIKORSKI: Off the record.
6      (Discussion off the record)
7      MS. KENNEDY: Let's go back on the
8  record.
9  Q. (by Mr. Sikorski) Do you know Mark
10  Richards?
11  A. Yes.
12  Q. And how long have you known Mark Richards?
13  A. About ten years. Nine or ten years, I
14  think.
15  Q. Did you ever work, did you ever report to
16  Mr. Richards?
17  A. Yes.
18  Q. And when did you do that?
19  A. I believe Mark Richards became my
20  supervisor in 1996, and then I reported to him from
21  '96 to '04.
22  Q. And what happened in '04?
23  A. Mark left the position in November of
24  '04.

## Page 8

1  Q. In November 2004 did your duties and
2  responsibilities change?
3  A. Yes.
4  Q. And let me just go back. Say to from 2000
5  until 2004 what were your duties and
6  responsibilities at River Valley Counseling Center?
7  A. I was a supervisor. My title was
8  supervisor, and I was in charge of scheduling for
9  groups for patients. When Mark was out, I would
10  make day-to-day decisions that needed to be made,
11  sort of a point person to go to as well as being a
12  clinician and taking on a clinician role.
13  Q. Okay. Did your duties and
14  responsibilities change about the first week of
15  November 2004?
16  A. Yeah. If I could back up a little bit?
17  Q. Sure.
18  A. Also during that time, I was keeping track
19  of some of the billing, the Medicare billing, and
20  sort of like checking and double checking whether we
21  were billing things out correctly. I was in charge
22  of overseeing our Medicare billing.
23  Q. And before November 2004, how would you
24  characterize your relationship with Mr. Richards?

ACCURATE COURT REPORTING                    Page 5 - Page 8

# EXHIBIT C

Page 1

1             UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
2                  WESTERN DIVISION

3                     CIVIL ACTION NO. 05-30061-MAP

4    MARK A. RICHARDS,                   )
                                         )
5                          Plaintiff )
     vs.                                 )
6                                        )
     RIVER VALLEY COUNSELING CENTER, INC.,)
7    VALLEY HEALTH SYSTEMS, INC.,        )
     DAVID G. MATTOCKS AND DONNA VIENS,  )
8                          Defendants )

9

10            D E P O S I T I O N

                      of

11

            DAVID G. MATTOCKS

12

     Taken at the Carlos G. Otis Health Care Center, Inc.,
13   185 Grafton Road, Townshend, Vermont on Wednesday,
     February 15, 2006 commencing at 11:00 a.m.
14

15   APPEARANCES:

16   JOHN C. SIKORSKI, Robinson Donovan, PC, 1500 Main
     Street, Suite 1600, PO Box 15609, Springfield,
17   Massachusetts 01115-5609
            On behalf of the Plaintiff
18

19   MARYLOU FABBO, Skoler, Abbott & Presser, PC, One
     Monarch Place, Suite 2000, Springfield, Massachusetts
20   01144
            On behalf of David G. Mattocks
21

     MARY J. KENNEDY, Bulkley, Richardson & Gelinas, LLP,
22   1500 Main Street, Suite 2700, PO Box 15507,
     Springfield, Massachusetts 01115-5507
23          On behalf of all other Defendants

24   Also Present:  Judith Tietz, MD

25   Reported by:  Sunnie Donath

Page 2

```
 1          INDEX OF EXAMINATION
 2   WITNESS        EXAMINED BY        Page    Line
 3   David G. Mattocks  Atty. Sikorski      4      1
 4
 5
 6          INDEX OF EXHIBITS
 7                      Page    Line
 8   No. 1 - Agreement to Treat Information   6      9
        as Confidential
 9
     No. 2 - Re-Notice of Taking Deposition   9     12
10
     No. 3 - August 30, 2004 Memo           60      1
11
     No. 4 - September 3, 2004 Letter to     60     18
12      Mark Richards from Donna Viens
13   No. 5 - September 17, 2004 Letter to    60     18
        Mark Richards from Donna Viens
14
15              *  *  *  *  *
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          STIPULATIONS
 2
 3       It is agreed by and between the parties that all
 4   objections, except objections as to the form of the
 5   question, are reserved to be raised at the time of
 6   trial for the first time.
 7
 8       It is further agreed by and between the parties
 9   that all motions to strike unresponsive answers are
10   also reserved to be raised at the time of trial for the
11   first time.
12
13       It is further agreed that the deponent will read
14   and sign the deposition, and that the sealing of the
15   deposition is waived.
16
17       It is further agreed by and between the parties
18   that notification to all parties of the receipt of the
19   original deposition transcript is also hereby waived.
20
21              *  *  *  *  *
22
23          DAVID G. MATTOCKS,
24   duly sworn to tell the truth, deposes and says as
25   follows:
```

Page 4

```
 1       EXAMINATION BY ATTORNEY SIKORSKI
 2   Q.    Would you please state your name and spell your
 3   last name for the record, sir?
 4   A.    David G. Mattocks, M-A-T-T-O-C-K-S.
 5         ATTORNEY SIKORSKI:  And would Mr.
 6   Mattocks like to read and sign his deposition?
 7         ATTORNEY FABBO:  Yes, he's going to read
 8   and sign.
 9         ATTORNEY SIKORSKI:  And, otherwise, we'll
10   have the usual stipulations?
11         ATTORNEY FABBO:  Sure.
12         ATTORNEY KENNEDY:  Yes.
13   BY ATTORNEY SIKORSKI:
14   Q.    Mr. Mattocks, we're here in the office of one of
15   your physicians, correct?
16   A.    Yes, in her suite.  It used to be her office.
17   It's now a podiatrist's office.
18   Q.    Okay.  But we're in the office of one of your
19   health care providers, correct?
20   A.    Yes.
21   Q.    And is that at your request?
22   A.    It is.
23   Q.    And we're here in Townshend, Vermont; is that
24   correct?
25   A.    It is.
```

Page 5

```
 1   Q.    And you informed me that you could not come down
 2   to have your deposition taken in Springfield or
 3   Northampton, Massachusetts; is that correct?
 4   A.    That's correct.
 5   Q.    If at any time today, Mr. Mattocks, if you'd
 6   like to take a break, will you please let me know, and
 7   I'll be happy to let you take a break?
 8   A.    Certainly.  Appreciate that.
 9   Q.    And, at any time, if you'd like to speak to
10   counsel or your physician, please let me know, and I'll
11   be happy to give you an opportunity to do that.  Do you
12   understand that?
13   A.    I do.  Thank you.
14   Q.    And, if at any time today you don't understand a
15   question of mine, please ask me to rephrase it or
16   repeat it.  Do you understand that?
17   A.    I do.
18   Q.    And do you understand the questions and answers
19   given today may later be used in court?
20   A.    I do.  I'm a little unclear about the
21   confidentiality agreement as it relates to that.
22   Q.    Okay.  Do you understand that we've entered into
23   a confidentiality agreement in an attempt to protect
24   your private information as much as possible?
25   A.    Yes.
```

Page 10

1  A.    I do not.
2  Q.    How long did you work at River Valley Counseling
3  Center?
4  A.    Um, almost a year to the day, I believe it was.
5  Q.    So when did you start?
6  A.    My recollection is June of 2004 until June or
7  July of 2005.
8  Q.    When was your last day of work at River Valley?
9  When was the last day you actually worked?
10  A.    If I could consult a calendar, I could give you
11  that exact date.
12  Q.    Okay. Well, I don't see a calendar here. Can
13  you give me an approximate, end of February 2005?
14  A.    No. I believe it was April or May of 2005, I
15  believe.
16        ATTORNEY FABBO: Could you speak up,
17  please?
18        THE WITNESS: April or May of 2005 to the
19  best of my recollection.
20  BY ATTORNEY SIKORSKI:
21  Q.    At some point in time, did you take a leave of
22  absence from River Valley?
23  A.    When I left River Valley, I was informed by Mary
24  Kelleher, the director of human resources, that I would
25  be placed on a medical leave of absence.

Page 11

1  Q.    And when did she tell you that?
2  A.    I don't have a specific date, but it was, I
3  would say, within the first 30 days of my absence from
4  work.
5  Q.    Did you ask for any type of leave from River
6  Valley Counseling Center?
7  A.    Not to my recollection it was offered to me.
8  Q.    Okay. Were you terminated, or did you resign
9  from River Valley Counseling Center, sir?
10  A.    At the end of my medical leave of absence, I
11  resigned.
12  Q.    And, just in general terms, what was the leave
13  of absence for?
14        ATTORNEY FABBO: Can we put this part
15  subject to the confidentiality, please?
16        ATTORNEY SIKORSKI: Absolutely.
17        (See confidential portion of this transcript.)
18  BY ATTORNEY SIKORSKI:
19  Q.    And when did you make the decision to terminate
20  Mark Richards?
21  A.    Mark, specifically, I don't have a recollection
22  of that. In terms of examining all of the positions
23  under my area of responsibility, it was an ongoing
24  process from the day I got there until the day I left.
25  Q.    Now, did you create any documents at all of any

Page 12

1  type referring to the elimination of Mark Richards's
2  position?
3  A.    Not specifically. I was operating under both a
4  charge from HC Management and Valley Health Systems to
5  look at all the positions within the organization for
6  their financial viability and the fact that we had been
7  operating under a significant deficit for many years
8  and that, wherever possible, to make cost reduction
9  measures.
10  Q.    So why did you eliminate Mark Richards's
11  position?
12  A.    Mark Richards's position was one of several
13  positions that were looked at in my tenure there with
14  respect to their ability to contribute to the program's
15  financial success as well as whether there was any
16  redundancy in the positions with respect to their
17  responsibilities.
18  Q.    Why did you eliminate Mark Richards's position?
19  A.    It was my opinion that his responsibilities had
20  by and large been subsumed by a subordinate and that
21  the level of salary and remuneration that he received
22  was no longer necessary and, in fact, would contribute
23  to the financial success of the organization through
24  its elimination.
25  Q.    Tell me each and every other position that you

Page 13

1  eliminated while you were the executive director of
2  River Valley Counseling Center.
3  A.    I have no recollection of the specific positions
4  that were eliminated. There were several.
5  Q.    Do you remember any single position that was
6  eliminated from River Valley Counseling Center while
7  you were executive director?
8  A.    Sure. Our contracts management position was
9  eliminated. There were two or three positions within
10  the business office staff that were eliminated either
11  through resignation or termination for cause. There
12  were some clinician positions that were eliminated
13  either through resignation or through cause. Those
14  would cover pretty much the scope of what I recall.
15  Q.    Some of the positions that were eliminated were
16  because the contract ran out, correct?
17  A.    That's correct. There were, there was a
18  substantial revenue flow from contracts, and some of
19  those positions were eliminated either with reduction
20  in contract funding or elimination of the contract.
21  Q.    And several of the people you talked about were
22  eliminated for cause, correct?
23  A.    I don't know the proportion of those people that
24  would have been for cause versus position eliminations
25  or resignations.

Page 14

1  Q.    Did you ever sit down and do an analysis of
2  positions that you had there and how much you could
3  save by eliminating each and every one of these
4  positions that you claim you eliminated?
5  A.    Certainly, from before I was employed as part of
6  my interview process and throughout my time there, I
7  was under what I would call marching orders to
8  constantly examine the expenses and the revenue of the
9  organization and to reduce revenues where possible and
10  increase, reduce expenses were possible and increase
11  revenues where probable and possible.
12  Q.    My question to you is, Did you ever sit down and
13  create a document indicating how much money could be
14  saved by eliminating X, Y, or Z position?
15  A.    Yes, a budget for the agency.
16  Q.    Okay.  Other than the budget for the agency?
17  A.    No, I did not have position-by-position
18  analysis.
19  Q.    Okay.  And so did you send an email to anyone
20  with your ideas for eliminating positions?
21  A.    Not specific positions, but, again, under the
22  general understanding that wherever possible, through
23  either resignations, terminations for cause, or
24  position eliminations, that we would make every effort
25  to save on the personnel expenses of the agency.

Page 15

1  Q.    My question is, Did you have any document at all
2  indicating that, by eliminating Mark Richards's
3  position, we'd save X, Y, or Z dollars?
4  A.    No document to my knowledge.  I certainly was
5  aware of his compensation level.
6  Q.    What other, what program did Mark Richards work
7  in?
8  A.    He was the program manager for our partial
9  hospitalization program.  That's, I believe that was
10  the correct title.
11  Q.    Did he report to you?
12  A.    He had a split reporting responsibility.  He was
13  not in my senior management staff, but he was one of
14  the program managers.  He reported in part to me for
15  administrative responsibilities and in part to Jeffrey
16  Kassis, who is our clinical director, for his clinical
17  functions.
18  Q.    That's K-A-S-S-I-S?
19  A.    That's correct.
20  Q.    What other programs did you oversee, sir?
21  A.    Either directly or indirectly, all of the
22  operations of River Valley Counseling Center.
23  Q.    Could you just list them?
24  A.    Sure.  We had a large outpatient mental health
25  service both English and bilingual English and Spanish.

Page 16

1  We had a partial hospitalization program that I have
2  mentioned with Mr. Richards as the program manager.  We
3  had numerous contracts with state, federal, and local
4  agencies for the provision of a wide variety of
5  services.  We had an AIDS prevention and treatment
6  program.  We had school based services for the
7  provision of both AIDS education awareness and harm
8  reduction.  There may have been others.  Those are the
9  top ones I remember.
10  Q.    What positions in the outpatient mental health
11  area did you eliminate?
12  A.    There were at least two that I recall for cause.
13  There were some positions that responsibilities were
14  consolidated and, through an individual's resignation,
15  were not filled.
16  Q.    What cost savings did you get out of the
17  outpatient mental health department?
18          ATTORNEY FABBO:  Objection.  You can
19  answer.
20          THE WITNESS:  I have no recollection of
21  the specific amount.
22  BY ATTORNEY SIKORSKI:
23  Q.    How much did you calculate before you eliminated
24  Mark Richards's position that you would save from
25  eliminating Mark Richards's position?

Page 17

1  A.    I did not know his exact salary.  I would say it
2  was in the 40- to 60-thousand-dollar range.
3  Q.    Okay.  And you were going to give more of his
4  responsibilities to Mr. Kassis and Mr. Avakian,
5  correct?
6  A.    I was going to divide the position elimination
7  parts of his job between Mr. Avakian, other staff
8  within the partial program, and Mr. Kassis for clinical
9  direction of the program.
10  Q.    And then you ended up hiring another clinician,
11  did you not, in that program?
12  A.    I did not.
13  Q.    But you ended up advertising for it, did you
14  not, sir?
15  A.    I did.
16  Q.    You advertised for it?
17  A.    My human resources director did advertise for
18  it.
19  Q.    Right.  So, ultimately, if you would have filled
20  that position, how much would you have saved by
21  eliminating Mark Richards's position?
22  A.    Probably 20 to 30 thousand dollars.
23  Q.    Okay.
24  A.    That's an estimate, obviously.
25  Q.    Okay.

Page 38

1  termination, correct?
2  A.    I did.
3  Q.    And you discussed with her a number of issues,
4  correct?
5  A.    I did.
6  Q.    And you, but you didn't ask her specifically
7  words to the effect of, I'm terminating, this guy's
8  been here 16, 17 years; is there any other place in the
9  Holyoke Hospital Organization for him?
10 A.    First of all, I always phrased them in terms of
11 position elimination, not a termination.  There may not
12 be a semantical difference in your mind.  In mine there
13 is a difference.  I'll just say that, in the meeting
14 with Mr. Richards, I made a very specific point of
15 asking him whether there was another position in the
16 agency for which he might be interested.
17 Q.    Was that after he was starting to take notes
18 that that part of the conversation came up?
19 A.    I don't recall.
20 Q.    Because you know that he took very detailed
21 notes, correct?
22        ATTORNEY FABBO:  Objection.  You can
23 answer.
24        THE WITNESS:  I don't know how detailed
25 they were.  I saw him writing on a piece of paper.

Page 39

1  BY ATTORNEY SIKORSKI:
2  Q.    Right.  You saw him writing on more than one
3  piece of paper, correct?
4  A.    I don't know how many pieces of paper he had.
5  Q.    What did you say to Mr. Kassis about whether the
6  new configuration of the day treatment program would
7  comply with the regulations?
8  A.    It was posed as a question to him and his
9  opinion as a clinical director whether or not either
10 immediately or with the employment of a subsequent
11 clinician we either would immediately or within short
12 order meet those requirements.
13 Q.    Did you ever pull the regulations out and go
14 over them with Mr. Kassis?
15 A.    Not to my recollection.
16 Q.    Did you ever give him a copy of the regulations?
17 A.    I, it was my understanding that he had them in
18 his possession.
19 Q.    Did you ever sit down and go over the
20 regulations with Mr. Avakian?
21 A.    I did.
22 Q.    And you sat down and went over the regulations
23 with Mr. Avakian?
24 A.    I did.
25 Q.    And when did you do that?

Page 40

1  A.    Actually, I think it was the subject of several
2  meetings shortly before my meeting with Mr. Richards
3  and within a day or two of the position being
4  eliminated.
5  Q.    Within a day or two after?
6  A.    Um-hum.
7        ATTORNEY FABBO:  You have to answer yes
8  or no.
9        THE WITNESS:  Yes.
10 BY ATTORNEY SIKORSKI:
11 Q.    When did you speak with Mary Kelleher about your
12 plans to --
13     (A brief discussion was held off the record.)
14     You spoke with Mary Kelleher prior to the
15 termination meeting with Mr. Richards, did you not?
16 A.    I did.
17 Q.    And how soon before the termination meeting with
18 Mr. Richards did you speak with her?
19 A.    Well, the entire process was not a protracted
20 one.  I believe I met with her almost immediately after
21 meeting with Mr. Porton wherein he expressed to me a
22 desire that I run this by Ms. Kelleher to find out
23 whether or not she had any specific objections from a
24 human resource point regarding this decision.
25 Q.    Well, let's back up, then.  Did you discuss this

Page 41

1  decision with Mr. Porton?
2  A.    Yes.
3  Q.    Okay.  What did you say to him, and what did he
4  say to you about this?
5  A.    I told him that, in my continuing efforts to
6  find, identify cost reduction measures within the
7  agency, that I had identified a position that would
8  result in significant cost savings without what I
9  believed to be a significant interruption in either the
10 clinical quality or the day-to-day operations of that
11 program.
12 Q.    And did you specifically identify the position
13 and the person who held it?
14 A.    I don't recall.  I certainly told him that it
15 was a person that had worked for the agency for some
16 time.
17 Q.    And what did he say in response to you telling
18 him that?
19 A.    My recollection is, again, that his concern was
20 that I meet with human resources to ensure that there
21 were no procedural or other reasons why that decision
22 could not be effected.
23 Q.    And did you, in fact, then meet with human
24 resources?
25 A.    I did along with Donna Viens.

Page 42

1  Q.    And was that an in-person meeting?
2  A.    It was.
3  Q.    And was it just the three of you, Mary Kelleher,
4  Donna Viens, and yourself?
5  A.    To the best of my ability, yes, knowledge.
6  Q.    And where was that held?
7  A.    In Ms. Kelleher's office.
8  Q.    Is that in 10 Hospital Drive?
9  A.    Yeah, in the complex, 20 Hospital Drive.  It's
10  within walking distance of the administrative building.
11  Q.    How soon before the termination meeting did this
12  meeting occur?
13  A.    I don't recall.
14  Q.    And who arranged the meeting?
15  A.    I believe I called for it after Mr. Porton had
16  indicated that that was his request and desire.
17  Q.    What was your understanding about the relative
18  age between, well, relative ages of Mr. Richards and
19  Mr. Avakian?
20  A.    I had absolutely no idea.
21  Q.    You didn't know Mr. Avakian was significantly
22  younger than Mr. Richards?
23  A.    I did not.
24  Q.    What did you say at the meeting with Ms.
25  Kelleher and Ms. Viens?

Page 43

1  A.    More or less a reiteration of what I've said,
2  that, in my opinion, the position was in essence
3  superfluous at this point in time, that it was costing
4  the agency salary and other related expenses that were
5  unnecessary, and that, with the elimination of the
6  position, I saw cost savings and the ability to
7  continue the program clinically and administratively
8  uninterrupted.
9  Q.    Okay.  And what did Ms. Kelleher say?
10  A.    She made some judgment with regard to whether or
11  not the program could be operated in such a manner.
12  Her concern was solely whether or not human resources
13  policies within the overall health system and within
14  River Valley in particular were being adhered to.
15  Q.    And did you and her discuss the fact that Mr.
16  Richards had requested intermittent FMLA leave?
17  A.    I did not.  I have a vague recollection of Ms.
18  Viens discussing it with Ms. Kelleher.
19  Q.    In your presence?
20  A.    Yes.
21  Q.    And do you recall what Ms. Viens said to Ms.
22  Kelleher and what she said to Ms. Viens?
23  A.    The gist of it was that Mr. Richards had
24  requested intermittent family leave and that that had
25  been granted.

Page 44

1  Q.    And was there any discussion about whether or
2  not the termination of Mr. Richards would be
3  retaliation against him for exercising his right to
4  request FMLA leave or to take it?
5  A.    None to my recollection whatsoever.
6  Q.    Was there any discussion about the age of the
7  persons that would take over his responsibilities?
8  A.    Not to my recollection.  I did not know the ages
9  of these individuals.
10  Q.    Was there any discussion about the fact that Mr.
11  Richards was in a relationship with someone with a
12  disability, to wit his daughter?
13  A.    I believe there was within the context of that,
14  of that was the reason why he had been, why he had
15  requested and why FMLA had been granted to him.
16  Q.    Was there any discussion about whether or not
17  the termination would violate the Americans with
18  Disabilities Act or the Massachusetts
19  Antidiscrimination Statute?
20  A.    None.
21  Q.    Mr. Mattocks, at the termination meeting did you
22  tell Mr. Richards that you were surprised he wasn't
23  weeping or words to that effect?
24  A.    Not at all.
25  Q.    Did you discuss with him the fact that you had

Page 45

1  been terminated from the Brattleboro Retreat?
2  A.    I told him that my position had been eliminated
3  with the Brattleboro Retreat, yes.
4  Q.    And did you also tell him that you had been
5  given little time to clear your office out?
6  A.    I don't recall that specific comment.  I
7  certainly did comment that the decision was, in my
8  opinion, a hasty one.
9  Q.    Let me ask you that.  What do you recall telling
10  Mr. Richards in the termination meeting about your own
11  experience at the Brattleboro Retreat?
12  A.    That the decision to eliminate my position came
13  to me as a total surprise; that I saw no reason from a
14  performance standpoint or an organizational operational
15  standpoint why that decision had been made; that I was
16  sympathetic to anyone, but particularly someone with
17  Mr. Richards's length of service, why that would come
18  as a shock to him; and that I was concerned about him
19  and would make every effort to make his departure from
20  the agency as smooth as possible.
21  Q.    Was Mr. Palmisano the person who made the
22  decision to eliminate your position?
23  A.    I don't know the answer to that question.  Mr.
24  Palmisano delivered that message to me.
25  Q.    Did anyone else other than Mr. Palmisano deliver

# EXHIBIT D

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                    )
            Plaintiff                )
VS.                                  )
                                     )
RIVER VALLEY COUNSELING CENTER,      )
INC., VALLEY HEALTH SYSTEMS, INC.,   )
DAVID G. MATTOCKS AND DONNA VIENS,   )
            Defendants               )

            DEPOSITION OF HANK PORTEN, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on December 9,

2005, commencing at 10:00 a.m.


APPEARANCES:  (See Page 2)


            Debra A. Vance
        Notary Public Stenographer

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
        BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
        BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
        BY:  MARY LOU FABBO, ESQ.

---

3

            I N D E X

WITNESS         DIRECT    CROSS    REDIRECT  RECROSS

Hank Porten      *4


*  By Mr. Sikorski


EXHIBITS:                                    PAGE:

Exhibit 1, notice of deposition..............30

Exhibit A, copy of protective order..........41

---

4

            HANK PORTEN, Deponent, having been

satisfactorily identified and duly sworn, deposes

and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI:

        Q.     Mr. Porten, could you please state

your name and spell your last name for the

record?

        A.     Hank Porten, P-O-R-T-E-N.

        Q.     And what's your residential address?

        A.     23 Dicsal, D-I-C-S-A-L, Lane,

Holyoke, Massachusetts 01040.

        Q.     Do you know a David Mattocks?

        A.     Yes, I do.

        Q.     Did you have any role in hiring David

Mattocks?

        A.     Yes, I did.

        Q.     What role did you have in hiring

David Mattocks?

        A.     He was presented as a recommended

candidate, and I interviewed him at that time.

        Q.     And for what position, sir?

        A.     For the executive director of River

Valley Counseling.

9

1       Q.    And would you also expect him to be

2  able to have some moderate level of financial

3  responsibility in his own private affairs?

4       MS. KENNEDY:   Objection to form.

5       THE WITNESS:   I didn't expect -- I

6  didn't ask him anything about his private

7  affairs.

8       Q.   (By Mr. Sikorski) Did he indicate to

9  you that he recently filed for bankruptcy before

10  he applied for the position at River Valley?

11      A.   Not that I recall.

12      Q.   Would it make a difference to you in

13  terms of hiring him if you would have known that

14  he had $45,000 in credit card debt, had his car

15  repossessed, and had an additional debt of

16  $12,000 of student loans that he was unable to

17  pay?

18       MS. KENNEDY:   Objection to form.

19       THE WITNESS:   I don't know what I

20  would answer, because I didn't ask the

21  question.

22      Q.   (By Mr. Sikorski) Do you know what

23  type of background check was done on

24  Mr. Mattocks?

*Accurate Court Reporting*             *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

---

10

1      A.   Not specifically, no.

2      Q.   Did Mr. Mattocks discuss with you his

3  intention to terminate Mark Richards before that

4  happened?

5      A.   He did not discuss a name with me,

6  no.

7      Q.   Did he discuss with you a position?

8      A.   He discussed with me that there would

9  be a reduction of positions, yes.

10     Q.   Now, do you know approximately when

11  he had that discussion with you?

12     A.   Possibly late fall, early winter.

13     Q.   What do you recall him telling you

14  about a possible reduction of force?

15     A.   That he was continuing to work on

16  being efficient, making the organization as

17  efficient as possible, that there was some

18  duplication of work, and that he thought he could

19  reduce some of that duplication.

20     Q.   Did he indicate to you how many

21  positions he was looking to reduce?

22     A.   No, he did not.

23     Q.   Did he just talk to you about one

24  position?

*Accurate Court Reporting*             *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

---

11

1      A.   He talked about positions. I don't

2  know a number.

3      Q.   Positions plural?

4      A.   I believe so, yes.

5      Q.   Any other cost saving measures other

6  than reducing positions?

7      A.   Not that I specifically recall.

8      Q.   Now, do you recall Mr. Mattocks

9  presenting you with anything in writing regarding

10  his plan to reduce expenses?

11     A.   No, I do not.

12     Q.   Again, I'm just going to ask you, do

13  you recall him sending you an e-mail ahead of

14  time with any specific figures or plans?

15     A.   Not that I recall.

16     Q.   You don't recall a memorandum from

17  him?

18     A.   No, I don't.

19     Q.   No spreadsheet or financial analysis

20  or anything like that?

21     A.   No, I do not.

22     Q.   Was this discussion you had with him

23  about reducing positions part of a regular

24  process of review you had with him?

*Accurate Court Reporting*             *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

---

12

1      A.   Yes.

2      Q.   Would you describe to me that process

3  of review?

4       MS. KENNEDY:   Objection to the form.

5       THE WITNESS:   We meet on a fairly

6  regular basis. And we talk about in

7  general the direction, the organization, in

8  general financial or billing issues that we

9  need to address. It would be at a very

10  high level. It was not specific in any

11  detail.

12     Q.   (By Mr. Sikorski) Again, what do you

13  mean by "at a high level," sir?

14     A.   The general approach, are we making

15  the economic or volume goals that we targeted,

16  yes or no, is there any issues that we can

17  improve on. It would be that kind of thing.

18     Q.   Were these meetings between yourself

19  and Mr. Mattocks, or did you have other members

20  of your staff there?

21     A.   Most frequently other members of the

22  staff, but some occasionally would be with

23  Mr. Mattocks alone.

24     Q.   At a particular meeting where you

*Accurate Court Reporting*             *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

**17**

```
1          MS. KENNEDY:   Is that the question?
2          MR. SIKORSKI:   Yes.
3          MS. KENNEDY:   Objection to form.  Go
4     ahead.
5          THE WITNESS:   I did not know it was
6     a highly suspect university.
7          Q.   (By Mr. Sikorski)  Were you ever
8     informed that he had a Ph.D. from a highly
9     suspect university?
10         A.   No, I was not.
11         Q.   Even today do you understand that he
12    had a Ph.D. from a highly suspect university?
13         MS. KENNEDY:   Objection to form.
14         THE WITNESS:   No, I don't.
15         Q.   (By Mr. Sikorski)  So as you come in
16    here today, you don't know that?
17         A.   No.
18         Q.   Is Mr. Mattocks still working for --
19    strike that.
20              What entity actually employed
21    Mr. Mattocks?
22         A.   H-C Management.
23         Q.   Does H-C stands for anything?
24         A.   I believe it was short for Holyoke,
```

**18**

```
1     dash, Chicopee, but that's an assumption.
2          Q.   Does Mr. Mattocks currently work for
3     H-C Management?
4          A.   No, he does not.
5          Q.   Does he work for any other entity
6     affiliated in any way with Holyoke Medical
7     Center?
8          A.   No, he does not.
9          Q.   When did he last work for any entity
10    associated with Holyoke Medical Center?
11         A.   I don't know the last day of his
12    resignation.  I'm not familiar with that.
13         Q.   Approximately?
14         A.   Approximately I think it would have
15    been in the summer of 2005.
16         Q.   What were the circumstances under
17    which Mr. Mattocks left the employment of H-C
18    Management?
19         A.   He was absent from work for sickness,
20    and he called and said he'd be away for a while.
21    That's the last I saw him.
22         Q.   Did you consider that he voluntarily
23    quit his position?
24         MS. KENNEDY:   Objection to the form.
```

**19**

```
1          THE WITNESS:   No.  I think he asked
2     for a brief leave and would be returning
3     and then he didn't.  And then I would
4     assume that he voluntarily resigned, yes.
5          Q.   (By Mr. Sikorski)  What is your
6     understanding of the nature of his illness?
7          MS. KENNEDY:   Objection.  I'm going
8     to instruct the witness not to answer.  It
9     involves private confidential medical
10    information of a party to this case, and
11    employee of H-C Management.  That is
12    privileged and is not subject to disclosure
13    under Federal Rules of Civil Procedure,
14    Rule 26.
15         MR. SIKORSKI:   How is it privileged?
16    We have a confidentiality order.  You can
17    say this is confidential.
18         MS. KENNEDY:   Although we have a
19    confidentiality order, this is private
20    confidential medical information that's not
21    subject to disclosure.  It's privileged and
22    I'm instructing him not to answer despite
23    the confidentiality order.
24         MR. SIKORSKI:   We'll take this up
```

**20**

```
1     later.
2          Q.   (By Mr. Sikorski)  Did Mr. Mattocks
3     supply you with any resignation letter?
4          A.   I don't recall seeing a letter.
5          Q.   Did Mr. Mattocks receive any type of
6     severance agreement; do you know?
7          A.   Not off the top of my head.
8          Q.   Who would know that?
9          A.   I think it would have been Mary
10    Kelleher.
11         Q.   Who was hired to replace Mr. Mattocks
12    as the executive director of River Valley
13    Counseling Center?
14         A.   An individual by the name of Matt
15    Hass.
16         Q.   And you announced that appointment;
17    did you not?
18         A.   Not personally, but we had an
19    announcement.
20         Q.   Right.  And then you are the person
21    making that announcement, correct?
22         A.   I'd have to see the articles.  Is my
23    name in there?  That's correct.
24         Q.   So when the organization puts out a
```

**21**

1  press release, they say that you're the person
2  announcing the appointment of Mr. Hass?
3        A.    That must be, yes.
4        Q.    What positions do you currently hold
5  professionally?
6        A.    Um, I'm president of Valley Health
7  Systems. I'm president of Holyoke Medical
8  Center. I'm president of H-C Management. And I
9  may hold other positions as officers in other
10  affiliates, but I would have to check my
11  organizational chart to determine that.
12        Q.    What is Valley Health Systems?
13        A.    Valley Health Systems is the parent
14  of our structure.
15        Q.    What do you mean by "our structure"?
16        A.    Under the parent, there are various
17  affiliates that they are the sole member of.
18        Q.    Just briefly what are those levels?
19        A.    Holyoke Medical Center, River Valley
20  Counseling, Community Foundation -- which has a
21  longer name than that but it's part of the
22  Visiting Nurses Association -- Western Mass
23  Physicians. There was a nursing home facility
24  called Falls, I believe.

**22**

1        Q.    Is that F-A-L-L-S?
2        A.    Yes. Now I'm struggling.
3        Q.    We can come back to that. What is
4  the Holyoke Medical Center?
5        A.    It's an acute care hospital, a
6  community hospital not for profit.
7        Q.    So Holyoke Medical Center just takes
8  care of running the hospital, that's what that
9  organization does?
10        A.    That is the hospital function, yes.
11        Q.    And will you describe for me H-C
12  Management, sir?
13        A.    H-C Management is a small company
14  that employs certain members of the management
15  team that may work in various affiliates at some
16  level.
17        Q.    Do you know when that was set up?
18        A.    No, I do not.
19        Q.    What was the relationship in 2004
20  between H-C Management and River Valley
21  Counseling?
22        A.    H-C Management was the employer of
23  the senior managers for River Valley on the
24  administrative side and the financial side.

**23**

1        Q.    And on the administrative side, would
2  that be the CEO?
3        A.    Senior manager.
4        Q.    That would be Mr. Mattocks and later
5  Mr. Hass?
6        A.    That would be correct.
7        Q.    And who would that be on the
8  financial side?
9        A.    The person that is there now is a
10  person by the name of Laurie, and I don't recall
11  her second name.
12        Q.    Do you know who Laurie replaced?
13        A.    A woman by the name of Shannon, and
14  her last name was a relatively long one, Van
15  something.
16        Q.    Did River Valley Counseling Center
17  ever receive human resources assistance from any
18  organization affiliated with Valley Health
19  Systems?
20        A.    Yes.
21        Q.    And what human resources assistance
22  did it receive?
23        A.    That would have been through H-C
24  Management, and it would have been a consultation

**24**

1  role from Mary Kelleher.
2        Q.    What other positions does Mary
3  Kelleher hold?
4        A.    She also functions as the vice
5  president of human resources for Holyoke Medical
6  Center.
7        Q.    Did River Valley Counseling receive
8  any risk management services from any other
9  entity?
10        MS. KENNEDY:   Objection to form.
11        THE WITNESS:   If they felt they
12        needed it, they had access to some of the
13        resources at Holyoke Medical Center's risk
14        management team.
15        Q.    (By Mr. Sikorski) Would that be a team
16  headed by Mr. Fenn, Clark Fenn?
17        A.    Yes.
18        Q.    Does Mr. Fenn have any role in
19  handling this particular claim of Mr. Richards?
20        MS. KENNEDY:   Objection to form. Go
21        ahead.
22        THE WITNESS:   Not that I'm aware of.
23        Q.    (By Mr. Sikorski) After River Valley
24  terminated Mr. Richards, did you become aware

# EXHIBIT E

1

```
              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS


                           C.A. No. 05-30061-MAP

MARK A. RICHARDS,            )
              Plaintiff      )
VS.                          )
                             )
RIVER VALLEY COUNSELING CENTER,  )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
           Defendants        )


          DEPOSITION OF HANK PORTEN, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30(b)(6) of

the Massachusetts Rules of Civil Procedure, at

the offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on December 9,

2005, commencing at 11:25 a.m.


APPEARANCES: (See Page 2)


             Debra A. Vance
          Notary Public Stenographer
```

---

3

```
                    I N D E X

WITNESS      DIRECT    CROSS    REDIRECT   RECROSS

Hank Porten    *4


* By Mr. Sikorski


EXHIBITS:                                    PAGE:

Exhibit 1, notice of taking deposition......4

Exhibit 2, Interrogatories..................6

Exhibit 3, letter from Ms. Kennedy 12/8/05..20
```

---

2

```
FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
     BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
     BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
     BY:  MARY LOU FABBO, ESQ.
```

---

4

1           HANK PORTEN, Deponent, having been

2   satisfactorily identified and duly sworn, deposes

3   and states as follows:

4   DIRECT EXAMINATION BY MR. SIKORSKI:

5        Q.   Mr. Porten, would you please state

6   your name and spell your last name for the

7   record?

8        A.   Hank Porten, P-O-R-T-E-N.

9             MR. SIKORSKI:  And now I'm going to

10       have this marked as Exhibit 1.

11            (Exhibit 1 marked)

12       Q.   (By Mr. Sikorski) Exhibit 1 is the

13  notice of taking deposition of the Defendant,

14  Valley Health Systems, Inc., pursuant to Federal

15  Rule Civil Procedure 30(b)(6).  Do you understand

16  that Mr. Porten?

17       A.   That this is for Valley Health

18  Systems, Inc., yes.

19       Q.   And do you understand that you have

20  been -- let me ask this:  There are a number of

21  topics on Exhibit A of Exhibit 1; do you see

22  that?

23       A.   Yes, I do.

9

1        A.    As best I recall, I was a manager of

2   housekeeping, manager of materials management,

3   manager for security.  Prior to 1985, right?

4        Q.    Yes.

5        A.    I was a division head for support

6   services, which would have included those

7   departments.  I was a division head for clinical

8   services outpatient.  I was a regional manager

9   for a region of laboratories and radiology

10   departments.  I worked at a for-profit

11   corporation and had responsibility for 105

12   radiology departments, laboratories, ERs, JCHL

13   inspections, and there might have been other

14   things.

15        I was the manager for Matrix

16   Management Development, a for-profit corporation.

17   I was the chief operating officer of a community

18   hospital.  I was the president of a small

19   community hospital.  Then I became president of

20   Valley Health Systems and Holyoke Hospital at the

21   time.

22        Q.    So you said you were the chief

23   operating officer of a community hospital?

24        A.    Yes.

10

1        Q.    Where was that?

2        A.    In Muskegon, Michigan.

3        Q.    When did you hold that position?

4        A.    That would have been in the early

5   '80s, I believe.

6        Q.    And you said you were president of a

7   community hospital?

8        A.    Yes.

9        Q.    And where was that?

10        A.    That would have been towards the

11   middle of -- I was carrying both positions as CEO

12   of a larger hospital and president of a smaller

13   hospital.

14        Q.    Both in Muskegon?

15        A.    Right, in that general area.

16        Q.    When you came to Holyoke, what

17   position did you assume or positions did you

18   assume in 1985?

19        A.    Valley Health Systems or its

20   predecessor named company, which was Holyoke

21   Chicopee Area Health Resources, Inc., Holyoke

22   Hospital, which is now Holyoke Medical Center.

23        Q.    Have you worked for any other entity

24   other than Holyoke Hospital related entities

11

1   since 1985?

2        A.    No.  Not in a paid position.

3        Q.    Right.  I'd like to call your

4   attention to point No. 1 on Exhibit A?

5        A.    Yes.

6        Q.    You were deposed earlier this morning

7   in your personal capacity, were you not?

8        A.    That's correct.

9        Q.    If I were to ask you the same

10   questions that I asked you in your personal

11   deposition about David Mattocks, in your capacity

12   as a representative of Valley Health Systems

13   would your answers be different?

14        A.    They could well be.

15        Q.    What did you do to prepare to be a

16   30(b)(6) deponent for Valley Health Systems

17   today, other than speaking with your counsel?

18        A.    I don't think anything.

19        Q.    Do you know what documents were

20   submitted by or on behalf of David Mattocks to

21   H-C Management Services or River Valley

22   Counseling Center, Valley Health Systems in

23   connection with his application for employment?

24        MS. KENNEDY:   Objection to the form

12

1   of the question.  You're asking him on

2   behalf of Valley Health Systems?

3        MR. SIKORSKI:   Yes.

4        MS. KENNEDY:   Objection.  Go ahead

5   and answer, if you can.

6        THE WITNESS:   Not in that capacity.

7        Q.   (By Mr. Sikorski) Did Valley Health

8   Systems have anything to do directly or

9   indirectly with the hiring of David Mattocks?

10        A.    Indirectly Valley Health Systems

11   assigned the responsibility to H-C Management to

12   do that job.  That would be the only involvement.

13        Q.    To what persons at H-C Management was

14   that job assigned?

15        A.    I would have been one of them.  Would

16   you ask that question again?

17        MR. SIKORSKI:   Could you read it

18   back.

19        (The last question was read.)

20        THE WITNESS:   Primarily myself.

21        Q.   (By Mr. Sikorski) Did Valley Health

22   Systems have anything to do directly or

23   indirectly with setting Mr. Mattocks's

24   compensation?

13

```
1         A.      No.
2         Q.      Did it have anything to do with
3   reviewing his job performance?
4         A.      No.
5         Q.      Did it have anything to do with
6   discipline or termination of him?
7         A.      No.
8         Q.      Did Valley Health Systems directly or
9   indirectly monitor the job performance of
10  Mr. Mattocks?
11        A.      No.
12        Q.      Did Valley Health Systems directly or
13  indirectly oversee any of the personnel decisions
14  made by David Mattocks?
15        A.      No.
16        Q.      Will you describe for me the
17  relationship between Valley Health Systems and
18  H-C Management Services Inc.?
19        A.      Valley Health Systems is the sole
20  member of H-C Management, Inc.
21        Q.      Is there a contractual relationship
22  between the two?
23        A.      No, not that I'm aware of.
24        Q.      When did that relationship become
```

15

```
1         Q.      Did Jeffrey Eagle personally or
2   through his company, Health Enhancement Services,
3   Inc., perform any service relating to David
4   Mattocks?
5         MS. KENNEDY:    Again, you're asking
6   this as Valley Health Systems?
7         MR. SIKORSKI:   Yes.
8         THE WITNESS:    Not that I'm aware of.
9         Q.      [By Mr. Sikorski] Did Valley Health
10  Systems directly or indirectly employ Donna
11  Viens?
12        A.      Not that I'm aware of.
13        Q.      Do you have an understanding of what
14  function Donna Viens served at River Valley
15  Counseling Center or any other organization
16  affiliated with Valley Health Systems?
17        A.      From Valley Health Systems'
18  perspective, no.
19        Q.      Did Valley Health Systems employ
20  directly or indirectly Mark Richards?
21        A.      Valley Health Systems, no.
22        Q.      Did valley Health Systems directly or
23  indirectly have any role regarding evaluating the
24  performance of Mark Richards?
```

14

```
1   established?
2         A.      I don't really recall.  It may have
3   actually been in existence when I was originally
4   hired.  But I'm vague on the timing of it.
5         Q.      What is the relationship between H-C
6   Management and River Valley Counseling Center?
7   And feel free to incorporate your testimony from
8   your personal deposition if you'd like, sir.
9         A.      The relationship between H-C
10  Management and River Valley, H-C Management
11  employs the senior manager and senior financial
12  person for River Valley.  From time to time there
13  may be other consulting services that they
14  provide.
15        Q.      What other services are you referring
16  to?
17        A.      It could be human resources.  It
18  could be risk management.  If it was a unique
19  need of some type for River Valley, they could
20  reach through H-C Management to get additional
21  resources.  For instance, information systems may
22  be available or plant operations kind of things,
23  building reviews and stuff like that from time to
24  time.
```

16

```
1         A.      No.
2         Q.      Did Valley Health Systems have a role
3   direct or indirectly in terminating Mr. Richards?
4         A.      No.
5         Q.      Does Valley Health Systems, Inc. have
6   any employees?
7         A.      Yes.
8         Q.      What employees does it have?
9         A.      It was either two or three -- I'm not
10  even sure if they're all full time -- fund
11  developers for fundraising.
12        Q.      What are the names of the current
13  employees of Valley Health Systems?
14        A.      Joanne Newman, Denise, I believe her
15  last name is Redman, and there may be a part-time
16  clerical of some type that's in and out.  I
17  wouldn't know that name.
18        Q.      Are all those employees in the
19  fundraising area?
20        A.      Yes.
21        Q.      You are the president of Valley
22  Health Systems, Inc.?
23        A.      Yes.
24        Q.      Do you receive any compensation from
```

# EXHIBIT F

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                            )
                    Plaintiff                )
VS.                                          )
                                             )
RIVER VALLEY COUNSELING CENTER,              )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS.)
                    Defendants               )

        DEPOSITION OF MATTHEW HAAS, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Massachusetts Rules

of Civil Procedure 30(b)(6), at the offices of

ROBINSON DONOVAN, P.C., 1500 Main Street,

Springfield, Massachusetts on January 31, 2006,

commencing at 2:00 p.m.


APPEARANCES:  (See Page 2)



            Debra A. Vance
         Notary Public Stenographer

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
      BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
      BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
      BY:  MARY LOU FABBO, ESQ.

---

3

                    I N D E X

WITNESS        DIRECT    CROSS    REDIRECT  RECROSS

Matthew Haas  *4


*  By Mr. Sikorski


EXHIBITS:                                   PAGE:

Exhibit 3, Interrogatories..................12

---

4

              STIPULATIONS

          It is agreed by and between the

parties that all objections, except objections as

to the form of the questions, and all motions to

strike unresponsive answers are reserved and may

be raised at the time of trial for the first

time.

          It is further agreed by and between

the parties that the sealing and the notification

to all parties of the receipt of the original

deposition transcript is hereby waived.

          MATTHEW HAAS, Deponent, having been

satisfactorily identified and duly sworn, deposes

and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI:

     Q.    Mr. Haas, will you please state your

name and spell your last name for the record?

     A.    Matthew Haas, H-A-A-S.

          MR. SIKORSKI:   I assume that

     Mr. Haas will want to read and sign his

9

1  H-C Management Services, Inc. and Valley Health
2  Systems?
3       A.     H-C Management is, as I understand
4  it, is one of the subsidiaries or affiliate
5  companies of Valley Health Systems along with
6  several other companies, including the hospital
7  and River Valley.
8       Q.     What is the relationship between H-C
9  Management Services, Inc. and River Valley
10  Counseling Center?
11       A.     There is a management agreement
12  between River Valley Counseling Center and H-C
13  Management that, as I understand it, in
14  consideration of some loans that Valley Health
15  Systems made to River Valley Counseling Center
16  some years ago H-C Management has a sort of
17  independent contractor relationship with River
18  Valley Counseling Center that involves providing
19  management consultation and direction and some
20  staffing.
21              So the executive director and
22  controller are employees of H-C Management. And
23  the -- I would have to look at -- I don't have
24  this all memorized, but my general understanding

10

1  of the relationship is that the president and CEO
2  of Valley Health Systems, you know, has an
3  interest in naming these two positions with the
4  approval of the Board of River Valley Counseling
5  Center. So the board has essentially contracted
6  with H-C Management to help provide management
7  expertise for the agency.
8       Q.     And does River Valley Counseling
9  Center pay for that management experience?
10       A.     Yes, it does.
11       Q.     And how does it do so?
12       A.     There is a monthly management fee
13  that is paid to H-C Management, the salary of the
14  controller and my own salary as well as money to
15  cover some of the consultation time by staff of
16  H-C Management which is primarily Mr. Porten,
17  Tony Correia, the CFO, and Mary Kelleher to a
18  lesser extent.
19       Q.     Is that billed monthly?
20       A.     Yeah, there's a monthly payment that
21  we make.
22       Q.     Have you reviewed the amended
23  complaint to this case?
24       A.     I have, yes.

11

1       Q.     And have you reviewed the answer of
2  defendant, River Valley Counseling Center, Inc.,
3  to the amended complaints?
4       A.     I have, yeah.
5       Q.     Do you understand the defenses of
6  River Valley Counseling Center to the claims of
7  Mr. Richards?
8       A.     To the best of my ability, yes.
9       Q.     What do you understand to be the
10  defenses of River Valley Counseling Center to the
11  claims of Mr. Richards?
12              MS. KENNEDY:    Again, if it requires
13  you to reveal attorney-client
14  communications I'd instruct you not to
15  answer. If you can answer it without
16  revealing attorney-client communication,
17  please do so.
18              THE WITNESS:    I would actually not
19  feel comfortable answering it without
20  looking at it. There's been so many
21  documents that have been produced by this
22  lawsuit it's hard for me to recall
23  specifics of a single document.
24              MR. SIKORSKI:    Let's mark a copy

12

1  here.
2              (Exhibit 3 marked)
3              MR. SIKORSKI:    Could you read the
4  last question.
5              (The last question was read.)
6              THE WITNESS:    And do you have a copy
7  of the claims? Because some of these
8  answers just say, for instance, we don't
9  have sufficient information to form an
10  opinion about them. Okay.
11              I did review, without looking at
12  these in detail now, I do recall that I
13  reviewed these answers and had no objection
14  to them or problem with them to the extent
15  of my knowledge.
16       Q.     (By Mr. Sikorski) That's the answer in
17  Exhibit 3?
18       A.     Yes.
19       Q.     What is your understanding of the
20  defense of River Valley Counseling Center to the
21  claim of Mr. Richards that he was fired in
22  violation of the Family Medical Leave Act?
23              MS. KENNEDY:    Again, to the extent
24  that your answer requires you to reveal

# EXHIBIT G

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION


MARK A. RICHARDS                      )
                                      )
                    Plaintiff         )
                                      )
v.                                    )
                                      )
RIVER VALLEY COUNSELING CENTER, INC., )
VALLEY HEALTH SYSTEMS, INC.,          )
DAVID G. MATTOCKS AND DONNA VIENS,    )
                                      )
                    Defendants        )


      DEPOSITION OF:  DONNA VIENS, taken before

Sharon R. Roy, Notary Public Stenographer, pursuant

to Rule 30 of the Massachusetts Rules of Civil

Procedure, at the law offices of ROBINSON DONOVAN,

P.C., 1500 Main Street, Suite 1600, Springfield,

Massachusetts on December 14, 2005 commencing at

10:09 a.m.


A P P E A R A N C E S :

(See Page 2)


                  Sharon R. Roy
             Certified Shorthand Reporter
             Registered Professional Reporter

---

A P P E A R A N C E S :


FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
413-732-2301
  BY:  JOHN C. SIKORSKI, ESQ.


FOR THE DEFENDANTS RIVER VALLEY COUNSELING CENTER,
INC., VALLEY HEALTH SYSTEMS, INC. and DONNA VIENS

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115
413-781-2820
  BY:  MARY JO KENNEDY, ESQ.


FOR THE DEFENDANT DAVID G. MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
One Monarch Place,
Springfield, MA 01144
413-737-4753
  BY:  MARY LOU FABBO, ESQ.


Also Present:

Mark Richards

---

3

                  I N D E X

---------------------------------------------------
WITNESS            EXAMINATION              PAGE
---------------------------------------------------

Donna Viens        Direct by Mr. Sikorski     4




EXHIBITS:                                    PAGE:

Exhibit 1:  Notice of Taking Deposition .......... 55

Exhibit 2:  Answers to Interrogatories ........... 57


MARKED TESTIMONY:

Page 8, Line 22
                  -*-

---

4

1
2              S T I P U L A T I O N S
3          It is agreed by and between the
4    parties that all objections, except
5    objections as to the form of the questions,
6    and all motions to strike unresponsive
7    answers are reserved and may be raised at the
8    time of trial for the first time.
9          It is further agreed by and between
10   the parties that the sealing of the original
11   deposition transcript and notification to all
12   parties of the receipt of the original
13   deposition transcript is hereby waived.
14
15        DONNA VIENS, Deponent, having been
16   satisfactorily identified by the production
17   of her driver's license and having first been
18   duly sworn by the Notary Public, deposes and
19   states as follows:
20
21   DIRECT EXAMINATION BY MR. SIKORSKI:
22        Q.   Ms. Viens, will you please state your name
23   and spell your last name, for the record?
24        A.   Donna Viens.  V as in Victor, I-E-N-S.

5

```
1        Q.   And where do you live?
2        A.   West Springfield, Massachusetts.
3        Q.   What's your residential address?
4        A.   31 Bayberry Lane.
5        Q.   And where do you work?
6        A.   I work at River Valley Counseling Center.
7        Q.   And how long have you been working there?
8        A.   A little over a year.
9        Q.   When did you start?
10       A.   In August of 2004.
11       Q.   What were you hired to do?
12       A.   Be the Director of Human Resources.
13       Q.   And have you served in that function
14  continuously since August of 2004?
15       A.   Yes.
16       Q.   Who do you report to?
17       A.   Matthew Haas.
18       Q.   When you first started in August 2004 who
19  did you work for?
20       A.   David Mattocks.
21       Q.   And when did Mr. Mattocks leave the
22  employment of River Valley?
23            MS. KENNEDY:   Object to the form,
24       but go ahead and answer.
```

6

```
1        A.   When he left -- could you please let me
2   know what time frame you mean?
3        Q.   Sure.  When did you start reporting to
4   Mr. Haas?
5        A.   In August of 2005.
6        Q.   And before that time who did you report to?
7        A.   David Mattocks.
8        Q.   Who was Mr. Mattocks employed by?
9        A.   HC Management.
10       Q.   And do you know when Mr. Mattocks left the
11  employ of HC Management?
12       A.   No, I don't.
13       Q.   Did Mr. Mattocks serve as the chief
14  executive officer of River Valley ever?
15       A.   At one time that was his title, yes.
16       Q.   Did he have other titles?
17       A.   Yes, executive director.
18       Q.   When did he serve as the executive director
19  of River Valley?
20       A.   During his tenure.  I don't recall what
21  date it changed.
22       Q.   When was the last time that Mr. Mattocks
23  served as the executive director of River Valley?
24       A.   In May of 2005.
```

7

```
1        Q.   Who did you report to between May of 2005
2   and August of 2005?
3        A.   Marianne Polmatier.
4        Q.   Can you spell that for the stenographer?
5        A.   Marianne, M-A-R-I-A-N-N-E.  Polmatier is
6   P-O-L-M-A-T-I-E-R.
7        Q.   During that period of time what title did
8   she hold?
9        A.   Intern Executive Director.
10       Q.   Before she held that title what was her
11  position?
12       A.   Senior Program Manager.
13       Q.   How long had she been the senior program
14  manager?
15       A.   I don't know.
16       Q.   What were the circumstances of Mr.
17  Mattocks' leaving his position as executive director
18  of River Valley?
19       A.   He did not return from a medical leave of
20  absence.
21       Q.   And when did he fail to return from the
22  medical leave of absence?
23       A.   I don't know what date they used.
24       Q.   Well, approximately.
```

8

```
1        A.   It calls for an assumption on my part, but
2   August --
3            MS. KENNEDY:   Mr. Sikorski wouldn't
4       want you to guess.
5        A.   Okay, then I don't know the official date.
6        Q.   When did he go on medical leave?
7        A.   The end of May.
8        Q.   What was your understanding of when he was
9   supposed to return from the medical leave?
10       A.   I did not have any such understanding.
11       Q.   Did he tell you he was going on medical
12  leave?
13       A.   Yes.
14       Q.   What did he tell you about his leave?
15            MS. KENNEDY:   To the extent the
16       question asks for private, confidential
17       medical information that is privileged, I'm
18       going to instruct you not to answer the
19       question.
20       A.   I'm going to take my attorney's advice and
21  not answer the question.
22       Q.   He told you he needed to go on a medical
23  leave?
24       A.   Yes.
```

9

```
1              MR. SIKORSKI:  Can you mark that
2      question?
3          Q.  (By Mr. Sikorski)  Did he tell you
4      approximately when he would be able to return?
5          A.  No.
6          Q.  Did he give you any indication of when he
7      would be able to return?
8          A.  No.
9          Q.  Do you know if he communicated with anyone
10     else at River Valley when he would be able to return
11     from medical leave?
12         A.  No.
13         Q.  Approximately what date did he tell you he
14     was going to go on medical leave?
15             MS. KENNEDY:  Objection to the form
16     of the question.
17         A.  I'm not positive on the date.
18         Q.  Approximately.
19         A.  May 24.
20         Q.  When was the next time after that May 24
21     date that you talked with Mr. Mattocks?
22         A.  May 25.
23         Q.  What were the circumstances of you speaking
24     to him on that day?
```

10

```
1          A.  Again, I'm very --
2              MS. KENNEDY:  Okay, to the extent
3      that that question asks for you to reveal any
4      confidential, private medical information
5      relating to Mr. Mattocks' medical leave of
6      absence, I'm going to instruct you not to
7      answer.  If you can answer that question
8      without revealing that, please go ahead and do
9      so.
10         A.  It was a personal conversation on his well
11     being.
12         Q.  When was the next time you spoke with Mr.
13     Mattocks?
14         A.  The 26th.
15         Q.  What was the substance of that
16     conversation?
17         A.  Still a personal check on his well being.
18         Q.  When was the next time after that you spoke
19     to Mr. Mattocks?
20         A.  I don't recall.
21         Q.  Was there a long period of time when you
22     didn't speak to him?
23         A.  Yes.
24         Q.  Why was Mr. Richards terminated from River
```

11

```
1      Valley?
2          A.  His position was eliminated.
3          Q.  And who made that decision to eliminate his
4      position?
5          A.  David Mattocks.
6          Q.  Why was his position eliminated?
7          A.  For financial reasons.
8          Q.  What were the financial reasons?
9          A.  To save money.
10         Q.  How much money?
11         A.  His salary.
12         Q.  What was his salary?
13         A.  I don't know off the top of my head.
14         Q.  Did Mr. Mattocks tell you that he had made
15     a decision to terminate Mr. Richards' position?
16         A.  Yes.
17         Q.  When did he tell you that?
18         A.  The last week of October 2004.
19         Q.  And what did he tell you at that time?
20         A.  That he had decided to eliminate the
21     position and he wanted to offer Mark a severance
22     agreement.
23         Q.  Prior to that time had there been any
24     discussions about saving money at River Valley?
```

12

```
1          A.  Yes.
2          Q.  Had there been any plans for ways to save
3      money at River Valley before that time?
4          A.  Yes.
5          Q.  And what were those plans?
6          A.  Could you be more specific?
7          Q.  Well, do you know approximately how much
8      River Valley thought they were going to save by
9      eliminating Mr. Richards' position?
10         A.  No, I don't.
11         Q.  You don't have a ball park; 50, 60,000?
12         A.  It wasn't my area of concern, so, no, I
13     don't.
14         Q.  Did you ever see any piece of paper
15     discussing or relating to the amount of money that
16     would be saved by eliminating Mr. Richards' position?
17         A.  I don't recall.
18         Q.  Do you remember seeing anything
19     electronically; by that I mean an e-mail or a Word
20     document or an Excel spread sheet or anything like
21     that that reflected how much money they would save by
22     eliminating Mr. Richards' position?
23         A.  I don't recall.
24       · Q.  Do you recall seeing anything such as a
```

17

```
1    had requested FMLA leave?
2         A.    Mr. Mattocks was aware of that.
3         Q.    That's two questions. Did you ever discuss
4    with Mr. Mattocks the fact that Mr. Richards was on
5    FMLA leave?
6         A.    He was not on FMLA leave, to my knowledge.
7         Q.    Did you ever discuss with Mr. Mattocks the
8    fact that Mr. Richards had requested FMLA leave?
9         A.    Yes.
10        Q.    And what did you say to him and what did he
11   say to you about that?
12        A.    It was when I approved the intermittent
13   leave for Mr. Richards.
14        Q.    How did you inform Mr. Mattocks of that?
15        A.    I provided him a copy of the approval
16   letter and brought the letter to him and indicated
17   that Mark was approved for intermittent leave.
18        Q.    What did you tell Mr. Mattocks when you
19   brought the letter to him?
20        A.    I told him that it was Mr. Richards'
21   responsibility to contact Mr. Mattocks when he
22   intended to use the intermittent leave so that we
23   could track it appropriately.
24        Q.    What did you understand was Mr. Richards'
```

18

```
1    need for intermittent leave?
2         A.    To assist in the care of his ill daughter.
3         Q.    What was your understanding of her illness?
4         A.    After I received the doctor's statement,
5    that she had severe late-stage Lyme disease.
6         Q.    I'd like to go back to the conversation in
7    which Mr. Mattocks told you he was going to eliminate
8    Mr. Richards' position. Do you have that
9    conversation in your mind?
10        A.    Yes.
11        Q.    Did he tell you in that conversation who
12   was going to replace Mr. Richards as the program
13   director?
14        A.    That we were not going to replace the
15   position.
16        Q.    Did Mr. Mattocks tell you who was going to
17   take over Mr. Richards' responsibilities?
18        A.    He explained that Jeff Kassis would
19   continue to have the fiscal responsibility for the
20   program as he always had, and that David Avakian
21   would continue with the daily supervision of the
22   staff, as he had.
23        Q.    Did Mr. Mattocks tell you whether or not he
24   had discussed the decision to eliminate Mr. Richards'
```

19

```
1    position with anyone else?
2         A.    He did not tell me at that time, no.
3         Q.    Mr. Richards at this time was working about
4    34 hours a week, was he not?
5         A.    I believe so.
6         Q.    Mr. Avakian was going to take over some of
7    his responsibilities, correct?
8         A.    Yes.
9         Q.    And did the organization hire someone to
10   take over or to assist Mr. Avakian with his previous
11   responsibilities?
12        A.    No.
13        Q.    They didn't hire another clinical person?
14        A.    We were in the process of hiring another
15   clinical person prior to Mr. Richards' departure.
16        Q.    And that was a 40-hour a week position,
17   correct?
18        A.    Yes.
19        Q.    So, Mr. Avakian moves up and takes some of
20   Mr. Richards' position, that was planned?
21        A.    He did not move up.
22        Q.    He was going to take some of his
23   responsibilities?
24        A.    Continue with the daily supervision, yes.
```

20

```
1         Q.    And between Mr. Avakian and Mr. Richards,
2    who had more experience in supervising clinicians?
3         A.    I don't know.
4         Q.    So some of Mr. Avakian's hours needed to be
5    replaced, correct?
6         A.    I don't know.
7         Q.    Isn't it true that Mr. Avakian's hours were
8    replaced with a newly-hired clinician at 40 hours a
9    week?
10        A.    No, that's not true.
11        Q.    Why isn't that true?
12        A.    Because that position was in the process of
13   being recruited for prior to Mr. Richards leaving, so
14   it was a position that was already going to be
15   filled.
16        Q.    When did you start looking for that
17   position?
18        A.    Sometime in October.
19        Q.    When in October?
20        A.    I don't recall.
21        Q.    October 1, October 15, October 25?
22        A.    Before Mr. Mattocks talked to me about Mr.
23   Richards' termination.
24        Q.    How soon before?
```

# EXHIBIT H

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                     )
                    Plaintiff         )
VS.                                   )
                                      )
RIVER VALLEY COUNSELING CENTER,       )
INC., VALLEY HEALTH SYSTEMS, INC.,    )
DAVID G. MATTOCKS AND DONNA VIENS,    )
                    Defendants        )

        DEPOSITION OF MARY KELLEHER, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on January 31,

2006, commencing at 1:15 p.m.


APPEARANCES:  (See Page 2)



              Debra A. Vance
           Notary Public Stenographer

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
     BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
     BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
     BY:  MARY LOU FABBO, ESQ.

---

3

            I N D E X

WITNESS        DIRECT    CROSS    REDIRECT  RECROSS

Mary Kelleher *4

* By Mr. Sikorski


EXHIBITS:                                    PAGE:

Exhibit 1, subpoena.........................25

---

4

1              STIPULATIONS
2
3         It is agreed by and between the
4   parties that all objections, except objections as
5   to the form of the questions, and all motions to
6   strike unresponsive answers are reserved and may
7   be raised at the time of trial for the first
8   time.
9
10        It is further agreed by and between
11  the parties that the sealing and the notification
12  to all parties of the receipt of the original
13  deposition transcript is hereby waived.
14
15        MARY KELLEHER, Deponent, having
16  been satisfactorily identified and duly sworn,
17  deposes and states as follows:
18
19  DIRECT EXAMINATION BY MR. SIKORSKI:
20       Q.    Would you please state your name,
21  spell your last name for the record, and give us
22  your address please?
23       A.    My name is Mary E. Kelleher,
24  K-E-L-L-E-H-E-R, and my home address is 60 Lindor

7

Heights in Holyoke.

Q.    Who do you work for?

A.    H-C Management Services, Inc.

Q.    What do you do for H-C Management Services?

A.    Vice president of human resources.

Q.    How many employees does H-C Management have?

A.    Probably 20, 25.

Q.    And whom do you provide human resources services?

A.    Um, employees of Holyoke Hospital, Inc., at H-C Management Services, Inc., River Valley Counseling Services on a consulting basis, and Western Mass Physician Associates, Inc., and Valley Health System and occasionally on a consultative basis to the Visiting Nurses Association.

Q.    For how long have you given human resources counseling to River Valley?

A.    Probably more than ten years, probably less than 15 years. I'm not exactly sure.

Q.    Does River Valley pay for your

6

services?

A.    Yes, they do.

Q.    And how are they charged or assessed?

A.    I believe it is an assessment from the management company to the subsidiaries for time that I log for the different corporations.

Q.    Do you fill out time sheets every day?

A.    I do an annual accounting, but I keep an accurate record in my appointment book.

Q.    Is River Valley assessed just one time at the end of a year?

A.    I'm not sure how the assessment works. I'm not in the finance area.

Q.    Okay. Do you know Mark Richards?

A.    A little bit.

Q.    And do you recall when you first met Mr. Richards?

A.    Several years ago. I have no idea exactly when.

Q.    Were you involved at all in the decision to terminate Mr. Richards?

A.    No.

Q.    Were you advised that River Valley

was going to terminate Mr. Richards before he was terminated?

A.    I was aware of it.

Q.    How did you become aware of it?

A.    Mr. Mattocks called me.

Q.    And did he speak to you over the phone or in person?

A.    Over the telephone.

Q.    And what did he say to you and what did you say to him?

A.    My recollection is that he told me he was going to do a reduction in force, and that he asked me what the policies and practices were of the organization relative to a layoff.

Q.    And what did you say to him?

A.    Well, I had asked him how long Mark had been employed, and I asked the position. And I told him that we had no formal policy on a corporate basis relative to layoff. But that where possible, we try to do some sort of a severance arrangement to do some form of a salary continuation for the party who is being affected by the reduction.

Q.    Did he say anything else to you in

8

that conversation?

A.    We just discussed what did I think was appropriate for an amount of severance. I told him what I did at the hospital, which is where I've had more reductions than I've been involved with in any other corporations. And I told him that based on his length of service that to do as much as he could, that we usually do, at the hospital we do a week of salary for every year of service with a cap of 12 weeks. And I asked him to see what he could do financially.

Q.    Was that the end of the conversation?

A.    Um, I'm not sure. I know we had a conversation at some point about how to do it, how to conduct the separation interview. I don't remember if it was at that time or if it was at a subsequent time.

Q.    And regarding that topic, what did you say to him and what did he say to you?

A.    I told him that as the senior leader in the organization that he should be involved, but that I advised him to have his HR person as a participant in the process so that she could explain the benefits.

9

1    Q.    Did you tell him anything else?

2    A.    No specifics are popping into my mind

3    right now.

4    Q.    Did you have any other discussion

5    with Mr. Mattocks about Mr. Richards'

6    termination?

7    A.    Not that I recall.

8    Q.    Did he talk to you about

9    Mr. Richards' request to speak to his staff?

10    A.    That was a conversation that was had,

11    I believe, on the day of the separation

12    interview.

13    Q.    Okay.  Let's focus on before the

14    termination then.  Do you recall any other

15    conversation with Mr. Mattocks about

16    Mr. Richards' termination?

17    A.    Only relative to procedural issues

18    and policies and like that, just what I've

19    explained to you.  And I don't remember if there

20    was one conversation or more than one

21    conversation with him, but it was procedural.

22    Q.    What do you mean by procedural?

23    A.    Well, the procedure to follow, have a

24    letter that explains that you're going to be

10

1    affected by a reduction.  In the case of if

2    you're going to do a severance agreement, if

3    you're going to do a severance package then we do

4    a severance agreement.  There are companies that

5    have an HR person available to make sure that the

6    things that you're required by law to give are

7    there, like in COBRA paperwork or the

8    unemployment paperwork, things like that,

9    procedural.

10    Q.    Did you discuss with him whether or

11    not this termination would violate any

12    discrimination laws or any other employment laws?

13    A.    No.

14    Q.    Did you provide any guidance to him

15    in evaluating this decision for compliance with

16    employment laws?

17    A.    He informed me that Mr. Richards was

18    on an intermittent Family Medical Leave.  And I

19    asked for some clarification on that, and in my

20    opinion it did not violate.  I was informed that

21    Mr. Richards was not using intermittent leave.

22    Q.    Did you ask whether there was an

23    issue involving Family Medical Leave or did

24    Mr. Mattocks bring it up to you?

11

1    A.    I don't recall.

2    Q.    You'd mentioned about Mr. Mattocks

3    talking about a reduction in force.  Is that the

4    term that he used?

5    A.    That's my term.

6    Q.    Do you use the term "reduction in

7    force" if you're just terminating one person?

8    A.    I do.

9    Q.    So regardless of whether you're

10    terminating one or twenty, in your vocabulary

11    that's still a reduction in force?

12    A.    It is.

13    Q.    And did you ask Mr. Richards -- I'm

14    sorry.

15    Did you ask Mr. Mattocks if he was

16    going to terminate anyone other than

17    Mr. Richards?

18    A.    He was specifically asking me about

19    Mr. Richards.

20    Q.    And what did he tell you about the

21    Family Medical Leave?

22    A.    Mr. Richards' Family Medical Leave or

23    in general?

24    Q.    Yes, Mr. Richards' Family Medical

12

1    Leave.

2    A.    He had requested a leave for his

3    daughter and that it was on an intermittent

4    basis.  I remember that.  And I remember that he

5    was supposed to touch base if he was going to be

6    needing time off for the leave, and that I

7    believe there had not been any use of time or any

8    significant use of time noted in the time sheets.

9    Q.    What did you say then to Mr. Mattocks

10    about Mr. Richards' use of Family Medical Leave

11    Act?

12    A.    I said that if he wasn't using the

13    time then you have to make your business

14    decision.

15    Q.    Would your advice have been different

16    if Mr. Richards had begun using the intermittent

17    leave?

18    A.    I'm not sure if it would have been

19    different.  I don't know.  I'd have to know what

20    the circumstances were.

21    Q.    What did Mr. Mattocks tell you was

22    the business reason for his termination?

23    A.    I believe it was a cost savings.

24    Q.    Did you ask him how much was involved

13

1   in the cost savings?
2       A.    I didn't ask him what Mr. Richards'
3   salary was.
4       Q.    Did you ask him to send any sort of
5   memorandum or anything in writing to you about
6   this?
7       A.    No.
8       Q.    What did Mr. Mattocks tell you about
9   Mr. Richards' daughter?
10      A.    He didn't tell me anything about
11  Mr. Richards' daughter.
12      Q.    Did you understand that the leave was
13  for Mr. Richards to take care of his daughter?
14      A.    His daughter was ill is what I was
15  told.
16      Q.    Did he describe at all the illness?
17      A.    No.
18      Q.    Did he characterize it at all?
19      A.    No.
20      Q.    Did you ever speak to Donna Viens
21  about Mr. Richards' termination before it
22  happened?
23      A.    I don't remember if I talked with her
24  or just sent a message through David. I don't

14

1   remember specifically.
2       Q.    Did you take any notes of any
3   conversation you had with Mr. Richards -- I mean
4   with Mr. Mattocks about Mr. Richards?
5       A.    The phone conversation?
6       Q.    Right.
7       A.    No.
8       Q.    Or any other notes about
9   Mr. Richards' termination?
10      A.    No.
11      Q.    How about after Mr. Richards'
12  termination, have you made any notes?
13      A.    No.
14      Q.    On the day of the termination, did
15  you and Mr. Mattocks speak about Mr. Richards'
16  termination?
17      A.    Yes.
18      Q.    Was that in person or over the phone?
19      A.    Over the phone.
20      Q.    And do you recall if he called you or
21  did you call him?
22      A.    I don't recall.
23      Q.    What did he say to you and what did
24  you say to him in that conversation?

15

1       A.    I just asked if, you know, how it
2   went. And he indicated that Mark had wanted to
3   speak with the staff to tell the staff that he
4   was resigning his employment. And he asked me if
5   I thought that was all right to do.
6       Q.    What did you tell him?
7       A.    I told him if Mark wanted to meet
8   with the staff I had no objection with him doing
9   so.
10      Q.    Did you suggest to Mr. Mattocks at
11  any time that he consult with counsel about the
12  decision to terminate Mr. Richards?
13      A.    I don't remember if I did or not.
14      Q.    Did you ever suggest to Mr. Mattocks
15  that he consult with counsel about the terms of
16  the separation agreement?
17      A.    Yes.
18      Q.    When did you give that advice to
19  Mr. Mattocks?
20      A.    When he asked me what should happen
21  relative to the severance package. I said that
22  he should consult with counsel so that they could
23  put it together, that that's not something that I
24  would do.

16

1       Q.    Do you know if he did so?
2       A.    Yes.
3       Q.    And how do you know that?
4       A.    Because I had contact with counsel
5   relative to the separation agreement.
6       Q.    At any time before the termination,
7   did you ever discuss with Mr. Mattocks whether or
8   not terminating Mr. Richards would implicate the
9   age discrimination statutes?
10      A.    No.
11      Q.    Did you ask him how he was going to
12  replace Mr. Richards?
13      A.    I believe he volunteered that
14  information.
15      Q.    What did he tell you?
16      A.    There was an associate director in
17  the program who was capable of running the
18  day-to-day operations.
19      Q.    Did you ask him how old that person
20  was?
21      A.    No.
22      Q.    Did Mr. Mattocks ever receive any
23  training in compliance with employment laws from
24  H-C Management or Valley Health Systems?

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.  05-30061-MAP

| | | |
|---|---|---|
| MARK A. RICHARDS, | ) | |
| Plaintiff | ) | |
| | ) | DEFENDANT, DAVID G. |
| vs. | ) | MATTOCKS' ANSWERS |
| | ) | TO INTERROGATORIES |
| RIVER VALLEY COUNSELING | ) | PROPOUNDED |
| CENTER, INC., VALLEY HEALTH | ) | BY THE PLAINTIFF |
| SYSTEMS, INC., DAVID G. MATTOCKS | ) | |
| AND DONNA VIENS, | ) | |
| Defendants | ) | |

The defendant, David G. Mattocks, responds to Interrogatories Propounded on

Behalf of the Plaintiff, Mark A. Richards, to be Answered by the Defendant, David G.

Mattocks, as follows:

INTERROGATORY NO. 1:  Please state your name, residential address, date of

birth, social security number, business address, occupation and position you hold with the

defendant corporation, River Valley Counseling Center, Inc.

OBJECTION:  To the extent that the foregoing request seeks his social

security number, Mr. Mattocks objects on the grounds that his social security

number is confidential.

Without waiving this objection, Mr. Mattocks answers as follows:

ANSWER:  David G. Mattocks; Mira Vista, 71 Valley View Drive,

Vernon, Vermont; January 18, 1950; former Executive Director.

INTERROGATORY NO. 2:  Please identify and give the last known address of

all persons having knowledge of discoverable material to this action.

INTERROGATORY NO. 7:  Please state the names and residential address of all those persons you intend to call as witnesses in the trial of this case, indicating what their expected testimony will be.

ANSWER:  The identity of witnesses has not yet been determined.


INTERROGATORY NO. 8:  Please list all of the documents you intend to introduce into evidence at the trial of this case, indicating the title, date, name and residential address of the person preparing each such document.

ANSWER:  The identity of documents intended to be introduced into evidence at trial has not yet been determined.


INTERROGATORY NO. 9:  Identify each person you expect to call as an expert witness at the trial and please state:

a)    the subject matter on which the expert is expected to testify;

b)    the substance of the facts and opinions to which the expert is expected to testify;

c)    a summary of the grounds for each opinion.

ANSWER:  The identity of any expert witnesses to be called at trial has not yet been determined.

Signed under the penalties of perjury this 26th day of September, 2005.

_____
David G. Mattocks

5

# EXHIBIT J

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                           )
                Plaintiff                   )
VS.                                         )
                                            )
RIVER VALLEY COUNSELING CENTER,             )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
                Defendants                  )

            DEPOSITION OF JEFFREY KASSIS, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on January 31,

2006, commencing at 10:00 a.m.

APPEARANCES:  (See Page 2)

            Debra A. Vance
        Notary Public Stenographer

---

3

1          I N D E X

2

3

4  WITNESS          DIRECT  CROSS  REDIRECT  RECROSS

5  Jeffrey Kassis      *4

6

7  *  By Mr. Sikorski

8

9

10 EXHIBITS:                          PAGE:

11 Exhibit 1, Subpoena.........................5

12

13

14

15

16

17

18

19

20

21

22

23

24

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
        BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
        BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
        BY:  MARY LOU FABBO, ESQ.

---

4

1             STIPULATIONS

2

3          It is agreed by and between the

4  parties that all objections, except objections as

5  to the form of the questions, and all motions to

6  strike unresponsive answers are reserved and may

7  be raised at the time of trial for the first

8  time.

9

10         It is further agreed by and between

11 the parties that the sealing and the notification

12 to all parties of the receipt of the original

13 deposition transcript is hereby waived.

14

15         JEFFREY KASSIS, Deponent, having

16 been satisfactorily identified and duly sworn,

17 deposes and states as follows:

18

19 DIRECT EXAMINATION BY MR. SIKORSKI:

20     Q.     Would you please state your name for

21 the record and spell your last name?

22     A.     It's Jeffrey Paul Kassis.  The last

23 name is Kassis.

24         MS. KENNEDY:  If you could just

41

```
 1                  At the time you became the director
 2   of the psychiatric day treatment program, how
 3   many people worked in that program?
 4          A.      At that point, there were about five
 5   and I directly supervised everybody in the
 6   program.
 7          Q.      That's five full-time equivalence?
 8          A.      It's changed a little bit.  It was
 9   about -- not five full-time equivalence.  I think
10   it was about 4.6.  And that's not including the
11   secretary.
12          Q.      At any time before Mark Richards'
13   termination, did Mr. Mattocks ask you to come up
14   with a plan to cut costs on the clinical side of
15   River Valley Counseling Center?
16          A.      No, he didn't.
17          Q.      After Mark Richards' termination, did
18   Mr. Mattocks ever ask you for a plan to cut costs
19   on the clinical side of River Valley Counseling
20   Center?
21          A.      With EAP we had to manage some costs
22   with that.  There was a business plan with EAP,
23   but no management of costs other than that.
24          Q.      What's your date of birth?
```

43

```
 1   of Mr. Richards with Mr. Avakian?
 2          A.      I think kind of after the fact, you
 3   know, we sat and strategized, you know, our plan
 4   for going forward.
 5          Q.      Was Mr. Avakian upset by the
 6   termination of Mr. Richards?
 7          A.      My memory is that he was shaken by
 8   it.
 9          Q.      What do you base that upon?
10          A.      I think it was because he expressed
11   fear about moving forward, what he was going to
12   do, how he was going to work all of that.  I
13   think he was -- I would think he was a bit scared
14   about what was going -- his future.
15          Q.      How long after Mark Richards'
16   termination did Mr. Avakian continue to work in
17   the psychiatric day treatment program?
18          A.      I think approximately five months.
19          Q.      And then what did he do?
20          A.      My memory is that he worked -- went
21   to work up in Greenfield, and then he was going
22   to do a bit of a private practice, too.
23          Q.      Do you know where in Greenfield he
24   went to work?
```

42

```
 1          A.      2/22/51.
 2          Q.      Prior to Mr. Richards' termination,
 3   was part of your salary carried on the budget of
 4   the psychiatric day treatment program?
 5          A.      Yes.
 6          Q.      Do you know approximately what
 7   percentage was carried?
 8          A.      I don't remember clearly.
 9          Q.      When was the position of assistant
10   director of the psychiatric day treatment program
11   created, when was that position created?
12          A.      My memory is fuzzy, but I believe
13   around three or four months, approximately
14   August, I think, of 2004.
15          Q.      And who created it?
16          A.      It was a mutual decision, I think.
17   Mark was involved.  David Mattocks was involved.
18   I was involved, I believe, is my memory.
19          Q.      Was there a formal position statement
20   created for that position?
21          A.      There was a client status form that
22   was created when we make a position.  But I don't
23   remember a job description.
24          Q.      Did you ever discuss the termination
```

44

```
 1          A.      You know, I'm not exactly clear.  I'm
 2   not exactly clear.
 3          Q.      What were the circumstances under
 4   which he left the psychiatric day treatment
 5   program?
 6          A.      I think he said it was personal
 7   issues between he and his wife.  His wife wanted
 8   him to have a job where he would be more
 9   accessible for his home life.
10          Q.      Did he come in and tell you that in
11   person?
12          A.      Yeah, we had a discussion.  Yes, we
13   had a discussion about his home world and what
14   that was like for him.
15          Q.      And did he, in fact, leave the River
16   Valley Health Center Psychiatric Day Treatment
17   Program?
18          A.      He did.
19          Q.      And has he returned to that program?
20          A.      No.
21          Q.      And has he returned to work for some
22   entity affiliated with the Holyoke Hospital
23   group?
24          A.      I haven't seen him except I saw him
```