UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARK RICHARDS,

          Plaintiff,

vs.

RIVER VALLEY COUNSELING
CENTER, INC., VALLEY HEALTH
SYSTEMS, INC., DAVID G.
MATTOCKS, AND DONNA VIENS,

          Defendants.

CIVIL ACTION NO. 05-30061-MAP

## DEFENDANT MATTOCKS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED[1]

1.    Mr. Richards began employment with River Valley Counseling Center, Inc. (River Valley) in the early 1990s.  (Richards 20, 23)  River Valley was comprised of a Day Treatment Program (also known as a partial hospitalization program), an AIDS Prevention and Treatment Program, and School-Based AIDS Education Awareness and Harm Reduction Programs.  (Mattocks 16, 18-19)[2]

2.    In 1997, Mr. Richards became the Program Director of River Valley's Psychiatric Day Treatment Program in Holyoke, MA.  (Richards 19-20, 25-26)  A Day Treatment Program is designed to prevent hospitalization of adults who have a serious mental illness and who are at risk of being hospitalized or have been

---

[1]To the extent there is dispute in the facts, the facts herein are presented by the testimony most favorable to Mr. Richards. *Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir. 1997); *Timpson v. Transamerica Ins. Co.*, 41 Mass. App. Ct. 344, 669 N.E.2d 1092 (1996).
[2] Relevant portions of the deposition transcripts referenced herein are attached as follows:  David Mattocks–Exhibit 1; Mark Richards–Exhibit 2; David Avakian-Exhibit 3; Jeffrey Kassis-Exhibit 4; and Donna Viens-Exhibit 5.

hospitalized for a psychiatric illness.  (Richards 19)

3.      As Program Director, Mr. Richards directed the day-to-day operations of the Day

        Treatment Program on a clinical and administrative basis.  (Richards 116-17)

4.      David Avakian began reporting to Mr. Richards in 1996 or 1997.  Mr. Avakian

        was the Day Treatment Program Supervisor.  As Program Supervisor, Mr.

        Avakian was the person in charge when Mr. Richards was not available.

        Additionally, Mr. Avakian scheduled group patients, oversaw Medicare billing,

        supervised interns and was himself a Clinician.  (Richards 120; Avakian 7-8)

5.      Jeffrey Kassis became the Clinical Director at River Valley Counseling Center in

        1988.  As Clinical Director he had Clinical responsibility for River Valley's Day

        Treatment Program for most of the time during 1988 through 2004.  (Kassis 6-7)

6.      In June 2004, H-C Management Company hired David G. Mattocks as the

        Executive Director of River Valley.  (Mattocks 23-24; Richards 61)  Mr. Richards

        reported to Mr. Mattocks in connection with his administrative responsibilities,

        and he reported to Mr. Kassis, Clinical Director, in connection with his clinical

        functions.  (Mattocks 15)  Mr. Mattocks and Mr. Richards did not work at the

        same physical location.  (Mattocks 26; Richards 69)

7.      Donna Viens began employment at River Valley Counseling Center in August,

        2004, as its Director of Human Resources.  (Viens 5)

8.      At some time prior to August 30, 2004, Mr. Richards told Mr. Mattocks that his

        daughter recently had received a new diagnosis for a long-term illness; that he

        expected to be involved in her treatment; and that he would be requesting

        intermittent family leave.  As Ms. Viens, not Mr. Mattocks, was responsible for

2

approving and approved FMLA leaves, Mr. Mattocks advised Mr. Richards to inform Ms. Viens of his need for leave and told him that she would provide him with any necessary paperwork.  (Richards 49, 84-85)

9.      On or about August 30, 2004, Mr. Mattocks received a memorandum from Mr. Richards requesting intermittent leave to care for his daughter.  The memorandum was copied to Ms. Viens.  (Mattocks 60-61, Richards 84; Exhibit 6)

10.     On September 2, 2004, Mr. Mattocks wrote Mr. Richards a memorandum informing him that the River Valley Business Office had not been receiving Day Treatment billings in a timely manner.  The memorandum requested Mr. Richards to set up a system whereby the billings would be sent to the Business Office on the same day, every three weeks.  Mr. Mattocks also, in that memorandum, asked Mr. Richards to make sure he had back up for implementing the system in his absence.  (Richards 240-41; Exhibit 7)

11.     On September 3, 2004, Ms. Viens responded in writing to Mr. Richards' August 30th memorandum that requested leave in writing, Ms. Viens copied Mr. Mattocks on the letter.  With the letter, Ms. Viens sent a Request for Leave of Absence Form for Mr. Richards to complete and a Certification of Health Care Provider for his daughter's physician to complete.  The letter informed Mr. Richards that it was his responsibility to let Mr. Mattocks know when he would be using his intermittent leave under the Family and Medical Leave Act.  (Mattocks 61; Richards 85-86; Exhibit 8)

12.     By letter dated September 17, 2004, Ms. Viens informed Mr. Richards that his request for intermittent FMLA leave was approved.  The letter also reiterated that

Mr. Richards was required to inform Mr. Mattocks of his need to be away from work for FMLA reasons at least 24 hours in advance whenever foreseeable or, if not foreseeable, as soon as possible. (Mattocks 61; Richards 89-90; Exhibit 9)

13.  Mr. Mattocks did not see the completed forms Mr. Richards submitted to support his need for FMLA leave. (Mattocks 61)

14.  In 2004, Mr. Richards worked only 34 hours per week and had flexibility in his schedule. Mr. Richards took FMLA intermittent leave that sometimes resulted in him arriving to work later than he normally would arrive. Mr. Richards had difficulty attending morning meetings but never requested that they be rescheduled to another time. (Richards 222)

15.  Mr. Richards did not tell Mr. Mattocks every time he took FMLA intermittent leave. (Richards 90-91)

16.  Instead, of telling Mr. Mattocks when he would be out of work for FMLA reasons, Mr. Richards let Mr. Avakian know when he would be out. (Richards 91).

17.  Mr. Richards was out of work many full or partial days during the summer and fall of 2004. (Richards 63-64, 91-93) Mr. Richards' timesheets indicated when he was out; however, they did not indicate whether he was out of work for his own personal reasons, holidays, sick time or vacation time or to care for his daughter. When Mr. Richards took FMLA time off, he took it and recorded the time off as personal time, vacation time or holiday time so that his pay would not get docked. (Richards 92, 95-96, 217-18) Mr. Richards did not submit any documentation to Mr. Mattocks or the Human Resources Department indicating when he took intermittent FMLA leave. (Richards 90-92, 95)

4

18.    In addition to Mr. Richards' leave, Donna Viens approved other FMLA leaves of
       absence, while Mr. Mattocks was employed with River Valley. (Mattocks 49)

19.    In the late summer of 2004, Mr. Richards told Mr. Mattocks that he believed that
       the Day Treatment Program Supervisor, Mr. Avakian, should receive a salary
       increase and promotion.  Mr. Richards considered Mr. Avakian to be a very
       valuable employee.  Mr. Avakian was the only person who could fill in for Mr.
       Richards in his absence.  Mr. Richards believed this made Mr. Avakian not only
       valuable as a Clinician but as a leader in the Program.  Mr. Mattocks asked Mr.
       Richards to prepare a writing advocating why Mr. Avakian should receive a raise.
       Mr. Richards did so and either submitted it to Mr. Mattocks or used it as a basis
       for discussion with Mr. Mattocks.  Mr. Mattocks initially was not in favor of raising
       Mr. Avakian's salary, but after he listened to or read Mr. Richards' advocacy on
       Mr. Avakian's behalf, Mr. Mattocks approved the increase and promotion.
       (Richards 100-105, 169-70)

20.    By Memorandum dated September 16, 2004, Mr. Mattocks formally offered Mr.
       Avakian a promotion to Assistant Director of the Psychiatric Day Treatment
       program and a raise.  (Richards 106; Exhibit 10)

21.    In September or October 2004, Mr. Mattocks asked Mr. Richards if he could join
       certain "smaller" Executive Team Meetings, which Mr. Richards believed were
       going to be held about three times per week.  Mr. Richards told Mr. Mattocks that
       he had a daily meeting of the Day Treatment Program that would overlap with the
       meetings Mr. Mattocks wanted him to attend.  Mr. Richards asked Mr. Mattocks

how he would be contributing at those meetings and what the goals of those meetings would be in comparison to other meetings he attended. Mr. Mattocks told Mr. Richards that he was still working out the purposes of the various meetings. Mr. Richards mentioned to Mr. Mattocks that it sometimes might be difficult for him to attend the meetings "due to his personal circumstances," and *might* have mentioned it was due to his daughter. Mr. Richards believes that Mr. Mattocks did not require Mr. Richards to attend the meetings because he had not determined what Mr. Richards' role would be at the meetings. He also speculates Mr. Mattocks did not require him to attend because Mr. Richards would not be able to be in regular attendance at the meetings due to his daughter. (Richards 74-75, 149-51, 222-25)

22.  At some point in time, Mr. Mattocks commented to Mr. Richards that he believed it was difficult for him to arrange meetings with him because he "wasn't around very much" because he was at home with his ill daughter. (Richards 148)

23.  Mr. Richards felt that his relationship with Mr. Mattocks changed in October 2004 because Mr. Mattocks left him a voicemail canceling a meeting the two had scheduled and did not drop by to speak with him as much as he had previously. (Richards 74-75, 149-151, 222-25)

24.  Nonetheless, Mr. Richards got along well with Mr. Mattocks and saw their relationship as being in an "orientation kind of phase." Mr. Richards believed that Mr. Mattocks responded quickly to issues Mr. Richards brought to his attention, sought out Mr. Richards' opinion, and respected Mr. Richards' role in the organization. Mr. Richards thought Mr. Mattocks had a vision for growing the

6

program and that he improved Mr. Richards' team's morale.  (Richards 229-30)

25.    Mr. Richards never complained to anyone at River Valley that he thought Mr.
Mattocks was treating him differently or inappropriately.  (Richards 221-22)

26.    At all times during his employment as Executive Director, Mr. Mattocks attempted
to find cost-saving measures for River Valley, which had been operating at a
significant deficit for several years prior to his hire.  (Mattocks 11-12)

27.    At meetings, Mr. Mattocks told Program Directors, including Mr. Richards, that he
would be speaking to people about cutting costs in programs at River Valley.
(Richards 114-15)

28.    Mr. Mattocks, on an on-going basis, examined all positions under his area of
responsibility to assess their contributions to the organization and to determine
whether there were any position redundancies.  (Mattocks 11-12)

29.    Mr. Mattocks made efforts to save on personnel expenses by not filling positions
of those who resigned or who were terminated.  (Mattocks 13-14, 20)  Mr.
Mattocks eliminated several positions, including a Contracts Management
position, two or three business office staff and Clinician positions.  He also
eliminated the Community-Based AIDS Education Coordinator.  Two other
Program Managers, too, were either eliminated or in the process of being
eliminated when Mr. Mattocks left employment.  (Mattocks 13-14, 18, 20-21)

30.    Prior to November 4, 2004, Mr. Mattocks estimated that River Valley could
achieve a cost savings of $40,000 - $60,000 by eliminating Mr. Richards'
position.  (Mattocks 16-17)  Mr. Mattocks therefore, decided to eliminate Mr.
Richards' position.  (Mattocks 11).

31.    At 8:30 a.m. on November 4, 2004, Mr. Mattocks held an Executive Team Meeting, which Mr. Richards attended.  At that meeting, Mr. Mattocks informed the attendees that there were going to be changes and cuts that would be difficult for people.  (Richards 122-23)

32.    Mr. Richards and Mr. Mattocks had a meeting scheduled for 9:30 a.m., after the Executive Team Meeting.  Ms. Viens joined their meeting.  (Richards 124)

33.    When the meeting began, Mr. Mattocks told Mr. Richards that it was going to be a very difficult meeting and that he had compassion for what he was about to do as he had encountered similarly disquieting discussions during his career.  Mr. Mattocks then told Mr. Richards that for financial and business reasons his position would be eliminated.  Mr. Mattocks told Mr. Richards that the elimination had nothing to do with his job performance.  Indeed, Mr. Mattocks had no reason to have any concern about Mr. Richards' clinical skills and found no deficits or performance problems with Mr. Richards' management skills.  (Mattocks 21-22)

34.    Mr. Mattocks told Mr. Richards that Mr. Richards' clinical responsibilities would be assigned to the Clinical Director, Mr. Kassis, and day-to-day operations would be assigned to Assistant Program Director, Mr. Avakian.  (Mattocks 29-30, 44-45; Richards 125-130; Viens 23-29)  Mr. Richards believes that Mr. Mattocks in fact did believe that by terminating him he could save money in terms of Mr. Richards' salary.  (Richards 183-84)

35.    During the termination meeting, Mr. Richards told Mr. Mattocks that he did not

believe that the reorganization would be in compliance with applicable

regulations. (Mattocks 31; Richards 126)

36.    Mr. Mattocks did not agree with Mr. Richards' belief that the Program would be

out of compliance with regulations under the restructuring. Mr. Mattocks reached

the conclusion that the Program would be in compliance by telephoning the

regulatory agency, reviewing the regulations himself, and consulting with Mr.

Kassis and Mr. Avakian. He also had contacted a trade association of

organizations offering partial hospitalization programs. That organization

informed Mr. Mattocks that there was some discrepancy in the interpretation of

the regulations and that after reorganizations, programs were given time to meet

regulations if they were then discovered not to be in compliance. Mr. Mattocks

also contacted one or two other programs that operated partial hospitalization

programs and inquired about their understanding of the regulations. (Mattocks

33-36, 39-40; Kassis 55-59)

37.    Toward the end of the meeting, Mr. Richards asked Mr. Mattocks if he could

inform his staff that he would be voluntarily leaving the organization. Mr.

Mattocks allowed him to do so. Mr. Richards informed his staff that he would be

leaving to spend more time caring for his daughter. (Mattocks 20; Richards 155-

58)

38.    Around the time when Mr. Mattocks decided to eliminate Mr. Richards' position,

Mr. Mattocks took additional steps to reduce costs at River Valley and increase

its revenues. Some examples are as follows: He stopped outsourcing graphic

design services and began doing the graphic design himself; he negotiated all

contracts for stationery, signage, and location of outpatient offices; he sent

someone to Puerto Rico for three weeks to recruit bilingual therapists in the hope

of increasing the agency's revenue with the Spanish-speaking population; he

negotiated with several agencies about increasing contractual involvement with

River Valley; and he negotiated with the Department of Mental Health for

increased revenue for services being provided.  (Mattocks 55-56)

39.    Mr. Richards, whose date of birth is in 1950 and who was 54 at the time of his

separation from employment, believes he was terminated because of his age.

(Amended Compl. ¶¶ 1, 23-26) However, Mr. Mattocks, who is slightly older than

Mr. Richards, had no idea of the relative ages of Mr. Richards and Mr. Avakian.

Mr. Mattocks did not even know Mr. Richards, Mr. Avakian or Mr. Kassis' ages.

(Mattocks 42, 44)  Prior to Mr. Richards' termination, Ms. Viens and Mr. Mattocks

did not discuss anything about the ages of Mr. Richards, Mr. Avakian or Mr.

Kassis.  (Viens 32-33)

40.    The only factor upon which Mr. Richards bases his conclusion that he was

terminated based on his age is the fact that one of the persons to whom his job

duties were assigned, Mr. Avakian, is younger than he is. (Richards 175)  Mr.

Avakian's date of birth is in 1959 and he was 45 at the time of Mr. Richards'

separation. (Avakian 4)  Mr. Kassis' date of birth is in 1951 and he was 53 at the

time of Mr. Richards' separation.  Mr. Mattocks' date of birth is in 1950.  He was

the same age as Mr. Richards when he terminated him. (See Defendant

Mattocks' Answer to Interrogatory No. 1, a copy of which is attached hereto as

Exhibit 11.)

41.   After Mr. Richards' position elimination, Mr. Avakian's title remained Assistant
Program Director; however, he assumed the additional duties of overseeing the
budget and ensuring compliance with regulatory agencies.  After Mr. Richards'
departure, Mr. Avakian communicated many times with trade associations about
the regulatory requirements for the Day Treatment Program's leadership team.
He also spoke to those who ran other Day Treatment Programs to determine
how they staffed their leadership, and he reviewed the applicable regulations with
Mr. Kassis and Mr. Mattocks.  (Avakian 19, 33-36; Kassis 55-56)

42.   When Mr. Richards' position was eliminated, Mr. Kassis continued as Clinical
Director at River Valley and also became the Program Director of the Day
Treatment Program.  As Program Director, Mr. Kassis assumed the responsibility
for the quality of the clinical care and oversight of its finances.  He took a more
"hands on" role in operating the Program.  Since he had overseen the Day
Treatment Program since the 1980s, he had experience running the Program
even though he had never been its Director previously.  (Kassis 8-9, 15)

43.   During Mr. Richards' employment with River Valley, other redundant positions
had been eliminated to achieve cost savings for the agency.  (Richards 25)

44.   After Mr. Richards' separation from employment, River Valley hired a Clinician
who generated revenue for the organization.  Prior to his separation from
employment, Mr. Richards had tried to fill this position to meet marketplace
needs and bring more income into the Program.  (Mattocks 17-18, 225-26)

45.    Mr. Mattocks went on a medical leave of absence in or about April or May 2005

and resigned in or about June or July 2005 at the end of that leave. (Mattocks

10-11)

Respectfully Submitted,

/s/ Marylou Fabbo
Marylou Fabbo, Esq.
BBO #566613
Counsel for Defendant David G. Mattocks
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts 01144
Dated:   May 12, 2006              Tel.: (413) 737-4753/Fax: (413) 787-1941

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing *Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried* was served upon the attorney of record for each other party via electronic filing on May 12, 2006.

/s/ Marylou Fabbo
Marylou Fabbo, Esq.

# EXHIBIT
# 1

Page 1

1                    UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTTS
2                         WESTERN DIVISION

3                               CIVIL ACTION NO. 05-30061-MAP

4    MARK A. RICHARDS,                    )
                                          )
5                          Plaintiff )
     vs.                                  )
6                                         )
     RIVER VALLEY COUNSELING CENTER, INC.,)    MAR 1, 2006
7    VALLEY HEALTH SYSTEMS, INC.,         )
     DAVID G. MATTOCKS AND DONNA VIENS,   )
8                          Defendants )

9

                    D E P O S I T I O N
10                              COPY
                           of
11
                    DAVID G. MATTOCKS
12
     Taken at the Carlos G. Otis Health Care Center, Inc.,
13   185 Grafton Road, Townshend, Vermont on Wednesday,
     February 15, 2006 commencing at 11:00 a.m.
14

15   APPEARANCES:

16   JOHN C. SIKORSKI, Robinson Donovan, PC, 1500 Main
     Street, Suite 1600, PO Box 15609, Springfield,
17   Massachusetts 01115-5609
             On behalf of the Plaintiff
18

19   MARYLOU FABBO, Skoler, Abbott & Presser, PC, One
     Monarch Place, Suite 2000, Springfield, Massachusetts
20   01144
             On behalf of David G. Mattocks
21
     MARY J. KENNEDY, Bulkley, Richardson & Gelinas, LLP,
22   1500 Main Street, Suite 2700, PO Box 15507,
     Springfield, Massachusetts 01115-5507
23           On behalf of all other Defendants

24   Also Present:  Judith Tietz, MD

25   Reported by:  Sunnie Donath

Page 2

1            INDEX OF EXAMINATION
2    WITNESS          EXAMINED BY        Page      Line
3    David G. Mattocks  Atty. Sikorski      4        1
4
5
6            INDEX OF EXHIBITS
7                        Page      Line
8    No. 1 - Agreement to Treat Information   6         9
         as Confidential
9
     No. 2 - Re-Notice of Taking Deposition   9        12
10
     No. 3 - August 30, 2004 Memo          60         1
11
     No. 4 - September 3, 2004 Letter to     60        18
12       Mark Richards from Donna Viens
13   No. 5 - September 17, 2004 Letter to    60        18
         Mark Richards from Donna Viens
14
15                * * * * *
16
17
18
19
20
21
22
23
24
25

Page 3

1          S T I P U L A T I O N S
2
3        It is agreed by and between the parties that all
4    objections, except objections as to the form of the
5    question, are reserved to be raised at the time of
6    trial for the first time.
7
8        It is further agreed by and between the parties
9    that all motions to strike unresponsive answers are
10   also reserved to be raised at the time of trial for the
11   first time.
12
13       It is further agreed that the deponent will read
14   and sign the deposition, and that the sealing of the
15   deposition is waived.
16
17       It is further agreed by and between the parties
18   that notification to all parties of the receipt of the
19   original deposition transcript is also hereby waived.
20
21               * * * * *
22
23           DAVID G. MATTOCKS,
24   duly sworn to tell the truth, deposes and says as
25   follows:

Page 4

1         EXAMINATION BY ATTORNEY SIKORSKI
2    Q.    Would you please state your name and spell your
3    last name for the record, sir?
4    A.    David G. Mattocks, M-A-T-T-O-C-K-S.
5          ATTORNEY SIKORSKI:  And would Mr.
6    Mattocks like to read and sign his deposition?
7          ATTORNEY FABBO:  Yes, he's going to read
8    and sign.
9          ATTORNEY SIKORSKI:  And, otherwise, we'll
10   have the usual stipulations?
11         ATTORNEY FABBO:  Sure.
12         ATTORNEY KENNEDY:  Yes.
13   BY ATTORNEY SIKORSKI:
14   Q.    Mr. Mattocks, we're here in the office of one of
15   your physicians, correct?
16   A.    Yes, in her suite.  It used to be her office.
17   It's now a podiatrist's office.
18   Q.    Okay.  But we're in the office of one of your
19   health care providers, correct?
20   A.    Yes.
21   Q.    And is that at your request?
22   A.    It is.
23   Q.    And we're here in Townshend, Vermont; is that
24   correct?
25   A.    It is.

Page 5

1    Q.    And you informed me that you could not come down
2    to have your deposition taken in Springfield or
3    Northampton, Massachusetts; is that correct?
4    A.    That's correct.
5    Q.    If at any time today, Mr. Mattocks, if you'd
6    like to take a break, will you please let me know, and
7    I'll be happy to let you take a break?
8    A.    Certainly.  Appreciate that.
9    Q.    And, at any time, if you'd like to speak to
10   counsel or your physician, please let me know, and I'll
11   be happy to give you an opportunity to do that.  Do you
12   understand that?
13   A.    I do.  Thank you.
14   Q.    And, if at any time today you don't understand a
15   question of mine, please ask me to rephrase it or
16   repeat it.  Do you understand that?
17   A.    I do.
18   Q.    And do you understand the questions and answers
19   given today may later be used in court?
20   A.    I do.  I'm a little unclear about the
21   confidentiality agreement as it relates to that.
22   Q.    Okay.  Do you understand that we've entered into
23   a confidentiality agreement in an attempt to protect
24   your private information as much as possible?
25   A.    Yes.

Page 6

1  Q.   Okay. But, putting that aside, do you
2  understand that this deposition is part of a legal
3  process?
4  A.   Absolutely.
5  Q.   And the questions and answers given here today
6  may later be used in the course of that legal process;
7  do you understand that?
8  A.   I do.
9       (Deposition Exhibit 1 marked.)
10 Q.   Let's mark as Exhibit 1 the Confidentiality
11 Agreement, and, Mr. Mattocks, do you understand that
12 we've just marked as Exhibit 1 a confidentiality
13 agreement prepared by your attorney?
14 A.   I do.
15 Q.   Did you bring any documents with you today that
16 support your claim, your defenses to this action?
17 A.   I did not.
18 Q.   Okay. Do you have any additional documents that
19 support your claim that you haven't already turned over
20 through your counsel?
21 A.   None.
22 Q.   Okay. Now, you live in Vernon, Vermont,
23 correct?
24 A.   That's correct.
25 Q.   And that's just right over the border of Vermont

Page 7

1  and Massachusetts?
2  A.   About five-tenths of a mile from the
3  Massachusetts border.
4  Q.   All right. And it's right off of that first
5  exit 91 in Vermont, correct?
6  A.   Actually, it's closer to the last exit in
7  Massachusetts, the Bernardston exit.
8  Q.   So it's actually an easier drive for you to get
9  down to Northampton than it is up here to Townshend, is
10 it not, from your house?
11      ATTORNEY FABBO: Objection. You can
12 answer.
13      THE WITNESS: I don't think so, no, not
14 for me.
15 BY ATTORNEY SIKORSKI:
16 Q.   Well, how long would it take you to drive down
17 91 to Northampton from your house?
18 A.   To Northampton or to Holyoke?
19 Q.   To Northampton.
20 A.   30 to 45 minutes, I'm guessing.
21 Q.   Okay. And how long did it take you to drive up
22 here on Route 30 from your house?
23 A.   45 minutes.
24 Q.   And you understood that you had an option of
25 having this deposition taken in Northampton as opposed

Page 8

1  to here, correct?
2  A.   I honestly have no -- I mean, I was under the
3  assumption that it was going to be in either Holyoke,
4  Springfield, or here.
5  Q.   Why did you request that the deposition be held
6  here in Townshend, Vermont in your physician's office?
7  A.   Both in terms of my prior medical history and
8  potential consequences of both the questions and the
9  answers that might be presented to me and the proximity
10 to an inpatient setting shall I require it.
11      ATTORNEY FABBO: Hold off for one minute.
12 Could we just go off the record?
13      ATTORNEY SIKORSKI: Yeah, absolutely,
14 absolutely.
15      (A brief recess was taken.)
16      (Dr. Tietz arrives at 11:14 a.m.)
17      ATTORNEY SIKORSKI: I guess, back on the
18 record, I would just like to, the Doctor to identify
19 herself.
20      DR. TIETZ: Yes, Dr. Judith Tietz,
21 psychiatry, at Carlos G. Otis Health Care Center.
22      ATTORNEY SIKORSKI: Can you spell your
23 last name for the record?
24      DR. TIETZ: Yes, T-I-E-T-Z.
25      ATTORNEY SIKORSKI: And, Doctor, do you

Page 9

1  understand that, if at any time you would like me to
2  stop my questioning so that Mr. Mattocks can take a
3  break or consult with you, I would just ask that he
4  finish the question, and then I'll be happy to give him
5  a chance to do so? Do you understand that?
6       DR. TIETZ: Yes, I do.
7       ATTORNEY SIKORSKI: And I'd like you to
8  feel free to interrupt, okay?
9       DR. TIETZ: Thank you.
10      ATTORNEY SIKORSKI: And I guess I'd just
11 like this marked as Exhibit 2.
12      (Deposition Exhibit 2 marked.)
13 BY ATTORNEY SIKORSKI:
14 Q.   And, Mr. Mattocks, do you understand that's the
15 re-notice of your taking of deposition today --
16 A.   I do.
17 Q.   -- Exhibit 2?
18 A.   Yes.
19 Q.   Okay. And it asks you to produce any other
20 documents that support your defenses to the claims in
21 the amended claim which have not yet been produced by
22 your counsel. Do you see that?
23 A.   I do.
24 Q.   And, again, just for the record, do you have any
25 additional documents?

Page 10

1  A.    I do not.
2  Q.    How long did you work at River Valley Counseling
3  Center?
4  A.    Um, almost a year to the day, I believe it was.
5  Q.    So when did you start?
6  A.    My recollection is June of 2004 until June or
7  July of 2005.
8  Q.    When was your last day of work at River Valley?
9  When was the last day you actually worked?
10  A.    If I could consult a calendar, I could give you
11  that exact date.
12  Q.    Okay.  Well, I don't see a calendar here.  Can
13  you give me an approximate, end of February 2005?
14  A.    No.  I believe it was April or May of 2005, I
15  believe.
16          ATTORNEY FABBO:  Could you speak up,
17  please?
18          THE WITNESS:  April or May of 2005 to the
19  best of my recollection.
20  BY ATTORNEY SIKORSKI:
21  Q.    At some point in time, did you take a leave of
22  absence from River Valley?
23  A.    When I left River Valley, I was informed by Mary
24  Kelleher, the director of human resources, that I would
25  be placed on a medical leave of absence.

Page 11

1  Q.    And when did she tell you that?
2  A.    I don't have a specific date, but it was, I
3  would say, within the first 30 days of my absence from
4  work.
5  Q.    Did you ask for any type of leave from River
6  Valley Counseling Center?
7  A.    Not to my recollection it was offered to me.
8  Q.    Okay.  Were you terminated, or did you resign
9  from River Valley Counseling Center, sir?
10  A.    At the end of my medical leave of absence, I
11  resigned.
12  Q.    And, just in general terms, what was the leave
13  of absence for?
14          ATTORNEY FABBO:  Can we put this part
15  subject to the confidentiality, please?
16          ATTORNEY SIKORSKI:  Absolutely.
17          (See confidential portion of this transcript.)
18  BY ATTORNEY SIKORSKI:
19  Q.    And when did you make the decision to terminate
20  Mark Richards?
21  A.    Mark, specifically, I don't have a recollection
22  of that.  In terms of examining all of the positions
23  under my area of responsibility, it was an ongoing
24  process from the day I got there until the day I left.
25  Q.    Now, did you create any documents at all of any

Page 12

1  type referring to the elimination of Mark Richards's
2  position?
3  A.    Not specifically.  I was operating under both a
4  charge from HC Management and Valley Health Systems to
5  look at all the positions within the organization for
6  their financial viability and the fact that we had been
7  operating under a significant deficit for many years
8  and that, wherever possible, to make cost reduction
9  measures.
10  Q.    So why did you eliminate Mark Richards's
11  position?
12  A.    Mark Richards's position was one of several
13  positions that were looked at in my tenure there with
14  respect to their ability to contribute to the program's
15  financial success as well as whether there was any
16  redundancy in the positions with respect to their
17  responsibilities.
18  Q.    Why did you eliminate Mark Richards's position?
19  A.    It was my opinion that his responsibilities had
20  by and large been subsumed by a subordinate and that
21  the level of salary and remuneration that he received
22  was no longer necessary and, in fact, would contribute
23  to the financial success of the organization through
24  its elimination.
25  Q.    Tell me each and every other position that you

Page 13

1  eliminated while you were the executive director of
2  River Valley Counseling Center.
3  A.    I have no recollection of the specific positions
4  that were eliminated.  There were several.
5  Q.    Do you remember any single position that was
6  eliminated from River Valley Counseling Center while
7  you were executive director?
8  A.    Sure.  Our contracts management position was
9  eliminated.  There were two or three positions within
10  the business office staff that were eliminated either
11  through resignation or termination for cause.  There
12  were some clinician positions that were eliminated
13  either through resignation or through cause.  Those
14  would cover pretty much the scope of what I recall.
15  Q.    Some of the positions that were eliminated were
16  because the contract ran out, correct?
17  A.    That's correct.  There were, there was a
18  substantial revenue flow from contracts, and some of
19  those positions were eliminated either with reduction
20  in contract funding or elimination of the contract.
21  Q.    And several of the people you talked about were
22  eliminated for cause, correct?
23  A.    I don't know the proportion of those people that
24  would have been for cause versus position eliminations
25  or resignations.

Page 14

1 Q.    Did you ever sit down and do an analysis of
2 positions that you had there and how much you could
3 save by eliminating each and every one of these
4 positions that you claim you eliminated?
5 A.    Certainly, from before I was employed as part of
6 my interview process and throughout my time there, I
7 was under what I would call marching orders to
8 constantly examine the expenses and the revenue of the
9 organization and to reduce revenues where possible and
10 increase, reduce expenses were possible and increase
11 revenues where probable and possible.
12 Q.    My question to you is, Did you ever sit down and
13 create a document indicating how much money could be
14 saved by eliminating X, Y, or Z position?
15 A.    Yes, a budget for the agency.
16 Q.    Okay. Other than the budget for the agency?
17 A.    No, I did not have position-by-position
18 analysis.
19 Q.    Okay. And so did you send an email to anyone
20 with your ideas for eliminating positions?
21 A.    Not specific positions, but, again, under the
22 general understanding that wherever possible, through
23 either resignations, terminations for cause, or
24 position eliminations, that we would make every effort
25 to save on the personnel expenses of the agency.

Page 15

1 Q.    My question is, Did you have any document at all
2 indicating that, by eliminating Mark Richards's
3 position, we'd save X, Y, or Z dollars?
4 A.    No document to my knowledge. I certainly was
5 aware of his compensation level.
6 Q.    What other, what program did Mark Richards work
7 in?
8 A.    He was the program manager for our partial
9 hospitalization program. That's, I believe that was
10 the correct title.
11 Q.    Did he report to you?
12 A.    He had a split reporting responsibility. He was
13 not in my senior management staff, but he was one of
14 the program managers. He reported in part to me for
15 administrative responsibilities and in part to Jeffrey
16 Kassis, who is our clinical director, for his clinical
17 functions.
18 Q.    That's K-A-S-S-I-S?
19 A.    That's correct.
20 Q.    What other programs did you oversee, sir?
21 A.    Either directly or indirectly, all of the
22 operations of River Valley Counseling Center.
23 Q.    Could you just list them?
24 A.    Sure. We had a large outpatient mental health
25 service both English and bilingual English and Spanish.

Page 16

1 We had a partial hospitalization program that I have
2 mentioned with Mr. Richards as the program manager. We
3 had numerous contracts with state, federal, and local
4 agencies for the provision of a wide variety of
5 services. We had an AIDS prevention and treatment
6 program. We had school based services for the
7 provision of both AIDS education awareness and harm
8 reduction. There may have been others. Those are the
9 top ones I remember.
10 Q.    What positions in the outpatient mental health
11 area did you eliminate?
12 A.    There were at least two that I recall for cause.
13 There were some positions that responsibilities were
14 consolidated and, through an individual's resignation,
15 were not filled.
16 Q.    What cost savings did you get out of the
17 outpatient mental health department?
18        ATTORNEY FABBO: Objection. You can
19 answer.
20        THE WITNESS: I have no recollection of
21 the specific amount.
22 BY ATTORNEY SIKORSKI:
23 Q.    How much did you calculate before you eliminated
24 Mark Richards's position that you would save from
25 eliminating Mark Richards's position?

Page 17

1 A.    I did not know his exact salary. I would say it
2 was in the 40- to 60-thousand-dollar range.
3 Q.    Okay. And you were going to give more of his
4 responsibilities to Mr. Kassis and Mr. Avakian,
5 correct?
6 A.    I was going to divide the position elimination
7 parts of his job between Mr. Avakian, other staff
8 within the partial program, and Mr. Kassis for clinical
9 direction of the program.
10 Q.    And then you ended up hiring another clinician,
11 did you not, in that program?
12 A.    I did not.
13 Q.    But you ended up advertising for it, did you
14 not, sir?
15 A.    I did.
16 Q.    You advertised for it?
17 A.    My human resources director did advertise for
18 it.
19 Q.    Right. So, ultimately, if you would have filled
20 that position, how much would you have saved by
21 eliminating Mark Richards's position?
22 A.    Probably 20 to 30 thousand dollars.
23 Q.    Okay.
24 A.    That's an estimate, obviously.
25 Q.    Okay.

Page 18

1  A.   Can I just addend that by saying that that --
2  Q.   Sure.
3  A.   -- just would be in salary? If the clinician,
4  as my expectation would be, would generate revenue for
5  his or her involvement in the program, it would be an
6  additional amount.
7  Q.   What positions did you eliminate in the AIDS
8  prevention programs?
9  A.   Again, I was only at the agency for
10 approximately a year. There was at least one or two
11 funding reductions to that program. I'm going to
12 estimate that there were four or five positions that
13 were eliminated during that time.
14 Q.   While you were there?
15 A.   Yes.
16 Q.   Can you name those positions?
17 A.   I can't name all of them, but I think probably
18 one of the more significant ones was the community
19 based AIDS education. The title is not exact, but the
20 community based AIDS education coordinator.
21 Q.   And who was that?
22 A.   I don't recall his name.
23 Q.   And you ran two school based programs, did you
24 not, one in Holyoke, one in Chicopee?
25 A.   There were deferral programs in Holyoke and

Page 19

1  Chicopee. I believe there were others.
2  Q.   Okay. And tell me what positions you eliminated
3  in the Holyoke based school program.
4  A.   I do not recall specific positions, but, again,
5  all of those decisions would have been based on
6  contract revenue that was either growing, remaining
7  constant, or being reduced.
8  Q.   And what positions did you eliminate in the
9  Chicopee school based services?
10 A.   My recollection is that the Chicopee school
11 based services were experiencing some growth.
12 Q.   Was the elimination of Mr. Richards's position
13 the first significant position you eliminated?
14     ATTORNEY KENNEDY: Objection to form.
15     THE WITNESS: Could you define
16 significant?
17 BY ATTORNEY SIKORSKI:
18 Q.   Approximately how much was Mr. Richards making
19 --
20     ATTORNEY FABBO: Objection. You can
21 answer.
22 BY ATTORNEY SIKORSKI:
23 Q.   -- a year?
24 A.   Again, the range I would give was between 40 and
25 60 thousand dollars.

Page 20

1  Q.   And would you call him a program director?
2  A.   We had two levels of basic management staff. At
3  the higher level within the organization, there were
4  program directors and program managers. My
5  understanding and my recollection is that he was a
6  program manager, not a program director.
7  Q.   Okay. Let's take a subset of all the program
8  managers and program directors that reported to you.
9  Do you have that in your mind?
10 A.   Um-hum.
11     ATTORNEY FABBO: You have to answer yes
12 or no.
13     THE WITNESS: Yes.
14 BY ATTORNEY SIKORSKI:
15 Q.   Okay. Out of that subset, was Mr. Richards, was
16 the elimination of Mr. Richards the first one of those
17 positions that fit into that subset that you
18 eliminated?
19 A.   I believe so, yes.
20 Q.   Okay. And tell me each and every other position
21 in that subset that you eliminated while you were an
22 executive director at River Valley.
23 A.   There were at least two program managers who
24 were either eliminated, their positions were either
25 eliminated or were in the process of being eliminated

Page 21

1  when I left employment there.
2  Q.   Would that be for the following fiscal year?
3  A.   It would have had an impact in the following
4  fiscal year but was part of the current fiscal year.
5  Q.   And what are the names of those two people?
6  A.   Cynthia Griffin, Katie Irizari, I believe.
7  Q.   How do you spell that?
8  A.   I-R-I-Z-A-R-I, that's a phonetic approach.
9  Q.   And what were their titles?
10 A.   I don't recall their specific title names.
11 Q.   Now, part of your responsibilities were not only
12 to cut expenses but try to grow revenue, correct?
13 A.   Absolutely.
14 Q.   Okay. Did you actually deliver the news to Mr.
15 Richards that he was being terminated?
16 A.   I did.
17 Q.   Okay. And was that in a meeting about November
18 4th?
19 A.   Again, I don't have the, recollect the specific
20 date. I believe it was in early November.
21 Q.   Now, focusing on the time before that, what was
22 your assessment of Mr. Richards's clinical skills?
23 A.   I had no reason to have any concern about his
24 clinical skills.
25 Q.   What was your assessment of Mr. Richards's

49d61f81-a776-11da-b008-000c41a99380

Page 22

1  management skills?
2  A.    He knew a great deal about the intricacies of
3  partial hospitalization, both clinically and
4  administratively, financially. I found no deficits or
5  performance problems related to those areas of
6  responsibility.
7  Q.    Do you know that he had taught for many years at
8  the University of Connecticut?
9  A.    I did not.
10 Q.    Now, what was your assessment of the level of
11 financial reporting that Mr. Richards gave you for this
12 program?
13        ATTORNEY FABBO: Objection. I'm sorry.
14 You can answer.
15        THE WITNESS: He gave me none directly.
16 They would have been presented to my comptroller and my
17 business office manager who would have then prepared a
18 statement for me along with the other programs, both
19 revenue and expenses.
20 BY ATTORNEY SIKORSKI:
21 Q.    So your testimony is that Mr. Richards didn't
22 give any financial updates periodically directly to
23 you?
24 A.    I believe he gave me periodic reports of the
25 number of clients being served by that aspect of the

Page 23

1  program.
2  Q.    And he gave you such a report in the meeting
3  just prior to the termination meeting, did he not?
4        ATTORNEY FABBO: Objection. You can
5  answer.
6        THE WITNESS: I have no idea of the timing
7  of that meeting, but he gave me, I believe, monthly
8  reports of the performance of that aspect of the
9  agency.
10 BY ATTORNEY SIKORSKI:
11 Q.    What was your assessment of the level of the
12 quality of the reports that he gave you?
13 A.    I thought they were of marginal quality.
14 Q.    And why?
15 A.    Primarily because the billing cycle that was
16 being utilized by Mr. Richards was overly burdensome,
17 complicated, and, from my vantage point, provided
18 uneven cash flows to the agency.
19 Q.    Did you ever tell him you wanted better
20 financial reports?
21 A.    Most definitely.
22 Q.    When did you tell him that?
23 A.    Probably after I'd been there about three months
24 and had a reconnoitering of the overall operations of
25 the agency.

Page 24

1  Q.    And when did you start there, sir?
2  A.    I believe you've asked me that before, but my
3  best recollection is June of 2004.
4  Q.    Did you take any time off right after you
5  started for medical reasons?
6  A.    Not that I recall.
7  Q.    Did you have some time of adjustment or
8  probationary period?
9  A.    My understanding is that the human resources
10 policy of both HC Management, which is the company I
11 worked for directly, and as a sole member of our board
12 and of the Holyoke Health System did have specific
13 guidelines for probationary periods.
14 Q.    And that was 90 days, wasn't it?
15 A.    I don't recall, but that would be typical.
16 Q.    Did you ever give Mr. Richards anything in
17 writing requesting that he provide you better financial
18 reports?
19 A.    Nothing in writing.
20 Q.    Did you ever make any notation that you had
21 asked him for such reports?
22 A.    Mental notations.
23 Q.    Okay. What was your assessment of the financial
24 performance of Mr. Richards's program?
25        ATTORNEY KENNEDY: Objection to the form.

Page 25

1  Go ahead and answer.
2        THE WITNESS: The partial hospitalization
3  program was probably the cost, the revenue leader of
4  all the many aspects of River Valley's programs.
5  BY ATTORNEY SIKORSKI:
6  Q.    What do you mean by revenue leader, sir?
7  A.    They brought in a higher proportion of revenue
8  versus expenses than probably any other operating unit.
9  Q.    At some point in time, did you learn that Mr.
10 Richards's daughter had some health problems?
11 A.    I did.
12 Q.    And how did you learn that, sir?
13 A.    I think a combination of his telling me directly
14 and other staff casually telling me that.
15 Q.    What other staff, sir?
16 A.    I don't recall.
17 Q.    Did Mr. Avakian tell you about it?
18 A.    I don't recall.
19 Q.    How about Mr. Kassis?
20 A.    Don't recall.
21        (See confidential portion of the transcript.)
22 Q.    Did you ever ask that Mr. Richards go in your
23 place to meet the commissioner of the Department of
24 Mental Health?
25 A.    I don't recall that specific request, but Mr.

49d61f81-a776-11da-b008-000c41a99380

Page 26

1 Richards was certainly well-known to the behavioral
2 health community in that part of Massachusetts. He was
3 also known and respected by many of those agencies, and
4 it would not surprise me if I had asked him to do
5 something like that.
6 Q.    Do you remember the meeting at which Mr.
7 Richards was terminated?
8 A.    I do.
9 Q.    And where was that meeting held?
10 A.    It was held in my conference anteroom.
11 Q.    At what location?
12 A.    At 319 Beech Street in Holyoke, the
13 Administrative Health Care of River Valley.
14 Q.    And was there another, was there a location at
15 207 Elm Street?
16 A.    Yes.
17 Q.    And what was at 207 Elm Street?
18 A.    207 Elm Street, I believe, held the clinical
19 offices of the partial hospitalization program for
20 which Mr. Richards was responsible was located there.
21 The AIDS awareness project was located there. There
22 may have been others, but those were the two primary
23 programs as I recall.
24 Q.    Was a handicap ramp ever put up in that building
25 while you were --

Page 27

1 A.    It was put up prior to my arrival.
2 Q.    Who put it up?  Do you know?
3 A.    I don't know who installed it originally. I
4 brought in a contractor during my time there to restore
5 it to operational capacity.
6 Q.    And who was that contractor that you brought in?
7 A.    His name was Mr. Edward Porter.
8 Q.    Porter?  And is he from Greenfield?
9 A.    Yes.
10 Q.    And did you and he work together?
11 A.    Yes.
12 Q.    Where did you work together?
13 A.    At the United Arc of Franklin and Hampshire
14 Counties.
15 Q.    Was he your boss there?
16 A.    He was.
17 Q.    And did he ever do any work on your house, or
18 his son?
19 A.    Yes.
20 Q.    Okay. What work did they do on your house?
21 A.    I've known Mr. Porter for probably five years
22 both as a friend and as a coworker. Countless times,
23 probably, I mean, 20, 30 times.
24 Q.    20 to 30 times?
25 A.    Throughout the time that I've known Mr. Porter.

Page 28

1 Q.    Mr. Porter or his son came to do work at your
2 house?
3 A.    Not his son, but Mr. Porter himself.
4 Q.    And then you brought him down to rehab this
5 handicap ramp on 207 Elm?
6 A.    After obtaining other bids, yes.
7 Q.    Was there a concern about the fact that other
8 bids weren't obtained?
9 A.    Pardon.
10 Q.    Was there a concern that, expressed that other
11 bids were not obtained for that work?
12 A.    Not that I'm aware of.
13 Q.    Would it surprise you if there was concern about
14 that, sir?
15 A.    Actually, no, it wouldn't. My experience with
16 Mr. Porter is his proposal for doing that particular
17 work was extremely reasonable. Actually, there had
18 been, I think, prior to my arrival at River Valley at
19 least one outside estimate for that work which was
20 substantially higher than Mr. Porter's.
21 Q.    So, if we can focus on this termination meeting
22 in your anteroom, and who was there?
23 A.    Donna Viens, my director of human resources, and
24 myself and Mr. Richards.
25 Q.    Okay. And what do you remember being said at

Page 29

1 that meeting?
2 A.    Could you break that down for me? There was a
3 lot said at that meeting.
4 Q.    Sure, sure. How was the meeting set up?
5        ATTORNEY FABBO:  Objection.  You can
6 answer.
7        THE WITNESS:  I don't recall whether I
8 personally or whether Ms. Viens asked Mark to come over
9 to the administrative offices to meet.
10 BY ATTORNEY SIKORSKI:
11 Q.    Okay. And was this meeting a follow-up to a
12 managers' meeting?
13 A.    I mean, it may have followed a managers'
14 meeting, but it was in no way connected to that.
15 Q.    Okay. Do you remember the managers' meeting
16 held earlier that morning?
17 A.    No.
18 Q.    So, when Mark came into the meeting room, were
19 you and Ms. Viens there already?
20 A.    I believe that Mark came in and I was there
21 alone and Ms. Viens joined us almost immediately
22 afterwards.
23 Q.    And what did you say to Mr. Richards to start
24 the meeting off?
25 A.    I actually believe I made some comment to try to

Page 30

1 put him somewhat at ease. I did tell him near the
2 beginning that this is going to be a very difficult
3 meeting, that I had compassion for what I was about to,
4 for him and for what I was about to tell him, and I
5 shared with him that I had had in my career similar
6 disquieting discussions.
7 Q.    And then what did you say to him?
8 A.    I told him that for financial and business
9 reasons that the position of director of the day
10 treatment program was going to be eliminated.
11 Q.    And what did he say in response to that?
12 A.    He actually said very little to my recollection.
13 He was obviously, not obviously, my impression was that
14 he was very surprised by that information. He
15 immediately moved to the position of taking out paper
16 and pencil and, from that point on in the meeting,
17 making notes regarding, I assume, everything that was
18 said.
19 Q.    Did you tell him who would be taking over the
20 program?
21 A.    I told him that the position was not going to be
22 filled, that it was a position elimination, that the
23 clinical responsibilities would fall to our clinical
24 director Jeffrey Kassis, the day-to-day operations
25 would be handled by Mr. David Avakian.

Page 31

1 Q.    Did Mr. Richards challenge that at all?
2 A.    He did.
3 Q.    And what did he say?
4 A.    My recollection is he told me that the
5 composition of that team with his absence would not
6 meet regulatory requirements.
7 Q.    And what did you say in response to that?
8 A.    That I had both made telephone calls to the
9 regulatory agency; consulted with Mr. Kassis, the
10 clinical director; Mr. Avakian, the day-to-day manager
11 of the program; and a cursory review of the regulations
12 on my own part.
13 Q.    And what did he say in response to that?
14 A.    That I didn't know what I was talking about.
15 Q.    Did you take the regulations out and go over
16 them with him?
17 A.    I did not.
18 Q.    Did Ms. Viens say anything in response on that
19 particular topic?
20 A.    I don't recall her saying anything about that,
21 no.
22 Q.    Now, when did you do this cursory review of the
23 regulations yourself?
24 A.    Probably two to three days before my meeting
25 with Mr. Richards.

Page 32

1 Q.    Do you remember where you got the regulations
2 from?
3 A.    I suspect I had a copy on file in my office, but
4 I may have asked either Mr. Avakian or Mr. Kassis for
5 their copies to see if there had been changes or
6 updates.
7 Q.    And that was two to three days before this
8 termination meeting?
9 A.    That's my best recollection, yes.
10 Q.    And do you have, do you recall specifically what
11 Mr. Richards was challenging, what part of the
12 regulations he was challenging you on?
13 A.    Well, again, it was the specific clinical
14 composition of the team that was necessary to run the
15 day treatment program. Beyond that I don't remember
16 the specifics.
17 Q.    Now, you said you had made telephone calls about
18 the, the staffing; is that true?
19 A.    Yes.
20 Q.    And who did you call?
21 A.    I mentioned the organization earlier. Could you
22 go back and refresh me in terms of the question that
23 you asked earlier?
24         ATTORNEY SIKORSKI:  That's okay. Off the
25 record.

Page 33

1         (A brief discussion was held off the record.)
2 BY ATTORNEY SIKORSKI:
3 Q.    Go back on the record. Mr. Mattocks, are you
4 having some trouble recalling specifically now the name
5 of the organization that you called?
6 A.    Yes.
7 Q.    And, if at some time in the course of this
8 deposition it comes to you, would you tell me what it
9 is?
10 A.    Oh, absolutely.
11 Q.    So was this a governmental organization or a
12 not-for-profit, or what type of organization was it
13 that you called?
14 A.    I believe it was a support organization for
15 agencies offering a variety of behavioral health
16 services including partial hospitalization programs,
17 a trade association, if you will.
18 Q.    And, well, did you make one or more than one
19 call?
20 A.    To that agency, one.
21 Q.    Okay. And who did you talk to?
22 A.    Do not recall.
23 Q.    And was this an organization in Boston?
24 A.    No. It was that direction, but I don't recall
25 the name of the town.

Page 34

1  Q.    Okay.  And what did you say to that person, and
2  what did they say to you?
3  A.    I asked them what their understanding was of the
4  specific composition of the clinical team necessary to
5  run a partial hospitalization program.
6  Q.    And what did they tell you?
7  A.    They told me that there was some discrepancy in
8  the interpretation of those regulations, that some
9  organizations interpreted it in a very strict way in
10  terms of examination, qualifications of individuals,
11  that some had duplications of those responsibilities
12  within one person, and that agencies had an opportunity
13  or a window of time in which to meet those regulations
14  should there be organizational reorganization.
15  Q.    Did you make any notes of that conversation?
16  A.    Mental notes.
17  Q.    Did you put anything in writing regarding that
18  conversation?
19  A.    I don't recall putting that in writing.  I did
20  have subsequent conversations with Mr. Avakian and with
21  Dr. Kassis, Mr. Kassis.
22  Q.    Okay.  Let's put those aside.  Did you speak
23  with anyone else outside of the River Valley Counseling
24  Center organization about this particular issue?
25  A.    I believe I contacted one or two other programs

Page 35

1  that operated partial hospitalization programs and
2  inquired them about their understanding of the
3  regulations.
4  Q.    And what other programs did you contact?
5  A.    I do not recall.
6  Q.    Did you actually speak with someone at those?
7  A.    I did.
8  Q.    Did you make any notes?
9  A.    I did not.
10  Q.    And then when did you speak with Mr. Avakian
11  about the regulations?
12  A.    I probably spoke to Mr. Avakian two or three
13  times over the preceding month or two so that I could
14  have a better understanding of what those regulations
15  were as well as some conversations with Mr. Kassis
16  about the same.
17  Q.    What did you speak with Mr., what did you say to
18  Mr. Avakian about the specific issue of the
19  applicability of these regulations, and what did he say
20  to you?
21  A.    Well, there was no question in my mind that
22  those, the constitution of that group needed to meet
23  certain minimum requirements.  Mr. Avakian and Mr.
24  Kassis explained to me the specific requirements as
25  well as my own recollection of what I'd read in the

Page 36

1  regulations and the time frame or at least the ability
2  to take a time frame to reach that constitution.
3  Q.    Do you recall what you said to Mr. Avakian about
4  the regulations and what he said to you?
5  A.    I recall, I recall asking him whether or not,
6  with Mr. Richards's absence from the program, whether
7  or not we would continue to meet the regulatory
8  requirements of that agency.
9  Q.    And what did he say?
10  A.    That it was his understanding that, with his own
11  credentials, the credentials of remaining members of
12  that management team, and with the open position that
13  we had that we were recruiting for, that we would have
14  no trouble meeting those requirements.
15  Q.    What was the open position you were recruiting
16  for?
17  A.    It was a general clinician position that I think
18  our primary prerequisite, at least beginning the
19  process, was that they be a licensed clinician in
20  Massachusetts at either the LPC level or the MSW level.
21  Q.    Did you ever offer that position to Mr.
22  Richards?
23  A.    I did not.
24  Q.    Why not?
25  A.    I discussed with him in general terms whether or

Page 37

1  not he felt there were other positions within the
2  agency for which he was either interested or qualified.
3  Q.    When did you have that discussion with him?
4  A.    Probably in the termination discussion.  That's
5  my best recollection.
6  Q.    What do you recall saying to him about other
7  positions in the organization?
8  A.    That off-hand I did not know of any specific
9  positions for which he would be either interested, in
10  my opinion, or qualified, but that decision was not
11  mine to make and that it would have to go through the
12  health system's human resources department.
13  Q.    Is that Mary Kelleher's department?
14  A.    Correct.
15  Q.    Prior to the termination meeting, did you ask
16  Ms. Kelleher if there were any other positions within
17  the Greater Holyoke Hospital System that Mr. Richards
18  might be qualified for?
19  A.    I did not ask that specific question.  I asked
20  whether or not the human resources department of the
21  hospital would be of assistance to employees whose
22  positions were eliminated as to whether or not there
23  were other positions that he might be qualified for.
24  Q.    Okay.  So, before this termination meeting, you
25  did speak with Ms. Kelleher about this upcoming

Page 38

1  termination, correct?
2  A.   I did.
3  Q.   And you discussed with her a number of issues,
4  correct?
5  A.   I did.
6  Q.   And you, but you didn't ask her specifically
7  words to the effect of, I'm terminating, this guy's
8  been here 16, 17 years; is there any other place in the
9  Holyoke Hospital Organization for him?
10  A.   First of all, I always phrased them in terms of
11  position elimination, not a termination.  There may not
12  be a semantical difference in your mind.  In mine there
13  is a difference.  I'll just say that, in the meeting
14  with Mr. Richards, I made a very specific point of
15  asking him whether there was another position in the
16  agency for which he might be interested.
17  Q.   Was that after he was starting to take notes
18  that that part of the conversation came up?
19  A.   I don't recall.
20  Q.   Because you know that he took very detailed
21  notes, correct?
22         ATTORNEY FABBO:  Objection.  You can
23  answer.
24         THE WITNESS:  I don't know how detailed
25  they were.  I saw him writing on a piece of paper.

Page 39

1  BY ATTORNEY SIKORSKI:
2  Q.   Right.  You saw him writing on more than one
3  piece of paper, correct?
4  A.   I don't know how many pieces of paper he had.
5  Q.   What did you say to Mr. Kassis about whether the
6  new configuration of the day treatment program would
7  comply with the regulations?
8  A.   It was posed as a question to him and his
9  opinion as a clinical director whether or not either
10  immediately or with the employment of a subsequent
11  clinician we either would immediately or within short
12  order meet those requirements.
13  Q.   Did you ever pull the regulations out and go
14  over them with Mr. Kassis?
15  A.   Not to my recollection.
16  Q.   Did you ever give him a copy of the regulations?
17  A.   I, it was my understanding that he had them in
18  his possession.
19  Q.   Did you ever sit down and go over the
20  regulations with Mr. Avakian?
21  A.   I did.
22  Q.   And you sat down and went over the regulations
23  with Mr. Avakian?
24  A.   I did.
25  Q.   And when did you do that?

Page 40

1  A.   Actually, I think it was the subject of several
2  meetings shortly before my meeting with Mr. Richards
3  and within a day or two of the position being
4  eliminated.
5  Q.   Within a day or two after?
6  A.   Um-hum.
7         ATTORNEY FABBO:  You have to answer yes
8  or no.
9         THE WITNESS:  Yes.
10  BY ATTORNEY SIKORSKI:
11  Q.   When did you speak with Mary Kelleher about your
12  plans to --
13         (A brief discussion was held off the record.)
14  You spoke with Mary Kelleher prior to the
15  termination meeting with Mr. Richards, did you not?
16  A.   I did.
17  Q.   And how soon before the termination meeting with
18  Mr. Richards did you speak with her?
19  A.   Well, the entire process was not a protracted
20  one.  I believe I met with her almost immediately after
21  meeting with Mr. Porton wherein he expressed to me a
22  desire that I run this by Ms. Kelleher to find out
23  whether or not she had any specific objections from a
24  human resource point regarding this decision.
25  Q.   Well, let's back up, then.  Did you discuss this

Page 41

1  decision with Mr. Porton?
2  A.   Yes.
3  Q.   Okay.  What did you say to him, and what did he
4  say to you about this?
5  A.   I told him that, in my continuing efforts to
6  find, identify cost reduction measures within the
7  agency, that I had identified a position that would
8  result in significant cost savings without what I
9  believed to be a significant interruption in either the
10  clinical quality or the day-to-day operations of that
11  program.
12  Q.   And did you specifically identify the position
13  and the person who held it?
14  A.   I don't recall.  I certainly told him that it
15  was a person that had worked for the agency for some
16  time.
17  Q.   And what did he say in response to you telling
18  him that?
19  A.   My recollection is, again, that his concern was
20  that I meet with human resources to ensure that there
21  were no procedural or other reasons why that decision
22  could not be effected.
23  Q.   And did you, in fact, then meet with human
24  resources?
25  A.   I did along with Donna Viens.

Page 42

1   Q.    And was that an in-person meeting?
2   A.    It was.
3   Q.    And was it just the three of you, Mary Kelleher,
4   Donna Viens, and yourself?
5   A.    To the best of my ability, yes, knowledge.
6   Q.    And where was that held?
7   A.    In Ms. Kelleher's office.
8   Q.    Is that in 10 Hospital Drive?
9   A.    Yeah, in the complex, 20 Hospital Drive. It's
10  within walking distance of the administrative building.
11  Q.    How soon before the termination meeting did this
12  meeting occur?
13  A.    I don't recall.
14  Q.    And who arranged the meeting?
15  A.    I believe I called for it after Mr. Porton had
16  indicated that that was his request and desire.
17  Q.    What was your understanding about the relative
18  age between, well, relative ages of Mr. Richards and
19  Mr. Avakian?
20  A.    I had absolutely no idea.
21  Q.    You didn't know Mr. Avakian was significantly
22  younger than Mr. Richards?
23  A.    I did not.
24  Q.    What did you say at the meeting with Ms.
25  Kelleher and Ms. Viens?

Page 43

1   A.    More or less a reiteration of what I've said,
2   that, in my opinion, the position was in essence
3   superfluous at this point in time, that it was costing
4   the agency salary and other related expenses that were
5   unnecessary, and that, with the elimination of the
6   position, I saw cost savings and the ability to
7   continue the program clinically and administratively
8   uninterrupted.
9   Q.    Okay. And what did Ms. Kelleher say?
10  A.    She made some judgment with regard to whether or
11  not the program could be operated in such a manner.
12  Her concern was solely whether or not human resources
13  policies within the overall health system and within
14  River Valley in particular were being adhered to.
15  Q.    And did you and her discuss the fact that Mr.
16  Richards had requested intermittent FMLA leave?
17  A.    I did not. I have a vague recollection of Ms.
18  Viens discussing it with Ms. Kelleher.
19  Q.    In your presence?
20  A.    Yes.
21  Q.    And do you recall what Ms. Viens said to Ms.
22  Kelleher and what she said to Ms. Viens?
23  A.    The gist of it was that Mr. Richards had
24  requested intermittent family leave and that that had
25  been granted.

Page 44

1   Q.    And was there any discussion about whether or
2   not the termination of Mr. Richards would be
3   retaliation against him for exercising his right to
4   request FMLA leave or to take it?
5   A.    None to my recollection whatsoever.
6   Q.    Was there any discussion about the age of the
7   persons that would take over his responsibilities?
8   A.    Not to my recollection. I did not know the ages
9   of these individuals.
10  Q.    Was there any discussion about the fact that Mr.
11  Richards was in a relationship with someone with a
12  disability, to wit his daughter?
13  A.    I believe there was within the context of that,
14  of that was the reason why he had been, why he had
15  requested and why FMLA had been granted to him.
16  Q.    Was there any discussion about whether or not
17  the termination would violate the Americans with
18  Disabilities Act or the Massachusetts
19  Antidiscrimination Statute?
20  A.    None.
21  Q.    Mr. Mattocks, at the termination meeting did you
22  tell Mr. Richards that you were surprised he wasn't
23  weeping or words to that effect?
24  A.    Not at all.
25  Q.    Did you discuss with him the fact that you had

Page 45

1   been terminated from the Brattleboro Retreat?
2   A.    I told him that my position had been eliminated
3   with the Brattleboro Retreat, yes.
4   Q.    And did you also tell him that you had been
5   given little time to clear your office out?
6   A.    I don't recall that specific comment. I
7   certainly did comment that the decision was, in my
8   opinion, a hasty one.
9   Q.    Let me ask you that. What do you recall telling
10  Mr. Richards in the termination meeting about your own
11  experience at the Brattleboro Retreat?
12  A.    That the decision to eliminate my position came
13  to me as a total surprise; that I saw no reason from a
14  performance standpoint or an organizational operational
15  standpoint why that decision had been made; that I was
16  sympathetic to anyone, but particularly someone with
17  Mr. Richards's length of service, why that would come
18  as a shock to him; and that I was concerned about him
19  and would make every effort to make his departure from
20  the agency as smooth as possible.
21  Q.    Was Mr. Palmisano the person who made the
22  decision to eliminate your position?
23  A.    I don't know the answer to that question. Mr.
24  Palmisano delivered that message to me.
25  Q.    Did anyone else other than Mr. Palmisano deliver

Page 46

1   that message to you?
2   A.   No.
3   Q.   And did the Brattleboro Retreat give you six
4   months' severance pay?
5   A.   The original understanding and written agreement
6   that I had with Retreat Health Care before I assumed
7   the position was that I would be given twelve months of
8   severance unless the dismissal were for cause.
9   Q.   And why did you end up not getting twelve
10  months?
11  A.   Mr. Palmisano offered me six months at the time
12  of our meeting. I informed him that I felt that was in
13  violation of my employment agreement and that I would
14  seek legal counsel to determine whether or not I could
15  reclaim what I considered to be my contractual right.
16  Q.   And did you, in fact, get legal counsel?
17  A.   I did.
18  Q.   And why didn't you end up getting the year?
19  A.   My estimate was I probably could have, but my
20  attorney, in meeting with the attorney from Retreat
21  Health Care, reached a compromise of nine months. I
22  was given the opportunity to either accept that or to
23  continue the fight.
24  Q.   And you chose to continue the fight?
25  A.   No, I did not. I chose to accept the nine

Page 47

1   months.
2   Q.   Did you get the whole nine months at one time?
3   A.   No. It was paid out as if I were still
4   employed.
5   (See confidential portion of the transcript.)
6   Q.   Prior to the termination meeting with Mr.
7   Richards, did you consult with an attorney?
8   A.   Not to my recollection.
9   Q.   Did you have any separation agreement to give to
10  Mr. Richards at the termination meeting?
11  A.   I had prepared a document, yes.
12  Q.   And what did you use to help you prepare that
13  document, sir?
14  A.   My previous experience as an administrator of
15  almost 30 years and the fact that I had prepared
16  probably 10 such agreements in the past, my desire to
17  extend the hospital's typical severance agreement for
18  people in Mr. Richards's position to recognize his
19  length of service.
20  Q.   What did you understand to be the hospital's
21  typical policy?
22  A.   I believe it was one week for every year of
23  employment.
24  Q.   How many years of employment did Mr. Richards
25  have?

Page 48

1   A.   I don't recall off hand. It was significant.
2   Q.   And did you believe that this was more generous
3   than one week per year of service or less generous?
4   A.   I certainly believed that my discussions with
5   Ms. Kelleher and my own opinion and what I believed to
6   be the document that I prepared were more generous than
7   those terms. May I interject something?
8   Q.   Yes.
9   A.   I do not recall whether Ms. Kelleher approved or
10  disapproved of that document.
11       ATTORNEY SIKORSKI: What I'd like to do
12  now is just take ten minutes, go through my notes, mark
13  some documents, and take a bathroom break if that's
14  okay.
15       (A brief recess was taken.)
16       ATTORNEY FABBO: Can we have a
17  clarification on the record that the entire questioning
18  about his education is not subject to Exhibit 1? I
19  think he started with questions about Parkwood.
20       ATTORNEY SIKORSKI: Okay. That's fine.
21  BY ATTORNEY SIKORSKI:
22  Q.   Mr. Mattocks, while you were the executive
23  director of River Valley Counseling Center, did anyone
24  else in the organization ask for family medical leave?
25  A.   At River Valley?

Page 49

1   Q.   Um-hum.
2   A.   I believe so, but I don't have specific
3   recollection of that.
4   Q.   Do you recall approving anyone else's request?
5   A.   I approved nobody's FMLA. That was handled by
6   Ms. Viens.
7   Q.   Do you recall her asking your opinion on any
8   other FMLA issue?
9   A.   I, she never asked my opinion about it. She
10  would inform me.
11  Q.   Did she inform you about any other FMLA leave?
12  A.   As I indicated, I don't recall that, but I have
13  a vague recollection that there were one or two, yeah.
14  Q.   Do you know what department those were in?
15  A.   I, no, I just significantly remember that they
16  happened. I don't know specific individuals.
17  Q.   Do you recall when in relation to Mr. Richards's
18  termination those occurred?
19  A.   Well, they were definitely before. There may
20  have been one or two after. I don't know.
21  Q.   I'm sorry. There were other FMLA leaves before
22  Mr. Richards was terminated?
23  A.   Before his position was eliminated, yes.
24  Q.   And do you recall who those people were?
25  A.   No, I do not.

49d61f81-a776-11da-b008-000c41a99380

Page 50

1  Q.    In the termination meeting was there a
2  discussion about how this news would be presented to
3  Mr. Richards's staff?
4  A.    There was.
5  Q.    And what was that discussion?
6  A.    Mr. Richards asked me personally whether he
7  could be afforded the opportunity to tell both his
8  immediate staff as well as the clients in the partial
9  hospitalization program about his departure.
10  Q.    And what did you say to him?
11  A.    I believe I placed a call to Mary Kelleher, the
12  corporate director of human resources, to run that
13  request by her. Her advice to me was absolutely not.
14  I made a decision independent of that that, as long as
15  I could be in attendance at that meeting, that I felt
16  it was a reasonable and humane request.
17  Q.    Did she tell you why she said absolutely not?
18  A.    Sure.
19  Q.    What did she say?
20  A.    Or she implied it. I certainly have worked for
21  enough organizations including some that escort people
22  whose positions have been eliminated or terminated out
23  the door and never let them back into their office.
24  Q.    I'm sorry. Did Ms. Kelleher tell you why you
25  should not allow Mr. Richards to talk to his staff?

Page 51

1  A.    I do not recall her specific words, but they had
2  something to do with that was not the policy or
3  precedent of the organization and that she was
4  concerned about how that would be presented to staff.
5  Those are the two things I recall.
6  Q.    And then you said you made a decision to
7  countermand that?
8  A.    I made a decision to act independently of that
9  advice, yes.
10  Q.    And were you there when Mr. Richards talked to
11  his staff?
12  A.    I was.
13  Q.    And what did he say to his staff?
14  A.    He presented to his staff that, as they knew,
15  that he had, that his daughter was ill, that it was
16  requiring more and more of his attention and time to
17  care for her appropriately, and that he wanted to, that
18  he was resigning his position in order to afford her
19  that level of care.
20  Q.    Did Mr. Richards also ask if he could get his
21  personal effects out of the office?
22  A.    He did.
23  Q.    And what did you say in response to that?
24  A.    That we would certainly make those arrangements.
25  Q.    And did you, in fact, make those arrangements?

Page 52

1  A.    Yes.
2  Q.    And what arrangements did you make?
3  A.    My recollection is that Mr. Avakian was going to
4  meet him at a subsequent time to both let him into the
5  building and to assist him in removing his personal
6  possessions.
7  Q.    And do you know if Mr. Avakian did that?
8  A.    I don't know firsthand, no.
9  Q.    And did you ask Mr. Kassis to do something to
10  Mr. Richards's computer?
11  A.    No.
12  Q.    Did you ask anyone to do something to Mr.
13  Richards's computer --
14  A.    I did not.
15  Q.    -- prior to the termination?
16  A.    May I just interject something?
17  Q.    Sure.
18  A.    Since it happened --
19       ATTORNEY FABBO:  Why don't you wait until
20  he asks the questions, okay?
21       THE WITNESS:  Okay, fine.
22  BY ATTORNEY SIKORSKI:
23  Q.    If you'd like to clarify your previous answer,
24  I'd be glad to let you do that.
25  A.    All of the computers at River Valley and within

Page 53

1  Valley Health Systems at Holyoke Medical Center were
2  all networked, and I can just tell you that my own
3  computer was obliterated of all documents and knowledge
4  after my departure without my knowledge or consent. So
5  I'm guessing that that was standard operating
6  procedure. Don't have knowledge of that personally.
7  I'm just telling you what my experience was.
8       (See confidential portion of the transcript.)
9  Q.    Going back to the termination meeting with Mr.
10  Richards, in the time before leading up to that
11  meeting, did you ever speak to anyone about Mr.
12  Richards's work history?
13  A.    Not that I recall, no.
14  Q.    Okay. And let me just put it a little
15  differently. Did you ever ask anyone before the
16  termination meeting, I'm thinking of terminating Mr.
17  Richards; tell me about his history with the agency,
18  his contributions to the agency, his value to the
19  agency, any discussions like that?
20  A.    I'm sure there were discussions of an informal
21  nature about that primarily focusing on not necessarily
22  since his arrival there but of the overall fiscal value
23  of that program.
24  Q.    Who did you have those discussions with?
25  A.    My executive management team.

Page 54

1  Q.    And who is that?
2  A.    Jeffrey Kassis, Mary, Paul Matier, Donna Viens,
3  Sean Munster, and Brian Duke.
4  Q.    Where does Brian Duke live now; do you know?
5  A.    I have no idea.
6  Q.    Do you know where he lived when you were working
7  at River Valley?
8  A.    Far away, I know that, Gardner or beyond. I
9  mean, it was, I believe he told me it was a 45-minute
10  commute or more.
11  Q.    Do you know his middle initial?
12  A.    Nope. No, sorry.
13  Q.    Do you know where he's working now?
14  A.    I do not, no.
15  Q.    Do you know where he went after he left River
16  Valley?
17  A.    He expressed to me that his expectation was that
18  he would go to work for some type of temporary agency
19  at least on an interim basis as he had significant
20  experience in hospital financial management.
21  Q.    Did Mr. Avakian at some point while you were
22  still executive director of River Valley leave the
23  employment of River Valley?
24  A.    During the time I was there?
25  Q.    Yes.

Page 55

1  A.    No.
2  Q.    Now, if I understand your testimony, Mr. Porton
3  requested that you find ways both to reduce costs and
4  increase revenue.
5  A.    Correct.
6  Q.    Correct? And in the October-November time frame
7  right around the time of the termination meeting, what
8  other steps did you take to reduce costs?
9  A.    As I've indicated before, there were other
10  positions that were either eliminated, people resigned
11  or were terminated for cause, and on each and every one
12  of those departures, there was an individual analysis
13  of the critical nature of the position, whether it
14  needed to be filled, whether those assignments could be
15  redistributed or simply dropped.
16  Q.    Did you put anything in writing regarding those
17  calculations?
18  A.    Only within the standpoint of the budgetary
19  impact of those decisions.
20  Q.    But, other than that, did you take any other
21  steps in the October-November time frame to reduce
22  costs?
23        ATTORNEY KENNEDY: Objection to form.
24        THE WITNESS: My daily job was to review
25  both revenue and expenses of the organization, and I'm

Page 56

1  positive that I took other steps in both areas.
2  BY ATTORNEY SIKORSKI:
3  Q.    But can you tell me any of those steps now?
4  A.    In reducing costs?
5  Q.    Yes.
6  A.    Sure. They're not overly significant, but
7  graphic design, something which I can do myself, had
8  been sent out before as a subcontract. I took on that
9  myself. Rebranding of the agency which would have been
10  done through a public relations firm, I did that
11  myself. Negotiated all the contracts for stationery,
12  signage, location of outpatient offices. I sent
13  someone to Puerto Rico for three weeks to attempt to
14  recruit bilingual therapists in the hope of increasing
15  our revenue in that population. Negotiated with
16  several agencies regarding either increasing or
17  expanding our contractual involvement with them.
18  Negotiating with the Department of Mental Health for
19  increased revenue for the services we were providing
20  and on and on.
21  Q.    And this is in October-November of 2003?
22  A.    It was throughout my entire tenure there.
23  Q.    Prior to becoming executive director of River
24  Valley, had you received any training in compliance
25  with discrimination laws?

Page 57

1  A.    I had certainly gone through, I guess you would
2  call, organizational organizations' pat programs on
3  sexual harassment, on equal employment opportunity laws
4  and regulations.
5  Q.    This was before you got to River Valley?
6  A.    I think probably every agency I've ever worked
7  with has had a similar type of training.
8  Q.    Did River Valley?
9  A.    River Valley did. They distributed documents
10  indicating what their policies were on those areas.
11  One had to sign off on them as terms of having read
12  them, agreed to them, and recognizing that there could
13  be disciplinary action if they were violated.
14  Q.    But did you undergo any training while you were
15  employed at River Valley Counseling?
16  A.    In the year or less, no.
17  Q.    Do you know an individual by the name of Clark
18  Fenn?
19  A.    I do.
20  Q.    And did you have any interactions with Clark
21  Fenn while you were the executive director of River
22  Valley?
23  A.    I did.
24  Q.    And what interactions did you have with him?
25  A.    My recollection was that he was in charge of

Page 58

1  risk management for the hospital at least in part. I
2  had two or three discussions with him regarding at
3  least one clinician who may or may not have been
4  involved in what I considered to be unethical or
5  illegal billing practices and what the exposure to the
6  agency would be and what actions I should take. That's
7  the specific thing that I remember.
8  Q.    At any time either before or after the
9  termination meeting, did you discuss Mr. Richards's
10  termination with Clark Fenn?
11  A.    Not to my knowledge. Let me amend that by
12  saying I may have had a discussion with him at Ms.
13  Kelleher's or Mr. Porton's request to inform him that
14  there was litigation that was beginning and to find out
15  what insurance or other coverage may be available to
16  the hospital.
17  Q.    Is that an in-person meeting or an
18  over-the-phone?
19  A.    I believe that meeting was over the telephone.
20  Q.    And did you at some point ascertain whether
21  there was insurance available to you?
22  A.    I did not other than learning that there was a
23  general office, officers' and directors' policy.
24  Q.    Have you personally been interviewed by any
25  insurance adjuster?

Page 59

1  A.    No.
2  Q.    Have you given any recorded statement to an
3  insurance adjuster?
4  A.    I have not.
5  Q.    Have you given a written statement to any
6  insurance company?
7  A.    I have not.
8  Q.    Have you ever spoken to any insurance adjuster?
9  A.    On this matter, on Mr. Richards's separation?
10  Q.    Yes.
11  A.    No.
12  Q.    What is your understanding of the insurance
13  coverage that might be available to pay a judgment if a
14  judgment was rendered against you?
15  A.    I have no detailed information. I was presented
16  with a document that would be quite onerous for even an
17  insurance expert to understand.
18  Q.    About five-page thing called a reservation of
19  rights letter?
20  A.    Oh, no. This was much more than five pages.
21  Q.    Citing all these different subsections of the
22  policy?
23  A.    Correct.
24  Q.    Okay. Not light reading?
25  A.    Not at all, sir.

Page 60

1        (Deposition Exhibit 3 marked.)
2        THE WITNESS: Just one thing I would like
3  to note. I had asked --
4        ATTORNEY FABBO: Don't say anything
5  unless you're asked questions unless it's something
6  unrelated to the deposition.
7        THE WITNESS: I think it's important that
8  I state that Dr. Tietz is here for a specific period of
9  time at my request and has patients to attend to.
10        (A brief discussion was held off the record.)
11  BY ATTORNEY SIKORSKI:
12  Q.    Do you recognize Exhibit 3, sir?
13  A.    I do not recognize it, but I certainly
14  understand its contents.
15  Q.    Okay. And what is it?
16  A.    A request for family medical leave from Mark to
17  me.
18        (Deposition Exhibits 4 and 5 marked.)
19  Q.    Do you recognize Exhibit 3, 4, and 5, sir?
20  A.    Yes.
21  Q.    Okay. And what do you recognize 3 as?
22  A.    Hold on. I need to find which one is 3.
23        ATTORNEY FABBO: Is that the one you just
24  asked him about?
25        ATTORNEY SIKORSKI: Yes.

Page 61

1        THE WITNESS: Number 3, yes, that's the
2  one that Mr. Richards wrote to me regarding his request
3  for family medical leave.
4  BY ATTORNEY SIKORSKI:
5  Q.    Okay. And do you recall receiving it around the
6  time it's dated?
7  A.    I don't recall the date, but I would suspect it
8  was.
9  Q.    Okay. And do you recognize Exhibit 4?
10  A.    I do.
11  Q.    And what do you recognize Exhibit 4 as?
12  A.    Ms. Viens's response to that request regarding
13  FMLA leave.
14  Q.    And what do you recognize Exhibit 5 as?
15  A.    A clarification of Exhibit 4 with respect to the
16  rules and regulations regarding taking FMLA.
17  Q.    And do you recall receiving Exhibits 4 and 5
18  around the time they're dated?
19  A.    I do.
20  Q.    Do you recall ever seeing the request for leave
21  of absence filed by Mr. Richards and the certification
22  of his health care provider?
23  A.    No.
24  Q.    Do you recall Ms. Viens explaining to you in any
25  more detail the basis for Mr. Richards's request for

Page 62

1  family medical leave?
2  A.    I believe she reiterated what I had heard
3  through the grapevine that his daughter was ill and
4  that was his reason for the request.
5  Q.    Okay.  And, again, do you remember anything more
6  about what she said about the daughter being ill?
7  A.    No.  I left those decisions in the hands of Ms.
8  Viens.
9  Q.    Okay.  Who's Anthony Corea?
10  A.    Anthony Corea is, and I may get his title wrong
11  because it changed somewhat, but I believe his title
12  during the time I was there was chief financial officer
13  for Valley Health Systems.
14  Q.    And did you ever meet with Mr. Corea?
15  A.    Regularly.
16  Q.    So did you meet with Mr. Porton and Mr. Corea
17  regularly before the termination meeting with Mr.
18  Richards?
19  A.    More or less on a weekly basis.
20  Q.    And did you meet regularly with Ms. Kelleher?
21  A.    No.  That's not to say I didn't meet with her,
22  but it was not on a scheduled basis.
23        ATTORNEY SIKORSKI:  Give me one minute.
24  Let me see if we can get you out of here by 1:00.
25        ATTORNEY FABBO:  Are we off the record?

Page 63

1        ATTORNEY SIKORSKI: Oh, the rest of that,
2  I don't think I'm going to go through those.  That's
3  just the set of --
4        ATTORNEY FABBO:  You're just giving me an
5  extra copy for today?
6  BY ATTORNEY SIKORSKI:  Yeah, that's all.  Just rather
7  than pull everything out.
8  Q.    Have you made a claim against River Valley
9  Counseling Center, sir?
10  A.    Can you clarify your question?
11  Q.    Let me back up.  Have you applied for any
12  long-term disability insurance?
13  A.    I have.  Ms. Kelleher sent me that paperwork, I
14  believe, at the time I told her that it was unlikely
15  that I would return to work.
16  Q.    And did that insurance carrier grant you
17  disability payments?
18  A.    In the final analysis, was it granted?
19  Q.    Yes.
20  A.    It was denied.
21  Q.    Have you made any claims against anyone
22  connected with, directly or indirectly, with River
23  Valley Counseling Center arising out of your employment
24  or the termination of your employment relationship?
25  A.    I have not.

Page 64

1  Q.    Have you had a lawyer contact anyone associated
2  with the River Valley Counseling Center or Holyoke
3  Hospital on your behalf?
4  A.    I was advised by Ms. Kelleher to consider having
5  the long-term disability agreement reviewed by counsel.
6  I was also advised by her after the initial denial of
7  those requests to both read the policy in terms of
8  appeal procedures and, once again, to consider
9  consulting an attorney, none of which I did.
10  Q.    Did you receive any type of a severance payment
11  or separation payment from River Valley Counseling
12  Center, HC Management, or any other entity associated
13  directly or indirectly with Holyoke Hospital?
14  A.    I did not.
15  Q.    Other than attorneys, have you spoken with
16  anyone to help you, yourself prepare for this
17  deposition today?
18  A.    I've spoken with Dr. Tietz regarding what I --
19  Q.    Okay.  I don't want to -- that's a confidential
20  conversation.  I don't want --
21  A.    I've spoken with Dr. Tietz.  I've spoken with
22  Attorney Fabbo.
23  Q.    And your counsel is also --
24  A.    And, prior to her being counsel of record for
25  me, I also spoke to Mary Jo Kennedy.

Page 65

1  Q.    But when is the last time you spoke, say, to Mr.
2  Avakian?
3  A.    Before I left River Valley.
4  Q.    And how about Mr. Kassis?
5  A.    I believe I sent him an email maybe a month or
6  two after my departure.
7  Q.    And how about Mr. Haas, H-A-A-S?
8  A.    I've had no contact with him other than he sent
9  me some personal belongings from my office.
10  Q.    Do you recall Mr. Richards telling you at any
11  time that he was going to be out a day or so to have
12  something taken off his face?
13  A.    I have a vague recollection of that, yes.
14  Q.    And do you remember him then saying that this
15  was because he had a problem with skin cancer?
16  A.    I do not.
17  Q.    What did you understand taking off the face to
18  be in a man in his 50's?
19        ATTORNEY FABBO:  Objection.  If you have
20  an understanding.
21        THE WITNESS: I didn't feel it was my
22  business to ask, and I had no preconceived idea.
23  BY ATTORNEY SIKORSKI:
24  Q.    Did you preserve any voice mails or emails
25  relating to Mr. Richards?

Page 66

1  A.    Preserve meaning beyond the time of my
2  employment?
3  Q.    Or, while you were there, did you, for example,
4  tape any voice mails, forward them to anyone for
5  preservation?
6  A.    No.  It may be possible that Mr. Richards or
7  other people left me voice mails that I subsequently
8  listened to but certainly didn't preserve.
9  Q.    Right, that's my question.  Did you preserve any
10  voice mails?
11  A.    No.
12  Q.    Let me ask you this.  Did you preserve any voice
13  mails from Mr. Richards?
14  A.    No.
15  Q.    Did you preserve any voice mails concerning Mr.
16  Richards?
17  A.    No.
18  Q.    Did you preserve any emails from Mr. Richards?
19  A.    No.
20  Q.    Did you preserve any emails regarding Mr.
21  Richards?
22  A.    No.
23  Q.    Did anyone ever ask you to preserve voice mails
24  or emails regarding Mr. Richards?
25  A.    No.

Page 67

1          ATTORNEY SIKORSKI:  No further questions
2  of this witness at this time.
3          ATTORNEY KENNEDY:  I have no questions.
4          ATTORNEY FABBO:  Deposition is concluded.
5  (Whereupon at 12:59 p.m. the deposition was adjourned.)
6
7
8
9              * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

1          I have carefully read the foregoing
2  transcript of my deposition given on Wednesday,
3  February 15, 2006, and the answers made by me
4  are true and correct.
5
6
7          ------------------------
           DAVID G. MATTOCKS
8
9  STATE OF _____
10  _____ SS.
11
12  At _____, in said
13  County, this _____ day of
14  _____, 2006, personally
15  appeared before me the above-named DAVID G.
16  MATTOCKS, and made oath that the foregoing
17  answers subscribed by him are true.
18
19
20          ------------------------------
           Notary Public
21
22  My Commission expires:
23
24  --------------------
25

Page 69

1          C E R T I F I C A T E
2          I, Sunnie Donath, Notary Public, do
3  hereby certify that the foregoing pages, numbered 1
4  through 69, inclusive, are a true and accurate
5  transcription of my stenographic notes of the sworn
6  deposition of DAVID G. MATTOCKS, taken before me on
7  Wednesday, February 15, 2006 for use in the matter of
8  MARK A. RICHARDS -vs- RIVER VALLEY COUNSELING CENTER,
9  INC., VALLEY HEALTH SYSTEMS, INC., DAVID G. MATTOCKS
10  AND DONNA VIENS, United States District Court, District
11  of Massachusetts, Civil Action No. 05-30061-MAP.
12
13
14
15
16          ------------------------------
17              Sunnie Donath
               Notary Public
18
19
20  My commission expires:
    February 10, 2007
21
22  THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
    APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
23  UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
    CERTIFYING REPORTER.
24
25

49d61f81-a776-11da-b008-000c41a99380

# EXHIBIT
# 3

1               UNITED STATES DISTRICT COURT

               DISTRICT OF MASSACHUSETTS

2                  Western Division

3                         C.A. No. 05-30061-MAP

4

5   MARK A. RICHARDS                )

                Plaintiff       )

6   v.                          )

                             )

7   RIVER VALLEY COUNSELING CENTER, INC.,)

  VALLEY HEALTH SYSTEMS, INC.,      )

8   DAVID G. MATTOCKS and DONNA VIENS    )

                Defendants     )

9

10

11

12             DEPOSITION OF: DAVID AVAKIAN taken

13   before Jessica R. Stasio, Notary Public-Stenographer,

14   pursuant to Rule 30 of the Federal Rules of Civil

15   Procedure, at the law offices of ROBINSON DONOVAN,

16   P.C., 1500 Main Street, Springfield, Massachusetts

17   on February 16, 2006.

18

19

20   Appearances: (see page 2)

21

22

23                Jessica R. Stasio

          Registered Professional Reporter

24

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2                 Western Division

 3                 C.A. No. 05-30061-MAP

 4

 5   MARK A. RICHARDS                    )
                      Plaintiff         )
 6   v.                                  )
                                         )
 7   RIVER VALLEY COUNSELING CENTER, INC.,)
     VALLEY HEALTH SYSTEMS, INC.,        )
 8   DAVID G. MATTOCKS and DONNA VIENS   )
                      Defendants         )
 9

10

11

12          DEPOSITION OF:  DAVID AVAKIAN taken

13   before Jessica R. Stasio, Notary Public-Stenographer,

14   pursuant to Rule 30 of the Federal Rules of Civil

15   Procedure, at the law offices of ROBINSON DONOVAN,

16   P.C., 1500 Main Street, Springfield, Massachusetts

17   on February 16, 2006.

18

19

20   Appearances: (see page 2)

21

22

23              Jessica R. Stasio
              Registered Professional Reporter
24
```

**Page 3**

## I N D E X

WITNESS      DIRECT    CROSS    REDIRECT    RECROSS

DAVID AVAKIAN    4

EXHIBITS:                          PAGE

Exhibit 1, deposition notice              32

Exhibit 2, letter of resignation          33

Exhibit 3, description of regulations      36

MAR 16, 2006

**Page 2**

```
 1   APPEARANCES

 2
     FOR THE PLAINTIFF:
 3   ROBINSON DONOVAN, P.C.
     1500 Main Street
 4   Springfield, MA 01115
     413-732-2301
 5     BY: JOHN C. SIKORSKI, ESQ.

 6   FOR RIVER VALLEY COUNSELING CENTER, INC.:
     BULKLEY RICHARDSON & GELINAS, LLC
 7   1500 Main Street
     Springfield, MA 01115
 8   413-781-2820
       BY: MARY J. KENNEDY, ESQ.
 9
     FOR VALLEY HEALTH SYSTEMS, INC.:
10   SKOLER ABBOT & PRESSER
     One Monarch Place
11   Springfield, MA 01144
     413-737-4753
12     BY: MARYLOU VARAO FABBO, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 4**

```
 1            STIPULATIONS

 2        It was stipulated and agreed by and

 3   between counsel for the respective parties that the

 4   witness will read and sign the deposition

 5   transcript, and the sealing, filing and

 6   certification thereof are waived.

 7        It was further stipulated and agreed that

 8   all objections, except as to the form of the

 9   question, shall be reserved until the time of trial.

10   All motions to strike shall be reserved until the

11   time of trial.

12

13        DAVID AVAKIAN, Deponent, having first

14   been duly sworn, deposes and states as follows:

15

16   DIRECT EXAMINATION BY MR. SIKORSKI:

17        Q. Will you please state your name and spell

18   your last name for the record, sir?

19        A. David Avakian.  A-V-A-K-I-A-N.

20        Q. And where do you live?

21        A. In 99 Chesterfield Road, Westhampton,

22   Mass.

23        Q. And what is your date of birth, sir?

24        A. 10/6/59.
```

| Page 5 |
|---|
| 1    Q. And where do you currently work? |
| 2    A. Holyoke Hospital. |
| 3    Q. And what do you do at Holyoke Hospital? |
| 4    A. I am the Patient Care Coordinator. |
| 5    Q. And what does that entail? |
| 6    A. That entails being in charge of quality of |
| 7   care and utilization review for patients in the |
| 8   partial hospitalization program. |
| 9    Q. What entity actually pays you? |
| 10    A. Holyoke Hospital is -- my paycheck says |
| 11   Holyoke Medical Center, -- |
| 12    Q. Okay. |
| 13    A. -- and -- yeah. |
| 14    Q. Who do you report to? |
| 15    A. Baxter Chandler. |
| 16    Q. And who does Mr. Chandler report to? |
| 17    A. Matt Haas. |
| 18    Q. That is H-A-A-S? |
| 19    A. Yes. |
| 20    Q. Is Mr. Haas the current CEO of River |
| 21   Valley Counseling Center? |
| 22    A. Yes. |
| 23    Q. At some point in time did you work for |
| 24   River Valley Counseling Center? |

| Page 6 |
|---|
| 1    A. I did. |
| 2    Q. And when did you do that, sir? |
| 3    A. From October '80 -- 1986 to June of 2005. |
| 4    Q. What is your educational background |
| 5   starting with high school? |
| 6    A. I went to Doherty High in Worcester, |
| 7   Mass., and then I went to Assumption College for one |
| 8   year and then transferred to the University of |
| 9   Massachusetts where I got my Bachelor's degree in |
| 10   Education with a concentration in counseling and |
| 11   graduated in 1981, and then I went back to school |
| 12   for my graduate degree, and I got my Master's degree |
| 13   in Education with a concentration in counseling, |
| 14   psychology in 1989. |
| 15    Q. And where was that from? |
| 16    A. University of Massachusetts, also. |
| 17    Q. And are you licensed in Massachusetts? |
| 18    A. I am. |
| 19    Q. And what licenses do you hold? |
| 20    A. I hold one license, licensed Mental Health |
| 21   Counselor, and I got that in 1991. |
| 22    Q. How does that differ from LICSW? |
| 23    A. LICSW is -- you get that if you majored in |
| 24   social work, and I majored in counseling/psychology, |

| Page 7 |
|---|
| 1   and the license for that is LMHC. |
| 2    Q. Have you held that license continuously -- |
| 3    A. Yes. |
| 4    Q. -- since you got it? |
| 5      MR. SIKORSKI: Off the record. |
| 6      (Discussion off the record) |
| 7      MS. KENNEDY: Let's go back on the |
| 8   record. |
| 9    Q. (by Mr. Sikorski) Do you know Mark |
| 10   Richards? |
| 11    A. Yes. |
| 12    Q. And how long have you known Mark Richards? |
| 13    A. About ten years. Nine or ten years, I |
| 14   think. |
| 15    Q. Did you ever work, did you ever report to |
| 16   Mr. Richards? |
| 17    A. Yes. |
| 18    Q. And when did you do that? |
| 19    A. I believe Mark Richards became my |
| 20   supervisor in 1996, and then I reported to him from |
| 21   '96 to '04. |
| 22    Q. And what happened in '04? |
| 23    A. Mark left the position in November of |
| 24   '04. |

| Page 8 |
|---|
| 1    Q. In November 2004 did your duties and |
| 2   responsibilities change? |
| 3    A. Yes. |
| 4    Q. And let me just go back. Say to from 2000 |
| 5   until 2004 what were your duties and |
| 6   responsibilities at River Valley Counseling Center? |
| 7    A. I was a supervisor. My title was |
| 8   supervisor, and I was in charge of scheduling for |
| 9   groups for patients. When Mark was out, I would |
| 10   make day-to-day decisions that needed to be made, |
| 11   sort of a point person to go to as well as being a |
| 12   clinician and taking on a clinician role. |
| 13    Q. Okay. Did your duties and |
| 14   responsibilities change about the first week of |
| 15   November 2004? |
| 16    A. Yeah. If I could back up a little bit? |
| 17    Q. Sure. |
| 18    A. Also during that time, I was keeping track |
| 19   of some of the billing, the Medicare billing, and |
| 20   sort of like checking and double checking whether we |
| 21   were billing things out correctly. I was in charge |
| 22   of overseeing our Medicare billing. |
| 23    Q. And before November 2004, how would you |
| 24   characterize your relationship with Mr. Richards? |

Page 9

1    A. It was good.
2    Q. Did you have a good, solid professional
3 relationship?
4    A. Absolutely.
5    Q. And did you have a good personal
6 relationship?
7    A. It was mainly professional. Um, on the
8 occasions that we did things on a personal basis, it
9 was good, yeah.
10    Q. At some point in time did you learn that
11 Mr. Richards' daughter had some health problems?
12    A. Yes.
13    Q. And do you remember when you first learned
14 that?
15    A. I don't remember when. Maybe 2000, 2001,
16 but I don't remember which year.
17    Q. And how did you learn about her health
18 problems?
19    A. Mark called me in the morning when he
20 wasn't able to come in, and he would say that his
21 daughter is sick. And then -- okay. And then that
22 was happening at a point where I think eventually he
23 had to say that "my daughter is -- she's ill", so, I
24 don't remember what year that was, though.

Page 10

1    Q. Okay. Do you remember it was well before
2 2004 that you learned that Mr. Richards' daughter
3 was ill?
4    A. Yes.
5    Q. And what was your understanding from Mr.
6 Richards of his daughter's illness?
7    A. I never heard a diagnosis. I heard
8 symptoms of headaches, dizziness, I think Mark
9 talked about possibly something neurological going
10 on. She had a lot of tests, different tests, done
11 to try to pinpoint what was going on.
12    Q. Did he mention hallucinations?
13    A. No.
14    Q. Did he mention how this affected her
15 school?
16    A. Yes.
17    Q. What did he tell you about that?
18    A. Mark was worried that she was missing
19 school and hoping that she could go back, you know,
20 and be with her class.
21    Q. I'd like to focus on the year 2004.
22 During that year would he call you to tell you that
23 he would have to miss some morning meetings?
24    A. Yes.

Page 11

1    Q. And was that an informal arrangement you
2 and he worked?
3    A. Yes.
4    Q. And in particular, in September, October,
5 and early November 2004, did he tell you that he had
6 to miss work on occasions?
7    A. Yes.
8    Q. What did you do when he would call you and
9 tell you that he was going to miss some work?
10    A. He let me know that his daughter was sick,
11 and sometimes he would say what symptoms she was
12 experiencing, and then he would -- he would say "I'm
13 sorry", you know, "I hope you can manage" --
14    Q. Sure.
15    A. -- "the day". And he asked what the day
16 looked like and so, you know, try to do some
17 troubleshooting if we needed to depending on what
18 the day was going to look like.
19    Q. At some point in time did you learn that
20 Mark had asked for family and medical leave?
21    A. Yes.
22    Q. And when did you learn that?
23    A. I think there were two different times, so
24 I don't remember the first time. It might have been

Page 12

1 early 2000's.
2    Q. Yeah.
3    A. And then there was another time in '04.
4    Q. And how did you learn in '04 that he was
5 taking family medical leave?
6    A. He told me.
7    Q. And do you remember just what he told you?
8    A. He told me he was applying for family
9 leave, and he would be using it as he does now, like
10 sort of intermittently when needed.
11    Q. And did you receive any official
12 notification from anyone that that leave had been
13 granted?
14    A. No.
15    Q. Did you learn at some time that Mark had
16 lesions removed from his face and neck?
17    A. I didn't know they were lesions.
18    Q. Did you know that he had had some surgery
19 on his face and neck?
20    A. Yes.
21    Q. And could you see wounds on his face and
22 neck from time to time?
23    A. Yeah. I saw red and bandages at different
24 times.

Page 13

1    Q. Did you ever learn that this was skin
2  cancer?
3    A. I learned about it when I read about it in
4  the newspaper.
5    Q. Okay. Did he ever indicate to you that --
6  strike that. Did you ever discuss with him what was
7  going on with these lesions?
8        MS. KENNEDY: Objection to the form.
9    Q. (by Mr. Sikorski) You can answer.
10    A. There was one time where he had a
11  procedure done, and he -- he told me that the
12  procedure did not go well.
13    Q. Did he say why it did not go well?
14    A. I think there was -- he got infections
15  afterwards. It was -- I think he had to go back,
16  and they had to patch it up again.
17    Q. In the year 2004 and near the time that he
18  was terminated, did he tell you he was scheduled for
19  more surgery?
20    A. No.
21    Q. Did you at some point in time learn that
22  Mr. Mattocks was considering eliminating Mr.
23  Richards' position and terminating him?
24    A. Can you rephrase -- say that again.

Page 14

1        THE COURT REPORTER: Q: Did you at
2    some point in time learn that Mr. Mattocks was
3    considering eliminating Mr. Richards' position
4    and terminating him?
5    A. No.
6    Q. How did you learn that Mark Richards was
7  going to be terminated?
8    A. I learned that morning that it was going
9  to happen.
10    Q. Okay. And can you tell me how you learned
11  that?
12    A. David and I spoke that morning about a
13  meeting, sort of an emergency meeting that was going
14  to be held at 11:00, 12:00, and at the meeting I
15  heard officially.
16    Q. Let me back up.
17    A. Um-hum.
18    Q. When you refer to David, who are you
19  referring to?
20    A. Oh, David Mattocks, yes.
21    Q. And do you remember this being on a
22  Thursday? You may not remember that, but --
23    A. I think it was a Thursday.
24    Q. Okay.

Page 15

1    A. November 4th.
2    Q. Do you remember him -- what do you
3  remember Mr. Mattocks telling you that morning?
4    A. That we were going into a meeting, and
5  Mark was going to tell people he was leaving and
6  that I would be in charge.
7    Q. And was that the first time that you had
8  been told that you were going to be in charge?
9    A. Yes.
10    Q. Was that surprising to you?
11    A. No.
12    Q. And why not?
13    A. That -- the week before that, David
14  Mattocks and I had a conversation about -- David
15  asked me if the leadership changed would I stay at
16  River Valley. So that had a lot -- lot to think
17  about what that meant.
18    Q. Okay. Was that meeting in person or over
19  the phone?
20    A. In person.
21    Q. And was anybody else there?
22    A. No.
23    Q. And do you remember how you came to this
24  meeting, who set it up?

Page 16

1    A. David called me and asked if -- whether I
2  was available to meet with him on Friday or Monday,
3  and --
4    Q. Okay. That would be the Friday or Monday
5  before the Thursday meeting?
6    A. Yes.
7    Q. And do you remember if it was on a Friday
8  or Monday?
9    A. It was Friday.
10    Q. And did you have the meeting in his
11  office?
12    A. In his office.
13    Q. And when you went in there, what did he
14  say to you, and what did you say to him?
15    A. He said -- it was a short meeting, and he
16  said that this is going to be a vague -- I'm not
17  sure his words were vague, but this is going to be a
18  vague conversation, but I just want to get a sense
19  from you sort of like my commitment to River
20  Valley. And he said if the leadership changed,
21  would I -- so he asked me that question directly, if
22  the leadership changed would I still stay. I told
23  him that I was committed to the work and --
24    Q. And did he say anything else to you?

Page 17

1    A. He said that there was going to be changes
2  in the agency, and I believe I asked what kind of
3  changes. And it wasn't specific at all. He didn't
4  get specific with me.
5    Q. And was that the first conversation about
6  changes in the agency's leadership that you had had
7  with David Mattocks?
8    A. Yes.
9    Q. And was this the first time that you had
10 heard David Mattocks talk about changes in the
11 leadership?
12   A. Prior to that -- in the leadership, yes.
13 Yes.
14   Q. Now, between the time of that meeting on
15 Friday and the Thursday meeting, did you have any
16 other conversations with Mr. Mattocks?
17   A. Mr. Mattocks came to a meeting with our
18 team that I worked in. He spoke about his vision
19 for the agency.
20   Q. And was that the Thursday morning meeting?
21   A. No, no. This was before that.
22   Q. Okay. Do you remember what day of the
23 week that was?
24   A. No.

Page 18

1    Q. Okay. And what did he say about what was
2  his vision of the agency?
3    A. Well, he was relatively new to the
4  agency. I think he probably came in late summer, I
5  don't remember exactly when, and he was talking
6  about his vision for the agency and wanting to see
7  us grow and really wanting day treatment to grow.
8    Q. If we can go back again to Thursday, then,
9  did you have any conversations with Mr. Mattocks
10 that day about what your role was going to be in the
11 agency?
12   A. Yeah. I didn't -- I asked him what is my
13 role going to be, and he was vague. And then I'd
14 say "so am I acting director, am I" -- and, um, he
15 said, "yeah", he said, "but you're in charge".
16   Q. Did you ask for clarification of that?
17   A. Not -- not on Thursday. Not Thursday.
18   Q. Okay. At some other time?
19   A. Oh, sure. Oh, sure.
20   Q. And when was the next time that you spoke
21 with Mr. Mattocks to clarify your role?
22   A. Probably the next week. And we probably
23 had a few meetings about it.
24   Q. Okay. And what was the sum and substance

Page 19

1  of those meetings?
2    A. Well, we were talking about my title, what
3  would my title be and what my job responsibility
4  would be, and my title remained Assistant Program
5  Director, and the role was clarified as being --
6  David used the words "player coach", which is sort
7  of like being the manager and having a clinical
8  role.
9    Q. So your title would be Assistant Program
10 Director, but you would have more responsibilities
11 than you had before?
12   A. Yes.
13   Q. And what additional responsibilities would
14 you have?
15   A. Overseeing the budget and making sure we
16 were in compliance with every regulatory agency out
17 there.
18   Q. And did you, in fact, assume those
19 responsibilities --
20   A. Yes.
21   Q. -- and carry those out --
22   A. Yes.
23   Q. -- to the best of your ability?
24   A. Yes.

Page 20

1    Q. Between the time of your meeting with
2  Mr. Mattocks on the Friday and the meeting on the
3  following Thursday, did you speak with Jeff Kassis
4  at all about potential changes at the agency?
5    A. I don't believe so.
6    Q. And during that period of time did you
7  speak with Mr. Richards about potential changes in
8  the agency?
9    A. No.
10   Q. At any time did Mr. Mattocks give you a
11 copy of the regulations governing psychiatric day
12 treatment programs?
13   A. No.
14   Q. And at any time before the Thursday
15 meeting did you and Mr. Mattocks discuss the
16 requirements of the regulations regarding what type
17 of leadership team was needed?
18   A. No.
19   Q. Now, after the Thursday meeting, did you
20 and Mr. Mattocks ever discuss the regulations of the
21 Commonwealth of Massachusetts regarding the
22 requirements for a leadership team of the program?
23   A. Yes.
24   Q. And when did you have those discussions?

Page 21

1    A. Within the week after Mark left.
2    Q. Did one or either of you pull out the
3  regulations --
4    A. I did.
5    Q. -- for you to review? And what was the
6  sum and substance of those discussions?
7    A. I wanted to go over the regulations line
8  by line with David and said whatever -- and I
9  pointed to whatever this position that I am now in
10  evolves into, I want to be clear that we are meeting
11  the regulations.
12    Q. And what did he say to you?
13    A. He agreed that we needed to do that.
14    Q. What did you understand was going to be
15  Mr. Kassis' role after Mr. Richards left?
16    A. He would be my supervisor.
17    Q. And what did you understand Mr. Kassis'
18  sort of responsibilities were going to be?
19    A. That he would assume the role of Program
20  Director.
21    Q. In addition to his other responsibilities?
22    A. In addition.
23    Q. Did you understand that Mr. Kassis was
24  going to spend any more of his time at the

Page 22

1  psychiatric day treatment program than he had before
2  Mr. Richards left?
3    A. A little bit more.
4    Q. And what do you mean by a little bit?
5    A. Few hours a week.
6    Q. Going back to that Thursday meeting, did
7  Mr. Mattocks tell you that Mr. Richards was
8  voluntarily quitting or had been terminated?
9    A. Say that again.
10    Q. Going back to the Thursday meeting, --
11    A. Thursday meeting.
12    Q. -- did Mr. Mattocks tell you Mr. Richards
13  was leaving voluntarily or he was terminated?
14    A. He didn't say.
15    Q. On that Thursday did you speak with Mark?
16    A. Yes.
17    Q. And was this in person?
18    A. Yes.
19    Q. And what did you say to him, and what did
20  he say to you?
21    A. Well, in the meeting -- I didn't talk to
22  him before the meeting, I don't believe. In the
23  meeting he said he -- he said he was resigning
24  because he needed to take care of his daughter, and

Page 23

1  he would be leaving today, that day. He said that,
2  and he also said -- can't remember his words -- that
3  this was not his idea. And I don't remember what he
4  said, but I got the impression that -- so I was
5  hearing two things. He resigned, and he was angry
6  about it.
7    Q. Did you later accompany Mark when he
8  cleaned out his office --
9    A. Yes.
10    Q. -- of personal things? And was that on
11  that Saturday?
12    A. That Saturday.
13    Q. And at that time did you and he discuss
14  his leaving the agency?
15    A. Not, not directly. I mean I talked -- I
16  told him about how sad I was that he was leaving,
17  and he again gave me the impression he was angry
18  about the fact that he was leaving.
19    Q. At some point in time did you learn that
20  Mr. Richards had challenged Mr. Mattocks' vision of
21  the leadership team at the psychiatric day treatment
22  program?
23    MS. KENNEDY: Objection --
24    A. No.

Page 24

1    MS. KENNEDY: -- to form. Go ahead.
2    A. No.
3    Q. At any point in time did you learn that
4  Mr. Richards thought that the way Mr. Mattocks was
5  going to restructure the agency violated the
6  regulations?
7    A. No.
8    Q. Before the Thursday meeting, did Mr.
9  Mattocks ever ask you your view of Mr. Richards'
10  competence as a clinician or a manager?
11    A. No.
12    Q. At any time before the Thursday meeting
13  did Mr. Mattocks ask your view of Mr. Richards'
14  value to the program?
15    A. No.
16    Q. In the course of your working with
17  Mr. Richards, did you have a chance to observe his
18  clinical skills?
19    A. Oh, yes.
20    Q. And did you have a chance to observe his
21  managerial skills?
22    A. Yes.
23    Q. And did you have a chance to understand
24  his performance as a financial manager?

Page 25

1  A. Yes.
2  Q. And as a financial reporter?
3  A. Um-hum.
4  Q. Answer yes or no.
5  A. Yes.
6  Q. And what was your opinion of Mr. Richards'
7  skills as a clinician?
8  A. He was a good clinician.
9  Q. And your opinion of his skills as a
10  manager?
11  A. He was a good manager.
12  Q. And your opinion of his skills as a
13  financial manager?
14  A. He was a good financial manager.
15  Q. And your opinion of his financial
16  reporting?
17  A. Good.
18  Q. And his commitment to ethics and
19  compliance with regulations?
20  A. Good.
21  Q. Did you know that he had taught at the
22  University of Connecticut?
23  A. Yes.
24  Q. And did you view that teaching as of some

Page 26

1  value to the organization?
2  A. No, not directly.
3  Q. How about indirectly?
4  A. Hadn't thought about it.
5  Q. How long after Mr. Richards left the
6  agency did you leave the agency?
7  A. I left in June of '05, so that would be
8  eight months, maybe.
9  Q. And where did you go to work after that?
10  A. Carson Center.
11  Q. And where is that?
12  A. I worked up in Greenfield.
13  Q. And what type of facility is that?
14  A. It's a mental health clinic.
15  Q. And what did you do at the Carson Center?
16  A. I was an outpatient therapist.
17  Q. And how long did you hold that position?
18  A. Eight weeks.
19  Q. And then what happened?
20  A. And then a position became open at Holyoke
21  Hospital.
22  Q. And when you went to the Carson Center,
23  did you know this position might open?
24  A. No.

Page 27

1  Q. How did you learn about the position?
2  A. It was in the newspaper.
3  Q. Oh. Is that the current position you
4  hold?
5  A. No.
6  Q. Okay.
7  A. The position in the newspaper was
8  clinician position.
9  Q. Clinician where?
10  A. At Holyoke Hospital.
11  Q. In what program?
12  A. Partial hospitalization.
13  Q. And who was running that partial
14  hospitalization program at that time?
15  A. Baxter Chandler.
16  Q. And did Mr. Chandler hire you for that
17  position?
18  A. No.
19  Q. But did you apply for that position?
20  A. I did.
21  Q. And then what happened?
22  A. Well, I did not get that position. Yet
23  then another position became open that they told me
24  about, which was the position I'm in now.

Page 28

1  Q. And did they tell you about that at the
2  interview for the first position?
3  A. No.
4  Q. Was there some time gap?
5  A. Well, when I learned that I did not get
6  the clinician position, I learned about this other
7  position opening up.
8  Q. And who hired you?
9  A. Baxter.
10  Q. Okay. At some point in time while you
11  were working at River Valley, did Mr. Mattocks take
12  a leave of some sort?
13  A. Yes.
14  Q. And for how long was he on leave while you
15  were working there, if you recall?
16  A. It was at the tail end of my tenure there,
17  so I believe he was gone maybe five or six weeks.
18  Q. Why did you leave River Valley Counseling
19  Center?
20  A. I wanted to pursue a different
21  professional direction, and I had some personal
22  reasons.
23  Q. Just focusing on the professional reasons,
24  what were they?

Page 29

1    A. I wanted to work doing more clinical work
2    than I was doing. My job became more of financial
3    manager than I had anticipated. And this position
4    opened up at the Carson Center that was doing
5    primarily outpatient therapy.
6    Q. So after Mark left, you were doing more of
7    the administrative piece --
8    A. Yes.
9    Q. -- of the agency? And was Mr. Kassis
10   doing more of the clinical oversight, or were you
11   doing both?
12   A. We both were doing both, yeah.
13   Q. Okay. No clear-cut line of authority?
14       MS. KENNEDY: Objection to form.
15   A. Well, he was the authority -- he was my
16   authority, yeah.
17   Q. But in terms of who was actually doing the
18   work, the clinical piece and the administrative
19   piece, both of you were doing that?
20       MS. KENNEDY: Objection to form. Go
21   ahead.
22   A. Yes.
23   Q. Did Mr. Mattocks ever tell you his
24   rationale for eliminating Mr. Richards' position?

Page 30

1    A. He thought that -- yeah, he -- yes. To
2    some extent, he did.
3    Q. What did he say?
4    A. That he wanted to make changes in the
5    agency, managerial changes in the agency, and this
6    was one of them. And he felt that the position, the
7    program could run with me as taking on a managerial
8    role. I think he felt that -- I don't know what he
9    felt, but I got the impression that Mark and I were
10   sort of both doing some administrative work, and I
11   think he thought that was overkill.
12   Q. After Mark Richards left, did you prepare
13   a memorandum or report of costs and savings that the
14   agency could attain?
15       MS. KENNEDY: Objection --
16   A. Did I prepare it?
17       MS. KENNEDY: -- to form.
18   Q. Yes.
19   A. No.
20   Q. While Mr. Mattocks was executive director,
21   did you ever see an analysis of potential cost
22   savings the agency could undergo in writing?
23   A. No.
24   Q. Were you ever asked to prepare in writing

Page 31

1    an analysis of cost savings the program you worked
2    in could attain?
3    A. No.
4    Q. Did you attend managers meetings?
5    A. Yes.
6    Q. Did you ever see any analyses in writing
7    by any other program manager of cost savings that
8    their program could attain?
9    A. Not specifically cost savings.
10   Q. Did you ever prepare an analysis in
11   writing of ways that your program could improve
12   revenues?
13   A. Yes.
14   Q. Okay. Did you prepare such a report?
15   A. Oh, yes.
16   Q. And when did you prepare it?
17   A. Um, monthly.
18   Q. Okay. And was this part of monthly
19   reports you made to Mr. Mattocks?
20   A. Yeah. And we were looking at how to
21   expand day treatment program, and I had some ideas
22   about how to do that.
23   Q. How many years did you have working in day
24   treatment programs?

Page 32

1    A. 18 and a half years.
2        MR. SIKORSKI: Just let me have this
3    marked as exhibit 1.
4        (Exhibit 1; so marked)
5    Q. Do you recognize exhibit 1?
6    A. Yes.
7    Q. And this is your notice of taking
8    deposition. Were you also served a subpoena, do you
9    know?
10   A. Yes.
11   Q. And that asked you to bring some records
12   with you?
13   A. Yes.
14   Q. And do you have any such records?
15   A. No.
16   Q. Okay.
17       MS. KENNEDY: In response to the
18   subpoena --
19       MR. SIKORSKI: Oh, --
20       MS. KENNEDY: -- that was served?
21       MR. SIKORSKI: -- yeah. I was going
22   to mark that.
23       MS. KENNEDY: Yeah.
24   A. We -- we -- I brought in a letter of

| | |
|---|---|
| **Page 33** | **Page 35** |

**Page 33**

1  resignation that Mark gave to me.

2  Q. Oh, okay.

3  MR. SIKORSKI: Could I have this

4  marked as exhibit 2.

5  (Exhibit 2; so marked)

6  Q. Do you recognize exhibit 2?

7  A. Yes.

8  Q. And what is it?

9  A. It's a letter of resignation that Mark

10  wrote.

11  Q. And was that distributed on November 4th?

12  A. Yes.

13  Q. Was it handed out to people, if you

14  remember?

15  A. I got one in my mailbox.

16  Q. Okay. At any time in 2004 or 2005, did

17  you speak with anyone at the Commonwealth of

18  Massachusetts Division Of Medical Assistance about

19  the requirements of the regulations for the

20  leadership team of the day treatment program?

21  A. No.

22  Q. Did you speak with any other day treatment

23  program to see how they staffed their leadership?

24  A. Oh, yes.

**Page 35**

1  interpretation of the regulations?

2  A. Not at the Commonwealth. He told me to go

3  to the trade association.

4  Q. And what was that trade association?

5  A. The day treatment trade association. It's

6  -- the initials are MSA -- I think Massachusetts

7  Substance Abuse And Counseling. It's in Natick.

8  Q. And do you remember who you spoke to

9  there?

10  A. Yeah. In fact, when you asked me that

11  other question, I was trying to think of the head --

12  that person, what her name is. Because I spoke with

13  her all the time. She is like the chairman of the

14  subcommittee. The name's not coming.

15  Q. Is she a professional staff person, or is

16  she --

17  A. Yes. She works for the trade association.

18  Q. Okay. And what did you say to her, and

19  what did she say to you?

20  A. Oh, we had many, many conversations --

21  Q. Okay.

22  A. -- about regulations in general.

23  Q. Did Mr. Kassis ever tell you that he had

24  called the Commonwealth of Massachusetts to review

| | |
|---|---|
| **Page 34** | **Page 36** |

**Page 34**

1  Q. And when did you do that?

2  A. I went to -- on a monthly basis, sometimes

3  more than that.

4  Q. Was that before Mark left or after Mark

5  left?

6  A. After.

7  Q. Did you ever speak with anybody in your

8  trade association about the requirements for

9  leadership team?

10  A. Yes.

11  Q. And who did you speak to?

12  A. Other day treatment directors. Names

13  don't come to me right now.

14  Q. Okay. Does any name come to you?

15  A. No. No. Andy. Someone, actually, named

16  Andy. Um, I can't remember his last name.

17  Q. Did Mr. Richards tell you -- I'm sorry.

18  Strike that. Did Mr. Mattocks ever tell you that he

19  had called anyone at the Commonwealth of

20  Massachusetts to review the requirements of the

21  regulations for the relationship team?

22  A. He did not tell me that.

23  Q. Did he ever ask you to call anyone at the

24  Commonwealth of Massachusetts to get an

**Page 36**

1  the regulations regarding the leadership team?

2  A. No.

3  Q. Did Mr. Kassis ever ask you to call the

4  Commonwealth of Massachusetts to get an

5  interpretation of the regulations regarding the

6  leadership team of the day treatment program?

7  A. No.

8  Q. Did you ever sit down and go over the

9  regulations with Mr. Kassis?

10  A. Yes.

11  Q. And did you do that separately from Mr.

12  Mattocks or with, in a meeting with Mr. Mattocks?

13  A. I think we did it both ways, separately

14  and with Mr. Mattocks.

15  MR. SIKORSKI: I am going to have

16  this marked as exhibit 3.

17  (Exhibit 3; so marked)

18  Q. Do you recognize exhibit 3?

19  A. It's a -- yes.

20  Q. Okay. And what do you recognize it as?

21  A. It's an old description of a portion of

22  the regulations for day treatment programs.

23  Q. Is there some writing on exhibit 3?

24  A. There's two -- yes.

Page 37

1  Q. Okay. And do you recognize the writing --
2  A. Yes.
3  Q. -- that's on exhibit 3? In the upper
4  left-hand part of page 1 of exhibit 3, whose writing
5  is that?
6  A. That is Phyllis Boothroyd's handwriting
7  who was the director before Mark.
8  Q. And then to the right, whose handwriting
9  is that?
10  A. That is mine.
11  Q. Can you just read into the record what it
12  says?
13  A. Sure. "Mark, thanks for these regs. I
14  made copies of some of the material and read it in
15  its entirety".
16  Q. Do you remember when Mr. Richards gave
17  these to you?
18  A. No.
19  Q. For the birth of your child you took
20  paternity leave, did you not?
21  A. Yes. Family -- well, they didn't call it
22  that. It's family leave, yeah.
23  Q. But the birth of your second child, or was
24  it your first?

Page 38

1  A. My first child I took family leave, and my
2  second child I did as well.
3  Q. Was Mr. Richards supportive of your taking
4  family leave?
5  A. Yes.
6  Q. How old are you in relation to
7  Mr. Richards?
8  A. I don't know hold Mark is.
9  Q. Do you believe he's older than you?
10  A. Yes. Eight, eight nine years older,
11  maybe.
12      MR. SIKORSKI: What I'd like to do
13    now is take a short break and see if we have
14    much more.
15      (A break was taken)
16  Q. (by Mr. Sikorski) Mr. Avakian, have you
17  given a written statement on this Mark Richards'
18  matter?
19  A. No.
20  Q. Okay. And have you given a recorded
21  statement?
22  A. No.
23  Q. Okay. At any time did Mr. Mattocks tell
24  you that he had handled the termination of Mr.

Page 39

1  Richards with due regard for his years of experience
2  at the agency?
3  A. Did he say that?
4  Q. Um-hum.
5  A. No, he did not say that.
6  Q. Mr. Avakian, at the end of a deposition I
7  like to give a witness a chance to clarify an
8  answer, add anything you'd like to. I'd be happy to
9  give you that opportunity now.
10  A. I think I answered the questions to the
11  best of my ability.
12      MR. SIKORSKI: Okay. Well, I have no
13    further questions of this witness at this time.
14      MS. KENNEDY: I have no questions.
15      MS. FABBO: I have no questions.
16
17      (The deposition was concluded)

Page 40

SIGNATURE/ERRATA SHEET

I have read the foregoing, and it is a true
transcript of the testimony given by me at the
taking of the subject examination with the following
corrections/changes, if any:

_____

date          DAVID AVAKIAN

PAGE  LINE  CHANGE      REASON
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
--------------------------------------------
Mark A. Richards v. River Valley Counseling Center,
Inc., et al
Date Taken: February 16, 2006
jrs

Page 41

1   COMMONWEALTH OF MASSACHUSETTS
    Hampden, ss.
2
            I, JESSICA R. STASIO, a Notary Public in and
3   for the Commonwealth of Massachusetts, do certify
    that pursuant to notice there came before me on the
4   16th day of February, 2006, at the law offices of
    ROBINSON DONOVAN, P.C., 1500 Main Street,
5   Springfield, Massachusetts, the following named
    person, to wit:  DAVID AVAKIAN, who was by me duly
6   sworn to testify to the truth and nothing but the
    truth as to his knowledge touching and concerning
7   the matters in controversy in this cause; that he
    was thereupon examined upon his oath and said
8   examination reduced to writing by me; and that the
    deposition is a true record of the testimony given
9   by the witness, to the best of my knowledge and
    ability.
10          I further certify that I am not a relative
    or employee of counsel or attorney for any of the
11  parties nor a relative or employee of such parties,
    nor am I financially interested in the outcome of
12  the action.
            WITNESS MY HAND, this 7th day of March, 2006.
13
            -------------------
14          Jessica R. Stasio

15  My Commission expires:
    March 15, 2007
16

17

18

19

20

21

22

23

24

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.