UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 05-30061-MAP

| | |
|---|---|
| MARK A. RICHARDS, | ) |
|     Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| RIVER VALLEY COUNSELING CENTER, INC., | ) |
| VALLEY HEALTH SYSTEMS, INC., | ) |
| DAVID G. MATTOCKS and DONNA VIENS, | ) |
|     Defendants | ) |

**PLAINTIFF'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT OF ALL DEFENDANTS**

## I.  SUMMARY OF ARGUMENT

The essence of this suit is that a mother does not always have to be the person taking leave from her job to care for a sick daughter.  The Family Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA) provide protection to parents of either gender who take intermittent leave to care for a seriously sick daughter.  Within days after the plaintiff told the defendants' chief decision maker, David Mattocks, that he would need intermittent leave to care for his sick daughter, Mattocks expressed his deep concern over Richards' upcoming leave in a written memo which is as close to a "smoking gun" memo as one is likely to find in a FMLA case.  Shortly thereafter, Mattocks took a key step in the process of terminating Richards and did ultimately do so two months later.  All the while Mattocks knew of the serious medical condition of the plaintiff's daughter.

Taking time off to care for a sick child on an intermittent basis is protected by the FMLA.  The ADA also protects persons in a relationship with a person with a disability, such as a father

452612

and a seriously ill daughter.  Although a closer question under state law, this Court should allow the state law claim under "relationship" discrimination to proceed forward.

The defendants' cost-cutting rationale carries no weight.  Mattocks described the program that Richards had run for years as "the revenue leader" of all the many programs run by the River Valley Counseling Center.  By that Mattocks meant that it "brought in a higher proportion of revenue versus expenses than probably any other operating unit."  To Jeffrey Kassis, the person that ostensibly took over some of Richards' duties, Richards' program was a "high performer, a very high performer" *vis a vis* other programs operated by River Valley Counseling Center.  Richards was in the "top 20% of managers" who presented financial information to the top management of the Counseling Center.  Richards was very knowledgeable and kept abreast of new techniques that would be important for his program.  Richards had a broad background prior to becoming a social worker, including background in police work and journalism.  He served on the adjunct faculty of the master's level program of the University of Connecticut Graduate School of Social Work for many years.  It made no business sense to terminate such a financially successful manager under the rubric of cost-cutting.

Four other points support a finding of pretext in this case and compel a finding that the plaintiff deserves a jury trial.  First, the defendants selected Richards and no other similarly situated person for termination or job elimination.  Others who lost their jobs lost them because of either misconduct or because they were tied to a program that lost a contract.  Two, the defendants could point to no document whatsoever relating to the reasons why they chose Richards.  That is, there was no memorandum, email, financial analysis in writing of any type, not even on the back of a napkin, showing the rationale or cost savings associated with eliminating Richards' position, although Mattocks sent out memos on numerous other topics.

When pressed at his deposition, Mattocks admitted that his initial belief that he could save $40,000-$60,000 by eliminating Richards' position was really closer to $20,000-$30,000. Third, the elimination of his position violated public policy because it did not allow for a full time program manager with the levels of experience required by the Code of Massachusetts Regulations, a problem Mattocks turned a blind eye to.

Fourth, and particularly important for purposes of summary judgment, the chief decision maker in this case, David Mattocks, engaged in professional fraud while serving as Director of the River Valley Counseling Center, a fraud countenanced by top officials of Valley Health Systems. The plaintiff had to take his deposition in the office of his physician in the State of Vermont with his physician present throughout the deposition. Other deponents could not tell if Mattocks was terminated or resigned. These and other matters addressed in confidential portions of this Memorandum submitted under seal show that a jury, and not this Court at the summary judgment stage, should weigh his testimony.

The plaintiff's age also played an impermissible part in his termination. The plaintiff was the most expert clinician in this program and in fact supervised the clinicians. He was the most experienced administrator and supervisor in the type of treatment delivery program he directed. He was also the most financially successful program director and at the time of his termination was on target to exceed his revenue target. After his termination, his assistant, David Avakian, a man nine years younger than him, took over the great bulk of his responsibilities. This Court should allow a jury to determine if there was a synergistic effect between the plaintiff's FMLA claims, his ADA claims and his claims under state age discrimination law.

## II.  STATEMENT OF MATERIAL ISSUES OF FACT IN DISPUTE

In accordance with Local Rule 56.1, the plaintiff presents the following statement of material issues of fact in dispute.  Many of these facts have been conclusively proven by the plaintiff.  The plaintiff files separately his response to Defendant Mattocks' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried as well as a separate reply to Statement of Material Facts Not in Dispute of the Defendants, River Valley Counseling Center, Inc., Valley Health Systems, Inc., and Donna Viens.

1.    The plaintiff had a strong professional background and years of experience running his program.  The plaintiff received a BA degree from Syracuse University in 1973 and a Masters in Social Work in 1986 from the University of Connecticut School of Social Work. He has been continuously licensed as a social worker since that time in the Commonwealth of Massachusetts.  The plaintiff served on the adjunct faculty of the University of Connecticut Graduate School of Social Work for eight years starting in 1994.  See generally Exhibit 1A, Deposition of Mark A. Richards dated February 2, 2006 (hereinafter "Richards Depo.") Day 1, pp. 6-11; 32-36.  Since 1989, he has served as the program director of River Valley Counseling Center Psychiatric Day Treatment Program in Holyoke, Massachusetts or its predecessors.  See Exhibit 1A, pp. 12-25.  The Day Treatment Program was designed to prevent hospitalization of adults with a serious mental illness and who are at risk of being hospitalized for a psychiatric illness.  See Exhibit 1A, p. 19.  As program director, he served as the clinical director and administrative manager.  See Exhibit 1A, pp. 116-117.

Richards impressed his colleagues and supervisors with his skills as both a manager and a clinician.  Dr. Abraham Linn, a psychiatrist who worked with the plaintiff at River Valley Counseling Center, at the time of Richards' termination, and who had significant experience in

day treatment centers, stated that in his professional opinion, Mr. Richards is a "first-rate clinician, among the best I have ever known"; that Mr. Richards is a "very good manager" and in fact, Richards is "one of the most conscientious managers" Linn had ever met.  While at River Valley Counseling Center, Richards "would often work extra hours and held his staff to a full day's work."  See generally, Exhibit 2, Affidavit of Abraham Linn, M.D., ¶¶ 4-7.

2.    <u>Even Mattocks admitted that the plaintiff has a superior job performance; that his program was the most profitable of all in the agency.  The plaintiff excelled in financial reporting, especially *vis a vis* other managers in the agency</u>.  Mattocks testified that the partial hospitalization program run by the plaintiff was "the revenue leader of all the many aspects of River Valley's programs."  By "revenue leader" Mattocks stated that "they brought in the higher proportion of revenue versus expenses than probably any other operating unit."  See Exhibit 3, Deposition of David Mattocks, pp. 24-25.  Mattocks noted that Richards was "known and respected" by many agencies in the behavioral health community in Massachusetts.  *Id.* at p. 26.

Jeffrey Kassis, an agency Senior Manager and one of two people that ostensibly took over Richards' functions testified both in his individual capacity and as a 30(b)(6) deponent of River Valley.  In his capacity as a 30(b)(6) deponent, Kassis testified that the psychiatric day treatment program under Mr. Richards' leadership "performed well and, *vis a vis* other programs operated by River Valley Counseling Center it was a high performer, a very high performer." Exhibit 4, pp. 10-11.  Kassis noted no disciplinary issues with Richards' job performance.  *Id.* at p. 12.  In his individual capacity, Kassis testified that Richards provided "accurate and timely financial information" about his program and that compared to the directors of other programs in River Valley Counseling Center, Richards was "in the upper percentile of people who presented

financials.  So I would say he was in the top 20 percent."  Exhibit 5, Deposition of Jeffrey Kassis, pp. 25-27.

Kassis and Mattocks support the plaintiff's contention in his Answers to Interrogatories wherein he claimed to be "the most financially successful program director and, at the time of my termination, was on target to once again exceed my revenue target."  See Exhibit 6, Plaintiff's Answers to Defendant, River Valley Counseling Center's, Interrogatories, No. 16.

3.    The plaintiff's request for intermittent leave was clearly communicated to both Mattocks and Viens and was properly granted.  The plaintiff's request for intermittent leave was clearly communicated.  On August 30, 2004 the plaintiff sent a memo to David Mattocks requesting intermittent leave pursuant to the FMLA to care for his daughter.  See Exhibit 7.  In Exhibit 7, Richards notes that his daughter had a "serious illness" and "was about to commence intensive treatments" which the doctors told him may last "between six months and two years."  Prior to this time, Richards had spoken with Mattocks about his daughter's illness and that he would be requesting FMLA leave.  See generally, Exhibit 1A, pp. 84-85.

Viens wrote a follow up to him on September 3, 2004, see Exhibit 8, a memorandum copied to David Mattocks.  Mark Richards sent her a standard United States Department of Labor official form seeking a request for leave of absence along with a physician's note, which are attached as Exhibit 8A and sealed confidentially.  Richards completed this on September 8, 2004.  Viens sent Richards a letter dated September 17, 2004 approving the leave with a copy to David Mattocks.  See Exhibit 9.  Thereafter, Richards spoke with Viens and Mattocks about his daughter's health care condition and how serious it was.  See generally, Exhibit 1A, Deposition of Richards, pp. 90-92 and 112-114; Exhibit 3, Deposition of Mattocks, p. 25; Exhibit 10, Deposition of Donna Viens, pp. 17-18.

Mattocks testified that Richards did miss morning meetings to care for his daughter. See Exhibit 3A, confidential transcript of Mattocks, p. 9. Richards describes the full extent of his daughter's illnesses and his attempts to get FMLA leave in the confidential portion of his deposition transcript, which is being filed under seal, as Exhibit 1C.

In Richards' mind, and everyone else in the agency, there is no doubt that Richards' daughter had a serious health condition which required Richards to help out and which had multiple components. The plaintiff and his colleagues all worked in an agency servicing persons with mental, emotional as well as physical disabilities and Richards' concerns and discussions about his daughter were obviously well understood by those persons in the agency.

4.    <u>Mattocks had immediate, negative reactions to Richards' request for FMLA leave and terminated him within two months after his request for leave all of which compels an inference of discrimination and retaliation</u>. Exhibit 11 is a memorandum from David Mattocks to Mark Richards dated September 2, 2004, just days after Richards formally requested FMLA leave. Mattocks indicates grave concern about Richards taking intermittent leave. He states: "This [issue over billing] concerns me even more, given the fact that you may be in and out quite a bit due to your [F]MLA." Richards replied to this concern at the bottom of the memo indicating that Mattocks simply did not yet understand the billing system. Mattocks terminated Richards on November 4, 2004.

Several weeks before the termination, Richards and Mattocks discussed Richards' attendance at a morning meeting. Mattocks told Richards he knew that Richards had been missing a lot of work to take care of his daughter. Richards corrected him telling Mattocks that he had <u>not</u> taken a great deal of time off. See Exhibit 1B, pp. 148-151 and 221-225; Exhibit 1A, p. 74-75. Taken together, these two statements reflect that Mattocks immediately jumped to a

conclusion that Richards' productivity would be impaired by his taking leave and evidencing the kind of stereotypical thinking prohibited by the FMLA and the ADA.   Interestingly, on September 16, 2004, the day before Richards received formal approval of his FMLA leave, Mattocks initiated a "promotion" to Richards' assistant, David Avakian, the person he eventually moved into Richards' position.  See Exhibit 12.

5.    Viens spoke negatively of the FMLA.   Viens was an experienced Human Resources professional who knew that Mark Richards was on intermittent FMLA leave to care for his daughter.   Nevertheless, she told him about a situation at her prior employer where an individual was on intermittent FMLA leave and she succeeded in preventing him from taking full-time FMLA leave.  She spoke with some pride about this "accomplishment."   See Exhibit 1B, pp. 148-149.

6.    The plaintiff properly took intermittent leave under the FMLA.  Richards took intermittent family leave.  There is no doubt in his mind that Mattocks knew because they had discussed his daughter's continuing health problems in their regular meetings.  Viens and he also discussed his daughter's continuing problems.  He told Viens that he just wanted his daughter to have a normal senior year in high school like other children.

7.    Mattocks subsequently showed hostility to the FMLA.  See discussion in Part 4 above.

8.    Mattocks singled out Richards' position for elimination and took no other substantive cost-cutting steps.

A.    The Only Manager Chosen.

In his appearance as a 30(b)(6) deponent of River Valley Counseling Center, Jeffrey Kassis testified that he could not remember anyone else that David Mattocks terminated for

financial reasons.  After Richards' termination, he did not believe any other person under a clinical program was terminated.  See Exhibit 4, pp. 14-15.  In his individual capacity, Kassis testified that no one on the clinical side was terminated in the three months before Richards and in the four months after Richards was terminated, two people left for performance issues.  See Exhibit 5, pp. 34-35.

Human Resources Director Donna Viens could not provide the names of any other employees who were terminated on November 4, 2004 or in the last quarter of the year.  While she testified that other positions were eliminated, she testified further that those terminations were related to performance or when the contract that supported the positions ran out.  See Exhibit 10, pp. 61-68.  No program manager submitted a plan on how to cut expenses.  *Id.* at p. 60.

Mattocks could not identify other specific cost savings from reductions in positions.  See Exhibit 3, pp. 13-21.  When pressed to articulate specific cost-cutting measures he took in the October-November time frame, Mattocks came up empty, being only able to describe steps that he admitted were "not overly significant," including taking on some graphic design responsibilities himself.  [The defendants rely heavily on these "not overly significant" measures].  See Exhibit 3, pp. 55-56.  See also Exhibit 13A, Affidavit of Mark Richards, especially ¶ 4.

9.    <u>The defendants could produce not one slip of paper relating to the rationale financial, or otherwise to terminate the plaintiff and/or eliminate his position</u>.  Mattocks could not produce one slip of paper related to the financial or other reasons to terminate the plaintiff and/or eliminate his position.  That is, he did not sit down and calculate anywhere, or send any type of e-mail, report, or document of any sort whatsoever to anyone regarding this decision.  In

fact, while he initially tried to testify this would save in the "$40,000 and $60,000 range," but because he would need to hire others to do some of the work that Avakian would do, the amount he saved by eliminating Mark Richards' position was "probably $20,000 to $30,000." *Id.* at p. 17. See also *Id.* at p. 15 (no document exists concerning the dollars saved by eliminating Mark Richards' position). As the 30(b)(6) deponent, Kassis testified that River Valley had no documents whatsoever relating to the decision to terminate Richards and/or eliminate his position. See Exhibit 4, pp. 12-13. See also Exhibit 13A, Richards Affidavit, ¶ 4.

10. <u>Mattocks new arrangement for filling Richards' position violated public policy in that it violated Massachusetts regulations</u>. According to the Regulations of the Commonwealth of Massachusetts, the Psychiatric Day Treatment Program needed a full-time Program Administrator who met certain qualifications. See generally, Exhibit 13. Once Mattocks told Richards he was being terminated, Richards immediately stated that by replacing him with Avakian and Kassis, the Agency would not be in compliance with the Regulations. Essentially, this would mean that all the Medicare and Medicaid money paid to the Agency would need to be forfeited. See generally, Exhibit 1, pp. 36, 126, 178-179. Kassis had responsibility for overseeing numerous programs and never devoted more than 10 or 15% of his time to the Program, a direct violations of the Regulations. Kassis also did not meet the experience requirements of the Regulations. See generally, Exhibit 5, pp. 6 to 15.

11. <u>Mattocks turned a deliberate blind eye to violation of the Massachusetts regulations</u>. Neither Mattocks, Avakian or Kassis ever called a relevant official at the Commonwealth of Massachusetts to ascertain whether or not replacing Richards with Avakian and Kassis complied with the Regulations. They called the trade association and other private

agencies, but not the regulators.  See generally, Exhibit 3, pp. 30-36; Exhibit 5; and Exhibit 14,

Deposition of David Avakian.  No one consulted an attorney.

12.    Mattocks' professional fraud and personal health and financial issues make his

testimony particularly unworthy of belief at the summary judgment stage.    This issue is

addressed in a confidential filing under seal pursuant to an agreement of counsel approved by the

Court.

13.    Valley Health Systems' CEO, Hank Porton, and Director of Human Resources,

Mary Kelleher, turned a blind eye to Mattocks' professional fraud compelling a negative

inference.  Neither Porten nor Viens, upon learning of Mattocks' "resume problem," took any

action against him even though integrity in credentialing, especially in the health care field, is

particularly important.    See generally, Exhibit 15, Deposition of Hank Porten; Exhibit 16,

Deposition of Kelleher, pp. 23 to 24.    Kassis, of course, testified that integrity in the

credentialing process is important.  See Exhibit 5, pp. 46 to 47.

14.    Mattocks replaced Richards in part with David Avakian, a substantially younger

person who was treated better than the plaintiff.  In his Answers to Interrogatories, the plaintiff

articulated why he believed his age played an impermissible role in his termination.    See

generally, Exhibit 6, ¶ 16.    While making out a *prima facie* case, Richards has produced

extensive testimony of pretext and Avakian is 9 years younger than him.  Avakian has been

treated consistently better than Richards, including being retained, given a raise and later, after

he left the Agency for a short time, he was hired back by Valley Health Systems.

15.    Valley Health Systems had a high level of control over River Counseling Center,

including control over key personnel and decisions relevant to this case.    The defendant, River

Valley Counseling Center, sets forth the close relationship in considerable detail in its Statement of Material Facts Not in Dispute.

## III.  ARGUMENT

### A.    The Summary Judgment Standard.

The defendants have correctly set forth the contours of the now familiar standard for summary judgment in the First Circuit.   In employment discrimination cases, Courts are "particularly cautious about granting employers motions for summary judgment when a plaintiff that a *prima facie* case and the issue becomes whether the employer's non-stated non-discriminatory reason is a pretext for discrimination.   See generally, *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 167 (1st Cir. 1998).   The strength of the employee's evidence regarding pretext is often key.   While there is little doubt that an employer, consistent with his business judgment, may eliminate positions during the course of a downsizing without violating discrimination laws, even though those positions are held by members of a protected group, the "flip side of the coin, however, is that an employer who selectively cleans house cannot hide behind convenient euphemisms such as 'downsizing' or 'streamlining'." *Daley v. Wellpoint Health Networks,* 146 F. Supp. 2d 92, 100, *citing, Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 422 (1st Cir. 1996).   In a case where the Court is presented with a "hotly contested credibility dispute" the resolution of which are dependent almost completely on resolution of conflicting depositions and affidavits, summary judgment is particularly inappropriate.   See *Dragonas v. School Comm. of Melrose,* 64 Mass. App. Ct. 429, 443 (2005).

### B.    The Plaintiff Has Presented Sufficient Evidence To Go To Trial On His FMLA Claim.

The First Circuit has recently revisited the requirements for prevailing on a FMLA claim. See *Colburn v. Parker Hanefin,* 429 F.3d 325, 330-332, *citing, Hodgens v. General Dynamics*

*Corp.,* 144 F.3d 151, 159-160 (1ˢᵗ Cir. 1998).  In addition to a claim alleging the deprivation of substantive rights, such as a denial of leave, an employee may also bring suit under the FMLA against an employer under a retaliation theory.  *Colburn, supra,* 429 F.3d at 330-331.  The First Circuit provides that a plaintiff may prove an FMLA claim of retaliation directly or by inference with the ultimate burden of proof remaining on the plaintiff to prove that the employer's adverse employment action was in retaliation for exercise of protected rights.  *Id., citing. Hodgens, supra,* 144 F.3d at 160.  The First Circuit has long held that a plaintiff can use the inferential model of showing intent under a modified version of the *McDonnell Douglas Corp. v. Green* burden shifting framework.  *Colburn v. Parker Hanefin, supra,* 429 F.3d at 335-336.  The essence of a claim of FMLA is whether the respondent acted on the basis of impermissible stereotyping or bias against persons who exercise their rights to FMLA leave.

The plaintiff must prove that he asserted a protected right under the FMLA; that the employer terminated his employment and there is a causal connection between his use of intermittent FMLA leave and the termination of employment.  *Hodgens, supra,* 144 F.3d at 161. The plaintiff easily makes out his *prima facie* case.  By August 30, 2004, the plaintiff had discussed his need to take intermittent leave with the CEO of River Valley Counseling Center, David Mattocks, noting that his daughter had a serious illness, which was about to commence "intensive treatments" which doctors told them "may last between six months and two years." See Statement of Material Issues of Fact in Dispute ¶ 3.  Just three days later, on September 2, 2004, Mattocks indicates grave concerns about Richards taking intermittent leave in a memo, Exhibit 11, in which he says:  "This [issue over billing] concerns me even more, given the fact that you may be in and out quite a bit due to your [F]MLA."  At the summary judgment stage, the Court is entitled to draw most negative inference from this comment.  Almost immediately

after being formally notified that Richards wanted to take FMLA leave, Mattocks expressed his grave concern. On September 16, 2004, Mattocks approved the "promotion" to Richards' assistant, David Avakian, the person he eventually moved into Richards' position. See Statement of Material Issues of Fact in Dispute ¶ 4. Just several weeks later, Richards and Mattocks discussed Richards' attendance at a morning meeting. Mattocks told Richards he knew Richards had been missing a lot of work to take care of his daughter. Richards corrected him telling Mattocks he had not taken a great deal of time off. Richards also testified that Mattocks appeared more hostile to him thereafter. Clearly, the amount of time that Richards might be taking weighed on Mattocks' mind and evidenced the kind of stereotypical thinking prohibited by the FMLA. Close temporal proximity between protected conducted and an adverse act may give rise to an inference of causal connection. *Hodgens v. General Dynamics Corp, supra.,* 144 F.3d at 168.

The burden then shifts to the plaintiff to show pretext. The plaintiff has particularly strong evidence of pretext. First, the employer's proffered explanation is unworthy of credence. See generally *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S.. 133, 143, 120 S. Ct. 2097 (2000). See generally Statement of Material Issues of Fact in Dispute ¶¶ 8-12. While the defendants proffer a financial reason for terminating Richards, Richards was the first and only employee similarly situated selected. Indeed, the defendants' representatives could not testify to others whose positions were terminated in the months before or after Richards, other than a few people who were terminated for cause and some people who lost their position when their contract expired in June, 2005. When pressed to articulate specific cost cutting measures he took in that time frame, Mattocks was only able to describe steps that he admitted "were not overly

significant."   Why would an agency terminate the manager of its top financial performing program?  See Statement of Material Issues of Fact in Dispute ¶ 2.

The Court should focus on the language Mattocks and Kassis used to describe Richards' performance.  The program Richards ran was "the revenue *leader* of all the many aspects of River Valley's programs" meaning that "they brought in the higher proportion of revenue versus expenses than probably *any other operating unit*."  (Emphasis supplied).  Kassis called Richards' program "a very high performer" and stated he was in the upper 20% of managers who provided accurate and timely financial information.

A legitimate reduction in force would have at least one piece of paper, even figures scribbled on a napkin, relating to the rationale, financial or otherwise, for a decision to terminate someone with 16 years of service.  Yet, the defendants could not produce one such slip of paper.  See Statement of Material Issues of Fact in Dispute ¶ 9.  In fact, Mattocks had to admit that savings would not be in the $40,000-$60,000 range but probably $20,000 to $30,000.  See Statement of Material Issues of Fact in Dispute ¶ 9.

Finally, according to the Regulations of the Commonwealth of Massachusetts, the partial day treatment program needed a full time program administrator which it did not have.  Thus removing Mark Richards placed the agency at risk for committing Medicare and Medicaid fraud.  See Statement of Material Issues of Fact in Dispute ¶¶ 10-12.  The defendants' position relies almost exclusively on the testimony of Mattocks inasmuch as it has not one piece of paper supporting its cost cutting rationale for selecting Richards as the only manager to terminate.  In such a case, the Court should allow a jury to resolve the dispute.  See *Dragonas v. School Comm. of Melrose, supra,* 64 Mass. App. Ct. at 690-691.

Valley Health Systems, Inc., Donna Viens, River Valley Counseling Center and Mattocks are all persons who acted, either "directly or indirectly" in the interest of the employer, River Valley Counseling Center, in relation to any of the employees such as Mark Richards. Valley Health Systems is the parent of River Valley Counseling Center. Mattocks reported to Hank Porton, the CEO of Valley Health Systems, and Mary Kelliher, the top Human Resources person in Valley Health Systems, provided advice on the termination. The defendant, Mattocks, claim that the defendant, Viens, was responsible for matters relating to the FMLA. In Richards' Affidavit, he states that it was the CEO, Mattocks', responsibility for approving FMLA leave. This conflict should be resolved at trial.

C.    **The Plaintiff's Claim Of Handicap Association Discrimination Under The ADA Should Be Resolved By A Jury As Well As The Americans With Disabilities Acts Protects Employees From Being Terminated Because Of Their Association With A Person With A Disability, Such As A Daughter.**

Pursuant to 42 U.S.C. § 12112(b)(4), an employer may not exclude or otherwise deny equal jobs or benefits to a qualified individual because of the "known disability of an individual with whom the qualified individual is known to have a relationship or association." This section is intended to protect qualified individuals from adverse job actions based on "unfounded stereotypes and assumptions" arising from the employee's relationship with a particular disabled persons. *Baker v. International Paper Co.,* 993 F. Supp. 10, 15 (D. Me. 1998). The plaintiff's claim of a disability association discrimination is simply the flip side of the FMLA coin. Applying the same burden shifting analysis, the plaintiff has clearly met his *prima facie* case. The only difference being whether the plaintiff's daughter actually had a disability within the meaning of the ADA. The plaintiff's detailed explanation set forth in the confidential transcript of his deposition filed under seal as well as his statement of his daughter's physician also filed under seal clearly show that she had a disability. Mattocks' blunt comment in his September 2,

2004 memo being concerned about the amount of time Richards was going to take off to take care of his daughter apply with equal force in his ADA claim.  Mattocks' later negative comments about the amount of time that he was taking off to care for his daughter solidified the inference that the disability of his daughter was a determining factor in Mattocks' decision to terminate him and only him.

It is clear from the deposition of Mary Kelliher, Senior Vice President of Human Resources for VHS and all associated entities, including River Valley, that she knew before Richards was terminated that Richards was on leave to take care of his seriously ill daughter.

The plaintiff has supplied sufficient evidence to show that VHS, River Valley, Viens and Mattocks were agents of Richards' employer for purposes of individual liability under the ADA.

**D.**     **The Plaintiff's Claim Of Handicap Association Discrimination Under M.G.L. c. 151B Should Proceed.**

Although a close issue, there has not been a definitive determination under Massachusetts state law as to whether such a claim of association discrimination under M.G.L. c. 151B exists. Counsel for defendant, Mattocks correctly points out that in an unpublished opinion, *Healy v. Brigham & Woman's Hospital, Inc.,* 2005 WL 2456211 (Mass. App. Ct. 2005), the Appeals Court accepted for purposes of citing emotion that there was such a association discrimination claim under M.G.L. c. 151B.  The MCAD refused to dismiss a Charge of Discrimination on the grounds that the individual had no standing to bring a discrimination complaint on the grounds that her husband had Lupus.  *Dittbenner v. Hapco Auto Parts, Inc.,* 1113 Mass. Discrim. L. Rptr. 1139, 1140-1141 (1989).

**E.**     **The Plaintiff Has Produced Sufficient Evidence Of Age Discrimination, Particularly In Light Of The Strong Evidence Of Pretext.**

The plaintiff articulated sufficient facts to make out both a *prima facie* case of discrimination and demonstrate pretext.  See generally, Statement of Material Issues of Fact in

Dispute ¶¶ 1, 2, 8-11, 13 and 14.  The defendants replaced the plaintiff in large part with David Avakian, an individual nine years younger than the plaintiff.  Avakian had been treated consistently better than Richards including being retained, given raise and later, after he left the agency for a short term, hired back by an affiliated organization.

What should tip this Court into allowing the age discrimination case to go forward is the extent of the defendants' cover up.  The essence of a pretext is an explanation that is unworthy of belief and that "covers up" a discriminatory or untoward reason.  In this case, the defendants baldly assert that their termination of Richards was part of some overall reduction in force.  Yet when pressed repeatedly to produce a single piece of paper evidencing such reduction in force or to identify any remotely similarly situated individual selected for termination, either before or after Richards, the defendants gave one implausible and incredible explanation after another.  The depth of this deception should weigh in favor of the plaintiff.  That, coupled with the utter lack of credibility of the chief decision maker, David Mattocks, for the reasons set forth in the confidential portion of this Memorandum, make summary judgment on the age discrimination counts particularly inappropriate.

As the defendants correctly identify, aiding and abetting liability can be found under M.G.L. c. 151B.  The plaintiffs have pled and proven that each of the defendants have aided and abetted the legal age discrimination directed to the plaintiff.

## IV.  CONCLUSION

The defendants terminated the plaintiff three days before he underwent an operation for skin cancer.  After considerable discovery, the plaintiff chose not to proceed on that theory of recovery, choosing to go with the well supported theories of discrimination and retaliation under the FMLA, the ADA and M.G.L. c. 151B.

452612

David Mattocks is no ordinary decision maker.  He, assisted by the other defendants, retaliated against and discriminated against Mark Richards who needed a modest amount of time off to care for his seriously ill daughter while his wife continued to work.  This Court should allow a jury to decide his case.

<div style="margin-left:40%">

THE PLAINTIFF
MARK A. RICHARDS

By____*/s/ John C. Sikorski*_____
John C. Sikorski, Esq., of
Robinson Donovan, P.C.
1500 Main Street,  Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO No.:  461970
jsikorski@robinson-donovan.com
</div>

<div style="text-align:center">

CERTIFICATE OF SERVICE
</div>

I, John C. Sikorski, Esq., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 7, 2006.

Subscribed under the penalties of perjury.

<div style="margin-left:40%">

_____*/s/ John C. Sikorski*_____
John C. Sikorski, Esq.
</div>

452612

1

VOLUME 1

PAGES 1 - 136

EXHS. 1 - 18

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * *

Mark A. Richards                          *

v.                                        *   Civil Action

River Valley Counseling Center,           *   No. 05-30061

Inc., Valley Health Systems, Inc.,        *      MAP

David G. Mattocks, and Donna Viens        *

* * * * * * * * * * * * * * * * * *

MAY - 8, 2006

Deposition of Mark A. Richards

Thursday, February 2, 2006

Bulkley Richardson and Gelinas, LLP

1500 Main Street - Suite 2700

Springfield, Massachusetts 01115


- - - - - - - - -    J. EDWARD VARALLO, RMR, CRR    - - - - - - - - - -

COURT REPORTER

PERLIK and COYLE REPORTING, SPRINGFIELD, MASS.

413.731.7931

Mark A. Richards
February 2, 2006

(Pages 2 to 5)

**2**

Counsel for Plaintiff:
   John C. Sikorski, Esq.
   Robinson Donovan, P.C.
   1500 Main Street - Suite 1600
   Springfield, Massachusetts 01115
   413.732.2301 Fax 413.785.4658
   jsikorski@robinson-donovan.com

Counsel for Defendants River Valley Counseling
Center, Inc., Valley Health Systems, Inc., and
Donna Viens:
   Mary J. Kennedy, Esq.
   Bulkley Richardson and Gelinas, LLP
   1500 Main Street - Suite 2700
   Springfield, Massachusetts 01115-5507
   413.781.2820 Fax 413.785.5060
   mkennedy@bulkley.com

Counsel for Defendant David G. Mattocks:
   Marylou Varao Fabbo, Esq.
   Skoler Abbott & Presser, P.C.
   One Monarch Place
   1414 Main Street - Suite 2000
   Springfield, Massachusetts 01144
   413.737.4753  Fax 413.787.1941
   mfabbo@skoler-abbott.com

**3**

--------------------------------------------------
MORNING SESSION
10:12 a.m.
--------------------------------------------------

MARK A. RICHARDS,
 having been first duly sworn on oath,
was examined and testified as follows:
EXAMINATION
BY MS. KENNEDY:
   Q.   Could you please state your full name for
the record.
   A.   Mark, M-a-r-k, Richards, R-i-c-h-a-r-d-s.
   Q.   Mr. Richards, my name, as you know, is
Mary Kennedy and I represent the defendants River
Valley Counseling Center, Inc., Valley Health
Systems, Inc. and Donna Viens. I'm going to be
asking you some questions today about your
employment at River Valley Counseling Center; and if
at any time you don't understand my question, please
let me know and I would be happy to rephrase the
question.
   A.   Mm-hmm.
   Q.   Also if at any time you would like to take
a break for any reason, to get something to drink,

**4**

 1   to use the restroom or to confer with your counsel,
 2   just let us know and we can accommodate you there as
 3   well.
 4     A.   (Witness nodded.)
 5          MR. SIKORSKI:  You have to answer yes or
 6   no.
 7     A.   Yes.
 8     Q.   And that moves right to the next
 9   suggestion, which is that since we have a
10   stenographer here, you need to let me complete my
11   question before you attempt to answer the question
12   so that the stenographer can accurately take down my
13   question and then your answer to the question.
14     A.   All right.
15     Q.   And the second suggestion is that you need
16   to respond verbally to the questions because the
17   stenographer cannot take down a shake or nod of the
18   head. Do you understand that?
19     A.   Yes.
20     Q.   Okay, great.  Where do you live,
21   Mr. Richards?
22     A.   19 Lyman Road, Chester, Massachusetts.
23     Q.   And with whom do you live there?
24     A.   With my wife and periodically with my

**5**

 1   daughter. She's away at college during the school
 2   year mostly.
 3     Q.   What college is she attending?
 4     A.   Westfield State College.
 5     Q.   And what year is she in at Westfield State
 6   College?
 7     A.   Freshman.
 8     Q.   And what is your date of birth?
 9     A.   July 6, 1950.
10     Q.   And your Social Security number?
11     A.   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.
12     Q.   And I take it you're married?
13     A.   Yes.
14     Q.   And to whom are you married?
15     A.   To Karen Richards.
16     Q.   And how long have you been married to
17   Karen?
18     A.   Thirty-two years.
19          MS. KENNEDY:  Just for the record now, I'm
20   going to mark the protective order.
21          (Richards Deposition Exhibit 1 marked for
22   identification.)
23   BY MS. KENNEDY:
24     Q.   Mr. Richards, I'm just going to show you

2

**6**

1 what's been marked as Exhibit 1. I can represent to
2 you that that's a copy of the protective order
3 entered into in this case.
4    A.  Yes, this concerns the confidential nature
5 of the case.
6    Q.  Yes, thank you.
7      Can you tell us a little bit about your
8 background, where you were born and raised?
9    A.  I was born in Syracuse, New York, raised
10 in Syracuse, attended schools there, including
11 undergraduate school at Syracuse University.
12    Q.  When did you attend Syracuse University?
13    A.  I attended the beginning of my junior
14 year, 1971, and graduated 1973.
15    Q.  What did you receive when you graduated in
16 1973?
17    A.  A dual B.A. degree in journalism and
18 history.
19    Q.  Where did you attend your freshman and
20 sophomore years of college?
21    A.  Onondaga Community College in Syracuse.
22    Q.  Could you spell the name of the college,
23 please?
24    A.  O-n-o-n-d-a-g-a.

**7**

1    Q.  And could you say that again?
2    A.  Onondaga.
3    Q.  Thank you.
4      And where is that college located?
5    A.  In Syracuse.
6      MR. SIKORSKI: That's the county too,
7 Onondaga?
8      THE WITNESS: That's the county, yes.
9 That's the county that Syracuse is located in.
10 BY MS. KENNEDY:
11    Q.  Have you continued on with your education
12 at any time after receiving your dual degree back in
13 1973?
14    A.  Yes, I have.
15    Q.  And where did you attend?
16    A.  I went to the University of Connecticut
17 School of Social Work in West Hartford, Connecticut.
18    Q.  What years did you attend the University
19 of Connecticut School of Social Work?
20    A.  I started around 1983, perhaps late 1982,
21 going part time and I finished up in 1986.
22    Q.  And what degree did you receive when you
23 completed that program?
24    A.  Master of social work.

**8**

1    Q.  Do you hold a license as a social worker?
2    A.  Yes, I do.
3    Q.  And from what states do you hold a
4 license?
5    A.  Massachusetts.
6    Q.  How long have you held a license as a
7 social worker?
8    A.  I'd have to look that up, but it was
9 around the late '80s that I got my license. Well, I
10 originally was licensed as an LCSW, a licensed
11 certified social worker, and I held that from about
12 1987. And about two years after that I obtained my
13 licensed independent clinical social worker license,
14 which I continue to hold.
15    Q.  Can you explain the difference between an
16 LCSW and an LISW?
17    A.  LCSW means you have graduated from your
18 social work program and have accomplished two years
19 of internship but are not qualified for your LICSW
20 until you have two years' postgraduate experience
21 under proper supervision and have successfully
22 completed the licensing exam.
23    Q.  Is there a separate exam for an LCSW?
24    A.  Yes, there is.

**9**

1    Q.  Do you recall what year you took the LCSW
2 exam?
3    A.  I believe it was 1987.
4    Q.  And did you pass that on the first time?
5    A.  Yes.
6    Q.  And when do you recall taking the LISW
7 exam?
8    A.  The LICSW exam --
9    Q.  Thank you.
10    A.  -- was, as best I can remember, about two
11 years after that. But I could look that up.
12 Actually, that should be on-line.
13    Q.  And did you pass that exam on the first
14 try?
15    A.  Yes.
16    Q.  Has your license as a clinical social
17 worker ever been suspended or revoked?
18    A.  No.
19    Q.  Where did you do your two years of
20 internship?
21    A.  My first year was at the Westfield Family
22 Counseling Agency and that was in Westfield,
23 Massachusetts, and my second year was with the
24 Veterans Administration in Leeds, Massachusetts.

(Pages 10 to 13)

10

```
 1    Q.   Other than your license as a clinical
 2 social worker, do you hold any other certifications
 3 or professional licenses?
 4    A.   No.
 5         (Richards Deposition Exhibit 2 marked for
 6 identification.)
 7         (Attorney/client conference)
 8    A.   Can I add to that?
 9    Q.   Sure.
10    A.   I have had trainings and they award what
11 they call a certification.  So, various trainings,
12 you're awarded a certification after the training.
13 For example, as a mediator, I've been certified as a
14 crisis intervention counselor.
15    Q.   When did you become certified as a
16 mediator?
17    A.   It was back in the 1980s, late 1980s,
18 middle to late 1980s.
19    Q.   Have you worked professionally as a
20 mediator?
21    A.   I did volunteer work as a mediator.
22    Q.   And where was that?
23    A.   In Springfield, Mass.
24    Q.   What in Springfield were you volunteering
```

11

```
 1 to be a mediator for?
 2    A.   It was at the Springfield Mediation
 3 Project.  It was associated with the courts here in
 4 Springfield.
 5    Q.   And you I believe just testified a few
 6 moments ago that you were also certified as a
 7 counselor in --
 8    A.   Crisis intervention.
 9    Q.   Crisis intervention, okay.  And when did
10 you become certified as a counselor in crisis
11 intervention?
12    A.   That was about five years ago.
13    Q.   And have you worked professionally using
14 that certification?
15    A.   I've done volunteer work.
16    Q.   Could you describe for us the volunteer
17 work that you've done that required your
18 certification in crisis intervention?
19    A.   It was this past September in Louisiana
20 with the American Red Cross.
21    Q.   Mr. Richards, I'm showing you what's been
22 marked as Exhibit 2 to your deposition.  Is that a
23 copy of your resume?
24    A.   Yes.
```

12

```
 1    Q.   Do you recall when you drafted this
 2 resume, a copy of which has been marked as Exhibit
 3 2?
 4    A.   I drafted this, well, different parts have
 5 been drafted at different times but I put it
 6 together for Mr. Sikorski and sent it to him within
 7 the past week.
 8         (Richards Deposition Exhibit 3 marked for
 9 identification.)
10 BY MS. KENNEDY:
11    Q.   Mr. Richards, what has been put in front
12 of you is another deposition exhibit which has been
13 marked as Exhibit 3.  Would you please identify what
14 that copy of the document is?
15    A.   This is a copy of my resume; it was an
16 older version.
17    Q.   Can you tell by looking at it when that
18 resume is from, what year?
19    A.   Well, the latest thing says June '89 to
20 present, and I'm not sure when the present was;
21 there's no date on it.  So.... But it doesn't speak
22 of my experience at River Valley Counseling; it
23 lists one of the predecessor organizations.  So it
24 does talk about Crossroads, which became River
```

13

```
 1 Valley Counseling.  It does mention Crossroads
 2 Community Growth Center, which prior to that was
 3 Johnson Life Center, or at least I was with Johnson
 4 Life Center, and later became --
 5         MR. SIKORSKI:  The question is what's the
 6 date.
 7         THE WITNESS:  Okay, I'm sorry.
 8 BY MS. KENNEDY:
 9    Q.   Mr. Richards, you have a very soft voice
10 and we also have a fan in here; and second to you,
11 Mr. Richards, the second most important person in
12 this room is the stenographer and he needs to hear
13 you clearly, so if you could please keep your voice
14 up.
15    A.   All right.
16    Q.   Just so I understand your testimony,
17 Mr. Richards, putting the resume that has been
18 marked as Exhibit 2 in front of you again, you
19 believe that your last edits on that were
20 approximately last week?
21    A.   Well, I added a piece last week, this
22 third page.  But the last time I wrote something on
23 this was prior to that.
24    Q.   I guess that's what I'm looking for:  When
```

4

14

1 did you edit the resume portion of this document?
2    A.   A few months ago; several months ago.
3    Q.   Do you recall the circumstances of why you
4 edited your resume at that time?
5    A.   To send it out to businesses for
6 employment.
7    Q.   Is your wife, Karen, employed outside of
8 the home?
9    A.   Yes.
10    Q.   And where does she work?
11    A.   She's at the Granby Connecticut School
12 District.
13    Q.   And how long has she held that position?
14    A.   I'm not exactly sure.  She's moved from
15 different districts, but about ten years or more.
16    Q.   She's been employed in the school district
17 for approximately ten years?
18    A.   I would have to check with her for the
19 exact date, yes, the exact year.
20    Q.   Has she worked out of the home, had a job
21 outside of the home for over ten years?
22    A.   Yes.
23    Q.   Okay.  After receiving your LCSW, could
24 you please describe your employment history up until

15

1 your position at River Valley Counseling Center?
2    A.   I was with the Key Program in Springfield,
3 the western part of the state, the Pioneer Valley
4 region.
5    Q.   And what did you do for the Key Program?
6    A.   I worked first part time as a supervisor
7 with them and then I was later moved to full time
8 and worked for them doing much the same thing but as
9 well as directing the clinical part of the program
10 in the Pioneer Valley region.
11    Q.   Could you explain what is the Key Program
12 and what services they were providing?
13    A.   Yes.  The Key Program is an adolescent
14 human service agency or the human service agency
15 that deals with adolescents and also their families.
16 They have a variety of programs and focuses,
17 including tracking individuals who have been
18 adjudicated by the courts as delinquent, as well as
19 adolescents who have been adjudicated to work with
20 the Department of Social Services.
21    Q.   Did you work as a licensed social worker
22 for the Key Program?
23    A.   Yes.
24    Q.   How long were you employed at the Key

16

1 Program?
2    A.   Well, I started in 1987, '86, '87, and
3 then worked until '88.  About two years.
4    Q.   And why did you leave the Key Program in
5 1988?
6    A.   I left the Key Program to work with the
7 Johnson Life Center.
8    Q.   Was it your decision to leave the Key
9 Program?
10    A.   It was a downsizing that happened at that
11 time.
12    Q.   When you say a downsizing, was your
13 position eliminated at the Key Program?
14    A.   Yes.
15    Q.   Were any other positions eliminated at
16 that same time that your position was eliminated?
17    A.   I believe so.  I'm not -- I don't recall.
18    Q.   Were you offered any severance from the
19 position when you were downsized at the Key Program?
20    A.   No.
21    Q.   And what was your next employment after
22 leaving the Key Program?
23    A.   At the Johnson Life Center in Springfield.
24    Q.   And was there any period of time that you

17

1 were out of work between leaving the Key Program and
2 going to the Johnson Life Center?
3    A.   No.
4    Q.   And what did you do for the Johnson Life
5 Center?
6    A.   I worked in the day treatment program
7 there, at first as the clinical director and then
8 later as the program director.
9    Q.   And how long did you work at the Johnson
10 Life Center?
11    A.   The Johnson Life Center day treatment
12 program became Crossroads and I would have to check
13 but it was about the late '80s that that happened to
14 early '90s.
15    Q.   I'll put your resume that's been marked as
16 Exhibit 2 back in front of you.  Perhaps that can
17 assist you as to how long you were at the Johnson
18 Life Center day treatment program.
19    A.   Well, this doesn't mention -- This resume
20 doesn't mention the Johnson Life Center.
21    Q.   Perhaps on the second page?
22    A.   Okay, I'm sorry.  (Pause)  Well, '88 to
23 June '89 I was the clinical director.  It was after
24 '89 that the Johnson Life Center became Crossroads

---

**18**

1 Community Growth Center.
2    Q.  Where was the Johnson Life Center day
3 treatment program located?
4    A.  It was on State Street in Springfield.
5    Q.  And just so I understand your testimony,
6 at some point the Johnson Life Center day treatment
7 program became part of another agency?
8    A.  Yes, it did.
9    Q.  And was that agency called Crossroads
10 Community Growth Center?
11    A.  Yes.
12    Q.  And did the name of the day treatment
13 program or the center change from Johnson Life
14 Center's day treatment program to something else?
15    A.  Yes, it was changed to Highland Center.
16    Q.  And it still remained located at what
17 location in Springfield?
18    A.  At the same location on State Street.
19    Q.  And what position did you hold at the
20 Highland Day Treatment Center?
21    A.  I was the director of the program.
22    Q.  And what was the program that you were the
23 director of?
24    A.  It was the psychiatric day treatment and

---

**19**

1 outpatient counseling services. There was a
2 medication clinic and we had partial
3 hospitalization.
4    Q.  Could you explain what partial
5 hospitalization is?
6    A.  Partial hospitalization is a program for
7 adults, in this case, who have a serious mental
8 illness, are at risk of going in the hospital or
9 have been in the hospital for a psychiatric illness
10 and are in this program to prevent them from going
11 into the hospital.
12    Q.  And how long were you the director of the
13 Highland day treatment program?
14    A.  That program closed in about 1997, I
15 believe.
16    Q.  Was the program still with Crossroads
17 Community Growth Center?
18    A.  No, because Crossroads Community Growth
19 Center became River Valley Counseling Center.
20    Q.  Do you recall when Crossroads Community
21 Growth Center became River Valley Counseling Center?
22    A.  I don't recall the exact date. It was in
23 the early '90s, I believe.
24    Q.  You may have answered this question; I

---

**20**

1 apologize. But at some point did you stop being the
2 director of the Highland day treatment program?
3    A.  No. I remained in the position through
4 the transition to the River Valley Counseling
5 Center.
6    Q.  And River Valley Counseling Center, Inc.
7 then became your employer at some point in the early
8 '90s?
9    A.  Yes.
10    Q.  And at that point in time you were still
11 the director of the Highland day treatment program.
12 Is that correct?
13    A.  That's correct.
14    Q.  Okay. At some point did your position
15 change at River Valley Counseling Center?
16    A.  Yes. I was asked to take over the
17 director's position of the Crossroads day treatment
18 program, which was at the time with River Valley
19 Counseling Center.
20    Q.  And where was that day treatment program
21 located?
22    A.  That was on Elm Street in Holyoke.
23    Q.  Had that been an existing day treatment
24 program at Holyoke?

---

**21**

1    A.  Yes.
2    Q.  And was there a prior program director
3 before you?
4    A.  Yes.
5    Q.  Who was that?
6    A.  That was Phyllis Boothroyd.
7    Q.  And what happened to Phyllis Boothroyd
8 when you took over the position as director of the
9 day treatment program?
10    A.  Her position was eliminated and I took
11 over her position.
12    Q.  Did her employment end with River Valley?
13    A.  Yes.
14    Q.  Do you recall what year it was that you
15 took over as the director of the day treatment
16 program in Holyoke?
17    A.  I believe it was 1998.
18    Q.  Did you have at that time any
19 understanding as to why -- Strike that. What
20 happened to the Highland day treatment program?
21    A.  It continued for a year.
22    Q.  And then what happened after a year?
23    A.  It was closed.
24    Q.  When you --

---

6

```
                                                            22
1     A.   Well, River Valley closed it for their
2   agency but it continued under another organization.
3     Q.   So at some point River Valley Counseling
4   Center, Inc. stopped having the day treatment
5   program in Springfield?
6     A.   Yes.
7     Q.   And what organization then took that day
8   treatment program over?
9     A.   That was the Center for Human Development.
10    Q.   And is that an entity that is unrelated to
11  River Valley Counseling Center?
12    A.   Yes.
13    Q.   And when you moved over from the director
14  of the Highland day treatment program to the
15  director of the day treatment program at Holyoke,
16  had the decision been made about River Valley no
17  longer operating that program in the upcoming year?
18    A.   No.
19    Q.   Why was it that you moved at that point,
20  in approximately 1988, from the Springfield day
21  treatment program to the Holyoke day treatment
22  program?
23    A.   River Valley was having financial
24  difficulties; it wasn't clear whether they would be
```

```
                                                            24
1   of financial difficulties; there were several, some
2   more severe than other times.  I remember my own
3   program was always doing very well, always making a
4   profit, and most of that time I remember that River
5   Valley was doing well financially through those
6   years up till '97.
7     Q.   When were the financial difficulties that
8   you recall that River Valley had, what years?  You
9   said they had them at various times, some more
10  severe than others.  Can you tell us with more
11  specifics as to the years when your memory is of the
12  financial problems of River Valley?
13    A.   That time that I took over the program at
14  Crossroads in Holyoke, about 1998, that was a very
15  difficult time financially for the agency.
16    Q.   Any other periods of time during your
17  years of employment at River Valley that you had an
18  understanding that River Valley had financial
19  difficulties?
20    A.   From that time on it was fairly regular,
21  up until about the early 2000s.
22    Q.   So for a period of time you were the
23  director of both the Springfield and the Holyoke day
24  treatment programs.  Is that correct?
```

```
                                                            23
1   able to survive the financial difficulties and they
2   were looking for ways to cut their costs in order to
3   survive.
4     Q.   Did River Valley Counseling Center have
5   financial difficulties prior to 1998 while you were
6   employed at River Valley?  That's a terrible
7   question.  Strike that.
8         You testified a few moments ago that you
9   started working for River Valley in the early '90s.
10  Is that correct?
11    A.   Yes.
12    Q.   And then I believe you just testified that
13  you believe you moved from the director of the
14  Springfield day treatment program in approximately
15  1998, from Springfield to Holyoke.  Is that correct?
16    A.   No, '97 I moved.
17    Q.   Pardon me.
18    A.   So I was directing both programs for a
19  year.
20    Q.   Using that time frame now of the early
21  '90s up until approximately 1997, what was your
22  understanding about River Valley having any
23  financial difficulties during that time?
24    A.   River Valley had gone through many periods
```

```
                                                            25
1     A.   Yes, for about a year.
2     Q.   And was that in 1998 or 1997?
3     A.   It would have started -- I believe it was
4   up till 1997.  I think 1997 was when the program in
5   Springfield closed.
6     Q.   Just so I understand your testimony, it
7   was in 1996 approximately --
8     A.   Yes.
9     Q.   -- you were the director of both programs,
10  Springfield and Holyoke?
11    A.   Yes, should have been about 1996, yes.
12    Q.   What was your understanding, if you had
13  one, why you were the director of both of those day
14  treatment programs?
15    A.   Because there would be a cost savings by
16  eliminating the redundancy of having two program
17  directors in the agency for day treatment and that
18  under the regulations they could have one director
19  to manage both programs.
20    Q.   What regulations are you referring to?
21    A.   Commonwealth of Massachusetts Medicaid
22  regulations.
23    Q.   And then, if I understand your testimony
24  correctly, sometime around 1997 you became the
```

(Pages 26 to 29)

26

1  director of just the Holyoke day treatment program?
2  A.  Yes.
3  Q.  And that was located on Elm Street?
4  A.  Yes.
5  Q.  How long did you hold that position?
6  A.  Until November 2004.
7  Q.  Just focusing on the late '90s,
8  approximately 1997, do you recall who the executive
9  director or the CEO of River Valley Counseling
10  Center was?
11  A.  Jim Siemianowski.
12  Q.  How long was Mr. Siemianowski, if I've
13  pronounced that correctly, the CEO or executive
14  director of River Valley?
15  A.  Several years.
16  Q.  And then who became the next, if you could
17  just move me up until 2004, who was the next CEO or
18  executive director after Mr. Siemianowski?
19  A.  I believe it was Joyce Toth.
20  Q.  And do you recall how long Ms. Toth -- Do
21  you know how to spell her last name?
22  A.  T-o-t-h.
23  Q.  Do you know how long Ms. Toth was the CEO
24  or executive director?

27

1  A.  For I believe about a year.
2  Q.  And after her, who was the next CEO or
3  executive director?
4  A.  Probably less than a year for Joyce Toth.
5  There was a group of consultants that came in and
6  one of the consultants acted as the executive
7  director from HES.
8  Q.  What does HES stand for?
9  A.  Health Enhancement Services, I believe.
10  Q.  And do you recall the name of the
11  consultant who was acting as the CEO at that time?
12  A.  Dale Harkness.
13  Q.  And after Mr. Harkness, who was next?
14  A.  It would have been Andy Phillips.
15  Q.  And do you know how long Mr. Phillips was
16  the CEO?
17  A.  For several years.
18  Q.  And after Mr. Phillips, who was the next
19  CEO or executive director?
20  A.  There was an acting director, Mary Ann
21  Palmetier; P-o-l-m-i-t-i-e-r, although I think
22  that's wrong.
23  Q.  Can't help you with that one.  And how
24  long was Ms. Palmetier the acting director?

28

1  A.  She was there until Mr. Mattocks began.
2  Q.  When did Mr. Mattocks become the executive
3  director or CEO?
4  A.  In the spring of '04.  Or, he was around,
5  becoming familiar with the place, meeting people.
6  I'm not sure the exact time that he became the
7  official director.  Probably late spring or summer.
8  Q.  When you were director of the day
9  treatment program in Holyoke, who was your immediate
10  supervisor?
11  A.  Well, I had different ones.  When I first
12  became the director it was Jeff Kassis.  That's when
13  the State Street program in Springfield went under
14  the Crossroads organization.
15  Q.  And then at some point Mr. Kassis no
16  longer was your supervisor?
17  A.  Yes.  About a year or two after that when
18  the organization became part of River Valley
19  Counseling I reported directly to the CEO of River
20  Valley, who was John -- it'll come to me.
21  Q.  And I understand that the CEO changed
22  throughout the years while you were the director of
23  the day treatment program, as you've just testified
24  to.

29

1  A.  Yes.
2  Q.  Did you continue to report to the CEO
3  throughout the rest of your employment at River
4  Valley as your immediate supervisor?
5  A.  No.  When Joyce Toth came back she was the
6  director as Crossroads, when Crossroads was the
7  organization my program came under, and when she
8  came back as the River Valley CEO, then I reported
9  back to Jeff Kassis.
10  Q.  What was your understanding why there was
11  a switch in who your immediate supervisor was at
12  that time?
13  A.  It's just internal, the way the CEO wants
14  things to be structured internally within the
15  organization.
16  Q.  And how long was Jeff Kassis your
17  supervisor after Ms. Toth came back?
18  A.  He was my supervisor until sometime during
19  the tenure of Andy Phillips.
20  Q.  And when Andy Phillips was the CEO, at
21  some point during his tenure, did your direct
22  supervisor change?
23  A.  Yes.
24  Q.  And who did it change to?

8

(Pages 30 to 33)

30

1    A.    To Andy Phillips.
2    Q.    And what is your understanding of why your
3  direct supervisor changed back to the CEO at that
4  point?
5    A.    That was something that made more sense;
6  it had been structured that way. I felt that it was
7  a cleaner organizational structure for the tasks
8  that I had.
9    Q.    Did you play any role in the decision to
10  have your supervisor be the CEO?
11    A.    I requested that from Mr. Phillips.
12    Q.    And why did you request that you report
13  directly to the CEO rather than to Mr. Kassis?
14    A.    I felt that it worked better that way at
15  the other times that I reported to the CEO. Most of
16  the time most of the CEOs that were there had it
17  structured that way.
18    Q.    Can you be more specific than your
19  testimony that you felt it worked better? What was
20  it that made it work better?
21    A.    Information that I had to share and
22  decisions that needed to be made didn't have to go
23  through a third party.
24    Q.    And that was Mr. Kassis?

31

1    A.    Yes.
2    Q.    What was Mr. Kassis's title?
3    A.    Clinical director of the agency.
4    Q.    Other than avoiding the sharing of
5  information with a third party to get to the CEO,
6  was there any other reason why you requested that
7  you report directly to the CEO at that time?
8        MR. SIKORSKI: Objection. Go ahead and
9  answer.
10    A.    No.
11    Q.    In November of 2004, how many hours a week
12  did you work?
13    A.    In November of 2004 I was scheduled for 34
14  hours a week.
15    Q.    And what was full time at River Valley
16  Counseling Center?
17    A.    40 hours a week.
18    Q.    And in the past had you had scheduled
19  hours of less than 34 hours?
20    A.    Yes.
21    Q.    And what were they?
22    A.    When the second program that I directed at
23  Springfield was closed or I no longer had
24  responsibility for it, I went from 40 hours to 30

32

1  hours a week.
2    Q.    So that would have been in the late '90s?
3    A.    Yes.
4    Q.    Around '96-97?
5    A.    Yes. '97, yes.
6    Q.    Okay, '97. And was that your decision, to
7  go from 40 to 30 hours?
8    A.    That was my request, yes.
9    Q.    Why did you request going from 40 to 30
10  hours?
11    A.    I had another position that I was working
12  and I felt it would allow me more time to work at
13  that other position.
14    Q.    What was the other position that you had
15  in 1997?
16    A.    I was working with the University of
17  Connecticut as an adjunct faculty.
18    Q.    And how many years did you work as an
19  adjunct facility at the University of Connecticut?
20    A.    About eight.
21    Q.    What department were you working for?
22    A.    Well, I worked for the School of Social
23  Work, the Graduate School of Social Work.
24    Q.    Let me just put your resume in front of

33

1  you. Does that indicate the years that you worked
2  at the School of Social Work at the University of
3  Connecticut?
4    A.    Yes.
5    Q.    In 1997 did you take on more classes to
6  teach at the University of Connecticut?
7    A.    Yes.
8    Q.    And was that the reason why you asked to
9  work 30 hours a week at River Valley Counseling
10  Center?
11    A.    Well, that, and that I didn't have both
12  programs to direct anymore.
13    Q.    At some point did your hours increase from
14  30 hours a week?
15    A.    Yes.
16    Q.    And when was that?
17    A.    That was two or three years after that.
18    Q.    And what did they go up to at that time?
19    A.    They went up to 32 hours.
20    Q.    And what was the reason why your hours
21  went from 30 to 32 hours a week?
22    A.    I had taken on more responsibility; and
23  I was getting requests from my staff to be around
24  more.

Mark A. Richards
February 2, 2006

(Pages 34 to 47)

34

1   Q.   What was the additional responsibility you
2 took on at that time?
3   A.   Went with the DBT program at that time, we
4 were putting in new parts of the program in day
5 treatment.
6   Q.   What is the DBT program?
7   A.   Dialectical behavior therapy, which is an
8 outpatient kind of behavior therapy. It had its own
9 team of outpatient clinicians as well as people that
10 worked in the day treatment program.
11   Q.   And at some point did your hours increase
12 again after the 32 hours a week?
13   A.   Yes.
14   Q.   And when was that?
15   A.   About another two years later, I believe.
16   Q.   What did they go up to?
17   A.   To 34 hours.
18   Q.   And what was the reason why your hours
19 increased from 32 to 34 hours?
20   A.   That was my request, to be able to spend
21 more time in the program, more hands-on work in the
22 program. There were more meetings to go to.
23   Q.   Was there any discussion about you working
24 40 hours a week at that time that it went to 34?

35

1   A.   No. No.
2   Q.   After your hours increased to 34 hours a
3 week, did any of the people that you reported to
4 ever have a discussion with you to go to 40 hours a
5 week?
6   A.   People in my program would like to have me
7 there and not go to meetings, so they were never
8 happy when I was out of the program.
9   Q.   I may not have posed my question artfully.
10 The people that you reported to, was there ever a
11 discussion with you about going to 40 hours a week?
12   A.   No.
13   Q.   At any time after your hours were
14 increased to 34 hours?
15   A.   No.
16   Q.   Did you make a conscious decision to keep
17 your hours at River Valley Counseling Center to 34
18 hours a week?
19   MR. SIKORSKI:  Objection. You can go
20 ahead and answer.
21   A.   Yes, it was a conscious decision. I
22 wanted to be there more time and also I was
23 concerned about the regulations that I wasn't there
24 enough time to meet the regulations requirement.

36

1   Q.   What was your understanding of what the
2 regulations required?
3   A.   Required a full-time director in day
4 treatment. My understanding was full time was about
5 35 hours a week.
6   Q.   Where did you get that understanding from?
7   A.   From other parts of the state.
8   Q.   Did you ever speak with anyone at the
9 Division of Medical Assistance regarding whether
10 your hours were in compliance with the regulations?
11   A.   No.
12   Q.   Now, in 2000 did you go on a medical --
13 Strike that. In 2000 did you request a leave under
14 the Family Medical Leave Act?
15   A.   Yes.
16   Q.   And what was the reason why?
17   A.   Because my daughter was ill.
18   Q.   When did your daughter become ill?
19   MS. KENNEDY:  Actually, right now, if you
20 would like, for the record we can mark this part as
21 subject to the protective order, so that this
22 portion of the transcript would be stamped
23 confidential.
24   (Discussion off the record.)

47

1 BY MS. KENNEDY:
2   Q.   Mr. Richards, what medical conditions have
3 you been diagnosed with?
4   A.   Skin cancer.
5   Q.   Any others?
6   A.   Nothing that was more than a single
7 episode.
8   Q.   When were you first treated for skin
9 cancer?
10   A.   I started having precancerous lesions
11 removed from my face in April of '96.
12   Q.   And who did you seek treatment from in
13 April of '96?
14   A.   New England Dermatology, Dr. Glazer.
15   Q.   And did you continue treating with
16 Dr. Glazer after April of '96?
17   A.   With Dr. Glazer or Dr. Sher, both in the
18 same office, yes.
19   Q.   Mr. Richards, answering the previous
20 question you referred to some notes that are in
21 front of you?
22   A.   Yes.
23   Q.   And what are they?
24   A.   These are notes from the records of the

10

48

1   doctor's office, just the dates and which doctor
2   I saw.
3       Q.   And are they notes just relating to your
4   medical care and treatment?
5       A.   Yes.
6       Q.   Are they relating also to your daughter
7   Leigh's medical care and treatment?
8       A.   Not these.
9       Q.   You have more than one page in front of
10  you.
11      A.   Yes.
12      Q.   Are the other pages all related to your
13  care and treatment?
14      A.   No. I have other notes here about my
15  history.
16      Q.   Your employment history? Your medical
17  history? What history are you referring to?
18      A.   Some of my work history, my daughter's
19  appointments, my time sheet history.
20      Q.   And does that help you when you're looking
21  at that in your testimony here today?
22      A.   For exact dates, yes.
23      MR. SIKORSKI:  Off the record.
24      (Discussion off the record.)

49

1           (In recess 11:32 a.m. to 11:39 a.m.)
2   BY MS. KENNEDY:
3       Q.   At some point did your diagnosis change
4   from precancerous lesions to something else?
5       A.   Yes.
6       Q.   When was that?
7       A.   That was, I'm not sure which visit, but
8   around the early 2000s.
9       Q.   And did you have --
10      A.   I couldn't read the writing of my doctors'
11  notes, so....
12      Q.   Did you in the early 2000s have any
13  surgical procedure done?
14      A.   Yes.
15      Q.   What was that?
16      A.   Well, even the precancerous things would
17  be removed using liquid nitrogen, and that would
18  also be used on some of the cancerous lesions. And
19  in September of 2003 I had a surgery with general
20  anesthesia with Dr. Russolillo at Noble Hospital for
21  a lesion on my cheek.
22      Q.   Which side of your cheek, Mr. Richards?
23      A.   My left cheek.
24      Q.   And after 2003 did you have any other

50

1   treatment for skin cancer?
2       A.   Yes. In August 2004 I had lesions taken
3   off either with a scalpel in the office or liquid
4   nitrogen. And again in November 2004 I had surgery
5   on my face and head at UMass Medical Center done by
6   Dr. Sweeney.
7       Q.   Since November of 2004 have you had any
8   other surgical procedures for skin cancer?
9       A.   Yes. Well, for precancerous since 2004.
10      Q.   And when was that?
11      A.   That was within the past month or two.
12      Q.   In 2006?
13      A.   In 2006, yes.
14      Q.   And what was done?
15      A.   Liquid nitrogen was applied to treat
16  precancerous pieces on top of my head and on my
17  back. I don't have the notes for 2005. I'm sorry.
18  I only took down notes through November of 2004.
19      Q.   And was that treatment that you had a
20  couple months ago at New England Dermatology?
21      A.   Yes.
22      Q.   And when they take a piece of your skin
23  off, do they send that to pathology?
24      A.   In this case, what just happened in the

51

1   past month or so, no, the doctor did not biopsy;
2   just treated it. Decided it didn't need to be
3   biopsied.
4       Q.   When you were at Noble Hospital did they
5   send anything to pathology?
6       A.   Yes.
7       Q.   And what is your understanding of what the
8   pathology report was?
9       A.   That they got all of the cancer in their
10  surgical procedure.
11      Q.   Was it determined to be precancerous?
12      A.   No, I understand it -- No, it was biopsied
13  actually before that and found to be basal cell
14  carcinoma.
15      Q.   What is your understanding of what basal
16  cell carcinoma is?
17      A.   It's a nonlife-threatening skin cancer, or
18  usually nonlife-threatening. It's rare that it
19  becomes life-threatening.
20      Q.   And the first time that you were diagnosed
21  with basal cell carcinoma, was that in 2003?
22      A.   I'm not clear on that. I think I might
23  have had a piece removed in the office prior to
24  2003.

(Pages 52 to 55)

52

1   Q.   And that piece was biopsied?
2   A.   Yes. That's how they determined it was
3   basal cell carcinoma, yes.
4   Q.   Okay. I can suggest that in 1998 your
5   records from New England Dermatology indicate that
6   the pathology report showed basal cell carcinoma
7   from your forehead. Does that refresh your memory?
8   A.   I don't remember it being that far back.
9   But if that's what the records say.
10  Q.   In 2004, in the procedure that was done at
11  UMass, was there a biopsy taken during that
12  procedure?
13  A.   Yes. I believe there was a biopsy done
14  prior to that procedure and they took several
15  biopsies during the procedure.
16  Q.   And what is your understanding of the
17  results of those biopsies?
18  A.   That it was basal cell carcinoma, maybe
19  with some other kind of term to it, I'm not sure,
20  micro or macro something.
21  Q.   Now, with whom at River Valley did you
22  discuss, if anyone, your skin cancer?
23  A.   Staff and also clients who asked. It was
24  rather apparent when I would come back, especially

53

1   from the treatments, and people would ask what
2   happened. Prior to going into appointments, if I
3   was going to be missing work, I would let my second
4   in charge know that I would be out and the reason.
5   And I don't remember who else I might have talked to
6   about it.
7   Q.   Focusing on when you say staff, who are
8   you referring to?
9   A.   Clinical staff and administrative
10  assistant.
11  Q.   Is that the clinical staff of your day
12  treatment program?
13  A.   Yes.
14  Q.   And when you say clinical staff, are you
15  referring to the counselors?
16  A.   Yes.
17  Q.   And then there was an administrative
18  assistant?
19  A.   Yes.
20  Q.   And what was his or her name?
21  A.   Well, I had several throughout the years.
22  Q.   Focusing on in 2003, what was the person's
23  name?
24  A.   I believe Sheileen Lopez was in 2003.

54

1   Q.   And your second in charge you referred to,
2   who is that?
3   A.   David Avakian, the supervisor of the
4   program.
5   Q.   What did you tell David about your medical
6   condition?
7   A.   I told him in more detail that I had skin
8   cancer and that I was having lesions taken off and
9   knew I would have to be out for a whole day; I'm not
10  sure if I needed to be out more than that.
11  Q.   Did you tell him that it had been
12  diagnosed as basal cell carcinoma?
13  A.   I believe I did, yes. I would have said
14  more than just cancer, yes, so that no one thought
15  that it was a life-threatening illness.
16  Q.   Did you tell Mr. Avakian that it wasn't a
17  life-threatening illness at that stage?
18  A.   Well, I think I would have assumed that he
19  knew what basal cell carcinoma was.
20  Q.   When you say it was rather apparent that
21  you were getting treatment, what do you mean by
22  that?
23  A.   These lesions would be taken off with
24  liquid nitrogen applied to the spot on my face and

55

1   head. Sometimes there'd be several at once or a few
2   at once; and as a result of this treatment my skin
3   would become very red and swollen in that area and
4   usually no Band-Aid would be applied.
5   Q.   Focusing on 2004, did you have lesions
6   taken off your head or face in 2004?
7   A.   I believe I had them taken off in August
8   of 2004; and I had surgery in November of 2004.
9   Q.   Did you tell Jeff Kassis about your skin
10  cancer?
11  A.   Not the latest one. I don't remember if
12  I did earlier, but not the one in 2004.
13  Q.   Did you tell him about your treatment in
14  2003 at Noble Hospital?
15  A.   I don't remember. I don't remember
16  speaking with him about it.
17  Q.   Now, when's your recollection of when
18  David Mattocks started as the executive director of
19  River Valley?
20  A.   In the spring and summer of 2004.
21  Q.   Did you ever have any discussions with
22  David Mattocks about your skin cancer?
23  A.   I mentioned it.
24  Q.   When did you mention it to him?

12

**56**

1   A.   Prior to the surgery I was going to be out
2 for.
3   Q.   The surgery in November of 2004?
4   A.   In November of 2004.
5   Q.   What did you tell him at that time?
6   A.   I just mentioned it in one of our meetings
7 that I was going to be out a day to have something
8 taken off my face. I played it down; didn't make a
9 big deal about it.
10   Q.   Did Mr. Mattocks ask you any questions
11 about the procedure?
12   A.   I don't remember.
13   Q.   Did you use the word skin cancer in your
14 conversation with David Mattocks?
15   A.   Yes, I believe I did.
16   Q.   Do you recall anything David Mattocks said
17 to you during that conversation?
18   A.   I don't recall.
19   Q.   Are there any activities that are
20 interfered with as a result of your skin cancer?
21   A.   Going out in the sun is something I have
22 to be careful of, so I need to wear protection from
23 the sun, both a hat and sunblock.
24   Q.   Anything else? Anything else that you

**57**

1 need to do as a result of your diagnosis of skin
2 cancer?
3   A.   No.
4   Q.   The diagnosis of your skin cancer, did it
5 interfere with your ability to do your job as the
6 program director of the day treatment program at
7 River Valley Counseling Center?
8   A.   Only when I would need to be out of work
9 because I was having treatment. And it was
10 unsightly so it made me self-conscious.
11   Q.   When you say unsightly, what do you mean?
12   A.   There were red spots that could flare up
13 and look as if I had sores on my face that people
14 would probably wonder about. They were there most
15 of the time. This is actually the best my face has
16 looked in a long time. I had a large blotch for
17 years up on my forehead and other spots across my
18 face.
19   Q.   Were you embarrassed by the spots on your
20 face?
21   A.   Well, I was used to it, but I would worry
22 about how it would appear to people I was
23 counseling, other professionals, whether it was
24 distracting for them.

**58**

1   Q.   You just testified that you were worried
2 that it would be distracting?
3   A.   I would worry that someone might be
4 distracted by it and not pay attention to what was
5 being said and so forth.
6   Q.   Are you aware that it actually caused any
7 distraction in your counseling of patients in the
8 day treatment program?
9   A.   Sometimes people would make mention of it.
10   Q.   Other than making mention of it, any other
11 concerns that you had that they were being
12 distracted in their counseling?
13   A.   No. Only when people would mention it
14 would I know that they were actually distracted. I
15 would not bring attention to it myself and ask them
16 if they were distracted.
17   Q.   What is your current prognosis for your
18 skin cancer?
19   A.   Continue to be seen every six months by
20 the dermatologist, have the pieces that are
21 precancerous removed and when it looks like cancer,
22 to be biopsied and procedures done then to remove
23 it.
24   Q.   Were you involved in the decision to hire

**59**

1 David Mattocks as the executive director?
2   A.   No.
3   Q.   I believe you testified earlier that you
4 recall him being present in the spring of 2004?
5   A.   Yes, I recall him coming in early prior to
6 his starting, to meet people and get the lay of the
7 land there.
8   Q.   When do you recall his start date was?
9   A.   I don't recall.
10     (Richards Deposition Exhibit 6 marked for
11 identification.)
12 BY MS. KENNEDY:
13   Q.   I put what's been marked as Exhibit 6 in
14 front of you. Could you identify what that is,
15 please?
16   A.   That is the site of the procedure that was
17 done by Dr. Russolillo in September of 2003; and
18 that's the left cheek of my face.
19   Q.   And is that a picture taken by your
20 physician?
21   A.   That's a picture taken by my wife.
22   Q.   What was the reason why your wife took
23 that picture, if you know?
24   A.   We were worried about the way that was

(Pages 60 to 63)

**60**

1 looking. The sutures kept breaking open and I would
2 go back to the doctor and he'd treat it and things
3 didn't seem to be getting better, so we took that
4 with a digital camera to send it via e-mail to my
5 sister who's a nurse and have her take a look.
6    Q. Now, you said this was in 2003 at Noble
7 Hospital?
8    A. That's the one from 2003 at Noble
9 Hospital, yes.
10    Q. And was David Mattocks at River Valley
11 Counseling Center in 2003?
12    A. No.
13    Q. At the time Mr. Mattocks came to work at
14 River Valley, did your face still have an open wound
15 from the procedure done in 2003?
16    A. No, it didn't. It had closed up by the
17 time he came.
18    Q. Was there a scar on your face?
19    A. Yes, there was a reddish scar that
20 continues to improve.
21    Q. And you still have that scar today on the
22 left side of your cheek?
23    A. Yes, I do.
24    Q. I may have asked you this and I'm sorry.

**61**

1 When did Mr. Mattocks start working as the executive
2 director?
3    MR. SIKORSKI: You did ask him that, but
4 you can ask him again.
5    A. In the spring and summer I remember him
6 being around and starting. I'm not sure of his
7 exact start date.
8    Q. At some point instead of just being around
9 and meeting people, did he actually start working as
10 the executive director?
11    A. Yes.
12    Q. Do you have any recollection of when that
13 was?
14    A. No. I don't remember.
15    Q. Did you take a summer vacation in 2004?
16    A. Yes.
17    Q. And when was that?
18    A. I'd have to look at my book to know, or my
19 time sheets.
20    Q. Did you also keep a diary or a daybook?
21    A. I kept a daybook.
22    (Richards Deposition Exhibit 7 marked for
23 identification.)
24 BY MS. KENNEDY:

**62**

1    Q. I'm going to show you a document that has
2 been marked as Exhibit 7 and I can represent to you
3 that it is portions of documents that have been
4 produced in the discovery in this case. Do you
5 recognize what that is a copy of?
6    A. That's a copy of my daybook.
7    Q. And is that a daybook for 2004?
8    A. Yes.
9    Q. And does that first page start in July?
10    A. Yes, July 5th.
11    Q. By looking at the summer months of 2004,
12 does that refresh your recollection of when you went
13 on vacation?
14    A. Yes.
15    Q. And when did you take a vacation in the
16 summer of 2004?
17    A. I was on vacation on July 6th. But some
18 things have been scratched off from here so I'm not
19 sure what's under there. But I was out the day of
20 July 6th. Do you want me to keep going?
21    Q. Sure.
22    A. The best way for me to tell would be to
23 compare it with the time sheets I had, because
24 sometimes I would write in vacation and not actually

**63**

1 be on vacation those days.
2    Q. What would you be on?
3    A. I might be back at work.
4    (Richards Deposition Exhibit 8 marked for
5 identification.)
6 BY MS. KENNEDY:
7    Q. I show you what's been marked as Exhibit 8
8 and ask you if you can identify what that document
9 is.
10    A. Copies of my time sheets.
11    Q. Is that for 2004, a portion of 2004?
12    A. Yes, this one starts June 28, 2004.
13    Q. By looking at that, does that refresh your
14 recollection as to when you went on vacation in the
15 summer of 2004?
16    A. Yes.
17    Q. And when was that?
18    A. I was on vacation June 29th, June 30th,
19 July 1st, July 2nd. I was out for personal time on
20 the 6th and holiday time on the 5th of July, so I
21 didn't work any of those days.
22    Q. How about the rest of July and August?
23    A. I was on vacation August 3rd and August
24 4th. August 5th I took holiday time. I didn't work

14

**64**

1  on August 6th. On August 9th I took holiday time.
2  August 10th I was out on vacation time and August
3  11th I was out on vacation time. Do you want all
4  time I was out?
5      Q.   Just through August.
6      A.   Just vacation time or -- ?
7      Q.   Vacation time or personal time.
8      A.   Personal time?
9      Q.   Sure.
10     A.   I did not work on August 20th but I had
11 enough hours or put in hours previously in the week.
12 Apparently I had a doctor's appointment with my
13 daughter that day, according to my daybook. I think
14 there's a page missing after August 22nd. The next
15 page starts September 6.
16     Q.   So the week ending --
17     A.   Oh, here it is. It's out of order.
18 August 24th I was out on holiday time which,
19 according to my daybook, I had a dermatology
20 appointment. August 31st I was out and I used
21 holiday time for that, but I don't know why. In my
22 book, there's something crossed off there, but
23 doesn't look like it's vacation time. That's August
24 31st. Want me to keep going?

**65**

1      Q.   No, that's fine. Thank you.
2          What's been marked as Exhibit 7, is that a
3  portion of your daybook, Mr. Richards?
4      A.   Yes.
5      Q.   And is this a book that you would write in
6  on a regular basis contemporaneously to the dates?
7      A.   I would write my appointments in there.
8      Q.   And you would use it during the month of
9  July to track your appointments?
10     A.   Some of them, yes.
11     Q.   And anything else that you would normally
12 record in this daybook, a portion of which is copied
13 as Exhibit 7?
14     A.   At one point I started using it to record
15 my daughter's symptoms.
16     Q.   Did you have a separate daybook to record
17 your daughter's symptoms?
18     A.   On occasion I did.
19     Q.   But sometimes you'd also use your daybook
20 that you have your appointments in to record your
21 daughter's symptoms?
22     A.   In this daybook I did, yes.
23     Q.   And when you used your daybook, the
24 original, were these portions of it blacked out?

**66**

1      A.   No.
2      Q.   Did you black out the original of this?
3      A.   I don't believe I did.
4      Q.   Did you write, for example, on July 4th
5  you have a 3:00 o'clock then a 3:30, if I've
6  read that correctly.
7      A.   Mm-hmm.
8      Q.   Would those be appointments with clients
9  that you would see at River Valley Counseling
10 Center?
11     A.   Clients or staff, clinicians, mm-hmm,
12 usually.
13     Q.   So when you gave this to your attorney to
14 be copied, did you give him the original daybook?
15     A.   Yes.
16     Q.   And they weren't blacked out at that
17 point?
18     A.   I don't remember them being blacked out.
19     Q.   Now, looking at your daybook, does that
20 give you any assistance or refresh your memory at
21 all as to when David Mattocks started working
22 regularly as the executive director of River Valley
23 Counseling Center?
24     A.   No, it doesn't.

**67**

1      Q.   When Mr. Mattocks became the executive
2  director, who was your immediate supervisor?
3      A.   Mary Ann Palmetier.
4      Q.   I'm sorry. When Mr. Mattocks became your
5  executive director at River Valley, your immediate
6  supervisor was Mary Ann Palmetier?
7      A.   Well, at the time that he became -- I'm
8  sorry. Prior to his starting it was Mary Ann
9  Palmetier. Once he started it was David Mattocks.
10     Q.   And did you meet with David Mattocks on
11 any regular basis?
12     A.   Yes.
13     Q.   And when was it that you met with him?
14     A.   I would meet with him for an hour either
15 once a week or once every two weeks.
16     Q.   And were they set appointments that you
17 had with Mr. Mattocks?
18     A.   Usually they were.
19     Q.   And what day of the week were they?
20     A.   That would vary.
21     Q.   Would you record those appointments in
22 your daybook?
23     A.   I remember doing so usually.
24     Q.   If I could just ask you to look through

(Pages 68 to 71)

68

1  what's been marked as Exhibit 7 to see if that
2  assists you at all with when you first started
3  seeing Mr. Mattocks.
4      A.   It seems that my initial meetings with him
5  are not obvious.
6      Q.   They're not on your daybook?
7      A.   No, they're not in these copies.  They may
8  be under the blacked-out portion.
9      Q.   Did you use any other databank in 2004
10 other than the copy that's been marked as Exhibit 7,
11 which is a portion of the daybook from 2004?
12     A.   This is what I usually used.
13     Q.   And would you record in your daybook
14 meetings with people within River Valley Counseling
15 Center?
16     A.   Yes.
17         MS. KENNEDY:  Off the record.
18         (Discussion off the record.)
19         MS. KENNEDY:  Back on the record.
20 BY MS. KENNEDY:
21     Q.   Mr. Richards, do you have any recollection
22 as to when it was you first started meeting with
23 David Mattocks one on one?
24     A.   When he was coming around to visit

69

1  programs, my first one-on-one time with him, face-
2  to-face meeting briefly would have been then.  He
3  would make informal visits or unannounced visits
4  and --
5      Q.   Was his office -- ?  I'm sorry to
6  interrupt you; I apologize.  I didn't mean to
7  interrupt.
8      A.   And I would sometimes see him over at his
9  office at 319 Beech Street, at times that weren't
10 scheduled appointments.
11     Q.   Mr. Mattocks' office was located at 319
12 Beech Street.  Is that correct?
13     A.   That's correct.
14     Q.   And the day treatment program was located
15 where?
16     A.   On Elm Street, several blocks away.
17     Q.   All right.  And that's where your office
18 was located, on Elm Street?
19     A.   That's right.
20     Q.   I am just trying to ask focusing on once
21 Mr. Mattocks started as the executive director and
22 I believe you testified that you met with him on a
23 regular basis, on a weekly basis, do you have any
24 recollection as to when those weekly meetings were

70

1  that you met with David Mattocks?
2      A.   Well, they're weekly or biweekly.
3      Q.   Any recollection as to when they started?
4      A.   In the summer, probably within a few weeks
5  of his starting.  I met with him in group meetings
6  initially or mostly at first, until he set up a
7  schedule to meet everyone who was going to report to
8  him.
9      Q.   And when do you recall that schedule being
10 set up that he would meet one on one with you?
11     A.   Probably should have been around the late
12 summer, early fall.
13     Q.   It certainly wasn't when you were out of
14 work because of vacation or personal time?  You
15 didn't come in to meet with him those days?
16     A.   I might have been on vacation part of the
17 day but I wasn't on vacation when I was meeting with
18 him.
19     Q.   The dates that we just went through,
20 Mr. Richards, were those dates that you took the
21 complete day off or were they partial days that we
22 just went over in August and July?
23     A.   The days I went over were full days.
24         MS. KENNEDY:  Would you mark this as the

71

1  next exhibit.
2         (Richards Deposition Exhibit 9 marked for
3  identification.)
4  BY MS. KENNEDY:
5      Q.   I've put another document which is marked
6  as Exhibit 9 in front of you.  Can you identify
7  that, please?
8      A.   It's the United States District Court for
9  the District of Massachusetts, Mark Richards,
10 plaintiff, versus River Valley Counseling Center,
11 Valley Health Systems, David G. Mattocks and Donna
12 Viens, the plaintiff's answer to defendant River
13 Valley Counseling Center's interrogatories.
14     Q.   Excuse me for reaching, Mr. Richards.  Is
15 that your signature on the ninth page of this
16 document?  A copy of your signature.
17     A.   Yes.
18     Q.   And that is signed on the 16th day of
19 October of 2005?
20     A.   Yes.
21     Q.   On page 6 of your answers to
22 interrogatories of River Valley Counseling Center,
23 I'm going to read upside down so please bear with
24 me --

16

**72**

1    MR. SIKORSKI: I have a copy here for him.
2    MS. KENNEDY: Okay.
3    MR. SIKORSKI: What page are we on?
4    MS. KENNEDY: Page 6.
5  BY MS. KENNEDY:
6    Q.   In the second paragraph it refers to a new
7  early-morning meeting every day.
8    A.   Yes, I see that.
9    Q.   When was it that you had to attend a new
10  early-morning meeting every day?
11    A.   Mr. Mattocks asked me if I could attend
12  that in September, I believe.
13    Q.   What meeting was he referring to?
14    A.   He was referring to the executive team
15  meeting that met with a smaller group of managers
16  from the agency, an existing meeting.
17    Q.   And what's your understanding of who were
18  members of the executive team?
19    A.   In that meeting it would have been Brian
20  Duke, Mary Ann Palmetier, Jeff Kassis, Sean Munster
21  I believe was in that, and Mr. Mattocks.
22    Q.   Was Donna Viens part of this executive
23  team?
24    A.   I believe she was.

**73**

1    Q.   And in your answers to interrogatories it
2  was in September that David Mattocks asked you to
3  attend a new early-morning meeting every day?
4    A.   That meeting didn't happen every day; it
5  would happen most days of the week.
6    Q.   So it's your understanding that the
7  executive team met at River Valley more than one day
8  a week?
9    A.   Yes.
10    Q.   And you said most days?
11    A.   I believe it was about three days a week
12  at one point, yes.
13    Q.   And just so I understand your testimony,
14  David Mattocks asked you in September to attend
15  those executive team meetings?
16    MR. SIKORSKI: Objection. You can go
17  ahead and answer.
18    A.   It was sometime, I believe sometime in
19  September.
20    Q.   Prior to September had you gone to the
21  executive team meetings?
22    A.   I went to -- Well, the names of the
23  meetings can be confusing because the meetings
24  didn't seem to have a standard name. There were two

**74**

1  of them that managers would go to. One was a large
2  group meeting, one was a small group meeting. I
3  went to the large group meeting. I believe the
4  executive team might have been interchangeably used
5  for both of those meetings.
6    Q.   Okay. How often did the large group
7  meeting meet in the fall of 2004?
8    A.   That met every other week as a rule.
9    Q.   And is it your understanding that there
10  was a smaller group meeting?
11    A.   Yes.
12    Q.   And did you ever attend that smaller group
13  meeting?
14    A.   I believe I might have attended it once or
15  twice for some kind of a special occasion or topic.
16    Q.   And that's a smaller group of managers at
17  River Valley Counseling Center?
18    A.   Yes.
19    Q.   Did David Mattocks in the fall of 2004 ask
20  you to attend that smaller group meeting of
21  managers?
22    A.   Yes.
23    Q.   And is that the meeting that you're
24  referring to on page 6 of your answers to

**75**

1  interrogatories?
2    A.   Yes, it is.
3    Q.   And what did you tell him when he asked
4  you to attend that smaller group meeting of
5  managers?
6    A.   Well, I told him that I had another
7  meeting that was happening at that time or that
8  would have overlapped with that, and that's a daily
9  meeting that I had at my own program. I mentioned
10  that sometimes it might be difficult for me to
11  attend due to my personal circumstances, but mostly
12  I focused on asking him how I would be able to
13  contribute to that meeting, what the goals of that
14  meeting were compared to the goals of the other
15  meeting, what kind of role I would play in the
16  smaller group meeting, the more frequent meeting.
17    Q.   I'm sorry. Are you done with your answer?
18    A.   Yes.
19    Q.   Okay. Did you tell Mr. Mattocks what
20  personal circumstances -- Strike that. You just in
21  your answer referred to personal circumstances that
22  made it difficult for you to attend the meeting. Is
23  that your testimony?
24    A.   Yes.

(Pages 76 to 83)

76

1    Q.   Did you tell Mr. Mattocks what were the
2  personal circumstances?
3    A.   I might have mentioned to him due to my
4  daughter.
5    Q.   Did you say anything more specific other
6  than due to your daughter?
7    A.   I don't remember going into detail.
8    Q.   Going back to the answers to
9  interrogatories, it said attending new early-morning
10  meeting every day. Now, is that accurate?
11    A.   No, that's not accurate.
12    Q.   But it was more than one day a week. Is
13  that your testimony?
14    A.   It was most days of the week, yes.
15    Q.   Can you be any more specific than most
16  days of the week?
17    A.   I don't believe it happened on Friday.
18    A.   And in addition to this group --
19    A.   And also did not happen on the days of the
20  large group meeting.
21    Q.   Okay. And in addition to this group
22  meeting that you just described, did you also meet
23  one on one with Mr. Mattocks on a regular basis?
24    A.   Yes.

77

1    Q.   Now, in 2004 did you request a family
2  medical leave of absence?
3    A.   Yes.
4    Q.   Why?
5    A.   Because of my daughter's illness and she
6  had recently been, well, was about to be placed on a
7  new treatment.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

82

1        MR. SIKORSKI: Is this a good time to
2  break for lunch?
3        MS. KENNEDY: Sure.
4        (Luncheon recess at 12:37 p.m.)
5  -------------------------------------------------
6            AFTERNOON SESSION
7              1:38 p.m.
8  -------------------------------------------------
9  BY MS. KENNEDY:
10    Q.   Mr. Richards, during the break did you
11  have an opportunity to look at the original
12  calendar, a portion of which has been marked as
13  Exhibit 7?
14    A.   Yes.
15        MS. KENNEDY: And, Attorney Sikorski, are
16  portions of the copy that has been produced in this
17  case blacked out?
18        MR. SIKORSKI: That was blacked out by
19  persons in our office in order to protect the
20  identity of patients or clients of the organization.
21        MS. KENNEDY: Okay, thank you.
22  BY MS. KENNEDY:
23    Q.   And, Mr. Richards, before the break I
24  believe you volunteered to look at the original to

83

1  see if looking at the original would assist you in
2  determining whether your calendar contains any
3  notations of scheduled meetings with David Mattocks.
4  And have you done that?
5    A.   Yes.
6    Q.   And what can you tell us your review of
7  the original calendar of 2004, a portion of which
8  has been marked as Exhibit 7, indicates for meetings
9  with David Mattocks?
10    A.   There were several scheduled meetings that
11  I have in the book with David Mattocks.
12    Q.   And could you identify those, please, for
13  the record?
14    A.   July 20th one was scheduled at 1:00
15  o'clock; August 17th at 1:00 o'clock; August 31st,
16  1:00 o'clock; and one the day after that, on
17  September 1st at 9:00 a.m. I also had one in there
18  for September 8th where I met with David Mattocks
19  and Sean Munster was brought in for part of that
20  meeting.
21    Q.   If I could stop you, just to interrupt for
22  a moment, the ones you just identified other than
23  Sean Munster, were they all meetings according to
24  your calendar just with David Mattocks?

18

84

1    A.    That's correct.
2    Q.    Okay.  If you could just continue now
3  after September 8th.
4    A.    September 14th, this was one scheduled for
5  1:00 o'clock; September 28th for 1:00 o'clock;
6  October 12th for 1:00 o'clock; October 26th, 1:00
7  o'clock; and November 4th, 9:30.
8        (Richards Deposition Exhibit 10 marked for
9  identification.)
10  BY MS. KENNEDY:
11    Q.    Mr. Richards, I'm going to show you what's
12  been marked as Exhibit 10, if you could identify
13  what that is a copy of?
14    A.    This is a memo from me to David Mattocks
15  dated August 30, 2004, regarding request for leave
16  under Family Medical Leave Act, FMLA.  And this is
17  cc'd to Donna Viens at human resources.
18    Q.    Did you have a conversation with David
19  Mattocks before sending the memo on August 30th
20  about taking family medical leave?
21    A.    I believe I did.
22    Q.    And what was that conversation?
23    A.    The conversation was that I mentioned my
24  daughter was ill, she'd been recently diagnosed with

85

1  a new diagnosis for long-term illness; that I was
2  expecting to be involved in some very rigorous
3  treatment that she was going to go through and that
4  I was going to be out on intermittent family leave
5  or requesting to be out on intermittent family
6  leave.
7    Q.    And before the break, Mr. Richards, did
8  you describe the rigorous treatment?
9    A.    Yes, I did.
10    Q.    Thank you.
11        What do you recall if anything that
12  Mr. Mattocks said when you told him about the need
13  for the family medical leave?
14    A.    He said that I needed to go through Donna
15  Viens, that I should tell her about it and fill out
16  the paperwork as she would give to me.
17    Q.    Anything else you recall him telling you
18  at that time?
19    A.    I don't recall.
20    Q.    At some point did you receive some
21  paperwork from Ms. Viens?
22    A.    Yes, I did.
23        (Richards Deposition Exhibit 11 marked for
24  identification.)

86

1  BY MS. KENNEDY:
2    Q.    Mr. Richards, I'm going to put in front of
3  you what's been marked as Exhibit 11 in this
4  deposition.  Can you identify what that is, please?
5    A.    This is a memo from Donna Viens to me
6  dated September 3, 2004, stating that she has
7  received my request for intermittent family leave to
8  care for my child and she was enclosing a request
9  for leave of absence form and the federal
10  certification of health care provider form for my
11  daughter's physician to complete, and that I was to
12  return it within fifteen days.  Do you want me to
13  continue?
14    Q.    No, thank you.
15        Before receiving this letter from
16  Ms. Viens which is dated September 3, 2004, did you
17  have any conversations with Donna Viens about going
18  out on family medical leave?
19    A.    I remember mentioning it to her, about the
20  paperwork, and I believe it was before this letter
21  came to me that, yes, I did need -- that I was going
22  to go through this process.
23    Q.    Do you recall anything else that Ms. Viens
24  said to you about your request for family medical

87

1  leave other than what you just testified to?
2    A.    No, just making reference to the
3  paperwork.
4    Q.    And did you fill out the paperwork that
5  was requested?
6    A.    Yes, I did.
7        MS. KENNEDY:  Off the record a moment.
8        (Discussion off the record.)
9        (Richards Deposition Exhibit 12 marked for
10  identification.)
11        MS. KENNEDY:  We're back on the record.
12  Just to clarify, earlier we had marked as
13  Exhibit Number 1 the protective order that has been
14  entered in this case.  My reading of the protective
15  order entered by Magistrate Neiman is that it
16  related to keeping confidential documents that were
17  produced by River Valley, Valley Health Systems,
18  David Mattocks, Donna Viens, or H-C Management
19  Services, Inc. and does not go to addressing any
20  confidentiality of documents produced on behalf of
21  the plaintiff.
22        So that what we have marked as
23  confidential for the purposes of this deposition, I
24  just want to clarify on behalf of my defendants that

(Pages 88 to 91)

88

1  I represent wouldn't be subject to the protective
2  order but that we will maintain the confidentiality
3  of that private medical information that was
4  disclosed during that testimony, and that there will
5  be a second exhibit that is stamped confidential
6  that it's my understanding would not technically be
7  subject to this protective order but we will
8  maintain it as a confidential document in this case.
9      Any objections?
10     MS. FABBO:  I'll agree to that on behalf
11 of Defendant Mattocks as well.
12     MR. SIKORSKI:  That's fine.
13     MS. KENNEDY:  So we'll mark this as the
14 next exhibit.
15     (Richards Deposition Exhibit 13 marked for
16 identification.)
17 BY MS. KENNEDY:
18     Q.  Mr. Richards, I am going to put in front
19 of you what's been marked as Exhibits 12 and 13 in
20 this case.  And are those copies of the forms that
21 you filled out in regard to your leave of absence
22 request under the Family Medical Leave?
23     A.  Yes.
24     Q.  And actually you didn't fill out all of

89

1  them.  Did your daughter's physician fill out what's
2  been marked as Exhibit 13?
3      A.  This is from the physician and what he
4  told me to write down.
5      Q.  Is that your handwriting on the form that
6  has been marked as Exhibit 13?
7      A.  Some of it is.
8      Q.  And where is the physician's handwriting?
9  Strike that.  Is part of the handwriting the
10 physician's?
11     A.  Yes.
12     Q.  And where is that?
13     A.  That's here on the second page under C and
14 on the third page under B and I think C too also.
15 That's a signature and I don't know whose writing
16 that is underneath the signature.
17     Q.  Which physician filled out the U.S.
18 Department of Labor form that is what's been marked
19 as Exhibit 13?
20     A.  This is Dr. Arthur Blake.
21     (Richards Deposition Exhibit 14 marked for
22 identification.)
23 BY MS. KENNEDY:
24     Q.  I've put in front of you what's been

90

1  marked as Exhibit 14, ask if you can identify that,
2  please.
3      A.  It's a memo from Donna Viens to me dated
4  September 17, 2004, and it's the approval for my
5  intermittent leave.
6      Q.  I am just going to bring to your attention
7  the third paragraph, if you could read that for the
8  record, please.
9      A.  "It is crucial to your continued
10 eligibility for this leave status to notify David
11 Mattocks of your need to be away from work for FMLA
12 needs at least 24 hours in advance," and that's
13 underlined, "when foreseeable.  In the event that
14 the time away is not foreseeable, please notify him
15 of your absence as soon as possible.  Failure to
16 keep David informed of your absence may result in
17 revoking of the leave or disciplinary action."
18     Q.  Did you keep Mr. Mattocks informed of the
19 times that you were taking a leave of absence under
20 the Family Medical Leave Act?
21     A.  In general I did and on specific occasions
22 I did.
23     Q.  What do you mean by in general you did?
24     A.  In our meetings when I'd speak with him,

91

1  he would frequently ask me how my daughter was doing
2  and I would give him an update.  And -- Well, I
3  would give him the updates.
4      Q.  Did you tell him in your meetings which
5  days or hours you were out on intermittent leave?
6      A.  I didn't give him every appointment and
7  every time I was out.  I would give that to my
8  supervisor in the program who was affected by my
9  being out and the staff in that program.
10     Q.  When you say you gave it to the
11 supervisor, who was that?
12     A.  David Avakian.
13     Q.  Just so I understand your testimony,
14 Mr. Richards, when you were out to care for your
15 daughter on intermittent leave, did you tell David
16 Avakian that that time you were out was for FMLA
17 leave?
18     MR. SIKORSKI:  Objection.  Go ahead and
19 answer.
20     A.  I told him it was for my daughter and what
21 the appointment was about and he was already aware
22 that I was out on family medical leave.
23     Q.  Was that for the times when there was a
24 scheduled doctor's appointment?

20

92

1    A.   That was for the times -- Oftentimes it
2  was for times that I wasn't aware I wasn't going to
3  be in, so I would call him just before I was
4  supposed to be there, a day I was supposed to be
5  there. But he was also aware of when I was going to
6  be out for doctor's appointments if I was scheduled
7  to be there.
8    Q.   I am going to put back in front of you
9  what's been marked as Exhibit 8. I can represent to
10 you that these are your time sheets for pay periods
11 ending July 11, '04, through October 31, '04.
12 Please look at them and then let me know if any of
13 the time sheets indicate when you used intermittent
14 FMLA leave?
15   A.   There's nothing specifically about
16 intermittent family leave on the time sheets. There
17 are indications of my coming in late in the day, and
18 that would be usually because of my being out with
19 my daughter. There were also times of personal
20 leave.
21   Q.   Just so I understand your testimony, when
22 you say there's times that indicated that you were
23 late, did you mark that as personal time?
24   A.   Not always. Because of the flexibility in

93

1  my schedule being 34 hours, I was not there the full
2  40 hours that the program ran.
3    Q.   Did you have a set time frame that you
4  were typically in the office at the day treatment
5  program Monday through Friday?
6    A.   I was there by 8:45 because we had a
7  morning meeting in our program at 8:45 that I wanted
8  to be at and would always try to get to; and I would
9  be there until the end of the day, till 5:00 o'clock
10 or later, all days, usually all days.
11   Q.   Was your position as the program director
12 of the day treatment program subject to overtime
13 pay?
14   A.   No.
15   Q.   But your salary was based on an hourly
16 basis?
17   A.   It was broken down into an hourly basis
18 but it was a yearly salary.
19   Q.   And the time sheets that you filled out
20 were just to record the 34 hours a week or was it
21 for the purpose of paying you on an hourly basis?
22   A.   I'm sorry. Could you repeat that?
23   Q.   Sure. That was a double question.
24        What was the reason you needed to fill out

94

1  a time sheet?
2    A.   The personnel department required it. It
3  was a way for the supervisor to check a person's
4  hours, an employee's hours.
5    Q.   Was it to track also your vacation time?
6    A.   There was the function also of, yes,
7  tracking vacation time, holiday time, sick time.
8    Q.   Did you also have personal time?
9    A.   And personal time.
10   Q.   But in the weeks that you worked more than
11 34 hours, you were still considered a salaried
12 employee not subject to any additional pay. Is that
13 your understanding?
14   A.   That's my understanding.
15   Q.   And these time sheets were submitted by
16 you to whom?
17   A.   They went with the group of time sheets
18 from the program, of all the staff in the program,
19 to the human resource department.
20   Q.   And is there a manager who signed the time
21 sheet?
22   A.   Yes.
23   Q.   And whose signature is that, if you can
24 identify it?

95

1    A.   David Mattocks, I believe.
2    Q.   Is there any written document that you
3  gave Mr. Mattocks or the HR department indicating
4  the hours that you took intermittent FMLA leave?
5    A.   No.
6    Q.   I believe you testified a few minutes ago
7  that sometimes there's some time out of work and
8  that may be for your own personal time. Is that
9  true?
10   A.   Yes.
11   Q.   So if a time sheet indicates personal
12 time, there was a P? Is that what you used?
13   A.   It could be P, it could be holiday or it
14 could be vacation, or even sick time if it was
15 related to a sick issue.
16   Q.   And that personal time could have been for
17 your own personal time to take care of things. Is
18 that correct?
19   A.   It could have been for that, yes.
20   Q.   It could have been for your own doctor's
21 appointments. Is that true?
22   A.   It could have been.
23   Q.   Or it could have been to care for your
24 daughter?

(Pages 96 to 99)

---

96

```
 1    A.  It could have been.
 2    Q.  Do you have any other children other than
 3  your daughter Leigh?
 4    A.  No.
 5    Q.  And what grade was she in in 2004?
 6    A.  She was a senior in high school.
 7    Q.  Now, as of the fall of 2004, when do you
 8  recall last receiving a raise?
 9    A.  It was under Andy Phillips'
10  administration, so a few years before.
11    Q.  Was it your understanding that in 2004
12  there was some discussion about the staff at River
13  Valley receiving raises?
14    A.  Yes, there was.
15    Q.  And what is your understanding of the
16  staff receiving a raise in 2004?
17    A.  That there was to be an across-the-board
18  raise to be determined by Mr. Mattocks and those he
19  consulted with and there was a change at one point
20  where it was going into effect for some but not for
21  the managers.
22    Q.  When did it go into effect, to your
23  knowledge, for the lower level of employees at River
24  Valley?
```

---

97

```
 1    A.  I believe it was October.
 2    Q.  And what was your understanding of when
 3  managers were going to get the across-the-board
 4  raise?
 5    A.  There wasn't a set time that I understood.
 6    Q.  And what was your understanding of what
 7  percentage increase that would be?
 8    A.  I believe it was 2-1/2 percent.
 9    Q.  Did you have any discussions with David
10  Mattocks about the across-the-board increase?
11    A.  Yes.
12    Q.  And when were those discussions?
13    A.  Well, he had spoken to the group in
14  general in the managers meeting, the large meeting,
15  and he had also spoken with me individually.
16    Q.  Which was first, the group or the
17  individual?
18    A.  I'm not sure.
19    Q.  What do you recall being said at the group
20  meeting about the raises?
21    A.  That there was a process of determining
22  how much the raises will be and then there was the
23  announcement that it would be at 2-1/2 percent given
24  to the staff, and then at some point it was
```

---

98

```
 1  announced that it would be given to the staff first
 2  and then to the managers.  They wanted to go
 3  through, make sure that the managers approved each
 4  and every individual to get the raise, and that the
 5  individuals had merit.  We had a lot of discussion
 6  about how much merit the individual needed to have,
 7  the employee, before they would receive the raise or
 8  be nominated for the raise.
 9    Q.  Anything else you recall of those
10  discussions?
11    A.  In general at the large group meetings?
12    Q.  In general at the large group meetings.
13    A.  Well, not at this time, but I haven't
14  thought about that since then.
15    Q.  What about the individual meeting with
16  Mr. Mattocks?  What do you recall of him telling you
17  about the raises?
18    A.  He said that he wanted a list of all my
19  staff and he wanted me to write down that I
20  nominated them for the raise and submit it to him.
21    Q.  Did he talk to you about a raise going to
22  you?
23    A.  He said that he had postponed the raises
24  to the managers and that they would be going into
```

---

99

```
 1  effect at some later time but he had decisions to
 2  make first or a process to go through; he wasn't
 3  specific about it.
 4    Q.  Did he say what decisions he had to make
 5  or what process he had to go through?
 6    A.  No, he didn't.
 7    Q.  Now, who is David Avakian?
 8    A.  He is the supervisor that worked in the
 9  program I directed, the day treatment program.
10    Q.  How long had you worked with David
11  Avakian?
12    A.  Since I became director in '96.
13    Q.  Was David Avakian a counselor at the Elm
14  Street day treatment program before you arrived as
15  the program director?
16    A.  He was one of the clinicians, yes.
17    Q.  And what was David Avakian's position in
18  the summer of 2004 in the day treatment program?
19    A.  He was the supervisor of the program.
20    Q.  Did you have any discussions with anyone
21  at River Valley Counseling Center regarding changing
22  Mr. Avakian's position in the summer and fall of
23  2004?
24    A.  I spoke with Mr. Mattocks about increasing
```

---

22

## 100

1  David's salary because he was looking for other
2  employment as a result of higher wages elsewhere,
3  being able to earn higher wages elsewhere, and I
4  advocated for David Avakian to receive a raise in
5  salary.
6  Q.  Above the across-the-board living increase
7  that was due?
8  A.  Oh, yes.  I don't remember whether that
9  had even come up yet, the across-the-board increase.
10  Q.  What were you advocating for a raise for
11  Mr. Avakian at that time?
12  A.  How much money?
13  Q.  Yes.
14  A.  I believe it was in the neighborhood of
15  $4,000, three or four thousand dollars.
16  Q.  And why were you advocating for a raise
17  for Mr. Avakian?
18  A.  Mr. Avakian was a very valuable employee.
19  He'd been at the program for eighteen years.  He had
20  actually lost wealth or amounts of money that he
21  earned at the agency as a result of having to pay a
22  lot more towards his insurance because the agency
23  had changed their policy about how much people with
24  a family plan had to pay.  He was the supervisor and

## 101

1  the only person who could step in for me, which made
2  him valuable not only as a clinician but also as a
3  leader in the program, and I didn't want to lose
4  him.
5  Q.  What did Mr. Mattocks say when you
6  advocated an increase in Mr. Avakian's salary?
7  A.  He asked me to put down the reasons and to
8  come up with figures to justify it, and I put
9  together figures.  Since the program had made such a
10  tremendous amount of profit, there was plenty of
11  room in the budget for what looked like a nominal
12  increase, and I did that.
13  Q.  You gave him a written document indicating
14  the reasons for increasing David Avakian's salary?
15  A.  I remember writing it out.  I don't know
16  if I gave it to him or had it in front of me in our
17  face-to-face meeting, but it was in an organized way
18  like that.
19  Q.  Do you recall when you had this
20  conversation with David Mattocks?
21  A.  It would have been late summer.
22  Q.  Would it have been at one of those
23  scheduled meetings that you read off from your
24  calendar?

## 102

1  A.  Probably was.
2  Q.  And you believe it was late summer?
3  A.  I believe so.  The -- Yes, I believe so.
4  It was delayed.
5  Q.  Do you have any written documentation of
6  the reasons for increasing David Avakian's salary?
7  A.  It might have been in an e-mail.  I don't
8  know if I have any documentation still around.
9  Q.  I may have interrupted you and you may
10  have already answered this but I apologize.  What
11  did Mr. Mattocks say other than put it in a
12  document, create a document or give me the reasons
13  why?
14  A.  Right, come up with something and give it
15  to me.
16  Q.  And you did that, I take it?
17  A.  Yes, I did.
18  Q.  And when you presented that to
19  Mr. Mattocks, what do you recall of what he said to
20  you?
21  A.  He said that at first he had not been in
22  favor of an increase in pay but when he heard my
23  reasons and the way I presented them, and a specific
24  part of them, I'm trying to remember what that was,

## 103

1  that I had sold it to him during the course of our
2  meeting essentially.
3  MR. SIKORSKI:  Let's go off the record for
4  a second.
5  (Discussion off the record.)
6  BY MS. KENNEDY:
7  Q.  Was there any discussion about any other
8  changes in Mr. Avakian's duties or responsibilities
9  or title at that time?
10  A.  Later on Mr. Mattocks called me and gave
11  me the news that he was going to go ahead with the
12  raise and thought that a good way to do it was to
13  also give it to Mr. Avakian with a new title,
14  because Mr. Avakian wanted to take on more
15  leadership responsibility, and he suggested that he
16  be given the raise along with the title of assistant
17  director of the program.
18  Q.  And what did you say in response to that,
19  if anything?
20  A.  Well, I was pleased that he had agreed on
21  the raise and said that the title would be something
22  I would pass along to David Avakian.  He probably
23  would -- It probably would be a way of justifying it
24  to the rest of the staff because it would sound like

(Pages 104 to 107)

---

**104**

1  a type of promotion even though I mentioned that I
2  didn't see how his job duties would really change.
3      Q.   Did David Avakian receive any increased
4  job duties after getting the increase in pay and
5  change in title?
6      A.   I don't believe so.
7      (Richards Deposition Exhibit 15 marked for
8  identification.)
9      A.   There might have been something -- Can I
10  finish?
11     Q.   Sure.  If you would like to add to your
12  answer, please do.
13     A.   Well, I'm trying to remember back; this is
14  the first time I've thought about anything like
15  that.  So, could I return to it if I think of
16  something?
17     Q.   Sure.  In this deposition if you want to
18  add to that answer or any other answer --
19     A.   Or any of my answers, yes, because some of
20  these things, a lot of things I've thought of,
21  but....
22     MR. SIKORSKI:  You will have an
23  opportunity later in the deposition to clarify
24  anything you need to.  Just wait for a question from

---

**105**

1  Attorney Kennedy.
2  BY MS. KENNEDY:
3      Q.   Mr. Richards, I am going to put in front
4  of you what has been marked as Exhibit 15, if you
5  could identify what that is a copy of.
6      A.   This is an internal form at River Valley
7  Counseling Center called employee status notice.
8  It's regarding David Avakian and it's the
9  notification going to the human resources department
10  that he is getting a raise in salary to $22.50 per
11  hour and a change in his job title to assistant
12  program director, from supervisor to assistant
13  program director.  And it's signed by me and David
14  Mattocks.
15     Q.   What is the date on that?
16     A.   And dated, well, the date is 9/12 but
17  that's apparently when -- Oh, 9/15 is when I dated
18  it and David Mattocks dated it 9/17, I think.
19     Q.   So were the discussions that you just
20  testified to a few moments ago with David Mattocks
21  about requesting an increase in pay, did those all
22  occur before September 15th of 2004?
23     A.   Yes.  Well, I'm trying to remember all the
24  discussions we just talked about, but the ones about

---

**106**

1  his getting the increase in pay and so forth, that
2  all happened before that, yes.
3      (Richards Deposition Exhibit 16 marked for
4  identification.)
5  BY MS. KENNEDY:
6      Q.   I have put in front of you what has now
7  been marked as Exhibit 16, ask if you can please
8  identify what that is a copy of.
9      A.   This is a memo dated September 16, 2004,
10  to David Avakian from David Mattocks and a cc to
11  myself and human resources.  And it is notification
12  that he is being formally offered a promotion to the
13  new position of assistant director of psychiatric
14  day treatment program and it talks about his salary
15  and hours.
16     Q.   Now, is it your understanding that -- You
17  still were Mr. Avakian's supervisor.  Is that
18  correct?  That did not change?
19     A.   That did not change.
20     Q.   Was Mr. Avakian entitled to overtime pay
21  in either his prior position as supervisor or in his
22  assistant director position?
23     A.   I'm not aware of his getting overtime pay,
24  although there's something about overtime pay that

---

**107**

1  happened that I was unclear about or I didn't have
2  all the answers to.
3      Q.   Going back again before September 15th,
4  had David Avakian told you that he was looking for a
5  new job or that he actually had a job offer?
6      A.   He first told me he was looking and that's
7  when I approached Mr. Mattocks and he later said
8  that he had the job offer.
9      Q.   And who did he have the job offer from?
10     A.   From the partial hospitalization program
11  at Holyoke Hospital.
12     Q.   And what if anything did you say to David
13  Avakian about that job offer, if anything?
14     A.   Well, I spoke with him about the money
15  that he would be making there and how much more it
16  was than where he was in the day treatment program,
17  and discussed with him that, you know, I wanted to
18  advocate for his getting more money, and he said
19  that he didn't want to leave the program but that it
20  was a matter of money.
21     MR. SIKORSKI:  Excuse me.  I need to take
22  a quick break, if you don't mind.
23     MS. KENNEDY:  Oh, sure.
24     (In recess 2:30 p.m. to 2:35 p.m.)

---

24

108

1   BY MS. KENNEDY:
2       Q.   Other than talking with Mr. Mattocks and
3   Mr. Avakian, did you speak with anyone else about
4   David Avakian's position as assistant director?
5       A.   I told the whole team.
6       Q.   Before the decision was actually made.
7       A.   Oh. I don't remember.
8       Q.   Now, who is Donna Viens?
9       A.   Donna Viens is the human resource director
10  for River Valley.
11      Q.   And when do you recall she started?
12      A.   She started about a month after
13  Mr. Mattocks, so in the late summer/early fall.
14      Q.   And what interactions would you have with
15  Donna Viens?
16      A.   She would come to the meetings, the large
17  group meetings that I was involved in. She would be
18  a person for me to go to to coordinate an ad for a
19  position in the paper. She was a person to contact
20  if there were any kind of problems with paychecks,
21  questions about personnel policy. Kind of the all-
22  around personnel person to go to.
23      Q.   What ads did you go to Donna Viens for to
24  help coordinate?

109

1       A.   A position for a full-time clinician,
2   preferably one that spoke Spanish.
3       Q.   When were you looking for a full-time
4   clinician in 2004?
5       A.   Soon after she came. It was right in that
6   time frame.
7       Q.   And while you were there in 2004, did you
8   fill that position of full-time clinician?
9       A.   No.
10      Q.   How would you describe your working
11  relationship with Donna Viens?
12      A.   Professional. It was -- I found her
13  helpful in advertising for the position. I thought
14  we got along well for the most part.
15      Q.   What do you mean, for the most part?
16      A.   Well, there was one instance in a large
17  group meeting where she kind of snapped at me, I
18  mean snap in terms of kind of spoke in a brusque
19  manner about something that I was repeating,
20  information I received from the Department of Labor
21  one time that she took issue with and made some
22  comments about it. Well, I don't know if I should
23  go into it, but....
24      Q.   Please do.

110

1       A.   Well, it was just something where I had
2   mentioned that I was told by the Department of Labor
3   that employees were eligible for a break within a
4   four-hour period and she came back and said no,
5   that's not accurate, something to that effect. And
6   I just said, well, I heard it from this person I
7   spoke with at the Department of Labor who I had
8   called to ask about it, knows regulations, and she
9   got defensive about it by saying that she would bet
10  her children's lives on the information she was
11  giving.
12      Q.   What else do you recall of the incident?
13          MR. SIKORSKI: Objection. Go ahead.
14      A.   I was just shocked that she replied in
15  that way and said nothing more. I didn't want that
16  to continue, so I -- I was okay with what she said.
17  I said I thought she should have a good
18  understanding of whatever the issues were.
19      Q.   Did you have any other -- I'm sorry.
20          MR. SIKORSKI: Wait for a question.
21      A.   Well, I think there's a second part to
22  your question that I was answering.
23          MR. SIKORSKI: Let her ask you a question.
24  Okay? Unless you haven't answered it.

111

1          THE WITNESS: Well, I felt I didn't answer
2   it fully.
3          MR. SIKORSKI: Okay.
4   BY MS. KENNEDY:
5       Q.   Are you finished with your answer to my
6   question?
7       A.   By now I've forgotten what it was I was
8   going to say. Perhaps I should ask you to repeat
9   it.
10         (The reporter read back as follows:
11         "Question: What else do you recall of the
12  incident?")
13      A.   Okay, I was asking about the original
14  question, that's the one I was answering. That's
15  all I recall of that incident.
16      Q.   I believe my original question was how
17  would you describe your working relationship with
18  Ms. Viens?
19      A.   And I guess I -- Well, the other piece was
20  when Ms. Viens was at my termination meeting, she --
21      Q.   Actually, I'll get to that in a minute,
22  Mr. Richards. I was focusing on before November
23  4th. I apologize.
24      A.   Okay. But, yes, I thought we had a good

(Pages 112 to 115)

112

1  working relationship.
2      Q.   Did Ms. Viens ever speak to you about
3  family medical leave other than your family medical
4  leave, family medical leave in general?
5      A.   She did.
6      Q.   And what do you recall of that
7  conversation?
8      A.   She mentioned that in her other job with
9  the ambulance company, which I understood to be the
10 ambulance company that she worked for in the human
11 resource department, that she had a gentleman who
12 was on intermittent family leave and was according
13 to knowledge that she had about to go out on full-
14 time family leave and she had found a way to prevent
15 that from happening.
16     Q.   And what was the context that this
17 conversation took place in?
18     A.   It was in her office; I had stopped by.
19 It was, I guess, an impromptu meeting. We were
20 talking about other things as well, about employees
21 and personnel issues in general, a variety of them.
22 And I'm not sure why the issue around personnel
23 taking family leave came up, other than we did speak
24 about my daughter.

113

1      Q.   The conversation about the gentleman not
2  employed by River Valley who was going out on family
3  medical leave that she was describing, was that in
4  the same conversation that she spoke about your
5  family medical leave with your daughter?
6      A.   We didn't speak about my family medical
7  leave specifically; we just spoke about my daughter
8  being ill.
9      Q.   And what did you say about your daughter
10 being ill?
11     A.   I kind of spoke in generalities about her
12 being a high school student and not being able to
13 fulfill or hoping that she would be able to fulfill
14 the things she wanted to in her high school life.
15     Q.   And what do you recall, if anything, that
16 Ms. Viens said in response?
17     A.   I don't know what she said in response.
18 It seemed like she listened, you know.
19     Q.   Did she seem concerned about your
20 daughter?
21     A.   Seemed concerned.
22     Q.   She seemed sympathetic about your
23 daughter's situation?
24     A.   I don't remember her sympathy.

114

1      Q.   And just so I understand your testimony,
2  you don't recall the context of her bringing up this
3  other person's issue with family medical leave
4  involving another employer, you just recall her
5  saying it?
6      A.   Well, I did explain what the context was,
7  being in her office, talking about personnel issues,
8  talking about my daughter. But verbatim how we got
9  to that, I don't know verbatim how the conversation
10 went.
11     Q.   Did you have any conversations with David
12 Mattocks from the time that he started as executive
13 director up until the end of October about cutting
14 costs in the day treatment program?
15     A.   Not specifically in the day treatment
16 program.
17     Q.   Did you have conversations with David
18 Mattocks about cutting costs at River Valley
19 Counseling Center?
20     A.   I heard him say that to other program
21 directors in the large group meeting.
22     Q.   And what did you hear him saying about
23 cutting costs to other program directors?
24     A.   That there were certain programs that he

115

1  was going to be speaking with people about how they
2  could cut cost.
3      Q.   And did he say why he needed to cut more
4  costs at River Valley Counseling Center?
5      A.   He wanted to have more money available to
6  spend on the loans that were outstanding.
7      Q.   What loans are you referring to?
8      A.   The loan that Holyoke Medical Center, the
9  overseeing -- They have a couple different names,
10 but Holyoke Medical Center at the time and Valley
11 Health Systems, the entity that we were part of that
12 loaned us money.
13     Q.   What is your understanding of the
14 organizational structure of River Valley in
15 comparison to Valley Health Systems?
16     A.   That Holyoke Medical Center, I'm pretty
17 sure right before that Holyoke Hospital, was part of
18 it, an arm of it, and River Valley and two or three
19 other agencies were also arms of that organization;
20 that Mr. Porten was in charge of overseeing all of
21 it, was chairman of the board of more than one of
22 those entities, and that they had taken more control
23 of the top management of River Valley by having them
24 report directly to Mr. Porten and actually be

26

116

1  employees of one of those entities outside of River
2  Valley.
3      Q.  Did you know that at the time you were
4  program director of the day treatment program at
5  River Valley? Was that your understanding then?
6      A.  That was my understanding at the time as
7  program director, yes.
8      Q.  And how did you obtain that understanding?
9  Do you recall?
10     A.  I had been in meetings with board members
11 of River Valley. I got it from the CEO of River
12 Valley, from the consultants that consulted with
13 those organizations, from Mr. Porten, having had
14 meetings with Mr. Porten, with the board.
15     Q.  Could you describe what your job duties
16 and responsibilities were in the fall of 2004 as the
17 program director? What did you do on a daily basis?
18     A.  I directed the day-to-day operations. I
19 supervised all the staff both clinically and
20 administratively. I intervened wherever I saw fit
21 in clinical matters. I developed the programming
22 and oversaw that programming. I was the person that
23 staff would go to if there was some kind of an issue
24 that needed to be resolved with a client;

117

1  interpretation of the rules, so forth. I was in
2  charge of the billing and oversaw the billing, the
3  scheduling, supervised that. I was the person that
4  would go out and represent the program at outside
5  meetings and also internal meetings.
6      Q.  Did you see clients of the day treatment
7  program, patients? What are they referred to as,
8  patients or clients?
9      A.  Either one.
10     Q.  Which do you refer to them as?
11     A.  Clients.
12     Q.  Okay. Did you see clients in the fall of
13 2004?
14     A.  Yes.
15     Q.  On a regular basis?
16     A.  I had some clients that I was responsible
17 for.
18     Q.  How many?
19     A.  I was responsible for -- At the time, in
20 the fall?
21     Q.  Yes.
22     A.  I don't know. One or two. I think they
23 might have terminated just before I left. They
24 would have left the program just before I did.

118

1      Q.  So at the time --
2      A.  And I also ran a group of clients. I also
3  co-led on a dual diagnosis group. I would oversee
4  the clinical meeting that happened with
5  psychiatrists where we would interview a client or
6  clients for medical and clinical reviews.
7      Q.  So as of November 3rd, the clients, the
8  one or two clients that you were seeing, had they
9  ended their treatment in the program?
10     A.  I believe they had already ended, yes.
11     Q.  And the group that you co-led, the dual
12 diagnosis group -- Do I have that right?
13     A.  That's right.
14     Q.  Who did you co-lead that group with?
15     A.  Patricia.
16     Q.  And who is Patricia?
17     A.  She was one of the clinicians there. She
18 was learning the dual diagnosis model. She was the
19 newest clinician.
20     Q.  How many clinicians did you have in the
21 day treatment program?
22     A.  There were five full time -- no, four full
23 time, one half time, another that was about a third
24 time; a psychiatrist that was there four hours a

119

1  week; a nurse practitioner there about six hours a
2  week. Then there was a half-time van driver and
3  maintenance persons and a full-time administrative
4  assistant.
5      Q.  Who was the psychiatrist that worked there
6  four hours a week?
7      A.  Abraham Linn.
8      Q.  When David Avakian was the supervisor or
9  the assistant program director, what job duties did
10 he have?
11     A.  He was mostly a clinician and he would
12 fill in for me when I wasn't there, so he was the
13 second in command or the person to go to in my
14 absence for day-to-day operations. He was -- Well,
15 the job he had as supervisor and the job he had as
16 assistant director were the same. There was no
17 filling of a supervisor's job when he was given the
18 title of assistant director. He did scheduling
19 tasks as well as billing, double-checking that the
20 billing was -- that notes for the billing were done
21 in a timely way and according to the regulations.
22     Q.  Anything else that he did either as the
23 supervisor or the assistant program director?
24     A.  He would supervise some interns, graduate

(Pages 120 to 123)

---

120

1    usually interns.  And I think I mentioned that he
2    was a person to provide impromptu supervision when
3    clinicians thought they needed it and I was not
4    available.
5        Q.   Now, I believe you testified right before
6    we came back from the lunch break that you had a
7    meeting with David Mattocks on November 4th at 9:30?
8        A.   Mm-hmm, yes.
9        Q.   Do you have a memory of that meeting as
10   you sit here today?
11       A.   Yes.
12       Q.   Do you recall when that meeting was
13   scheduled, the November 4th meeting?
14       A.   Do I recall that it was scheduled on
15   November 4th at 9:30?
16       Q.   No, I'm sorry, I wasn't very clear in my
17   question.
18            Was that a standing meeting that you
19   always had every set day or had that meeting been
20   scheduled earlier?
21       A.   That meeting I believe had been scheduled
22   earlier and was moved to that time.  I did have
23   meetings where I would just kind of touch base with
24   David Mattocks right after the large group meeting

---

121

1    if there was an issue I wanted to bring up to him.
2        Q.   Do you have any memory of the meeting that
3    you had with David Mattocks on October 26th at 1:00
4    o'clock?
5        A.   In that list of meetings, I'm not sure
6    which ones I actually met with him and which ones
7    might have been moved.  Usually they happened when
8    they were first scheduled, but there was a meeting I
9    remember that he did not make and I was not aware he
10   wasn't going to be there so I showed up at his
11   office and he wasn't there.  And that was towards
12   the end of my tenure, so I don't even remember
13   whether that meeting happened.
14       Q.   Did you have a meeting before your 9:30
15   meeting with David Mattocks?
16       A.   There was an executive team or a large
17   group meeting before it.
18       Q.   And did you attend that meeting?
19       A.   Yes.
20       Q.   What do you recall being said at that
21   large group meeting?
22       A.   I recall that Mr. Mattocks said that he'd
23   had a meeting, just recently had a meeting with
24   Mr. Porten -- that's Hank Porten -- and that in that

---

122

1    meeting he felt very good about it, he thought it
2    went well; that Mr. Porten had agreed with him on
3    topics pertaining to the agency and some changes
4    that he wanted to make.  He said that he had just
5    finished his three months, I believe it was three
6    months of probation and that now he was no longer in
7    that status and that he had been looking at the
8    agency and had decided to implement some changes.
9    He implied that there were going to be cuts and that
10   -- Well, the implication was that there were going
11   to be cuts somewhere or changes that might be
12   difficult for people.
13       Q.   Your memory is that Mr. Mattocks used the
14   words that he had just ended his three months'
15   probation?
16       A.   He said something about that, that this
17   was why this was the moment he was enacting these
18   changes.
19       Q.   What else do you recall Mr. Mattocks
20   saying at the large group meeting that morning?
21       A.   Nothing that I can attribute to that
22   meeting.  Could be from another meeting.
23       Q.   Do you recall how long that meeting was?
24       A.   I believe it was about the same length as

---

123

1    the usual large group meetings, about an hour.
2    Sometimes it would go over.  Usually it would go
3    over a little bit.
4        Q.   Do you recall anything else about the
5    meeting, anything anyone else said?
6        A.   Yes.
7        Q.   What do you recall?
8        A.   I recall Sean Munster saying something to
9    the effect that changes were going to come but
10   everybody needed to be on board and kind of gave me
11   the impression that he was aware of some of the
12   changes and that he was trying to build cohesion in
13   the group to weather the changes.
14       Q.   Anything else you recall about that
15   meeting?
16       A.   The meeting was well-attended, a lot of my
17   colleagues, I would say about all my colleagues were
18   there.  Well, I don't remember who said what
19   specifically.
20       Q.   Where did the meeting take place?
21       A.   It was in Mr. Mattocks's office where the
22   large group meetings happened.
23       Q.   How many people would be at this large
24   group meeting?

---

28

124

1    A.    It was a table about this size; maybe
2    close to a dozen. And that's packing them in. They
3    would be packed in pretty well.
4    Q.    And did you have the individual meeting
5    with Dave Mattocks?
6    A.    I had that 9:30 meeting, yes.
7    Q.    And where did that meeting take place?
8    A.    Right there at the same table.
9    Q.    And what was your understanding about what
10   that meeting was for?
11   A.    A make-up meeting that didn't happen. I
12   believe it was the one that was scheduled before or
13   one that was scheduled a little bit before that.
14   Q.    And did you just stay in the room with
15   David Mattocks until people left or how did it
16   happen that --
17   A.    Yes. The people left; and right after
18   they had left, this meeting started.
19   Q.    Was Donna Viens in the large group meeting
20   at 8:30?
21   A.    I don't remember if she was there the
22   whole time or in and out. I'm not sure what her
23   attendance was at that meeting.
24   Q.    What do you recall happening at that

125

1    meeting with David Mattocks at 9:30? What's the
2    first thing that you recall?
3    A.    That Donna Viens came into the meeting.
4    Q.    And what happened next?
5    A.    That she sat down next to Mr. Mattocks and
6    Mr. Mattocks said that one of the changes he was
7    making was to terminate my job.
8    Q.    Is that the words he used?
9    A.    I don't remember the specific words that
10   he used.
11   Q.    What's the next thing you recall him
12   saying or happening?
13   A.    He said that it was not because of my
14   performance, that that had nothing to do with it.
15   And I took some notes during the meeting; you've
16   probably reviewed them.
17        MR. SIKORSKI: Do you want to show him the
18   notes?
19        MS. KENNEDY: I didn't know if he was done
20   with this answer.
21   A.    I could go on with what I remember or I
22   could look at the notes, either one. Would you like
23   me to go on?
24   Q.    Sure. What do you recall?

126

1    A.    I recall that we got into specifics about
2    a severance agreement. He gave me a copy of the
3    severance agreement. Also talked about how this
4    process was going to proceed; that when I was done
5    that day, that I would be leaving immediately. And
6    Ms. Viens just described the unemployment insurance
7    particulars. I remember saying to Mr. Mattocks, or
8    I asked who was going to be replacing me.
9    Mr. Mattocks said that it would be Jeff Kassis; and
10   also he might have mentioned at that time that David
11   Avakian would have a role. He did mention it later
12   in a meeting that happened just after this one with
13   my staff.
14        I mentioned to him that I knew of
15   Mr. Kassis's qualifications and he wasn't qualified
16   for that position because he had not worked a year
17   in the day treatment program. I remember Ms. Viens
18   saying something when I was trying to talk with
19   Mr. Mattocks and I said to her that I was talking to
20   Mr. Mattocks and not to her, because she doesn't
21   know about the regulations, you know, at which point
22   she said "I do too know about the regulations. It's
23   my job to know about these regulations."
24        I asked Mr. Mattocks if I could meet with

127

1    my staff or say good-bye to them, say good-bye to
2    the clients. I mentioned that I would rather have a
3    way to save face in this, present it in a way that
4    would sound like I was leaving to take care of my
5    daughter rather than I was being fired. He asked
6    "Well, would you like to resign?" I said "No, I'm
7    not resigning."
8         He said that Ms. Viens wouldn't like what
9    he was about to say but that he would allow me to go
10   back and visit staff. And I had asked too if I
11   could come back on the weekend and clean up my
12   office, and he said that he was going to allow me to
13   do that; and that he would participate in the
14   meeting with my staff and would arrange that. And
15   at some point, I don't know if in this meeting or
16   the next, we talked about my saying good-bye to the
17   clients.
18   Q.    Do you recall anything else that you said
19   during the meeting with Donna Viens, David Mattocks
20   and yourself present?
21   A.    Well, there's a lot of things that I
22   recall that come and go. You know, if you have
23   something particular to ask me, I could possibly lay
24   my finger on it or refresh my memory with the notes.

(Pages 128 to 131)

128

1    MS. KENNEDY: Let me mark that, please.
2    (Richards Deposition Exhibit 17 marked for
3 identification.)
4 BY MS. KENNEDY:
5    Q.    Mr. Richards, I am going to put in front
6 of you what's been marked as Exhibit 17. Can you
7 please tell me what that is a copy of?
8    A.    This is a copy of the notes I took during
9 my termination meeting with Mr. Mattocks and
10 Ms. Viens.
11    Q.    If you could just for the record read into
12 the record slowly your notes.
13    A.    Okay. I've got these just kind of listed
14 with a space or two in between and I've written "not
15 performance-related"; skip a space, then I wrote
16 "21 days." Then I skipped a space and I wrote
17 "recommends attorney" and I skipped a couple of
18 spaces, "seven-day revocation period if I agree to
19 terms." Skip a space, "does not preclude
20 unemployment during severance." Skip a space, "four
21 months severance." Skip two spaces, "agreement in
22 force after eighth day after signing." Then under
23 that I wrote "then six-week clock begins." Skip a
24 space, "can't start my own business within 25 miles

129

1 for one year." Skip a space, "can't recruit
2 actively within one year." Skipped a space,
3 "continue the dental for full period."
4    Then on the next page "will be paid for
5 remainder of week." Skip a space, "at most will be
6 December 1st latest or we will not take any stance
7 against your filing for unemployment." Then I've
8 skipped a space and wrote "unemployment $507 per
9 week plus $25 per dependent, maximum 29 weeks with
10 three weeks extension," then skipped a space and
11 wrote "life insurance" with a question mark.
12    Q.    Thank you.
13    When David Mattocks said that you were
14 terminated in your position, how did you feel about
15 that?
16    A.    Surprised; confused.
17    Q.    Why were you confused?
18    A.    About the cause, why I was singled out.
19 Probably that -- Well, I remember that's what would
20 have been confusing to me.
21    (Richards Deposition Exhibit 18 marked for
22 identification.)
23 BY MS. KENNEDY:
24    Q.    Other than telling you it was not

130

1 performance-related, did he tell you any other
2 reason why your employment was being terminated?
3    A.    He said it was for financial reasons.
4    Q.    And was he any more specific than
5 financial reasons?
6    A.    No.
7    Q.    Was your understanding that financial
8 reasons meant for cost savings?
9    A.    That's what I understood.
10    Q.    Let me put in front of you what's been
11 marked as Exhibit 18 and if you could identify what
12 that is a copy of.
13    A.    This is a severance agreement and general
14 release between River Valley Counseling Center and
15 Mark Richards. This appears to be the severance
16 agreement that they presented me with at that
17 meeting.
18    Q.    And did someone go over this severance
19 agreement with you at that meeting?
20    A.    Yes, we talked about the particulars of
21 what I could do/what I couldn't do, what I would be
22 paid. I think in my notes I wrote down things about
23 how that might take place and what the schedule was.
24 He said that I should see a lawyer. That was said

131

1 several times to me by, well, sometimes together by
2 Mr. Mattocks and Ms. Viens, that I should review it
3 with an attorney and see an attorney about this.
4 And Mr. Mattocks said how helpful an attorney was
5 for him when he had this happen to him at the
6 Brattleboro Retreat. He said that he was surprised
7 I wasn't crying because he cried when he was treated
8 this same way or had this same thing happen to him
9 at the Brattleboro Retreat.
10    So things are still coming to mind,
11 but....
12    Q.    Were you emotional at this meeting at all?
13    A.    I was surprised. I was also surprised
14 that Donna Viens thought that I had yelled at her
15 during this meeting when I said that she was not the
16 person who was in charge of regulations, of knowing
17 the regulations. I was confrontational and I was
18 direct, but I didn't think my tone was any different
19 than hers.
20    Q.    You were present during the deposition of
21 Donna Viens earlier in December of '05?
22    A.    Yes, I was at her deposition.
23    Q.    And is that when you heard that Ms. Viens
24 testified that you yelled at her during this

30

132

```
 1  meeting?
 2     A.   Yes.
 3     Q.   And you were surprised when you heard that
 4  testimony?
 5     A.   Yes, that she interpreted it as yelling.
 6     Q.   But you did characterize yourself as being
 7  confrontational during that meeting?
 8     A.   No, I wasn't confrontational.
 9     Q.   Oh, I'm sorry, I must have misheard you.
10     A.   I said that statement in a tone that was
11  confrontational and direct.
12        MR. SIKORSKI:  Could we just speak for a
13  second off the record.
14        (Discussion off the record.)
15        (Deposition recessed at 3:26 p.m. to
16  March 7, 2006, at 10:00 a.m.)
17
18
19
20
21
22
23
24
```

133

```
 1        COURT REPORTER'S CERTIFICATE
 2     I, J. Edward Varallo, Registered Professional
 3  Reporter, Certified Realtime Reporter, and Notary
 4  Public in the Commonwealth of Massachusetts (my
 5  commission expires 01/09/2009), hereby certify that
 6  the deposition of Mark A. Richards taken on February
 7  2, 2006, in the matter of Mark A. Richards v. River
 8  Valley Counseling Center, Inc., Valley Health
 9  Systems, Inc., David G. Mattocks and Donna Viens,
10  was recorded by me stenographically and transcribed;
11  that before being sworn by me, the deponent provided
12  satisfactory evidence of identification as required
13  by Executive Order 455 (03-13) of the Governor.
14     I certify that the deposition transcript
15  produced by me is true and accurate to the best of
16  my ability.
17     I certify further that I am not counsel,
18  attorney, or relative of any party litigant, and
19  have no interest, financial or otherwise, in the
20  outcome of this suit.
21
22
23
24  DATED: 2/13/2006      J. Edward Varallo
```

134

```
 1
 2              I N D E X
 3  -----------------------------------------
 4  DEPONENT                           PAGE
 5  -----------------------------------------
 6  Mark A. Richards
 7    by Ms. Kennedy.............................  3
 8
 9  -----------------------------------------
10  EXHIBITS        FOR IDENTIFICATION      PAGE
11  -----------------------------------------
12  Richards Deposition Exhibit 1          5
13  Richards Deposition Exhibit 2         10
14  Richards Deposition Exhibit 3         12
15  Richards Deposition Exhibits 4 and 5    43
16  Richards Deposition Exhibit 6         59
17  Richards Deposition Exhibit 7         61
18  Richards Deposition Exhibit 8         63
19  Richards Deposition Exhibit 9         71
20  Richards Deposition Exhibit 10        84
21  Richards Deposition Exhibit 11        85
22  Richards Deposition Exhibit 12        87
23  Richards Deposition Exhibit 13        88
24  Richards Deposition Exhibit 14        89
```

135

```
-----------------------------------------
EXHIBITS      FOR IDENTIFICATION      PAGE
-----------------------------------------
Richards Deposition Exhibit 15        104
Richards Deposition Exhibit 16        106
Richards Deposition Exhibit 17        128
Richards Deposition Exhibit 18        129

(EXHIBITS RETAINED BY ATTORNEY KENNEDY)

-----------------------------------------
CONFIDENTIAL TESTIMONY TRANSCRIBED SEPARATELY
-----------------------------------------
Pages 37 through 46
Pages 78 through 81
```

IN THE MATTER OF:

MARK A. RICHARDS vs.

RIVER VALLEY COUNSELING CENTER, INC. ET AL

---

DEPOSITION OF:

MARK A. RICHARDS
DATE: MARCH 17, 2006

---

## PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

# COMPRESSED TRANSCRIPT & WORD INDEX

Case 3:05-cv-30061-MAP   Document 61-9   Filed 06/07/2006   Page 2 of 29

VOLUME II - 137

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061MAF
Volume II
Pages 137-249

MARK A. RICHARDS

vs.

RIVER VALLEY COUNSELING
CENTER, INC., VALLEY HEALTH
SYSTEMS, INC., DAVID G.
MATTOCKS, and DONNA VIENS

---------------------------------
DEPOSITION OF: MARK A. RICHARDS
---------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Bulkley, Richardson and
Gelinas, LLP, 1500 Main Street, Springfield,
Massachusetts on MARCH 17, 2006, commencing
at 1:30 p.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

PERLIK and COYLE REPORTING
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931    Fax (413) 731-7451

---

VOLUME II - 138

APPEARANCES:

FOR THE PLAINTIFF:

ROBINSON DONOVAN
1500 Main Street
Springfield, Massachusetts 01115
BY: JOHN C. SIKORSKI

FOR THE DEFENDANTS RIVER VALLEY
COUNSELING CENTER, INC., VALLEY
HEALTH SYSTEMS, INC., and DONNA VIENS:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street
Springfield, Massachusetts 01115
BY: MARY J. KENNEDY, ESQUIRE and
FRANCIS D. DIBBLE, ESQUIRE

FOR THE DEFENDANT DAVID G. MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
One Monarch Place
Springfield, Massachusetts 01144
BY: MARYLOU VARAO FABBO, ESQUIRE

---

VOLUME II - 139

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK A. RICHARDS | 141* | 216** | 241* | |
| | | | 241*** | |

* Ms. Kennedy
** Ms. Fabbo
***Mr. Sikorski

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 19 | Revenue Report | 145 |
| 20 | Various Memos | 146 |
| 21 | November 4, 2004 Memo | 163 |
| 22 | Plaintiff's Answers to Valley Health Systems Interrogatories | 184 |
| 23 | Business Plan | 193 |
| 24 | Compensation Analysis | 195 |
| 25 | Financial Projection | 196 |
| 26 | Copies of Newspaper Ads | 209 |

---

VOLUME II - 140

S T I P U L A T I O N S

It is agreed by and between the parties
that all objections, except objections as to the
form of the question, are reserved to be raised at
the time of trial for the first time.

It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the time
of trial for the first time.

It is further agreed that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

*****

### VOLUME II - 141

1    MARK A. RICHARDS, the Deponent, having been
2  previously satisfactorily identified by the
3  production of his driver's license and having been
4  first duly sworn by the Notary Public, deposes and
5  says as follows:
6                    *****
7    DIRECT EXAMINATION BY MS. KENNEDY
8    Q.  Good afternoon, Mr. Richards. This is
9  the continuation of your deposition which was
10  started on February 2nd.
11    I'll just remind you, I had some
12  suggestions earlier in the beginning of that
13  deposition about taking breaks at any time you
14  need to, about letting me complete my question
15  before you attempt to answer it, and answering
16  verbally and not with shakes of your head. I just
17  want to remind you of those suggestions and
18  guidelines.
19    Have you reviewed the transcript of your
20  deposition which was taken on February 2nd, 2006?
21    A.  Yes.
22    Q.  Have you had the opportunity to make any
23  corrections to your deposition transcript?
24    A.  That's in process. I haven't given it

### VOLUME II - 142

1  to my attorney yet.
2    Q.  Other than reviewing your deposition
3  transcript, have you reviewed any other document
4  in preparation for your testimony today?
5    A.  I've read other depositions.
6    Q.  Whose depositions have you read?
7    A.  Mr. Mattocks' and a portion of
8  Mr. Avakian.
9    Q.  Anybody else's depositions?
10    A.  No.
11    Q.  As you sit here today, do you recall
12  anything in Mr. Mattocks' deposition that you
13  disagreed with?
14    A.  Yes.
15    Q.  What do you recall?
16    MR. SIKORSKI: Object, but he can
17  answer.
18    THE WITNESS: Well, I made notes and
19  I don't have those notes with me.
20    I recall that my -- in meetings with
21  him, what he remembers saying, I remember it to be
22  inaccurate. Various things that I remember
23  differently than he did and I take issue with.
24    Q.  (BY MS. KENNEDY) Anything else as you

### VOLUME II - 143

1  sit here today that you recall other than
2  conversations with Mr. Mattocks in meetings that
3  you recall differently than he does?
4    A.  There were things throughout but I would
5  have to refer to my notes.
6    Q.  How about Mr. Avakian's deposition?
7    A.  It was only --
8    Q.  (Interposing) Let me ask my question so
9  it's clear for the record.
10    Is there anything in Mr. Avakian's
11  deposition that you disagreed with that testimony?
12    A.  I just received that just prior to this
13  meeting and have not been able to get through most
14  of it yet.
15    I haven't come across much in the way
16  that I saw as not being the way I remembered it.
17    Q.  What about Donna Viens' deposition?
18  Have you reviewed her deposition?
19    A.  I was present for her deposition.
20    Q.  Any other documents other than
21  deposition transcripts that you reviewed in
22  preparation for your testimony today?
23    A.  I did go through notes that I had -- or
24  rather records that I had from my employment and I

### VOLUME II - 144

1  did bring some of those to my attorney today.
2    Q.  In reviewing your notes, did you find
3  any memo to Mr. Mattocks regarding increasing
4  Mr. Avakian's pay?
5    A.  I found a memo that regarded increasing
6  all employees' pay at the agency, including all
7  the employees in my program, which included
8  Mr. Avakian.
9    Q.  I may not have been clear in my
10  question.
11    In reviewing the documents in
12  preparation for your testimony here today, did you
13  locate a document that you wrote to David Mattocks
14  regarding giving David Avakian a pay raise back in
15  the summer, fall of 2004?
16    A.  That's possible. My attorney pulled
17  various things out from a folder that I had and
18  that's possible that that was in there.
19    I do remember such a document. I don't
20  know if that was one that was pulled out by my
21  attorney or not.
22    Q.  So you gave some documents to your
23  attorney and some were pulled, is that your -- not
24  produced -- is that your understanding?

VOLUME II - 145

1    A.   I'm not clear on the question.
2    Q.   Sure.
3            (Defendant's Deposition Exhibit
         No. 19-20 offered and marked.)
4
5    Q.   (BY MS. KENNEDY)  Mr. Richards, I'm
6 going to put in front of you two sets of exhibits,
7 one marked Defendant's Deposition Exhibit
8 Number 19 and the other marked Defendant's
9 Deposition Exhibit 20.
10           I can represent to you that those are
11 the documents that were produced by your attorney
12 today. (Indicating.)
13   A.   (Witness examining document.)
14   Q.   Did you have a chance to review what's
15 been marked as Exhibits Number 19 and 20?
16   A.   Yes.
17   Q.   Just so I understand your testimony a
18 few minutes ago, did you bring to your attorney's
19 office other documents that are not here today --
20 that are not part of Exhibits 19 or 20?
21   A.   Yes.
22   Q.   Do you know whether the memo to
23 Mr. Mattocks regarding David Avakian was a part of
24 that?

VOLUME II - 146

1    A.   I don't know whether it was part of that
2 or not; no.
3    Q.   Just sticking with these exhibits, I'll
4 start with Number 20 and take them out of order,
5 what is that a copy of?
6    A.   This is a copy of a revenue report that
7 I produced for the Day Treatment Program and the
8 partial hospitalization programs and would share
9 with Mr. Mattocks and other interested
10 administrators as a way of indicating the
11 financial progress of my programs.
12   Q.   You say you shared them with
13 Mr. Mattocks and others.  How would you share them
14 with them?
15   A.   I would give them a copy and I would sit
16 down with them at a meeting face to face and go
17 over it.
18   Q.   That's a document that you took with you
19 when you left River Valley back in November of
20 2004?
21   A.   That's right.
22   Q.   Why did you take those productivity
23 reports back in November of 2004 when you left
24 River Valley?

VOLUME II - 147

1    A.   I was rather proud of my financial
2 reporting and also had problems in the past with
3 River Valley and its predecessor agencies and
4 their inaccuracies in their budgetary process and
5 I would keep these things -- always keep copies
6 with me so that if ever there were questions, I
7 could refer to my own figures.
8    Q.   Is that something you took when you left
9 your employment or something you had at your home
10 before you left your employment in November of
11 2004?
12   A.   I would keep these in my office, so I
13 took them.
14   Q.   Why did you take them when you left your
15 employment in November of 2004?
16   A.   I was taking a variety of things in my
17 office and this was something that I saw as --
18 that I was proud of -- and I wasn't too proud the
19 day I left.
20   Q.   What do you mean by that?
21   A.   I meant I had been terminated
22 unexpectedly, singled out, feeling that it was
23 being done because I had an ill daughter.
24           I was feeling pretty ashamed of my

VOLUME II - 148

1 situation, that I had these things occurring, and
2 I wasn't feeling very good about myself, I guess.
3    Q.   What was the basis of your thinking that
4 you were being terminated because you had an ill
5 daughter?
6    A.   Various things that Mr. Mattocks said to
7 me leading up to that day; and that my program --
8 there was no financial reasons since my program
9 had earned over three hundred thousand dollars
10 profit the year before and was on track to earn
11 even more this year, so it was my opinion that
12 this was being done for other reasons.
13   Q.   What were the various things that
14 Mr. Mattocks told you that led you to believe that
15 you were being terminated because you had an ill
16 daughter?
17   A.   He had made comments that I wasn't
18 around very much, that I was -- he believed that
19 it was hard for me to make meetings and hard to --
20 for him to set meetings with me because of my
21 being home to take care of my daughter.
22           There was a comment that Ms. Viens had
23 made about being proud that she prevented someone
24 from going out on Family Medical Leave at another

## VOLUME II - 149

1  place that she was employed.
2      Q.  Did she use the word that she was
3  "proud"?
4      A.  No; it was my sense that she was proud
5  of it.
6      Q.  What other comments were made by David
7  Mattocks that led you to believe that you were
8  being terminated because you had an ill daughter?
9      A.  When he asked me to participate in an
10 ongoing meeting of managers that would meet a few
11 times a week and balked at that, our relationship
12 changed after that.
13     I sensed a change in our relationship
14 and he was withdrawing from our relationship.
15     Q.  How would you describe your relationship
16 before that with David Mattocks?
17     A.  It was good.  It was one of looking
18 towards the future and increasing the day
19 treatment hospitalization programs, using that as
20 a way to bolster the rest of the agency.
21     Q.  How was it that your relationship
22 changed with David Mattocks?
23     A.  He would, before, come around to the
24 building and drop in and we'd have talks about

## VOLUME II - 150

1  various things that was going on in the agency and
2  that had slowed down.
3      I noticed that he wanted -- one of our
4  meetings that he had set up, he didn't show up for
5  and apparently left a voicemail for me but I don't
6  think that was left in a way where I would have
7  picked it up prior to the meeting happening.
8      Those things did not happen before.  He
9  was diligent about meeting times and being
10 respectful to my time.
11     Q.  It's your testimony that the manner in
12 which he left you the voice message and not making
13 a meeting led you to believe that your
14 relationship had changed?
15     A.  That was a part of it in context of the
16 other things I was picking up on.
17     Q.  When did this occur -- the change that
18 you observed in the relationship you had?
19     A.  Well, I believe --
20     Q.  (Interposing) Strike that.  Let me just
21 get the question out so the record is clear.
22     When is it that you recall that there
23 was a change in the work relationship you had with
24 David Mattocks?

## VOLUME II - 151

1      A.  I noticed after he asked me to attend
2  the managers' meeting that occurred a few times a
3  week.
4      Q.  When did he ask you to attend the
5  managers' meeting?
6      A.  It was about a month -- somewhere in the
7  area of a month before I was terminated.
8      Q.  That would be in approximately October?
9      A.  Early October.
10     Q.  I'll put in front of you what's been
11 marked as Exhibit 19.
12     I'll just ask, skipping over the first
13 few pages, I'll ask you to look at the memo from
14 you to Mr. Mattocks dated September 2nd, 2004?
15 (Indicating.)
16     A.  (Witness examining document.)
17     Q.  Did you have a chance to look over that
18 page of what's been marked as Exhibit 19?
19     A.  Yes.
20     Q.  Did you disagree with Mr. Mattocks'
21 opinion that billings were not being received by
22 the River Valley business office in a timely
23 manner?
24     A.  Yes; I wrote him a memo explaining that,

## VOLUME II - 152

1  and I later had a meeting with him which involved
2  Sean Munster, who is someone that brought this
3  issue to his attention, and we sat down and
4  discussed this topic.
5      Q.  Is the first part of this page a typed
6  memo, the first half of the page?
7      A.  The entire thing is typed except for my
8  notes at the bottom.
9      Q.  Could you read into the record what
10 your -- strike that.  Is that handwritten notes on
11 the bottom?
12     A.  Yes.
13     Q.  Could you -- is all of the handwriting
14 on there, halfway down the page, is that all your
15 writing?
16     A.  Yes.
17     Q.  Could you read into the record just your
18 handwritten notes, please?
19     A.  "David, hyphen, Med A billing has
20 historically been every four weeks" -- the word
21 four is underlined -- "and must be begun after a
22 three-day, parenthesis, such as Labor Day, close
23 parenthesis, weekend for optimum revenue
24 recovery" -- and "optimum revenue recovery" is

## VOLUME II - 153

1  underlined. "I'd be happy to discuss this
2  procedure with you. Mark. P.S., all non, hyphen,
3  Med A billing is done weekly and is always
4  timely."
5      Q.    The next page that's in Exhibit 19 is a
6  copy of an e-mail, is that correct?
7      A.    Yes.
8      Q.    Is that an e-mail from you to
9  Mr. Mattocks?
10     A.    Yes.
11     Q.    Regarding that same subject?
12     A.    Yes.
13     Q.    Was that e-mail written after the
14  handwritten note?
15     A.    It is dated September 3rd. I'm not sure
16  whether I sent that handwritten note -- I probably
17  wrote out the e-mail and sent that instead and
18  used the handwritten note as a way of organizing
19  my thoughts.
20     Q.    The last page, which has been marked --
21  of the document that's been marked as Exhibit 19,
22  can you identify that document, please?
23     A.    This is a memo from me to David Mattocks
24  dated October 26, 2004 regarding job performance,

## VOLUME II - 154

1  goals, and objectives.
2      Q.    Did you send that to Mr. Mattocks?
3      A.    Yes -- I believe I handed it to him in
4  one of our supervision sessions.
5      Q.    How was it that -- strike that. Why did
6  you create that memo?
7      A.    It was at his request. He was asking
8  for managers' job performance and goals and
9  objectives.
10     Q.    Do you recall when he asked you for that
11  information?
12     A.    I don't think it was more than a week
13  before I gave it to him.
14     Q.    Did you have an opportunity to speak to
15  Mr. Mattocks about your goals and objectives
16  outlined in your memo dated October 26, 2004?
17     A.    I don't remember doing so.
18     Q.    Going back to the November 4th meeting
19  with David Mattocks and Donna Viens, I believe you
20  testified that you wanted an opportunity to say
21  good-bye to your staff. Do you recall that
22  testimony?
23     A.    Yes; I do.
24     Q.    Did you have an opportunity to do that?

## VOLUME II - 155

1      A.    Yes; I did.
2      Q.    How did that come about? What happened?
3      A.    There was a meeting with my staff that
4  included Mr. Mattocks in the building where I
5  worked.
6      Q.    Was that a scheduled meeting with your
7  staff that day?
8      A.    No; that was an impromptu meeting.
9      Q.    Do you recall what time of day that was?
10     A.    It was close to lunchtime.
11     Q.    How did that meeting get coordinated?
12     A.    Mr. Mattocks called over, I believe, to
13  Mr. Avakian to set that meeting up.
14     Q.    Who attended that meeting?
15     A.    The employees from the agency who
16  reported to me who were present at the time, and
17  Mr. Mattocks.
18     Q.    You said the employees from the agency
19  who reported to you.
20          Are those the clinicians that you
21  testified to earlier?
22     A.    Yes, for the most part.
23     Q.    But not all of them were present?
24     A.    I don't believe so; no.

## VOLUME II - 156

1      Q.    You said Mr. Avakian was also at that
2  meeting?
3      A.    Yes.
4      Q.    Who, outside of your staff, attended
5  that meeting?
6      A.    Mr. Mattocks.
7      Q.    What was said at that meeting? Who
8  started the conversation?
9      A.    I don't remember whether Mr. Mattocks
10  did or I did.
11     Q.    Did you say anything at that meeting?
12     A.    Oh, yes.
13     Q.    What did you say?
14     A.    I told the staff that I was leaving,
15  that it was my last day, that they had meant a lot
16  to me and I was going to miss them.
17          I told them that the reason I was
18  leaving was because of my daughter being ill and I
19  was going to be home to take care of her and
20  Administration decided I should leave right away.
21     Q.    Do you recall anything else you said to
22  your staff at that meeting?
23     A.    I told them I was proud of them and the
24  work they had done and asked them to continue

VOLUME II - 157

1  doing the same, that the work they had been doing
2  on behalf of the clients was exemplary. I wished
3  them luck.
4       Q.  Anything more that you recall?
5       A.  During that part of the meeting?
6       Q.  Yes.
7       A.  No -- well, not presently, I don't.
8       Q.  Was there more than one part of the
9  meeting?
10      A.  There was a part of the meeting that
11 preceded it when I was with the staff and before
12 Mr. Mattocks and Mr. Avakian came into the room in
13 which I gave them a quick summary of what this
14 meeting was about, because they were very worried.
15      In past times when we had such meetings,
16 there was some kind of an emergency in the
17 financial part of either the service or the agency
18 and oftentimes -- and in those cases, a risk that
19 people may be losing their jobs because the
20 program may no longer exist so I wanted to dispel
21 that and not have them worry that this meeting was
22 about the potential of their being out of work.
23      Q.  What did you tell your staff in the
24 meeting that preceded the meeting when David

VOLUME II - 158

1  Mattocks was there?
2       A.  I told them that I was going to be
3  leaving, that this meeting was about my leaving
4  the agency and that they should be on their best
5  behavior -- or words to that effect.
6       Q.  Did you tell them in the first part of
7  the meeting that you were leaving because you were
8  going to care for your daughter who was ill?
9       A.  I don't remember.
10      Q.  I interrupted you. Did you say anything
11 else --
12      A.  (Interposing) There was a brief amount
13 of time and there wasn't a lot said.
14      Q.  Other than what you just testified to,
15 what else did you tell your staff during that
16 meeting that -- the first part of the meeting?
17      A.  I don't remember.
18      Q.  I believe you just testified a few
19 moments ago that in the meeting in which -- with
20 your staff in which Mr. Mattocks was in
21 attendance, you told your staff that the reason
22 you were leaving was because your daughter was ill
23 and you were going to care for your daughter at
24 home.

VOLUME II - 159

1       Did I understand your testimony
2  correctly?
3       A.  Yes. Words to that effect is what I
4  told them.
5       Q.  Why did you tell them that you were
6  leaving to go to care for your daughter?
7       A.  I was ashamed that I was being
8  terminated and singled out.
9       I'd been working full time since I was
10 fifteen years old and going to school and not
11 working was an embarrassing thing for me and I
12 didn't want that stigma with the people that I had
13 worked so long with and felt so close to.
14      Q.  Do you recall Mr. Mattocks saying
15 anything during the meeting with the staff?
16      A.  He had things to say, I remember.
17      Q.  What were the things he had to say?
18      A.  Well, I only remember his saying that,
19 yes, Mark is going to go take care of his daughter
20 and I'm not sure -- that things would be going
21 forward in the program, that the program would be
22 all right though, because the agency was still
23 behind it or words to that effect.
24      Q.  Did any of the staff speak at that

VOLUME II - 160

1  meeting?
2       A.  During the meeting, I don't remember.
3       Q.  How long did this meeting take with the
4  staff?
5       A.  Ten or fifteen minutes, maybe twenty at
6  the outside. It didn't seem long.
7       Q.  How many staff did you have at that
8  time?
9       A.  Well, I don't remember who was staying
10 on the floor because we had a program running at
11 the time so I don't know if everybody came into
12 the meeting that was working in the program.
13 There may have been six or seven people there
14 besides me.
15      Q.  Approximately how many clinicians did
16 you have working in your staff at that time?
17      A.  Eight or nine.
18      Q.  Mr. Richards, I'm going to put back in
19 front of you what's been marked as Defendant's
20 Exhibit Number 19 and if you would just turn to
21 the third page of that document.
22      Is that a list of the staff of the Day
23 Treatment Program? (Indicating.)
24      A.  It's a partial list.

VOLUME II - 161

1    Q.   Who is missing from the program that was
2  employed there in November of 2004?
3    A.   We had a Spanish-speaking clinician who
4  is not on this list who came in part time.  She
5  was also a manager of another Spanish-speaking
6  program.  We had a psychiatrist.
7    Q.   Is that Mr. Lee?
8    A.   Doctor Linn.
9    Q.   Doctor Linn, pardon me.
10   A.   Yes.
11   Q.   Anybody else?
12   A.   I don't remember anybody else.
13   Q.   Thank you.  What happened after the
14  meeting with the staff?  What did you do?
15   A.   After the meeting with the staff, I went
16  to my office and then I later met with the
17  clients.
18   Q.   You met with clients later in the day?
19   A.   Yes.
20   Q.   How many?
21   A.   Just the ones that were there during the
22  lunch hour or soon after.  Maybe fifteen.
23   Q.   What did you tell the fifteen clients?
24   A.   I mentioned to them that I was

VOLUME II - 162

1  resigning, it was my last day.  I was going to be
2  caring for my daughter and talked with them about
3  how the staff and the program would be staying
4  there and they weren't to worry about people
5  leaving.
6        I reviewed how long everybody had been
7  there so they would not worry that there was going
8  to be some kind of exodus of staff that would hurt
9  the integrity of the program as well as the
10  relationships that they had built.
11       I mentioned to them how important they
12  had been to me and how I would miss them.
13   Q.   These fifteen -- approximately fifteen
14  clients that you met with, were they clients that
15  you saw one-on-one?
16   A.   Not on a regular basis.  I'd see them
17  one-on-one if something special was needed.
18   Q.   Did they treat with other clinicians on
19  your staff?
20   A.   They were assigned to the caseloads of
21  other clinicians on the staff.
22   Q.   Did you discuss with David Mattocks
23  speaking with the clients about your departure?
24   A.   Yes.

VOLUME II - 163

1    Q.   Was that at the meeting that you were
2  informed that your employment was being
3  terminated?
4    A.   Yes.
5    Q.   What did Mr. Mattocks say about you
6  speaking with the clients about leaving?
7    A.   He thought that would be fine, and even
8  talked about maybe a more formal get-together
9  later on where I could say good-bye and also meet
10  with those people that weren't able to be there on
11  that day.
12   Q.   Did that formal meeting ever take place?
13   A.   No.
14   Q.   You went back to your office, I believe
15  you testified, and you met with approximately
16  fifteen clients.
17       What's the next thing you recall doing
18  on that day?
19   A.   I wrote out a memo to go to other
20  providers to announce that I was leaving the
21  agency.
22       (Defendant's Deposition Exhibit
          No. 21 offered and marked.)
23
24       THE WITNESS:  And I started

VOLUME II - 164

1  organizing my office to pack up.
2        I met with my secretary to tell her what
3  was happening and to discuss who should get the
4  memo.
5    Q.   (BY MS. KENNEDY)  Mr. Richards, I'm
6  going to put in front of you what's been marked as
7  Defendant's Exhibit Number 21 and ask if you could
8  identify that, please? (Indicating.)
9    A.   (Witness examining document.)  That's
10  the memo that I wrote to distribute to other
11  providers notifying them of my leaving the agency.
12   Q.   Did you tell your secretary who to send
13  that memo to?
14   A.   Yes.
15   Q.   Do you know approximately how many
16  people it was sent to?
17   A.   About fifteen.
18   Q.   Did you return back to River Valley
19  another day to pack your belongings?
20   A.   Yes.
21   Q.   Was anyone there with you?
22   A.   Yes; David Avakian.
23   Q.   Did you have any conversations with
24  David Avakian as you were packing your things?

VOLUME II - 165

1    A.   Yes.

2    Q.   What do you recall saying to David

3 Avakian?

4    A.   I recall talking with him about what he

5 would need to do and giving him sort of

6 last-minute instructions for the program, telling

7 him where things were and so forth, talking with

8 him about my leaving and going over, again, that

9 this was something that I wasn't blaming him for,

10 even though he was aware that I was going to be

11 leaving beforehand and he knew that they were

12 going to terminate me beforehand and not blaming

13 him for any of that, because he was feeling sorry

14 about it.

15         He was feeling somewhat responsible, I

16 think.

17    Q.   Are you done with your answer?  I don't

18 want to interrupt.

19    A.   Yes.

20    Q.   Just so I understand your testimony,

21 Mr. Richards, based on your conversation with

22 David Avakian that day, you were led to believe

23 that he knew that you were not leaving to care for

24 your daughter but for some other reason?

VOLUME II - 166

1         MR. SIKORSKI:  Objection.

2         THE WITNESS:  Yes.

3    Q.   (BY MS. KENNEDY) Did you understand him

4 to know that your employment was being terminated?

5    A.   Yes.

6    Q.   What led you to believe that Mr. Avakian

7 knew that prior to November 4th?

8    A.   Well, on the day that I was terminated,

9 when I came back to the office before my meeting

10 with he and Mr. Mattocks, David came into my

11 office and said what's going on and I said, well,

12 it's about my leaving the agency and that's what

13 this meeting that's being called is about and he

14 said, what do you mean, you're leaving the agency?

15         He was speaking as if he had no

16 knowledge of it and I said, David, I know you know

17 what's going on.  He goes, what do you mean and I

18 said David Mattocks told me that you were aware of

19 this.  He goes -- he said, I'm so sorry; yeah.

20    Q.   You just testified that David Mattocks

21 told you that you were aware of this, what are you

22 referring to?

23    A.   That David Avakian was aware of my being

24 terminated prior to me knowing about it.

VOLUME II - 167

1    Q.   When did David Mattocks tell you that?

2    A.   He told me that at the termination

3 meeting or sometime before I went back to my

4 office.

5    Q.   So it is your testimony that on

6 November 4th when you first met with Donna Viens

7 and David Mattocks, that during that conversation,

8 David Mattocks told you that David Avakian is

9 aware of this?

10         MR. SIKORSKI:  Objection.

11         THE WITNESS:  The topic came up and

12 it was clear to me that David Avakian was aware of

13 it.

14    Q.   I'm getting confused about your

15 testimony, Mr. Richards.  Let's go back to the

16 November 4th meeting.

17         During the November 4th meeting you had,

18 did David Mattocks tell you that David Avakian

19 knew that your employment was going to be

20 terminated?

21         MR. SIKORSKI:  Objection.

22         THE WITNESS:  Something that he said

23 made it clear to me -- and I don't remember

24 exactly what he said -- but it made it clear to me

VOLUME II - 168

1 that David Avakian was aware of my being

2 terminated.

3    Q.   (BY MS. KENNEDY) It was something that

4 Mr. Mattocks said but you don't recall what was

5 specifically said that led you to believe that, is

6 that your testimony?

7         MR. SIKORSKI:  Objection.

8         MS. KENNEDY:  That was a terrible

9 question.

10         MR. SIKORSKI:  Objection; go ahead

11 and answer it.

12         THE WITNESS:  I don't recall

13 specifically.

14    Q.   (BY MS. KENNEDY) Before today's

15 deposition, you had not reviewed David Avakian's

16 deposition, is that correct?

17    A.   I read about the first half or so, maybe

18 a little less.

19    Q.   What else do you recall of your

20 conversation with David Avakian on the day that

21 you were packing up, other than what you've

22 testified to?

23    A.   Well, we had a long time together.  It

24 took a period of hours, it seemed.  It was at

## VOLUME II - 169

1  least two hours that I was there.

2  He was with me just about all of that

3  time as I remember and there were many things that

4  we talked about. I can't remember them all.

5  Q. Were you mad at David Avakian for not

6  telling you that your employment was going to be

7  ending?

8  A. No; I wasn't mad at him. I felt that he

9  was caught in the middle.

10  Q. Did you talk to David Avakian about

11  whether the requirements for Medicare would be in

12  compliance with you not being the program

13  director?

14  A. I don't remember if I talked with him

15  about that. I know I passed information to him

16  about the regulations, some documents that

17  pertained to the regulations and he had recently

18  been reviewing them. It is possible but I don't

19  remember.

20  Q. Did you have an opinion back then

21  whether David Avakian would be a good assistant

22  director of the program without you being there?

23  MR. SIKORSKI: Objection.

24  THE WITNESS: He was already the

## VOLUME II - 170

1  assistant director. Mr. Mattocks made him the

2  assistant director prior to my leaving.

3  Q. (BY MS. KENNEDY) At your request, is

4  that correct?

5  A. My request was to give him a promotion

6  and salary.

7  It was Mr. Mattocks' decision that he

8  should be made assistant program director.

9  Q. Did you disagree with that decision?

10  A. No; I did not disagree.

11  Q. Did you have any concerns about David

12  Avakian working in the program without you being

13  there?

14  A. I didn't have any concerns about his

15  competence. I just felt it was going to be a

16  shock for him to have to take all this up at once

17  and go through many changes.

18  I like David a lot and I felt that he

19  should be treated fairly.

20  Q. During this long period of time that you

21  were packing up your office, did you tell David

22  Avakian that it was not your choice to leave River

23  Valley and to care for your daughter?

24  A. I believe it was more of a continuation

## VOLUME II - 171

1  of a conversation that we had earlier that week,

2  that it was understood between the two of us that

3  it was not my decision to be leaving.

4  I was not as emotionally upset as I was

5  on the previous day -- the Thursday before.

6  Q. Did you discuss with David Avakian

7  during the time period that you were packing up

8  about the reasons why David Mattocks chose to

9  eliminate your position?

10  A. No; I don't believe so. I wasn't clear

11  on the reasons, myself.

12  Q. Did you have any conversations with any

13  of your other co-workers about your termination of

14  employment, other than David Mattocks and the

15  people you said good-bye to on November 4th?

16  MR. SIKORSKI: Objection; at any

17  time?

18  MS. KENNEDY: I'll rephrase the

19  question; thank you.

20  Q. (BY MS. KENNEDY) Since leaving River

21  Valley on the fourth, other than the conversation

22  you had with David Avakian when you were packing

23  up, have you spoken with any of your co-workers at

24  River Valley?

## VOLUME II - 172

1  A. Yes.

2  Q. Have you spoken to those co-workers

3  about your termination of employment?

4  A. Yes.

5  Q. Who?

6  A. I spoke with Doctor Linn, Rorry

7  Zahourek -- Doctor Rorry Zahourek -- and Doctor

8  Abraham Linn, both on the day -- on November 4th,

9  I spoke with them, as well as later on.

10  Q. What did you tell them on November 4th?

11  A. I told them that I was terminated by

12  Mr. Mattocks.

13  Q. Why did you tell them that and not the

14  other story of leaving to care for your daughter?

15  MR. SIKORSKI: Objection; go ahead.

16  THE WITNESS: I felt that their

17  having that information would not be as burdensome

18  to them as it would to the other staff.

19  I felt closer to them to share my own

20  personal situation without having to -- because

21  they were more peers of mine -- that I would have

22  felt passing boundaries of people that I was

23  supervising.

24  Q. (BY MS. KENNEDY) Did you tell Doctor

VOLUME II - 173

1    Zahourek and Abraham Linn about your termination
2    of employment?
3        A.   Yes.
4        Q.   What did you tell them?
5        A.   I told them that Mr. Mattocks had
6    terminated me and I did not expect it.
7        Q.   I believe that's what you told them on
8    November 4th, is that correct?
9        A.   That's correct.
10       Q.   You had a conversation sometime after
11   November 4th?
12       A.   Yes.
13       Q.   What else did you tell them about your
14   termination of employment?
15       A.   I don't remember.
16       Q.   Any other colleagues that you worked
17   with that you spoke to since leaving River Valley
18   on November 4th regarding -- and you spoke to them
19   regarding the termination of your employment?
20       A.   No.
21       Q.   Other than any conversations you may
22   have had with your lawyer, has anyone told you
23   that River Valley Counseling Center had terminated
24   your employment because of your age?

VOLUME II - 174

1        A.   No.
2        Q.   Other than any conversations you may
3    have had with your lawyer, has anyone told you
4    that River Valley Counseling Center terminated
5    your employment because you have skin cancer?
6        A.   No.
7        Q.   Other than any conversations you had
8    with your lawyer, did anyone tell you that River
9    Valley terminated your employment because of your
10   daughter's illness?
11       A.   No.
12       Q.   Other than any conversations you may
13   have had with your lawyer, has anyone told you
14   River Valley Counseling Center terminated your
15   employment because you had been approved for
16   intermittent Family Medical Leave?
17       A.   No.
18       Q.   Mr. Richards, you have brought an age
19   discrimination claim against your former employer,
20   River Valley Counseling Center, and the other
21   defendants in this case. Are you aware of that?
22       A.   Yes.
23       Q.   What facts do you rely on that form the
24   basis of your belief that River Valley Counseling

VOLUME II - 175

1    Center terminated your employment because of your
2    age?
3            MR. SIKORSKI:  Objection; you can go
4    ahead.
5            THE WITNESS:  Mr. Avakian, who was
6    the primary leader in the position after I left --
7    in the program after I left -- is about ten years
8    younger than I am.
9        Q.   (BY MS. KENNEDY)  Any other fact that
10   you rely on that forms the basis of your belief
11   that River Valley Counseling Center terminated
12   your employment because of your age?
13       A.   No.
14       Q.   You also understand that you brought a
15   claim of disability discrimination, is that
16   correct?
17       A.   Yes.
18       Q.   Against all of the defendants in this
19   case, is that your understanding?
20       A.   Yes.
21       Q.   What facts do you rely on that form the
22   basis of your belief that River Valley Counseling
23   Center terminated your employment because you have
24   skin cancer?

VOLUME II - 176

1        A.   I believe it's something that is added
2    to the other factors and made it -- or weighted
3    the decision against me. It was -- my skin cancer
4    is something that had been ongoing for years and
5    people were aware of.
6            I did have a most serious procedure that
7    was done about a year before my termination.
8        Q.   That was in 2003?
9        A.   2003; and I continued to have many marks
10   and blotches on my face that were not improving.
11       Q.   What facts do you rely on that form the
12   basis of your belief that your skin cancer may
13   have been a factor in the termination of your
14   employment at River Valley?
15       A.   That Mr. Mattocks and others were aware
16   that I had skin cancer.
17       Q.   Who were the others that were aware that
18   you had skin cancer?
19       A.   People who I worked with at the agency.
20   It was easy to see and I did speak with some
21   people about it.
22       Q.   Other than those individuals' awareness
23   that you had skin cancer, is there any other fact
24   that you rely on that forms the basis of your

VOLUME II - 177

1  belief that skin cancer was a factor in the
2  termination of your employment?
3     A.   No.
4     Q.   What facts do you rely on that form the
5  basis of your belief that River Valley Counseling
6  Center terminated your employment because your
7  daughter has an illness?
8     A.   My daughter's illness was well-known by
9  people in the management part of the agency.
10 Mr. Mattocks was aware of it, Ms. Viens was aware
11 of it.
12          They were also aware that it interfered
13 with my being able to be at work in the mornings,
14 especially. They knew that I was a primary
15 caretaker to help her with her illness when
16 Mr. Mattocks would make mention of my not being
17 there in the mornings because of my daughter --
18 because I was taking care of my daughter.
19          Ms. Viens made mention that she had
20 prevented a person at another -- at her other job
21 from going out on Family Medical Leave.
22          My staff knew that I was not coming in
23 on some mornings because of my daughter's illness
24 and my staff, even though they never said anything

VOLUME II - 178

1  about that directly, would make mention of my not
2  being around enough.
3     Q.   Are you done with your answer?
4     A.   Yes.
5     Q.   Is there any other fact that you rely on
6  that forms the basis of your belief that River
7  Valley terminated your employment because you have
8  a daughter with an illness?
9          MR. SIKORSKI: Objection; go ahead
10 and answer.
11    Q.   (BY MS. KENNEDY) Other than what you've
12 already testified to?
13    A.   The only things are a process of
14 elimination. There were no other reasons to
15 terminate me. It made sense to me.
16    Q.   Did it make sense to you that your
17 position was being eliminated for a cost savings
18 reason?
19    A.   No.
20    Q.   Why not?
21    A.   Because by eliminating me, the agency
22 put itself in jeopardy of being out of compliance
23 with the regulations and having the finances from
24 that point forward being taken back by the

VOLUME II - 179

1  payers -- Medicaid and Medicare -- which would
2  have been extraordinarily costly; and instead of
3  making money, they would have lost money with the
4  program.
5     Q.   Is it your belief that since
6  November 4th, 2004, the agency has been in
7  jeopardy because they don't have a program
8  director that meets the requirements of the
9  Medicaid regulations?
10    A.   That's my belief.
11    Q.   Have you -- other than contacting --
12 strike that.
13          Other than speaking with your attorney,
14 have you spoken with anyone else outside of River
15 Valley Counseling Center regarding your belief?
16          MR. SIKORSKI: You mean, for
17 example, has he filed a Quit Am action?
18    Q.   (BY MS. KENNEDY) No; my question is
19 other than contacting -- my question specifically
20 is other than speaking with your attorney, have
21 you spoken with anyone outside of River Valley
22 Counseling Center regarding your belief that the
23 agency is in jeopardy because they are not in
24 compliance with the Medicare regulations?

VOLUME II - 180

1     A.   Yes.
2     Q.   Who have you spoken with?
3     A.   I've spoken with my wife.
4     Q.   Who else besides your wife?
5     A.   I don't remember if there was anyone
6  else besides my wife that I've spoken with about
7  that.
8     Q.   Thank you. I just want to make sure --
9  and I may have already asked you this -- but other
10 than what you have already told us, is there any
11 other facts that you rely on that form the basis
12 of your belief that River Valley terminated your
13 employment because of your age, other than what
14 you've already told us -- so anything else?
15    A.   No.
16    Q.   The same thing for your claim regarding
17 skin cancer.
18          Other than what you've already testified
19 to, is there any other fact that you rely on that
20 forms the basis of your belief that River Valley
21 terminated your employment because of your skin
22 cancer?
23    A.   I can't think of anything now.
24    Q.   You've also brought a claim,

VOLUME II - 181

1 Mr. Richards, under the Family Medical Leave Act,
2 do you understand that?
3    A.   Yes.
4    Q.   What facts are you relying on that form
5 the basis of your belief that River Valley
6 Counseling Center terminated your employment
7 because you went out on intermittent family leave?
8         MR. SIKORSKI:  Objection.
9         THE WITNESS:  I think I'd be
10 restating what I've already said.
11    Q.   (BY MS. KENNEDY)  Please do, to make it
12 clear for the record.
13    A.   Okay.  That --
14         MR. SIKORSKI:  (Interposing)
15 Objection.
16         THE WITNESS:  That Mr. Mattocks
17 seemed to be upset with my being out in the
18 mornings; not being able to attend certain
19 meetings; not being able to give more time to the
20 management team; to my not being available when he
21 called sometimes in the morning; to his belief
22 that I was not billing in a timely way because of
23 my daughter's illness.
24         Also, Ms. Viens spoke in a way that led

VOLUME II - 182

1 me to believe that she was proud that she had
2 prevented an employee at her other work site from
3 going out on Family Medical Leave.  I believe that
4 sums up the reasons.
5    Q.   Any other reasons other than what you've
6 just testified to?
7    A.   I can't think of them currently.
8    Q.   Do you believe that Valley Health
9 Systems, Inc. played any role in the termination
10 of your employment at River Valley Counseling
11 Center?
12    A.   I'm under the understanding from
13 Mr. Mattocks that he discussed my termination with
14 people at Holyoke Medical Center, including
15 Mr. Porten and Ms. Kelleher.
16         It was my understanding from
17 Mr. Mattocks that on the morning of November 4th,
18 in a meeting, that he had received approval from
19 Mr. Porten to make the changes that he was about
20 to make.
21         Right after that meeting, he told me I
22 was being terminated.
23    Q.   Is there any other fact that you rely on
24 other than what you've just testified to that

VOLUME II - 183

1 forms the basis of your belief that Valley Health
2 Systems played any role in the decision to
3 terminate your employment?
4    A.   I also remember Mr. Mattocks speaking
5 about needing to pay back Valley Health Systems
6 money that River Valley owed as quickly as
7 possible, even if it meant moving faster than the
8 schedule of pay-backs, so it was my opinion that
9 he was motivated by Valley Health Systems to save
10 money and make money as quickly as he could.
11    Q.   What is your understanding of the fact
12 that River Valley was motivated to save money and
13 make money as quickly as it could had to do with a
14 decision to eliminate your position?
15         MR. SIKORSKI:  Objection.
16         THE WITNESS:  I believe that in the
17 short term, Mr. Mattocks believed that my
18 getting -- by terminating me he would be saving my
19 salary to use as a way of speeding up the loan
20 payments back to Valley Health Systems.
21    Q.   (BY MS. KENNEDY)  Just so I understand
22 your testimony, it's your understanding that
23 Mr. Mattocks believed by eliminating your
24 position, it could save money?

VOLUME II - 184

1         MR. SIKORSKI:  Objection.
2    Q.   (BY MS. KENNEDY)  For River Valley?
3         MR. SIKORSKI:  Objection.
4         THE WITNESS:  This is a belief I
5 have.
6    Q.   (BY MS. KENNEDY)  But that was your
7 belief, is that correct?
8    A.   In hindsight, yes, it's my belief.
9         MR. SIKORSKI:  Would this be a good
10 time to take a break?
11         MS. KENNEDY:  Sure.
12         (A recess was taken.)
13         MS. KENNEDY:  Can you mark this,
14 please?
15         (Defendant's Deposition Exhibit
         No. 22 offered and marked.)
16
17    Q.   (BY MS. KENNEDY)  Mr. Richards, I'm
18 going to put in front of you what's been marked as
19 Defendant's Exhibit Number 22 and ask if you can
20 identify that, please? (Indicating.)
21    A.   (Witness examining document.)  It says
22 "Plaintiff's Answers to Defendant Valley Health
23 Systems, Incorporated Interrogatories."  This is
24 a --

**VOLUME II - 185**

1 Q. (Interposing) If I could interrupt you
2 and just ask you to turn to page six of that
3 document?
4 A. (Witness complying.)
5 Q. Excuse me for leaning over but again,
6 just directing you to a portion of your answer
7 with respect to the second to the last paragraph
8 in your answer to interrogatory number nine, I'm
9 just going to read this to you.
10 "Valley Health Systems and Hank Porten
11 as CEO of Valley Health Systems failed to protect
12 my rights under FMLA and in addition, failed to
13 intervene on my behalf when David Mattocks and
14 Donna Viens of River Valley Counseling Center
15 terminated me due to my lawful use of FMLA." Did
16 I read that correctly?
17 A. Yes.
18 Q. What was it that you expected Valley
19 Health Systems to do regarding the termination of
20 your employment?
21 A. Since Mr. Mattocks reported directly to
22 Hank Porten and also since Ms. Kelleher supervised
23 Ms. Viens, I expected that their greater
24 experience and expertise would have intervened and

**VOLUME II - 186**

1 stopped both of them from going ahead with what I
2 believe is terminating somebody because he's got a
3 sick daughter.
4 I thought they had more expertise and
5 would have recognized that, especially in two very
6 new employees who were unproven and making such a
7 drastic move as they were making.
8 Q. The two employees that were unproven,
9 are you referring to David Mattocks and Donna
10 Viens?
11 A. Mr. Mattocks, who had only been there
12 three months, and Ms. Viens, who was hired by him;
13 yes.
14 Q. You believe Mr. Mattocks terminated your
15 employment because you have a sick daughter?
16 A. Because I was out on FMLA leave and
17 caring for my sick daughter; yes.
18 Q. What is your belief that Valley Health
19 Systems knew that you were the person being --
20 that your employment was being terminated --
21 strike that.
22 What's the basis of your belief that
23 Valley Health Systems knew that your employment
24 was being terminated?

**VOLUME II - 187**

1 A. That in the meeting on November 4th
2 prior to my termination meeting, Mr. Mattocks told
3 the entire management team that he had a very good
4 meeting with -- just recently had a very good
5 meeting with Mr. Porten and was going over some of
6 the changes that he wanted to make and that Mr.
7 Porten was fully behind him. Then,
8 within the hour, he told me that my position was
9 being terminated.
10 Q. Any other facts that you rely on that
11 forms the basis of your belief that Valley Health
12 Systems knew that your employment was being
13 terminated?
14 A. I knew that because of the problems that
15 Mr. Porten had had with other River Valley CEOs
16 and having problems with their competency and his
17 trust in them, that he was keeping a very close
18 eye on any managerial decision that was being made
19 by the CEOs and financial decisions that were
20 being made.
21 Q. How do you know that?
22 A. I was told that by other administrators
23 in the agency, by the consultants who were hired
24 by Mr. Porten to report to him and watch over the

**VOLUME II - 188**

1 decisions being made by the executives at River
2 Valley, even by taking away the power on two
3 occasions when I was there from the CEO and giving
4 it to others who Mr. Porten had report directly to
5 him.
6 Q. Did you ever have those conversations
7 with Mr. Porten directly?
8 A. I was in board meetings where such
9 things were talked about where Mr. Porten was
10 present.
11 Q. Is it your testimony that Mr. Porten, in
12 a meeting, told you that he was watching over the
13 CEO of River Valley?
14 A. No; I didn't say Mr. Porten said that to
15 me.
16 Q. What is the basis of your belief that
17 anyone at Valley Health Systems knew that you had
18 a daughter who was ill?
19 A. Ms. Kelleher and another woman who
20 worked with Ms. Kelleher were being paid by River
21 Valley to oversee the Human Resource Department at
22 River Valley. Human Resource decisions that were
23 being made were being passed through them for
24 years.

## VOLUME II - 189

1  Q.  Do you have personal knowledge of that?
2  A.  Yes.
3  Q.  What is your personal knowledge of that?
4  A.  I would see them in the office every
5  week. I'd hear it from the person who they were
6  reporting -- who was reporting to them, from a
7  previous Human Resource individual. I heard
8  Mr. Mattocks speak of their paying for this
9  service.
10  Q.  Did you see Mary Kelleher in the offices
11  of River Valley Counseling Center in the fall of
12  2004?
13  A.  No; not Mary Kelleher.
14  Q.  Any other basis that led you -- strike
15  that.
16      Any other fact that led you to believe
17  that Valley Health Systems knew that you were out
18  on Family Medical Leave?
19  A.  Nothing directly.
20  Q.  You have named Donna Viens as a
21  defendant in this case, is that correct?
22  A.  Yes.
23  Q.  What facts do you rely on that form the
24  basis of your belief that Donna Viens played any

## VOLUME II - 190

1  role in the decision to terminate your employment?
2  A.  Mr. Mattocks mentioned that he used
3  Ms. Viens as a confident because he did not feel
4  as close to other people in the administration and
5  that he would run things by her.
6      When I first asked him for Family
7  Medical Leave, he instructed me to go see
8  Ms. Viens to fill out the paperwork. Ms. Viens
9  and I spoke on occasion about my daughter's
10  illness and Ms. Viens told me a story in which she
11  prevented an employee at another place she worked
12  from going out on Family Medical Leave.
13  Q.  Are you done with your answer?
14  A.  Yes.
15  Q.  Any other fact that you rely on that
16  formed the basis of your belief that Donna Viens
17  played any role in the decision to terminate you
18  based on your Family Medical Leave, other than
19  what you just testified to?
20  A.  Nothing that I can think of now.
21  Q.  Are you currently employed?
22  A.  No.
23  Q.  What is your source of income?
24  A.  I am going to be starting my own

## VOLUME II - 191

1  business and I've made some money through that
2  over the past month.
3  Q.  How is it that you already made money
4  when you haven't started your business?
5  A.  Well, I did start my business, but I
6  hadn't made any money from it until the past month
7  or middle of February.
8  Q.  Are you employed in your own business,
9  Mr. Richards?
10  A.  My own business; yes.
11  Q.  What's the name of your business?
12  A.  Berkshire Counseling Associates.
13  Q.  Is that entity -- strike that. What
14  kind of entity is Berkshire Counseling Associates?
15  A.  It's a sole proprietorship doing
16  business as that name.
17  Q.  Any other people that work for Berkshire
18  Counseling Associates, other than yourself?
19  A.  No.
20  Q.  When did you start this business?
21  A.  I started this soon after leaving River
22  Valley.
23  Q.  How soon?
24  A.  About a month later.

## VOLUME II - 192

1  Q.  Would that be December?
2  A.  Yes; about that.
3  Q.  You say -- did you start it in December?
4  A.  I went to a program that helps
5  entrepreneurs set up businesses and I discussed it
6  with them then and started the process at that
7  point.
8  Q.  When did you go to that program?
9  A.  About December of '04.
10  Q.  Would looking at your day calendar
11  assist you as to when in December you went?
12  A.  Perhaps.
13  Q.  I'll put what has been marked as
14  Exhibit 7 in front of you and perhaps go to the
15  end of December of '04. (Indicating.)
16  A.  (Witness examining document.) I've got
17  a notation here going to Berkshire Works who put
18  me in touch with this program in December 14th
19  of '04.
20  Q.  Just so I understand your testimony,
21  December 14th, you met with someone at Berkshire
22  Works?
23  A.  Yes.
24  Q.  And then they put you in touch with

VOLUME II - 193

1  someone in the program that you went to that
2  seminar that you just described?
3      A.   Yes; I went that same day, I believe.
4           (Defendant's Deposition Exhibit
            No. 23 offered and marked.)
5
6           THE WITNESS:  You mentioned the word
7  seminar; it wasn't a seminar.
8      Q.   (BY MS. KENNEDY)  I apologize.  I may
9  have misheard you.  What did you go to?
10     A.   It's a program, a course.
11     Q.   A course?
12     A.   That this program runs.
13     Q.   What was the course that you attended?
14     A.   It was entrepreneurial development.
15     Q.   Mr. Richards, I want to put in front of
16 you Defendant's Exhibit Number 23 and ask you if
17 you can identify that? (Indicating).
18     A.   (Witness examining document.)  That's a
19 business plan for the business I'm setting up.
20     Q.   Is that a document you created?
21     A.   Yes.
22     Q.   When did you create that?
23     A.   Towards the end of the course -- or it
24 would have been early summer, I think, of '05.

VOLUME II - 194

1      Q.   So the program that you attended was
2  more than one day?
3      A.   Three days a week; yes.
4      Q.   For how long?
5      A.   Well, I was to begin things in the
6  conceptual stages right after meeting with the
7  course instructor; and the course began around
8  February or March of last year and ran through, I
9  believe it was early August.
10     Q.   So February, March of '05 through August
11 of '05?
12     A.   Early August of '05.
13     Q.   What's does Berkshire Counseling
14 Associates do?  What's the purpose?
15     A.   The purpose is to counsel individuals
16 who have emotional, mental illness.
17          That's where it started, the main part
18 of the business.
19     Q.   When did you first consider starting
20 Berkshire Counseling Associates?
21     A.   In December when I met with -- about the
22 time that I met with the people in the program.
23     Q.   Had you considered starting a private
24 practice of mental health counseling before

VOLUME II - 195

1  December of '04?
2      A.   Years ago I had looked into it.
3      Q.   Since your daughter's medical condition
4  was diagnosed as being related to Lyme disease,
5  had you considered starting -- strike that.
6           I believe you testified earlier that
7  your daughter's medical condition was diagnosed as
8  being related to Lyme disease in the summer of
9  2004, is that correct?
10     A.   Yes.
11     Q.   After learning of that diagnosis
12 relating to your daughter in the summer of 2004,
13 did you consider developing a mental health
14 counseling practice in central Berkshire County?
15     A.   No.
16          (Defendant's Deposition Exhibit
            No. 24 offered and marked.)
17
18     Q.   (BY MS. KENNEDY)  I'll put what's been
19 marked as Defendant's Exhibit Number 24 in front
20 of you and ask if you can identify that, please?
21 (Indicating.)
22     A.   (Witness examining document.)  This is
23 Mark Richards, compensation analysis.  Would you
24 like me to say more about it?

VOLUME II - 196

1      Q.   Did you create that document?
2      A.   This was created through my attorney's
3  office in consultation with me.
4      Q.   That wasn't done as part of the
5  entrepreneurial training course that you had
6  attended?
7      A.   No.
8      Q.   What's been marked as Exhibit 24 was
9  done for the purposes of this lawsuit, is that
10 correct?
11     A.   Yes.
12     Q.   But what's been marked as Exhibit
13 Number 23 was done as part of your course -- the
14 program that you attended that you just described
15 a few moments ago?
16     A.   Yes.
17     Q.   If I could see Exhibit 24 again?
18     A.   (Witness handing document.)
19          (Defendant's Deposition Exhibit
            No. 25 offered and marked.)
20
21     Q.   (BY MS. KENNEDY)  Mr. Richards, I'm
22 going to put what's been marked as Defendant's
23 Exhibit Number 25 in front of you.
24          Can you please identify that for the

VOLUME II - 197

1 record? (Indicating.)

2     A.    (Witness examining document.) I believe
3 this looks like the projection -- financial
4 projection that I made when I wrote out my
5 business plan.

6     Q.    Is that financial projection that you
7 did as part of your entrepreneurial training
8 course?

9     A.    Yes; that's right -- this is page one,
10 actually.

11     Q.    So what's been marked with the sticky on
12 it as Exhibit 25 is actually the second page of
13 the document?

14     A.    Yes; year 2 -- year 1 and year 2.

15     Q.    Where is Berkshire Counseling Associates
16 located?

17     A.    In my home, currently.

18     Q.    Approximately how many clients do you
19 currently have?

20     A.    I don't have any clients.

21     Q.    I believe you testified a few moments
22 ago that you have -- that Berkshire Counseling
23 Associates has generated some income?

24     A.    Yes.

VOLUME II - 198

1     Q.    How is that income generated?

2     A.    Through work that I did through a
3 consulting firm, contracting with the Substance
4 Abuse and Mental Health Services Administration
5 providing mental health services in southeast
6 Louisiana.

7     Q.    Is that part of the Red Cross trip that
8 you went down on?

9     A.    No; the Red Cross trip was back in
10 September. That was two weeks of unpaid voluntary
11 service.

12         This is with a different organization.
13 This is with SAMHSA -- Substance Abuse Mental
14 Health Service Administration -- that's the mental
15 health arm of the federal government. It comes
16 under the Department of Health and Human Services.

17         I did work with Westover Consultants who
18 was being contracted with SAMHSA to provide mental
19 health services is New Orleans. It's called the
20 Hurricane Katrina Project.

21     Q.    Have you had any clients as part of your
22 mental health counseling private practice with
23 Berkshire Counseling Associates?

24     A.    No.

VOLUME II - 199

1     Q.    What have you done to market your
2 private practice of Berkshire Counseling
3 Associates?

4     A.    Well, I haven't -- I've gone out and
5 spoken with doctors and referring sources --
6 mental health agencies, other mental health
7 providers in the area -- but I haven't, yet, told
8 them that I'm open for business and asked for
9 referrals.

10     Q.    What is your -- strike that. When do
11 you anticipate opening for business and being open
12 for referrals?

13     A.    I'm hoping to do that this spring, now
14 that my daughter has been feeling better and I
15 don't believe I'm going -- I'm hoping I won't have
16 to interrupt my business to care for her.

17     Q.    Why was it you had not been open for
18 business before December of 2005?

19     A.    Well, I was taking the course and doing
20 the preliminary work up to the summer.

21         Then my daughter became ill in the
22 fall -- had a relapse -- and she was -- she
23 became -- got back on treatments and was better
24 around the time, just before the semester ended.

VOLUME II - 200

1 She became ill again at the beginning of the
2 second semester for a few weeks and has been
3 feeling better since then. That's why I felt I
4 could go to -- to be away for a month in
5 Louisiana.

6         She still is doing well and I'm hoping
7 that this second -- or actually third round of
8 treatments has done the trick.

9     Q.    She's doing better now, Mr. Richards?

10     A.    Yes.

11     Q.    I'm glad to hear that.

12     A.    Thank you.

13     Q.    Just so I understand your testimony,
14 when you ended your program in the summer of 2005,
15 you did not start your business at that time
16 because of your daughter's illness?

17     A.    I was reticent to jump in to be
18 responsible for a caseload of clients, not being
19 sure how the next few months would go for my
20 daughter.

21         I did take time out, though -- two
22 weeks, though -- to go to Louisiana. She was
23 doing well in September and I knew I would not
24 have any ongoing responsibilities at the end of

VOLUME II - 201

1 those two weeks.
2     Q.   You testified earlier in your deposition
3 that you're the primary caretaker for your
4 daughter, is that correct?
5     A.   Yes.
6     Q.   What role does your wife Karen play --
7     A.   (Interposing) She --
8     Q.   -- in the caring for your daughter?
9     A.   She does what I do when she's home from
10 her job. She carries the insurance -- the health
11 care insurance.
12           She has very good insurance and we
13 decided that -- and plus she makes more money than
14 I made so we decided that I would be the one to be
15 the primary care provider and she would do
16 whatever she could to protect her job.
17     Q.   What is your wife Karen's job?
18     A.   She's a special education teacher.
19     Q.   I think you already told us, in the
20 school district in Granby, Connecticut?
21     A.   That's right.
22     Q.   Since your termination from River Valley
23 Counseling Center, did you collect unemployment?
24     A.   Yes.

VOLUME II - 202

1     Q.   For how long did you collect
2 unemployment?
3     A.   I don't remember the weeks. I have them
4 written down somewhere, but it was into the summer
5 of '05.
6     Q.   Was Exhibit 24 created before the summer
7 of '05?
8     A.   There's a date of 8/12/2005 and it's up
9 in the corner but I don't remember when this was
10 created.
11     Q.   Does that indicate how much unemployment
12 you received?
13     A.   I believe it does. There's a figure of
14 twenty-five thousand two hundred and forty-three
15 dollars and I believe that that was the total --
16 wait a minute. No; I think I'm wrong.
17           This total compensation goes through
18 December 31st so -- I'd have to look at my records
19 to be able to be sure.
20     Q.   That's fine. My question simply was
21 does this document indicate how much you received
22 in unemployment benefits?
23     A.   There is a potential -- it says
24 potential offset of wages for unemployment

VOLUME II - 203

1 collected for thirty-seven weeks and it has a
2 figure of nineteen thousand eight hundred
3 thirty-two dollars.
4     Q.   Did you collect unemployment through the
5 whole period of time that you were entitled to?
6     A.   Yes.
7     Q.   Going back to your résumé which has been
8 marked as Exhibit 2, does that indicate December
9 of '04 is starting your business of Berkshire
10 Counseling Associates?
11     A.   Yes.
12     Q.   Since your employment ended at River
13 Valley Counseling Center on November 4th, 2004,
14 did you search for employment anywhere?
15     A.   Yes.
16     Q.   Where?
17     A.   At hospitals that -- where I could work
18 on an interim basis, on-call basis.
19     Q.   Who did you contact?
20     A.   I sent résumés to Berkshire Medical
21 Center, Hillcrest Hospital, Baystate, Veterans
22 Administration.
23           I called contacts to see -- I met with
24 people to see what might be available on a per

VOLUME II - 204

1 diem basis.
2     Q.   Why did you want to work -- I'm sorry,
3 you weren't done with your answer; I apologize.
4     A.   And I did work on a per diem basis last
5 month and into this month.
6     Q.   Where?
7     A.   Well, in Louisiana.
8     Q.   That's that name you identified earlier?
9     A.   Right; Westover Consultants.
10     Q.   Why did you want to work on a per diem
11 or an on-call basis?
12     A.   I didn't want to get fired for having an
13 ill daughter again.
14     Q.   Is it your testimony, Mr. Richards, that
15 you purposely did not look for any full-time
16 employment because your daughter was ill?
17     A.   No.
18     Q.   Did you look for full-time employment,
19 Mr. Richards?
20     A.   I looked for full-time employment.
21     Q.   Where did you look for full-time
22 employment?
23     A.   Contacts that I made. I planned to turn
24 my business into full-time employment.

VOLUME II - 205

1    Q.   While you were waiting to turn your
2  business into full-time employment, did you look
3  for employment somewhere else?
4    A.   No; this was part of the search for
5  employment, according to the people in the
6  unemployment office.
7    Q.   Just so I understand your testimony,
8  starting up your own business was part of your
9  search for employment?
10   A.   That's correct.
11        MR. SIKORSKI:  Objection.
12        THE WITNESS:  It was actually a
13 substitute for my search for employment.
14   Q.   (BY MS. KENNEDY)  I may have interrupted
15 your testimony a few moments ago, but you said you
16 made contacts with -- you had some contacts for
17 employment?
18   A.   Yes.
19   Q.   And who were they?
20   A.   People that I used to work with.
21   Q.   Who did you contact regarding
22 employment?
23   A.   Dan Olshansky, Ed -- I'm trying to
24 remember his last name right now, the director at

VOLUME II - 206

1  a mental health clinic in Holyoke.
2        I met with people who I knew who were in
3  private practice to help set up this business and
4  also to feel out whether there was a possibility
5  of going in partnership with them.
6    Q.   Anyone else that you contacted?
7    A.   I'm not remembering right now.
8    Q.   Did you hear back from Berkshire Medical
9  Center?
10   A.   No.
11   Q.   How about Hillcrest Hospital?
12   A.   No.
13   Q.   Baystate Medical Center?
14   A.   No.
15   Q.   Veterans Administration?
16   A.   No.
17   Q.   Any of the contacts that you spoke with,
18 were there any job offers out of those contacts
19 that you just described?
20   A.   Nothing materialized.
21   Q.   Did you look in the newspaper?
22   A.   Yes.
23   Q.   Did you notice in July of 2005 that
24 there was a position for program director LICSW at

VOLUME II - 207

1  Behavioral Health Network?
2    A.   I was aware of that.
3    Q.   Did you apply for that job?
4    A.   No.
5    Q.   Why not?
6    A.   I was setting up my own business.
7    Q.   You were certainly qualified to be the
8  program director of a psychiatric day treatment
9  program, is that correct?
10   A.   I believe I'm qualified for that; yes.
11   Q.   In October of 2005, did you apply for a
12 job at the Village For Families and Children,
13 Inc., in Hartford, Connecticut?
14   A.   No.
15   Q.   Did you see that ad in the paper?
16   A.   I believe I saw it.
17   Q.   And you did not apply for that position?
18   A.   No.
19   Q.   And why not?
20   A.   I was setting up my own business.
21   Q.   You chose not to seek employment because
22 you were setting up your own business?
23   A.   That's correct.
24   Q.   Did you see ads in the paper from River

VOLUME II - 208

1  Valley Counseling Center?
2    A.   Yes.
3    Q.   Did you circle them and take them out of
4  the newspaper?
5    A.   Yes.
6    Q.   Why did you do that?
7    A.   To give to my attorney.
8    Q.   Without knowing what you said to your
9  attorney or your attorney said to you, why did you
10 want to give those ads to your attorney?
11   A.   Because I thought it was pertinent to
12 the case.
13   Q.   Why did you believe it was pertinent to
14 the case?
15   A.   Because it had to do with positions that
16 they were filling at the agency and the program
17 that I had worked in.
18   Q.   Did you ever apply for any of those
19 positions?
20   A.   No.
21   Q.   No?
22   A.   No.
23        MS. KENNEDY:  Can you mark that as
24 Exhibit 26?

**VOLUME II - 209**

1    (Defendant's Deposition Exhibit
     No. 26 offered and marked.)

2

3    Q.   (BY MS. KENNEDY) I'll show you what has
4    been marked as Exhibit 26. I believe it's three
5    pages, Mr. Richards.
6         Are those copies of the ads that you
7    provided to your attorney? (Indicating.)
8    A.   I don't remember exactly what the ads
9    said now but they could be.
10   Q.   Is one of them for temporary -- is one
11   of them listed temporary and temporary to
12   permanent fee-for-service behavioral health
13   clinicians? Did I read that title correctly?
14   A.   (No response.)
15   Q.   I'm sorry, I think I'm looking at the
16   second page of what has been marked as Exhibit 26.
17   A.   (Witness examining document.) On the
18   second page, there's one for day treatment
19   part-time hospitalization clinicians program
20   coordinator part time -- day treatment slash
21   partial hospitalization positions.
22        One says program coordinator full time,
23   another says group psychotherapist slash licensed
24   clinician full time and part time, nothing about

**VOLUME II - 210**

1    temporary.
2    Q.   I apologize. How about the third page
3    of that document?
4    A.   The third page, temporary and temporary
5    to permanent fee-for-service behavioral health
6    clinicians at River Valley Counselling.
7    Q.   Are those three ads that have been
8    marked as Exhibit 26 positions -- strike that.
9         Are those three ads which have been
10   marked as Exhibit 26 positions which you were
11   qualified to do, Mr. Richards?
12   A.   I believe I'm qualified.
13   Q.   Did you apply for those positions?
14   A.   No.
15   Q.   Why not?
16   A.   I was setting up my own business and I
17   had a lawsuit against them.
18   Q.   Why did you think it was important to
19   send those -- again, you may have already answered
20   this and I apologize.
21        Without revealing anything that you and
22   your attorney have discussed, why did you feel it
23   was important to send those ads which have been
24   marked as Defendant's Exhibit 26 to your counsel?

**VOLUME II - 211**

1    A.   I'm not sure how to answer that without
2    revealing what I've discussed with my attorney.
3    Q.   If you can't answer it without revealing
4    what's been discussed with your attorney, then
5    just let me know that.
6         MR. SIKORSKI: Don't answer it.
7         THE WITNESS: I can't answer it.
8    Q.   (BY MS. KENNEDY) Are you claiming
9    emotional distress damages in this case?
10   A.   Yes.
11   Q.   Can you describe the emotional distress
12   that you claim you have suffered from because of
13   the termination of your employment at River Valley
14   Counseling Center?
15   A.   From the start, I was embarrassed --
16   Q.   (Interposing) I apologize for the
17   interruption, but from the start, from the fourth?
18   A.   From the day I was terminated I was
19   embarrassed and ashamed that I had lost my job and
20   wasn't even able to tell the people I worked with,
21   even though I knew it wasn't my fault, but I still
22   felt responsible.
23        I'm embarrassed to be with anyone who
24   knows that I lost my job. That includes friends,

**VOLUME II - 212**

1    neighbors. I have to be with my family so it's
2    something I deal with whenever I'm with my family.
3    I don't have to be with my extended family so I
4    avoid them.
5         I'm an older brother and -- the oldest
6    brother -- and they saw me as the person who
7    followed in the footsteps of their parents,
8    hardworking people who taught their children to be
9    hardworking and honest and I was not -- I had
10   fallen out of that role even though since I was
11   fifteen years old I had been working full time.
12        I started full-time work, going away
13   from home at that age, going to college, working
14   jobs on the side, working as a full-time -- even
15   when I was working as a full-time day treatment
16   director, still working two-thirds job as a
17   college professor.
18        I was especially bothered by my daughter
19   having to see me out of work and even though we
20   did everything we could to tell her it wasn't her
21   fault, she's pretty smart and very emotionally
22   attuned and she feels a good deal of
23   responsibility for what's happened to me because
24   she was the one that got sick. I can't isolate

## VOLUME II - 213

1  myself from her and still be her caregiver so I
2  kind of relive that whenever I see her, whenever
3  she's sick and when she comes home from college.
4  She is embarrassed by me when she talks to her
5  friends at college.
6         My wife, who I've been married to for
7  thirty-two years and knew seven years before that
8  has only known me as a worker and somebody who
9  provides and she's been very good about it but I
10 think she mostly feels for my daughter and she
11 knows my daughter shouldn't have to feel this way
12 or shouldn't be feeling this way.
13     Q.  Are you finished?
14     A.  That about sums it up.
15         MR. SIKORSKI:  Why don't we take
16 five minutes.
17         (A recess was taken.)
18     Q.  (BY MS. KENNEDY) Mr. Richards, have you
19 undergone any counseling or mental health
20 treatments since November 4, 2005?
21     A.  Nothing formal for me.  With my
22 daughter; yes.
23     Q.  I should have been more specific.  With
24 respect to you, have you -- when you say -- strike

## VOLUME II - 214

1  that.
2         When you said informally, have you
3  undergone any informal counseling for you,
4  yourself?
5     A.  I have friends who are counselors and we
6  kind of cut to the chase.
7     Q.  You've not seen them on a professional
8  basis?
9     A.  No.
10    Q.  So they don't have a patient record in
11 their office file, is that correct?
12    A.  No.
13    Q.  Who of your friends who are counselors
14 that you spoken to and kind of informally sought
15 out counseling?
16    A.  Doctor Rorry Zahourek.
17    Q.  Could you spell the last name, please?
18    A.  Z-A-H-O-U-R-E-K; but I talk with her as
19 a friend who knows what I'm going through.
20        It's not that I'm going to her saying I
21 need -- I want to come and receive counseling for
22 emotional problems I'm having.
23    Q.  What type of doctor is Doctor Zahourek?
24    A.  She is a doctor of nursing.  She is a

## VOLUME II - 215

1  prescribing nurse -- mental health nurse.  She
2  provides mental health counseling but she also
3  prescribes psychiatric medications.
4     Q.  What type of a degree does Doctor
5  Zahourek have, if you know?
6     A.  A Doctor of Nursing, Ph.D.
7     Q.  What is her first name?
8     A.  Rorry -- R-O-R-R-Y.
9     Q.  Anybody else that you -- any of your
10 colleagues that you've spoken to on an informal
11 basis for any counseling?
12    A.  Yes.
13    Q.  Who else?
14    A.  Could I consult with my attorney?
15        MS. KENNEDY:  Sure.
16        (Pause in proceedings.)
17        THE WITNESS:  Daniel Olshansky.
18    Q.  (BY MS. KENNEDY) Have you spelled that
19 already for us?
20    A.  Yes; I did.
21    Q.  Anybody else?
22    A.  Doctor Holtzman.
23    Q.  What is Doctor Holtzman's first name?
24    A.  He's married to Rorry Zahourek.  He's a

## VOLUME II - 216

1  psychiatrist.
2     Q.  Anybody else?
3     A.  Doctor Linn -- Abraham Linn.  He's is
4  psychiatrist.
5     Q.  Anybody else?
6     A.  I can't think of anybody else.
7         MS. KENNEDY:  That's all I have.
8  Thank you, Mr. Richards.
9         MS. FABBO:  I have a few questions
10 but because Ms. Kennedy was so thorough, it will
11 be just a few, hopefully.
12         *****
13     CROSS-EXAMINATION BY MS. FABBO
14    Q.  Mr. Richards, are you aware of any other
15 people who had taken leave under the Family
16 Medical Leave Act from River Valley?
17    A.  No; I'm not.
18    Q.  Do you know whether Mr. Avaklan ever
19 took Family Medical Leave?
20    A.  He took leave when his wife was pregnant
21 and having their first child.
22    Q.  Do you know whether Mr. Kassis ever took
23 Family Medical Leave?
24    A.  I'm not aware of it.

Case MARK 30 IRICHARDS Document 3LUME Filed 06/02/2006 17 Page 086 of 29

## VOLUME II - 217

1     Q.   Were you paid on an hourly or a salary
2 basis?
3     A.   I was paid on a salary basis and was
4 recorded by the hours.
5     Q.   So you received a set amount each week,
6 even if your hours varied a little bit, is that
7 correct?
8     A.   As long as the hours didn't dip below a
9 minimum.
10     Q.   What was that minimum?
11     A.   Thirty-four hours a week.
12     Q.   So if you worked, for example,
13 thirty-six hours, you would not get extra pay, is
14 that right?
15     A.   That's correct.
16     Q.   But if you dipped below thirty-four --
17     A.   (Interposing) Actually at points I
18 would. I'm not sure exactly why that happened but
19 that was not common.
20     Usually or almost always, if it dipped
21 below, I would have to take vacation time or
22 personal time or if I had accumulated holiday
23 time, holiday time.
24     There was no Family Leave time. That

## VOLUME II - 218

1 was not a category on the time sheet.
2     Q.   Did you record on your time sheets any
3 time that was taken for Family Leave by indicating
4 it was for Family Leave?
5     A.   No; there's no place to indicate that on
6 the time sheets.
7     Q.   Was your pay at all docked for your
8 leave that was attributed to Family Medical Leave?
9     A.   It would be taken as personal time or
10 vacation time or holiday time. I have quite a bit
11 of that usually stored up.
12     Q.   Do you know for a fact whether
13 Mr. Mattocks saw the marks on your face which was
14 treatment for skin cancer or are you just
15 speculating that he must have known?
16     A.   I never had a conversation with him
17 about it so I don't know what he saw.
18     Q.   Do you know whether Mr. Mattocks has
19 skin cancer?
20     A.   I don't know.
21     Q.   Did you ever see any lesions on his face
22 that you suspected might be cancerous lesions or
23 any marks that might have been cancerous lesions?
24     A.   I never saw anything that looked like my

## VOLUME II - 219

1 marks; no.
2     Q.   Aside from what might have looked like
3 your marks but what might have been cancerous
4 lesions?
5     A.   I wouldn't know how to recognize it
6 since even my dermatologist doesn't know if it's
7 cancer until he puts it under a microscope.
8     Q.   Did you see anything that looked like
9 Mr. Mattocks had had any surgery or portions of
10 skin frozen off on his face?
11     A.   I don't remember.
12     Q.   Do you know whether Mr. Kassis has any
13 mental or physical impairment?
14     A.   He has a back problem.
15     Q.   Do you know the nature of that back
16 problem?
17     A.   At times he needs to stand because it
18 bothers him to sit. That's about as much as I
19 know about it.
20     Q.   What about Mr. Avakian? Do you know
21 whether he has any mental or physical impairments?
22     A.   He had some problems with his intestines
23 while he reported to me.
24     Q.   Do you know when that was?

## VOLUME II - 220

1     A.   I think I knew it for the last few years
2 that he was working for me.
3     Q.   Up until the time of your separation,
4 was it ongoing?
5     A.   I believe it was. He also was having a
6 leakage in his bowel of blood. That was towards
7 the time when I was terminated.
8     That was something that he had gone
9 through tests for and they couldn't locate the
10 problem or what the leakage -- where the blood was
11 coming from.
12     Q.   Did he ever take any time off in
13 connection with his condition?
14     A.   Yes.
15     Q.   What about Mr. Kassis? Do you know
16 whether he ever took any time off in connection
17 with his back problem?
18     A.   I never knew when Mr. Kassis was working
19 or not working unless we had a meeting together.
20     Q.   Do you know whether Mr. Mattocks had any
21 physical or mental impairments when he was working
22 with you?
23     A.   I had heard that he had a problem with
24 phlebitis.

VOLUME II - 221

1    Q.   Do you know when that was?
2    A.   He was out for a period of time during
3  the summer and I heard that he was out -- it
4  seemed like it was an extended time. I heard that
5  it was because of phlebitis.
6    Q.   What is phlebitis?
7    A.   My understanding is it's a possibility
8  of blood clots in the leg that could move to the
9  other parts of the body, including the lungs.
10    Q.   Who did you hear this from, that
11  Mr. Mattocks may have phlebitis?
12    A.   I heard it from a doctor who worked at
13  the agency.
14    Q.   Who was that?
15    A.   Doctor Linn.
16    Q.   You had referenced a few times that
17  Mr. Mattocks wanted you to attend some morning
18  meetings that were to take place, is that correct?
19    A.   That's correct.
20    Q.   I believe you said that at some point
21  after that, his attitude towards you changed, is
22  that correct as well?
23    A.   Yes.
24    Q.   Did you ever complain to anyone --

VOLUME II - 222

1  formally or informally -- that you thought
2  Mr. Mattocks was treating you differently or
3  inappropriately when you were still employed at
4  River Valley?
5    A.   I think only to my wife.
6    Q.   No one ever at River Valley?
7    A.   I don't believe so.
8    Q.   Did you ever ask Mr. Mattocks to
9  schedule the meetings at some time other than in
10  the morning if you felt you could not attend?
11    A.   No; that was a meeting that seemed to be
12  locked into that time slot.
13         I instead asked him to -- the purpose of
14  the meeting and my role -- what my role would be
15  in it and if there was some other way I could be
16  of assistance in that role.
17    Q.   What did he tell you the purpose of the
18  meeting was to be?
19    A.   He said he wasn't clear himself. He was
20  still working out the purposes of the various
21  meetings and that was something that was in
22  process.
23    Q.   What did he tell you your role was to be
24  in this meeting?

VOLUME II - 223

1    A.   He didn't say anything other than what
2  my role was in the larger meetings that I already
3  attended.
4    Q.   Did you give him any specific
5  suggestions as to how you could -- if you couldn't
6  be at the meetings -- how you could fulfill
7  whatever role it was going to be that you would
8  play at these meetings?
9    A.   No. I asked him to give me direction
10  rather than my volunteering any ideas.
11    Q.   Did he have any suggestions for you?
12    A.   Well, that's when he said he was still
13  working out what the roles of the meetings -- what
14  the purposes of the meetings would be and that he
15  hadn't worked that out yet.
16    Q.   Did these meetings that you say he
17  wanted you to attend, did they actually begin
18  taking place at some point, to your knowledge?
19    A.   They were already in existence.
20    Q.   Did you attend any of them?
21    A.   On occasion, I think maybe once or twice
22  because of something -- a special topic that was
23  being addressed in the meeting.
24    Q.   Were you to only attend when there were

VOLUME II - 224

1  certain topics you were going to address or were
2  you supposed to be attending all of the meetings?
3    A.   To be attending all of the meetings.
4    Q.   Are you saying that you weren't able to
5  attend any other than those where there were
6  special topics addressed?
7    A.   That was the only time that I came in to
8  those meetings, and that was, I believe, prior to
9  his asking me anyway.
10    Q.   Once he asked you to attend the
11  meetings, did you, in fact, attend any of them?
12    A.   No.
13    Q.   Why was that?
14    A.   That was because I asked him what the
15  purposes of those meetings would be because I did
16  not feel that it was going to work out for me to
17  be in regular attendance at those meetings because
18  of my daughter, so he dropped it.
19    Q.   He didn't tell you that you had to
20  attend those meetings?
21    A.   No.
22    Q.   And he did not -- did he identify any
23  critical role you would play in those meetings?
24    A.   No; that's when we had the conversation

## VOLUME II - 225

1   about what the purposes of the meetings would be
2   and he said he wasn't sure, himself, what all the
3   purposes of the meetings were and he was still
4   looking at all the meetings and trying to decide
5   what the meeting schedule would like look in the
6   future and then he dropped it.
7       Q.   You read Mr. Mattocks' deposition
8   transcript, is that correct?
9       A.   Yes.
10      Q.   Do you recall that he mentioned that he
11  wanted to eliminate your position as a cost
12  savings measure?
13      A.   That's my understanding.
14      Q.   Do you have any other suggestions as to
15  how the cost savings could have been better
16  accomplished other than by eliminating your
17  position?
18      A.   Well, I already had a position that I
19  was withholding the hiring on and I was telling
20  him that I was doing that -- even though he didn't
21  ask me to make any cuts in my program as he had
22  with other programs.
23      Q.   What was this position that you were
24  withholding hiring?

## VOLUME II - 226

1       A.   It was a clinician's position.
2       Q.   Does the clinician's position bring in
3   income to the agency?
4       A.   Yes; it does -- well, allows us to see
5   more people, which would bring in more income once
6   the volume is there, so if the marketplace has the
7   clientele there, then we would need to add that
8   position in order to meet the needs of the
9   population.
10      Q.   Are you saying as of the time of your
11  separation, you did or you did not need to fill
12  that position based on the demands of the
13  population?
14      A.   I was trying to fill it at that time.  I
15  held off for awhile but at the time -- a few weeks
16  before I left -- I was in the process of
17  advertising and filling the position.
18      Q.   What other cost savings can you identify
19  that would have eliminated the need to eliminate
20  your position?
21           MR. SIKORSKI:  Objection.
22           THE WITNESS:  I'm not --
23      Q.   (BY MS. FABBO)  (Interposing) Do you
24  understand my question?

## VOLUME II - 227

1       A.   Could you repeat it?
2       Q.   Can you think of other ways that
3   Mr. Mattocks could have saved money other than by
4   eliminating your position?
5       A.   My program was one where we were making
6   money.
7            The way that we worked in my program was
8   that we generated more revenue and tried to hold
9   down our expenses or keep them where they were
10  while increasing productivity because we had that
11  ability.  It was something that not all the
12  programs had.
13           We would need to keep a certain staffing
14  level there to meet state regulations.
15      Q.   So is your answer yes or no?
16           MR. SIKORSKI:  Objection.  Is this
17  other cost savings available in the entire River
18  Valley Counseling Center organization or just to
19  the program?
20           THE WITNESS:  I'm not clear whether
21  you're asking me to find cuts throughout the
22  agency or just my program.
23      Q.   (BY MS. FABBO)  Let me ask you another
24  question.

## VOLUME II - 228

1            Based on what you just said -- that
2   there should be certain staffing levels -- do you
3   think it was inappropriate to eliminate any
4   positions?
5            MR. SIKORSKI:  Objection.
6            THE WITNESS:  In my program; yes.
7       Q.   (BY MS. FABBO)  Did you have any
8   suspicion or information that led you to believe
9   that you would or might be terminated prior to
10  your termination?
11      A.   Ever since I was a child and lost my
12  first job because the YMCA collapsed and the place
13  closed down, I was always worried about losing a
14  position.
15      Q.   I'm asking you specifically about your
16  position at River Valley.
17           Was there anything that you learned or
18  heard or rumors going around that made you suspect
19  that you might be let go prior to the time you
20  were, in fact --
21      A.   (Interposing) No; all the talk was about
22  expanding the program and increasing revenue and
23  hiring more staff.
24      Q.   How would you assess the management

VOLUME II - 229

1 abilities of Mr. Mattocks as a director, from your
2 perspective.
3      A.   Which particular parts of the
4 administration?
5      Q.   What did you consider, if anything, to
6 be his strengths?
7      A.   There was an instance where an employee
8 notified me that an employee in another program
9 was acting inappropriately and I determined that
10 there was a potential for workplace violence. I
11 called Mr. Mattocks up and gave him the
12 information.
13          He responded quickly, took the
14 information from me and addressed the situation
15 quickly and decisively and I appreciated that and
16 so did my employees who brought the issue to me.
17      Q.   Can you think of any other strengths you
18 perceived in Mr. Mattocks?
19      A.   He gave a vision of growing the program
20 and met with my team when I asked him if he could
21 to answer their questions.
22          He improved their morale because they
23 felt very positively about his vision and his
24 desire to grow the program and treat it with

VOLUME II - 230

1 respect.
2      Q.   Can you identify anything you saw as
3 Mr. Mattocks' weaknesses as the executive
4 director?
5          MR. SIKORSKI:  Objection; go ahead
6 and answer.
7          THE WITNESS:  There were times that
8 it seemed he repeated himself and did not remember
9 stories that he had told in a group setting and
10 privately and repeated them a few times.
11          I got along well with him and I saw our
12 relationship as being an orientation kind of
13 phase.
14          MR. SIKORSKI:  The question is
15 weakness. Are you still answering that question?
16      Q.   (BY MS. FABBO)  Are you done answering
17 the question regarding his weaknesses?
18      A.   I'm done.
19      Q.   You started to say, Mr. Richards, that
20 you got along well with Mr. Mattocks. Could you
21 tell me what you mean by "well"?
22      A.   As I mentioned, when I would call him up
23 and ask him to respond to something, he responded
24 to it. He sought out my opinion. He respected my

VOLUME II - 231

1 role.
2          We felt good about each other's
3 competencies and the joint vision that we had for
4 the program.
5      Q.   When did you first become aware that
6 Mr. Mattocks had a degree from Parkwood
7 University?
8      A.   I saw it online where he had an
9 announcement of his taking the job at River Valley
10 Counselling.
11      Q.   Did you see this prior to the time that
12 he started at River Valley Counselling?
13      A.   No.
14      Q.   Did you see it prior to the end of your
15 employment at River Valley?
16      A.   No.
17      Q.   Do you believe the fact that
18 Mr. Mattocks had a degree from Parkwood University
19 played any role in any decision affecting you?
20      A.   I don't know how to answer that.
21      Q.   I'm asking you what your belief is?
22      A.   I believe that he did not have the
23 training that was necessary to be in the job that
24 he was in.

VOLUME II - 232

1      Q.   Are you on any medications today,
2 Mr. Richards?
3      A.   No.
4      Q.   Have you taken any medications for your
5 mental health situation?
6      A.   No.
7      Q.   Have you ever had any formal counseling?
8      A.   Yes.
9      Q.   When was that?
10      A.   Seven years ago, eight years ago.
11      Q.   Can you just very generally tell me what
12 prompted that counseling?
13          MR. SIKORSKI:  Very generally.
14          THE WITNESS:  It was a transitional
15 phase in my life and I wanted to get an objective
16 opinion for some changes that were happening in my
17 life.
18      Q.   (BY MS. FABBO)  Personal or
19 professional?
20      A.   Personal.
21      Q.   Other than seven or eight years ago,
22 have you ever had any other counseling -- formal
23 counseling?
24      A.   With my daughter and my wife.

## VOLUME II - 233

1    Q.   Together or separately?
2    A.   Both.
3    Q.   Have you gone through marital counseling
4  ever?
5    A.   Yes.
6    Q.   When was the last time that you went to
7  marital counseling?
8    A.   About a year or two into my daughter's
9  illness.
10   Q.   When would that have been?
11   A.   2002, somewhere in there.
12   Q.   Who did you see at that time?
13   A.   I saw -- his first name was Mark.  He's
14  in Northampton.
15            MR. SIKORSKI:  Karpell.
16            THE WITNESS:  Yes; and Irene
17  Yerkovitz.
18   Q.   (BY MS. FABBO)  Anyone else?
19   A.   No.
20   Q.   How long did you go for marital
21  counseling at that time?
22   A.   About three sessions.
23   Q.   Had you ever gone for marital counseling
24  prior to that?

## VOLUME II - 234

1    A.   Prior to my daughter being born.
2    Q.   How long did you go at that time?
3    A.   Two months.
4    Q.   You said also you've gone to counseling
5  sessions with your daughter, is that correct?
6    A.   Yes; the family has gone as a family
7  with my daughter.
8    Q.   Who have you seen for those?
9    A.   Irene Yerkovitz.
10   Q.   That would be you and your wife and your
11  daughter?
12   A.   Yes -- and sometimes just my wife and I.
13  She was my daughter's counselor, primarily.
14   Q.   When did you start seeing -- is it
15  Doctor Yerkovitz?
16   A.   A social worker.
17   Q.   When did you start seeing Irene
18  Yerkovitz?
19   A.   Shortly after my daughter's symptoms
20  appeared.
21   Q.   Have you discussed your loss of
22  employment with Ms. Yerkovitz at all?
23   A.   No.
24   Q.   Do you continue to see Ms. Yerkovitz?

## VOLUME II - 235

1    A.   No; she stopped her practice a couple of
2  years ago.
3    Q.   Was that the last time you saw her?
4    A.   Yes.
5    Q.   Was that the last time you've had any
6  formal counseling?
7    A.   Yes; although my daughter got another
8  therapist -- a couple of other therapists -- and
9  I've been in sessions with her.
10   Q.   Have you told any of these other
11  therapists about your loss of employment?
12   A.   No.
13   Q.   Do they know whether you work or not?
14   A.   Yes; through my daughter.
15   Q.   Who are the other therapists that your
16  daughter has gone to after Ms. Yerkovitz?
17   A.   I'll have to look that up.
18   Q.   Do you know where they're located?
19   A.   One is on Route 202 in Southwick or on
20  the Westfield, Southwick border; and Marj Ferrini
21  is in Northampton -- Marjorie.
22   Q.   Has your daughter's illness been
23  emotionally upsetting to you?
24   A.   Yes.

## VOLUME II - 236

1    Q.   What about her relapses that you talked
2  about earlier today?  Have those caused any
3  symptoms of emotional distress?
4    A.   Yes; I don't enjoy seeing my daughter
5  suffer.  It is upsetting to watch my daughter
6  suffer.
7            Fortunately the relapses have not been
8  as extended as the original illness was.
9    Q.   You mentioned that your daughter had a
10  relapse in the fall of 2005, is that correct?
11   A.   Yes.
12   Q.   For how long was that?
13   A.   Well, it was going on for a few weeks
14  before she told us and then it went on for another
15  month and a half or so.
16   Q.   What month?  When did she first tell you
17  about it?
18   A.   She told us in October.
19   Q.   Beginning, middle, end?
20   A.   Middle to end.
21   Q.   What about her more recent relapse?  How
22  long was that?
23   A.   That was soon after the semester
24  started -- January.

## VOLUME II - 237

1  Q.  When did the semester start?
2  A.  Middle of January.
3  Q.  Was she out of school for a period of
4  time?
5  A.  Not too long.  On weekends -- she'd come
6  home for the weekends.
7  Q.  How long was the relapse that time?
8  A.  She responded pretty quickly to the
9  medication that time -- two or three weeks.
10  Q.  Did your wife ever take leave under the
11  Family Medical Leave Act or the Connecticut Family
12  Leave Act to care for your daughter?
13  A.  No.
14  Q.  You had, if I recall correctly, some
15  surgery in November of 2004, is that correct?
16  A.  I don't have the dates in front of me
17  but -- oh, that was the time I had the surgery the
18  week after I was terminated; yes.
19  Q.  When had you scheduled this surgery?
20  A.  My dermatologist scheduled it a couple
21  of weeks before, a few weeks before, a month
22  before; I'm not sure.
23  Q.  Did you request to take Family Medical
24  Leave for your own serious health condition in

## VOLUME II - 238

1  connection with the surgery?
2  A.  No.
3  Q.  Did you anticipate being out of work in
4  connection with the surgery?
5  A.  Yes; for a brief time.
6  Q.  By brief, what do you mean?
7  A.  A day or two.
8  Q.  Had you told anyone at River Valley that
9  you were going to be out for surgery?
10  A.  Yes.
11  Q.  Who?
12  A.  I told David Avakian and I told Dave
13  Mattocks.
14  Q.  When did you tell Mr. Mattocks?
15  A.  I believe that was during one of my
16  counseling individual sessions with him just prior
17  to my being terminated.  It would have been maybe
18  a week or two before.
19  Q.  Did he say anything in response?
20  A.  No; nothing I remember.
21  Q.  What exactly did you tell him?
22  A.  That I was going to be out probably to
23  have something removed from my face and I'd be out
24  maybe, the most, a day or two.

## VOLUME II - 239

1  Q.  Do you remember specifically telling him
2  you were going to have something removed from your
3  face?
4  A.  I believe I did.
5  Q.  Are you just guessing?
6  A.  Well, there's been so much about this
7  since -- I've thought back on it many, many times
8  and I had told both Mr. Mattocks and Mr. Avakian
9  but I believe I just made a brief mention of it to
10  Mr. Mattocks and I made a more detailed mention of
11  it to Mr. Avakian.
12  Q.  When you say a brief mention of it, do
13  you mean you just told him you were going to be
14  out or did you exactly tell him the reasons why
15  you were going to be out with respect to
16  Mr. Mattocks?
17  A.  I believe it was just something as brief
18  as I'm going to be out because I have this thing I
19  have to have done for a day or two.  I played it
20  down.
21  Q.  What is your understanding, if any, as
22  to why Mr. Mattocks is no longer working at River
23  Valley?
24  A.  That he went out on medical leave and

## VOLUME II - 240

1  resigned after that.
2  Q.  Do you have any knowledge as to what the
3  reasons for that leave were?
4  A.  From reading the deposition, it was for
5  mental health reasons.
6  Q.  Did you ever hear that from any other
7  source?
8  A.  No.
9  MS. FABBO:  I don't have any further
10  questions.
11  MR. SIKORSKI:  Can I see the
12  exhibits?
13  MS. KENNEDY:  The new ones or the
14  old ones?
15  MR. SIKORSKI:  The new ones.
16  *****
17  CROSS-EXAMINATION BY MR. SIKORSKI
18  Q.  I'm going to call your attention,
19  Mr. Richards, to Exhibit 19.
20  There's a memo there dated Thursday,
21  September 2nd, do you see that?  (Indicating.)
22  A.  Yes.
23  Q.  Could you read into the record the last
24  typed paragraph there?

## VOLUME II - 241

1    A.  "Please institute a system whereby these
2  billings get sent every three weeks on a set day
3  to the billing office. It is also essential that
4  you have reliable backup for conducting this
5  function in your absence. Thank you. DG."
6    Q.  Can you read the sentence above what you
7  just read?
8    A.  Just the last sentence?
9    Q.  Yes.
10    A.  "This concerns me even more, given the
11  fact that you may be in and out quite a bit due to
12  your MLA."
13    Q.  Do you see a reference to MLA there?
14    A.  Yes.
15    Q.  What do you understand that reference to
16  MLA to be?
17    A.  I believe it's a typo. They left off
18  the F, for FMLA.
19        MR. SIKORSKI: No further questions
20  of this witness at this time.
21        MS. KENNEDY: Just a few follow-up.
22           *****
23  REDIRECT EXAMINATION BY MS. KENNEDY
24    Q.  Mr. Richards, on examination by

## VOLUME II - 242

1  Ms. Fabbo, I believe you testified that it was
2  your opinion that Mr. Mattocks, in his position as
3  director of River Valley Counseling Center, did
4  not have appropriate training for that position?
5      Did I understand your testimony to be
6  correct?
7    A.  Right; appropriate training and
8  experience.
9    Q.  And experience. What was the training
10  and experience that Mr. Mattocks lacked that you
11  believe he should have had?
12    A.  I don't believe he had a thorough enough
13  understanding of community mental health services
14  or the operation of community mental health
15  centers or the financial responsibilities and
16  expertise that's needed to be the CEO of such an
17  organization.
18    Q.  Your opinion that Mr. Mattocks didn't
19  have appropriate training and experience as you've
20  just described, did that, in your opinion, play
21  any role in his decision to eliminate your
22  position?
23    A.  I don't know.
24    Q.  You were just asked a few questions

## VOLUME II - 243

1  about the third page -- about the fourth page of
2  what's been marked Exhibit 19. I'm going to put
3  that back in front of you.
4      Did you receive that memo around or
5  about September 2nd, 2004, the date of the memo?
6    A.  Yes; I believe I did.
7    Q.  The reference to you being out on an
8  MLA -- you thought it meant FMLA?
9    A.  I thought it meant FMLA; yes.
10    Q.  Did you ever -- strike that. After
11  receiving that memo which is the fourth page in
12  Exhibit 19, did you ever speak to Mr. Mattocks
13  about his concerns that you would be out quite a
14  bit due to your FMLA leave?
15    A.  Yes; later than this, I did.
16    Q.  When was that, sir?
17    A.  When I received a voicemail from him
18  wanting to schedule a meeting with me and saying
19  that he understood that it would be -- that I'd
20  been out a lot lately due to my daughter and that
21  it might be difficult to set up a meeting.
22    Q.  Did he tell you how he knew that you
23  were out a lot lately due to your daughter?
24    A.  No; he didn't.

## VOLUME II - 244

1    Q.  When you read this memo which is dated
2  September 2nd, 2004, did you have any concerns
3  about Mr. Mattocks referencing that you may be out
4  quite a bit due to your FMLA leave?
5    A.  Yes; I was very sensitive to that. I
6  was trying to play down my not being available and
7  I wanted to be seen for what I was doing when I
8  was there and how the program was doing very well
9  despite my being on FMLA leave intermittently. I
10  was sensitive about that; yes.
11    Q.  Did you talk to Mr. Mattocks about your
12  concern or sensitivity to this statement that's
13  contained in the memo?
14    A.  I don't remember doing so with that
15  memo; no.
16    Q.  As of December 2nd, 2004 --
17        MR. SIKORSKI: (Interposing)
18  September.
19    Q.  (BY MS. KENNEDY) September 2nd, 2004,
20  had your Family Medical Leave been approved by
21  River Valley?
22    A.  I don't have the dates in front of me.
23  I went to Mr. Mattocks with my desire to take FMLA
24  leave in late August, I believe, and told him what

VOLUME II - 245

1   was going on with my daughter at that time and
2   then he told me to begin the process, which I did
3   soon after -- right away.
4       Q.   I'm going to put what's been marked as
5   Exhibit 14 in front of you, sir.
6            Is that letter dated December 17 --
7   September 17, 2004? (Indicating.)
8       A.   This letter is -- it says
9   September 17th, 2004.
10      Q.   Is that the letter that you received
11  notifying you that your intermittent FMLA leave
12  had been approved?
13      A.   This is the letter I received from Donna
14  Viens notifying me that it had been approved.
15      Q.   That is after, isn't it fair to say, you
16  received the September 2nd, 2004 memo from
17  Mr. Mattocks, which is the fourth page of
18  Exhibit 19, correct?
19      A.   That memo from Donna Viens is after the
20  memo from Mr. Mattocks.
21           However, I had spoken to Mr. Mattocks
22  about my planning to take FMLA leave prior to
23  September 2nd. It was in late August.
24      Q.   And it was approved by River Valley,

VOLUME II - 246

1   isn't that correct -- your intermittent FMLA
2   leave, correct?
3       A.   It was approved after -- yes; later on
4   in the process.
5            MS. KENNEDY: That's all I have.
6   Thank you, Mr. Richards.
7            MS. FABBO: I don't have any
8   questions.
9            MR. SIKORSKI: Nothing further.
10           (The deposition was concluded.)
11                    * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24

VOLUME II - 247

1
2   SIGNATURE PAGE - ERRATA SHEET
3   To be signed by deponent and returned to
    counsel within thirty (30) days.
4        I, the undersigned, MARK A. RICHARDS, do
5   hereby certify that I have read the foregoing
    transcript of my testimony given in the matter of
6   MARK A. RICHARDS vs. RIVER VALLEY COUNSELING
    CENTER, INC. ET AL, on MARCH 17, 2006 and that, to
7   the best of my knowledge, said transcript is true
    and accurate (with the exception of the following
8   corrections listed below:)
9   PAGE : LINE; CHANGE AND REASON
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
20  DEPONENT'S SIGNATURE: _____
21  Signed under the pain and penalties of perjury
22  this ____ of ____, 2006.
23  NOTARY PUBLIC
24  My Commission expires: _____

VOLUME II - 248

1   COMMONWEALTH OF MASSACHUSETTS
    COUNTY OF HAMPDEN
2
3        I, JOANNE COYLE, a Notary Public within and
    for the Commonwealth of Massachusetts at large, do
4   hereby certify that I took the deposition of MARK
    A. RICHARDS, pursuant to Rule 30 of the
5   Massachusetts Rules of Civil Procedure, at the
    offices of Bulkley, Richardson and Gelinas, LLP,
6   1500 Main Street, Springfield, Massachusetts, on
    MARCH 17, 2006.
7        I further certify that the above-named
8   deponent was by me first duly sworn to testify to
    the truth, the whole truth and nothing but the
9   truth concerning his knowledge in the matter of
    the case of MARK A. RICHARDS vs. RIVER VALLEY
10  COUNSELING CENTER, INC. ET AL, now pending in the
    United States District Court, District of
    Massachusetts.
11
12       I further certify that the within testimony
    was taken by me stenographically and reduced to
13  typewritten form under my direction by means of
    COMPUTER ASSISTED TRANSCRIPTION; and, I further
    certify that said deposition is a true record of
14  the testimony given by said witness.
15       I further certify that I am neither counsel
16  for, related to, nor employed by any of the
    parties to the action in which this deposition was
17  taken; and further, that I am not a relative or
    employee of any attorney or counsel employed by
18  the parties hereto, nor financially or otherwise
    interested in the outcome of the action.
19       WITNESS my hand and seal this ____ day of
20  APRIL, 2006.
21           Joanne Coyle
             Notary Public
22           Certified Shorthand Reporter
             License No. 106693
23
    My Commission Expires
24  May 12, 2011

CIVIL ACTION NO. 05-30061-MAP

RICHARDS V. RIVER VALLEY COUNSELING CENTER, INC., ET AL.

# Exhibit 1C filed conventionally under seal

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 05-30061-MAP

MARK A. RICHARDS,                           )
      Plaintiff                            )
                                           )
vs.                                         )
                                           )
RIVER VALLEY COUNSELING CENTER, INC.,  )
VALLEY HEALTH SYSTEMS, INC.,               )
DAVID G. MATTOCKS AND DONNA VIENS,    )
      Defendants                           )

## AFFIDAVIT OF DR. ABRAHAM LINN

I, Dr. Abraham Linn, first being duly sworn, do hereby depose and say:

1.  I am an adult and understand the obligation of an oath.  I am a psychiatrist duly licensed to practice psychiatry in the Commonwealth of Massachusetts.

2.  I worked with Mark Richards at River Valley Counseling Center for several years.  I voluntarily left the employ of River Valley Counseling Center approximately four (4) months ago.

3.  Currently, I work for an agency in Massachusetts with offices in Greenfield, Westfield, and Athol.

4.  Prior to working at River Valley Counseling Center, I had much experience in the day treatment center area, and had run several day treatment centers in other areas, including centers in California.

5.  In my professional opinion, Mr. Richards is a first-rate clinician, among the best I have ever known.

6.  In my professional opinion, Mr. Richards is a very good manager.  In fact, he is one of the most conscientious managers I have ever met.

7.  While at River Valley Counseling Center, Mr. Richards would often work extra hours.  Also, he always held the staff to 5:00 PM on the dot, even when some individuals wanted to leave earlier.

8.  On the day of Mr. Richards' termination, November 4, 2004, I was at work at River Valley Counseling Center.  Mr. Mattocks came by and informed me, as well as other

419163

employees, that Mr. Richards had been terminated, and stated that the termination was "necessary for the organization."

9.  On the day of Mr. Richards' termination, Mr. Jeffrey Kassis removed Mr. Richards' computer out of the office.  Mr. Kassis stated, "this is the way they do things in the industry."  Mr. Kassis did not tell me why Mr. Richards was terminated, but he did insinuate that he [Kassis] had nothing to do with it.


Signed under the pains and penalties of perjury this 31st day of March , 2006

_____

Abraham Linn, M.D.

Page 1

```
 1              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
 2                   WESTERN DIVISION

 3                     CIVIL ACTION NO. 05-30061-MAP

 4    MARK A. RICHARDS,                   )
                                          )
 5                        Plaintiff )
      vs.                                 )
 6                                        )
      RIVER VALLEY COUNSELING CENTER, INC.,)    MAR 1, 2006
 7    VALLEY HEALTH SYSTEMS, INC.,        )
      DAVID G. MATTOCKS AND DONNA VIENS,  )
 8                        Defendants )

 9

10           D E P O S I T I O N

                    of
11
             DAVID G. MATTOCKS
12
      Taken at the Carlos G. Otis Health Care Center, Inc.,
13    185 Grafton Road, Townshend, Vermont on Wednesday,
      February 15, 2006 commencing at 11:00 a.m.
14

15    APPEARANCES:

16    JOHN C. SIKORSKI, Robinson Donovan, PC, 1500 Main
      Street, Suite 1600, PO Box 15609, Springfield,
17    Massachusetts 01115-5609
             On behalf of the Plaintiff
18

19    MARYLOU FABBO, Skoler, Abbott & Presser, PC, One
      Monarch Place, Suite 2000, Springfield, Massachusetts
20    01144
             On behalf of David G. Mattocks
21

22    MARY J. KENNEDY, Bulkley, Richardson & Gelinas, LLP,
      1500 Main Street, Suite 2700, PO Box 15507,
      Springfield, Massachusetts 01115-5507
23           On behalf of all other Defendants

24    Also Present:  Judith Tietz, MD

25    Reported by:  Sunnie Donath
```

COPY

Page 2

```
1        INDEX OF EXAMINATION
2   WITNESS        EXAMINED BY      Page   Line
3   David G. Mattocks  Atty. Sikorski    4     1
4
5
6        INDEX OF EXHIBITS
7                      Page    Line
8   No. 1 - Agreement to Treat Information   6     9
         as Confidential
9
10  No. 2 - Re-Notice of Taking Deposition   9    12
11
    No. 3 - August 30, 2004 Memo            60     1
11
    No. 4 - September 3, 2004 Letter to      60    18
12       Mark Richards from Donna Viens
13  No. 5 - September 17, 2004 Letter to     60    18
         Mark Richards from Donna Viens
14
15              * * * * *
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1        S T I P U L A T I O N S
2
3        It is agreed by and between the parties that all
4   objections, except objections as to the form of the
5   question, are reserved to be raised at the time of
6   trial for the first time.
7
8        It is further agreed by and between the parties
9   that all motions to strike unresponsive answers are
10  also reserved to be raised at the time of trial for the
11  first time.
12
13       It is further agreed that the deponent will read
14  and sign the deposition, and that the sealing of the
15  deposition is waived.
16
17       It is further agreed by and between the parties
18  that notification to all parties of the receipt of the
19  original deposition transcript is also hereby waived.
20
21              * * * * *
22
23       DAVID G. MATTOCKS,
24  duly sworn to tell the truth, deposes and says as
25  follows:
```

Page 4

```
1        EXAMINATION BY ATTORNEY SIKORSKI
2   Q.   Would you please state your name and spell your
3   last name for the record, sir?
4   A.   David G. Mattocks, M-A-T-T-O-C-K-S.
5             ATTORNEY SIKORSKI:  And would Mr.
6   Mattocks like to read and sign his deposition?
7             ATTORNEY FABBO:  Yes, he's going to read
8   and sign.
9             ATTORNEY SIKORSKI:  And, otherwise, we'll
10  have the usual stipulations?
11            ATTORNEY FABBO:  Sure.
12            ATTORNEY KENNEDY:  Yes.
13  BY ATTORNEY SIKORSKI:
14  Q.   Mr. Mattocks, we're here in the office of one of
15  your physicians, correct?
16  A.   Yes, in her suite.  It used to be her office.
17  It's now a podiatrist's office.
18  Q.   Okay.  But we're in the office of one of your
19  health care providers, correct?
20  A.   Yes.
21  Q.   And is that at your request?
22  A.   It is.
23  Q.   And we're here in Townshend, Vermont; is that
24  correct?
25  A.   It is.
```

Page 5

```
1   Q.   And you informed me that you could not come down
2   to have your deposition taken in Springfield or
3   Northampton, Massachusetts; is that correct?
4   A.   That's correct.
5   Q.   If at any time today, Mr. Mattocks, if you'd
6   like to take a break, will you please let me know, and
7   I'll be happy to let you take a break?
8   A.   Certainly.  Appreciate that.
9   Q.   And, at any time, if you'd like to speak to
10  counsel or your physician, please let me know, and I'll
11  be happy to give you an opportunity to do that.  Do you
12  understand that?
13  A.   I do.  Thank you.
14  Q.   And, if at any time today you don't understand a
15  question of mine, please ask me to rephrase it or
16  repeat it.  Do you understand that?
17  A.   I do.
18  Q.   And do you understand the questions and answers
19  given today may later be used in court?
20  A.   I do.  I'm a little unclear about the
21  confidentiality agreement as it relates to that.
22  Q.   Okay.  Do you understand that we've entered into
23  a confidentiality agreement in an attempt to protect
24  your private information as much as possible?
25  A.   Yes.
```

49d61f81-a776-11da-b908-000c41a99380

Page 6

1  Q.    Okay. But, putting that aside, do you
2  understand that this deposition is part of a legal
3  process?
4  A.    Absolutely.
5  Q.    And the questions and answers given here today
6  may later be used in the course of that legal process;
7  do you understand that?
8  A.    I do.
9        (Deposition Exhibit 1 marked.)
10  Q.    Let's mark as Exhibit 1 the Confidentiality
11  Agreement, and, Mr. Mattocks, do you understand that
12  we've just marked as Exhibit 1 a confidentiality
13  agreement prepared by your attorney?
14  A.    I do.
15  Q.    Did you bring any documents with you today that
16  support your claim, your defenses to this action?
17  A.    I did not.
18  Q.    Okay. Do you have any additional documents that
19  support your claim that you haven't already turned over
20  through your counsel?
21  A.    None.
22  Q.    Okay. Now, you live in Vernon, Vermont,
23  correct?
24  A.    That's correct.
25  Q.    And that's just right over the border of Vermont

Page 7

1  and Massachusetts?
2  A.    About five-tenths of a mile from the
3  Massachusetts border.
4  Q.    All right. And it's right off of that first
5  exit, exit 91 in Vermont, correct?
6  A.    Actually, it's closer to the last exit in
7  Massachusetts, the Bernardston exit.
8  Q.    So it's actually an easier drive for you to get
9  down to Northampton than it is up here to Townshend, is
10  it not, from your house?
11        ATTORNEY FABBO: Objection. You can
12  answer.
13        THE WITNESS: I don't think so, no, not
14  for me.
15  BY ATTORNEY SIKORSKI:
16  Q.    Well, how long would it take you to drive down
17  91 to Northampton from your house?
18  A.    To Northampton or to Holyoke?
19  Q.    To Northampton.
20  A.    30 to 45 minutes, I'm guessing.
21  Q.    Okay. And how long did it take you to drive up
22  here on Route 30 from your house?
23  A.    45 minutes.
24  Q.    And you understood that you had an option of
25  having this deposition taken in Northampton as opposed

Page 8

1  to here, correct?
2  A.    I honestly have no -- I mean, I was under the
3  assumption that it was going to be in either Holyoke,
4  Springfield, or here.
5  Q.    Why did you request that the deposition be held
6  here in Townshend, Vermont in your physician's office?
7  A.    Both in terms of my prior medical history and
8  potential consequences of both the questions and the
9  answers that might be presented to me and the proximity
10  to an inpatient setting shall I require it.
11        ATTORNEY FABBO: Hold off for one minute.
12  Could we just go off the record?
13        ATTORNEY SIKORSKI: Yeah, absolutely,
14  absolutely.
15        (A brief recess was taken.)
16        (Dr. Tietz arrives at 11:14 a.m.)
17        ATTORNEY SIKORSKI: I guess, back on the
18  record, I would just like to, the Doctor to identify
19  herself.
20        DR. TIETZ: Yes, Dr. Judith Tietz,
21  psychiatry, at Carlos G. Otis Health Care Center.
22        ATTORNEY SIKORSKI: Can you spell your
23  last name for the record?
24        DR. TIETZ: Yes, T-I-E-T-Z.
25        ATTORNEY SIKORSKI: And, Doctor, do you

Page 9

1  understand that, if at any time you would like me to
2  stop my questioning so that Mr. Mattocks can take a
3  break or consult with you, I would just ask that he
4  finish the question, and then I'll be happy to give him
5  a chance to do so? Do you understand that?
6        DR. TIETZ: Yes, I do.
7        ATTORNEY SIKORSKI: And I'd like you to
8  feel free to interrupt, okay?
9        DR. TIETZ: Thank you.
10        ATTORNEY SIKORSKI: And I guess I'd just
11  like this marked as Exhibit 2.
12        (Deposition Exhibit 2 marked.)
13  BY ATTORNEY SIKORSKI:
14  Q.    And, Mr. Mattocks, do you understand that's the
15  re-notice of your taking of deposition today --
16  A.    I do.
17  Q.    -- Exhibit 2?
18  A.    Yes.
19  Q.    Okay. And it asks you to produce any other
20  documents that support your defenses to the claims in
21  the amended claim which have not yet been produced by
22  your counsel. Do you see that?
23  A.    I do.
24  Q.    And, again, just for the record, do you have any
25  additional documents?

Page 10

1  A.  I do not.

2  Q.  How long did you work at River Valley Counseling

3  Center?

4  A.  Um, almost a year to the day, I believe it was.

5  Q.  So when did you start?

6  A.  My recollection is June of 2004 until June or

7  July of 2005.

8  Q.  When was your last day of work at River Valley?

9  When was the last day you actually worked?

10  A.  If I could consult a calendar, I could give you

11  that exact date.

12  Q.  Okay. Well, I don't see a calendar here. Can

13  you give me an approximate, end of February 2005?

14  A.  No. I believe it was April or May of 2005, I

15  believe.

16       ATTORNEY FABBO:  Could you speak up,

17  please?

18       THE WITNESS:  April or May of 2005 to the

19  best of my recollection.

20  BY ATTORNEY SIKORSKI:

21  Q.  At some point in time, did you take a leave of

22  absence from River Valley?

23  A.  When I left River Valley, I was informed by Mary

24  Kelleher, the director of human resources, that I would

25  be placed on a medical leave of absence.

Page 11

1  Q.  And when did she tell you that?

2  A.  I don't have a specific date, but it was, I

3  would say, within the first 30 days of my absence from

4  work.

5  Q.  Did you ask for any type of leave from River

6  Valley Counseling Center?

7  A.  Not to my recollection it was offered to me.

8  Q.  Okay. Were you terminated, or did you resign

9  from River Valley Counseling Center, sir?

10  A.  At the end of my medical leave of absence, I

11  resigned.

12  Q.  And, just in general terms, what was the leave

13  of absence for?

14       ATTORNEY FABBO:  Can we put this part

15  subject to the confidentiality, please?

16       ATTORNEY SIKORSKI:  Absolutely.

17       (See confidential portion of this transcript.)

18  BY ATTORNEY SIKORSKI:

19  Q.  And when did you make the decision to terminate

20  Mark Richards?

21  A.  Mark, specifically, I don't have a recollection

22  of that. In terms of examining all of the positions

23  under my area of responsibility, it was an ongoing

24  process from the day I got there until the day I left.

25  Q.  Now, did you create any documents at all of any

Page 12

1  type referring to the elimination of Mark Richards's

2  position?

3  A.  Not specifically. I was operating under both a

4  charge from HC Management and Valley Health Systems to

5  look at all the positions within the organization for

6  their financial viability and the fact that we had been

7  operating under a significant deficit for many years

8  and that, wherever possible, to make cost reduction

9  measures.

10  Q.  So why did you eliminate Mark Richards's

11  position?

12  A.  Mark Richards's position was one of several

13  positions that were looked at in my tenure there with

14  respect to their ability to contribute to the program's

15  financial success as well as whether there was any

16  redundancy in the positions with respect to their

17  responsibilities.

18  Q.  Why did you eliminate Mark Richards's position?

19  A.  It was my opinion that his responsibilities had

20  by and large been subsumed by a subordinate and that

21  the level of salary and remuneration that he received

22  was no longer necessary and, in fact, would contribute

23  to the financial success of the organization through

24  its elimination.

25  Q.  Tell me each and every other position that you

Page 13

1  eliminated while you were the executive director of

2  River Valley Counseling Center.

3  A.  I have no recollection of the specific positions

4  that were eliminated. There were several.

5  Q.  Do you remember any single position that was

6  eliminated from River Valley Counseling Center while

7  you were executive director?

8  A.  Sure. Our contracts management position was

9  eliminated. There were two or three positions within

10  the business office staff that were eliminated either

11  through resignation or termination for cause. There

12  were some clinician positions that were eliminated

13  either through resignation or through cause. Those

14  would cover pretty much the scope of what I recall.

15  Q.  Some of the positions that were eliminated were

16  because the contract ran out, correct?

17  A.  That's correct. There were, there was a

18  substantial revenue flow from contracts, and some of

19  those positions were eliminated either with reduction

20  in contract funding or elimination of the contract.

21  Q.  And several of the people you talked about were

22  eliminated for cause, correct?

23  A.  I don't know the proportion of those people that

24  would have been for cause versus position eliminations

25  or resignations.

Page 14

1  Q.    Did you ever sit down and do an analysis of
2  positions that you had there and how much you could
3  save by eliminating each and every one of these
4  positions that you claim you eliminated?
5  A.    Certainly, from before I was employed as part of
6  my interview process and throughout my time there, I
7  was under what I would call marching orders to
8  constantly examine the expenses and the revenue of the
9  organization and to reduce revenues where possible and
10 increase, reduce expenses were possible and increase
11 revenues where probable and possible.
12 Q.    My question to you is, Did you ever sit down and
13 create a document indicating how much money could be
14 saved by eliminating X, Y, or Z position?
15 A.    Yes, a budget for the agency.
16 Q.    Okay. Other than the budget for the agency?
17 A.    No, I did not have position-by-position
18 analysis.
19 Q.    Okay. And so did you send an email to anyone
20 with your ideas for eliminating positions?
21 A.    Not specific positions, but, again, under the
22 general understanding that wherever possible, through
23 either resignations, terminations for cause, or
24 position eliminations, that we would make every effort
25 to save on the personnel expenses of the agency.

Page 15

1  Q.    My question is, Did you have any document at all
2  indicating that, by eliminating Mark Richards's
3  position, we'd save X, Y, or Z dollars?
4  A.    No document to my knowledge. I certainly was
5  aware of his compensation level.
6  Q.    What other, what program did Mark Richards work
7  in?
8  A.    He was the program manager for our partial
9  hospitalization program. That's, I believe that was
10 the correct title.
11 Q.    Did he report to you?
12 A.    He had a split reporting responsibility. He was
13 not in my senior management staff, but he was one of
14 the program managers. He reported in part to me for
15 administrative responsibilities and in part to Jeffrey
16 Kassis, who is our clinical director, for his clinical
17 functions.
18 Q.    That's K-A-S-S-I-S?
19 A.    That's correct.
20 Q.    What other programs did you oversee, sir?
21 A.    Either directly or indirectly, all of the
22 operations of River Valley Counseling Center.
23 Q.    Could you just list them?
24 A.    Sure. We had a large outpatient mental health
25 service both English and bilingual English and Spanish.

Page 16

1  We had a partial hospitalization program that I have
2  mentioned with Mr. Richards as the program manager. We
3  had numerous contracts with state, federal, and local
4  agencies for the provision of a wide variety of
5  services. We had an AIDS prevention and treatment
6  program. We had school based services for the
7  provision of both AIDS education awareness and harm
8  reduction. There may have been others. Those are the
9  top ones I remember.
10 Q.    What positions in the outpatient mental health
11 area did you eliminate?
12 A.    There were at least two that I recall for cause.
13 There were some positions that responsibilities were
14 consolidated and, through an individual's resignation,
15 were not filled.
16 Q.    What cost savings did you get out of the
17 outpatient mental health department?
18        ATTORNEY FABBO: Objection. You can
19 answer.
20        THE WITNESS: I have no recollection of
21 the specific amount.
22 BY ATTORNEY SIKORSKI:
23 Q.    How much did you calculate before you eliminated
24 Mark Richards's position that you would save from
25 eliminating Mark Richards's position?

Page 17

1  A.    I did not know his exact salary. I would say it
2  was in the 40- to 60-thousand-dollar range.
3  Q.    Okay. And you were going to give more of his
4  responsibilities to Mr. Kassis and Mr. Avakian,
5  correct?
6  A.    I was going to divide the position elimination
7  parts of his job between Mr. Avakian, other staff
8  within the partial program, and Mr. Kassis for clinical
9  direction of the program.
10 Q.    And then you ended up hiring another clinician,
11 did you not, in that program?
12 A.    I did not.
13 Q.    But you ended up advertising for it, did you
14 not, sir?
15 A.    I did.
16 Q.    You advertised for it?
17 A.    My human resources director did advertise for
18 it.
19 Q.    Right. So, ultimately, if you would have filled
20 that position, how much would you have saved by
21 eliminating Mark Richards's position?
22 A.    Probably 20 to 30 thousand dollars.
23 Q.    Okay.
24 A.    That's an estimate, obviously.
25 Q.    Okay.

5 (Pages 14 to 17)

Page 18

1  A.    Can I just addend that by saying that that --
2  Q.    Sure.
3  A.    -- just would be in salary? If the clinician,
4  as my expectation would be, would generate revenue for
5  his or her involvement in the program, it would be an
6  additional amount.
7  Q.    What positions did you eliminate in the AIDS
8  prevention programs?
9  A.    Again, I was only at the agency for
10  approximately a year. There was at least one or two
11  funding reductions to that program. I'm going to
12  estimate that there were four or five positions that
13  were eliminated during that time.
14  Q.    While you were there?
15  A.    Yes.
16  Q.    Can you name those positions?
17  A.    I can't name all of them, but I think probably
18  one of the more significant ones was the community
19  based AIDS education. The title is not exact, but the
20  community based AIDS education coordinator.
21  Q.    And who was that?
22  A.    I don't recall his name.
23  Q.    And you ran two school based programs, did you
24  not, one in Holyoke, one in Chicopee?
25  A.    There were deferral programs in Holyoke and

Page 19

1  Chicopee. I believe there were others.
2  Q.    Okay. And tell me what positions you eliminated
3  in the Holyoke based school program.
4  A.    I do not recall specific positions, but, again,
5  all of those decisions would have been based on
6  contract revenue that was either growing, remaining
7  constant, or being reduced.
8  Q.    And what positions did you eliminate in the
9  Chicopee school based services?
10  A.    My recollection is that the Chicopee school
11  based services were experiencing some growth.
12  Q.    Was the elimination of Mr. Richards's position
13  the first significant position you eliminated?
14        ATTORNEY KENNEDY: Objection to form.
15        THE WITNESS: Could you define
16  significant?
17  BY ATTORNEY SIKORSKI:
18  Q.    Approximately how much was Mr. Richards making
19  --
20        ATTORNEY FABBO: Objection. You can
21  answer.
22  BY ATTORNEY SIKORSKI:
23  Q.    -- a year?
24  A.    Again, the range I would give was between 40 and
25  60 thousand dollars.

Page 20

1  Q.    And would you call him a program director?
2  A.    We had two levels of basic management staff. At
3  the higher level within the organization, there were
4  program directors and program managers. My
5  understanding and my recollection is that he was a
6  program manager, not a program director.
7  Q.    Okay. Let's take a subset of all the program
8  managers and program directors that reported to you.
9  Do you have that in your mind?
10  A.    Um-hum.
11        ATTORNEY FABBO: You have to answer yes
12  or no.
13        THE WITNESS: Yes.
14  BY ATTORNEY SIKORSKI:
15  Q.    Okay. Out of that subset, was Mr. Richards, was
16  the elimination of Mr. Richards the first one of those
17  positions that fit into that subset that you
18  eliminated?
19  A.    I believe so, yes.
20  Q.    Okay. And tell me each and every other position
21  in that subset that you eliminated while you were an
22  executive director at River Valley.
23  A.    There were at least two program managers who
24  were either eliminated, their positions were either
25  eliminated or were in the process of being eliminated

Page 21

1  when I left employment there.
2  Q.    Would that be for the following fiscal year?
3  A.    It would have had an impact in the following
4  fiscal year but was part of the current fiscal year.
5  Q.    And what are the names of those two people?
6  A.    Cynthia Griffin, Katie Irizari, I believe.
7  Q.    How do you spell that?
8  A.    I-R-I-Z-A-R-I, that's a phonetic approach.
9  Q.    And what were their titles?
10  A.    I don't recall their specific title names.
11  Q.    Now, part of your responsibilities were not only
12  to cut expenses but try to grow revenue, correct?
13  A.    Absolutely.
14  Q.    Okay. Did you actually deliver the news to Mr.
15  Richards that he was being terminated?
16  A.    I did.
17  Q.    Okay. And was that in a meeting about November
18  4th?
19  A.    Again, I don't have the, recollect the specific
20  date. I believe it was in early November.
21  Q.    Now, focusing on the time before that, what was
22  your assessment of Mr. Richards's clinical skills?
23  A.    I had no reason to have any concern about his
24  clinical skills.
25  Q.    What was your assessment of Mr. Richards's

Page 22

1  management skills?
2  A.    He knew a great deal about the intricacies of
3  partial hospitalization, both clinically and
4  administratively, financially. I found no deficits or
5  performance problems related to those areas of
6  responsibility.
7  Q.    Do you know that he had taught for many years at
8  the University of Connecticut?
9  A.    I did not.
10  Q.    Now, what was your assessment of the level of
11  financial reporting that Mr. Richards gave you for this
12  program?
13          ATTORNEY FABBO: Objection. I'm sorry.
14  You can answer.
15          THE WITNESS: He gave me none directly.
16  They would have been presented to my comptroller and my
17  business office manager who would have then prepared a
18  statement for me along with the other programs, both
19  revenue and expenses.
20  BY ATTORNEY SIKORSKI:
21  Q.    So your testimony is that Mr. Richards didn't
22  give any financial updates periodically directly to
23  you?
24  A.    I believe he gave me periodic reports of the
25  number of clients being served by that aspect of the

Page 23

1  program.
2  Q.    And he gave you such a report in the meeting
3  just prior to the termination meeting, did he not?
4          ATTORNEY FABBO: Objection. You can
5  answer.
6          THE WITNESS: I have no idea of the timing
7  of that meeting, but he gave me, I believe, monthly
8  reports of the performance of that aspect of the
9  agency.
10  BY ATTORNEY SIKORSKI:
11  Q.    What was your assessment of the level of the
12  quality of the reports that he gave you?
13  A.    I thought they were of marginal quality.
14  Q.    And why?
15  A.    Primarily because the billing cycle that was
16  being utilized by Mr. Richards was overly burdensome,
17  complicated, and, from my vantage point, provided
18  uneven cash flows to the agency.
19  Q.    Did you ever tell him you wanted better
20  financial reports?
21  A.    Most definitely.
22  Q.    When did you tell him that?
23  A.    Probably after I'd been there about three months
24  and had a reconnoitering of the overall operations of
25  the agency.

Page 24

1  Q.    And when did you start there, sir?
2  A.    I believe you've asked me that before, but my
3  best recollection is June of 2004.
4  Q.    Did you take any time off right after you
5  started for medical reasons?
6  A.    Not that I recall.
7  Q.    Did you have some time of adjustment or
8  probationary period?
9  A.    My understanding is that the human resources
10  policy of both HC Management, which is the company I
11  worked for directly, and as a sole member of our board
12  and of the Holyoke Health System did have specific
13  guidelines for probationary periods.
14  Q.    And that was 90 days, wasn't it?
15  A.    I don't recall, but that would be typical.
16  Q.    Did you ever give Mr. Richards anything in
17  writing requesting that he provide you better financial
18  reports?
19  A.    Nothing in writing.
20  Q.    Did you ever make any notation that you had
21  asked him for such reports?
22  A.    Mental notations.
23  Q.    Okay. What was your assessment of the financial
24  performance of Mr. Richards's program?
25          ATTORNEY KENNEDY: Objection to the form.

Page 25

1  Go ahead and answer.
2          THE WITNESS: The partial hospitalization
3  program was probably the cost, the revenue leader of
4  all the many aspects of River Valley's programs.
5  BY ATTORNEY SIKORSKI:
6  Q.    What do you mean by revenue leader, sir?
7  A.    They brought in a higher proportion of revenue
8  versus expenses than probably any other operating unit.
9  Q.    At some point in time, did you learn that Mr.
10  Richards's daughter had some health problems?
11  A.    I did.
12  Q.    And how did you learn that, sir?
13  A.    I think a combination of his telling me directly
14  and other staff casually telling me that.
15  Q.    What other staff, sir?
16  A.    I don't recall.
17  Q.    Did Mr. Avakian tell you about it?
18  A.    I don't recall.
19  Q.    How about Mr. Kassis?
20  A.    Don't recall.
21          (See confidential portion of the transcript.)
22  Q.    Did you ever ask that Mr. Richards go in your
23  place to meet the commissioner of the Department of
24  Mental Health?
25  A.    I don't recall that specific request, but Mr.

Page 26

1  Richards was certainly well-known to the behavioral
2  health community in that part of Massachusetts. He was
3  also known and respected by many of those agencies, and
4  it would not surprise me if I had asked him to do
5  something like that.
6  Q.    Do you remember the meeting at which Mr.
7  Richards was terminated?
8  A.    I do.
9  Q.    And where was that meeting held?
10  A.    It was held in my conference anteroom.
11  Q.    At what location?
12  A.    At 319 Beech Street in Holyoke, the
13  Administrative Health Care of River Valley.
14  Q.    And was there another, was there a location at
15  207 Elm Street?
16  A.    Yes.
17  Q.    And what was at 207 Elm Street?
18  A.    207 Elm Street, I believe, held the clinical
19  offices of the partial hospitalization program for
20  which Mr. Richards was responsible was located there.
21  The AIDS awareness project was located there. There
22  may have been others, but those were the two primary
23  programs as I recall.
24  Q.    Was a handicap ramp ever put up in that building
25  while you were --

Page 27

1  A.    It was put up prior to my arrival.
2  Q.    Who put it up? Do you know?
3  A.    I don't know who installed it originally. I
4  brought in a contractor during my time there to restore
5  it to operational capacity.
6  Q.    And who was that contractor that you brought in?
7  A.    His name was Mr. Edward Porter.
8  Q.    Porter? And is he from Greenfield?
9  A.    Yes.
10  Q.    And did you and he work together?
11  A.    Yes.
12  Q.    Where did you work together?
13  A.    At the United Arc of Franklin and Hampshire
14  Counties.
15  Q.    Was he your boss there?
16  A.    He was.
17  Q.    And did he ever do any work on your house, or
18  his son?
19  A.    Yes.
20  Q.    Okay. What work did they do on your house?
21  A.    I've known Mr. Porter for probably five years
22  both as a friend and as a coworker. Countless times,
23  probably, I mean, 20, 30 times.
24  Q.    20 to 30 times?
25  A.    Throughout the time that I've known Mr. Porter.

Page 28

1  Q.    Mr. Porter or his son came to do work at your
2  house?
3  A.    Not his son, but Mr. Porter himself.
4  Q.    And then you brought him down to rehab this
5  handicap ramp on 207 Elm?
6  A.    After obtaining other bids, yes.
7  Q.    Was there a concern about the fact that other
8  bids weren't obtained?
9  A.    Pardon.
10  Q.    Was there a concern that, expressed that other
11  bids were not obtained for that work?
12  A.    Not that I'm aware of.
13  Q.    Would it surprise you if there was concern about
14  that, sir?
15  A.    Actually, no, it wouldn't. My experience with
16  Mr. Porter is his proposal for doing that particular
17  work was extremely reasonable. Actually, there had
18  been, I think, prior to my arrival at River Valley at
19  least one outside estimate for that work which was
20  substantially higher than Mr. Porter's.
21  Q.    So, if we can focus on this termination meeting
22  in your anteroom, and who was there?
23  A.    Donna Viens, my director of human resources, and
24  myself and Mr. Richards.
25  Q.    Okay. And what do you remember being said at

Page 29

1  that meeting?
2  A.    Could you break that down for me? There was a
3  lot said at that meeting.
4  Q.    Sure, sure. How was the meeting set up?
5        ATTORNEY FABBO: Objection. You can
6  answer.
7        THE WITNESS: I don't recall whether I
8  personally or whether Ms. Viens asked Mark to come over
9  to the administrative offices to meet.
10  BY ATTORNEY SIKORSKI:
11  Q.    Okay. And was this meeting a follow-up to a
12  managers' meeting?
13  A.    I mean, it may have followed a managers'
14  meeting, but it was in no way connected to that.
15  Q.    Okay. Do you remember the managers' meeting
16  held earlier that morning?
17  A.    No.
18  Q.    So, when Mark came into the meeting room, were
19  you and Ms. Viens there already?
20  A.    I believe that Mark came in and I was there
21  alone and Ms. Viens joined us almost immediately
22  afterwards.
23  Q.    And what did you say to Mr. Richards to start
24  the meeting off?
25  A.    I actually believe I made some comment to try to

49d61f61-a776-11da-b008-000d41a99380

Page 30

1  put him somewhat at ease. I did tell him near the
2  beginning that this is going to be a very difficult
3  meeting, that I had compassion for what I was about to,
4  for him and for what I was about to tell him, and I
5  shared with him that I had had in my career similar
6  disquieting discussions.
7  Q.    And then what did you say to him?
8  A.    I told him that for financial and business
9  reasons that the position of director of the day
10 treatment program was going to be eliminated.
11 Q.    And what did he say in response to that?
12 A.    He actually said very little to my recollection.
13 He was obviously, not obviously, my impression was that
14 he was very surprised by that information. He
15 immediately moved to the position of taking out paper
16 and pencil and, from that point on in the meeting,
17 making notes regarding, I assume, everything that was
18 said.
19 Q.    Did you tell him who would be taking over the
20 program?
21 A.    I told him that the position was not going to be
22 filled, that it was a position elimination, that the
23 clinical responsibilities would fall to our clinical
24 director Jeffrey Kassis, the day-to-day operations
25 would be handled by Mr. David Avakian.

Page 31

1  Q.    Did Mr. Richards challenge that at all?
2  A.    He did.
3  Q.    And what did he say?
4  A.    My recollection is he told me that the
5  composition of that team with his absence would not
6  meet regulatory requirements.
7  Q.    And what did you say in response to that?
8  A.    That I had both made telephone calls to the
9  regulatory agency; consulted with Mr. Kassis, the
10 clinical director; Mr. Avakian, the day-to-day manager
11 of the program; and a cursory review of the regulations
12 on my own part.
13 Q.    And what did he say in response to that?
14 A.    That I didn't know what I was talking about.
15 Q.    Did you take the regulations out and go over
16 them with him?
17 A.    I did not.
18 Q.    Did Ms. Viens say anything in response on that
19 particular topic?
20 A.    I don't recall her saying anything about that,
21 no.
22 Q.    Now, when did you do this cursory review of the
23 regulations yourself?
24 A.    Probably two to three days before my meeting
25 with Mr. Richards.

Page 32

1  Q.    Do you remember where you got the regulations
2  from?
3  A.    I suspect I had a copy on file in my office, but
4  I may have asked either Mr. Avakian or Mr. Kassis for
5  their copies to see if there had been changes or
6  updates.
7  Q.    And that was two to three days before this
8  termination meeting?
9  A.    That's my best recollection, yes.
10 Q.    And do you have, do you recall specifically what
11 Mr. Richards was challenging, what part of the
12 regulations he was challenging you on?
13 A.    Well, again, it was the specific clinical
14 composition of the team that was necessary to run the
15 day treatment program. Beyond that I don't remember
16 the specifics.
17 Q.    Now, you said you had made telephone calls about
18 the, the staffing; is that true?
19 A.    Yes.
20 Q.    And who did you call?
21 A.    I mentioned the organization earlier. Could you
22 go back and refresh me in terms of the question that
23 you asked earlier?
24       ATTORNEY SIKORSKI:  That's okay. Off the
25 record.

Page 33

1        (A brief discussion was held off the record.)
2  BY ATTORNEY SIKORSKI:
3  Q.    Go back on the record. Mr. Mattocks, are you
4  having some trouble recalling specifically now the name
5  of the organization that you called?
6  A.    Yes.
7  Q.    And, if at some time in the course of this
8  deposition it comes to you, would you tell me what it
9  is?
10 A.    Oh, absolutely.
11 Q.    So was this a governmental organization or a
12 not-for-profit, or what type of organization was it
13 that you called?
14 A.    I believe it was a support organization for
15 agencies offering a variety of behavioral health
16 services including partial hospitalization programs,
17 a trade association, if you will.
18 Q.    And, well, did you make one or more than one
19 call?
20 A.    To that agency, one.
21 Q.    Okay. And who did you talk to?
22 A.    Do not recall.
23 Q.    And was this an organization in Boston?
24 A.    No. It was that direction, but I don't recall
25 the name of the town.

49d61f81-a776-11da-b008-000c41a99380

Page 34

1 Q.    Okay.  And what did you say to that person, and
2 what did they say to you?
3 A.    I asked them what their understanding was of the
4 specific composition of the clinical team necessary to
5 run a partial hospitalization program.
6 Q.    And what did they tell you?
7 A.    They told me that there was some discrepancy in
8 the interpretation of those regulations, that some
9 organizations interpreted it in a very strict way in
10 terms of examination, qualifications of individuals,
11 that some had duplications of those responsibilities
12 within one person, and that agencies had an opportunity
13 or a window of time in which to meet those regulations
14 should there be organizational reorganization.
15 Q.    Did you make any notes of that conversation?
16 A.    Mental notes.
17 Q.    Did you put anything in writing regarding that
18 conversation?
19 A.    I don't recall putting that in writing.  I did
20 have subsequent conversations with Mr. Avakian and with
21 Dr. Kassis, Mr. Kassis.
22 Q.    Okay.  Let's put those aside.  Did you speak
23 with anyone else outside of the River Valley Counseling
24 Center organization about this particular issue?
25 A.    I believe I contacted one or two other programs

Page 35

1 that operated partial hospitalization programs and
2 inquired them about their understanding of the
3 regulations.
4 Q.    And what other programs did you contact?
5 A.    I do not recall.
6 Q.    Did you actually speak with someone at those?
7 A.    I did.
8 Q.    Did you make any notes?
9 A.    I did not.
10 Q.    And then when did you speak with Mr. Avakian
11 about the regulations?
12 A.    I probably spoke to Mr. Avakian two or three
13 times over the preceding month or two so that I could
14 have a better understanding of what those regulations
15 were as well as some conversations with Mr. Kassis
16 about the same.
17 Q.    What did you speak with Mr., what did you say to
18 Mr. Avakian about the specific issue of the
19 applicability of these regulations, and what did he say
20 to you?
21 A.    Well, there was no question in my mind that
22 those, the constitution of that group needed to meet
23 certain minimum requirements.  Mr. Avakian and Mr.
24 Kassis explained to me the specific requirements as
25 well as my own recollection of what I'd read in the

Page 36

1 regulations and the time frame or at least the ability
2 to take a time frame to reach that constitution.
3 Q.    Do you recall what you said to Mr. Avakian about
4 the regulations and what he said to you?
5 A.    I recall, I recall asking him whether or not,
6 with Mr. Richards's absence from the program, whether
7 or not we would continue to meet the regulatory
8 requirements of that agency.
9 Q.    And what did he say?
10 A.    That it was his understanding that, with his own
11 credentials, the credentials of remaining members of
12 that management team, and with the open position that
13 we had that we were recruiting for, that we would have
14 no trouble meeting those requirements.
15 Q.    What was the open position you were recruiting
16 for?
17 A.    It was a general clinician position that I think
18 our primary prerequisite, at least beginning the
19 process, was that they be a licensed clinician in
20 Massachusetts at either the LPC level or the MSW level.
21 Q.    Did you ever offer that position to Mr.
22 Richards?
23 A.    I did not.
24 Q.    Why not?
25 A.    I discussed with him in general terms whether or

Page 37

1 not he felt there were other positions within the
2 agency for which he was either interested or qualified.
3 Q.    When did you have that discussion with him?
4 A.    Probably in the termination discussion.  That's
5 my best recollection.
6 Q.    What do you recall saying to him about other
7 positions in the organization?
8 A.    That off-hand I did not know of any specific
9 positions for which he would be either interested, in
10 my opinion, or qualified, but that decision was not
11 mine to make and that it would have to go through the
12 health system's human resources department.
13 Q.    Is that Mary Kelleher's department?
14 A.    Correct.
15 Q.    Prior to the termination meeting, did you ask
16 Ms. Kelleher if there were any other positions within
17 the Greater Holyoke Hospital System that Mr. Richards
18 might be qualified for?
19 A.    I did not ask that specific question.  I asked
20 whether or not the human resources department of the
21 hospital would be of assistance to employees whose
22 positions were eliminated as to whether or not there
23 were other positions that he might be qualified for.
24 Q.    Okay.  So, before this termination meeting, you
25 did speak with Ms. Kelleher about this upcoming

Page 38

1 termination, correct?
2 A.    I did.
3 Q.    And you discussed with her a number of issues,
4 correct?
5 A.    I did.
6 Q.    And you, but you didn't ask her specifically
7 words to the effect of, I'm terminating, this guy's
8 been here 16, 17 years; is there any other place in the
9 Holyoke Hospital Organization for him?
10 A.    First of all, I always phrased them in terms of
11 position elimination, not a termination. There may not
12 be a semantical difference in your mind. In mine there
13 is a difference. I'll just say that, in the meeting
14 with Mr. Richards, I made a very specific point of
15 asking him whether there was another position in the
16 agency for which he might be interested.
17 Q.    Was that after he was starting to take notes
18 that that part of the conversation came up?
19 A.    I don't recall.
20 Q.    Because you know that he took very detailed
21 notes, correct?
22        ATTORNEY FABBO: Objection. You can
23 answer.
24        THE WITNESS: I don't know how detailed
25 they were. I saw him writing on a piece of paper.

Page 39

1 BY ATTORNEY SIKORSKI:
2 Q.    Right. You saw him writing on more than one
3 piece of paper, correct?
4 A.    I don't know how many pieces of paper he had.
5 Q.    What did you say to Mr. Kassis about whether the
6 new configuration of the day treatment program would
7 comply with the regulations?
8 A.    It was posed as a question to him and his
9 opinion as a clinical director whether or not either
10 immediately or with the employment of a subsequent
11 clinician we either would immediately or within short
12 order meet those requirements.
13 Q.    Did you ever pull the regulations out and go
14 over them with Mr. Kassis?
15 A.    Not to my recollection.
16 Q.    Did you ever give him a copy of the regulations?
17 A.    I, it was my understanding that he had them in
18 his possession.
19 Q.    Did you ever sit down and go over the
20 regulations with Mr. Avakian?
21 A.    I did.
22 Q.    And you sat down and went over the regulations
23 with Mr. Avakian?
24 A.    I did.
25 Q.    And when did you do that?

Page 40

1 A.    Actually, I think it was the subject of several
2 meetings shortly before my meeting with Mr. Richards
3 and within a day or two of the position being
4 eliminated.
5 Q.    Within a day or two after?
6 A.    Um-hum.
7        ATTORNEY FABBO: You have to answer yes
8 or no.
9        THE WITNESS: Yes.
10 BY ATTORNEY SIKORSKI:
11 Q.    When did you speak with Mary Kelleher about your
12 plans to --
13        (A brief discussion was held off the record.)
14        You spoke with Mary Kelleher prior to the
15 termination meeting with Mr. Richards, did you not?
16 A.    I did.
17 Q.    And how soon before the termination meeting with
18 Mr. Richards did you speak with her?
19 A.    Well, the entire process was not a protracted
20 one. I believe I met with her almost immediately after
21 meeting with Mr. Porton wherein he expressed to me a
22 desire that I run this by Ms. Kelleher to find out
23 whether or not she had any specific objections from a
24 human resource point regarding this decision.
25 Q.    Well, let's back up, then. Did you discuss this

Page 41

1 decision with Mr. Porton?
2 A.    Yes.
3 Q.    Okay. What did you say to him, and what did he
4 say to you about this?
5 A.    I told him that, in my continuing efforts to
6 find, identify cost reduction measures within the
7 agency, that I had identified a position that would
8 result in significant cost savings without what I
9 believed to be a significant interruption in either the
10 clinical quality or the day-to-day operations of that
11 program.
12 Q.    And did you specifically identify the position
13 and the person who held it?
14 A.    I don't recall. I certainly told him that it
15 was a person that had worked for the agency for some
16 time.
17 Q.    And what did he say in response to you telling
18 him that?
19 A.    My recollection is, again, that his concern was
20 that I meet with human resources to ensure that there
21 were no procedural or other reasons why that decision
22 could not be effected.
23 Q.    And did you, in fact, then meet with human
24 resources?
25 A.    I did along with Donna Viens.

Page 42

1  Q.    And was that an in-person meeting?
2  A.    It was.
3  Q.    And was it just the three of you, Mary Kelleher,
4  Donna Viens, and yourself?
5  A.    To the best of my ability, yes, knowledge.
6  Q.    And where was that held?
7  A.    In Ms. Kelleher's office.
8  Q.    Is that in 10 Hospital Drive?
9  A.    Yeah, in the complex, 20 Hospital Drive. It's
10  within walking distance of the administrative building.
11  Q.    How soon before the termination meeting did this
12  meeting occur?
13  A.    I don't recall.
14  Q.    And who arranged the meeting?
15  A.    I believe I called for it after Mr. Porton had
16  indicated that that was his request and desire.
17  Q.    What was your understanding about the relative
18  age between, well, relative ages of Mr. Richards and
19  Mr. Avakian?
20  A.    I had absolutely no idea.
21  Q.    You didn't know Mr. Avakian was significantly
22  younger than Mr. Richards?
23  A.    I did not.
24  Q.    What did you say at the meeting with Ms.
25  Kelleher and Ms. Viens?

Page 43

1  A.    More or less a reiteration of what I've said,
2  that, in my opinion, the position was in essence
3  superfluous at this point in time, that it was costing
4  the agency salary and other related expenses that were
5  unnecessary, and that, with the elimination of the
6  position, I saw cost savings and the ability to
7  continue the program clinically and administratively
8  uninterrupted.
9  Q.    Okay. And what did Ms. Kelleher say?
10  A.    She made some judgment with regard to whether or
11  not the program could be operated in such a manner.
12  Her concern was solely whether or not human resources
13  policies within the overall health system and within
14  River Valley in particular were being adhered to.
15  Q.    And did you and her discuss the fact that Mr.
16  Richards had requested intermittent FMLA leave?
17  A.    I did not. I have a vague recollection of Ms.
18  Viens discussing it with Ms. Kelleher.
19  Q.    In your presence?
20  A.    Yes.
21  Q.    And do you recall what Ms. Viens said to Ms.
22  Kelleher and what she said to Ms. Viens?
23  A.    The gist of it was that Mr. Richards had
24  requested intermittent family leave and that that had
25  been granted.

Page 44

1  Q.    And was there any discussion about whether or
2  not the termination of Mr. Richards would be
3  retaliation against him for exercising his right to
4  request FMLA leave or to take it?
5  A.    None to my recollection whatsoever.
6  Q.    Was there any discussion about the age of the
7  persons that would take over his responsibilities?
8  A.    Not to my recollection. I did not know the ages
9  of these individuals.
10  Q.    Was there any discussion about the fact that Mr.
11  Richards was in a relationship with someone with a
12  disability, to wit his daughter?
13  A.    I believe there was within the context of that,
14  of that was the reason why he had been, why he had
15  requested and why FMLA had been granted to him.
16  Q.    Was there any discussion about whether or not
17  the termination would violate the Americans with
18  Disabilities Act or the Massachusetts
19  Antidiscrimination Statute?
20  A.    None.
21  Q.    Mr. Mattocks, at the termination meeting did you
22  tell Mr. Richards that you were surprised he wasn't
23  weeping or words to that effect?
24  A.    Not at all.
25  Q.    Did you discuss with him the fact that you had

Page 45

1  been terminated from the Brattleboro Retreat?
2  A.    I told him that my position had been eliminated
3  with the Brattleboro Retreat, yes.
4  Q.    And did you also tell him that you had been
5  given little time to clear your office out?
6  A.    I don't recall that specific comment. I
7  certainly did comment that the decision was, in my
8  opinion, a hasty one.
9  Q.    Let me ask you that. What do you recall telling
10  Mr. Richards in the termination meeting about your own
11  experience at the Brattleboro Retreat?
12  A.    That the decision to eliminate my position came
13  to me as a total surprise; that I saw no reason from a
14  performance standpoint or an organizational operational
15  standpoint why that decision had been made; that I was
16  sympathetic to anyone, but particularly someone with
17  Mr. Richards's length of service, why that would come
18  as a shock to him; and that I was concerned about him
19  and would make every effort to make his departure from
20  the agency as smooth as possible.
21  Q.    Was Mr. Palmisano the person who made the
22  decision to eliminate your position?
23  A.    I don't know the answer to that question. Mr.
24  Palmisano delivered that message to me.
25  Q.    Did anyone else other than Mr. Palmisano deliver

Page 46

1  that message to you?
2  A.   No.
3  Q.   And did the Brattleboro Retreat give you six
4  months' severance pay?
5  A.   The original understanding and written agreement
6  that I had with Retreat Health Care before I assumed
7  the position was that I would be given twelve months of
8  severance unless the dismissal were for cause.
9  Q.   And why did you end up not getting twelve
10 months?
11 A.   Mr. Palmisano offered me six months at the time
12 of our meeting. I informed him that I felt that was in
13 violation of my employment agreement and that I would
14 seek legal counsel to determine whether or not I could
15 reclaim what I considered to be my contractual right.
16 Q.   And did you, in fact, get legal counsel?
17 A.   I did.
18 Q.   And why didn't you end up getting the year?
19 A.   My estimate was I probably could have, but my
20 attorney, in meeting with the attorney from Retreat
21 Health Care, reached a compromise of nine months. I
22 was given the opportunity to either accept that or to
23 continue the fight.
24 Q.   And you chose to continue the fight?
25 A.   No, I did not. I chose to accept the nine

Page 47

1  months.
2  Q.   Did you get the whole nine months at one time?
3  A.   No. It was paid out as if I were still
4  employed.
5  (See confidential portion of the transcript.)
6  Q.   Prior to the termination meeting with Mr.
7  Richards, did you consult with an attorney?
8  A.   Not to my recollection.
9  Q.   Did you have any separation agreement to give to
10 Mr. Richards at the termination meeting?
11 A.   I had prepared a document, yes.
12 Q.   And what did you use to help you prepare that
13 document, sir?
14 A.   My previous experience as an administrator of
15 almost 30 years and the fact that I had prepared
16 probably 10 such agreements in the past, my desire to
17 extend the hospital's typical severance agreement for
18 people in Mr. Richards's position to recognize his
19 length of service.
20 Q.   What did you understand to be the hospital's
21 typical policy?
22 A.   I believe it was one week for every year of
23 employment.
24 Q.   How many years of employment did Mr. Richards
25 have?

Page 48

1  A.   I don't recall off hand. It was significant.
2  Q.   And did you believe that this was more generous
3  than one week per year of service or less generous?
4  A.   I certainly believed that my discussions with
5  Ms. Kelleher and my own opinion and what I believed to
6  be the document that I prepared were more generous than
7  those terms. May I interject something?
8  Q.   Yes.
9  A.   I do not recall whether Ms. Kelleher approved or
10 disapproved of that document.
11      ATTORNEY SIKORSKI: What I'd like to do
12 now is just take ten minutes, go through my notes, mark
13 some documents, and take a bathroom break if that's
14 okay.
15      (A brief recess was taken.)
16      ATTORNEY FABBO: Can we have a
17 clarification on the record that the entire questioning
18 about his education is not subject to Exhibit 1? I
19 think he started with questions about Parkwood.
20      ATTORNEY SIKORSKI: Okay. That's fine.
21 BY ATTORNEY SIKORSKI:
22 Q.   Mr. Mattocks, while you were the executive
23 director of River Valley Counseling Center, did anyone
24 else in the organization ask for family medical leave?
25 A.   At River Valley?

Page 49

1  Q.   Um-hum.
2  A.   I believe so, but I don't have specific
3  recollection of that.
4  Q.   Do you recall approving anyone else's request?
5  A.   I approved nobody's FMLA. That was handled by
6  Ms. Viens.
7  Q.   Do you recall her asking your opinion on any
8  other FMLA issue?
9  A.   I, she never asked my opinion about it. She
10 would inform me.
11 Q.   Did she inform you about any other FMLA leave?
12 A.   As I indicated, I don't recall that, but I have
13 a vague recollection that there were one or two, yeah.
14 Q.   Do you know what department those were in?
15 A.   I, no, I just significantly remember that they
16 happened. I don't know specific individuals.
17 Q.   Do you recall when in relation to Mr. Richards's
18 termination those occurred?
19 A.   Well, they were definitely before. There may
20 have been one or two after. I don't know.
21 Q.   I'm sorry. There were other FMLA leaves before
22 Mr. Richards was terminated?
23 A.   Before his position was eliminated, yes.
24 Q.   And do you recall who those people were?
25 A.   No, I do not.

Page 50

1  Q.   In the termination meeting was there a
2  discussion about how this news would be presented to
3  Mr. Richards's staff?
4  A.   There was.
5  Q.   And what was that discussion?
6  A.   Mr. Richards asked me personally whether he
7  could be afforded the opportunity to tell both his
8  immediate staff as well as the clients in the partial
9  hospitalization program about his departure.
10  Q.   And what did you say to him?
11  A.   I believe I placed a call to Mary Kelleher, the
12  corporate director of human resources, to run that
13  request by her. Her advice to me was absolutely not.
14  I made a decision independent of that that, as long as
15  I could be in attendance at that meeting, that I felt
16  it was a reasonable and humane request.
17  Q.   Did she tell you why she said absolutely not?
18  A.   Sure.
19  Q.   What did she say?
20  A.   Or she implied it. I certainly have worked for
21  enough organizations including some that escort people
22  whose positions have been eliminated or terminated out
23  the door and never let them back into their office.
24  Q.   I'm sorry. Did Ms. Kelleher tell you why you
25  should not allow Mr. Richards to talk to his staff?

Page 51

1  A.   I do not recall her specific words, but they had
2  something to do with that was not the policy or
3  precedent of the organization and that she was
4  concerned about how that would be presented to staff.
5  Those are the two things I recall.
6  Q.   And then you said you made a decision to
7  countermand that?
8  A.   I made a decision to act independently of that
9  advice, yes.
10  Q.   And were you there when Mr. Richards talked to
11  his staff?
12  A.   I was.
13  Q.   And what did he say to his staff?
14  A.   He presented to his staff that, as they knew,
15  that he had, that his daughter was ill, that it was
16  requiring more and more of his attention and time to
17  care for her appropriately, and that he wanted to, that
18  he was resigning his position in order to afford her
19  that level of care.
20  Q.   Did Mr. Richards also ask if he could get his
21  personal effects out of the office?
22  A.   He did.
23  Q.   And what did you say in response to that?
24  A.   That we would certainly make those arrangements.
25  Q.   And did you, in fact, make those arrangements?

Page 52

1  A.   Yes.
2  Q.   And what arrangements did you make?
3  A.   My recollection is that Mr. Avakian was going to
4  meet him at a subsequent time to both let him into the
5  building and to assist him in removing his personal
6  possessions.
7  Q.   And do you know if Mr. Avakian did that?
8  A.   I don't know firsthand, no.
9  Q.   And did you ask Mr. Kassis to do something to
10  Mr. Richards's computer?
11  A.   No.
12  Q.   Did you ask anyone to do something to Mr.
13  Richards's computer --
14  A.   I did not.
15  Q.   -- prior to the termination?
16  A.   May I just interject something?
17  Q.   Sure.
18  A.   Since it happened --
19        ATTORNEY FABBO:  Why don't you wait until
20  he asks the questions, okay?
21        THE WITNESS: Okay, fine.
22  BY ATTORNEY SIKORSKI:
23  Q.   If you'd like to clarify your previous answer,
24  I'd be glad to let you do that.
25  A.   All of the computers at River Valley and within

Page 53

1  Valley Health Systems at Holyoke Medical Center were
2  all networked, and I can just tell you that my own
3  computer was obliterated of all documents and knowledge
4  after my departure without my knowledge or consent. So
5  I'm guessing that that was standard operating
6  procedure. Don't have knowledge of that personally.
7  I'm just telling you what my experience was.
8        (See confidential portion of the transcript.)
9  Q.   Going back to the termination meeting with Mr.
10  Richards, in the time before leading up to that
11  meeting, did you ever speak to anyone about Mr.
12  Richards's work history?
13  A.   Not that I recall, no.
14  Q.   Okay. And let me just put it a little
15  differently. Did you ever ask anyone before the
16  termination meeting, I'm thinking of terminating Mr.
17  Richards; tell me about his history with the agency,
18  his contributions to the agency, his value to the
19  agency, any discussions like that?
20  A.   I'm sure there were discussions of an informal
21  nature about that primarily focusing on not necessarily
22  since his arrival there but of the overall fiscal value
23  of that program.
24  Q.   Who did you have those discussions with?
25  A.   My executive management team.

49d61f81-a776-11da-b008-000c41a99380

Page 54

1    Q.    And who is that?
2    A.    Jeffrey Kassis, Mary, Paul Matier, Donna Viens,
3    Sean Munster, and Brian Duke.
4    Q.    Where does Brian Duke live now; do you know?
5    A.    I have no idea.
6    Q.    Do you know where he lived when you were working
7    at River Valley?
8    A.    Far away, I know that, Gardner or beyond.  I
9    mean, it was, I believe he told me it was a 45-minute
10   commute or more.
11   Q.    Do you know his middle initial?
12   A.    Nope.  No, sorry.
13   Q.    Do you know where he's working now?
14   A.    I do not, no.
15   Q.    Do you know where he went after he left River
16   Valley?
17   A.    He expressed to me that his expectation was that
18   he would go to work for some type of temporary agency
19   at least on an interim basis as he had significant
20   experience in hospital financial management.
21   Q.    Did Mr. Avakian at some point while you were
22   still executive director of River Valley leave the
23   employment of River Valley?
24   A.    During the time I was there?
25   Q.    Yes.

Page 55

1    A.    No.
2    Q.    Now, if I understand your testimony, Mr. Porton
3    requested that you find ways both to reduce costs and
4    increase revenue.
5    A.    Correct.
6    Q.    Correct?  And in the October-November time frame
7    right around the time of the termination meeting, what
8    other steps did you take to reduce costs?
9    A.    As I've indicated before, there were other
10   positions that were either eliminated, people resigned
11   or were terminated for cause, and on each and every one
12   of those departures, there was an individual analysis
13   of the critical nature of the position, whether it
14   needed to be filled, whether those assignments could be
15   redistributed or simply dropped.
16   Q.    Did you put anything in writing regarding those
17   calculations?
18   A.    Only within the standpoint of the budgetary
19   impact of those decisions.
20   Q.    But, other than that, did you take any other
21   steps in the October-November time frame to reduce
22   costs?
23        ATTORNEY KENNEDY:  Objection to form.
24        THE WITNESS:  My daily job was to review
25   both revenue and expenses of the organization, and I'm

Page 56

1    positive that I took other steps in both areas.
2    BY ATTORNEY SIKORSKI:
3    Q.    But can you tell me any of those steps now?
4    A.    In reducing costs?
5    Q.    Yes.
6    A.    Sure.  They're not overly significant, but
7    graphic design, something which I can do myself, had
8    been sent out before as a subcontract.  I took on that
9    myself.  Rebranding of the agency which would have been
10   done through a public relations firm, I did that
11   myself.  Negotiated all the contracts for stationery,
12   signage, location of outpatient offices.  I sent
13   someone to Puerto Rico for three weeks to attempt to
14   recruit bilingual therapists in the hope of increasing
15   our revenue in that population.  Negotiated with
16   several agencies regarding either increasing or
17   expanding our contractual involvement with them.
18   Negotiating with the Department of Mental Health for
19   increased revenue for the services we were providing
20   and on and on.
21   Q.    And this is in October-November of 2003?
22   A.    It was throughout my entire tenure there.
23   Q.    Prior to becoming executive director of River
24   Valley, had you received any training in compliance
25   with discrimination laws?

Page 57

1    A.    I had certainly gone through, I guess you would
2    call, organizational organizations' pat programs on
3    sexual harassment, on equal employment opportunity laws
4    and regulations.
5    Q.    This was before you got to River Valley?
6    A.    I think probably every agency I've ever worked
7    with has had a similar type of training.
8    Q.    Did River Valley?
9    A.    River Valley did.  They distributed documents
10   indicating what their policies were on those areas.
11   One had to sign off on them as terms of having read
12   them, agreed to them, and recognizing that there could
13   be disciplinary action if they were violated.
14   Q.    But did you undergo any training while you were
15   employed at River Valley Counseling?
16   A.    In the year or less, no.
17   Q.    Do you know an individual by the name of Clark
18   Fenn?
19   A.    I do.
20   Q.    And did you have any interactions with Clark
21   Fenn while you were the executive director of River
22   Valley?
23   A.    I did.
24   Q.    And what interactions did you have with him?
25   A.    My recollection was that he was in charge of

Page 58

1  risk management for the hospital at least in part. I
2  had two or three discussions with him regarding at
3  least one clinician who may or may not have been
4  involved in what I considered to be unethical or
5  illegal billing practices and what the exposure to the
6  agency would be and what actions I should take. That's
7  the specific thing that I remember.
8    Q.   At any time either before or after the
9  termination meeting, did you discuss Mr. Richards's
10  termination with Clark Fenn?
11   A.   Not to my knowledge. Let me amend that by
12  saying I may have had a discussion with him at Ms.
13  Kelleher's or Mr. Porton's request to inform him that
14  there was litigation that was beginning and to find out
15  what insurance or other coverage may be available to
16  the hospital.
17   Q.   Is that an in-person meeting or an
18  over-the-phone?
19   A.   I believe that meeting was over the telephone.
20   Q.   And did you at some point ascertain whether
21  there was insurance available to you?
22   A.   I did not other than learning that there was a
23  general office, officers' and directors' policy.
24   Q.   Have you personally been interviewed by any
25  insurance adjuster?

Page 59

1   A.   No.
2   Q.   Have you given any recorded statement to an
3  insurance adjuster?
4   A.   I have not.
5   Q.   Have you given a written statement to any
6  insurance company?
7   A.   I have not.
8   Q.   Have you ever spoken to any insurance adjuster?
9   A.   On this matter, on Mr. Richards's separation?
10   Q.   Yes.
11   A.   No.
12   Q.   What is your understanding of the insurance
13  coverage that might be available to pay a judgment if a
14  judgment were rendered against you?
15   A.   I have no detailed information. I was presented
16  with a document that would be quite onerous for even an
17  insurance expert to understand.
18   Q.   About five-page thing called a reservation of
19  rights letter?
20   A.   Oh, no. This was much more than five pages.
21   Q.   Citing all these different subsections of the
22  policy?
23   A.   Correct.
24   Q.   Okay. Not light reading?
25   A.   Not at all, sir.

Page 60

1       (Deposition Exhibit 3 marked.)
2       THE WITNESS: Just one thing I would like
3  to note. I had asked --
4       ATTORNEY FABBO: Don't say anything
5  unless you're asked questions unless it's something
6  unrelated to the deposition.
7       THE WITNESS: I think it's important that
8  I state that Dr. Tietz is here for a specific period of
9  time at my request and has patients to attend to.
10       (A brief discussion was held off the record.)
11  BY ATTORNEY SIKORSKI:
12   Q.   Do you recognize Exhibit 3, sir?
13   A.   I do not recognize it, but I certainly
14  understand its contents.
15   Q.   Okay. And what is it?
16   A.   A request for family medical leave from Mark to
17  me.
18       (Deposition Exhibits 4 and 5 marked.)
19   Q.   Do you recognize Exhibit 3, 4, and 5, sir?
20   A.   Yes.
21   Q.   Okay. And what do you recognize 3 as?
22   A.   Hold on. I need to find which one is 3.
23       ATTORNEY FABBO: Is that the one you just
24  asked him about?
25       ATTORNEY SIKORSKI: Yes.

Page 61

1       THE WITNESS: Number 3, yes, that's the
2  one that Mr. Richards wrote to me regarding his request
3  for family medical leave.
4  BY ATTORNEY SIKORSKI:
5   Q.   Okay. And do you recall receiving it around the
6  time it's dated?
7   A.   I don't recall the date, but I would suspect it
8  was.
9   Q.   Okay. And do you recognize Exhibit 4?
10   A.   I do.
11   Q.   And what do you recognize Exhibit 4 as?
12   A.   Ms. Viens's response to that request regarding
13  FMLA leave.
14   Q.   And what do you recognize Exhibit 5 as?
15   A.   A clarification of Exhibit 4 with respect to the
16  rules and regulations regarding taking FMLA.
17   Q.   And do you recall receiving Exhibits 4 and 5
18  around the time they're dated?
19   A.   I do.
20   Q.   Do you recall ever seeing the request for leave
21  of absence filed by Mr. Richards and the certification
22  of his health care provider?
23   A.   No.
24   Q.   Do you recall Ms. Viens explaining to you in any
25  more detail the basis for Mr. Richards's request for

Page 62

1  family medical leave?
2  A.    I believe she reiterated what I had heard
3  through the grapevine that his daughter was ill and
4  that was his reason for the request.
5  Q.    Okay. And, again, do you remember anything more
6  about what she said about the daughter being ill?
7  A.    No. I left those decisions in the hands of Ms.
8  Viens.
9  Q.    Okay. Who's Anthony Corea?
10  A.    Anthony Corea is, and I may get his title wrong
11  because it changed somewhat, but I believe his title
12  during the time I was there was chief financial officer
13  for Valley Health Systems.
14  Q.    And did you ever meet with Mr. Corea?
15  A.    Regularly.
16  Q.    So did you meet with Mr. Porton and Mr. Corea
17  regularly before the termination meeting with Mr.
18  Richards?
19  A.    More or less on a weekly basis.
20  Q.    And did you meet regularly with Ms. Kelleher?
21  A.    No. That's not to say I didn't meet with her,
22  but it was not on a scheduled basis.
23        ATTORNEY SIKORSKI:  Give me one minute.
24  Let me see if we can get you out of here by 1:00.
25        ATTORNEY FABBO:  Are we off the record?

Page 63

1        ATTORNEY SIKORSKI:  Oh, the rest of that,
2  I don't think I'm going to go through those.  That's
3  just the set of --
4        ATTORNEY FABBO:  You're just giving me an
5  extra copy for today?
6  BY ATTORNEY SIKORSKI: Yeah, that's all.  Just rather
7  than pull everything out.
8  Q.    Have you made a claim against River Valley
9  Counseling Center, sir?
10  A.    Can you clarify your question?
11  Q.    Let me back up. Have you applied for any
12  long-term disability insurance?
13  A.    I have. Ms. Kelleher sent me that paperwork, I
14  believe, at the time I told her that it was unlikely
15  that I would return to work.
16  Q.    And did that insurance carrier grant you
17  disability payments?
18  A.    In the final analysis, was it granted?
19  Q.    Yes.
20  A.    It was denied.
21  Q.    Have you made any claims against anyone
22  connected with, directly or indirectly, with River
23  Valley Counseling Center arising out of your employment
24  or the termination of your employment relationship?
25  A.    I have not.

Page 64

1  Q.    Have you had a lawyer contact anyone associated
2  with the River Valley Counseling Center or Holyoke
3  Hospital on your behalf?
4  A.    I was advised by Ms. Kelleher to consider having
5  the long-term disability agreement reviewed by counsel.
6  I was also advised by her after the initial denial of
7  those requests to both read the policy in terms of
8  appeal procedures and, once again, to consider
9  consulting an attorney, none of which I did.
10  Q.    Did you receive any type of a severance payment
11  or separation payment from River Valley Counseling
12  Center, HC Management, or any other entity associated
13  directly or indirectly with Holyoke Hospital?
14  A.    I did not.
15  Q.    Other than attorneys, have you spoken with
16  anyone to help you, yourself prepare for this
17  deposition today?
18  A.    I've spoken with Dr. Tietz regarding what I --
19  Q.    Okay. I don't want to -- that's a confidential
20  conversation. I don't want --
21  A.    I've spoken with Dr. Tietz. I've spoken with
22  Attorney Fabbo.
23  Q.    And your counsel is also --
24  A.    And, prior to her being counsel of record for
25  me, I also spoke to Mary Jo Kennedy.

Page 65

1  Q.    But when is the last time you spoke, say, to Mr.
2  Avakian?
3  A.    Before I left River Valley.
4  Q.    And how about Mr. Kassis?
5  A.    I believe I sent him an email maybe a month or
6  two after my departure.
7  Q.    And how about Mr. Haas, H-A-A-S?
8  A.    I've had no contact with him other than he sent
9  me some personal belongings from my office.
10  Q.    Do you recall Mr. Richards telling you at any
11  time that he was going to be out a day or so to have
12  something taken off his face?
13  A.    I have a vague recollection of that, yes.
14  Q.    And do you remember him then saying that this
15  was because he had a problem with skin cancer?
16  A.    I do not.
17  Q.    What did you understand taking off the face to
18  be in a man in his 50's?
19        ATTORNEY FABBO:  Objection. If you have
20  an understanding.
21        THE WITNESS: I didn't feel it was my
22  business to ask, and I had no preconceived idea.
23  BY ATTORNEY SIKORSKI:
24  Q.    Did you preserve any voice mails or emails
25  relating to Mr. Richards?

49d61f81-a776-11da-b008-000c41a99350

Page 66

1  A.    Preserve meaning beyond the time of my
2  employment?
3  Q.    Or, while you were there, did you, for example,
4  tape any voice mails, forward them to anyone for
5  preservation?
6  A.    No.  It may be possible that Mr. Richards or
7  other people left me voice mails that I subsequently
8  listened to but certainly didn't preserve.
9  Q.    Right, that's my question.  Did you preserve any
10 voice mails?
11 A.    No.
12 Q.    Let me ask you this.  Did you preserve any voice
13 mails from Mr. Richards?
14 A.    No.
15 Q.    Did you preserve any voice mails concerning Mr.
16 Richards?
17 A.    No.
18 Q.    Did you preserve any emails from Mr. Richards?
19 A.    No.
20 Q.    Did you preserve any emails regarding Mr.
21 Richards?
22 A.    No.
23 Q.    Did anyone ever ask you to preserve voice mails
24 or emails regarding Mr. Richards?
25 A.    No.

Page 67

1          ATTORNEY SIKORSKI:  No further questions
2  of this witness at this time.
3          ATTORNEY KENNEDY:  I have no questions.
4          ATTORNEY FABBO:  Deposition is concluded.
5  (Whereupon at 12:59 p.m. the deposition was adjourned.)
6
7
8
9              * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

1          I have carefully read the foregoing
2  transcript of my deposition given on Wednesday,
3  February 15, 2006, and the answers made by me
4  are true and correct.
5
6
7          --------------------------
           DAVID G. MATTOCKS
8
9  STATE OF _____
10 _____ SS.
11
12 At _____, in said
13 County, this _____ day of
14 _____, 2006, personally
15 appeared before me the above-named DAVID G.
16 MATTOCKS, and made oath that the foregoing
17 answers subscribed by him are true.
18
19
20          --------------------------
           Notary Public
21
22 My Commission expires:
23
24 --------------------
25

Page 69

1          C E R T I F I C A T E
2          I, Sunnie Donath, Notary Public, do
3  hereby certify that the foregoing pages, numbered 1
4  through 69, inclusive, are a true and accurate
5  transcription of my stenographic notes of the sworn
6  deposition of DAVID G. MATTOCKS, taken before me on
7  Wednesday, February 15, 2006 for use in the matter of
8  MARK A. RICHARDS -vs- RIVER VALLEY COUNSELING CENTER,
9  INC., VALLEY HEALTH SYSTEMS, INC., DAVID G. MATTOCKS
10 AND DONNA VIENS, United States District Court, District
11 of Massachusetts, Civil Action No. 05-30061-MAP.
12
13
14
15
16          --------------------------
17          Sunnie Donath
           Notary Public
18
19
20 My commission expires:
   February 10, 2007
21
22 THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
   APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
23 UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
   CERTIFYING REPORTER.
24
25

49d61f81-a776-11da-b008-000c41a99360

CIVIL ACTION NO. 05-30061-MAP

RICHARDS V. RIVER VALLEY COUNSELING CENTER, INC., ET AL.

# Exhibit 3A filed conventionally under seal

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,           )
           Plaintiff        )
VS.                         )
                            )
RIVER VALLEY COUNSELING CENTER, )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
           Defendants       )

DEPOSITION OF JEFFREY KASSIS, taken
before Debra Vance, Notary Public Stenographer,
pursuant to the provisions of Massachusetts Rules
of Civil Procedure 30(b)(6), at the offices of
ROBINSON DONOVAN, P.C., 1500 Main Street,
Springfield, Massachusetts on January 31, 2006,
commencing at 12:00 p.m.

APPEARANCES: (See Page 2)

Debra A. Vance
Notary Public Stenographer

---

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Jeffrey Kassis | *4 | | | |

* By Mr. Sikorski

EXHIBITS:                                    PAGE:

Exhibit 1, re-notice of taking deposition....5
Exhibit 2, memo to Mr. Eagle 4/29/04.........15

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
     BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

SULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
     BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
     BY:  MARY LOU FABBO, ESQ.

---

4

STIPULATIONS

It is agreed by and between the
parties that all objections, except objections as
to the form of the questions, and all motions to
strike unresponsive answers are reserved and may
be raised at the time of trial for the first
time.

It is further agreed by and between
the parties that the sealing and the notification
to all parties of the receipt of the original
deposition transcript is hereby waived.

JEFFREY KASSIS, Deponent, having
been satisfactorily identified and duly sworn,
deposes and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI:

Q.    This is the 30(b)(6) deposition of
Defendant, River Valley Counseling Center, and
the first person who's been designated as a
deponent is Mr. Kassis.

I ask, Mr. Kassis, please state your

7

1  name, spell your last name for the record,
2  please, sir.
3      A.    It's Jeffrey Paul Kassis, last name
4  is K-A-S-S-I-S.
5      Q.    And were you just deposed in your
6  individual capacity, sir?
7      A.    I'm confused by the question.
8      Q.    Did you just finish your deposition?
9      A.    Yes.
10         MR. SIKORSKI:    And I'm going to have
11     this marked as Exhibit 1.
12         (Exhibit 1 marked)
13     Q.    (By Mr. Sikorski) I'm going to
14  represent to you, Mr. Kassis, that Exhibit 1 is
15  the re-notice of taking a 30(b)(6) deposition of
16  River Valley Counseling Center and ask you of
17  your counsel to indicate which items on Exhibit A
18  you are being designated to testify about.
19         MS. KENNEDY:    For the record,
20     Mr. Kassis has been designated with respect
21     to subject areas on Exhibit A 1, 4, and 6.
22     Q.    (By Mr. Sikorski) And, Mr. Kassis,
23  Exhibit B of Exhibit 1 calls for you to bring
24  additional documents with you.  Have you brought

8

1      about what Ms. Kennedy and you discussed.  I
2  understand you met with Ms. Kennedy.  Did you do
3  anything else to prepare yourself to be a
4  30(b)(6) deponent?
5      A.    No.
6      Q.    Did you interview anyone?
7      A.    No, I didn't.
8      Q.    Did you review any documents?
9      A.    Just this document itself.
10     Q.    The notice.  Did you review
11  Ms. Viens' deposition transcript, for example?
12     A.    No.
13     Q.    Did you talk to Mr. Brian Duke?
14     A.    No.
15     Q.    Did you talk to David Mattocks?
16     A.    No.
17     Q.    Did you review any documents of
18     A.    No.
19     Q.    Did you review any documents of
20  Health Enhancement Services, Inc.?
21     A.    I didn't.
22     Q.    Did you review any documents created
23  by Jeff Eagle or anyone else associated with
24  Health Enhancement Services, Inc.?

6

1  any?
2      A.    I haven't.
3         MS. KENNEDY:    For the record again,
4     I believe I sent you a letter earlier this
5     week addressing the document production in
6     Exhibit B to the re-notice of the
7     deposition of River Valley Counseling
8     Center.
9         MR. SIKORSKI:    Yes, you did.  I did
10     receive that, thank you.
11         I assume that this deponent will
12     want to read and sign this portion of the
13     deposition?
14         MS. KENNEDY:    Yes, please.
15         MR. SIKORSKI:    Otherwise, usual
16     stipulations, Counsel?
17         MS. FABBO:    Yes.
18         MS. KENNEDY:    Yes.
19     Q.    (By Mr. Sikorski) Mr. Kassis, what did
20  you do to prepare yourself to be a 30(b)(6)
21  deponent on Items 1, 4, and 6?
22     A.    I met with the lawyer, Mary Jo
23  Kennedy.
24     Q.    And I don't want to hear anything

8

1      A.    No, I didn't.
2      Q.    Did you review Mr. Mattocks' resume?
3      A.    No, I didn't.
4         You said any documents, right, was
5  the question?
6      Q.    Yes.
7      A.    I did review Mark's performance eval.
8  and my own.
9      Q.    And was that your performance
10  evaluation that Mr. Mattocks did for you?
11     A.    Yes.  I reviewed that and I reviewed
12  Mark's, the ones I gave Mark.
13     Q.    When was the last time you gave one
14  to Mark?
15     A.    I think it was 1991.
16     Q.    And did you review the --
17         MS. KENNEDY:    '91 you said?
18         THE WITNESS:    I'm sorry, 2001.
19     Q.    (By Mr. Sikorski) The review that
20  Mr. Mattocks gave you just a couple days after
21  terminating Mr. Richards?
22     A.    Yes.  I believe it was the 8th.
23     Q.    Did you sit down with Mr. Mattocks
24  and review the evaluation he gave you on

11

1  November 8?

2          MS. KENNEDY:   Again, objection to

3      the extent that it is outside of the scope

4      of the areas he's designated.  Go ahead and

5      answer, but I'm objecting just for the

6      record.

7          THE WITNESS:   Yes, I did.

8      Q.   (By Mr. Sikorski) Did you review

9  records relating to the financial performance of

10  the psychiatric day treatment program under

11  Mr. Richards' supervision prior to today?

12      A.   Yes, I did.  I did that with -- can I

13  say this?

14          MS. KENNEDY:   He asked you whether

15      you reviewed them.

16          THE WITNESS:   Yes, I did.

17      Q.   (By Mr. Sikorski) What financial

18  records did you review?

19      A.   Basically the -- how the program did

20  over the last three or four years.

21      Q.   When you say "program," that's the

22  psychiatric day treatment program?

23      A.   Yes.

24      Q.   Under Mr. Richards' supervision,

---

1          Go ahead and answer.

2          THE WITNESS:   It performed well.

3      Q.   (By Mr. Sikorski) How did it perform

4  vis-a-vis other programs operated by River Valley

5  Counseling Center?

6          MS. KENNEDY:   Same objection.

7          THE WITNESS:   It was a high

8      performer, a very high performer.

9      Q.   (By Mr. Sikorski) In the three years

10  before Mr. Richards' termination, were there any

11  issues noted with Mr. Richards' job performance?

12      A.   There were none noted.

13      Q.   And any disciplinary issues?

14      A.   There were none.

15      Q.   What was the reason why River Valley

16  Counseling Center terminated Mark Richards?

17      A.   There was a financial analysis that

18  the basic structure of the agency, the rate

19  structure could be sustained with a savings of

20  his position, the amount of money that was paid

21  to him, that would contribute to the overall

22  financial benefit of the agency.

23      Q.   When you say "financial analysis," is

24  that a financial analysis done by someone --

---

10

1  correct?

2      A.   Yes.  I looked at that and for the

3  whole year because it was continued after Mark

4  left.

5      Q.   And that's the fiscal year.  It goes

6  from 7/1 to 6/30, correct?

7      A.   Yes.

8      Q.   So the fiscal year 2005 financial

9  records would reflect financial performance from

10  7/1/04 to 6/30/05, correct?

11      A.   For that fiscal year 2004, 2005, yes.

12      Q.   And Mr. Richards' last day of

13  employment was about November 5, 2004, correct?

14      A.   Approximately, yes.

15      Q.   How did the psychiatric day treatment

16  program perform financially under Mr. Richards'

17  leadership?

18          MS. KENNEDY:   Objection.  I'm just

19      objecting on the grounds that it's outside

20      of the designated scope of the 30(6)(b)

21      designation, but go ahead and answer.

22          MR. SIKORSKI:   That's part of the

23      job performance of Mr. Richards.

24          MS. KENNEDY:   That's my objection.

---

12

1      A.   David Mattocks --

2          MS. KENNEDY:   Let him finish his

3      question.

4      Q.   (By Mr. Sikorski) -- on behalf of

5  River Valley Counseling Center?

6      A.   Yes.

7      Q.   Who did that financial analysis?

8      A.   David Mattocks.

9      Q.   Was it one analysis or more than one

10  analysis, to your knowledge?

11      A.   I'm unclear.

12      Q.   Was the financial analysis in

13  writing?

14      A.   I never saw anything anywhere in

15  writing.

16      Q.   Any documents at all referring to or

17  supporting or consisting of this financial

18  analysis?

19      A.   I never saw it.

20      Q.   As the 30(b)(6) deponent, do you

21  know --

22      A.   I don't believe --

23          MS. KENNEDY:   Let him ask his

24      question.

1  Q.  (By Mr. Sikorski) -- if there was any
2  financial analysis in writing or any document
3  relating to the financial analysis?
4  A.  I, as a representative of River
5  Valley Counseling Center, know of no documents
6  that exist.
7  Q.  You used the term "rate structure
8  sustained." What do you mean by that?
9  A.  Rate structure sustained is that
10  there is rates from the payers that is a very
11  favorable rate structure in terms of what the
12  agency pulls in for its services. And it
13  contributes to the success of the program.
14  Q.  What do you mean when you say rate
15  structure could be sustained?
16  A.  That means that the rate structure
17  was going to be kept because these are existing
18  contracts we have with the existing payers.
19  Q.  And did River Valley Counseling
20  Center terminate Mr. Richards as part of a group
21  of terminations designed to save money?
22  A.  There was a group of terminations
23  that existed over a two-year period that began
24  back in 2002. So if your time frame is over

---

**14**

1  those 24 months, there was a series of people in
2  sites and exchanges that were all made to
3  consolidate to improve the financial position.
4  Q.  Who made the decision to terminate
5  Mr. Richards?
6  A.  David Mattocks did.
7  Q.  And did David Mattocks do a financial
8  analysis of other terminations that could be done
9  to improve the finances of River Valley
10  Counseling Center?
11  A.  There is internally within 319, there
12  was a -- they looked at that structure within 319
13  which is a -- it contributes to the overhead
14  expenses. They were looking at that
15  simultaneously, David Mattocks was.
16  Q.  Did David Mattocks do a financial
17  analysis of any other termination while he was
18  executive director?
19  A.  There was an analysis of that, of the
20  319. I don't remember anything in writing.
21  Q.  Do you remember any specific figures
22  that were tracked?
23  A.  No, I don't remember.
24  Q.  Prior to Mark Richards' termination,

---

**15**

1  did David Mattocks terminate anyone else for
2  financial reasons?
3  A.  I'm unclear whether that happened. I
4  don't remember.
5  Q.  After Mr. Richards' termination, was
6  anyone else terminated by Mr. Mattocks for
7  financial reasons?
8  A.  Not that I know of. I don't believe
9  so under any clinical programs.
10  Q.  What work or other assistance did
11  Jeff Eagle supply concerning or related to David
12  Mattocks?
13  A.  I don't know directly what work he
14  provided.
15  MR. SIKORSKI:  May I have this
16  marked as Exhibit 2.
17  (Exhibit 2 marked)
18  Q.  (By Mr. Sikorski) Have you had a
19  chance to review Exhibit 2?
20  A.  I have.
21  Q.  Have you seen it before today?
22  A.  I haven't.
23  Q.  Have not?
24  A.  I have not seen this.

---

**16**

1  Q.  Do you know if River Valley
2  Counseling Center ever received an assessment of
3  Mr. Mattocks' ability to develop a strategic
4  business plan and implement the same from Jeff
5  Eagle?
6  A.  I don't remember any such assessment.
7  Q.  I'm asking as the 30(b)(6) deponent.
8  Do you know if River Valley Counseling Center
9  ever received assessment of Mr. Mattocks' ability
10  to develop a strategic business plan and
11  implement the same from Jeff Eagle?
12  A.  I'm unclear.
13  Q.  Do you know if Jeff Eagle ever
14  assessed Mr. Mattocks' energy level?
15  A.  Again, I'm unclear.
16  Q.  Do you know if anyone associated with
17  the Health Enhancement Services, Inc. did any
18  work concerning or related to David Mattocks?
19  MS. KENNEDY:  Objection to the form.
20  Go ahead and answer.
21  THE WITNESS:  The only thing I knew
22  is that there was -- and I heard this
23  indirectly, not directly -- that there was
24  a phone conversation, something was

```
 1    verified. But I never knew any specifics
 2    about what that was.
 3        Q.    (By Mr. Sikorski) As a 30(b)(6)
 4    deponent, did you make any inquiries as to topic
 5    No. 4 before today, other than meeting with your
 6    counsel?
 7        A.    No, I haven't.
 8        Q.    So you didn't call Mr. Eagle and ask
 9    him what he did?
10        A.    No, I didn't.
11        Q.    You didn't call anybody at Health
12    Enhancement Services, Inc. and ask them what they
13    did?
14        A.    No, I didn't.
15        Q.    Did you make any efforts to determine
16    if anyone at River Valley Counseling Center knew
17    that Mark Richards had treatment for skin cancer
18    prior to his termination?
19        MS. KENNEDY:   Objection to the form
20    of the question in that it's outside the
21    scope of a 30(b)(6), but go ahead and
22    answer.
23        THE WITNESS:   I didn't know that
24    Mark had skin cancer. Consequently I never
```

18

```
 1    made inquiries.
 2        Q.    (By Mr. Sikorski) After Mark Richards
 3    was terminated, who replaced him as the director
 4    of the psychiatric day treatment program?
 5        A.    I did.
 6        Q.    And after Mark Richards was
 7    terminated, who took over his responsibilities
 8    that he had formerly done as the director of the
 9    psychiatric day treatment program?
10        A.    Those responsibilities were mine.
11        Q.    Did anyone other than you take over
12    those responsibilities?
13        A.    The responsibilities were delegated
14    to other people in leadership positions within
15    the program.
16        Q.    Who were those other people?
17        A.    David Avakian.
18        Q.    Anyone else?
19        A.    And Susan informally.
20        Q.    Just for the record, Susan's last
21    name?
22        A.    Levitt.
23        Q.    Can you spell it?
24        A.    L-E-V-I-T-T.
```

```
 1        Q.    Prior to Mr. Richards' termination,
 2    what was Ms. Levitt's position at River Valley
 3    Counseling Center?
 4        A.    She was an ongoing -- she was a
 5    counselor within the program and she remained a
 6    counselor. I'm talking about an informal
 7    leadership not a formal leadership.
 8        Q.    Did she receive any compensation for
 9    this leadership role?
10        A.    No.
11        Q.    Prior to today, did you review
12    Mr. Mattocks' personnel file?
13        A.    No, I haven't.
14        Q.    Did you review his application for
15    employment?
16        A.    No, I haven't.
17        Q.    Did you review any records related to
18    his compensation?
19        A.    No, I haven't.
20        Q.    Did you review any records related to
21    his job performance?
22        A.    No, I haven't.
23        Q.    Did you review any records related to
24    discipline, termination, or resignation?
```

20

```
 1        A.    No, I haven't.
 2        Q.    Who employed David Mattocks?
 3        A.    I refer to it as Valley Health
 4    Systems.
 5        Q.    Other than Mark Richards, did anyone
 6    complain to River Valley Counseling Center that
 7    Mr. Mattocks had discriminated against them?
 8        MS. KENNEDY:   Objection to the form.
 9    Go ahead and answer. And again, the second
10    objection is that it's outside the scope of
11    the 30(b)(6) deposition notice and what
12    Mr. Kassis has been designated to testify
13    on. Go ahead and answer.
14        THE WITNESS:   Could you give your
15    definition of discrimination? I'm unclear.
16        MS. KENNEDY:   Can you rephrase the
17    question?
18        THE WITNESS:   I'm still unclear of
19    what he means. I understand the question.
20    I just don't know what he means by
21    discrimination. It's a broad term. I
22    don't know what it means.
23        Q.    (By Mr. Sikorski) You're aware that
24    Mr. Richards has brought a claim of
```

23

1  discrimination on the basis of age and disability
2  against Mr. Mattocks, correct?
3       A.     Yes.
4       Q.     Are you aware of any other employee
5  that has brought a claim of illegal
6  discrimination either formally or informally
7  against Mr. Mattocks?
8       A.     I'm not aware of any.
9       Q.     Are you aware of anyone who has
10 complained informally that David Mattocks
11 discriminated against them?
12      MS. KENNEDY:     Again, same objection,
13 outside the scope of the 30(b)(6) but go
14 ahead and answer.
15      THE WITNESS:     Um, there was no
16 person -- no discrimination, there was no
17 discrimination.  But at times, certainly
18 him being a new person, some tension.
19      Q.     (By Mr. Sikorski) And what do you mean
20 by "some tension"?
21      A.     Um, program directors, you know,
22 going through ups and downs about where do I --
23 where do I stand with the person, the CEO.  There
24 was -- in my role as being the clinical director

*Accurate Court Reporting*                          *1500 Main Street, Suite 1412*
                                                    *Springfield, MA 01115*
                                                    *413-747-1806*

1  termination and/or resignation, other than
2  meeting with Ms. Kennedy and what she told you?
3  I don't want to know that.
4       A.     Can I have a minute?
5       MR. SIKORSKI:     Sure.  Off the
6  record.
7       (Off record discussion)
8       MR. SIKORSKI:     Back on the record.
9       (The last question was read.)
10      THE WITNESS:     Other than meeting
11 with Ms. Kennedy, I did nothing to
12 ascertain.
13      Q.     (By Mr. Sikorski) So you can't tell us
14 today whether Mr. Mattocks was terminated or
15 resigned, correct?
16      A.     I'm unclear.
17      Q.     Did you speak with anyone at H-C
18 Management Services about Mr. Mattocks's
19 application for employment, employment
20 compensation, job performance, discipline,
21 termination, and/or resignation before today?
22      A.     No.
23      Q.     Did you speak with anyone at Valley
24 Health Systems or any corporation or entity

*Accurate Court Reporting*                          *1500 Main Street, Suite 1412*
                                                    *Springfield, MA 01115*
                                                    *413-747-1806*

22

1  there was some other managers who went through
2  some personal issues around he's new, where do I
3  stand, and am I being accepted and all that.
4       Q.     What is River Valley Counseling
5  Center's understanding of the reason why David
6  Mattocks resigned?
7       MS. KENNEDY:     Objection to the form
8  of the question.
9       Q.     (By Mr. Sikorski) Let me rephrase it.
10      Was Mr. Mattocks terminated from
11 employment?
12      MS. KENNEDY:     Objection to the form
13 of the question.
14      THE WITNESS:     I'm not clear about
15 that.  I'm unclear.
16      Q.     (By Mr. Sikorski) Did Mr. Mattocks
17 resign?
18      A.     I'm unclear about that.
19      Q.     What steps did you take to ascertain
20 the circumstances surrounding Mr. Mattocks'
21 termination and/or resignation?
22      A.     Could you repeat the question again?
23      Q.     What steps did you take to ascertain
24 the circumstances surrounding David Mattocks'

*Accurate Court Reporting*                          *1500 Main Street, Suite 1412*
                                                    *Springfield, MA 01115*
                                                    *413-747-1806*

24

1  associated or affiliated with it regarding
2  Mr. Mattocks' application for employment,
3  employment compensation, job performance,
4  discipline, termination, and/or resignation?
5       A.     Just say that again.
6       MR. SIKORSKI:     Would you read that
7  back.
8       (The last question was read.)
9       THE WITNESS:     No, I didn't.
10      Q.     (By Mr. Sikorski) Did you speak with
11 anyone at H-C Management Services before today
12 regarding Mark Richards' application for
13 employment, employment compensation, job
14 performance, discipline, and/or termination?
15      MS. KENNEDY:     Yes or no.
16      THE WITNESS:     Yes.  Job performance
17 like 2001 I talked to people about his job
18 performance.  The job performance area,
19 yes, definitely.
20      Q.     (By Mr. Sikorski) In order to prepare
21 for your deposition today?
22      A.     No.  I'm confused.
23      MS. KENNEDY:     Would you read that
24 question back to Mr. Kassis.

*Accurate Court Reporting*                          *1500 Main Street, Suite 1412*
                                                    *Springfield, MA 01115*
                                                    *413-747-1806*

1    (The last question was read.)
2    THE WITNESS:   As applied to what?
3    Your question is confusing.
4    Q.   (By Mr. Sikorski)  That's fine.  I'll
5    rephrase it.
6    In order to prepare for your
7    deposition -- strike that.  Let me rephrase it.
8    In order to prepare for your role as
9    30(b)(6) deponent, did you speak with anyone at
10   H-C Management Services regarding Mark Richards'
11   application for employment, employment
12   compensation, job performance, discipline, and/or
13   termination?
14   A.   No, I didn't.
15   Q.   In order to prepare for your role as
16   a 30(b)(6) deponent today, did you speak with
17   anyone at Valley Health Systems or any
18   corporation or entity associated with it
19   regarding Mark Richards' application for
20   employment, employment compensation, job
21   performance, discipline, and/or termination?
22   A.   No, I didn't.
23   Q.   Did you review Mr. Porten's
24   deposition transcript before today?

---

1    took the steps necessary to be an
2    appropriate 30(b)(6) deponent as to Items
3    1, 4, and 6 of Exhibit 1.
4    MS. KENNEDY:   I'm going to object.
5    The deponent was asked questions of him,
6    what he did to prepare.  It's not the
7    requirement here.  We are here to designate
8    someone with knowledge according to the
9    30(b)(6) deposition rule.  That has been
10   done.
11   Mr. Sikorski has asked questions of
12   that witness, and I think we have satisfied
13   our obligation as River Valley Counseling
14   Center, Inc. to produce people with
15   knowledge regarding the subject areas of 1,
16   4, and 6.  We know there's other areas to
17   be going into by other witnesses.
18   MR. SIKORSKI:   Do you have any
19   questions?
20   MS. FABBO:   I have no questions.
21   (Deposition concluded at 12:32 p.m.)
22
23
24

---

1    A.   No, I didn't.
2    Q.   Did you review Donna Viens'
3    transcript prior to today?
4    A.   No.
5    Q.   Did you review the Answers to
6    Interrogatories of Mr. Mattocks before today?
7    A.   No, I didn't.
8    Q.   Or the Answers to Interrogatories of
9    Ms. Viens?
10   A.   No, I didn't.
11   Q.   Or the Answers to Interrogatories of
12   Valley Health Systems?
13   A.   No, I didn't.
14   Q.   Or River Valley Counseling Center,
15   Inc.?
16   A.   No, I didn't.
17   Q.   Or the response to request for
18   production of documents issued to those entities
19   by Mr. Richards and his counsel?
20   A.   No, I didn't.
21   MR. SIKORSKI:   I have no further
22   questions of this witness at this time.
23   I'm going to suspend the deposition because
24   it's unclear to me whether this deponent

---

1    I, Debra A. Vance, a Notary Public within
2    and for the Commonwealth of Massachusetts at large,
3    do certify that pursuant to notice, there came
4    before me on January 31, 2006, at the offices of
5    ROBINSON DONOVAN, P.C., 1500 Main Street,
6    Springfield, Massachusetts, 01115, the following
7    person, to wit:  JEFFREY KASSIS, who was duly sworn
8    to testify to the truth and nothing but the truth as
9    to his knowledge touching and concerning the matters
10   in controversy in this case; that he was thereupon
11   examined upon his oath and said examination reduced
12   to writing by me; and that the deposition is a true
13   record of the testimony given by the witness, to the
14   best of my knowledge and ability.
15   I further certify that I am not a relative
16   or employee of counsel or attorney for any of the
17   parties, nor a relative or employee of such parties,
18   nor am I financially interested in the outcome of
19   the action.
20   WITNESS MY HAND, this 31st day of January, 2006.
21
22                    Debra A. Vance
23   My Commission Expires:
     April 26, 2007
24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


C.A. No. 05-30061-MAP


MARK A. RICHARDS,                    )
                Plaintiff            )
VS.                                  )
                                     )
RIVER VALLEY COUNSELING CENTER,      )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
                Defendants           )


        DEPOSITION OF JEFFREY KASSIS, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on January 31,

2006, commencing at 10:00 a.m.


APPEARANCES:  (See Page 2)


            Debra A. Vance
       Notary Public Stenographer

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,          )
                Plaintiff  )
VS.                        )
                           )
RIVER VALLEY COUNSELING CENTER,  )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
                Defendants  )

DEPOSITION OF JEFFREY KASSIS, taken before Debra Vance, Notary Public Stenographer, pursuant to the provisions of Rule 30 of the Massachusetts Rules of Civil Procedure, at the offices of ROBINSON DONOVAN, P.C., 1500 Main Street, Springfield, Massachusetts on January 31, 2006, commencing at 10:00 a.m.

APPEARANCES: (See Page 2)

Debra A. Vance
Notary Public Stenographer

---

**2**

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
     BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
     BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
     BY:  MARY LOU FABBO, ESQ.

---

**3**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Jeffrey Kassis | *4 | | | |

* By Mr. Sikorski

| EXHIBITS: | PAGE: |
|-----------|-------|
| Exhibit 1, Subpoena | 5 |

---

**4**

1                         STIPULATIONS

2
3              It is agreed by and between the
4    parties that all objections, except objections as
5    to the form of the questions, and all motions to
6    strike unresponsive answers are reserved and may
7    be raised at the time of trial for the first
8    time.
9
10             It is further agreed by and between
11   the parties that the sealing and the notification
12   to all parties of the receipt of the original
13   deposition transcript is hereby waived.
14
15             JEFFREY KASSIS, Deponent, having
16   been satisfactorily identified and duly sworn,
17   deposes and states as follows:
18
19   DIRECT EXAMINATION BY MR. SIKORSKI:
20        Q.   Would you please state your name for
21   the record and spell your last name?
22        A.   It's Jeffrey Paul Kassis.  The last
23   name is Kassis.
24             MS. KENNEDY:   If you could just

5

1    speak up, because there's a fan there and
2    the stenographer needs to hear you.
3        THE WITNESS:    The last name is
4    Kassis, K-A-S-S, as in Sam, S, so it's
5    K-A-S-S-I-S, three S's.
6        MR. SIKORSKI:    I assume Mr. Kassis
7    wants to read and sign this deposition?
8        MS. KENNEDY:    Yes.  Thank you.
9        MR. SIKORSKI:    And other than that,
10    usual stipulations, is that acceptable?
11        MS. FABBO:    That's fine.
12        MS. KENNEDY:    That's fine.
13        MR. SIKORSKI:    I'd like to have this
14    marked as Exhibit 1.
15        (Exhibit 1 marked)
16        Q.    (By Mr. Sikorski) Mr. Kassis, I'm
17    going to show you what's been marked as Exhibit
18    1, the subpoena in this case.  Do you understand
19    the subpoena asks that you bring certain records
20    with you today?
21        A.    Yes.
22        Q.    Do you have any of those records?
23        A.    I don't have any of those records.
24        Q.    Have you consulted with your attorney

*Accurate Court Reporting    1350 Main Street, Suite 1412
Springfield, MA 01103
413-747-1814*

6

1    about whether you have any records responsive to
2    that?
3        A.    I have.
4        MS. KENNEDY:    For the record, if you
5    could just rephrase the question so that it
6    doesn't ask for attorney-client privilege.
7        MR. SIKORSKI:    It's just a yes or no
8    whether he consulted or not.
9        Q.    (By Mr. Sikorski) Mr. Kassis, how are
10    you currently employed?
11        A.    I'm employed as the clinic director
12    at River Valley Counseling Center.
13        Q.    And how long have you had that
14    position, sir?
15        A.    I've had that position since 1988
16    with a brief redefinition of the position between
17    approximately '92 and '95 where I was the site
18    director of two different sites, the Beech Street
19    site and the Elm Street site.
20        Q.    Have you had responsibility for the
21    psychiatric day treatment program at River
22    Valley?
23        A.    Yes.
24        Q.    And during what periods of time did

*Accurate Court Reporting    1350 Main Street, Suite 1412
Springfield, MA 01103
413-747-1814*

7

1    you have responsibility for that program?
2        A.    Um, to the best of my memory from '88
3    when I was hired as clinic director all the way
4    through to when the CRS program left the Elm
5    Street site and I was briefly reassigned.  I
6    moved out of the Elm Street building and there
7    was about seven months, eight months where my
8    oversight of that was limited and Andy Phillips
9    was going to be taking over.  But he left in
10    November of 2003, I believe.
11        And then Maryann Pomaltier was the
12    temporary CEO, and I was given oversight of that
13    again under her.  So there was a brief time where
14    they wanted to change my span of control with
15    the oversight of that program.
16        Q.    Did you receive any additional
17    responsibilities for that program when
18    Mr. Richards was terminated?
19        A.    Yes, I did.
20        Q.    What were those additional
21    responsibilities, sir?
22        A.    Additional responsibilities were that
23    I became the director of that program.
24        Q.    Do you know approximately how many

*Accurate Court Reporting    1350 Main Street, Suite 1412
Springfield, MA 01103
413-747-1814*

8

1    people that program served at the time you became
2    director?
3        MS. KENNEDY:    You can answer.  Just
4    keep your voice up so everyone can hear.
5        THE WITNESS:    I apologize.
6        MS. KENNEDY:    I'm sorry, I
7    interrupted.  Let Mr. Sikorski put a
8    question before you.
9        Q.    (By Mr. Sikorski) Let me repeat it
10    then.  At the time that Mr. Richards was
11    terminated, did you then assume some additional
12    responsibilities for the psychiatric day
13    treatment program, sir?
14        A.    I did.
15        Q.    What additional responsibilities did
16    you receive?
17        A.    I needed to be much — I needed to be
18    directly responsible not only for the quality of
19    the clinical care, which was already there, but I
20    had to have the financial piece.  But I had to be
21    much more hands on in terms of the operations of
22    the program.
23        Q.    So did you become the director of the
24    psychiatric day treatment program at that time?

*Accurate Court Reporting    1350 Main Street, Suite 1412
Springfield, MA 01103
413-747-1814*

9

1    A.    I did, yes.
2    Q.    And for how long did you hold that
3    position of director of the psychiatric day
4    treatment program?
5    A.    I'm still currently in that position.
6    Q.    Now, I'd like you to focus on that
7    time. Do you remember what day specifically you
8    became director of the psychiatric day treatment
9    program?
10    A.    It's unclear to me exactly the date,
11    but it was pretty soon after Mark left.
12    Q.    And who gave you these additional
13    responsibilities?
14    A.    David Mattocks.
15    Q.    What did he say to you when he gave
16    you these responsibilities?
17    A.    Basically I need you to be in this
18    position. I need you to be responsible and
19    you're going to be working with a coordinator of
20    that program. And I expect you to work with the
21    coordinator and manage the program well.
22    Q.    Did you receive any documents
23    designating you as the director of the
24    psychiatric day treatment program?

10

1    A.    I received none that I can remember.
2    Q.    At the time that you became the
3    director of the psychiatric day treatment
4    program, did you have other responsibilities
5    within River Valley Counseling Center?
6    A.    I did.
7    Q.    And what other responsibilities did
8    you have at that time?
9    A.    I was overseeing all the managed care
10    components of River Valley Counseling Center, the
11    outpatient component, which was housed at the
12    Beech Street site, the Grape Street site. We
13    have a school-based program. We were in the
14    Chicopee schools. We're also in the Holyoke
15    schools.
16    Q.    When you say you had responsibility
17    for overseeing all the managed care; is that your
18    term?
19    A.    Yes.
20    Q.    And what did that entail, sir?
21    A.    That means budget program
22    development, utilization review. There's
23    utilization review teams, multi-disciplinary
24    review teams. We have a psychologist who

11

1    provides utilization review. There's supervisory
2    structure that supports all the clinicians in
3    sites and I oversee that.
4    Q.    And you described school-based
5    programs?
6    A.    Yes.
7    Q.    And one was in the Chicopee schools
8    and one was in the Holyoke schools?
9    A.    Yes.
10    Q.    And how many people worked in the
11    Chicopee school program?
12    A.    There's approximately, to go back,
13    probably ten people, but they're not all
14    full-time equivalence. They share positions in
15    the clinic, and then they go out to the different
16    schools.
17    Q.    And that's ten people in Chicopee?
18    A.    Approximately.
19    Q.    And about how many full-time
20    equivalence does that come out to?
21    A.    Approximately five.
22    Q.    How many in the Holyoke School
23    System?
24    A.    Back at that point about five

12

1    therapists.
2    Q.    And a nurse practitioner ran the
3    program?
4    A.    There's two different components to
5    the program. The nurse practitioner ran the
6    medical components called the teen clinic, and
7    the psychiatric or the mental health component
8    reported through me.
9    Q.    How many people in the Holyoke School
10    System?
11    A.    Again five and approximately three
12    FTs would be in the system. And, again, that's a
13    little tricky because it's a ten-month conversion
14    to figure out the exact FTs.
15    Q.    And you also oversaw the provision of
16    mental health services at two physically
17    different locations; is that correct?
18    A.    Yes, the two major sites.
19    Q.    And what were they again?
20    A.    Beech Street in Holyoke and 147 Grape
21    Street Chicopee.
22    Q.    It's Grape?
23    A.    Grape.
24    Q.    How many people did you oversee at

13

1  each of those locations?
2      A.    Approximately 40 people, 28, 30 FTs.
3  These are approximates. I don't have the exact
4  figures. I'd have to go back and get that for
5  you.
6      Q.    And approximately how many
7  participants were there in the psychiatric day
8  treatment program when you became the program
9  director?
10     A.    Could you explain what you mean by
11 participants?
12     Q.    Well, I'm using the term as that is
13 defined in the psychiatric day treatment program
14 manual of the Commonwealth of Massachusetts.
15     A.    The full-time equivalence of people
16 showing up were approximately 20.5, 21. It
17 varied. That means who showed up per day and the
18 range of who was in the census. Because the
19 census, not everyone makes a full-time
20 equivalence to coming to the program. We have
21 no-shows. So the full-time equivalence was
22 approximately 20.5.
23     Q.    So you had about 40 clients on the
24 roster at that time, did you not?

*Accurate Court Reporting*                1500 Main Street, Suite 1422
                                          Springfield, MA 01115
                                          413-747-2826

15

1  program, did you have any experience in running
2  another day treatment program?
3      MS. KENNEDY:    Objection to form.
4      THE WITNESS:    You objected?
5      MS. KENNEDY:    I'm objecting to the
6  form. Go ahead and answer the question.
7      THE WITNESS:    The answer is, I
8  oversaw the programs since '88 but I never
9  directly — I was never in the position as
10 clinical director. Day treatment was prior
11 even to Mark being there. The prior
12 director reported through me. So the
13 answer is, I had the experience but I was
14 not a director of that program ever.
15     Q.    (By Mr. Sikorski) How long have you
16 known Mark Richards?
17     A.    Um, I believe since around '86.
18     Q.    I'm sorry.
19     A.    But my memory is, I believe, it's
20 around '86.
21     Q.    And how long did the two of you work
22 together at the River Valley Counseling Center?
23     A.    Since the first time that he was part
24 of another program, Highland Day Treatment, that

*Accurate Court Reporting*                1500 Main Street, Suite 1422
                                          Springfield, MA 01115
                                          413-747-2826

14

1      A.    I don't remember exactly, because
2  that's varied so much over time.
3      Q.    And no one else was the program
4  director after Mark was terminated, that was your
5  job, your responsibility, correct?
6      A.    That was made my position by the CEO.
7      Q.    You've described a variety of
8  responsibilities that you had at that time. Can
9  you give me a percentage of the time that you
10 spent in the position of psychiatric day
11 treatment program director?
12     A.    It varied. I would say about 10 to
13 20 percent of my time.
14     Q.    Did anyone assist you as the program
15 director of the psychiatric day treatment
16 program?
17     A.    I delegated responsibilities.
18 Responsibilities were delegated to two particular
19 people who were incredibly important, and that
20 was the coordinator of the position, David
21 Avakian, and Susan Levitt, who has stepped up
22 into a leadership. She's a senior clinician.
23     Q.    Prior to becoming the program
24 director of the psychiatric day treatment

*Accurate Court Reporting*                1500 Main Street, Suite 1422
                                          Springfield, MA 01115
                                          413-747-2826

16

1  Crossroads — which was another organization at
2  that point — basically took over that particular
3  program. And that program was included in the
4  Crossroads Program. And so from that moment we
5  were part of a team.
6      Q.    When is the last time that you spoke
7  with Mr. Richards?
8      A.    Sometime two or three weeks, a week
9  before he was — whatever negotiation went on
10 between him and David Mattocks about his leaving.
11 But I don't really remember. That's just the —
12 I don't really remember the exact date, but it
13 was before that.
14     Q.    Do you remember the day Mark was
15 terminated?
16     A.    I don't remember the day. I remember
17 being told. It was 11/4, I believe.
18     Q.    Do you remember being told by someone
19 that Mark was terminated?
20     A.    I was told by David Mattocks the
21 morning of that they were going — that he had a
22 discussion with Mark and they were having
23 something where they were going to go to one of
24 his meetings. So it was the morning of that I

*Accurate Court Reporting*                1500 Main Street, Suite 1422
                                          Springfield, MA 01115
                                          413-747-2826

**17**

1  was — that's my memory, my best memory, that I
2  was told that morning that they were going to go,
3  there was going to be some discussion, and that
4  Mark was going to be leaving.
5      Q.    Do you remember a morning management
6  meeting that you attended on that day?
7      A.    I don't.  I remember more of just a
8  talk with David, but I don't remember a
9  management meeting.  I don't.
10     Q.    Was this a one-on-one discussion
11 between you and Mr. Mattocks?
12     A.    This is my memory, yes.  There was
13 some kind of just this is going to happen, it's
14 going to go down today.
15     Q.    What do you remember him telling you
16 was going to go down that day?
17     A.    That there was going to be a meeting.
18 Mark was going to talk with his team and have
19 some kind of termination with his team.  And then
20 there was going to be — basically that was going
21 to be the finish of the work relationship,
22 completion of the work relationship.
23     Q.    And on that day, did you say anything
24 to Mr. Richards?

**18**

1      A.    I had no opportunity to, no.
2      Q.    At any time after that, did you say
3  anything to him?
4      A.    I did not.
5      Q.    So on that day, did you seek him out
6  to say it had been nice working with you or
7  anything like that?
8      A.    I did not.
9      Q.    Did Mr. Mattocks assign you certain
10 responsibilities regarding Mr. Richards' work
11 papers and computer?
12     A.    Can you restate that?  I'm unclear as
13 to what you're saying.
14     Q.    Did you do anything with
15 Mr. Richards' computer after he left?
16     A.    I had nothing to do with his
17 computer, absolutely not.
18     Q.    You didn't go over and pack it up,
19 dismantle it?
20     A.    No, I did not.
21     Q.    Do you remember telling anyone that
22 doing something with Mr. Richards' computer was
23 the way they did things in industry?
24     A.    Um, I did not do anything with Mark

**19**

1  Richards' computer.  And there were maybe global
2  statements around that when people leave people
3  do things with computers.  But that was not my
4  business.  I wasn't involved in computers.  I'm
5  not skilled with computers.  So I'm unclear what
6  you're asking.  I never dismantled anybody's
7  computer, so I'm unclear.
8      Q.    During the course of your work with
9  Mr. Richards, did you learn that he had a
10 daughter?
11     A.    Yes, I did.
12     Q.    And did you learn that his daughter
13 had any health problems?
14     A.    I did.  I think it was well after
15 whatever the health problems Mark and I had a
16 discussion about it.
17     Q.    What did you understand at the time
18 you took over Mr. Richards' responsibilities as
19 the director of the psychiatric day treatment
20 program to be the health problems of his
21 daughter?
22     A.    Um, first of all, it was not
23 absolutely clear to me.  But I thought that she
24 had — my memory is that she had some history of

**20**

1  some question emotional, whether it was physical
2  problems, but it was not absolutely clear to me
3  what it absolutely was.  It's nothing that would
4  be diagnosable, but he shared with me that there
5  was some issues.
6          My memory is that he did not go into
7  detail about what specifically was going on with
8  her.  I knew it was serious.  I knew he was
9  really concerned.  Certainly I felt badly for
10 whatever issues he was dealing with.  There was
11 nothing I could say this is what was.  It was
12 fairly vague to me.  I think there was some
13 emotional component to it.  And whether there
14 was, you know, slash, physical, I didn't know.
15     Q.    And what did you understand to be the
16 emotional, slash, physical component of his
17 daughter's problems?
18     A.    I'm not really clear.  It just seemed
19 that she was on some kind of emotional roller
20 coaster that made it difficult for her to
21 function.  I'm really not clear.
22     Q.    What do you mean by "made it
23 difficult for her to function"?
24     A.    Um, going to school regularly, that

21

1    kind of thing.

2        Q.    Anything other than problems going to

3    school regularly?

4        A.    Not that I remember clearly.

5        Q.    You said you had understood it was a

6    serious condition?

7        A.    Yeah. Mark, when I talked with him,

8    he made it sound like it was — he was very

9    concerned about his daughter. I didn't talk with

10   him that many times about it. It might have been

11   a couple times. I don't remember it was in that

12   much detail.

13       Q.    Did you understand that he took some

14   time off to tend to his daughter's needs?

15       A.    I understood that, yes.

16       Q.    What was your understanding of when

17   he took time off to care for his daughter?

18       A.    Unclear, because it was very

19   sporadic. It was a few times here and a few

20   times there, so I'm unclear.

21       Q.    So it was your understanding that he

22   took time off on an intermittent basis to take

23   care of his daughter?

24       A.    My memory is that it was

22

1    intermittent.

2        Q.    Did you know that Mark had skin

3    cancer?

4        A.    At the point —

5             MS. KENNEDY:    Objection to the form

6    of the question. To the extent that it

7    asks you to reveal attorney-client

8    communications, I instruct you not to

9    answer. If you learned it from anyone

10   else, go ahead and answer the question.

11            THE WITNESS:    At the time back in

12   that fall area of November, I did not know

13   that he had skin cancer. I saw that he had

14   some spots on his face, and he came back

15   with some spots. I thought that was one of

16   many possibilities.

17       Q.    (By Mr. Sikorski) Let's break that

18   down. Do you remember Mark having spots on his

19   face and neck?

20       A.    Yes. He had a spot on his forehead

21   or his cheek. I can't remember which area. But

22   I remember it was — I noticed it and I basically

23   observed that that was what he came to work with.

24       Q.    In relation to his termination, when

23

1    did you observe that condition on his face?

2        A.    Um, I think that there was a period

3    of about four months, that prior to the

4    termination I think that's what I observed, him

5    coming in with, I think — I can't remember

6    exactly, but my memory is around about four

7    months to — I'm not sure when it stopped or it

8    healed. I can't remember.

9        Q.    Can you give me your best memory of

10   what you observed on his face?

11       A.    It was kind of like he had a bandage

12   on it a couple times. There was a time when

13   there was like an open sore that appeared raw.

14       Q.    This would be on his forehead and

15   upper right cheek?

16       A.    I can't remember the sequence,

17   because I think there were two different spots.

18   I can't remember. There was one on like the

19   cheek and one on the forehead. I can't remember

20   the sequence of that.

21       Q.    Do you remember his ever having a

22   surgical excision of something on his face or

23   neck?

24            MS. KENNEDY:    Objection to the form.

24

1             Go ahead and answer.

2             THE WITNESS:    Um, there might have

3    been a time — I can't remember except I

4    remember he had something over it. So

5    maybe I saw a little corner of an excision,

6    but I don't remember seeing the excision

7    totally exposed. He may have.

8        Q.    (By Mr. Sikorski) And did you ever

9    learn that he had an appointment to have further

10   excision after his termination?

11            MS. KENNEDY:    Objection. To the

12   extent it asks you to reveal

13   attorney-client information, I'd instruct

14   you not answer. If you can answer it

15   without it, go ahead and answer.

16            THE WITNESS:    I never knew that.

17   And, furthermore, I didn't know about an

18   initial incision either.

19       Q.    (By Mr. Sikorski) As the clinical

20   director of River Valley Counseling Center, did

21   you have any responsibility for overseeing the

22   clinical care delivered by the psychiatric day

23   treatment program before Mark's termination?

24       A.    Could you restate the question?

25

```
 1        MR. SIKORSKI:   Could you read that
 2    back.
 3            (The last question was read.)
 4        THE WITNESS:   Yes, I have.
 5        Q.   (By Mr. Sikorski) Did you have an
 6    opportunity to observe Mr. Richards as a
 7    clinician?
 8        A.    I have. I mean, um, as a supervisor
 9    and administrator, not directly as a clinician.
10    I was not in any of his private sessions with
11    clients, but I did have an opportunity to observe
12    him as an administrator and supervisor.
13        Q.    So did you have an opportunity to
14    observe him as a manager of the program?
15        A.    Yes.
16        Q.    What was your opinion of
17    Mr. Richards' performance as a manager of the
18    psychiatric day treatment program?
19        A.    I thought he was competent and did a
20    good job.
21        Q.    What was your opinion of his clinical
22    skills?
23        A.    I thought Mark was very knowledgeable
24    about the practices that were appropriate to his
```

26

```
 1    programming. I think he kept abreast of all of
 2    the new techniques that would be interventions,
 3    strategies that would be important for his
 4    program.
 5        Q.    What was Mr. Richards' reputation in
 6    the field of this type of clinical mental health
 7    programs?
 8        MS. KENNEDY:   Objection to the form.
 9    Go ahead and answer.
10        MR. SIKORSKI:   Off the record.
11            (Off record discussion)
12        MR. SIKORSKI:   Back on the record.
13    Could you read the last question.
14            (The last question was read.)
15        THE WITNESS:   There weren't a lot of
16    people that talked to me about his
17    reputation, so this is my opinion. There
18    were people — I think he had a good
19    reputation in the community.
20        Q.   (By Mr. Sikorski) Prior to
21    Mr. Richards' termination, did you regularly
22    review financial reports of the various programs
23    under the RVCC umbrella?
24        A.    I did.
```

27

```
 1        Q.    Did Mr. Richards provide accurate and
 2    timely financial information to you about his
 3    program?
 4        A.    Yes, he did.
 5        Q.    Did he provide more financial
 6    information than the directors of other programs
 7    under River Valley?
 8        A.    Um, I would say he was in the upper
 9    percentile of people who presented financials.
10    So I would say he was in the top 20 percent.
11        Q.    Financially, how did Mr. Richards'
12    program do in the two years prior to his
13    termination?
14        MS. KENNEDY:   Objection to the form.
15    You can answer.
16        THE WITNESS:   The financial reports
17    were very positive, and he had a profitable
18    program.
19        Q.   (By Mr. Sikorski) Did you interview
20    David Mattocks prior to him becoming the
21    executive director of River Valley?
22        A.    I was part of a group of four people
23    who interviewed him as representatives of RVCC.
24        Q.    And who were those four people, sir?
```

28

```
 1        A.    Let's see, Maryann Pomaltier, Brian
 2    Duke, who was the former comptroller and
 3    financial officer, and — this is a little
 4    unclear — Sean Munster, who is now our
 5    operations director. I believe he was also part
 6    of that.
 7        Q.    Did you interview other candidates
 8    for the position?
 9        A.    There were two other candidates and I
10    interviewed one of those other two. The other
11    one, I was in some meeting or some kind of place
12    where I couldn't interview that other person.
13        Q.    Do you remember the name of the other
14    candidate?
15        A.    No, I don't remember the other two
16    candidates.
17        Q.    Do you remember if you made a
18    recommendation as to which of the two candidates
19    should be hired?
20        A.    There was a fellow from Connecticut
21    that I thought was a good candidate. I can't
22    remember his name. I can see his face, but I'd
23    have to pull out all of the records for me to
24    recover the name for you.
```

29

```
 1        Q.     When you interviewed David Mattocks,
 2   did he tell you he had a Ph.D.?
 3        A.     He didn't tell me that, no.
 4        Q.     Did you learn that from his resume or
 5   otherwise?
 6        A.     I saw it on his resume, yes.
 7        Q.     Did you ask him about the Ph.D.?
 8        A.     I didn't ask him about the Ph.D.
 9        Q.     Did he tell you anything about the
10   Ph.D.?
11        A.     No.  In my portion of the interview,
12   I was more focused on his clinical experience.
13   Because that was the piece I was most willing to
14   ask.
15        Q.     What was his clinical -- strike that.
16               What did he tell you was his clinical
17   experience?
18        A.     Well, clinical experience is
19   clinical, slash, management.  And we discussed
20   mostly his experience at Duke.  He had earlier
21   experience.  He had worked at Duke doing --
22   working with physician practices, and we spent a
23   lot of time on that.
24        Q.     Is Duke affiliated with the Medical
```

30

```
 1   College of Eastern Virginia?
 2        A.     I don't know.  I don't know.
 3        Q.     Do you remember him telling you about
 4   work that he did at Duke University?
 5        A.     I believe that's my memory at this
 6   moment.
 7        Q.     That's Duke as in the Blue Devils?
 8        A.     As in that there's a facility -- when
 9   I say that, a facility associated with that,
10   whatever complex they have.  That's my memory of
11   it.  I'd have to take a look at the resume to be
12   more specific.
13        Q.     Was there a delay in Mr. Mattocks
14   assuming the position of executive director
15   because of some health issues that he had?
16        A.     Um, that's not my memory.  I remember
17   him having some health issues directly after he
18   was hired that kept him out a week or two, but I
19   don't remember a delay being a factor.
20        Q.     And just in general terms, do you
21   know what those health issues were?
22        A.     Can I ask you, is that privileged?
23               MS. KENNEDY:  Sure.  Why don't we go
24   off record.
```

31

```
 1               (Off record discussion)
 2               MR. SIKORSKI:  Back on the record.
 3        Q.     (By Mr. Sikorski) What is your
 4   understanding of why River Valley terminated Mark
 5   Richards?
 6        A.     The reason he was terminated was as
 7   part of a financial analysis to save money.
 8   That's my answer.
 9        Q.     What financial analysis are you
10   referring to?
11        A.     The statement by David Mattocks that
12   we could sustain favorable rate structure,
13   eliminate Mark's position, move me into that
14   position, and have a coordinator that supports me
15   in that position.
16        Q.     Was this a verbal statement or a
17   written statement?
18        A.     There was no written statement.
19        Q.     So it was a one-on-one conversation
20   you had with Mr. Mattocks?
21        A.     Um, I had -- he relayed his analysis
22   to me.  Whether he had other -- I believe he had
23   other conversations with other people.  I don't
24   know that for sure, but I believe he had other
```

32

```
 1   conversations.
 2        Q.     Was there an in-person conversation?
 3        A.     Yes.
 4        Q.     One on one?
 5        A.     I talked with him, yes.
 6        Q.     And where did this take place?
 7        A.     In his office, at his office.
 8        Q.     Did he have any document in front of
 9   him that he was referring to?
10        A.     I don't remember any document.
11        Q.     Did he give you any specific dollar
12   figures as to the amount that could be saved?
13        A.     The specific figures were
14   approximately $50,000.
15        Q.     How did he put that $50,000 figure to
16   you, what did he say?
17        A.     I'm not clear.
18        Q.     Let me withdraw the question.
19               What did he say to you about the
20   amount of money that could be saved from this
21   move?
22        A.     That he was looking for opportunities
23   financially, that the $50,000 was a statement
24   from Mark's leaving, his salary plus the fringes
```

33

plus a small no change in my salary, a small
increase for the coordinator position.

Q.     Did you receive an increase in
salary?

A.     I didn't. I'm just trying to think
if there was an increase. I did receive an
increase. I'd have to take a look at the dates
of that. I did receive an increase.

Q.     An increase from what to what?

A.     It was — there were two things. It
was an increase that was a regular increase that
was — I'm going to go back there. It was the
regular salary raise that everyone was getting.
It was two-and-a-half percent. So everyone was
going to get that raise. But the agency waited
and didn't give it at the beginning of the year.
They gave it about October.

Q.     So did you receive a two-and-a-half
percent increase or more than two-and-a-half
percent?

A.     At that point, around 11/8, I believe
around that time I received a two-and-a-half
percent raise that was the raise that was the
agency raise.

34

Q.     And what did it do to your salary,
raised it from what to what?

A.     Oh, golly, um, it raised it
approximately $2,500, $2,400. I'd have to go
back and take a look at the exact amount.

Q.     So what were you making before the
raise?

A.     Approximately 62,000, I think. This,
again, these are approximates because....

Q.     In the conversation in which
Mr. Mattocks mentioned $50,000 as a savings, did
he mention any other cost savings that he was
looking to make?

A.     As related to what, costs savings
regarding the program, costs savings regarding --
you're unclear. The statement is unclear. The
question is unclear, to me it is.

Q.     You learned that Mr. Mattocks wanted
to terminate Mr. Richards' position and save
money in a face-to-face conversation with
Mr. Mattocks, correct?

A.     Yes.

Q.     Please tell me everything else you
recall about that conversation with Mr. Mattocks.

35

A.     Everything else? Um, let's see. I
don't clearly remember everything else related to
it. It's such a global statement. There was so
many different conversations. It's too global
for me.

Q.     I want you to focus on that
conversation in which Mr. Mattocks mentioned to
you potentially saving $50,000 by terminating
Mark Richards. Do you have that conversation in
your mind?

A.     Again, I don't have that specific
conversation. I remember hearing it, but that
specific conversation is not in my mind.

Q.     Before Mr. Richards was terminated,
did Mr. Mattocks discuss with you terminating any
other employees to save money?

A.     Um, no one in the clinical programs.
There was discussions around people within the
building, and I don't remember exactly who that
would be.

Q.     What do you mean by "people around
the building"?

A.     There was some people leaving. There
was discussions about infrastructure around

36

there. When I meant the building, I meant the
administrative office, 319. But there was
nothing about anybody else clinically at that
point under my clinical management. But they
were looking at the infrastructure with 319.

Q.     Did he mention any specific names or
positions that he wanted to eliminate?

A.     There was some positions, but I can't
remember exactly who the people were that were
leaving and they weren't going to fill in the
positions. I can't remember.

Q.     Three months before Mr. Richards was
terminated, was anybody else on the clinical side
terminated?

A.     No.

Q.     And three months after Mr. Richards
was terminated, was anybody on the clinical side
terminated for cost purposes?

A.     Not for cost purposes. There were
people — about four months two people were asked
to leave for clinical reasons.

Q.     What do you mean by "clinical
reasons"?

A.     Issues around paperwork performance.

**37**

1   Q.    Do you remember Mr. Mattocks ever
2   telling you that the decision to eliminate
3   Mr. Richards' employment was made with
4   consideration of his years of service to the
5   organization?
6       A.    Could you repeat that again?
7           MR. SIKORSKI:   Please read that
8   back.
9           (The last question was read.)
10          THE WITNESS:   I don't remember that
11  occurring.
12      Q.    (By Mr. Sikorski) When Mr. Mattocks
13  told you he was thinking of terminating
14  Mr. Richards as a cost-savings measure, did you
15  say anything back to him about that?
16      A.    Um, I was — there was a positive
17  ledger and there was a negative ledger for it.
18  The positive ledger is that indeed it was a
19  cost-savings measure. The negative side was the
20  continuity of the connections that Mark had in
21  the community, like bringing in referrals and
22  that kind of thing.
23      Q.    Did you tell that to Mr. Mattocks?
24      A.    My memory is that I discussed that

**38**

1   with him.
2       Q.    And what did he say in response to
3   that?
4       A.    I think that he just took it in as
5   part of his information to make a decision.
6       Q.    Did you ever discuss what impact that
7   termination might have on Mark?
8       A.    I don't believe so, not thoroughly.
9       Q.    Who's Anthony Correia?
10      A.    I don't remember Anthony Correia.
11      Q.    Tony Correia?
12      A.    Tony Correia. Thank you. Tony is
13  the chief financial officer — I believe that's
14  his title — for Valley Health Systems.
15      Q.    Had you had interaction with Tony
16  Correia over the years?
17      A.    Not separately but within the context
18  of the executive team was beginning to be invited
19  to meet with Hank Porten and him in a weekly
20  meeting. So I began to see him in meetings
21  there.
22      Q.    When did you start attending these
23  meetings with Mr. Porten and Mr. Correia?
24          MS. KENNEDY:   Objection to the form

**39**

1   of the question.
2           THE WITNESS:   The answer is that
3   there was different sequences in which I
4   became involved. I first became involved
5   going to those meetings after Andy Phillips
6   left and Maryann Pomaltier was the acting
7   director. So in some ways I became a part
8   of the team that had to keep the agency
9   afloat. And in that format, that's when I
10  began going to meetings.
11      Q.    (By Mr. Sikorski) Did Mr. Mattocks
12  ever tell you that he was sending a report to
13  Tony Correia about cost savings that he was
14  trying to implement?
15      A.    I have no memory of that.
16      Q.    I'd like to go back for a minute to
17  your work in psychiatric day treatment programs
18  before the termination of Mr. Richards. Before
19  the termination of Mr. Richards, did you ever
20  work with clients in a psychiatric day treatment
21  program?
22      A.    I never worked with clients in a
23  psychiatric day treatment program.
24      Q.    Did you ever lead a group in a

**40**

1   psychiatric day treatment program?
2       A.    Yes, I've led groups in psychiatric
3   day treatment programs.
4       Q.    How many had you done before
5   Mr. Richards was terminated?
6       A.    Two or three different times.
7       Q.    Two or three total?
8       A.    Different groups, yes.
9       Q.    Did you ever manage the day-to-day
10  operations of a psychiatric day treatment program
11  prior to Mr. Richards' termination?
12      A.    I oversaw but did not directly
13  manage.
14      Q.    Did you ever work day-to-day inside a
15  psychiatric day treatment program before
16  Mr. Richards' termination?
17      A.    No, I did not.
18      Q.    Once you became the director of the
19  psychiatric day treatment program, how many
20  people did you supervise?
21      A.    Supervise where?
22      Q.    In the psychiatric day treatment
23  program. Let me withdraw the question and ask
24  you again.

41

```
1          At the time you became the director
2  of the psychiatric day treatment program, how
3  many people worked in that program?
4          A.     At that point, there were about five
5  and I directly supervised everybody in the
6  program.
7          Q.     That's five full-time equivalence?
8          A.     It's changed a little bit.  It was
9  about -- not five full-time equivalence.  I think
10  it was about 4.6.  And that's not including the
11  secretary.
12          Q.     At any time before Mark Richards'
13  termination, did Mr. Mattocks ask you to come up
14  with a plan to cut costs on the clinical side of
15  River Valley Counseling Center?
16          A.     No, he didn't.
17          Q.     After Mark Richards' termination, did
18  Mr. Mattocks ever ask you for a plan to cut costs
19  on the clinical side of River Valley Counseling
20  Center?
21          A.     With EAP we had to manage some costs
22  with that.  There was a business plan with EAP,
23  but no management of costs other than that.
24          Q.     What's your date of birth?
```

42

```
1          A.     2/22/51.
2          Q.     Prior to Mr. Richards' termination,
3  was part of your salary carried on the budget of
4  the psychiatric day treatment program?
5          A.     Yes.
6          Q.     Do you know approximately what
7  percentage was carried?
8          A.     I don't remember clearly.
9          Q.     When was the position of assistant
10  director of the psychiatric day treatment program
11  created, when was that position created?
12          A.     My memory is fuzzy, but I believe
13  around three or four months, approximately
14  August, I think, of 2004.
15          Q.     And who created it?
16          A.     It was a mutual decision, I think.
17  Mark was involved.  David Mattocks was involved.
18  I was involved, I believe, is my memory.
19          Q.     Was there a formal position statement
20  created for that position?
21          A.     There was a client status form that
22  was created when we make a position.  But I don't
23  remember a job description.
24          Q.     Did you ever discuss the termination
```

43

```
1  of Mr. Richards with Mr. Avakian?
2          A.     I think kind of after the fact, you
3  know, we sat and strategized, you know, our plan
4  for going forward.
5          Q.     Was Mr. Avakian upset by the
6  termination of Mr. Richards?
7          A.     My memory is that he was shaken by
8  it.
9          Q.     What do you base that upon?
10          A.     I think it was because he expressed
11  fear about moving forward, what he was going to
12  do, how he was going to work all of that.  I
13  think he was -- I would think he was a bit scared
14  about what was going -- his future.
15          Q.     How long after Mark Richards'
16  termination did Mr. Avakian continue to work in
17  the psychiatric day treatment program?
18          A.     I think approximately five months.
19          Q.     And then what did he do?
20          A.     My memory is that he worked -- went
21  to work up in Greenfield, and then he was going
22  to do a bit of a private practice, too.
23          Q.     Do you know where in Greenfield he
24  went to work?
```

44

```
1          A.     You know, I'm not exactly clear.  I'm
2  not exactly clear.
3          Q.     What were the circumstances under
4  which he left the psychiatric day treatment
5  program?
6          A.     I think he said it was personal
7  issues between he and his wife.  His wife wanted
8  him to have a job where he would be more
9  accessible for his home life.
10          Q.     Did he come in and tell you that in
11  person?
12          A.     Yeah, we had a discussion.  Yes, we
13  had a discussion about his home world and what
14  that was like for him.
15          Q.     And did he, in fact, leave the River
16  Valley Health Center Psychiatric Day Treatment
17  Program?
18          A.     He did.
19          Q.     And has he returned to that program?
20          A.     No.
21          Q.     And has he returned to work for some
22  entity affiliated with the Holyoke Hospital
23  group?
24          A.     I haven't seen him except I saw him
```

**45**

1  once. But he had returned into the partial
2  program that's run by Valley Health Systems. I'm
3  not sure exactly the timing of that.
4      Q.   So, again, tell me all the reasons
5  why Mr. Avakian told you he was leaving the
6  psychiatric day treatment program.
7      A.   I think that the main reason was
8  family. I think he also had difficulties setting
9  boundaries between the pressures of work and his
10  home life and that was really a big deal. He
11  kind of took worries back with him. And so I
12  think that that was a piece for him.
13      Q.   At some point in time, did you learn
14  that Mr. Mattocks' Ph.D. was not from an
15  accredited institution?
16      A.   I've never learned that positively,
17  but I did hear after he left rumors that were
18  floating around the agency about that being a
19  fact. After he left, there was some rumors that
20  people kind of floated to me. But I still
21  haven't seen anything in writing to say whether
22  it's documented or not documented. I really
23  don't know. I've heard.
24      Q.   I just want you to focus on not what

**46**

1  you may have heard from attorneys but from what
2  you've heard others in the agency regarding
3  Mr. Mattocks' Ph.D. Can you tell me what rumors
4  you heard?
5      A.   Basically there was a rumor floating
6  that his Ph.D. was not a -- what's the term --
7  licensed or -- I can't think of the term.
8      Q.   Accredited?
9      A.   Accredited, that it wasn't
10  accredited.
11      Q.   Did anyone at the agency express
12  concern to you about the fact that it might be
13  from a nonaccredited institution?
14      A.   Again, this was after the fact. And
15  at that point, it wasn't a concern. It was just
16  more like what's going on here, you know. It
17  wasn't like a concern. It's just like what's
18  going on.
19      Q.   In the area of the clinical provision
20  of mental health services, is integrity in
21  credentialing important?
22      A.   In my area it's very important.
23      Q.   So it would be important as to
24  whether someone had claimed to have a Ph.D. from

**47**

1  an accredited or nonaccredited institute?
2      A.   From my clinical side?
3      Q.   Yes.
4      A.   It's important to me.
5          MR. SIKORSKI:   What I'd like to do
6  is take five or ten minutes.
7          (A recess was taken)
8      Q.   (By Mr. Sikorski) Mr. Kassis, you've
9  mentioned a Mr. Duke. Who is Brian Duke?
10      A.   He was the financial officer of River
11  Valley Counseling Center.
12      Q.   And how long did he have that
13  position, sir?
14      A.   I'm unclear.
15      Q.   In relation to the termination of
16  Mr. Richards, how long before that time,
17  approximately, did he have that position?
18      A.   I think approximately three years.
19      Q.   And how long after Mr. Richards'
20  termination did he hold that position?
21      A.   Um, there was another -- he left, and
22  I can't remember the sequence, and then there was
23  another chief financial officer there. I can't
24  remember the sequence. I'd have to refer to some

**48**

1  notes. There was another financial officer.
2      Q.   Then did Mr. Duke come back to work
3  for River Valley?
4      A.   He left the agency and there was
5  another financial officer hired, and I can't
6  remember when he left.
7      Q.   Would it have been not in 2006?
8      A.   No.
9          MS. KENNEDY:   Objection to form.
10      Q.   (By Mr. Sikorski) Would it have been
11  sometime in 2005?
12          MS. KENNEDY:   As to who left?
13          MR. SIKORSKI:   As to Mr. Duke
14  leaving.
15          THE WITNESS:   Yes. I can't remember
16  the exact time.
17      Q.   (By Mr. Sikorski) And what were the
18  circumstances under which Mr. Brian Duke left
19  River Valley?
20          MS. KENNEDY:   Objection to the form.
21          THE WITNESS:   I'm unclear about --
22  what I am clear about is that he had a
23  change in his daughter's school. So his
24  commute was already about an hour and 15

49

1  minutes and the school that they were going
2  to send their kid to was another 20 minutes
3  in the wrong direction. And it was just
4  his commute was killing him. It was just
5  basically not working for him. That's what
6  I know.
7      Q.    (By Mr. Sikorski) Where did Mr. Duke
8  live?
9      A.    Up near Athol, that area.
10     Q.    When is the last time you spoke to
11 Mr. Duke?
12     A.    Close to when he left, and I can't
13 remember the exact date. But I haven't spoken to
14 him since.
15         MR. SIKORSKI:   Off the record.
16            (Off record discussion)
17     Q.    (By Mr. Sikorski) Mr. Kassis, do you
18 remember when the program was applying for
19 Medicaid certification back in the late '80s?
20         MS. KENNEDY:   Object to the form of
21 the question. Go ahead and answer.
22         THE WITNESS:   It's very fuzzy to me.
23     Q.    (By Mr. Sikorski) Do you remember a
24 woman by the name of Renee Cochran.

Accurate Court Reporting
1384 Main Street, Suite 1412
Springfield, MA 01103
413-747-2984

50

1      C-O-C-H-R-I-N?
2      A.    I don't remember.
3      Q.    Do you remember any interaction with
4  the Commonwealth's Medicaid auditor who was
5  auditing the program to certify it with Medicaid?
6      A.    I don't remember.
7      Q.    Do you remember the Commonwealth ever
8  raising an issue about the extent of the program,
9  the director's authority being shifted to you as
10 the clinical director?
11     A.    I don't remember.
12     Q.    Do you remember that as ever being an
13 issue while you worked at River Valley?
14     A.    I remember it being an issue with
15 Mark but not the agency.
16     Q.    What do you mean "being an issue with
17 Mark"?
18     A.    Mark, we had some conversations when
19 he brought that up as a concern he had.
20     Q.    What did he say to you that leads you
21 to conclude it was a concern of Mr. Richards'?
22     A.    It's very vague. It's just that he
23 was -- my memory is that that was an issue around
24 his, quote, "authority," vis-a-vis me.

Accurate Court Reporting
1384 Main Street, Suite 1412
Springfield, MA 01103
413-747-2984

51

1      Q.    And the issue was whether the
2  splitting of authority would violate Medicaid
3  regulations?
4          MS. KENNEDY:   Objection to the form.
5          THE WITNESS:   I think he was
6  reporting under me and at times there was
7  tension between he and I regarding that the
8  agency was clear that he reports to me.
9  And he had some feelings at times where he
10 would question that.
11     Q.    (By Mr. Sikorski) Who is Jeffrey
12 Eagle?
13     A.    Jeffrey Eagle is a consultant, one of
14 the lead consultants of a firm called Health
15 Enhancements.
16     Q.    Did you ever work with Jeff Eagle?
17     A.    On several occasions.
18         Are we doing the corporate piece?
19         MS. KENNEDY:   No.
20     Q.    (By Mr. Sikorski) On what projects did
21 you work with Mr. Eagle?
22     A.    Basically he came in on one occasion
23 because we had problems financially. And the
24 Health Enhancements was hired by Valley Health

Accurate Court Reporting
1384 Main Street, Suite 1412
Springfield, MA 01103
413-747-2984

52

1  Systems to write or correct the financial
2  difficulties. And I became a person that was
3  interacting with him regarding maintaining the
4  viability of the clinical programs. That was the
5  first occasion.
6      Q.    And who was the director of River
7  Valley at that time?
8      A.    The first occasion Joyce Toth was.
9  She left and Jeff Eagle's group created a
10 temporary CEO from their group named Gale -- I
11 can't remember his last name. But it was a CEO
12 right from that group that reported to the
13 hospital, to the Valley Health Systems.
14     Q.    What other occasions did you work
15 with Mr. Eagle?
16     A.    The next time that he came in was
17 again around financial difficulties. Valley
18 Health Systems asked him to come in, and I worked
19 with him in conjunction with Andy Phillips, who
20 was the CEO.
21     Q.    Did you work with him at any other
22 time?
23     A.    No. It was all around the business
24 of the agency.

Accurate Court Reporting
1384 Main Street, Suite 1412
Springfield, MA 01103
413-747-2984

57

```
 1      Q.    And what did he say to you when he
 2  gave you the regulations?
 3      A.    He said review them and in a sense do
 4  you believe that you meet the regulations in
 5  terms of who you are. He clearly said that he
 6  believed that I did and that I looked at him and
 7  said I said I believe that I meet those
 8  requirements.
 9      Q.    What was the context of this
10  exchange?
11      A.    The context was post the issue around
12  moving towards that decision, towards having Mark
13  potentially not be the program director. It was
14  all in that context.
15      Q.    Was anyone else at that meeting?
16      A.    I don't remember clearly. I just
17  remember myself being there.
18      Q.    Do you remember ever discussing with
19  Donna Viens of whether or not you met the
20  requirements?
21      A.    My memory is unclear.
22      Q.    Did Mr. Mattocks ever tell you that
23  Mr. Richards had challenged your qualifications
24  to be the program director?
```

Accurate Court Reporting          1350 Main Street, Suite 1415
                                   Springfield, MA 01103
                                   413-747-1824

59

```
 1      Q.    At that time, you had at least five
 2  programs that you oversaw, is that correct, from
 3  a clinical point of view?
 4      A.    Yes.
 5      Q.    So according to your definition, what
 6  if you had 15 programs to oversee, would you
 7  still meet the requirements there?
 8          MS. KENNEDY:   Objection to the form.
 9          THE WITNESS:   Within the frame of my
10  position I met the requirements. If it was
11  five, six, seven, I met the requirements.
12  This was my belief.
13          MS. KENNEDY:   You answered the
14  question.
15      Q.    (By Mr. Sikorski) Did you seek anyone
16  else's opinion as to whether or not you met the
17  requirements?
18      A.    No, I didn't.
19      Q.    What is the Crossroads Day Treatment
20  Program?
21      A.    Currently there is no Crossroads Day
22  Treatment Program.
23      Q.    Was that a predecessor type of
24  program to programs currently being run by River
```

Accurate Court Reporting          1350 Main Street, Suite 1415
                                   Springfield, MA 01103
                                   413-747-1824

58

```
 1      A.    I don't remember him doing that.
 2      Q.    And do you understand that the
 3  regulations require that a psychiatric day
 4  treatment program was designated a full-time
 5  professional as overall administrator and
 6  clinical director?
 7      A.    I'm a full-time professional. I
 8  understand that.
 9      Q.    So you understand full-time
10  professional to be someone who could only spend
11  10 or 15 percent of their time on a program?
12          MS. KENNEDY:   Objection to the form.
13          THE WITNESS:   I think I'd like you
14  to restate that.
15      Q.    (By Mr. Sikorski) What is your
16  understanding of the requirements that a
17  psychiatric day treatment program must designate
18  a full-time professional as overall administrator
19  and clinical director full-time responsible for
20  the program in charge of day-to-day
21  responsibility over it?
22      A.    My understanding was that I was a
23  person that was employed fully full time at the
24  agency. That was my understanding.
```

Accurate Court Reporting          1350 Main Street, Suite 1415
                                   Springfield, MA 01103
                                   413-747-1824

60

```
 1  Valley?
 2      A.    What I meant by that is that it was
 3  simply transferred to the name of River Valley
 4  Counseling Center.
 5      Q.    Okay. When you and Mr. Mattocks
 6  discussed the termination of Mr. Richards, wasn't
 7  the original plan to have Mr. Avakian take over
 8  some of the responsibilities and you take over
 9  other responsibilities?
10      A.    When you're a director, you always
11  delegate so there was delegation of
12  responsibilities. There's cooperation.
13      Q.    My question is, wasn't it originally
14  the responsibilities were going to be split up
15  between you and Mr. Avakian?
16      A.    The question is unclear. They're
17  always split up.
18      Q.    To your memory, was there any change
19  in the allocation of responsibilities between you
20  and Mr. Avakian at any time after Mr. Richards'
21  termination?
22      A.    A change from when to when? I'm
23  unclear what you mean. A change from before?
24      Q.    An change from before Mr. Richards'
```

Accurate Court Reporting          1350 Main Street, Suite 1415
                                   Springfield, MA 01103
                                   413-747-1824

1 termination to after Mr. Richards' termination.
2     A.    The question is unclear to me.
3     Q.    After Mr. Richards' termination, was
4 there a change in allocation of responsibilities
5 between you and Mr. Avakian?
6     A.    We adapted to a situation where we
7 basically provided leadership for the team to
8 move forward.
9     MR. SIKORSKI:   I have no further
10 questions of this witness at this time.
11     MS. FABBO:   I have no questions.
12     MS. KENNEDY:   I have nothing.
13     (Deposition concluded at 11:54 a.m.)

---

SIGNATURE/ERRATA SHEET

2     To be signed by deponent and
3 returned to counsel.
4     I, the undersigned, JEFFREY KASSIS,
5 do hereby certify that I have read the foregoing
6 transcript of my testimony given in the matter of
7 MARK A. RICHARDS V. RIVER VALLEY COUNSELING
8 CENTER, INC. VALLEY HEALTH SYSTEMS, INC. DAVID G.
9 MATTOCKS AND DONNA VIENS and to the best of my
10 knowledge, said transcript is true and accurate
11 with the exception of the corrections listed
12 below:
13 PAGE/LINE/CORRECTION_____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
23 DEPONENT'S SIGNATURE _____
24 DATE OF SIGNING _____

---

62

1     I, Debra A. Vance, a Notary Public within
2 and for the Commonwealth of Massachusetts at large,
3 do certify that pursuant to notice, there came
4 before me on January 31, 2006, at the offices of
5 ROBINSON DONOVAN, P.C., 1500 Main Street,
6 Springfield, Massachusetts, 01115, the following
7 person, to wit: JEFFREY KASSIS, who was duly sworn
8 to testify to the truth and nothing but the truth as
9 to his knowledge touching and concerning the matters
10 in controversy in this case; that he was thereupon
11 examined upon his oath and said examination reduced
12 to writing by me; and that the deposition is a true
13 record of the testimony given by the witness, to the
14 best of my knowledge and ability.
15     I further certify that I am not a relative
16 or employee of counsel or attorney for any of the
17 parties, nor a relative or employee of such parties,
18 nor am I financially interested in the outcome of
19 the action.
20     WITNESS MY HAND, this 31st day of January, 2006.
22     _____
    Debra A. Vance
23 My Commission Expires:
24 April 26, 2007

---

February 16, 2006

MARY J. KENNEDY
BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115

Dear Attorney Kennedy:

    RE:  MARK A. RICHARDS V. RIVER
        VALLEY COUNSELING CENTER,
        INC., ET ALS

    The deposition transcript of
JEFFREY KASSIS taken January 31, 2006, in the
above captioned case is now ready for signature.

    According to the Massachusetts
Rules of Civil Procedure, the witness has 30 days
to read and sign the deposition transcript.

    If the witness has not read and
signed the original signature page within 30 days
from the above date, it will be deemed signed.

    Please return errata sheet to
Attorney Sikorski. Thank you in advance for your
cooperation in this matter.

Sincerely,

Debra A. Vance
Stenographer, Notary Public

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION
CIVIL ACTION NO. 05-30061-MAP

| | |
|---|---|
| MARK A. RICHARDS, | ) |
|     Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| RIVER VALLEY COUNSELING CENTER, INC., | ) |
| VALLEY HEALTH SYSTEMS, INC., | ) |
| DAVID G. MATTOCKS AND DONNA VIENS, | ) |
|     Defendants | ) |

**PLAINTIFF'S ANSWER TO DEFENDANT, RIVER VALLEY
COUNSELING CENTER'S, INTERROGATORIES**

QUESTION
1.    Please identify yourself and your date of birth and social security number.

ANSWER
    Mark A. Richards;

    Date of Birth:  July 6, 1950

    Social Security No.:  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

QUESTION
2.    Please identify each person you claim has knowledge of facts pertinent to the allegations in the Amended Complaint, and state the substance of the knowledge you claim they have.

ANSWER
1. David G. Mattocks, Vernon, VT.   Mr. Mattocks has knowledge as to my job performance, my job duties, my request for FMLA, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.  He also has knowledge as to the reasons for my termination.

2. Donna Viens, Director of Human Resources for River Valley Counseling Center, 319 Beech Street, Holyoke, MA.  Ms. Vienes has knowledge as to my job performance, my job duties, my request for FMLA, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.   She also has knowledge as to the reasons for my termination.

3. Leigh Richards, 19 Lyman Road, Chester, MA.  (413) 667-3157.  My daughter has knowledge concerning her illness, and the care I provided her resulting there from.  She

408595

also has knowledge as to damages (more specifically, how the loss of my job has affected me personally).

4.  Karen Richards, 19 Lyman Road, Chester, MA.   (413) 667-3157.   My wife has knowledge as to my use of FMLA, our daughter's illness, and the care I provided to our daughter.   She also has knowledge as to damages (more specifically, how the loss of my job has affected me personally).

5.  Hank Porten, CEO, Valley Health Systems, 20 Hospital Drive, Holyoke, MA. Mr. Porten has knowledge as to my job performance, my job duties, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.   He also has knowledge as to the reasons for my termination, and the relationship among the defendants.

6.  David Avakian, River Valley Counseling, Center, 319 Beech Street, Holyoke, MA. Mr. Avakian has knowledge as to my job performance, my request for FMLA, the approval of my request for FMLA, my use of FMLA, and my daughter's illness.  Mr. Avakian also has knowledge as to the requirements and duties of the job he performed at River Valley Counseling Center following my termination.

7.  Jeff Kassis, River Valley Counseling Center, 319 Beech Street, Holyoke, MA.   Mr. Kassis has knowledge as to the requirements and duties of the job he performed at River Valley Counseling Center following my termination.

8.  Jeff Eagle, Health Enhancement Services, Inc., 42 Natka Drive, Centerville, MA 02631. Mr. Eagle has knowledge as to the background, qualifications, and education of David Mattocks, Mr. Mattocks search for employment, and his being hired at River Valley Counseling Center.

9.  Matthew Haas, 319 Beech Street, Holyoke, MA. Mr. Haas is the Executive Director of River Valley Counseling Center.   Mr. Haas has knowledge as to my professional qualifications and stature in the mental health community.

10. Abraham Linn, MD, 319 Beech Street, Holyoke, MA.  Dr. Linn is the Medical Director of River Valley Counseling Center's Psychiatric Day Treatment Program.  Dr. Linn has knowledge as to my skill, experience, and success in running the programs at River Valley.  He also has knowledge as to my clinical expertise.

11. Nenita Shea, MD .  Dr. Shea has knowledge as to my skill, experience, and success in running the programs at River Valley.  He also has knowledge as to my clinical expertise.

I reserve my right to supplement this answer at a later date, pending further discovery.

QUESTION
3.      Please identify each person whom you expect to call as an expert witness at the trial of this matter, and state the subject matter on which each expert is expected to testify, the substance of the facts and opinions to which each expert is expected to testify, and a summary of the grounds for each opinion.

408595

ANSWER

My attorney has informed me that, as of this date, no determination has been made concerning expert trial witnesses. I understand my obligation to supplement this answer when, and if, such a decision is made.

QUESTION

4.    Please identify each person other than expert witnesses whom you intend to call as a witness at trial of this matter and the substance of each witness's expected testimony.

ANSWER

My attorney has informed me that, as of this date, no determination has been made concerning trial witnesses. I understand my obligation to supplement this answer when, and if, such a decision is made.

QUESTION

5.    Please state the basis for your claim that you have worked for RVCC numerous hours uncompensated, as alleged in paragraph 8 of the Amended Complaint.

ANSWER

I worked for RVCC for numerous hours, uncompensated, covering the agency's after-hours emergencies. Every 6 – 8 weeks, for a one week period at a time, I worked these extra hours. This began in about 1997 or 1998, during CEO Jim Siemianowski's administration.

QUESTION

6.    Please state the basis for your claim that your daughter has a disability, as alleged in paragraphs 10 and 13 of the Amended Complaint.

ANSWER

My daughter, Leigh Richards, became ill in the early Spring of 1998. Initially, my wife and I had to stay home with her to prevent her from being hospitalized. Due to her illness, my daughter missed many hours of school, most often during the morning hours. To accommodate her illness, my daughter was given a Section 504 plan at school. My daughter was treated by multiple neurologists, psychiatrists, and internists. She had a psychotherapist for years as well. Eventually, in the summer of 2004, my daughter was diagnosed as suffering from CNS Lyme disease, and was treated with daily IV antibiotics for many months thereafter. She was also given other strong medications. Today, my daughter is almost symptom free. However, over the six years she was ill, she was prescribed and was taking numerous psychotropic medications, as well as anti-convulsive medications and pain medications. My daughter also underwent numerous medical tests related to the brain, and many of these procedures were repeated more than once.

QUESTION

7.    Please identify all communications between you and RVCC concerning your taking intermittent leave in 2000-2001 and identify all documents reflecting or comprising such communications. Please include in your description:

    (a)    the date and place of each such communication with RVCC;

408595

(b)    each person who was present at, involved in, connected with, or participated in such communication;

(c)    the type of communication in which this information was provided to you and;

(d)    the substance of each communication.

ANSWER

On April 10, 2000, I filled out a River Valley Counseling Center, Inc. LOA Request Form, indicating I would need to take intermittent/ongoing leave, and submitted it to the Human Resources Department (please see LOA Request Form, attached hereto as Exhibit 7A). On April 17, 2000, I received the Employer Response to Employee Request for Family Medical Leave (copy attached hereto as Exhibit 7B). This response form indicated that RVCC had received my request to take family medical leave due to a serious health condition affecting our child. The response form also indicated that my request was approved. I also advised my entire staff at the time of my situation and that I would be taking intermittent leave under FMLA.

QUESTION

8.    Please identify all communications between you and RVCC concerning your taking intermittent family leave in 2004 and identify all documents reflecting or comprising such communications. Please include in your description:

(a)    the date and place of each such communication;

(b)    each person who was present at, involved in, connected with, or participated in such communication;

(c)    the type of communication in which this information was provided to you; and

(d)    the substance of each such communication.

ANSWER

On August 30, 2004, I forwarded a memorandum to David Mattocks, CEO, concerning my request for leave under the Family Medical Leave Act, in order to attend to the medical needs of my seriously ill daughter (copy attached hereto as Exhibit 8A). Mr. Mattocks said he understood, and that he had been though a similar experience. He also told me that I should fill out the FMLA paperwork obtained from Donna Viens. On September 3, 2004, I received correspondence from Donna Viens, Director of Human Resources, indicating that my request had been received and providing forms for me to fill out (copy attached hereto as Exhibit 8B). I had the paperwork signed by my daughter's doctor, Arthur Blake, MD. On September 17, 2004, I received correspondence from Donna Viens, indicating that my application had been reviewed and approved for intermittent family leave to care for my ill child (copy attached hereto as Exhibit 8C). I then advised my entire staff to expect my periodically being out on FMLA intermittently.

408595

QUESTION

9.     Please identify all communications between you and RVCC concerning your being away from work for intermittent FMLA leave in 2004 and identify all documents reflecting or comprising such communications. Please include in your description:

(a)     the date and place of such communication;

(b)     each person who was present at, involved in, connected with, or participated in such communication;

(c)     the type of communication in which this information was provided to RVCC; and

(d)     the substance of each such communication.

ANSWER

When I was out on FMLA, I would advise different personnel, depending on who I was scheduled to meet with that particular day. If my absence was unexpected, usually first thing in the morning, I would inform Mr. Mattocks if I had a meeting with him. I would always inform the program supervisor, David Avakian, know and he would pass it along to my staff at the daily morning meeting. If I knew beforehand that I would need to be out, I would notify the necessary individuals, as well as my staff, in advance. As much as possible, I would try to make up my missed time during each two-week pay period. I tried very hard to minimize any impact my personal situation might have on my staff and the other agency personnel by attempting to make up as much time as possible. In addition, please see Answer # 8.

QUESTION

10.     Please state the basis of your claim that RVCC terminated your employment because of your intermittent FMLA leave, as alleged in paragraph 13 of the Amended Complaint.

ANSWER

OBJECTION. The plaintiff objects to this interrogatory on the grounds that it seeks a legal opinion and analysis from a lay person and requests a lay person to render an opinion on a legal term which is more properly a question of fact to be determined by the trier of fact and/or jury. Without waiving the foregoing objections, a few days before I was terminated, Ms. Donna Viens relayed a story to me in which an employee at her other employer's business was on intermittent FMLA. Ms. Viens informed me that, in this other case, the employee was about to take an increased amount of leave under FMLA, and she was able to intervene in her human resources position and prevent the employee from going out on leave.

My daughter's symptoms increased due to her diagnosis of CNS Lyme Disease and the resulting treatments. Mr. Mattocks did not like that I needed to take intermittent leave under FMLA to care for my daughter. I believe he may have been concerned that I would not have the time available to perform my duties as he envisioned them. He saw my assistant, David Avakian, as being more readily available for work.

408595

Ms. Viens also did not approve of the fact that I was taking intermittent family leave to care for my seriously ill daughter. A few days before I was terminated, Ms. Donna Viens relayed a story to me in which an employee at her other employer's business was on intermittent FMLA. Ms. Viens informed me that, in this other case, the employee was about to take an increased amount of leave under FMLA, and she was able to intervene in her human resources position and prevent the employee from going out on leave. It was my impression that she was proud of her intervention to limit FMLA leave in this instance.

Furthermore, despite his knowledge of my daughter's illness and my need to care for her, David Mattocks informed me that he wanted me to attend a new early-morning meeting every day. Up to this point, I had not been required to attend this meeting. I was worried that daughter's morning symptoms would cause me to be absent from this meeting to frequently, and I informed Mr. Mattocks of my reservations in this regard. Following this exchange, Mr. Mattocks and my relationship changed, as he treated me differently than he used to.

Valley Health Systems, and Hank Porten as CEO of Valley Health Systems, failed to protect my rights under FMLA and, in addition, failed to intervene on my behalf when David Mattocks, Donna Viens, and River Valley Counseling Center unlawfully terminated me due to my lawful use of FMLA.

QUESTION

11.   Please state the basis of your claim that you suffered from a disability, as alleged in paragraph 14 of the Amended Complaint.

ANSWER

I suffered from skin cancer. In addition, I had the need to care for my seriously ill daughter.

QUESTION

12.   Please state the basis of your claim that RVCC regarded you as having a disability, as alleged in paragraph 14 of the Amended Complaint.

ANSWER

Please see Answer # 11 and Answer # 13.

QUESTION

13.   Please identify all communications between you and RVCC concerning your disability and identify all documents reflecting or comprising such communications. Please include in your description:

(a)   the date and place of each such communication with RVCC;

(b)   each person who was present at, involved in, connected with, or participated in such communication;

(c)   the type of communication in which this information was provided to you and;

408595

(d)    the substance of each communication.

ANSWER

I suffered from skin cancer, and informed my staff of my intention to be out of work for a day or two in order to undergo minor surgery in this regard. It was obvious to everyone that I had a problem with my skin. I would periodically receive treatments by my dermatologist, wherein small spots on my face were "burned" with liquid nitrogen. This had been going on for many years and, following these treatments, the spots were quite visible. Oftentimes, clients would notice and comment on it. A year earlier, I had surgery on my face which was slow in healing and left a significant scar.

I was scheduled to have additional skin cancer surgery performed the week I was terminated. Prior to my termination, I had informed Mr. Mattocks and Mr. Avakian of my need to be out a day or two for this surgery.

In addition, please see Answer #'s 7, 8, & 9.

QUESTION

14.    Please state the basis of your claim that RVCC terminated your employment because of your disability or because it regarded you as disabled, as alleged in paragraphs 20 and 22 of the Amended Complaint.

ANSWER

Please see Answer # 13.

QUESTION

15.    Please state the basis of your claim that RVCC terminated your employment because of your association with a disabled person, your daughter, as alleged in paragraphs 20 and 22 of the Amended Complaint.

ANSWER

My daughter's symptoms increased due to her diagnosis of CNS Lyme Disease and the resulting treatments. Mr. Mattocks did not like that I needed to take intermittent leave under FMLA to care for her. I believe he may have been concerned that I would not have the time available to perform my duties as he envisioned them. He saw my assistant, David Avakian, as being more readily available for work. In addition, please see Answer # 10.

QUESTION

16.    Please state the basis of your claim that RVCC terminated your employment because of your age, as alleged in paragraphs 24 and 26 of the Amended Complaint.

ANSWER

I was the most expert clinician in my program and, in fact, supervised the clinicians. I was the most experienced administrator and supervisor in the type of treatment delivery program I directed. I was also the most financially successful program director and, at the time of my termination, was on-target to once again exceed my revenue target. After

my termination, my director's job was allegedly split up between my second-in-charge, David Avakian, and Jeff Kassis. Mr. Kassis is not qualified to hold this position according to the Department of Public Health Regulations, as he has not worked in a psychiatric day treatment program for at least one year, and this position is to be held by a single person (not divided up amongst two or more individuals). My assistant, David Avakian, is approximately 11 years younger than me. He has no obvious health conditions.

QUESTION

17.    Please identify each and every treating physician, therapist, psychiatrist, psychotherapist, counselor, or other health care provider consulted by you from November 2000 to the present, stating the details and results of any tests performed on you or treatments prescribed for you by each practitioner, the diagnosis and prognosis given by each practitioner, and identify all documents concerning such consultations or visits.

ANSWER

OBJECTION.   The plaintiff objects to this interrogatory on the grounds that it seeks information neither relevant nor material to this legal action nor reasonably calculated to lead to the discovery of admissible evidence; and is vague, overly broad, and undefined.

QUESTION

18.    Please itemize and describe with particularity each and every damage, loss, injury, or harm which you claim you have suffered or will suffer as a result of the offenses alleged in the Amended Complaint, describing the manner in which each such damage, loss, injury, or harm was calculated and identifying all documents concerning such damage, loss, injury, or harm.

ANSWER

Please see Compensation Analysis, attached hereto as Exhibit # 18.

QUESTION

19.    Please identify all measures taken by you to attempt to mitigate the alleged damages that you lost or suffered as a result of the offenses or claims alleged in the Amended Complaint, describing the results of all such measure taken and identifying all documents concerning such measures.

ANSWER

I have started a business, Berkshire Counseling Associates.  Please see my business plan, included with my document response.  In addition, please see Answer # 18.

QUESTION

20.    Please itemize each and every source of income you have received since November 2004, including but not limited to the person or entity which paid you the income, the amount of the income, and the services rendered in exchange for the income.

ANSWER

Please see Answer # 18.

408595

QUESTION

21.     Please describe with particularity in what ways, if any, you sustained emotional distress
        as a result of the offenses or claims alleged in the Amended Complaint, describing all
        physical, mental, and emotional manifestations resulting from that alleged emotional
        distress, identifying the name and address of any medical, social, or psychiatric health
        care provider or counselor you consulted as a result of this alleged emotional distress; and
        identifying all documents concerning such consultations.

ANSWER

        I suffered from emotion distress following my termination from River Valley Counseling
        Center.  I did not treat with a paid professional.  Many of my friends are mental health
        clinicians, and I used them for support.  My wife has also been very supportive
        concerning my emotional distress.  In addition, I am a mental health professional and
        have treated many people who have experienced a loss similar to what I experienced.  My
        self-esteem has suffered, as has the esteem I was once held in by my family, friends, and
        co-workers.

QUESTION

22.     Please identify the "new venture" referred to in the document entitled "Mark Richards
        Compensation Analysis August 12, 2005," a copy of which is attached hereto as Tab 1.

ANSWER

        I have started a business, Berkshire Counseling Associates.  Please see my business plan,
        included with my document response.

        Signed under the pains and penalties of perjury this ___ day of October, 2005.

                                                        _____
                                                        Mark A. Richards


AS TO OBJECTIONS:

By_____
John C. Sikorski, Esq., of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO No.:  461970

408595

<u>CERTIFICATE OF SERVICE</u>

I, John C. Sikorski, Esq., hereby certify that on this _19_ day of October, 2005, I served a copy of the above upon the parties in the action by mailing, postage prepaid, to counsel, Mary J. Kennedy, Esq., Francis D. Dibble, Jr., Esq. and Katherine A. Robertson, Esq., Bulkley Richardson & Gelinas, LLP, 1500 Main Street, P.O. Box 15507, Springfield, MA 01115.

Subscribed under the penalties of perjury.

John C. Sikorski

408595



**RIVER VALLEY**
**COUNSELING**
**C·E·N·T·E·R**

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 • 536 • 8221
FAX 413 • 536 • 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 534 • 7158

AIDS Project
207 Elm Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 538 • 9126

Chicopee Clinic
147 Grape Street
Chicopee, MA 01013
413 • 594 • 2141

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 • 534 • 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 • 534 • 2625

AIDS Project
120 Maple Street
Springfield, MA 01103
413 • 737 • 2437

Crossroads
202 Elm St.

## MEMO

Aug. 30, 2004

To:    David Mattocks, CEO

From: Mark Richards, Program Director

Re:    Request for Leave - Family Medical Leave Act (FMLA)

I would like to request using family medical leave (FMLA) in order to attend to the medical needs of my daughter. She has a serious medical illness and is about to commence intensive treatments which the doctors are telling me may last between six months and two years.

I expect that the time I would require would mostly be comprised of intermittent periods away from work lasting from a portion of a day to a day at a time.   I hope that this will cause minimal disruption to my duties here at River Valley Counseling Center.

Thank you for your consideration. I am familiar with the agency policy concerning this type of leave and understand that I need to complete the FMLA Form.

cc: Donna Viens, Human Resource



EXHIBIT
Richards
10
2-2-06 EV

MR000019

A United Way Agency
An Affiliate of Holyoke Hospital



**RIVER VALLEY**
**COUNSELING**
**C·E·N·T·E·R**

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 • 536 • 8221
FAX 413 • 536 • 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 • 534 • 3361

Crossroads Clinic
207 Elm Street
Holyoke, MA 01040
413 • 536 • 4240

Chicopee Clinics
99 Church Street
413 • 592 • 4632
147 Grape Street
413 • 594 • 2141
Chicopee, MA 01013

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 • 534 • 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 • 534 • 2625

AIDS Project
397 Appleton Street
Holyoke, MA 01040
413 • 532 • 3334

AIDS Project
120 Maple Street
Springfield, MA 01103
413 • 737 • 2437

September 3, 2004

Mr. Mark Richards
Lyman Road
Chester, MA 01011

Dear Mark:

I am writing this letter to you regarding your request for an Intermittent Family leave to care for your ill child.

Enclosed please find the Request for Leave of Absence form and the Federal Certification of Health Care Provider form for your and your daughter's physician to complete.

Please return the forms to me within the next 15 days for review and approval.

As stated on the Request for Leave of Absence form, you may be required to exhaust your accrued Holiday, Vacation and Personal time during the leave.

If approved, you should notify David Mattocks of your need to be away from work for FMLA needs at least 24 hours in advance whenever foreseeable. In the event that the time away is not foreseeable, please notify him of your absence as soon as possible.

We understand this is a difficult time for you and your family. Please let us know if there is anything we can do for you.

Sincerely,

Dorian Viens, PHR
Director, Human Resources

EXHIBIT
Richards
11
2-2-06 EV

Enclosures

CC:    D. Mattocks
       Pile

MR000018

A United Way Agency
An Affiliate of Holyoke Hospital



# RIVER VALLEY COUNSELING C·E·N·T·E·R

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 • 536 • 8221
FAX 413 • 536 • 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 534 • 7158

AIDS Project
207 Elm Street
Holyoke, MA 01040
413 • 540 • 1100
Fax 413 • 538 • 9126

Chicopee Clinic
147 Grape Street
Chicopee, MA 01013
413 • 594 • 2141

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 • 534 • 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 • 534 • 2625

AIDS Project
120 Maple Street
Springfield, MA 01103
413 • 737 • 2437

September 17, 2004

Mr. Mark Richards
Lyman Road
Chester, MA 01011

Dear Mark:

I am writing this letter to you regarding your request for an Intermittent Family leave to care for your ill child.

Your application has been reviewed and approved for intermittent leave.

It is crucial to your continued eligibility for this leave status to notify David Mattocks of your need to be away from work for FMLA needs **at least 24 hours in advance** whenever foreseeable. In the event that the time away is not foreseeable, please notify him of your absence as soon as possible. Failure to keep David informed of your absence may result in revoking of the leave or disciplinary action.

When you do take full days of leave from work, you will be required to use vacation, personal or any remaining holiday accruals you have.

Please let us know if you have any remaining questions.

Sincerely,

Donna Viens, PHR
Director, Human Resources

CC:     D. Mattocks
        File

EXHIBIT
Richards
14
2-2-06 EV

MR000011

A United Way Agency
An Affiliate of Holyoke Hospital

COPY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

MARK A. RICHARDS                                    )
                                                    )
                                    Plaintiff )
                                                    )
v.                                                  )
                                                    )
RIVER VALLEY COUNSELING CENTER, INC.,   )
VALLEY HEALTH SYSTEMS, INC.,            )
DAVID G. MATTOCKS AND DONNA VIENS,      )
                                                    )
                                    Defendants )

        DEPOSITION OF:  DONNA VIENS, taken before

Sharon R. Roy, Notary Public Stenographer, pursuant

to Rule 30 of the Massachusetts Rules of Civil

Procedure, at the law offices of ROBINSON DONOVAN,

P.C., 1500 Main Street, Suite 1600, Springfield,

Massachusetts on December 14, 2005 commencing at

10:09 a.m.

A P P E A R A N C E S:

(See Page 2)

                    Sharon R. Roy
            Certified Shorthand Reporter
            Registered Professional Reporter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

MARK A. RICHARDS                    )
                                    )
                         Plaintiff )
                                    )
v.                                  )
                                    )
RIVER VALLEY COUNSELING CENTER, INC.,)
VALLEY HEALTH SYSTEMS, INC.,        )
DAVID G. MATTOCKS AND DONNA VIENS,  )
                                    )
                        Defendants )

DEPOSITION OF: DONNA VIENS, taken before
Sharon R. Roy, Notary Public Stenographer, pursuant
to Rule 30 of the Massachusetts Rules of Civil
Procedure, at the law offices of ROBINSON DONOVAN,
P.C., 1500 Main Street, Suite 1600, Springfield,
Massachusetts on December 14, 2005 commencing at
10:09 a.m.

A P P E A R A N C E S :

(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

---

A P P E A R A N C E S :

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
413-732-2301
   BY:  JOHN C. SIKORSKI, ESQ.


FOR THE DEFENDANTS RIVER VALLEY COUNSELING CENTER,
INC., VALLEY HEALTH SYSTEMS, INC. and DONNA VIENS

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115
413-781-2820
   BY:  MARY JO KENNEDY, ESQ.

FOR THE DEFENDANT DAVID G. MATTOCKS

SKOLER, ABBOTT & PRESSER, P.C.
One Monarch Place,
Springfield, MA 01144
413-737-4753
   BY:  MARY LOU FABBO, ESQ.


Also Present:

Mark Richards

---

I N D E X

--------------------------------------------
WITNESS          EXAMINATION          PAGE
--------------------------------------------

Donna Viens      Direct by Mr. Sikorski      4


EXHIBITS:                              PAGE:

Exhibit 1:  Notice of Taking Deposition .......... 55
Exhibit 2:  Answers to Interrogatories .......... 57


MARKED TESTIMONY:

Page 6, Line 22

---

1
2          S T I P U L A T I O N S
3          It is agreed by and between the
4    parties that all objections, except
5    objections as to the form of the questions,
6    and all motions to strike unresponsive
7    answers are reserved and may be raised at the
8    time of trial for the first time.
9          It is further agreed by and between
10   the parties that the sealing of the original
11   deposition transcript and notification to all
12   parties of the receipt of the original
13   deposition transcript is hereby waived.
14
15          DONNA VIENS, Deponent, having been
16   satisfactorily identified by the production
17   of her driver's license and having first been
18   duly sworn by the Notary Public, deposes and
19   states as follows:
20
21   DIRECT EXAMINATION BY MR. SIKORSKI:
22      Q.   Ms. Viens, will you please state your name
23   and spell your last name, for the record?
24      A.   Donna Viens.  V as in Victor, I-E-N-S.

5

1    Q.    And where do you live?

2    A.    West Springfield, Massachusetts.

3    Q.    What's your residential address?

4    A.    31 Bayberry Lane.

5    Q.    And where do you work?

6    A.    I work at River Valley Counseling Center.

7    Q.    And how long have you been working there?

8    A.    A little over a year.

9    Q.    When did you start?

10   A.    In August of 2004.

11   Q.    What were you hired to do?

12   A.    Be the Director of Human Resources.

13   Q.    And have you served in that function

14   continuously since August of 2004?

15   A.    Yes.

16   Q.    Who do you report to?

17   A.    Matthew Haas.

18   Q.    When you first started in August 2004 who

19   did you work for?

20   A.    David Mattocks.

21   Q.    And when did Mr. Mattocks leave the

22   employment of River Valley?

23        MS. KENNEDY:    Object to the form,

24   but go ahead and answer.

6

1    A.    When he left -- could you please let me

2    know what time frame you mean?

3    Q.    Sure. When did you start reporting to

4    Mr. Haas?

5    A.    In August of 2005.

6    Q.    And before that time who did you report to?

7    A.    David Mattocks.

8    Q.    Who was Mr. Mattocks employed by?

9    A.    HC Management.

10   Q.    And do you know when Mr. Mattocks left the

11   employ of HC Management?

12   A.    No, I don't.

13   Q.    Did Mr. Mattocks serve as the chief

14   executive officer of River Valley ever?

15   A.    At one time that was his title, yes.

16   Q.    Did he have other titles?

17   A.    Yes, executive director.

18   Q.    When did he serve as the executive director

19   of River Valley?

20   A.    During his tenure. I don't recall what

21   date it changed.

22   Q.    When was the last time that Mr. Mattocks

23   served as the executive director of River Valley?

24   A.    In May of 2005.

7

1    Q.    Who did you report to between May of 2005

2    and August of 2005?

3    A.    Marianne Polmatier.

4    Q.    Can you spell that for the stenographer?

5    A.    Marianne, M-A-R-I-A-N-N-E. Polmatier is

6    P-O-L-M-A-T-I-E-R.

7    Q.    During that period of time what title did

8    she hold?

9    A.    Intern Executive Director.

10   Q.    Before she held that title what was her

11   position?

12   A.    Senior Program Manager.

13   Q.    How long had she been the senior program

14   manager?

15   A.    I don't know.

16   Q.    What were the circumstances of Mr.

17   Mattocks' leaving his position as executive director

18   of River Valley?

19   A.    He did not return from a medical leave of

20   absence.

21   Q.    And when did he fail to return from the

22   medical leave of absence?

23   A.    I don't know what date they used.

24   Q.    Well, approximately.

8

1    A.    It calls for an assumption on my part, but

2    August --

3        MS. KENNEDY:    Mr. Sikorski wouldn't

4    want you to guess.

5    A.    Okay, then I don't know the official date.

6    Q.    When did he go on medical leave?

7    A.    The end of May.

8    Q.    What was your understanding of when he was

9    supposed to return from the medical leave?

10   A.    I did not have any such understanding.

11   Q.    Did he tell you he was going on medical

12   leave?

13   A.    Yes.

14   Q.    What did he tell you about his leave?

15       MS. KENNEDY:    To the extent the

16   question asks for private, confidential

17   medical information that is privileged, I'm

18   going to instruct you not to answer the

19   question.

20   A.    I'm going to take my attorney's advice and

21   not answer the question.

22   Q.    He told you he needed to go on a medical

23   leave?

24   A.    Yes.

1     MR. SIKORSKI:   Can you mark that
2   question?
3     Q.   (By Mr. Sikorski)  Did he tell you
4   approximately when he would be able to return?
5     A.   No.
6     Q.   Did he give you any indication of when he
7   would be able to return?
8     A.   No.
9     Q.   Do you know if he communicated with anyone
10  else at River Valley when he would be able to return
11  from medical leave?
12    A.   No.
13    Q.   Approximately what date did he tell you he
14  was going to go on medical leave?
15        MS. KENNEDY:   Objection to the form
16    of the question.
17    A.   I'm not positive on the date.
18    Q.   Approximately.
19    A.   May 24.
20    Q.   When was the next time after that May 24
21  date that you talked with Mr. Mattocks?
22    A.   May 25.
23    Q.   What were the circumstances of you speaking
24  to him on that day?

1     A.   Again, I'm very --
2         MS. KENNEDY:   Okay, to the extent
3     that that question asks for you to reveal any
4     confidential, private medical information
5     relating to Mr. Mattocks' medical leave of
6     absence, I'm going to instruct you not to
7     answer.  If you can answer that question
8     without revealing that, please go ahead and do
9     so.
10    A.   It was a personal conversation on his well
11  being.
12    Q.   When was the next time you spoke with Mr.
13  Mattocks?
14    A.   The 26th.
15    Q.   What was the substance of that
16  conversation?
17    A.   Still a personal check on his well being.
18    Q.   When was the next time after that you spoke
19  to Mr. Mattocks?
20    A.   I don't recall.
21    Q.   Was there a long period of time when you
22  didn't speak to him?
23    A.   Yes.
24    Q.   Why was Mr. Richards terminated from River

11

1   Valley?
2     A.   His position was eliminated.
3     Q.   And who made that decision to eliminate his
4   position?
5     A.   David Mattocks.
6     Q.   Why was his position eliminated?
7     A.   For financial reasons.
8     Q.   What were the financial reasons?
9     A.   To save money.
10    Q.   How much money?
11    A.   His salary.
12    Q.   What was his salary?
13    A.   I don't know off the top of my head.
14    Q.   Did Mr. Mattocks tell you that he had made
15  a decision to terminate Mr. Richards' position?
16    A.   Yes.
17    Q.   When did he tell you that?
18    A.   The last week of October 2004.
19    Q.   And what did he tell you at that time?
20    A.   That he had decided to eliminate the
21  position and he wanted to offer Mark a severance
22  agreement.
23    Q.   Prior to that time had there been any
24  discussions about saving money at River Valley?

12

1     A.   Yes.
2     Q.   Had there been any plans for ways to save
3   money at River Valley before that time?
4     A.   Yes.
5     Q.   And what were those plans?
6     A.   Could you be more specific?
7     Q.   Well, do you know approximately how much
8   River Valley thought they were going to save by
9   eliminating Mr. Richards' position?
10    A.   No, I don't.
11    Q.   You don't have a ball park; 50, 60,000?
12    A.   It wasn't my area of concern, so, no, I
13  don't.
14    Q.   Did you ever see any piece of paper
15  discussing or relating to the amount of money that
16  would be saved by eliminating Mr. Richards' position?
17    A.   I don't recall.
18    Q.   Do you remember seeing anything
19  electronically; by that I mean an e-mail or a Word
20  document or an Excel spread sheet or anything like
21  that that reflected how much money they would save by
22  eliminating Mr. Richards' position?
23    A.   I don't recall.
24    Q.   Do you recall seeing anything such as a

1 budget with notations on it reflecting cost savings
2 from Mr. Richards' -- the eliminating of Mr.
3 Richards' position?
4  A. Not specifically, no.
5  Q. Do you know whether there's any document,
6 either in electronic form or paper form, that relates
7 or refers to the amount of money they would save by
8 terminating Mr. Richards' position?
9  A. I'm not aware of any document.
10  Q. Were you surprised that Mr. Mattocks had
11 decided to eliminate Mr. Richards' position?
12  A. Yes.
13  Q. Why were you surprised?
14  A. It's always a shock when you make a
15 decision to eliminate positions.
16  Q. Well, had there been some campaign before
17 that time to find ways to cut the budget of River
18 Valley?
19  A. Yes.
20  Q. So had you been involved in any discussions
21 or heard of any discussions about various
22 alternatives to eliminating Mr. Richards' position as
23 ways of saving money?
24  A. Alternatives to eliminating his position

1 specifically?
2  Q. Yes.
3  A. No.
4  Q. When Mr. Mattocks told you that he was
5 going to eliminate Mr. Richards' position, what did
6 you say to him?
7  A. I said, "When did you want to do that?"
8  Q. And what did he say to you?
9  A. He said, "Effective soon. Immediately."
10  Q. And then did he discuss with you whether or
11 not to offer Mr. Richards' a severance package?
12  A. Yes.
13  Q. What did he say about that?
14  A. He said he felt he -- that we should offer
15 him a severance package, River Valley should.
16  Q. Did he say why?
17  A. Because of Mark's tenure with the
18 organization.
19  Q. Did he tell you what Mark's tenure with the
20 organization was?
21  A. I don't believe that was discussed at that
22 time.
23  Q. Do you know what Mr. Richards' tenure with
24 the organization was?

15

1  A. After I looked it up, yes.
2  Q. What else did Mr. Mattocks say to you about
3 the severance package?
4  A. That he would like me to contact our
5 attorneys so that we get all the appropriate language
6 in it.
7  Q. Did he indicate to you any amount of money
8 that would be involved in the severance package?
9  A. We had not decided it at that time.
10  Q. When was the decision made as to the amount
11 of money to be offered to him?
12  A. Probably a couple of days later.
13  Q. Who made that decision?
14  A. David Mattocks.
15  Q. Did you consult with him on that issue?
16  A. No.
17  Q. Did you discuss Mr. Richards' upcoming
18 termination with Mary Kelleher?
19  A. Yes.
20  Q. Who's Mary Kelleher?
21  A. She's the vice president for Human
22 Resources for HC Management and Holyoke Hospital.
23  Q. When did you have discussions with her?
24  A. I believe the same day that we discussed

16

1 the severance.
2  Q. What did you say to her and what did she
3 say to you in that conversation?
4  A. I don't recall exactly.
5  Q. Well, give me your best memory.
6  A. My best recollection would be that I asked
7 her what the hospital's severance policy was, and she
8 explained what theirs was, and I don't recall exactly
9 the number of weeks, and I let her know what David
10 wanted to offer to Mr. Richards and she felt
11 comfortable with that and asked me to contact Skoler
12 Abbott.
13  Q. Now, you just mentioned what David wanted
14 to offer Mr. Richards. What was that?
15  A. Sixteen weeks.
16  Q. How was that figured out?
17  A. One week for every year of service to River
18 Valley.
19  Q. And when did he tell you, when did
20 Mr. Mattocks tell you that sixteen weeks was --
21  A. I don't recall the date. It was that same
22 week.
23  Q. Did you ever discuss with Mr. Mattocks
24 before Mr. Richards' termination that Mr. Richards

1  had requested FMLA leave?

2      A.  Mr. Mattocks was aware of that.

3      Q.  That's two questions. Did you ever discuss

4  with Mr. Mattocks the fact that Mr. Richards was on

5  FMLA leave?

6      A.  He was not on FMLA leave, to my knowledge.

7      Q.  Did you ever discuss with Mr. Mattocks the

8  fact that Mr. Richards had requested FMLA leave?

9      A.  Yes.

10     Q.  And what did you say to him and what did he

11 say to you about that?

12     A.  It was when I approved the intermittent

13 leave for Mr. Richards.

14     Q.  How did you inform Mr. Mattocks of that?

15     A.  I provided him a copy of the approval

16 letter and brought the letter to him and indicated

17 that Mark was approved for intermittent leave.

18     Q.  What did you tell Mr. Mattocks when you

19 brought the letter to him?

20     A.  I told him that it was Mr. Richards'

21 responsibility to contact Mr. Mattocks when he

22 intended to use the intermittent leave so that we

23 could track it appropriately.

24     Q.  What did you understand was Mr. Richards'

1      need for intermittent leave?

2      A.  To assist in the care of his ill daughter.

3      Q.  What was your understanding of her illness?

4      A.  After I received the doctor's statement,

5  that she had severe late-stage Lyme disease.

6      Q.  I'd like to go back to the conversation in

7  which Mr. Mattocks told you he was going to eliminate

8  Mr. Richards' position. Do you have that

9  conversation in your mind?

10     A.  Yes.

11     Q.  Did he tell you in that conversation who

12 was going to replace Mr. Richards as the program

13 director?

14     A.  That we were not going to replace the

15 position.

16     Q.  Did Mr. Mattocks tell you who was going to

17 take over Mr. Richards' responsibilities?

18     A.  He explained that Jeff Kassis would

19 continue to have the fiscal responsibility for the

20 program as he always had, and that David Avakian

21 would continue with the daily supervision of the

22 staff, as he had.

23     Q.  Did Mr. Mattocks tell you whether or not he

24 had discussed the decision to eliminate Mr. Richards'

19

1  position with anyone else?

2      A.  He did not tell me at that time, no.

3      Q.  Mr. Richards at this time was working about

4  34 hours a week, was he not?

5      A.  I believe so.

6      Q.  Mr. Avakian was going to take over some of

7  his responsibilities, correct?

8      A.  Yes.

9      Q.  And did the organization hire someone to

10 take over or to assist Mr. Avakian with his previous

11 responsibilities?

12     A.  No.

13     Q.  They didn't hire another clinical person?

14     A.  We were in the process of hiring another

15 clinical person prior to Mr. Richards' departure.

16     Q.  And that was a 40-hour a week position,

17 correct?

18     A.  Yes.

19     Q.  So, Mr. Avakian moves up and takes some of

20 Mr. Richards' position, that was planned?

21     A.  He did not move up.

22     Q.  He was going to take some of his

23 responsibilities?

24     A.  Continue with the daily supervision, yes.

20

1      Q.  And between Mr. Avakian and Mr. Richards,

2  who had more experience in supervising clinicians?

3      A.  I don't know.

4      Q.  So some of Mr. Avakian's hours needed to be

5  replaced, correct?

6      A.  I don't know.

7      Q.  Isn't it true that Mr. Avakian's hours were

8  replaced with a newly-hired clinician at 40 hours a

9  week?

10     A.  No, that's not true.

11     Q.  Why isn't that true?

12     A.  Because that position was in the process of

13 being recruited for prior to Mr. Richards leaving, so

14 it was a position that was already going to be

15 filled.

16     Q.  When did you start looking for that

17 position?

18     A.  Sometime in October.

19     Q.  When in October?

20     A.  I don't recall.

21     Q.  October 1, October 15, October 25?

22     A.  Before Mr. Mattocks talked to me about Mr.

23 Richards' termination.

24     Q.  How soon before?

22

1    A.    I don't recall. I did have conversations
2   and shared e-mails with Mr. Richards about creating
3   an advertisement for the position, what level it
4   would be replaced at, so it was before he left the
5   organization.
6    Q.    Now, regarding the severance package that
7   was offered to Mr. Richards, did you in fact contact
8   Skoler Abbott?
9    A.    Yes, I did.
10    Q.    I don't want to ask you about any
11   conversations with attorneys from Skoler Abbott, do
12   you understand that?
13    A.    Yes.
14    Q.    After you contacted Skolar Abbott, did
15   you -- at any point before terminating Mr. Richards
16   did you discuss again the severance package with Mr.
17   Mattocks?
18    A.    It was mostly with the attorneys. We did
19   it as a conference call.
20    Q.    And how about with Ms. Kelleher?
21    A.    Once it was completed, yes.
22    Q.    You discussed it with her?
23    A.    Yes.
24    Q.    Outside the presence of attorneys?

22

1    A.    I don't recall.
2    Q.    Did you understand that Ms. Kelleher had to
3   sign off and approve on the agreement?
4    A.    No, that was not my understanding.
5    Q.    How was Mr. Richards told that his position
6   was going to be eliminated?
7    A.    In a meeting with Mr. Mattocks and myself.
8    Q.    When was that meeting?
9    A.    On November 4.
10    Q.    What time of the day was it, approximately?
11    A.    About 10:00 in the morning.
12    Q.    And where was it?
13    A.    In Mr. Mattocks' office.
14    Q.    Was it just the three of you?
15    A.    Yes.
16    Q.    Who arranged the meeting?
17    A.    Mr. Mattocks.
18    Q.    Did you make any notes of the meeting?
19    A.    No, I did not.
20    Q.    Did you send an e-mail to anyone about the
21   meeting?
22    A.    No, I did not.
23    Q.    Do you know if there was any document
24   either in paper or electronic form relating to the

23

1   substance of that meeting?
2    A.    No, there was not.
3    Q.    Just to be clear, Mr. Mattocks didn't make
4   a memorandum of the meeting?
5    A.    Not to my knowledge.
6    Q.    You've never seen a memorandum that he
7   wrote about the meeting?
8    A.    No, I did not.
9    Q.    And are you aware of whether Mr. Mattocks
10   created any electronic document or e-mail or anything
11   like that relating to the meeting?
12    A.    I'm not aware of any such document.
13    Q.    Now, before the 10 a.m. meeting did you
14   discuss how the meeting was going to be conducted
15   with Mr. Mattocks?
16    A.    Yes.
17    Q.    When did you do that?
18    A.    Probably 9:00.
19    Q.    Did you do that in person or over the
20   phone?
21    A.    In person.
22    Q.    What did you say to him and what did he say
23   to you?
24    A.    To the best of my recollection, I asked him

24

1   how he wanted the meeting to go. He said that he
2   would start the conversation, explain to Mark why the
3   position was being eliminated, and then he asked me
4   if I would go over the separation agreement and
5   benefit issues.
6    Q.    Did you have any notes with you when you
7   went into the meeting?
8    A.    No, I did not.
9    Q.    Did Mr. Mattocks have any notes when he
10   went into the meeting?
11    A.    I don't believe he had notes. He had the
12   separation agreement.
13    Q.    Did either one of you have any electronic
14   document, an e-mail or anything else, in front of you
15   or with you when you went to the meeting?
16    A.    No.
17    Q.    Who summoned Mr. Richards to the meeting?
18    A.    Mr. Mattocks.
19    Q.    Were you and Mr. Mattocks waiting for Mr.
20   Richards?
21    A.    I believe that Mr. Richards was in the room
22   prior to me going in.
23    Q.    So who started off the conversation?
24    A.    To the best of my knowledge, Mr. Mattocks.

26

```
1    Q.  And what did he say?
2    A.  He explained to Mark that we were looking
3  at ways to reduce expenses and that his position was
4  being eliminated.
5    Q.  Did Mr. Mattocks say anything else
6  initially?
7    A.  I don't recall.
8    Q.  Did you add anything or did Mr. Richards
9  respond first?
10   A.  Mr. Richards did respond.  Again, this is
11 all to the best of my recollection.  I believe he
12 asked if it -- something about it being performance
13 related, and Mr. Mattocks again disagreed -- again,
14 this is to the best of my recollection -- disagreed
15 with him and said, "No, this is nothing performance
16 related.  It has to do with trying to reduce the
17 expenses in the agency."
18   Q.  Did you say anything at that point?
19   A.  After Mr. Mattocks had explained that to
20 Mr. Richards, at some point he asked me to go over
21 the separation agreement.
22   Q.  And what did you say?
23   A.  I explained that we were offering him a
24 separation agreement equivalent to one week for every
```

```
1  year of service, that we -- you know, whatever the
2  contents of it were.  I explained to him -- I believe
3  he had dental insurance with us and I was explaining
4  how COBRA would work.  I also explained to him that
5  he would be entitled to unemployment.  And I did --
6  before we left that day, I gave him a brochure on how
7  to file for unemployment benefits.
8    I asked Mr. Richards how he would like to
9  be paid out his remaining benefit time and offered to
10 him that since he had a 21-day election period to
11 select whether to take the separation agreement, that
12 we would gladly continue to pay out his benefit time
13 through the regular payroll or we would cut him a
14 check that day, if he wanted it.  But because the
15 severance would be paid through the regular payroll,
16 this would allow his payroll to just continue.  He
17 said he would call me either later that day or the
18 next day to let me know his decision as to whether he
19 wanted the lump sum or if he wanted it to continue.
20   Mr. Richards took a lot of notes during the
21 meeting as I spoke.  And then he -- at some point
22 Mr. Richards began to question Mr. Mattocks in
23 regards to who was going to take over certain duties
24 or whatnot.
```

27

```
1    Q.  What did Mr. Richards say about that?
2    A.  He said something to the extent that he --
3  was Mr. Mattocks aware that, if he was not part of
4  the program, then the program would not be in
5  compliance with regulations, state regulations.
6    Q.  And did Mr. Mattocks say anything in
7  response to that?
8    A.  He told Mr. Richards that that was his
9  responsibility.  And as the conversation went on, I
10 did explain to Mark that that is something that David
11 looked into prior to any decision being made.  And at
12 that point Mr. Richards got very angry with me and
13 turned to me and said, "I really don't know why
14 you're in this meeting in the first place."
15   Q.  And what did you say?
16   A.  I said because that's my role, to be here.
17   Q.  Did you say anything else about the issue
18 of the regulations?
19   A.  I don't believe so.
20   Q.  What else was said in that meeting?
21   A.  Mr. Richards asked about closure and what
22 was going to be said to the staff.  We again offered
23 to Mr. Richards, you know, that we wanted to handle
24 this in a humane way and that what would he like --
```

28

```
1  how would he like it presented.  And he asked if
2  there was a way that he could have some kind of
3  closure with the staff and with the patients, and so
4  we agreed that Mr. Richards would return to the day
5  treatment program that day with Mr. Mattocks and have
6  a meeting, staff meeting, to explain that he had
7  decided to leave the organization to care for his
8  daughter full time and that we were not going to hold
9  him to a notice period and he would be leaving
10 immediately.
11   Q.  Was anything else said about the
12 communication issue?
13   A.  I don't remember.
14   Q.  Do you recall anything else that was said
15 in that meeting that you haven't already testified
16 to?
17   A.  Just reconfirming with Mr. Richards how
18 to -- again, how to file for unemployment, that he
19 would be eligible even if he signed the separation
20 agreement, he could collect simultaneously, and
21 talked about the COBRA for his dental, if he wanted
22 it.
23   Q.  Now, you said that Mr. Richards became
24 angry.  What do you mean by that?
```

**29**

1    A.    He yelled at me.
2    Q.    What did he say?
3    A.    He said, "I don't know what you're doing
4  here anyway," in a very angry way.
5    Q.    Now, you said "David looked into the
6  regulations." Is that true?
7    A.    That is what Mr. Mattocks explained to me.
8    Q.    When did Mr. Mattocks explain that to you?
9    A.    Probably that morning.
10    Q.    What did he explain to you exactly?
11    A.    That he wanted to be certain that we had
12  coverage for the program in the appropriate way,
13  because there were changes in the Medicare
14  regulations.
15    Q.    How did this whole issue of compliance with
16  the regulations come up that morning?
17    A.    I don't remember.
18    Q.    So did you ask Mr. Mattocks a question that
19  he was responding to you?
20    A.    No, not that I recall.
21    Q.    So what, again, did he say about these
22  regulations?
23    A.    That he was aware that there were recent
24  changes to the Medicare regulations and he wanted to

**30**

1  be sure that we had the appropriate level of
2  licensure in the program.
3    Q.    Did he tell you what the appropriate level
4  of licensure was in the program?
5    A.    No.
6    Q.    Did you ask him what the appropriate level
7  of licensure was?
8    A.    I don't believe so.
9    Q.    In the meeting with Mr. Richards did
10  Mr. Mattocks say that he had looked into the issue of
11  the regulations?
12    A.    I don't recall.
13    Q.    After the meeting did you review the issue
14  of compliance with the regulations at all?
15    A.    Myself?
16    Q.    Yes.
17    A.    No.
18    Q.    Do you know if Mr. Mattocks reviewed that
19  issue after the termination?
20    A.    I believe so.
21    Q.    What's that belief based on?
22    A.    Just further conversation that was held
23  during an executive team meeting, or a senior
24  management meeting.

**31**

1    Q.    And what was that conversation?
2    A.    That Jeff Kassis was the appropriate level
3  of licensure, that he continued to be the clinical
4  director of the program, and I don't recall anything
5  further.
6    Q.    And when was that discussion held?
7    A.    I don't remember exactly.
8    Q.    Well, approximately how many weeks after
9  the termination of Mr. Richards was that meeting
10  held?
11    A.    It was probably the next week. I don't
12  know.
13    Q.    But Mr. Kassis, you stated, was going to
14  have fiscal responsibility for the program, correct?
15    A.    Correct.
16    Q.    So now you're saying that there's a
17  position that Mr. Kassis would have the overall
18  clinical responsibilities of as well?
19    A.    He always has had the overall clinical
20  responsibilities of that program as the program
21  director and clinical director.
22    Q.    Mr. Kassis has been the program director
23  and the clinical director?
24    A.    Yes.

**32**

1    Q.    What's Mr. Kassis' background, do you know?
2    A.    I don't know his resume off the top of my
3  head, no.
4    Q.    How old is Mr. Kassis?
5    A.    I believe he's 54.
6    Q.    And how old's Mr. Avakian?
7    A.    I believe he's 45.
8    Q.    Is Mr. Avakian considerably younger than
9  Mr. Richards?
10      MS. KENNEDY:    Objection to form.
11    A.    Could you change the format of the
12  question?
13    Q.    Is Mr. Avakian younger than Mr. Richards?
14    A.    Yes.
15    Q.    Approximately how much younger than Mr.
16  Richards is Mr. Avakian?
17    A.    Approximately nine years.
18    Q.    At any time before the meeting with Mr.
19  Richards whereby he was informed he was being
20  terminated, did you ever discuss with Mr. Mattocks
21  the age differential between Mr. Avakian and Mr.
22  Richards?
23    A.    No.
24    Q.    Did you ever discuss anything with Mr.

34

1   Mattocks before the termination, anything about the
2   age issue?
3       A.   No.
4       Q.   You've used a term called "the executive
5   team."
6       A.   Yes.
7       Q.   What do you mean by that term?
8       A.   It is all of the senior managers in the
9   organization.
10      Q.   When you started in August 2004 was there
11  such an entity, the executive team?
12      A.   Yes.
13      Q.   Who was on the executive team?
14      A.   At that time it was David Mattocks, Brian
15  Duke, Jeffrey Kassis, Marianne Polmatier, Sean
16  Munster, and myself.
17      Q.   And was Mr. Richards on that executive
18  team?
19      A.   No, he was not.
20      Q.   Why not?
21      A.   Because he's not a senior manager or a
22  program director. He was the program manager.
23      Q.   How many program managers were there?
24      A.   The total management team was comprised of

1   approximately 14 people, so that would leave nine.
2       Q.   So there was a management team and an
3   executive team?
4       A.   Yes.
5       Q.   When did the executive team meet?
6       A.   When I began my employment, Monday,
7   Wednesday, and Friday of every week.
8       Q.   What time of the day?
9       A.   8:30 a.m.
10      Q.   And how long did the meetings generally
11  last?
12      A.   Anywhere from an hour to two hours.
13      Q.   And when did the management team meet?
14      A.   I believe it was every -- I don't recall if
15  it was every Thursday back then or if it was once a
16  month on the first Thursday of the month.
17      Q.   What time of day were those meetings?
18      A.   8:30 in the morning.
19      Q.   8:30 until when?
20      A.   Approximately 10:00.
21      Q.   Was the issue of whether or not to
22  eliminate Mr. Richards' position discussed at a
23  management team meeting before the termination with
24  Mr. Richards?

35

1       A.   No.
2       Q.   Did anyone keep minutes or notes of
3   management team meetings before Mr. Richards'
4   termination?
5       A.   Occasionally Mr. Mattocks did.
6       Q.   Are you aware of any notes or minutes of
7   management team meetings before November 4, 2004 that
8   discussed or referred to the decision to eliminate
9   Mr. Richards' position?
10      A.   No, I don't.
11      Q.   Who has custody or control of those minutes
12  or notes?
13          MS. KENNEDY:   Objection to the form.
14  Go ahead and answer.
15      A.   I don't know.
16      Q.   Do you know where they're kept?
17      A.   I'm not aware if they still exist.
18      Q.   Why wouldn't they still exist?
19      A.   Because Mr. Mattocks is no longer there.
20      Q.   Is anyone on the management team assigned
21  the task of keeping notes?
22      A.   No.
23      Q.   Is anyone on the management team assigned
24  the task of creating an agenda for these meetings?

36

1       A.   Mr. Mattocks.
2       Q.   Were there typically agendas for these
3   meetings?
4       A.   Yes.
5       Q.   Do you know if any of the agendas referred
6   to the issue of whether or not to eliminate Mr.
7   Richards' position for cost reasons?
8       A.   I don't believe so.
9       Q.   Who would know for sure?
10      A.   I'm not sure who would know for sure.
11      Q.   Were those agendas kept in either print
12  form or electronic form?
13      A.   They were printed.
14      Q.   And do you know if they've been kept or
15  retained --
16      A.   No, I don't.
17      Q.   And who would know that?
18      A.   I'm not sure.
19      Q.   Following the termination meeting, did Mr.
20  Richards have a meeting with the staff?
21      A.   To my knowledge, yes.
22      Q.   Did you participate in that meeting?
23      A.   No, I did not.
24      Q.   Did you overhear the meeting?

37

1    A.  No, I did not.

2    Q.  Do you know if he had a meeting with his

3  patients?

4    A.  No, I do not.

5    Q.  Do you know if there was any communication

6  with his patients about --

7    A.  No, I do not.

8        MS. KENNEDY:  Let him finish his

9  question.

10       THE WITNESS:  Oh, I'm sorry.

11   Q.  (By Mr. Sikorski)  When were members of the

12  management team told that Mr. Richards' position was

13  going to be eliminated?

14   A.  I believe it was Friday morning,

15  afterwards.

16   Q.  What day of the week was November 4?

17   A.  A Thursday.

18   Q.  So were the senior management team members

19  told the next day?

20   A.  Yes.

21   Q.  Had Mr. Mattocks told Mr. Kassis before he

22  told Mr. Richards?

23   A.  To the best of my knowledge, he met with

24  Mr. Kassis on Thursday afternoon.

38

1    Q.  What was the purpose of that meeting?

2    A.  To inform him that Mr. Richards was no

3  longer with the organization, that he would be

4  supervising Mr. Avakian and be more actively involved

5  than he had been in the previous years.

6    Q.  Were you in on that meeting?

7    A.  No.

8    Q.  Did Mr. Mattocks tell you that's what he

9  had --

10   A.  Yes, that's why I said I believe that's

11  what was said.

12   Q.  The source of your testimony is that Mr.

13  Mattocks told you that's what he had told Mr. Kassis?

14   A.  Yes.

15       MR. SIKORSKI:  Off the record for a

16  second.

17       (off record discussion)

18   Q.  (By Mr. Sikorski)  Were you in on any

19  meeting with Mr. Mattocks and Mr. Avakian?

20   A.  No.

21   Q.  Did Mr. Mattocks tell you what he had told

22  Mr. Avakian?

23   A.  I believe he summarized the meeting to just

24  say that he let David know that Mark's position had

39

1  been eliminated and that his role would continue as

2  it had been; he may just need to attend a meeting or

3  two now and again.

4    Q.  When you say David, that's David Avakian?

5    A.  David Mattocks told me that that's what he

6  said to David Avakian, yes.

7    Q.  Did you ever have any discussion with Mr.

8  Avakian about Mr. Richards' termination?

9    A.  Not that I can recall.

10   Q.  Did you ever have a discussion with Mr.

11  Kassis about his termination, about Mr. Richards'

12  termination?

13   A.  Alone?

14   Q.  Yes.

15   A.  No.

16   Q.  How about in a small group, outside the

17  presence of lawyers?

18   A.  In the executive team we talked about the

19  elimination of the position.

20   Q.  And what did you say about it?

21   A.  I said that we had offered Mark a severance

22  package and that we'll see where we go from here.

23   Q.  And what did Mr. Kassis say about the

24  termination of Mr. Richards?

40

1    A.  Nothing that I can recall.

2    Q.  What did Mr. Avakian say?

3    A.  Mr. Avakian was not in that meeting.

4    Q.  Did Mr. Mattocks explain the termination to

5  the group?

6    A.  Yes.

7    Q.  What did he say?

8    A.  That the position was eliminated.

9    Q.  Did he say anything else?

10   A.  I believe he explained that we allowed Mark

11  to tell the staff that he had resigned, because that

12  was his preference.

13   Q.  You testified, I believe, that the meeting

14  with Mr. Richards, you, and Mr. Mattocks occurred

15  about 10 a.m. in the morning?

16   A.  Yes.

17   Q.  Had there been a management team meeting

18  earlier that day?

19   A.  No, not that I recall.

20   Q.  You don't recall a management team meeting

21  that day and Mr. Mattocks talking about having

22  received guidance from Mr. Porten?

23   A.  I don't recall.

24   Q.  Did Mr. Mattocks ever tell you whether or

**41**

1   not he had discussed the elimination of Mr.
2   Richards' position with Mr. Porten?
3       A.  Can you repeat the question?
4       THE COURT REPORTER:  "Did Mr.
5   Mattocks ever tell you whether or not he had
6   discussed the elimination of Mr. Richards'
7   position with Mr. Porten?"
8       A.  I believe he had mentioned it.
9       Q.  When did he mention it?
10      A.  I don't recall.
11      Q.  What exactly did he say?
12      A.  I don't remember exactly what he said.
13      MS. KENNEDY:  Before you go,
14   Mr. Sikorski, can you just raise your voice.
15   I'm surprised I'm asking this, but I'm having
16   trouble hearing your question.  Thank you.
17      A.  I don't recall what he said or--
18      Q.  Do you recall generally what he said?
19      A.  Generally that he -- he informed the
20  hospital that the position had been eliminated.
21      Q.  And did he inform them before the position
22  had been eliminated or after?
23      A.  Before.
24      Q.  Did Mr. Mattocks treat you as a confidante?

**42**

1      A.  At times.
2      Q.  Before the termination of Mr. Richards, did
3  he treat you as a confidante?
4      A.  On personal matters, yes.
5      Q.  Personal matters or personnel matters?
6      A.  Personal.
7      Q.  On what personal matters did he treat you
8  as a confidante?
9      A.  Things about how he felt, things that were
10  going on in his life.
11      Q.  I don't want to get into a lot of detail
12  but, in general, what sort of things?
13      A.  We would talk about our kids and he would
14  talk about, you know, things that were happening with
15  him and how he felt about them.
16      Q.  Did he talk to you about his bankruptcy
17  ever?
18      A.  Prior to Mr. Richards' termination?
19      Q.  Yes.
20      A.  No.
21      Q.  How about after his termination?
22      A.  I believe it came up in conversation.
23      Q.  And how did it come up?
24      A.  Just discussing the case, the lawsuit, or

**43**

1   the case that was being brought forward.
2      Q.  And what did you say to him and what did he
3  say to you about the bankruptcy issue?
4      A.  That he had filed in the past.
5      Q.  Did he tell you anything about his filing?
6      A.  Not specifically that I remember.
7      Q.  Did he tell you generally anything about
8  it?
9      A.  That he was just concerned how it was going
10  to make him look to the staff if it came out, because
11  this was a -- you know, as the case progressed.
12      Q.  What was his concern?
13      A.  Being embarrassed.
14      Q.  Anything else?
15      A.  Not that I recall.
16      Q.  Did he think it reflected poorly on his
17  ability to manage the organization --
18      MS. KENNEDY:  Objection to the form.
19      A.  No.
20      Q.  Now, you mentioned in the termination
21  meeting there was some discussion about the
22  qualifications under the Medicaid regulations of the
23  program director, do you recall that?
24      A.  Yes.

**44**

1      Q.  Did Mr. Richards challenge your knowledge
2  of those regulations in that meeting?
3      A.  Yes.
4      Q.  What did he say?
5      A.  He said how would I know anything about it?
6      Q.  And what did you say to him?
7      A.  I believe I said because it was explained
8  to me.
9      Q.  How familiar were you before that meeting
10  with the Medicaid regulations regarding the
11  qualifications of the program director?
12      A.  Again, just what was explained to me.
13      Q.  So had you pulled out the regulations and
14  looked at them yourself?
15      A.  No.
16      Q.  Did you consider that as part of your
17  responsibilities as Human Resources Director to make
18  sure that there were people properly qualified to run
19  programs?
20      A.  No.
21      Q.  Whose responsibility was that?
22      A.  The executive director.
23      Q.  At any time before the termination meeting
24  with Mr. Richards was there any discussion of

45

1  comparing the financial performance of the program
2  that Mr. Richards managed with the financial
3  performance of other programs?
4       A.   Can you explain what you mean by that?  I'm
5  not quite understanding the question.
6       Q.   River Valley Counseling Center in 2004
7  operated a number of programs, correct?
8       A.   Correct.
9       Q.   Did each of those programs have a budget,
10 an income?
11      A.   Yes.
12      Q.   And so there was financial performance of
13 each of these programs, correct?
14      A.   Correct.
15      Q.   So before the termination of Mr. Richards,
16 was there ever a discussion that compared the
17 financial performance of Mr. Richards' program with
18 the financial performance of other programs in the
19 River Valley Counseling Center umbrella?
20      A.   Not with me.
21      Q.   Do you know if there were discussions with
22 anyone else?
23      A.   I don't know.
24      Q.   At any time before the meeting, termination

46

1  meeting with Mr. Richards, did you ever see some
2  comparison of financial performance of these programs
3  within River Valley Counseling Center umbrella?
4       A.   Comparison of the programs?  In what way?
5  Compared in what way?
6       Q.   In the financial performance as to which
7  programs were making money, which ones were losing
8  money.
9       A.   I remember it being discussed during either
10 a management team meeting or an executive team
11 meeting.
12      Q.   Did any one particular person lead that
13 discussion?
14      A.   I'm not positive who it would have been.
15      Q.   Did you ever see any comparative data of
16 the financial performance of these different
17 programs?
18      A.   I saw the budgets, or the financial
19 statements, yes.
20      Q.   Did anybody create a document
21 electronically or in print form that compared the
22 financial performance of these various programs?
23      A.   I believe so.
24      Q.   And who created that?

47

1       A.   I don't know who.  If I had to guess, I
2  would think Brian Duke.
3       Q.   What was Mr. Duke's position at the time?
4       A.   Our CFO.
5       Q.   Did Mr. Mattocks ever tell you that he
6  could not confide in Mr. Duke?
7       A.   No.
8       Q.   Did he ever tell you that he did not
9  consider Mr. Duke to be a confidante?
10      A.   No.
11      Q.   What was Sean Munster's position?
12      A.   The billing manager.
13      Q.   You had mentioned before the break the
14 issue of hiring another clinician?
15      A.   Yes.
16      Q.   Do you remember that?  And did you have
17 some discussions with Mr. Richards about that?
18      A.   Yes.
19      Q.   Do you recall when you had the first
20 discussion with Mr. Richards about that issue?
21      A.   No, I don't.
22      Q.   Do you recall how long the issue of hiring
23 another clinician had been on the table at River
24 Valley?

48

1       A.   I believe for a while.
2       Q.   And what do you mean by a while?
3       A.   I believe the discussion or the position
4  had been open prior to me coming on board.
5       Q.   And do you know how long it had been open
6  prior to you coming on board?
7       A.   No.
8       Q.   After the termination of the meeting with
9  Mr. Richards, did you ever pull out the Medicaid
10 regulations regarding the qualifications of the
11 program director?
12      A.   I did not, no.
13      Q.   Do you know if anyone else did, other than
14 the attorneys?
15      A.   It would be speculation for me to say
16 anything.
17      Q.   After the termination meeting with
18 Mr. Richards, did Mr. Mattocks ever come to you and
19 say, "I looked at those regulations and Richards was
20 wrong"?
21      A.   Yes.
22      Q.   What did he say to you?
23      A.   What I recall of the conversation is that
24 he said that he had looked at the regulations and

1   that, based upon Jeff Kassis' license and David
2   Avakian's license, that he felt we were in
3   compliance, so Mr. Richards was not correct in his
4   statement.
5       Q.  Did he show you the regulation?
6       A.  No.
7       Q.  And when was that conversation?
8       A.  I don't recall exactly when.
9       Q.  Before the termination meeting did you know
10   that Mr. Richards had any form of cancer?
11       A.  No.
12       Q.  At some point in time after the termination
13   meeting did you learn that he had some form of
14   cancer?
15       A.  Yes.
16       Q.  And how did you learn that?
17       A.  I received an MCAD complaint.
18       Q.  Before you received the MCAD complaint did
19   you learn that he had cancer?
20       MS. KENNEDY:  Again, let me just
21       instruct you at this point, anything that you
22       learned from counsel I'm instructing you not
23       to answer on the grounds that it's protected
24       by attorney-client privilege.  If you can

1   answer the question without revealing any
2   attorney-client privilege, please do so.
3       A.  No, I can't.
4       Q.  Did Mr. Mattocks ever tell you that Mr.
5   Richards had had surgery scheduled for the following
6   week after the termination?
7       A.  No.
8       Q.  Did you learn from any staff member that
9   Mr. Richards had had lesions cut off his face or neck
10   area?
11       A.  No.
12       Q.  Nobody every mentioned to you he had
13   cancerous lesions cut off his face and neck?
14       A.  No.
15       Q.  Regarding Mr. Richards' request for
16   intermittent FMLA leave, did he have a discussion
17   with you about his request?
18       A.  I recall one discussion we had just prior
19   to his termination when we were discussing the open
20   position, and he -- I don't believe we talked about
21   his leave.
22       Q.  What did you discuss?
23       A.  I asked him how his daughter was.
24       Q.  And what did he say?

51

1       A.  He said that she was in a lot of pain, and
2   that he just wished that she could enjoy -- I believe
3   it was her senior year of high school, that she could
4   enjoy her senior year like the rest of her friends.
5       Q.  Now, you mentioned it was in the context of
6   a discussion of the open position?
7       A.  Yes.
8       Q.  What open position are you referring to?
9       A.  The clinician position that was open.
10       Q.  What did you say to him and what did he say
11   to you about this clinician position?
12       A.  We were discussing the advertisement of the
13   position.
14       Q.  And what did you discuss about the
15   advertisement?
16       A.  We were discussing at what level we would
17   be recruiting.
18       Q.  And what do you mean by what level?
19       A.  Bachelor's level, master's level,
20   licensure.
21       Q.  What's the significance of the educational
22   requirement for the position?
23       A.  It has something to do with what insurances
24   accept the billing.

52

1       Q.  And what is it about the insurance company
2   practices that would dictate recruiting at one level
3   or another?
4       A.  I don't know the regulations.
5       Q.  As a general matter, are levels of
6   education important in filling staff positions at
7   River Valley Counseling?
8       A.  That's what I've been told, yes.
9       Q.  Has that been your experience as the human
10   resources director there?
11       A.  Yes.
12       Q.  Before Mr. Richards' termination, River
13   Valley had placed ads in the newspaper for various
14   positions, had it not?
15       A.  Yes.
16       Q.  Did those ads direct the applicants to send
17   resumes to Mr. Mattocks?
18       A.  Prior to me being on board or after --
19       Q.  How about after you were on board?
20       A.  No, it would be directed to Human
21   Resources.
22       Q.  And before you came on board, do you know?
23       A.  I don't know.
24       Q.  When you started at River Valley, what did

**Page 53**

1 you understand to be Mr. Mattocks' level of
2 education?
3     A.   Based upon the diplomas on his wall, I saw
4 a Ph.D.
5     Q.   Did you see a Ph.D. diploma on his wall?
6     A.   Yes.
7     Q.   And where was that from?
8     A.   I believe Parkwood University.
9     Q.   And where did you understand Parkwood
10 University to be?
11     A.   I never asked.
12     Q.   Where did you understand Parkwood
13 University to be?
14     A.   I had no idea.
15     Q.   Did you ever see Mr. Mattocks' resume?
16     A.   No.
17     Q.   Did you ever see an announcement from River
18 Valley about hiring Mr. Mattocks and his credentials?
19     A.   I remember reading something in the
20 internal Holyoke Hospital newsletter.
21     Q.   Did you ever see a reference to Parkwood
22 University being in London?
23     A.   Again, I had no idea where Parkwood was.
24     Q.   At some point in time did you ever discuss

**Page 54**

1 with Mr. Mattocks outside the presence of attorneys
2 his Ph.D. from Parkwood University?
3     A.   No.
4     Q.   Did you ever discuss with anyone affiliated
5 with River Valley outside the presence of counsel
6 Mr. Mattocks' Ph.D. from Parkwood University?
7     A.   No.
8     Q.   Did you ever discuss with Mary Kelleher
9 Mr. Mattocks' Ph.D. from Parkwood University?
10     MS. KENNEDY:  Again, same condition,
11     outside --
12     Q.   (By Mr. Sikorski)  Outside the presence of
13 counsel.
14     MS. KENNEDY:  Thank you.
15     A.   Not that I recall.
16     Q.   Did you ever discuss with anyone employed
17 by or working at River Valley Counseling Center
18 outside the presence of counsel Mr. Mattocks' Ph.D.
19 from Parkwood University?
20     A.   No.
21     Q.   And did you discuss it with anyone
22 affiliated with or employed by HC Management?
23     A.   No.
24     Q.   To the best of your knowledge, was

**Page 55**

1 Mr. Mattocks ever disciplined for representing that
2 he had a Ph.D. from an accredited university?
3     A.   To the best of my knowledge, no.
4     Q.   Did Mr. Mattocks ever stop using the Ph.D.
5 designation after his name?
6     A.   Not that I recall.
7     Q.   Did you ever ask Mr. Mattocks to stop using
8 the Ph.D. designation after his name?
9     A.   No.
10     Q.   Why not?
11     A.   There was no reason to.
12     Q.   Do you remember being part of a
13 conversation with David Mattocks and Jeffrey Kassis
14 regarding what additional duties and/or
15 responsibilities Mr. Kassis would have with the
16 elimination of the position of the Director of the
17 Psychiatric Day Treatment Program?
18     A.   Directly, no.
19     Q.   How about indirectly?
20     A.   Mr. Mattocks explained to me that he had
21 spoken with Mr. Kassis about it.
22     (Exhibit 1, marked)
23     Q.   (By Mr. Sikorski)  I'd like to show you
24 what's been marked as Exhibit 1. Do you recognize

**Page 56**

1 Exhibit 1?
2     A.   Yes.
3     Q.   And do you recognize it as a Notice of
4 Taking Deposition directed to you?
5     A.   Yes.
6     Q.   And it also asks that you bring with you
7 any other documents that support your defenses to the
8 claims in the amended complaint in which have not yet
9 been produced by your counsel. Do you see that?
10     A.   Yes.
11     Q.   Do you have any documents that are
12 responsive to that today?
13     A.   No.
14     Q.   Are there any documents that are responsive
15 to that?
16     A.   No.
17     Q.   Did you ever keep a diary or a log or
18 anything like that of events that happened at River
19 Valley?
20     A.   No.
21     Q.   And at any point in time, other than at the
22 direction of counsel, did you make any notes
23 regarding the events surrounding the termination of
24 Mr. Richards?

57

1    A.    Outside of counsel, no.

2         MR. SIKORSKI:   I'd like to have this

3    marked as Exhibit 2.

4         (Exhibit 2, marked)

5    Q.    (By Mr. Sikorski) I'd like to show you

6    what's been marked as Exhibit 2.

7    A.    Mm-hmm.

8    Q.    And do you recognize that?

9    A.    Yes.

10   Q.    And are those your Answers to

11   Interrogatories?

12   A.    Yes.

13   Q.    And is that your signature on page 6?

14   A.    Yes.

15   Q.    And there's an Exhibit 1 there, do you see

16   that?

17   A.    Yes.

18   Q.    And is that a true and accurate copy of

19   your resume?

20   A.    Yes.

21   Q.    And does it fairly and accurately summarize

22   your work experience and education?

23   A.    Yes.

24   Q.    You recently left your position at American

58

1    Medical Response, did you not?

2    A.    Yes.

3    Q.    I'd like to call your attention to Answer

4    to Interrogatory No. 3, on page 3, if you can take a

5    look at that.

6    A.    Yes.

7    Q.    And there's a sentence there on page 3 I

8    want to read and ask you about. It says, "In early

9    November 2004, I was part of a conversation with

10   David Mattocks and Jeffrey Kassis regarding what

11   additional duties and/or responsibilities Mr. Kassis

12   would have with the elimination of the position of

13   Director of the Psychiatric Day Treatment Program."

14   Do you see that?

15   A.    Mm-hmm.

16   Q.    And do you recall having such a

17   conversation?

18   A.    Now that I read it, yes.

19   Q.    And when did you have that conversation?

20   A.    I don't know. It had to have been within

21   the first three days of November.

22   Q.    So would that have been before or after the

23   termination meeting of Mr. Richards?

24   A.    I don't recall.

59

1    Q.    Did anyone make any notes of that meeting?

2    A.    No. I did not personally.

3    Q.    Do you know if there were any notes

4    prepared before that meeting?

5         MS. KENNEDY:   Objection to the form.

6    A.    Did I prepare any notes for that meeting?

7    Q.    Did you prepare any notes for that meeting?

8    A.    No.

9    Q.    Are you aware of whether anyone else

10   prepared any notes before that meeting?

11   A.    No.

12   Q.    And are you aware of anyone who prepared

13   notes of that meeting after the meeting?

14   A.    I'm not aware of any, no.

15   Q.    Did anyone take notes during that meeting?

16   A.    I can't recall.

17   Q.    At the bottom of page 3 there's a reference

18   to you telling Walter Malanson that Mr. Richards was

19   no longer with River Valley?

20   A.    Yes.

21   Q.    Who is Mr. Malanson?

22   A.    He's the payroll manager.

23   Q.    Now, you described Mr. Richards as program

24   manager, is that correct?

60

1    A.    Yes.

2    Q.    And you said there were several program

3    managers, maybe eight or nine?

4    A.    Yes.

5    Q.    Prior to the termination meeting with

6    Mr. Richards, were the program managers asked to come

7    up with ways to cut expenses?

8    A.    We all were, yes.

9    Q.    Was there a specific directive to come up

10   with a way to cut a specific number?

11   A.    I don't remember.

12   Q.    Who asked everyone to come up with ways to

13   cut expenses?

14   A.    Mr. Mattocks.

15   Q.    Did other program managers submit plans on

16   how to cut expenses?

17        MS. KENNEDY:   Objection to form.

18   Q.    (By Mr. Sikorski) Before the termination

19   meeting with Mr. Richards?

20        MS. KENNEDY:   Same objection.

21   A.    I'm not sure. To me? Did they submit them

22   to me?

23   Q.    Submit them to anyone.

24   A.    Not that I'm aware of.

61

1    Q.   Were any other employees of River Valley
2    terminated on November 4, 2004?
3    A.   I don't believe so.
4    Q.   Were any other employees of River Valley
5    terminated in the time between November 4, 2004 and
6    December 31, 2004?
7    A.   I believe so.
8    Q.   What other employees were terminated?
9    A.   I don't know.  But like I said, I'd have to
10   see a list, I'm sorry.
11   Q.   I'd like you to focus on the last quarter
12   of 2004, and that would be from, say, October 1, 2004
13   to December 31, 2004.  Do you have that time frame in
14   your mind?
15   A.   Sure.
16   Q.   During that period of time, how many
17   positions were eliminated at River Valley?
18   A.   What was the beginning date again?
19   Q.   October 1, 2004.
20       MS. KENNEDY:   And what was the
21   ending date, please?
22       MR. SIKORSKI:   December 31, 2004.
23   The last quarter of calendar year 2004.
24   A.   Without looking at payroll to see who was

62

1    terminated, I can't remember exact dates.  At least
2    one.
3    Q.   And who was that?
4    A.   Mr. Richards.
5    Q.   And your understanding is that Mr.
6    Richards' position was eliminated for cost-savings
7    purposes, correct?
8    A.   Correct.
9    Q.   Can you tell me what other positions were
10   eliminated at River Valley for cost-savings purposes?
11       MS. KENNEDY:   Objection to the form.
12   A.   In total?  In what time frame?  Prior to me
13   coming on board?
14   Q.   Since you've been there.
15   A.   I know there's been at least two or three
16   other positions eliminated for cost savings.
17   Q.   And what were those positions?
18   A.   Biller.  Half of the accounts payable.
19   Court representative.  Half of the contract billing
20   representative.  Consortium coordinator.  A nurse.
21   Again, without looking at a list of terminations, I
22   can't give you a conclusive list off the top of my
23   head, but those are the ones that I can think of.
24   Q.   Who was the biller that was eliminated?

63

1    A.   Tanya Scott.
2    Q.   And when was Ms. Scott's position
3    eliminated?
4    A.   I believe it was February of 2005.
5    Q.   And one half of the accounts payable; who
6    was that?
7    A.   That was Esther Foley.
8    Q.   And when was that position eliminated?
9    A.   January 2005.
10   Q.   One half of the contract billing
11   representative; who was that?
12   A.   I don't recall which month in 2005.
13   Q.   How about in relation to Tanya and Esther?
14   A.   It was after.
15   Q.   And the consortium coordinator, was that a
16   full-time position or a part-time position?
17   A.   Yes, full time.  June 30, 2005.
18   Q.   And you said a nurse position was
19   eliminated?
20   A.   Yes.
21   Q.   When was that?
22   A.   June 30, 2005.
23   Q.   What was River Valley's fiscal year?
24   A.   July 1 to June 30.

64

1    Q.   When did you start?
2    A.   August 2004.
3    Q.   From the time you started until June 30,
4    2005, has River Valley added any positions?
5    A.   Just clinical.
6    Q.   How many clinical positions?
7    A.   I don't know.
8    Q.   And when you say "clinical," does that
9    refer to a group of positions or group of
10   classifications, or what?
11   A.   It's billable clinicians.
12   Q.   Prior to the termination meeting on
13   November 4, 2004, did Mr. Mattocks tell you that he
14   had reviewed Mr. Richards' work record?
15   A.   In what context?  Reviewed his work record?
16   Q.   At River Valley.
17   A.   Most likely, between the time I started and
18   the termination meeting.
19   Q.   Did you ever review Mr. Richards' work
20   record prior to the termination meeting?
21   A.   Only to look at the dates of hire and
22   whatnot.
23   Q.   Were there any physicians affiliated with
24   River Valley Counseling Center in the last quarter of

65

```
1    2004?
2        A.   Psychiatrists, yes.
3        Q.   How many psychiatrists?
4        A.   I believe four.
5        Q.   Did any of those psychiatrists leave around
6    the time that Mr. Richards was terminated?
7        A.   I don't believe so.
8        Q.   After Mr. Richards was terminated, did any
9    of those psychiatrists leave?
10       A.   Yes.
11       Q.   Who?
12       A.   Dr. Linn.
13       Q.   Can you spell that?
14       A.   L-I-N-N.
15       Q.   What's Dr. Linn's first name?
16       A.   Abraham, I believe.
17       Q.   And what were the circumstances of Dr. Linn
18   leaving?
19       A.   He resigned.
20       Q.   And do you know the reasons why he
21   resigned?
22       A.   No, I don't.
23       Q.   Did he ever tell you why he was resigning?
24       A.   No.
```

66

```
1        Q.   Did you ever hear why he was resigning?
2        A.   No.
3        Q.   Did you ever ask him why he was resigning?
4        A.   No.
5        Q.   Regarding this severance agreement offered
6    to Mr. Richards, was that a severance agreement that
7    was typically offered to upper-level executives of
8    organizations affiliated with Holyoke Hospital?
9            MS. KENNEDY:   Objection to the form.
10       A.   I wouldn't know.
11       Q.   Who was responsible for putting in ads in
12   the newspaper for employees of River Valley?
13       A.   Prior to or after my coming on board?
14       Q.   After you came on board.
15       A.   Me.
16           MR. SIKORSKI:   Okay.  What I'd like
17   to do is take a short break here and see if I
18   have any more questions for you.
19           (A recess was taken)
20       Q.   (By Mr. Sikorski)  Ms. Viens, I'd like to
21   focus on the positions that you indicated have been
22   eliminated.
23       A.   Yes.
24       Q.   Esther Foley, was her position eliminated
```

67

```
1    in part because of performance?
2        A.   She was terminated.
3        Q.   She was terminated.  And how about the
4    biller, Tanya Scott; was she terminated?
5        A.   Yes.
6        Q.   Performance related?
7        A.   No.
8        Q.   And who was the person, the contract
9    billing representative?
10       A.   Paula Wilkie.
11       Q.   Paula Wilkie?
12       A.   Mm-hmm.
13       Q.   And was she terminated in part because of
14   performance?
15       A.   No.
16       Q.   Now, the nurse and the consortium
17   coordinator, were those two positions affiliated with
18   some type of contract?
19       A.   Yes.
20       Q.   And what contract was that?
21       A.   I don't know.
22       Q.   Did the contract run out?
23       A.   Yes.
24       Q.   And typically those contracts run out on
```

68

```
1    6/30 of the year, correct?
2        A.   Yes.
3        Q.   Did Mr. Mattocks receive a severance
4    payment, do you know?
5        A.   I have no idea.
6        Q.   Did you ever see a severance agreement Mr.
7    Mattocks --
8        A.   No.
9        Q.   When's the last time you talked to Mr.
10   Mattocks?
11       A.   About a week ago.
12       Q.   And did you do it in the presence of
13   counsel?
14       A.   No.
15       Q.   Did you talk in person or on the phone?
16       A.   Via e-mail.
17       Q.   What did you e-mail to him or what did he
18   e-mail to you?
19       A.   He asked me how I was doing and asked if I
20   would be a character reference for any position he
21   may be applying for.
22       Q.   And what did you e-mail back to him?
23       A.   I said I would gladly do that.
24       Q.   When was the last time you saw Mr.
```

**69**

1  Mattocks?
2      A.   May.
3      Q.   And where was that?
4      A.   River Valley.
5      Q.   Since then have you seen him?
6      A.   No.
7      Q.   Have you spoken to him on the phone?
8      A.   Yes.
9      Q.   And about how many times have you spoken to
10 him on the phone?
11     A.   I don't know, maybe about twelve.
12     Q.   Did you ever discuss this case with him
13 outside the presence of counsel?
14     A.   No.
15     Q.   Did you tell him you were going to be
16 deposed today?
17     A.   No.
18     Q.   How long have you known Mr. Mattocks?
19     A.   Since August of 2004.
20     Q.   Did you ever interact with Mr. Mattocks
21 while you were employed by or affiliated with the
22 Employers' Association of Western Massachusetts?
23     A.   No, I did not.
24     Q.   When you worked at the Employers'

**70**

1  Association did you provide training?
2      A.   Occasionally.
3      Q.   Did you ever provide training to a company
4  affiliated with Mr. Mattocks before this?
5      A.   No.
6      Q.   Did Mr. Mattocks hire you?
7      A.   Yes.
8      Q.   Explain to me the process by which you were
9  hired at River Valley.
10     A.   I applied for the job, Mr. Mattocks called
11 me for an interview, I interviewed with him and Mary
12 Kelleher, and then I was offered the position.
13     Q.   Did you interview with anyone other than
14 Mary Kelleher and Mr. Mattocks?
15     A.   No.
16     Q.   What was your understanding about why you
17 interviewed with Mary Kelleher?
18     A.   For her HR expertise.
19     Q.   Did Ms. Kelleher provide any services to
20 River Valley while you've been there?
21     A.   I don't understand the kind of services
22 you --
23     Q.   Has she provided any advice or counsel to
24 River Valley while you've been there?

**71**

1      A.   Yes.
2      Q.   On what type of issues?
3      A.   If I had questions about a policy or what
4  things had been done in the past, I would confer with
5  her.
6      Q.   Did River Valley get charged for the
7  services that Ms. Kelleher provided?
8      A.   I don't know.
9      Q.   Do you know Margaret Wagner?
10     A.   I know of her.
11     Q.   Who is Margaret Wagner?
12     A.   My understanding is she's the prior HR
13 person for River Valley Counseling Center.
14     Q.   Do you know when she left the organization?
15     A.   I know it was early 2004.
16     Q.   Do you know why she left?
17     A.   No.
18     Q.   Did Mr. Mattocks ever discuss with you his
19 separation from the Brattleboro Retreat?
20     A.   No.
21     Q.   In the termination meeting did Mr. Mattocks
22 mention anything about his termination at the
23 Brattleboro Retreat?
24          MS. KENNEDY:   Objection to the form.

**72**

1  Could you just repeat the question again?
2          THE COURT REPORTER:   "Question:  In
3  the termination meeting did Mr. Mattocks
4  mention anything about his termination at the
5  Brattleboro Retreat?"
6      A.   I don't remember.
7      Q.   Do you remember Mr. Mattocks saying
8  anything that he understood the emotional impact of a
9  termination because of his experience at Brattleboro
10 Retreat?
11     A.   He may have said that.
12     Q.   What do you recall him saying at the
13 meeting?
14     A.   I recall -- I do recall him talking about
15 personal experience, yes.
16     Q.   What was your understanding of Mr.
17 Mattocks' position immediately prior to him assuming
18 the responsibilities at River Valley?
19          MS. KENNEDY:   Objection to the form.
20     A.   I'm not understanding -- I'm not sure what
21 you're asking for.
22     Q.   You understood that Mr. Mattocks worked at
23 the Brattleboro Retreat, correct?
24     A.   Yes.

73

```
1        Q.   And then he had another job before he came
2   to River Valley?
3        A.   Yes.
4        Q.   What did he tell you about the job that he
5   had right before he started working at River Valley?
6        A.   That his position was eliminated.
7        Q.   Did he tell you what organization he had
8   worked for?
9        A.   To the best of my recollection, it was
10  Berkshire Ark or something along those lines.
11       Q.   What was your understanding of what that
12  organization did?
13       A.   I honestly don't know.
14       Q.   What was your understanding of his position
15  in the organization?
16       A.   I believe he told me he was a vice
17  president.
18       Q.   Did he tell you why his position was
19  eliminated?
20       A.   No.
21            MR. SIKORSKI:  We'll just step
22  outside for a second.
23            (A recess was taken)
24       Q.   (By Mr. Sikorski) Ms. Viens, at the end of
```

74

```
1   a deposition I like to give the deponent an
2   opportunity to add anything, correct anything, or
3   make any statements, so I give you that opportunity
4   now, if you'd like to take it.
5        A.   I don't -- I don't think there's anything
6   that I need to correct.
7            MR. SIKORSKI:  Okay.  Thank you very
8   much.
9            MS. FABBO:  I don't have any
10  questions.
11           MS. KENNEDY:  I have nothing.  Thank
12  you.
13              (Witness excused)
14              (Deposition concluded at 12:07 p.m.)
15
16
17
18
19
20
21
22
23
24
```

75

```
1   COMMONWEALTH OF MASSACHUSETTS
2   Hampden
3
4        I, Sharon R. Roy, a Notary Public in and for the
5   Commonwealth of Massachusetts, do certify that
    pursuant to notice, there came before me on the 14th
6   day of December, 2005, at the law offices of ROBINSON
    DONOVAN, P.C., 1500 Main Street, Suite 1600,
7   Springfield, Massachusetts the following named
    person, to wit: DONNA VIENS, who was by me duly
8   sworn to testify to the truth and nothing but the
    truth as to her knowledge touching and concerning the
9   matters in controversy in this cause; that she was
    thereupon examined upon her oath and said examination
10  reduced to writing by me; and that the deposition is
    a true record of the testimony given by the witness,
11  to the best of my knowledge and ability.
12       I further certify that I am not a relative or
    employee of counsel or attorney for any of the
13  parties, nor a relative or employee of such parties,
    nor am I financially interested in the outcome of the
14  action.
15       Witness my hand, this 14th day of December,
    2005.
16
17
18       --------------------------
19              Sharon R. Roy
20
21  My commission expires:
22  April 28, 2011
23
24
```

```
1              ERRATA SHEET
2
3   To be signed by deponent and returned to counsel.
4
5   I, the undersigned, DONNA VIENS, do hereby
    certify that I have read the foregoing transcript of
6   my testimony given in the matter of RICHARDS v.
    RIVER VALLEY, et al, and to the best of my
7   knowledge, said transcript is true and accurate with
    the exception of the corrections listed below:
8   PAGE   LINE   CORRECTION
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21
22  DEPONENT'S SIGNATURE   _____
23  DATE OF SIGNING        _____
24  12.14.05/sr
```

# RIVER VALLEY COUNSELING CENTER, INC.
## INTEROFFICE MEMORANDUM

**TO:**      Mark Richards

**FROM:**    David G. Mattocks, Ph.D., CEO

**SUBJECT:** Billing

**DATE:**    Thursday, September 02, 2004

**CC:**      Brian Duke; Sean Munster

෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴෴

It has come to my attention that there have been times when Day Treatment billings have not been received by the RVCC Business Office in a timely manner. This concerns me even more, given the fact that you may be in and out quite a bit due to your MLA.

Please institute a system whereby these billings get sent every three weeks on a set day to the Billing Office.  It is also essential that you have reliable backup for conducting this function in your absence.  Thank you.

DGM

*[handwritten note]* David – Med. A Billing has traditionally been every four weeks and must be begun after the a 3-day (such as Labor Day) weekend for optimum revenue recovery. I'd be happy to discuss this procedure with you. — Mark

*[handwritten note]* P.S. All Non-Med A billing is done weekly & is always timely.

RVCC0336



RIVER VALLEY
COUNSELING
C · E · N · T · E · R

All Services: 1-800-286-8221

Administration
319 Beech Street
Holyoke, MA 01040
413 · 536 · 8221
FAX 413 · 536 · 8224

Holyoke Clinics
303 Beech Street
Holyoke, MA 01040
413 · 540 · 1100
Fax 413 · 534 · 7158

AIDS Project
207 Elm Street
Holyoke, MA 01040
413 · 540 · 1100
Fax 413 · 538 · 9126

Chicopee Clinic
147 Grape Street
Chicopee, MA 01013
413 · 594 · 2141

Teen Clinic
Holyoke High School
500 Beech Street
Holyoke, MA 01040
413 · 534 · 2033

CONCERN
An EAP Program
575 Beech Street
Holyoke, MA 01040
413 · 534 · 2625

AIDS Project
120 Maple Street
Springfield, MA 01103
413 · 737 · 2437

September 16, 2004

David P. Avakian
99 Chesterfield Road
Westhampton, MA 01027-9633

Dear David:

On behalf of River Valley Counseling Center, Inc., I am pleased to formally offer you a promotion to the new position of Assistant Director in our Psychiatric Day Treatment Program. You will report directly to Mark Richards for this position; however, I would like to meet with you on a regular basis as well to further promote our shared vision of moving our programs and services forward.

Your position is salaried at an hourly rate of $22.50, and you are scheduled to work forty (40) hours weekly; your bi-weekly pay will therefore be $1,800, less any mandated or elected deductions. This increase also includes the general 2½ % increase. Your start date has been set for Monday, October 4, 2004.

Please sign and return this letter in the enclosed, postage-paid envelope as an indication of your acceptance of this employment offer; please keep a copy of this letter for your records. Again, on behalf of the agency and the individuals we serve, congratulations on your promotion!

Cordially,

David G. Mattocks, Ph.D.
Chief Executive Officer

EXHIBIT
Richards
16
2-2-06 EV

c:    Mark Richards, Program Director
      RVCC Human Resources

I accept the terms of employment as outlined in this letter.

_____        _____
David P. Avakian                         Date

Enclosure

DGM



CIVIL ACTION NO. 05-30061-MAP

RICHARDS V. RIVER VALLEY COUNSELING CENTER, INC., ET AL.

# Exhibit 8A filed conventionally under seal

| Commonwealth of Massachusetts Division of Medical Assistance Provider Manual Series | SUBCHAPTER NUMBER AND TITLE 4 PROGRAM REGULATIONS (130 CMR 417.000) | | PAGE 4-9 |
|---|---|---|---|
| PSYCHIATRIC DAY TREATMENT PROGRAM MANUAL | TRANSMITTAL LETTER PDT-19 | | DATE 10/01/03 |

### 417.421:  Staffing Requirements

(A) Minimum Staffing Requirements.
(1) A psychiatric day treatment program with fewer than 28 participants must be staffed at a minimum by a treatment team of three qualified professionals.  At least two of the treatment team members must be employed full time by the program.  The third team member may be two part-time employees or one full-time employee.
(2) Programs with 28 participants or more must have one additional full-time professional for every eight additional participants.

(B) Composition of the Treatment Team.
(1) Each member of a treatment team must represent a different discipline from the other members of the same treatment team.
(2) At least two full-time staff members of the same treatment team must be drawn from the following disciplines:  psychiatry, psychology and/or counseling psychology, social work, psychiatric nursing, licensed mental health counseling, occupational therapy, or rehabilitation counseling.
(3) The remaining members of the same treatment team may separately represent any disciplines listed in 130 CMR 417.421(B)(2) or expressive therapy or allied health.
(4) The composition of the treatment team must be appropriate to the needs of the participants and, where possible, include participant representation.

(C) Additional Staff.  The program must ensure an overall staff-to-participant ratio of one to six by hiring additional professional or paraprofessional staff from any of the disciplines listed in 130 CMR 417.421(B)(2) and (3).

### 417.422:  Organizational Structure

(A) Program Director.
(1) A psychiatric day treatment program must designate a full-time professional as overall administrator and clinical director to be responsible for the program and charged with day-to-day responsibility over it.
(2) If the psychiatric day treatment program has more than 22 participants but less than 28, the program director must not also provide over 10 hours a week of direct service.
(3) The program director must have the following educational and work experience.
(a) Educational Requirements.  A program director must have one of the following college degrees:
(i) a master's degree in one of the disciplines set forth in 130 CMR 417.421(B)(2) and (3), except for occupational therapy and psychiatric nursing;
(ii) a master's degree in a related health field (such as health administration or public health); or
(iii) a bachelor's degree in nursing (to become a registered nurse) or in occupational therapy, unless the basic preparation took place at a master's degree level.

| Commonwealth of Massachusetts Division of Medical Assistance Provider Series | SUBCHAPTER NUMBER AND TITLE 4 PROGRAM REGULATIONS (130 CMR 417.000) | PAGE 4-10 |
|---|---|---|
| PSYCHIATRIC DAY TREATMENT PROGRAM MANUAL | TRANSMITTAL LETTER PDT-19 | DATE 10/01/03 |

(b) **Experience Requirements.** A program director must have five years of full-time, supervised clinical experience in a multidisciplinary team treatment setting, and a familiarity with the principles of the rehabilitation and recovery model. Two years of this experience must be attained after the degree required in 130 CMR 417.422(A)(3)(a) has been received, except for registered nurses and occupational therapists with a bachelor's degree who must have the required five years of experience subsequent to receiving their degrees. Occupational therapists with a bachelor's degree in occupational therapy and a master's degree in a related health field, as described in 130 CMR 417.422(A)(3)(a)(ii), must have two years of the below experience subsequent to receiving their master's degree. Experience should be broken down as follows:

    (i)  two years of work with a participant population similar to that receiving psychiatric day treatment program services;

    (ii)  one year (which may be concurrent with one of the foregoing two years) in another day treatment program; and

    (iii)  two years in an administrative/supervisory category.

(4) The program director's responsibilities include:

    (a)  hiring and firing of clinical staff;

    (b)  overall supervision of staff performance;

    (c)  establishing policies and procedures for participant treatment;

    (d)  accountability for adequacy and appropriateness of participant treatment;

    (e)  coordinating staff activities to meet program objectives;

    (f)  program evaluation; and

    (g)  establishing and supervising in-service training and education.

(B) **Medical Director.**

(1) The psychiatric day treatment program must designate a psychiatrist who meets the qualifications outlined in 130 CMR 417.423(A) as the medical director. The medical director is responsible for establishing all medical policies and protocols and for supervising all medical services provided by the staff.

(2) The role of the medical director in the program, apart from any other duties assumed under 130 CMR 417.422(B)(1), must include the following:

    (a)  participation in the ongoing multidisciplinary evaluation and review of each participant's status;

    (b)  review of physical examination reports on all participants participating in the program;

    (c)  prescription of any required medication in writing; and

    (d)  coordination of all aspects of the participant's treatment plan that involve physicians outside the program.

(3) The medical director may be either a staff member or a consultant, but must work on site for a minimum of four hours a week. In addition, arrangements must be made so that the medical director or another psychiatrist is available for telephone consultations every day the program is open.

(4) If the medical director is a member of the treatment team, his or her responsibilities must include active involvement in all aspects of treatment planning and service delivery.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 05-30061-MAP

| | |
|---|---|
| MARK A. RICHARDS, | ) |
|     Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| RIVER VALLEY COUNSELING CENTER, INC., | ) |
| VALLEY HEALTH SYSTEMS, INC., | ) |
| DAVID G. MATTOCKS AND DONNA VIENS, | ) |
|     Defendants | ) |

## **AFFIDAVIT OF MARK A. RICHARDS**

I, Mark A. Richards, first being duly sworn, do hereby depose and say:

1. I am an adult and understand the obligations of an oath.

2. Through my counsel, I asked for my entire personnel record as that term is defined in M.G.L. c. 149, § 52C. I received and reviewed those documents that were provided. I received no document relating to the reasons why River Valley Counseling Center selected me to be the only person in the Agency to lose my job on November 4, 2004.

3. I have also reviewed the Defendant River Valley Counseling Center's Response to Plaintiff's First Request for Production of Documents, which also asked for my complete personnel record as that term is defined in M.G.L. c. 149, § 52C. River Valley Counseling Center responded that in November 2004 they had produced to my counsel a copy of my personnel file.

4. The defendants at one time or another have claimed that I was not selected for termination but rather that my termination was part of a pattern of other job cuts. The loss of my job was the only one that was not related to performance or to the Agency losing a contract. That is, when a social service agency such as River Valley Counseling Center loses a contract, often persons whose jobs are funded under that contract are eliminated. That is what happened during Mr. Mattocks's tenure. The only possible exception to this based on the defendants' response to my Request for Production of Documents was the elimination of a part-time Courier position that Mr. Mattocks apparently implemented by memorandum dated March 18, 2005.

5. I note that Mr. Mattocks, as of the date March 18, 2005, was still using the title "Ph.D." after his name when it had become apparent that his Ph.D. was from a sham university which was unaccredited and which had been shut down by the FTC at the time he still claimed to have a Ph.D. from it.

6.  I note in his deposition that Mr. Mattocks stated that he discussed with me at my termination meeting getting me another job, and that he made some efforts to find another job within the organization.   He did not speak about that issue with me, nor did he seek to help me find another job within the organization.

7.  I had a great deal of experience with River Valley Counseling Center, having worked there approximately 16 years.  I had received an FMLA leave in the years 2000 and 2001. Based upon my knowledge of the personnel policies of the Agency, and my experience at the Agency, it was the Executive Director, David Mattocks, who was ultimately responsible for approving FMLA leaves and not the Human Resources Director, Donna Viens.

Signed under the pains and penalties of perjury this 7th day of June, 2006

Mark A. Richards

1                    UNITED STATES DISTRICT COURT
2                     DISTRICT OF MASSACHUSETTS
                            Western Division
3
                                   C.A. No. 05-30061-MAP
4

5       MARK A. RICHARDS                        )
                              Plaintiff         )
6       v.                                      )
                                                )
7       RIVER VALLEY COUNSELING CENTER, INC.,)
        VALLEY HEALTH SYSTEMS, INC.,            )
8       DAVID G. MATTOCKS and DONNA VIENS       )
                              Defendants        )
9

10

11

12             DEPOSITION OF:  DAVID AVAKIAN taken

13      before Jessica R. Stasio, Notary Public-Stenographer,

14      pursuant to Rule 30 of the Federal Rules of Civil

15      Procedure, at the law offices of ROBINSON DONOVAN,

16      P.C., 1500 Main Street, Springfield, Massachusetts

17      on February 16, 2006.

18

19

20      Appearances: (see page 2)

21

22

23                      Jessica R. Stasio
                Registered Professional Reporter
24

                      ACCURATE COURT REPORTING
                    1500 Main Street, Suite 1412
                       Springfield, MA 01115
                          413-747-1806

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
                     Western Division
 3
                  C.A. No. 05-30061-MAP
 4
 5    MARK A. RICHARDS
                      Plaintiff      )
 6    v.                             )
                                     )
 7    RIVER VALLEY COUNSELING CENTER, INC.,)
      VALLEY HEALTH SYSTEMS, INC.,   )
 8    DAVID G. MATTOCKS and DONNA VIENS )
                      Defendants     )
 9
10
11
12         DEPOSITION OF:  DAVID AVAKIAN taken
13    before Jessica R. Stasio, Notary Public-Stenographer,
14    pursuant to Rule 30 of the Federal Rules of Civil
15    Procedure, at the law offices of ROBINSON DONOVAN,
16    P.C., 1500 Main Street, Springfield, Massachusetts
17    on February 16, 2006.
18
19
20    Appearances: (see page 2)
21
22
23              Jessica R. Stasio
24            Registered Professional Reporter
```

**Page 3**

```
 1                    I N D E X
 2
 3    WITNESS    DIRECT   CROSS   REDIRECT   RECROSS
 4    DAVID AVAKIAN  4
 5
 6
 7
 8
 9    EXHIBITS:                    PAGE
10
11    Exhibit 1, deposition notice        32
12    Exhibit 2, letter of resignation    33
13    Exhibit 3, description of regulations  36
14
15
16
17
18
19                   MAR 16 2006
20
21
22
23
24
```

**Page 2**

```
 1    APPEARANCES
 2
 3    FOR THE PLAINTIFF:
      ROBINSON DONOVAN, P.C.
 4    1500 Main Street
      Springfield, MA 01115
 5    413-732-2301
         BY: JOHN C. SIKORSKI, ESQ.
 6
      FOR RIVER VALLEY COUNSELING CENTER, INC.:
 7    BULKLEY RICHARDSON & GELINAS, LLC
      1500 Main Street
 8    Springfield, MA 01115
      413-781-2820
 9       BY: MARY J. KENNEDY, ESQ.
10    FOR VALLEY HEALTH SYSTEMS, INC.:
      SKOLER ABBOT & PRESSER
11    One Monarch Place
      Springfield, MA 01144
12    413-737-4753
         BY: MARYLOU VARAO FABBO, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1               STIPULATIONS
 2         It was stipulated and agreed by and
 3    between counsel for the respective parties that the
 4    witness will read and sign the deposition
 5    transcript, and the sealing, filing and
 6    certification thereof are waived.
 7         It was further stipulated and agreed that
 8    all objections, except as to the form of the
 9    question, shall be reserved until the time of trial.
10    All motions to strike shall be reserved until the
11    time of trial.
12
13         DAVID AVAKIAN, Deponent, having first
14    been duly sworn, deposes and states as follows:
15
16    DIRECT EXAMINATION BY MR. SIKORSKI:
17       Q. Will you please state your name and spell
18    your last name for the record, sir?
19       A. David Avakian.  A-V-A-K-I-A-N.
20       Q. And where do you live?
21       A. In 99 Chesterfield Road, Westhampton,
22    Mass.
23       Q. And what is your date of birth, sir?
24       A. 10/6/59.
```

ACCURATE COURT REPORTING

1    Q. And where do you currently work?
2    A. Holyoke Hospital.
3    Q. And what do you do at Holyoke Hospital?
4    A. I am the Patient Care Coordinator.
5    Q. And what does that entail?
6    A. That entails being in charge of quality of
7    care and utilization review for patients in the
8    partial hospitalization program.
9    Q. What entity actually pays you?
10   A. Holyoke Hospital is -- my paycheck says
11   Holyoke Medical Center, --
12   Q. Okay.
13   A. -- and -- yeah.
14   Q. Who do you report to?
15   A. Baxter Chandler.
16   Q. And who does Mr. Chandler report to?
17   A. Matt Haas.
18   Q. That is H-A-A-S?
19   A. Yes.
20   Q. Is Mr. Haas the current CEO of River
21   Valley Counseling Center?
22   A. Yes.
23   Q. At some point in time did you work for
24   River Valley Counseling Center?

1    A. I did.
2    Q. And when did you do that, sir?
3    A. From October '80 -- 1986 to June of 2005.
4    Q. What is your educational background
5    starting with high school?
6    A. I went to Doherty High in Worcester,
7    Mass., and then I went to Assumption College for one
8    year and then transferred to the University of
9    Massachusetts where I got my Bachelor's degree in
10   Education with a concentration in counseling and
11   graduated in 1981, and then I went back to school
12   for my graduate degree, and I got my Master's degree
13   in Education with a concentration in counseling,
14   psychology in 1989.
15   Q. And where was that from?
16   A. University of Massachusetts, also.
17   Q. And are you licensed in Massachusetts?
18   A. I am.
19   Q. And what licenses do you hold?
20   A. I hold one license, licensed Mental Health
21   Counselor, and I got that in 1991.
22   Q. How does that differ from LICSW?
23   A. LICSW is -- you get that if you majored in
24   social work, and I majored in counseling/psychology,

1    and the license for that is LMHC.
2    Q. Have you held that license continuously --
3    A. Yes.
4    Q. -- since you got it?
5    MR. SIKORSKI: Off the record.
6    (Discussion off the record)
7    MS. KENNEDY: Let's go back on the
8    record.
9    Q. (by Mr. Sikorski) Do you know Mark
10   Richards?
11   A. Yes.
12   Q. And how long have you known Mark Richards?
13   A. About ten years. Nine or ten years, I
14   think.
15   Q. Did you ever work, did you ever report to
16   Mr. Richards?
17   A. Yes.
18   Q. And when did you do that?
19   A. I believe Mark Richards became my
20   supervisor in 1996, and then I reported to him from
21   '96 to '04.
22   Q. And what happened in '04?
23   A. Mark left the position in November of
24   '04.

1    Q. In November 2004 did your duties and
2    responsibilities change?
3    A. Yes.
4    Q. And let me just go back. Say to from 2000
5    until 2004 what were your duties and
6    responsibilities at River Valley Counseling Center?
7    A. I was a supervisor. My title was
8    supervisor, and I was in charge of scheduling for
9    groups for patients. When Mark was out, I would
10   make day-to-day decisions that needed to be made,
11   sort of a point person to go to as well as being a
12   clinician and taking on a clinician role.
13   Q. Okay. Did your duties and
14   responsibilities change about the first week of
15   November 2004?
16   A. Yeah. If I could back up a little bit?
17   Q. Sure.
18   A. Also during that time, I was keeping track
19   of some of the billing, the Medicare billing, and
20   sort of like checking and double checking whether we
21   were billing things out correctly. I was in charge
22   of overseeing our Medicare billing.
23   Q. And before November 2004, how would you
24   characterize your relationship with Mr. Richards?

Page 9

```
 1      A. It was good.
 2      Q. Did you have a good, solid professional
 3  relationship?
 4      A. Absolutely.
 5      Q. And did you have a good personal
 6  relationship?
 7      A. It was mainly professional. Um, on the
 8  occasions that we did things on a personal basis, it
 9  was good, yeah.
10      Q. At some point in time did you learn that
11  Mr. Richards' daughter had some health problems?
12      A. Yes.
13      Q. And do you remember when you first learned
14  that?
15      A. I don't remember when. Maybe 2000, 2001,
16  but I don't remember which year.
17      Q. And how did you learn about her health
18  problems?
19      A. Mark called me in the morning when he
20  wasn't able to come in, and he would say that his
21  daughter is sick. And then -- okay. And then that
22  was happening at a point where I think eventually he
23  had to say that "my daughter is -- she's ill", so, I
24  don't remember what year that was, though.
```

Page 10

```
 1      Q. Okay. Do you remember it was well before
 2  2004 that you learned that Mr. Richards' daughter
 3  was ill?
 4      A. Yes.
 5      Q. And what was your understanding from Mr.
 6  Richards of his daughter's illness?
 7      A. I never heard a diagnosis. I heard
 8  symptoms of headaches, dizziness, I think Mark
 9  talked about possibly something neurological going
10  on. She had a lot of tests, different tests, done
11  to try to pinpoint what was going on.
12      Q. Did he mention hallucinations?
13      A. No.
14      Q. Did he mention how this affected her
15  school?
16      A. Yes.
17      Q. What did he tell you about that?
18      A. Mark was worried that she was missing
19  school and hoping that she could go back, you know,
20  and be with her class.
21      Q. I'd like to focus on the year 2004.
22  During that year would he call you to tell you that
23  he would have to miss some morning meetings?
24      A. Yes.
```

Page 11

```
 1      Q. And was that an informal arrangement you
 2  and he worked?
 3      A. Yes.
 4      Q. And in particular, in September, October,
 5  and early November 2004, did he tell you that he had
 6  to miss work on occasions?
 7      A. Yes.
 8      Q. What did you do when he would call you and
 9  tell you that he was going to miss some work?
10      A. He let me know that his daughter was sick,
11  and sometimes he would say what symptoms she was
12  experiencing, and then he would -- he would say "I'm
13  sorry", you know, "I hope you can manage" --
14      Q. Sure.
15      A. -- "the day". And he asked what the day
16  looked like and so, you know, try to do some
17  troubleshooting if we needed to depending on what
18  the day was going to look like.
19      Q. At some point in time did you learn that
20  Mark had asked for family and medical leave?
21      A. Yes.
22      Q. And when did you learn that?
23      A. I think there were two different times, so
24  I don't remember the first time. It might have been
```

Page 12

```
 1  early 2000's.
 2      Q. Yeah.
 3      A. And then there was another time in '04.
 4      Q. And how did you learn in '04 that he was
 5  taking family medical leave?
 6      A. He told me.
 7      Q. And do you remember just what he told you?
 8      A. He told me he was applying for family
 9  leave, and he would be using it as he does now, like
10  sort of intermittently when needed.
11      Q. And did you receive any official
12  notification from anyone that that leave had been
13  granted?
14      A. No.
15      Q. Did you learn at some time that Mark had
16  lesions removed from his face and neck?
17      A. I didn't know they were lesions.
18      Q. Did you know that he had had some surgery
19  on his face and neck?
20      A. Yes.
21      Q. And could you see wounds on his face and
22  neck from time to time?
23      A. Yeah. I saw red and bandages at different
24  times.
```

Page 13

1  Q. Did you ever learn that this was skin
2  cancer?
3      A. I learned about it when I read about it in
4  the newspaper.
5      Q. Okay. Did he ever indicate to you that --
6  strike that. Did you ever discuss with him what was
7  going on with these lesions?
8          MS. KENNEDY: Objection to the form.
9      Q. (by Mr. Sikorski) You can answer.
10     A. There was one time where he had a
11 procedure done, and he -- he told me that the
12 procedure did not go well.
13     Q. Did he say why it did not go well?
14     A. I think there was -- he got infections
15 afterwards. It was -- I think he had to go back,
16 and they had to patch it up again.
17     Q. In the year 2004 and near the time that he
18 was terminated, did he tell you he was scheduled for
19 more surgery?
20     A. No.
21     Q. Did you at some point in time learn that
22 Mr. Mattocks was considering eliminating Mr.
23 Richards' position and terminating him?
24     A. Can you rephrase -- say that again.

Page 14

1         THE COURT REPORTER: Q: Did you at
2  some point in time learn that Mr. Mattocks was
3  considering eliminating Mr. Richards' position
4  and terminating him?
5      A. No.
6      Q. How did you learn that Mark Richards was
7  going to be terminated?
8      A. I learned that morning that it was going
9  to happen.
10     Q. Okay. And can you tell me how you learned
11 that?
12     A. David and I spoke that morning about a
13 meeting, sort of an emergency meeting that was going
14 to be held at 11:00, 12:00, and at the meeting I
15 heard officially.
16     Q. Let me back up.
17     A. Um-hum.
18     Q. When you refer to David, who are you
19 referring to?
20     A. Oh, David Mattocks, yes.
21     Q. And do you remember this being on a
22 Thursday? You may not remember that, but --
23     A. I think it was a Thursday.
24     Q. Okay.

Page 15

1      A. November 4th.
2      Q. Do you remember him -- what do you
3  remember Mr. Mattocks telling you that morning?
4      A. That we were going into a meeting, and
5  Mark was going to tell people he was leaving and
6  that I would be in charge.
7      Q. And was that the first time that you had
8  been told that you were going to be in charge?
9      A. Yes.
10     Q. Was that surprising to you?
11     A. No.
12     Q. And why not?
13     A. That -- the week before that, David
14 Mattocks and I had a conversation about -- David
15 asked me if the leadership changed would I stay at
16 River Valley. So that had a lot -- lot to think
17 about what that meant.
18     Q. Okay. Was that meeting in person or over
19 the phone?
20     A. In person.
21     Q. And was anybody else there?
22     A. No.
23     Q. And do you remember how you came to this
24 meeting, who set it up?

Page 16

1      A. David called me and asked if -- whether I
2  was available to meet with him on Friday or Monday,
3  and --
4      Q. Okay. That would be the Friday or Monday
5  before the Thursday meeting?
6      A. Yes.
7      Q. And do you remember if it was on a Friday
8  or Monday?
9      A. It was Friday.
10     Q. And did you have the meeting in his
11 office?
12     A. In his office.
13     Q. And when you went in there, what did he
14 say to you, and what did you say to him?
15     A. He said -- it was a short meeting, and he
16 said that this is going to be a vague -- I'm not
17 sure his words were vague, but this is going to be a
18 vague conversation, but I just want to get a sense
19 from you sort of like my commitment to River
20 Valley. And he said if the leadership changed,
21 would I -- so he asked me that question directly, if
22 the leadership changed would I still stay. I told
23 him that I was committed to the work and --
24     Q. And did he say anything else to you?

Page 17

1    A. He said that there was going to be changes
2    in the agency, and I believe I asked what kind of
3    changes. And it wasn't specific at all. He didn't
4    get specific with me.
5    Q. And was that the first conversation about
6    changes in the agency's leadership that you had had
7    with David Mattocks?
8    A. Yes.
9    Q. And was this the first time that you had
10    heard David Mattocks talk about changes in the
11    leadership?
12    A. Prior to that -- in the leadership, yes.
13    Yes.
14    Q. Now, between the time of that meeting on
15    Friday and the Thursday meeting, did you have any
16    other conversations with Mr. Mattocks?
17    A. Mr. Mattocks came to a meeting with our
18    team that I worked in. He spoke about his vision
19    for the agency.
20    Q. And was that the Thursday morning meeting?
21    A. No, no. This was before that.
22    Q. Okay. Do you remember what day of the
23    week that was?
24    A. No.

Page 18

1    Q. Okay. And what did he say about what was
2    his vision of the agency?
3    A. Well, he was relatively new to the
4    agency. I think he probably came in late summer, I
5    don't remember exactly when, and he was talking
6    about his vision for the agency and wanting to see
7    us grow and really wanting day treatment to grow.
8    Q. If we can go back again to Thursday, then,
9    did you have any conversations with Mr. Mattocks
10    that day about what your role was going to be in the
11    agency?
12    A. Yeah. I didn't -- I asked him what is my
13    role going to be, and he was vague. And then I'd
14    say "so am I acting director, am I" -- and, um, he
15    said, "yeah", he said, "but you're in charge".
16    Q. Did you ask for clarification of that?
17    A. Not -- not on Thursday. Not Thursday.
18    Q. Okay. At some other time?
19    A. Oh, sure. Oh, sure.
20    Q. And when was the next time that you spoke
21    with Mr. Mattocks to clarify your role?
22    A. Probably the next week. And we probably
23    had a few meetings about it.
24    Q. Okay. And what was the sum and substance

Page 19

1    of those meetings?
2    A. Well, we were talking about my title, what
3    would my title be and what my job responsibility
4    would be, and my title remained Assistant Program
5    Director, and the role was clarified as being --
6    David used the words "player coach", which is sort
7    of like being the manager and having a clinical
8    role.
9    Q. So your title would be Assistant Program
10    Director, but you would have more responsibilities
11    than you had before?
12    A. Yes.
13    Q. And what additional responsibilities would
14    you have?
15    A. Overseeing the budget and making sure we
16    were in compliance with every regulatory agency out
17    there.
18    Q. And did you, in fact, assume those
19    responsibilities --
20    A. Yes.
21    Q. -- and carry those out --
22    A. Yes.
23    Q. -- to the best of your ability?
24    A. Yes.

Page 20

1    Q. Between the time of your meeting with
2    Mr. Mattocks on the Friday and the meeting on the
3    following Thursday, did you speak with Jeff Kassis
4    at all about potential changes at the agency?
5    A. I don't believe so.
6    Q. And during that period of time did you
7    speak with Mr. Richards about potential changes in
8    the agency?
9    A. No.
10    Q. At any time did Mr. Mattocks give you a
11    copy of the regulations governing psychiatric day
12    treatment programs?
13    A. No.
14    Q. And at any time before the Thursday
15    meeting did you and Mr. Mattocks discuss the
16    requirements of the regulations regarding what type
17    of leadership team was needed?
18    A. No.
19    Q. Now, after the Thursday meeting, did you
20    and Mr. Mattocks ever discuss the regulations of the
21    Commonwealth of Massachusetts regarding the
22    requirements for a leadership team of the program?
23    A. Yes.
24    Q. And when did you have those discussions?

1    A. Within the week after Mark left.
2    Q. Did one or either of you pull out the
3  regulations --
4    A. I did.
5    Q. -- for you to review? And what was the
6  sum and substance of those discussions?
7    A. I wanted to go over the regulations line
8  by line with David and said whatever -- and I
9  pointed to whatever this position that I am now in
10  evolves into, I want to be clear that we are meeting
11  the regulations.
12    Q. And what did he say to you?
13    A. He agreed that we needed to do that.
14    Q. What did you understand was going to be
15  Mr. Kassis' role after Mr. Richards left?
16    A. He would be my supervisor.
17    Q. And what did you understand Mr. Kassis'
18  sort of responsibilities were going to be?
19    A. That he would assume the role of Program
20  Director.
21    Q. In addition to his other responsibilities?
22    A. In addition.
23    Q. Did you understand that Mr. Kassis was
24  going to spend any more of his time at the

1  psychiatric day treatment program than he had before
2  Mr. Richards left?
3    A. A little bit more.
4    Q. And what do you mean by a little bit?
5    A. Few hours a week.
6    Q. Going back to that Thursday meeting, did
7  Mr. Mattocks tell you that Mr. Richards was
8  voluntarily quitting or had been terminated?
9    A. Say that again.
10    Q. Going back to the Thursday meeting, --
11    A. Thursday meeting.
12    Q. -- did Mr. Mattocks tell you Mr. Richards
13  was leaving voluntarily or he was terminated?
14    A. He didn't say.
15    Q. On that Thursday did you speak with Mark?
16    A. Yes.
17    Q. And was this in person?
18    A. Yes.
19    Q. And what did you say to him, and what did
20  he say to you?
21    A. Well, in the meeting -- I didn't talk to
22  him before the meeting, I don't believe. In the
23  meeting he said he -- he said he was resigning
24  because he needed to take care of his daughter, and

1  he would be leaving today, that day. He said that,
2  and he also said -- can't remember his words -- that
3  this was not his idea. And I don't remember what he
4  said, but I got the impression that -- so I was
5  hearing two things. He resigned, and he was angry
6  about it.
7    Q. Did you later accompany Mark when he
8  cleaned out his office --
9    A. Yes.
10    Q. -- of personal things? And was that on
11  that Saturday?
12    A. That Saturday.
13    Q. And at that time did you and he discuss
14  his leaving the agency?
15    A. Not, not directly. I mean I talked -- I
16  told him about how sad I was that he was leaving,
17  and he again gave me the impression he was angry
18  about the fact that he was leaving.
19    Q. At some point in time did you learn that
20  Mr. Richards had challenged Mr. Mattocks' vision of
21  the leadership team at the psychiatric day treatment
22  program?
23      MS. KENNEDY: Objection --
24    A. No.

1      MS. KENNEDY: -- to form. Go ahead.
2    A. No.
3    Q. At any point in time did you learn that
4  Mr. Richards thought that the way Mr. Mattocks was
5  going to restructure the agency violated the
6  regulations?
7    A. No.
8    Q. Before the Thursday meeting, did Mr.
9  Mattocks ever ask you your view of Mr. Richards'
10  competence as a clinician or a manager?
11    A. No.
12    Q. At any time before the Thursday meeting
13  did Mr. Mattocks ask your view of Mr. Richards'
14  value to the program?
15    A. No.
16    Q. In the course of your working with
17  Mr. Richards, did you have a chance to observe his
18  clinical skills?
19    A. Oh, yes.
20    Q. And did you have a chance to observe his
21  managerial skills?
22    A. Yes.
23    Q. And did you have a chance to understand
24  his performance as a financial manager?

Page 25

1    A. Yes.
2    Q. And as a financial reporter?
3    A. Um-hum.
4    Q. Answer yes or no.
5    A. Yes.
6    Q. And what was your opinion of Mr. Richards'
7  skills as a clinician?
8    A. He was a good clinician.
9    Q. And your opinion of his skills as a
10  manager?
11    A. He was a good manager.
12    Q. And your opinion of his skills as a
13  financial manager?
14    A. He was a good financial manager.
15    Q. And your opinion of his financial
16  reporting?
17    A. Good.
18    Q. And his commitment to ethics and
19  compliance with regulations?
20    A. Good.
21    Q. Did you know that he had taught at the
22  University of Connecticut?
23    A. Yes.
24    Q. And did you view that teaching as of some

Page 26

1  value to the organization?
2    A. No, not directly.
3    Q. How about indirectly?
4    A. Hadn't thought about it.
5    Q. How long after Mr. Richards left the
6  agency did you leave the agency?
7    A. I left in June of '05, so that would be
8  eight months, maybe.
9    Q. And where did you go to work after that?
10    A. Carson Center.
11    Q. And where is that?
12    A. I worked up in Greenfield.
13    Q. And what type of facility is that?
14    A. It's a mental health clinic.
15    Q. And what did you do at the Carson Center?
16    A. I was an outpatient therapist.
17    Q. And how long did you hold that position?
18    A. Eight weeks.
19    Q. And then what happened?
20    A. And then a position became open at Holyoke
21  Hospital.
22    Q. And when you went to the Carson Center,
23  did you know this position might open?
24    A. No.

Page 27

1    Q. How did you learn about the position?
2    A. It was in the newspaper.
3    Q. Oh.  Is that the current position you
4  hold?
5    A. No.
6    Q. Okay.
7    A. The position in the newspaper was
8  clinician position.
9    Q. Clinician where?
10    A. At Holyoke Hospital.
11    Q. In what program?
12    A. Partial hospitalization.
13    Q. And who was running that partial
14  hospitalization program at that time?
15    A. Baxter Chandler.
16    Q. And did Mr. Chandler hire you for that
17  position?
18    A. No.
19    Q. But did you apply for that position?
20    A. I did.
21    Q. And then what happened?
22    A. Well, I did not get that position.  Yet
23  then another position became open that they told me
24  about, which was the position I'm in now.

Page 28

1    Q. And did they tell you about that at the
2  interview for the first position?
3    A. No.
4    Q. Was there some time gap?
5    A. Well, when I learned that I did not get
6  the clinician position, I learned about this other
7  position opening up.
8    Q. And who hired you?
9    A. Baxter.
10    Q. Okay.  At some point in time while you
11  were working at River Valley, did Mr. Mattocks take
12  a leave of some sort?
13    A. Yes.
14    Q. And for how long was he on leave while you
15  were working there, if you recall?
16    A. It was at the tail end of my tenure there,
17  so I believe he was gone maybe five or six weeks.
18    Q. Why did you leave River Valley Counseling
19  Center?
20    A. I wanted to pursue a different
21  professional direction, and I had some personal
22  reasons.
23    Q. Just focusing on the professional reasons,
24  what were they?

Condenseit

Page 29

1    A. I wanted to work doing more clinical work
2  than I was doing. My job became more of financial
3  manager than I had anticipated. And this position
4  opened up at the Carson Center that was doing
5  primarily outpatient therapy.
6    Q. So after Mark left, you were doing more of
7  the administrative piece --
8    A. Yes.
9    Q. -- of the agency? And was Mr. Kassis
10  doing more of the clinical oversight, or were you
11  doing both?
12    A. We both were doing both, yeah.
13    Q. Okay. No clear-cut line of authority?
14      MS. KENNEDY: Objection to form.
15    A. Well, he was the authority -- he was my
16  authority, yeah.
17    Q. But in terms of who was actually doing the
18  work, the clinical piece and the administrative
19  piece, both of you were doing that?
20      MS. KENNEDY: Objection to form. Go
21  ahead.
22    A. Yes.
23    Q. Did Mr. Mattocks ever tell you his
24  rationale for eliminating Mr. Richards' position?

Page 30

1    A. He thought that -- yeah, he -- yes. To
2  some extent, he did.
3    Q. What did he say?
4    A. That he wanted to make changes in the
5  agency, managerial changes in the agency, and this
6  was one of them. And he felt that the position, the
7  program could run with me as taking on a managerial
8  role. I think he felt that -- I don't know what he
9  felt, but I got the impression that Mark and I were
10  sort of both doing some administrative work, and I
11  think he thought that was overkill.
12    Q. After Mark Richards left, did you prepare
13  a memorandum or report of costs and savings that the
14  agency could attain?
15      MS. KENNEDY: Objection --
16    A. Did I prepare it?
17      MS. KENNEDY: -- to form.
18    Q. Yes.
19    A. No.
20    Q. While Mr. Mattocks was executive director,
21  did you ever see an analysis of potential cost
22  savings the agency could undergo in writing?
23    A. No.
24    Q. Were you ever asked to prepare in writing

Page 31

1  an analysis of cost savings the program you worked
2  in could attain?
3    A. No.
4    Q. Did you attend managers meetings?
5    A. Yes.
6    Q. Did you ever see any analyses in writing
7  by any other program manager of cost savings that
8  their program could attain?
9    A. Not specifically cost savings.
10    Q. Did you ever prepare an analysis in
11  writing of ways that your program could improve
12  revenues?
13    A. Yes.
14    Q. Okay. Did you prepare such a report?
15    A. Oh, yes.
16    Q. And when did you prepare it?
17    A. Um, monthly.
18    Q. Okay. And was this part of monthly
19  reports you made to Mr. Mattocks?
20    A. Yeah. And we were looking at how to
21  expand day treatment program, and I had some ideas
22  about how to do that.
23    Q. How many years did you have working in day
24  treatment programs?

Page 32

1    A. 18 and a half years.
2      MR. SIKORSKI: Just let me have this
3  marked as exhibit 1.
4      (Exhibit 1; so marked)
5    Q. Do you recognize exhibit 1?
6    A. Yes.
7    Q. And this is your notice of taking
8  deposition. Were you also served a subpoena, do you
9  know?
10    A. Yes.
11    Q. And that asked you to bring some records
12  with you?
13    A. Yes.
14    Q. And do you have any such records?
15    A. No.
16    Q. Okay.
17      MS. KENNEDY: In response to the
18  subpoena --
19      MR. SIKORSKI: Oh, --
20      MS. KENNEDY: -- that was served?
21      MR. SIKORSKI: -- yeah. I was going
22  to mark that.
23      MS. KENNEDY: Yeah.
24    A. We -- we -- I brought in a letter of

Page 33

1   resignation that Mark gave to me.
2       Q. Oh, okay.
3           MR. SIKORSKI:  Could I have this
4   marked as exhibit 2.
5           (Exhibit 2; so marked)
6       Q. Do you recognize exhibit 2?
7       A. Yes.
8       Q. And what is it?
9       A. It's a letter of resignation that Mark
10  wrote.
11      Q. And was that distributed on November 4th?
12      A. Yes.
13      Q. Was it handed out to people, if you
14  remember?
15      A. I got one in my mailbox.
16      Q. Okay.  At any time in 2004 or 2005, did
17  you speak with anyone at the Commonwealth of
18  Massachusetts Division Of Medical Assistance about
19  the requirements of the regulations for the
20  leadership team of the day treatment program?
21      A. No.
22      Q. Did you speak with any other day treatment
23  program to see how they staffed their leadership?
24      A. Oh, yes.

Page 34

1       Q. And when did you do that?
2       A. I went to -- on a monthly basis, sometimes
3   more than that.
4       Q. Was that before Mark left or after Mark
5   left?
6       A. After.
7       Q. Did you ever speak with anybody in your
8   trade association about the requirements for
9   leadership team?
10      A. Yes.
11      Q. And who did you speak to?
12      A. Other day treatment directors.  Names
13  don't come to me right now.
14      Q. Okay.  Does any name come to you?
15      A. No.  No.  Andy.  Someone, actually, named
16  Andy.  Um, I can't remember his last name.
17      Q. Did Mr. Richards tell you -- I'm sorry.
18  Strike that.  Did Mr. Mattocks ever tell you that he
19  had called anyone at the Commonwealth of
20  Massachusetts to review the requirements of the
21  regulations for the relationship team?
22      A. He did not tell me that.
23      Q. Did he ever ask you to call anyone at the
24  Commonwealth of Massachusetts to get an

Page 35

1   interpretation of the regulations?
2       A. Not at the Commonwealth.  He told me to go
3   to the trade association.
4       Q. And what was that trade association?
5       A. The day treatment trade association.  It's
6   -- the initials are MSA -- I think Massachusetts
7   Substance Abuse And Counseling.  It's in Natick.
8       Q. And do you remember who you spoke to
9   there?
10      A. Yeah.  In fact, when you asked me that
11  other question, I was trying to think of the head --
12  that person, what her name is.  Because I spoke with
13  her all the time.  She is like the chairman of the
14  subcommittee.  The name's not coming.
15      Q. Is she a professional staff person, or is
16  she --
17      A. Yes.  She works for the trade association.
18      Q. Okay.  And what did you say to her, and
19  what did she say to you?
20      A. Oh, we had many, many conversations --
21      Q. Okay.
22      A. -- about regulations in general.
23      Q. Did Mr. Kassis ever tell you that he had
24  called the Commonwealth of Massachusetts to review

Page 36

1   the regulations regarding the leadership team?
2       A. No.
3       Q. Did Mr. Kassis ever ask you to call the
4   Commonwealth of Massachusetts to get an
5   interpretation of the regulations regarding the
6   leadership team of the day treatment program?
7       A. No.
8       Q. Did you ever sit down and go over the
9   regulations with Mr. Kassis?
10      A. Yes.
11      Q. And did you do that separately from Mr.
12  Mattocks or with, in a meeting with Mr. Mattocks?
13      A. I think we did it both ways, separately
14  and with Mr. Mattocks.
15          MR. SIKORSKI:  I am going to have
16      this marked as exhibit 3.
17          (Exhibit 3; so marked)
18      Q. Do you recognize exhibit 3?
19      A. It's a -- yes.
20      Q. Okay.  And what do you recognize it as?
21      A. It's an old description of a portion of
22  the regulations for day treatment programs.
23      Q. Is there some writing on exhibit 3?
24      A. There's two -- yes.

Page 37

1    Q. Okay. And do you recognize the writing --
2    A. Yes.
3    Q. -- that's on exhibit 3? In the upper
4 left-hand part of page 1 of exhibit 3, whose writing
5 is that?
6    A. That is Phyllis Boothroyd's handwriting
7 who was the director before Mark.
8    Q. And then to the right, whose handwriting
9 is that?
10    A. That is mine.
11    Q. Can you just read into the record what it
12 says?
13    A. Sure. "Mark, thanks for these regs. I
14 made copies of some of the material and read it in
15 its entirety".
16    Q. Do you remember when Mr. Richards gave
17 these to you?
18    A. No.
19    Q. For the birth of your child you took
20 paternity leave, did you not?
21    A. Yes. Family -- well, they didn't call it
22 that. It's family leave, yeah.
23    Q. But the birth of your second child, or was
24 it your first?

Page 38

1    A. My first child I took family leave, and my
2 second child I did as well.
3    Q. Was Mr. Richards supportive of your taking
4 family leave?
5    A. Yes.
6    Q. How old are you in relation to
7 Mr. Richards?
8    A. I don't know hold Mark is.
9    Q. Do you believe he's older than you?
10    A. Yes. Eight, eight nine years older,
11 maybe.
12        MR. SIKORSKI: What I'd like to do
13    now is take a short break and see if we have
14    much more.
15        (A break was taken)
16    Q. (by Mr. Sikorski) Mr. Avakian, have you
17 given a written statement on this Mark Richards'
18 matter?
19    A. No.
20    Q. Okay. And have you given a recorded
21 statement?
22    A. No.
23    Q. Okay. At any time did Mr. Mattocks tell
24 you that he had handled the termination of Mr.

Page 39

1 Richards with due regard for his years of experience
2 at the agency?
3    A. Did he say that?
4    Q. Um-hum.
5    A. No, he did not say that.
6    Q. Mr. Avakian, at the end of a deposition I
7 like to give a witness a chance to clarify an
8 answer, add anything you'd like to. I'd be happy to
9 give you that opportunity now.
10    A. I think I answered the questions to the
11 best of my ability.
12        MR. SIKORSKI: Okay. Well, I have no
13    further questions of this witness at this time.
14        MS. KENNEDY: I have no questions.
15        MS. FABBO: I have no questions.
16
17        (The deposition was concluded)
18
19
20
21
22
23
24

Page 40

1        SIGNATURE/ERRATA SHEET
2    I have read the foregoing, and it is a true
3 transcript of the testimony given by me at the
4 taking of the subject examination with the following
5 corrections/changes, if any:
6
7 _____    _____
8 date            DAVID AVAKIAN
9
10 PAGE  LINE  CHANGE      REASON
11 -------------------------------------------------
12 -------------------------------------------------
13 -------------------------------------------------
14 -------------------------------------------------
15 -------------------------------------------------
16 -------------------------------------------------
17 -------------------------------------------------
18 -------------------------------------------------
19 -------------------------------------------------
20 -------------------------------------------------
21 Mark A. Richards v. River Valley Counseling Center,
   Inc., et al
22 Date Taken: February 16, 2006
   jrs
23
24

1   COMMONWEALTH OF MASSACHUSETTS
    Hampden, ss.
2

3          I, JESSICA R. STASIO, a Notary Public in and
    for the Commonwealth of Massachusetts, do certify
4   that pursuant to notice there came before me on the
    16th day of February, 2006, at the law offices of
5   ROBINSON DONOVAN, P.C., 1500 Main Street,
    Springfield, Massachusetts, the following named
6   person, to wit:  DAVID AVAKIAN, who was by me duly
    sworn to testify to the truth and nothing but the
7   truth as to his knowledge touching and concerning
    the matters in controversy in this cause; that he
8   was thereupon examined upon his oath and said
    examination reduced to writing by me; and that the
9   deposition is a true record of the testimony given
    by the witness, to the best of my knowledge and
10  ability.

11         I further certify that I am not a relative
    or employee of counsel or attorney for any of the
12  parties nor a relative or employee of such parties,
    nor am I financially interested in the outcome of
13  the action.

14         WITNESS MY HAND, this 7th day of March, 2006.

15         -------------------
                Jessica R. Stasio
16
    My Commission expires:
17  March 15, 2007

18

19

20

21

22

23

24

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,          )
            Plaintiff      )
VS.                        )
RIVER VALLEY COUNSELING CENTER, )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
            Defendants     )

DEPOSITION OF HANK PORTEN, taken
before Debra Vance, Notary Public Stenographer,
pursuant to the provisions of Rule 30 of the
Massachusetts Rules of Civil Procedure, at the
offices of ROBINSON DONOVAN, P.C., 1500 Main
Street, Springfield, Massachusetts on December 9,
2005, commencing at 10:00 a.m.

APPEARANCES: (See Page 2)

Debra A. Vance
Notary Public Stenographer

---

I N D E X

WITNESS          DIRECT     CROSS     REDIRECT   RECROSS

Hank Porten      •4

• By Mr. Sikorski

EXHIBITS:                                        PAGE:

Exhibit 1, notice of deposition.............30
Exhibit A, copy of protective order..........41

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
    BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
    BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
    BY:  MARY LOU FABBO, ESQ.

---

4

            HANK PORTEN, Deponent, having been
satisfactorily identified and duly sworn, deposes
and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI

    Q.    Mr. Porten, could you please state
your name and spell your last name for the
record?

    A.    Hank Porten, P-O-R-T-E-N.

    Q.    And what's your residential address?

    A.    23 Dicsal, D-I-C-S-A-L, Lane,
Holyoke, Massachusetts 01040.

    Q.    Do you know a David Mattocks?

    A.    Yes, I do.

    Q.    Did you have any role in hiring David
Mattocks?

    A.    Yes, I did.

    Q.    What role did you have in hiring
David Mattocks?

    A.    He was presented as a recommended
candidate, and I interviewed him at that time.

    Q.    And for what position, sir?

    A.    For the executive director of River
Valley Counseling.

1   Q.    You use the term "recommended
2  candidate." What do you mean by that?
3        A.    There was a screening process before
4  that and other candidates, I'm sure, presented
5  themselves.  I didn't see those.
6        Q.    Who conducted that screening process?
7        A.    That would have been our human
8  resources director Mary Kelleher.
9        Q.    Anybody else other than Ms. Kelleher?
10       A.    In the screening process, not that I
11 recall.
12       Q.    Did you use any outside company to
13 assist in getting a candidate to fill this
14 position?
15       A.    Not that I recall.
16       Q.    Did you just review Mr. Mattocks's
17 credentials or the credentials of other
18 candidates?
19       A.    I believe there was another
20 candidate, so it would be both.
21       Q.    Do you know who the candidate was?
22       A.    I don't recall his name.
23       Q.    Why were you searching to fill this
24 position, what were the circumstances under which

1        A.    Not at the time.
2        Q.    Did he present himself as having a
3  Ph.D.?
4        A.    No, he did not.
5        Q.    Did he tell you about his level of
6  education?
7        A.    Actually, I was more interested in
8  his level of work experience.  I don't recall if
9  we talked about his education.
10       Q.    What level of education were you
11 searching for at that position?
12       A.    I'm not sure we had it even as a
13 listed item as for education.  My interest was in
14 work experience.
15       Q.    What did he tell you about his
16 position at the Brattleboro retreat?
17       A.    That he was the manager there.
18       Q.    Did he tell you the circumstances
19 under which he left?
20       A.    I don't recall.
21       Q.    Did you ask him?
22       A.    It would have been normal for me to
23 do that.  I just don't recall if I did or if he
24 answered it.

6

1  the position --
2        A.    The previous senior manager for River
3  Valley left and went to look for another job.
4        Q.    And what other job?
5        A.    He was, I believe, a mental health
6  hospital in the state of Washington, I believe.
7        Q.    And who was that?
8        A.    Mr. Andy Phillips.
9        Q.    Did you have an in-person interview
10 with Mr. Mattocks?
11       A.    Pardon me?
12       Q.    Did you have an in-person interview
13 with Mr. Mattocks?
14       A.    Yes, I did.
15       Q.    Where did that occur?
16       A.    I believe it happened initially in my
17 office.
18       Q.    Do you know how long that interview
19 lasted?
20       A.    Not exactly.
21       Q.    Did you have a resume?
22       A.    Yes, I did.
23       Q.    Do you remember him presenting
24 credentials of a Ph.D from Parkwood University?

8

1        Q.    Do you recall his position
2  immediately before coming to work for River
3  Valley?
4        A.    That was in, I believe, Greenfield.
5  I don't recall the circumstances.  I don't recall
6  anything negative.
7        Q.    Do you remember how large that
8  position was in terms of level of responsibility?
9        A.    It was smaller, I believe, than River
10 Valley, but I don't recall the size.
11       Q.    Did you expect Mr. Mattocks to have
12 responsibility for running certain programs in a
13 financially sound way?
14       A.    Yes.
15       Q.    Was that an important credential for
16 you?  Let me rephrase the question.
17             Was it important to you that he
18 demonstrate a level of experience in running
19 programs in a financially sound manner?
20       A.    Yes.
21       Q.    And did you satisfy yourself that he
22 had been able to do that?
23       A.    The answer is, yes, I believe he had
24 the experience to do that.

1  Q.  And would you also expect him to be
2  able to have some moderate level of financial
3  responsibility in his own private affairs?
4      MS. KENNEDY:  Objection to form.
5      THE WITNESS:  I didn't expect -- I
6  didn't ask him anything about his private
7  affairs.
8      Q.  (By Mr. Sikorski) Did he indicate to
9  you that he recently filed for bankruptcy before
10  he applied for the position at River Valley?
11      A.  Not that I recall.
12      Q.  Would it make a difference to you in
13  terms of hiring him if you would have known that
14  he had $45,000 in credit card debt, had his car
15  repossessed, and had an additional debt of
16  $12,000 of student loans that he was unable to
17  pay?
18      MS. KENNEDY:  Objection to form.
19      THE WITNESS:  I don't know what I
20  would answer, because I didn't ask the
21  question.
22      Q.  (By Mr. Sikorski) Do you know what
23  type of background check was done on
24  Mr. Mattocks?

10

1      A.  Not specifically, no.
2      Q.  Did Mr. Mattocks discuss with you his
3  intention to terminate Mark Richards before that
4  happened?
5      A.  He did not discuss a name with me,
6  no.
7      Q.  Did he discuss with you a position?
8      A.  He discussed with me that there would
9  be a reduction of positions, yes.
10      Q.  Now, do you know approximately when
11  he had that discussion with you?
12      A.  Possibly late fall, early winter.
13      Q.  What do you recall him telling you
14  about a possible reduction of force?
15      A.  That he was continuing to work on
16  being efficient, making the organization as
17  efficient as possible, that there was some
18  duplication of work, and that he thought he could
19  reduce some of that duplication.
20      Q.  Did he indicate to you how many
21  positions he was looking to reduce?
22      A.  No, he did not.
23      Q.  Did he just talk to you about one
24  position?

1      A.  He talked about positions. I don't
2  know a number.
3      Q.  Positions plural?
4      A.  I believe so, yes.
5      Q.  Any other cost saving measures other
6  than reducing positions?
7      A.  Not that I specifically recall.
8      Q.  Now, do you recall Mr. Mattocks
9  presenting you with anything in writing regarding
10  his plan to reduce expenses?
11      A.  No, I do not.
12      Q.  Again, I'm just going to ask you, do
13  you recall him sending you an e-mail ahead of
14  time with any specific figures or plans?
15      A.  Not that I recall.
16      Q.  You don't recall a memorandum from
17  him?
18      A.  No, I don't.
19      Q.  No spreadsheet or financial analysis
20  or anything like that?
21      A.  No, I do not.
22      Q.  Was this discussion you had with him
23  about reducing positions part of a regular
24  process of review you had with him?

12

1      A.  Yes.
2      Q.  Would you describe to me that process
3  of review?
4      MS. KENNEDY:  Objection to the form.
5      THE WITNESS:  We met on a fairly
6  regular basis. And we talk about in
7  general direction, the organization, in
8  general financial or billing issues that we
9  need to address. It would be at a very
10  high level. It was not specific in any
11  detail.
12      Q.  (By Mr. Sikorski) Again, what do you
13  mean by "at a high level," sir?
14      A.  The general approach, are we making
15  the economic or volume goals that we targeted,
16  yes or no, is there any issues that we can
17  improve on. It would be that kind of thing.
18      Q.  Were these meetings between yourself
19  and Mr. Mattocks, or did you have other members
20  of your staff there?
21      A.  Most frequently other members of the
22  staff, but some occasionally would be with
23  Mr. Mattocks alone.
24      Q.  At a particular meeting where you

**15**

1  discussed about reducing positions, do you recall
2  if anyone else was at that meeting?
3       A.     I do not.
4            MS. KENNEDY:    Objection.
5       Q.     (By Mr. Sikorski) Would Ms. Kelleher
6  typically be involved in these discussions when
7  it involved the reduction in force?
8       A.     Not with my office.
9       Q.     What did you say to Mr. Mattocks when
10 he told you he was thinking about reducing
11 positions?
12      A.     I don't remember the exact words.
13      Q.     In general?
14      A.     In general, I would think continue to
15 do the work. We need to save expenses in this
16 organization.
17      Q.     At some point in time, did anyone
18 discuss with you offering a severance package to
19 Mr. Richards?
20            MS. KENNEDY:    Offering, is that the
21      question you asked?
22            MR. SIKORSKI:   Uh-huh.
23            THE WITNESS:    I vaguely remember a
24      discussion about being offered a severance

**14**

1       package for the employee or employees that
2       were being reduced.
3       Q.     (By Mr. Sikorski) What do you remember
4  about that conversation?
5       A.     Just that I said if we can work that
6  out that's acceptable to me.
7       Q.     Do you recall there being a
8  discussion about Mr. Richards getting a more
9  substantial severance package than others at his
10 level?
11      A.     I do not, no.
12      Q.     What individual in the general
13 Holyoke Hospital/Holyoke Medical Center
14 organization would have the most say about the
15 level of severance benefits provided to departing
16 employees?
17            MS. KENNEDY:    Objection to form.
18            THE WITNESS:    Well, are you asking
19      what we do at Holyoke Medical Center?
20      Q.     (By Mr. Sikorski) In all the
21 affiliated Holyoke Medical Center entities.
22      A.     I would think that Mary Kelleher
23 would be involved at some level of that
24 discussion. But I would rely pretty heavily on

**15** (right column)

1       the senior manager of the various affiliate to
2       concur or to disagree.
3       Q.     At some point in time, did you learn
4  that there was an allegation that Mr. Mattocks
5  had a Ph.D. from a non-accredited university?
6            MS. KENNEDY:   Objection. To the
7       extent that other than anything you've been
8       told by counsel, go ahead and answer if you
9       can.
10           THE WITNESS:    Yes, I recall a
11      conversation about the Ph.D.
12      Q.     (By Mr. Sikorski) And what
13 conversation do you recall?
14      A.     Mr. Mattocks called me and indicated
15 that there was some concern about the Ph.D.
16 credential that he had, and I asked him what that
17 was. He said it was from a non-accredited
18 organization and that he wanted me to know before
19 it became a more public issue. And my response
20 was, "I didn't hire you for a Ph.D. I hired you
21 for your management experience."
22      Q.     Did you follow up at all on this
23 allegation about a non-accredited Ph.D.?
24      A.     It was not an important issue for me.

**16**

1       Q.     Is credentials an important issue in
2  health care facilities in general?
3            MS. KENNEDY:    What was the question
4       again, I'm sorry?
5            (The last question was read.)
6            MS. KENNEDY:   Objection to the form.
7            THE WITNESS:    If the job requires a
8       credential, like a physician, it's very
9       important. If the job does not require a
10      credential, it is not important.
11      Q.     (By Mr. Sikorski) Did you understand
12 that Mr. Mattocks had held himself out as having
13 a Ph.D. from an accredited university?
14            MS. KENNEDY:    Objection.
15            THE WITNESS:    I never really talked
16      to him about his Ph.D. prior to the phone
17      call. If you're asking me prior to that, I
18      wouldn't even have known.
19      Q.     (By Mr. Sikorski) But after that. At
20 some point in time you learned that he had a
21 Ph.D. from a non-accredited university, correct?
22      A.     Yes.
23      Q.     Did you also learn that that was from
24 a university that was highly suspect?

1  MS. KENNEDY:  Is that the question?
2  MR. SIKORSKI:  Yes.
3  MS. KENNEDY:  Objection to form.  Go
4  ahead.
5  THE WITNESS:  I did not know it was
6  a highly suspect university.
7  Q.  (By Mr. Sikorski) Were you ever
8  informed that he had a Ph.D. from a highly
9  suspect university?
10  A.  No, I was not.
11  Q.  Even today do you understand that he
12  had a Ph.D. from a highly suspect university?
13  MS. KENNEDY:  Objection to form.
14  THE WITNESS:  No, I don't.
15  Q.  (By Mr. Sikorski) So as you come in
16  here today, you don't know that?
17  A.  No.
18  Q.  Is Mr. Mattocks still working for --
19  strike that.
20  What entity actually employed
21  Mr. Mattocks?
22  A.  H-C Management.
23  Q.  Does H-C stands for anything?
24  A.  I believe it was short for Holyoke,

18

1  dash, Chicopee, but that's an assumption.
2  Q.  Does Mr. Mattocks currently work for
3  H-C Management?
4  A.  No, he does not.
5  Q.  Does he work for any other entity
6  affiliated in any way with Holyoke Medical
7  Center?
8  A.  No, he does not.
9  Q.  When did he last work for any entity
10  associated with Holyoke Medical Center?
11  A.  I don't know the last day of his
12  resignation. I'm not familiar with that.
13  Q.  Approximately?
14  A.  Approximately I think it would have
15  been in the summer of 2005.
16  Q.  What were the circumstances under
17  which Mr. Mattocks left the employment of H-C
18  Management?
19  A.  He was absent from work for sickness,
20  and he called and said he'd be away for a while.
21  That's the last I saw him.
22  Q.  Did you consider that he voluntarily
23  quit his position?
24  MS. KENNEDY:  Objection to the form.

1  THE WITNESS:  No. I think he asked
2  for a brief leave and would be returning
3  and then he didn't.  And then I would
4  assume that he voluntarily resigned, yes.
5  Q.  (By Mr. Sikorski) What is your
6  understanding of the nature of his illness?
7  MS. KENNEDY:  Objection. I'm going
8  to instruct the witness not to answer.  It
9  involves private confidential medical
10  information of a party to this case, and
11  employee of H-C Management.  That is
12  privileged and is not subject to disclosure
13  under Federal Rules of Civil Procedure,
14  Rule 26.
15  MR. SIKORSKI:  How is it privileged?
16  We have a confidentiality order.  You can
17  say this is confidential.
18  MS. KENNEDY:  Although we have a
19  confidentiality order, this is private
20  confidential medical information that's not
21  subject to disclosure.  It's privileged and
22  I'm instructing him not to answer despite
23  the confidentiality order.
24  MR. SIKORSKI:  We'll take this up

20

1  later.
2  Q.  (By Mr. Sikorski) Did Mr. Mattocks
3  supply you with any resignation letter?
4  A.  I don't recall seeing a letter.
5  Q.  Did Mr. Mattocks receive any type of
6  severance agreement; do you know?
7  A.  Not off the top of my head.
8  Q.  Who would know that?
9  A.  I think it would have been Mary
10  Kelleher.
11  Q.  Who was hired to replace Mr. Mattocks
12  as the executive director of River Valley
13  Counseling Center?
14  A.  An individual by the name of Matt
15  Hass.
16  Q.  And you announced that appointment;
17  did you not?
18  A.  Not personally, but we had an
19  announcement.
20  Q.  Right.  And then you are the person
21  making that announcement, correct?
22  A.  I'd have to see the articles.  Is my
23  name in there?  That's correct.
24  Q.  So when the organization puts out a

1     press release, they say that you're the person
2     announcing the appointment of Mr. Hass?
3         A.    That must be, yes.
4         Q.    What positions do you currently hold
5     professionally?
6         A.    Um, I'm president of Valley Health
7     Systems. I'm president of Holyoke Medical
8     Center. I'm president of H-C Management. And I
9     may hold other positions as officers in other
10     affiliates, but I would have to check my
11     organizational chart to determine that.
12         Q.    What is Valley Health Systems?
13         A.    Valley Health Systems is the parent
14     of our structure.
15         Q.    What do you mean by "our structure"?
16         A.    Under the parent, there are various
17     affiliates that they are the sole member of.
18         Q.    Just briefly what are those levels?
19         A.    Holyoke Medical Center, River Valley
20     Counseling, Community Foundation -- which has a
21     longer name than that but it's part of the
22     Visiting Nurses Association -- Western Mass
23     Physicians. There was a nursing home facility
24     called Falls, I believe.

1         Q.    And on the administrative side, would
2     that be the CEO?
3         A.    Senior manager.
4         Q.    That would be Mr. Mattocks and later
5     Mr. Hass?
6         A.    That would be correct.
7         Q.    And who would that be on the
8     financial side?
9         A.    The person that is there now is a
10     person by the name of Laurie, and I don't recall
11     her second name.
12         Q.    Do you know who Laurie replaced?
13         A.    A woman by the name of Shannon, and
14     her last name was a relatively long one, Van
15     something.
16         Q.    Did River Valley Counseling Center
17     ever receive human resources assistance from any
18     organization affiliated with Valley Health
19     Systems?
20         A.    Yes.
21         Q.    And what human resources assistance
22     did it receive?
23         A.    That would have been through H-C
24     Management, and it would have been a consultation

---

1         Q.    Is that F-A-L-L-S?
2         A.    Yes. Now I'm struggling.
3         Q.    We can come back to that. What is
4     the Holyoke Medical Center?
5         A.    It's an acute care hospital, a
6     community hospital not for profit.
7         Q.    So Holyoke Medical Center just takes
8     care of running the hospital, that's what that
9     organization does?
10         A.    That is the hospital function, yes.
11         Q.    And will you describe for me H-C
12     Management, sir?
13         A.    H-C Management is a small company
14     that employs certain members of the management
15     team that may work in various affiliates at some
16     level.
17         Q.    Do you know when that was set up?
18         A.    No, I do not.
19         Q.    What was the relationship in 2004
20     between H-C Management and River Valley
21     Counseling?
22         A.    H-C Management was the employer of
23     the senior managers for River Valley on the
24     administrative side and the financial side.

1     role from Mary Kelleher.
2         Q.    What other positions does Mary
3     Kelleher hold?
4         A.    She also functions as the vice
5     president of human resources for Holyoke Medical
6     Center.
7         Q.    Did River Valley Counseling receive
8     any risk management services from any other
9     entity?
10         MS. KENNEDY:    Objection to form.
11         THE WITNESS:    If they felt they
12     needed it, they had access to some of the
13     resources at Holyoke Medical Center's risk
14     management team.
15         Q.    (By Mr. Sikorski) Would that be a team
16     headed by Mr. Fenn, Clark Fenn?
17         A.    Yes.
18         Q.    Does Mr. Fenn have any role in
19     handling this particular claim of Mr. Richards?
20         MS. KENNEDY:    Objection to form. Go
21     ahead.
22         THE WITNESS:    Not that I'm aware of.
23         Q.    (By Mr. Sikorski) After River Valley
24     terminated Mr. Richards, did you become aware

1   that he made allegations that his treatment was
2   illegal?
3         MS. KENNEDY:   I'm going to object.
4   Other than anything you've been told by
5   counsel, go ahead.
6         THE WITNESS:   No.
7      Q.   (By Mr. Sikorski) Did you ever discuss
8   his termination with Mary Kelleher?
9         MS. KENNEDY:   "His" meaning?
10      Q.   (By Mr. Sikorski) Did you ever discuss
11  Mr. Richards' termination with Mary Kelleher
12  outside the presence of an attorney?
13      A.   Not that I recall.
14      Q.   Did you ever discuss the termination
15  of Mr. Richards with anyone other than
16  Ms. Kelleher outside the presence of an attorney?
17      A.   Not that I recall.  I need to add
18  something, other than Mr. Mattocks who reported
19  he was letting somebody go.
20      Q.   At any time after he let Mr. Richards
21  go, did he come to you to discuss the termination
22  and any questions that have been raised about it?
23      A.   I believe when he mentioned that his
24  Ph.D. was in question that he was referring to an

---

26

1  individual that was terminated.
2      Q.   Did he indicate to you there was some
3  question as to the replacement he had selected
4  for some of the responsibilities?
5         MS. KENNEDY:   Objection to the form.
6  Go ahead.
7         MR. SIKORSKI:   I'm not finished.
8         MS. KENNEDY:   I'm sorry.
9      Q.   (By Mr. Sikorski) Did Mr. Mattocks
10  ever tell you that Mr. Richards was challenging
11  his plan for how Mr. Richards duties were going
12  to be fulfilled?
13      A.   No.
14      Q.   Did River Valley Counseling have a
15  loan from an entity affiliated with Valley Health
16  Systems?
17      A.   Yes.
18      Q.   Could you explain to me the origin of
19  that loan?
20         MS. KENNEDY:   Again, this might be a
21  series of questions and perhaps it might
22  now be good to say this is subject to the
23  protective order and perhaps, Attorney
24  Sikorski, when you feel you've reached it,

---

1  it will be concluded then.
2         THE WITNESS:   Could you ask the
3  question again, please?
4         (The last question was read.)
5         THE WITNESS:   It was a loan from
6  Valley Health Systems.
7      Q.   (By Mr. Sikorski) How much was the
8  loan originally?
9      A.   I don't recall the specifics of it.
10  It was in the neighborhood -- it was a series of
11  loans over a period of time.  I don't remember
12  the individual incidents.
13      Q.   Can you give me some idea of the size
14  of the loan?
15      A.   I would think over the year it was
16  probably in excess of a million and a half.
17      Q.   Do you know the approximate balance
18  in 2004?
19      A.   I do not.
20      Q.   Who would know?
21      A.   That would be Mr. Tony Correia.
22      Q.   Can you spell his last name?
23      A.   C-O-R-R-I-E-A (sic), I think.
24      Q.   And who is Mr. Correia?

---

28

1      A.   He is the vice president of
2  financials for H-C Management for -- he's one of
3  our senior financial officers.
4      Q.   You spoke about a series of loans
5  from Valley Health Systems to River Valley; is
6  that correct?
7      A.   That's correct.
8      Q.   Did those loans start when you were
9  the president of Valley Health Systems?
10      A.   Yes.
11      Q.   Can you tell me about the
12  circumstances surrounding the origins of that
13  loan or those loans?
14      A.   Yes.  River Valley was having some
15  serious financial issues, part of what was due to
16  the payer mix of our community which is very
17  poor.  Part of it was, quite frankly, due to
18  patients who book time and don't show up, also a
19  reflection of our community.  So they were not
20  generating enough revenue to pay for the services
21  that they were attempting to provide.  This was
22  occurring over a period of time.
23      Q.   Do you know approximately when the
24  first of the series of loans were made?

1    A.    I don't know precisely, but I suggest
2 it was probably in the mid to latter part of the
3 '90s.
4    Q.    Who was the executive director of
5 River Valley at the time the loan was made?
6    A.    I'm not sure.
7    Q.    Does H-C Management charge River
8 Valley for services that it provides?
9    A.    There is a charge, yes.
10    Q.    Would you explain to me how those
11 charges are computed in general?
12    A.    In general, we try to make an
13 assessment of what costs that we have associated
14 with helping them. I'm sure there is interest on
15 the note. That would be the general knowledge.
16    Q.    Going back to when you interviewed
17 Mr. Mattocks, did Mr. Mattocks discuss with you
18 his previous experience with trying to start up a
19 day treatment program?
20    A.    Not that I recall.
21    Q.    Other than documents that you
22 received from counsel, after Mr. Richards'
23 termination did you receive any documents
24 relating to his termination?

---

1 Mr. Porten.
2    A.    Yes, I have seen this document.
3    Q.    And do you have any documents
4 responsive to the document request portion of
5 Exhibit 1?
6    A.    Exhibit 1?
7    MS. KENNEDY:    Are you referring to
8 page 3 of 4, is that where you would like
9 him to look?
10    MR. SIKORSKI:    Right.
11    THE WITNESS:    Do you want me to go
12 through each bullet to --
13    MS. KENNEDY:    He can ask a question.
14    Q.    (By Mr. Sikorski)  Yes.  Sure.  Do you
15 have any documents responsive to this request?
16    A.    No, I don't have personally these
17 documents referring to bullet 1.
18    Q.    How about the second bullet?
19    A.    I'd say not personally.
20    Q.    Okay. Third bullet?
21    A.    I don't believe I do.
22    Q.    The next bullet point regarding
23 Mr. Eagle in Health Enhancement Services?
24    A.    I don't keep these kinds of documents

---

1    A.    Not that I recall.
2    Q.    Just specifically, did Mr. Mattocks
3 give you anything in writing to apprise you about
4 the claims made by Mr. Richards?
5    A.    Not that I recall.
6    Q.    Do you recall Mary Kelleher providing
7 you with any documents concerning the claims made
8 by Mr. Richards?
9    A.    No.
10    Q.    Do you recall Ms. Kelleher coming in
11 and briefing you on the claims that Mr. Richards
12 was making?
13    A.    I think she did come in the office
14 and indicate that there was some issues brewing
15 with an individual, which she was working with
16 Dave Mattocks to resolve those. And I don't
17 recall any greater discussion than that.
18    MR. SIKORSKI:    Would you mark that,
19 please.
20    (Exhibit 1 marked)
21    Q.    (By Mr. Sikorski) Mr. Mattocks, have
22 you had a chance to review Exhibit 1?
23    MS. KENNEDY:    Mr. Porten.
24    Q.    (By Mr. Sikorski) I'm sorry.

---

1 for me personally.
2    Q.    Would that be the same regarding
3 records concerning Ms. Viens and Mr. Richards?
4    A.    Yes.
5    Q.    Who is Jeffrey Eagle, sir?
6    A.    Jeff Eagle is the senior manager of
7 the consulting firm for Behavioral Health
8 Services. The firm's name is Health Enhancement
9 Services as it says in this document.
10    Q.    Do you know if Mr. Eagle or his
11 company, Health Enhancement Services, Inc.,
12 provided any services regarding David Mattocks?
13    A.    No, I do not.
14    Q.    Who would know that?
15    A.    I think I would.
16    Q.    What type of consulting services did
17 Health Enhancement services provide to any entity
18 of Valley Health Systems?
19    A.    They consulted to us for River Valley
20 Counseling. And the services they provide was
21 expertise in behavior health management, behavior
22 health management services, and loaned executive.
23    Q.    What do you mean by "loaned
24 executive"?

**[Page 33 — top left]**

1    A.    They do offer a team to come in to
2  fill vacant positions from time to time.
3    Q.    And did they, in fact, loan an
4  executive to River Valley?
5    A.    Yes, they did.
6    Q.    What executive did they loan?
7    A.    He was the acting senior management,
8  and I don't recall his name.
9    Q.    During what period of time?
10    A.    I'm going to say in the late '90s,
11  early 2000.
12    Q.    And what type of financial services
13  did it provide to River Valley Counseling?
14    A.    Strictly advisory, consulting.
15    Q.    And how about on behavior management?
16    A.    Well, they advised and consulted, but
17  they also had a loaned executive for us at that
18  time.
19    Q.    Again, during what time frame were
20  these consulting services provided?
21    A.    I would say late '90s, early 2000,
22  and I do remember the first name of the guy.  I
23  think his name was Gale.
24    Q.    I'm sorry?

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

**[Page 34 — bottom left]**

1    A.    Gale.  His last name began with "H."
2    Q.    Were consulting services provided at
3  one time or more than one time?
4    A.    More than one time.
5    Q.    Do you know approximately how many
6  times?
7    A.    I believe it was twice that they
8  actually came and did some work.  From time to
9  time I think another one or two times we've asked
10  them to come back and audit that work.
11    Q.    When was the most recent time that
12  they came and actually did substantive
13  consulting?
14    A.    Consulting, I would say it's been
15  years, three or four years.  From an audit
16  perspective, probably the last couple of years.
17    Q.    Who would have custody of the records
18  relating to the work that Jeffrey Eagle and
19  Health Enhancement Services, Inc. provided to
20  River Valley Counseling?
21    A.    It would be under H-C Management.  It
22  would probably be Tony Correia, but it would be
23  under H-C Management files and other people have
24  access to those.

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

**[Page 35 — top right]**

1    Q.    What person would have the most
2  knowledge of the consulting services and auditing
3  services provided by Jeffrey Eagle and Health
4  Enhancement Services, Inc.?
5    A.    It would be myself and Tony Correia
6  and the senior managers of River Valley.  They
7  would have, obviously, knowledge as well.
8    Q.    How long did Dave Mattocks serve as
9  the executive director of River Valley
10  Counseling?
11    A.    Approximately a year.
12    Q.    What is your evaluation of the
13  quality of the job that he performed for River
14  Valley?
15    A.    The official evaluation I did on him
16  was in the neighborhood of February, March, maybe
17  April, that time frame, and that was a positive
18  evaluation.
19    Q.    What did you identify as his
20  strengths?
21    A.    He was addressing some of the
22  economic issues.  He was trying to stabilize the
23  company's economic situation.
24    Q.    What did you identify as his

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

**[Page 36 — bottom right]**

1  weaknesses?
2    A.    In the time period that he was
3  working, he had a lot of development curve or
4  learning curve that was relatively short.  There
5  were a lot of things that he had to learn about
6  the community and things that he had to learn
7  about the organization and things of that nature.
8  I don't know that I'd call it a negative.  It was
9  kind of a learning curve kind of process.
10    Q.    Did you believe that his learning
11  curve should have been shorter?
12    A.    Not at that time.
13    MR. SIKORSKI:    I'd like to take a
14  short break.
15    (A recess was taken)
16    Q.    (By Mr. Sikorski) Mr. Porten, did you
17  meet on a weekly basis with the executive
18  director of River Valley?
19    A.    Not every week but it was common in a
20  month.
21    Q.    Did River Valley have to supply you
22  with monthly reports?
23    A.    That was the goal.  It wasn't always
24  achieved.

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

1   Q.    Where was the goal set out?
2   A.    The goal for the monthly reports?
3   Q.    Right. Was that in writing some
4   place?
5   A.    No. That would have been verbal.
6   Q.    We were talking about monthly
7   reports. Were they oral reports or written
8   reports?
9   A.    A combination of both.
10  Q.    What did you expect would be in those
11  monthly reports?
12  A.    We would want to see balance sheets,
13  income statements, cash flows, summaries of that
14  data of some type.
15  Q.    And did you think it was unusual that
16  Mr. Mattocks did not give you something in
17  writing that would indicate what amount of
18  savings or type of savings that he would get from
19  reducing certain positions?
20  A.    I would see that at the gross level
21  of the financial statements. I would not see
22  that on an individual basis at all.
23  Q.    Did Mr. Mattocks ever give you a plan
24  in writing for reducing expenses overall?

1   management. A new manager came in and was
2   reviewing some of the processes, identified a
3   concern over a process. We contacted our
4   counsel. They led us through a review process
5   and then they contacted the -- I think it was the
6   Federal. It might have been the Federal and the
7   State. I don't recall which body. Then they
8   came and reviewed the process, and they concurred
9   that there was a bad process, yes.
10  Q.    And was that overbilling for
11  counseling services in nursing homes?
12  A.    Pardon me?
13  Q.    Did that involve overbilling for
14  counseling services in nursing homes?
15  A.    I don't recall.
16  Q.    When was this identified?
17  A.    I would say the middle to late '90s.
18  Q.    And was there an arrangement reached
19  with the law enforcement authority?
20  A.    Yes.
21  Q.    And did it involve repayment and
22  monitoring?
23  A.    Yes.
24  Q.    Is the monitoring still going on?

1   A.    Not that I recall.
2   Q.    Again can you recall any other
3   specific cost saving measures that Mr. Mattocks
4   brought to your attention before the termination
5   of Mr. Richards?
6   A.    We were talking about a guardianship
7   program that was not functioning properly and for
8   the elimination of that program.
9   Q.    Did he give you anything in writing
10  regarding that document or report?
11  A.    No.
12  Q.    Was there some involvement with
13  either the State or Federal law enforcement
14  authorities with River Valley Counseling arising
15  out of some issues relating to billing for
16  counseling services?
17         MS. KENNEDY:    Did you say loan or
18  law?
19         MR. SIKORSKI:    Law.
20         THE WITNESS:    There was an incident,
21  yes.
22  Q.    (By Mr. Sikorski) Describe for me
23  generally the incident.
24  A.    We had a turnover in senior

1   A.    Yes.
2   Q.    How long is the monitoring going to
3   last, if you know?
4   A.    I don't recall.
5   Q.    Do you know the approximate amounts
6   of the repayment?
7   A.    No, I do not.
8   Q.    What does the monitoring consist of,
9   sir?
10  A.    What I recall of it is that our audit
11  has to be sent to them. There's State compliance
12  reviews that gets sent to them. Whatever we do
13  as far as reviews get sent to the various
14  agencies that were involved.
15  Q.    Do you know Mr. Avakian?
16  A.    Mr. Avakian?
17  Q.    Avakian, A-V-A-K-I-A-N.
18  A.    No, I do not.
19  Q.    Mr. Porten, I'm going to conclude
20  your individual deposition in just a moment. But
21  at the end of every deposition, I give the
22  deponent a chance to if they want to add
23  anything, change anything, or comment on anything
24  they've said. I'll give you that opportunity now

1    if you'd like to do that.

2      A.   No. I think I answered to the best

3    of my ability.

4      MR. SIKORSKI:   I have no further

5    questions of this witness at this time on

6    his personal deposition.

7      MS. FABBO:   I have no questions.

8      MS. KENNEDY:   I don't have any

9    questions, just some administrative things.

10    I'd like to mark the protective order as an

11    exhibit, please.

12      (Exhibit A marked)

13      MS. KENNEDY:   The other thing is

14    we're going to talk about reading and

15    signing for Mr. Porten individually. He'll

16    read and sign and I'm going to talk about

17    objections now. All objections except as

18    to form reserved to be raised at trial and

19    motions to strike reserved and to be raised

20    at trial. We can waive the notification

21    and notary and he'll read and sign. That's

22    it.

23      (Deposition concluded at 11:13 a.m.)

24

*Accurate Court Reporting*

*1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

---

SIGNATURE/ERRATA SHEET

To be signed by deponent and
returned to counsel.

I, the undersigned, HANK PORTEN, do
hereby certify that I have read the foregoing
transcript of my testimony given in the matter of
MARK A. RICHARDS V. RIVER VALLEY COUNSELING
CENTER, INC. VALLEY HEALTH SYSTEMS, INC. DAVID G.
MATTOCKS AND DONNA VIENS and to the best of my
knowledge, said transcript is true and accurate
with the exception of the corrections listed
below:

PAGE/LINE/CORRECTION_____

_____

_____

_____

_____

_____

_____

_____

_____

DEPONENT'S SIGNATURE _____

DATE OF SIGNING _____

*Accurate Court Reporting*

*1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

---

42

1      I, Debra A. Vance, a Notary Public within

2    and for the Commonwealth of Massachusetts at large,

3    do certify that pursuant to notice, there came

4    before me on December 9, 2005, at the offices of

5    ROBINSON DONOVAN, P.C., 1500 Main Street,

6    Springfield, Massachusetts, 01115, the following

7    person, to wit: HANK PORTEN, who was duly sworn to

8    testify to the truth and nothing but the truth as to

9    his knowledge touching and concerning the matters in

10    controversy in this case; that he was thereupon

11    examined upon his oath and said examination reduced

12    to writing by me; and that the deposition is a true

13    record of the testimony given by the witness, to the

14    best of my knowledge and ability.

15      I further certify that I am not a relative

16    or employee of counsel or attorney for any of the

17    parties, nor a relative or employee of such parties,

18    nor am I financially interested in the outcome of

19    the action.

20    WITNESS MY HAND, this 9th day of December, 2005.

21

22      _____

23    My Commission Expires:    Debra A. Vance

24    April 26, 2007.

*Accurate Court Reporting*

*1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

---

December 23, 2005

MARY J. KENNEDY
BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115

Dear Attorney Kennedy:

RE:   MARK A. RICHARDS V. RIVER
       VALLEY COUNSELING CENTER,
       INC., ET ALS

The deposition transcript of HANK
PORTEN taken December 9, 2005, in the above
captioned case is now ready for signature.

According to the Massachusetts
Rules of Civil Procedure, the witness has 30 days
to read and sign the deposition transcript.

If the witness has not read and
signed the original signature page within 30 days
from the above date, it will be deemed signed.

Please return errata sheet to
Attorney Sikorski. Thank you in advance for your
cooperation in this matter.

Sincerely,


Debra A. Vance
Stenographer, Notary Public

*Accurate Court Reporting*

*1500 Main Street, Suite 1412*
*Springfield, MA 01115*
*413-747-1806*

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                    )
              Plaintiff              )
VS.                                  )
                                     )
RIVER VALLEY COUNSELING CENTER,      )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
              Defendants             )

          DEPOSITION OF MARY KELLEHER, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ROBINSON DONOVAN, P.C., 1500 Main

Street, Springfield, Massachusetts on January 31,

2006, commencing at 1:15 p.m.

APPEARANCES:  (See Page 2)

          Debra A. Vance
          Notary Public Stenographer

Accurate Court Reporting
1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

1
2
3
4          I N D E X
5
6  WITNESS      DIRECT      CROSS      REDIRECT   RECROSS
7
8  Mary Kelleher *4
9
10  * By Mr. Sikorski
11
12
13  EXHIBITS:                                    PAGE:
14
15  Exhibit 1, subpoena........................25
16
17
18
19
20
21
22
23
24

Accurate Court Reporting
1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts  01115
413-732-2301
     BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts  01115
413-781-2820
     BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts  01144
413-737-4753
     BY:  MARY LOU FABBO, ESQ.

Accurate Court Reporting
1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

4

1          STIPULATIONS
2
3          It is agreed by and between the
4  parties that all objections, except objections as
5  to the form of the questions, and all motions to
6  strike unresponsive answers are reserved and may
7  be raised at the time of trial for the first
8  time.
9
10          It is further agreed by and between
11  the parties that the sealing and the notification
12  to all parties of the receipt of the original
13  deposition transcript is hereby waived.
14
15          MARY KELLEHER, Deponent, having
16  been satisfactorily identified and duly sworn,
17  deposes and states as follows:
18
19  DIRECT EXAMINATION BY MR. SIKORSKI:
20      Q.    Would you please state your name,
21  spell your last name for the record, and give us
22  your address please?
23      A.    My name is Mary E. Kelleher,
24  K-E-L-L-E-H-E-R, and my home address is 60 Lindor

Accurate Court Reporting
1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

1  Heights in Holyoke.

2      Q.    Who do you work for?

3      A.    H-C Management Services, Inc.

4      Q.    What do you do for H-C Management

5  Services?

6      A.    Vice president of human resources.

7      Q.    How many employees does H-C

8  Management have?

9      A.    Probably 20, 25.

10     Q.    And whom do you provide human

11 resources services?

12     A.    Um, employees of Holyoke Hospital,

13 Inc., at H-C Management Services, Inc., River

14 Valley Counseling Services on a consulting basis,

15 and Western Mass Physician Associates, Inc., and

16 Valley Health System and occasionally on a

17 consultative basis to the Visiting Nurses

18 Association.

19     Q.    For how long have you given human

20 resources counseling to River Valley?

21     A.    Probably more than ten years,

22 probably less than 15 years.  I'm not exactly

23 sure.

24     Q.    Does River Valley pay for your

---

6

1  services?

2      A.    Yes, they do.

3      Q.    And how are they charged or assessed?

4      A.    I believe it is an assessment from

5  the management company to the subsidiaries for

6  time that I log for the different corporations.

7      Q.    Do you fill out time sheets every

8  day?

9      A.    I do an annual accounting, but I keep

10 an accurate record in my appointment book.

11     Q.    Is River Valley assessed just one

12 time at the end of a year?

13     A.    I'm not sure how the assessment

14 works.  I'm not in the finance area.

15     Q.    Okay.  Do you know Mark Richards?

16     A.    A little bit.

17     Q.    And do you recall when you first met

18 Mr. Richards?

19     A.    Several years ago.  I have no idea

20 exactly when.

21     Q.    Were you involved at all in the

22 decision to terminate Mr. Richards?

23     A.    No.

24     Q.    Were you advised that River Valley

---

1  was going to terminate Mr. Richards before he was

2  terminated?

3      A.    I was aware of it.

4      Q.    How did you become aware of it?

5      A.    Mr. Mattocks called me.

6      Q.    And did he speak to you over the

7  phone or in person?

8      A.    Over the telephone.

9      Q.    And what did he say to you and what

10 did you say to him?

11     A.    My recollection is that he told me he

12 was going to do a reduction in force, and that he

13 asked me what the policies and practices were of

14 the organization relative to a layoff.

15     Q.    And what did you say to him?

16     A.    Well, I had asked him how long Mark

17 had been employed, and I asked the position.  And

18 I told him that we had no formal policy on a

19 corporate basis relative to layoff.  But that

20 where possible, we try to do some sort of a

21 severance arrangement to do some form of salary

22 continuation for the party who is being affected

23 by the reduction.

24     Q.    Did he say anything else to you in

---

8

1  that conversation?

2      A.    We just discussed what did I think

3  was appropriate for an amount of severance.  I

4  told him what I did at the hospital, which is

5  where I've had more reductions than I've been

6  involved with in any other corporations.  And I

7  told him that based on his length of service that

8  to do as much as he could, that we usually do, at

9  the hospital we do a week of salary for every

10 year of service with a cap of 12 weeks.  And I

11 asked him to see what he could do financially.

12     Q.    Was that the end of the conversation?

13     A.    Um, I'm not sure.  I know we had a

14 conversation at some point about how to do it,

15 how to conduct the separation interview.  I don't

16 remember if it was at that time or if it was at a

17 subsequent time.

18     Q.    And regarding that topic, what did

19 you say to him and what did he say to you?

20     A.    I told him that as the senior leader

21 in the organization that he should be involved,

22 but that I advised him to have his HR person as a

23 participant in the process so that she could

24 explain the benefits.

---

1  Q.    Did you tell him anything else?
2  A.    No specifics are popping into my mind
3  right now.
4  Q.    Did you have any other discussion
5  with Mr. Mattocks about Mr. Richards'
6  termination?
7  A.    Not that I recall.
8  Q.    Did he talk to you about
9  Mr. Richards' request to speak to his staff?
10  A.    That was a conversation that had,
11  I believe, on the day of the separation
12  interview.
13  Q.    Okay. Let's focus on before the
14  termination then. Do you recall any other
15  conversation with Mr. Mattocks about
16  Mr. Richards' termination?
17  A.    Only relative to procedural issues
18  and policies and like that, just what I've
19  explained to you. And I don't remember if there
20  was one conversation or more than one
21  conversation with him, but it was procedural.
22  Q.    What do you mean by procedural?
23  A.    Well, the procedure to follow, have a
24  letter that explains that you're going to be

*Accurate Court Reporting*                     1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

**11**

1  A.    I don't recall.
2  Q.    You'd mentioned about Mr. Mattocks
3  talking about a reduction in force. Is that the
4  term that he used?
5  A.    That's my term.
6  Q.    Do you use the term "reduction in
7  force" if you're just terminating one person?
8  A.    I do.
9  Q.    So regardless of whether you're
10  terminating one or twenty, in your vocabulary
11  that's still a reduction in force?
12  A.    It is.
13  Q.    And did you ask Mr. Richards -- I'm
14  sorry.
15  Did you ask Mr. Mattocks if he was
16  going to terminate anyone other than
17  Mr. Richards?
18  A.    He was specifically asking me about
19  Mr. Richards.
20  Q.    And what did he tell you about the
21  Family Medical Leave?
22  A.    Mr. Richards' Family Medical Leave or
23  in general?
24  Yes, Mr. Richards' Family Medical

*Accurate Court Reporting*                     1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

**10**

1  affected by a reduction. In the case of if
2  you're going to do a severance agreement, if
3  you're going to do a severance package then we do
4  a severance agreement. There are companies that
5  have an HR person available to make sure that the
6  things that you're required by law to give are
7  there, like in COBRA paperwork or the
8  unemployment paperwork, things like that,
9  procedural.
10  Q.    Did you discuss with him whether or
11  not this termination would violate any
12  discrimination laws or any other employment laws?
13  A.    No.
14  Q.    Did you provide any guidance to him
15  in evaluating this decision for compliance with
16  employment laws?
17  A.    He informed me that Mr. Richards was
18  on an intermittent Family Medical Leave. And I
19  asked for some clarification on that, and in my
20  opinion it did not violate. I was informed that
21  Mr. Richards was not using intermittent leave.
22  Q.    Did you ask whether there was an
23  issue involving Family Medical Leave or did
24  Mr. Mattocks bring it up to you?

*Accurate Court Reporting*                     1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

**12**

1  Leave.
2  A.    He had requested a leave for his
3  daughter and that it was on an intermittent
4  basis. I remember that. And I remember that he
5  was supposed to touch base if he was going to be
6  needing time off the leave, and that I
7  believe there had not been any use of time or any
8  significant use of time noted in the time sheets.
9  Q.    What did you say then to Mr. Mattocks
10  about Mr. Richards' use of Family Medical Leave
11  Act?
12  A.    I said that if he wasn't using the
13  time then you have to make your business
14  decision.
15  Q.    Would your advice have been different
16  if Mr. Richards had begun using the intermittent
17  leave?
18  A.    I'm not sure if it would have been
19  different. I don't know. I'd have to know what
20  the circumstances were.
21  Q.    What did Mr. Mattocks tell you was
22  the business reason for his termination?
23  A.    I believe it was a cost savings.
24  Q.    Did you ask him how much was involved

*Accurate Court Reporting*                     1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

**15**

1 in the cost savings?
2     A.   I didn't ask him what Mr. Richards'
3 salary was.
4     Q.   Did you ask him to send any sort of
5 memorandum or anything in writing to you about
6 this?
7     A.   No.
8     Q.   What did Mr. Mattocks tell you about
9 Mr. Richards' daughter?
10     A.   He didn't tell me anything about
11 Mr. Richards' daughter.
12     Q.   Did you understand that the leave was
13 for Mr. Richards to take care of his daughter?
14     A.   His daughter was ill is what I was
15 told.
16     Q.   Did he describe at all the illness?
17     A.   No.
18     Q.   Did he characterize it at all?
19     A.   No.
20     Q.   Did you ever speak to Donna Viens
21 about Mr. Richards' termination before it
22 happened?
23     A.   I don't remember if I talked with her
24 or just sent a message through David. I don't

**14**

1 remember specifically.
2     Q.   Did you take any notes of any
3 conversation you had with Mr. Richards -- I mean
4 with Mr. Mattocks about Mr. Richards?
5     A.   The phone conversation?
6     Q.   Right.
7     A.   No.
8     Q.   Or any other notes about
9 Mr. Richards' termination?
10     A.   No.
11     Q.   How about after Mr. Richards'
12 termination, have you made any notes?
13     A.   No.
14     Q.   On the day of the termination, did
15 you and Mr. Mattocks speak about Mr. Richards'
16 termination?
17     A.   Yes.
18     Q.   Was that in person or over the phone?
19     A.   Over the phone.
20     Q.   And do you recall if he called you or
21 did you call him?
22     A.   I don't recall.
23     Q.   What did he say to you and what did
24 you say to him in that conversation?

**16**

1     A.   I just asked if, you know, how it
2 went. And he indicated that Mark had wanted to
3 speak with the staff to tell the staff that he
4 was resigning his employment. And he asked me if
5 I thought that was all right to do.
6     Q.   What did you tell him?
7     A.   I told him if Mark wanted to meet
8 with the staff I had no objection with him doing
9 so.
10     Q.   Did you suggest to Mr. Mattocks at
11 any time that he consult with counsel about the
12 decision to terminate Mr. Richards?
13     A.   I don't remember if I did or not.
14     Q.   Did you ever suggest to Mr. Mattocks
15 that he consult with counsel about the terms of
16 the separation agreement?
17     A.   Yes.
18     Q.   When did you give that advice to
19 Mr. Mattocks?
20     A.   When he asked me what should happen
21 relative to the severance package. I said that
22 he should consult with counsel so that they could
23 put it together, that that's not something that I
24 would do.

1     Q.   Do you know if he did so?
2     A.   Yes.
3     Q.   And how do you know that?
4     A.   Because I had contact with counsel
5 relative to the separation agreement.
6     Q.   At any time before the termination,
7 did you ever discuss with Mr. Mattocks whether or
8 not terminating Mr. Richards would implicate the
9 age discrimination statutes?
10     A.   No.
11     Q.   Did you ask him how he was going to
12 replace Mr. Richards?
13     A.   I believe he volunteered that
14 information.
15     Q.   What did he tell you?
16     A.   There was an associate director in
17 the program who was capable of running the
18 day-to-day operations.
19     Q.   Did you ask him how old that person
20 was?
21     A.   No.
22     Q.   Did Mr. Mattocks ever receive any
23 training in compliance with employment laws from
24 H-C Management or Valley Health Systems?



19

1    A.    I don't know what you're speaking of.
2    Q.    Let me back up.
3          What is your formal title?
4    A.    Vice president of human resources.
5    Q.    Are you the top HR person in all the
6    entities affiliated with Holyoke Hospital?
7    A.    I am.
8    Q.    And you have been for quite some
9    time?
10   A.    Yes.
11   Q.    You're basically Hank Porten's people
12   person, if you want to use the colloquial?
13         MS. KENNEDY:    Objection.
14         THE WITNESS:    Okay.
15   Q.    (By Mr. Sikorski) And as part of your
16   responsibilities as vice president of human
17   resources, do you conduct training and compliance
18   with discrimination and other employment laws for
19   managers of the various programs and entities
20   affiliated with Holyoke Hospital?
21   A.    Do I personally?
22   Q.    First of all, do you personally?
23   A.    No.
24   Q.    Did you arrange to have others do

18

1    that sort of training?
2    A.    At times.
3    Q.    And did you ever encourage or request
4    that Mr. Mattocks receive such training?
5    A.    No.
6    Q.    Are you aware of whether Mr. Mattocks
7    ever received any training in compliance with the
8    discrimination laws?
9    A.    I don't know that.
10   Q.    Do you know if Mr. Mattocks ever
11   received training in compliance with other
12   employment laws such as the Family Medical Leave
13   Act?
14   A.    I don't know if he did.
15   Q.    Were you involved in hiring
16   Mr. Mattocks?
17   A.    I was.
18   Q.    What was your involvement in hiring
19   Mr. Mattocks?
20   A.    I participated in the recruitment
21   process for the position of executive director,
22   and I participated in the interview process.
23   Q.    And did you ask Mr. Eagle to
24   participate in some way?



20

1    A.    Jeff brought -- yes, I did.
2    Q.    I'm going to show you what was marked
3    as Exhibit 2 in the 30(b)(6) deposition of
4    Mr. Kassis.  Do you recognize that?
5    A.    I believe it's a fax cover sheet.
6    Q.    Is that from you to Jeff Eagle?
7    A.    It is.
8    Q.    And in that, did you ask Mr. Eagle
9    for certain assistance in hiring the executive
10   director of River Valley Counseling Center?
11   A.    No, he wasn't executive director at
12   the time.
13   Q.    Let me rephrase my question.
14         In Exhibit 2, what are you asking
15   Mr. Eagle to do?
16   A.    I'm asking him to conduct a phone
17   interview with an applicant for the position of
18   executive director.
19   Q.    And did he do so?
20   A.    Yes, he did.
21   Q.    And did he report to you?
22   A.    Yes, he did.
23   Q.    And did he give you a report in
24   writing?

20

1    A.    No, just over the phone.
2    Q.    What did he tell you about
3    Mr. Mattocks?
4    A.    He told me that he did not have the
5    direct community-based mental health background
6    that the other applicants had.  He assessed that
7    his financial skills were not at the same level
8    as the other candidates but he felt that he could
9    do the job.
10   Q.    How did you weigh Mr. Eagle's input?
11   A.    How did I weigh it?  I think I wanted
12   validation that he felt that David Mattocks could
13   do the job but that he certainly was not going to
14   be a deciding vote, if you will, in the process.
15   But that if he had come back and said that he
16   didn't feel that he had had the credentials or
17   that he was capable of leading the agency, that
18   would have been something that I would have
19   brought back.
20   Q.    Who had the votes to select
21   Mr. Mattocks?
22   A.    Perhaps my term "vote" isn't the
23   right term.  But the people who interviewed all
24   weighed in or gave input into the process.

1  Q.   And who were those persons?
2  A.   Hank and Tony and myself interviewed
3  first, and I believe Maryann.  Maryann
4  interviewed with us.  Maryann was the interim
5  director of River Valley at the time.  She
6  participated.  And then we had the candidates
7  meet the management team.  It's kind of the
8  senior management team at River Valley.  And that
9  was Jeff, Brian Duke.  I forget who else.
10  Q.   When you say "Hank," is that Hank
11  Porten?
12  A.   Yes.
13  Q.   And when you say "Tony," is that Tony
14  Correia?
15  A.   It is.
16  Q.   Who made the decision to hire David
17  Mattocks?
18  A.   Ultimately Hank would make that
19  decision with input from the interviewing
20  parties.
21  Q.   Including you and Tony Correia?
22  A.   Correct.
23  Q.   Did you inquire as to whether or not
24  Mr. Mattocks had ever received training in

1  that he had had some financial difficulties, but
2  I don't believe he explained that it was
3  bankruptcy.
4  Q.   Did he describe the personal
5  difficulties in any way?
6  A.   No.
7  Q.   Did anyone in the interviewing
8  process ever question a Ph.D. from a London
9  university?
10  A.   I think I commented on the fact that
11  he didn't spend much time in London, because I
12  had visited there not that long before.  That was
13  it.
14  Q.   What did he say?
15  A.   He got his Ph.D. from a London
16  school.
17  Q.   Is integrity in the credentialing
18  process important in the mental health field?
19  A.   Yes.
20  Q.   At some point in time, did you learn
21  that Mr. Mattocks' Ph.D. was not from an
22  accredited university?
23  A.   I did.
24  Q.   What steps did you take once you

1  compliance with discrimination laws?
2  A.   In the interview process?
3  Q.   Yes.
4  A.   No.
5  Q.   Did you ever ascertain whether or not
6  Mr. Mattocks had had training in compliance with
7  employment laws other than discrimination laws?
8  A.   No.
9  Q.   Did you ever have a background check
10  done on Mr. Mattocks?
11  A.   No.
12  Q.   What did you understand were his
13  reasons for leaving the Brattleboro Retreat?
14  A.   It was a reduction in force.
15  Q.   And did you ever learn about his
16  personal bankruptcy?
17  A.   Through this process, through -- I
18  think it was something that you brought up at one
19  point.
20  Q.   But other than through this
21  litigation process, did anyone involved in the
22  screening process learn that Mr. Mattocks had
23  filed personal bankruptcy?
24  A.   I believe he indicated at one point

1  learned that?
2  A.   Asked him about it.
3  Q.   And what did he say?
4  A.   It was not an accredited school.
5  Q.   What else did he say about it?
6  A.   That he had done coursework that he
7  had done, I believe he'd done a paper or
8  something.  I don't remember all the details.  He
9  had done work to achieve it.  It was just an
10  unaccredited program.
11  Q.   Did you take any action against him
12  upon learning that?
13  A.   Action, no.
14  Q.   Did you implement any policy or
15  procedure to ensure that future candidates for
16  positions would have Ph.D.s from accredited
17  organizations?
18  A.   The position didn't require a Ph.D.
19  Q.   I understand.  But did you take any
20  steps to make sure that persons claiming to have
21  Ph.D.s have them from accredited universities?
22  A.   No.
23  MR. SIKORSKI:   I'm going to have
24  this marked as Exhibit 1 in this



---

25

```
 1    deposition.
 2            (Exhibit 1 marked)
 3        Q.    (By Mr. Sikorski) I'm going to show
 4    you Exhibit 1, and that's a subpoena for you.
 5    Did you bring any documents responsive to this?
 6        A.    No.
 7        Q.    Do you know if there are any
 8    documents that Jeff Eagle sent regarding David
 9    Mattocks to anyone at H-C Management, River
10    Valley, or Valley Health Systems?
11        A.    Could you say that again, please?
12        MR. SIKORSKI:    Could you read that
13    back.
14            (The last question was read.)
15        THE WITNESS:    Not that I'm aware of.
16        Q.    (By Mr. Sikorski) Do you know if there
17    are any documents sent by Health Enhancement
18    Services, Inc. concerning or related to David
19    Mattocks?
20        A.    That would be Jeff Eagle so, no.
21        Q.    I just have to ask the questions.
22        A.    That's okay.
23        Q.    Was Mr. Mattocks terminated?
24        A.    How do you define terminated?
```

Accurate Court Reporting

1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

26

```
 1        Q.    Was he involuntarily separated from
 2    employment?
 3        A.    I still don't know how to answer that
 4    question.
 5        Q.    Was he terminated or did he resign?
 6        A.    His employment ended following an
 7    expiration of a maximum period of leave of
 8    absence.  So terminated sometimes to me means --
 9    has a negative connotation, and I just wasn't
10    sure what you were saying.
11        Q.    Now, you testified to a conversation
12    with Mr. Mattocks on the day of Mr. Richards'
13    termination, correct?
14        A.    Right.
15        Q.    And after that conversation, did you
16    have any other conversations with Mr. Mattocks
17    about the termination of Mark Richards?
18        A.    After that day?
19        Q.    Yes.
20        A.    We probably discussed the separation
21    agreement, but I don't remember if that was
22    before or after.
23        Q.    Do you recall any other discussions
24    with Mr. Mattocks about Mr. Richards'
```

Accurate Court Reporting

1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

27

```
 1    termination?
 2        MS. KENNEDY:    Out of the presence of
 3    counsel.
 4        THE WITNESS:    I don't recall
 5    anything specifically.
 6        Q.    (By Mr. Sikorski) Did you discuss with
 7    Donna Viens the termination of Mark Richards?
 8        A.    I probably did.
 9        Q.    When do you think the first time is
10    that you spoke with Donna Viens about the
11    termination of Mark Richards?
12        A.    I don't know the timing.  I know she
13    was upset about Mark's demeanor relative to her
14    presence at the meeting.
15        Q.    What did she say to you about that?
16        A.    She felt Mark was angry that she was
17    there.  And I just reinforced the fact that
18    that's the way we do it, and she's the person
19    with the expertise.  I don't expect David to have
20    that expertise in any questions relative to the
21    employment law or benefits.  So she was asked to
22    be there for that purpose.
23        Q.    Did she say anything else to you in
24    that conversation about the termination meeting?
```

Accurate Court Reporting

1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

---

28

```
 1        A.    Not that I recall.
 2        Q.    Was this an over-the-phone
 3    conversation?
 4        A.    Yes.
 5        Q.    Did you ever meet with her after the
 6    termination?
 7        A.    I met with her routinely like every
 8    two weeks or every four weeks.  But I don't
 9    recall any special meeting over this subject.
10        Q.    Do you recall meeting with her before
11    Mr. Richards' termination to go over the
12    termination?
13        A.    Not for that purpose.  I'm sure I did
14    meet with her before that as one of our routine
15    meetings.
16        Q.    Do you recall any other discussions
17    with Ms. Viens about Mr. Richards' termination or
18    anything that occurred afterwards relating to
19    Mr. Richards outside the presence of counsel?
20        A.    Not that I can think of.
21        MR. SIKORSKI:    Just give me a couple
22    of minutes.
23            (A recess was taken)
24        Q.    (By Mr. Sikorski) Ms. Kelleher, can
```

Accurate Court Reporting

1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

1 you recall any other conversations with Donna
2 Viens about Mr. Richards' termination?
3   A.   I don't think so.
4   Q.   Can you recall any other
5 conversations with Mr. Mattocks about
6 Mr. Richards' termination?
7   A.   Just there was discussion about the
8 separation agreement and the back and forth
9 request for an extension for time and, you know.
10 They asked me if I would approve that, if I
11 thought they should approve that and things like
12 that, nothing specific.
13   Q.   Well, they came to you for advice as
14 to whether to give Mr. Richards more time to
15 consider the separation agreement?
16   A.   Well, I believe the separation
17 agreement called for, I think it was 21 days.
18 And at the very end of that period, you called
19 Attorney Fabbo and asked if you could have a
20 seven-day extension. I was made aware of that
21 request.
22   Q.   And who made you aware of that?
23   A.   I don't know, maybe David. I'm not
24 sure.

---

1     I, Debra A. Vance, a Notary Public within
2 and for the Commonwealth of Massachusetts at large,
3 do certify that pursuant to notice, there came
4 before me on January 31, 2006, at the offices of
5 ROBINSON DONOVAN, P.C., 1500 Main Street,
6 Springfield, Massachusetts, 01115, the following
7 person, to wit: MARY KELLEHER, who was duly sworn
8 to testify to the truth and nothing but the truth as
9 to her knowledge touching and concerning the matters
10 in controversy in this case; that she was thereupon
11 examined upon her oath and said examination reduced
12 to writing by me; and that the deposition is a true
13 record of the testimony given by the witness, to the
14 best of my knowledge and ability.
15     I further certify that I am not a relative
16 or employee of counsel or attorney for any of the
17 parties, nor a relative or employee of such parties,
18 nor am I financially interested in the outcome of
19 the action.
20 WITNESS MY HAND, this 31st day of January, 2006.
21
22                    _____
22                    Debra A. Vance
23 My Commission Expires:
24 April 26, 2007

---

1   Q.   And what did you advise?
2   A.   I didn't see any problem with that.
3   Q.   And did you have any other
4 conversations about the separation agreement with
5 Mr. Mattocks?
6   A.   Not that I recall. I might have had
7 conversations with the attorneys.
8   Q.   And did you have any other
9 conversations with Donna Viens about the
10 separation agreement?
11   A.   I'm not sure I had any conversations
12 with Donna about the separation agreement.
13   Q.   Ms. Kelleher, at the end of a
14 deposition I like to give a deponent a chance to
15 add anything, clarify anything, or correct
16 anything. I'll be glad to give you that
17 opportunity now.
18   A.   I don't think there is anything.
19       MR. SIKORSKI:   I have no further
20 questions.
21       MS. FABBO:   I have no questions.
22       MS. KENNEDY:   I have nothing, thank
23 you.
24       (Deposition concluded at 1:57 p.m.)

---

1         SIGNATURE/ERRATA SHEET
2
3       To be signed by deponent and
returned to counsel.
4       I, the undersigned, MARY KELLEHER,
5 do hereby certify that I have read the foregoing
6 transcript of my testimony given in the matter of
7 MARK A. RICHARDS v. RIVER VALLEY COUNSELING
8 CENTER, INC. VALLEY HEALTH SYSTEMS, INC. DAVID G.
9 MATTOCKS AND DONNA VIENS and to the best of my
10 knowledge, said transcript is true and accurate
11 with the exception of the corrections listed
12 below:
13 PAGE/LINE/CORRECTION_____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 DEPONENT'S SIGNATURE _____
24 DATE OF SIGNING _____