UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION
CIVIL ACTION NO. 05-30061-MAP

| | |
|---|---|
| MARK A. RICHARDS, | ) |
|     Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| RIVER VALLEY COUNSELING CENTER, INC., | ) |
| VALLEY HEALTH SYSTEMS, INC., | ) |
| DAVID G. MATTOCKS AND DONNA VIENS, | ) |
|     Defendants | ) |

**PLAINTIFF'S REPLY TO DEFENDANT MATTOCKS STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

1. Mr. Richards began employment with River Valley Counseling Center, Inc. (River Valley) in the early 1990s. (Richards 20, 23) River Valley was comprised of a Day Treatment Program (also known as a partial hospitalization program), an AIDS Prevention and Treatment Program, and School-Based AIDS Education Awareness and Harm Reduction Programs. (Mattocks 16, 18-19)

Response 1. Admitted. Except that the Plaintiff was the Program Director.

2. In 1997, Mr. Richards became the Program Director of River Valley's Psychiatric Day Treatment Program in Holyoke, MA. (Richards 19-20, 25-26) A Day Treatment Program is designed to prevent hospitalization of adults who have a serious mental illness and who are at risk of being hospitalized or have been [1]To the extent there is dispute in the facts, the facts herein are presented by the testimony most favorable to Mr. Richards. *Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir. 1997); *Timpson v. Transamerica Ins. Co.*, 41 Mass. App. Ct. 344, 669 N.E.2d 1092 (1996). [2] Relevant portions of the deposition transcripts referenced herein are attached as follows: David Mattocks–Exhibit 1; Mark Richards–Exhibit 2; David Avakian-Exhibit 3; Jeffrey Kassis-Exhibit 4; and Donna Viens-Exhibit 5. hospitalized for a psychiatric illness. (Richards 19)

Response 2. Admitted. Except that Mr. Richards became the Program Director in 1989.

451042

3. As Program Director, Mr. Richards directed the day-to-day operations of the Day Treatment Program on a clinical and administrative basis. (Richards 116-17)

Response 3. Admitted.  Except that Mr. Richards more correctly was known as the Clinical Director and Administrative Manager.


4. David Avakian began reporting to Mr. Richards in 1996 or 1997. Mr. Avakian was the Day Treatment Program Supervisor. As Program Supervisor, Mr. Avakian was the person in charge when Mr. Richards was not available. Additionally, Mr. Avakian scheduled group patients, oversaw Medicare billing, supervised interns and was himself a Clinician. (Richards 120; Avakian 7-8)

Response 4. Admitted.  Except that Mr. Avakian oversaw a part of the Medicare billing.


5. Jeffrey Kassis became the Clinical Director at River Valley Counseling Center in 1988. As Clinical Director he had Clinical responsibility for River Valley's Day Treatment Program for most of the time during 1988 through 2004. (Kassis 6-7)

Response 5. Admitted.  Except that Mr. Kassis was the Clinical Director of the entire agency.


6. In June 2004, H-C Management Company hired David G. Mattocks as the Executive Director of River Valley. (Mattocks 23-24; Richards 61) Mr. Richards reported to Mr. Mattocks in connection with his administrative responsibilities, and he reported to Mr. Kassis, Clinical Director, in connection with his clinical functions. (Mattocks 15) Mr. Mattocks and Mr. Richards did not work at the same physical location. (Mattocks 26; Richards 69)

Response 6. Admitted.  Mr. Richards was a Clinical Director of the Day Treatment Program and had to be so designated under state regulations


7. Donna Viens began employment at River Valley Counseling Center in August, 2004, as its Director of Human Resources. (Viens 5)

Response 7. Admitted.


8. At some time prior to August 30, 2004, Mr. Richards told Mr. Mattocks that his daughter recently had received a new diagnosis for a long-term illness; that he expected to be involved in her treatment; and that he would be requesting intermittent family leave. As Ms. Viens, not Mr. Mattocks, was responsible for

451042

approving and approved FMLA leaves, Mr. Mattocks advised Mr. Richards to inform Ms. Viens of his need for leave and told him that she would provide him with any necessary paperwork. (Richards 49, 84-85)

Response 8. Admitted. The CEO, David Mattocks was responsible for granting FMLA leave. See generally Exhibit 13A, Affidavit of Mark Richards.

9. On or about August 30, 2004, Mr. Mattocks received a memorandum from Mr. Richards requesting intermittent leave to care for his daughter. The memorandum was copied to Ms. Viens. (Mattocks 60-61, Richards 84; Exhibit 6)

Response 9. Admitted.

10. On September 2, 2004, Mr. Mattocks wrote Mr. Richards a memorandum informing him that the River Valley Business Office had not been receiving Day Treatment billings in a timely manner. The memorandum requested Mr. Richards to set up a system whereby the billings would be sent to the Business Office on the same day, every three weeks. Mr. Mattocks also, in that memorandum, asked Mr. Richards to make sure he had back up for implementing the system in his absence. (Richards 240-41; Exhibit 7)

Response 10. Admitted only in part. The memorandum expressed deep concern over Mr. Richard's upcoming FMLA leave. Mattocks had trouble grasping the billing procedure and Richards had been providing the business office with billings in a timely manner.

11. On September 3, 2004, Ms. Viens responded in writing to Mr. Richards' August 30th memorandum that requested leave in writing, Ms. Viens copied Mr. Mattocks on the letter. With the letter, Ms. Viens sent a Request for Leave of Absence Form for Mr. Richards to complete and a Certification of Health Care Provider for his daughter's physician to complete. The letter informed Mr. Richards that it was his responsibility to let Mr. Mattocks know when he would be using his intermittent leave under the Family and Medical Leave Act. (Mattocks 61; Richards 85-86; Exhibit 8)

Response 11. Admitted. The Plaintiff's note that Viens sent a carbon copy of all of the correspondence relating to Richards FMLA leave to Mattocks who admitted receiving it.

12. By letter dated September 17, 2004, Ms. Viens informed Mr. Richards that his request for intermittent FMLA leave was approved. The letter also reiterated that Mr. Richards was required to inform Mr. Mattocks of his need to be away

451042

from work for FMLA reasons at least 24 hours in advance whenever foreseeable or, if not foreseeable, as soon as possible. (Mattocks 61; Richards 89-90; Exhibit 9)

Response 12. Admitted.

13. Mr. Mattocks did not see the completed forms Mr. Richards submitted to support his need for FMLA leave. (Mattocks 61)

Response 13.  Denied.  See Exhibit 10, Deposition of Donna Viens at page 17-18; confidential portion of David Mattock's Deposition.  Diens Kelliher, the Human Resources Director of the overall Holyoke Hospital's system, as well as Mattocks discussed the fact that Mark Richards had requested intermittent FMLA leave prior to Mattocks firing Richards.

14. In 2004, Mr. Richards worked only 34 hours per week and had flexibility in his schedule. Mr. Richards took FMLA intermittent leave that sometimes resulted in him arriving to work later than he normally would arrive. Mr. Richards had difficulty attending morning meetings but never requested that they be rescheduled to another time. (Richards 222)

Response 14.  Denied, insofar as the Defendant attempts to put a negative connotation to Mr. Richard's working "only" 34 hours per week.  According to the Affidavits of Dr. Abraham Linn, Exhibit 2, and Richard's own testimony, Richard's often worked more than 34 hours per week and was a fully competent, committed and financially astute manager.  See generally Plaintiff's Statement of Material Issues of Fact in Dispute No. 1 and 2 (hereinafter Facts Numbered _____).

15. Mr. Richards did not tell Mr. Mattocks every time he took FMLA intermittent leave. (Richards 90-91)

Response 15.  Admitted.  Richards would provide a summary of the time he took FMLA intermittent leave at his weekly or bi-weekly meetings.  Mattocks knew that Richards had taken time off to care for his daughter.  See confidential portion of Mattock's Deposition filed under seal.

16. Instead, of telling Mr. Mattocks when he would be out of work for FMLA reasons, Mr. Richards let Mr. Avakian know when he would be out. (Richards 91).

Response 16. Denied.  Richards let Avakian know and also kept Mr. Mattocks informed.


17. Mr. Richards was out of work many full or partial days during the summer and fall of 2004. (Richards 63-64, 91-93) Mr. Richards' timesheets indicated when he was out; however, they did not indicate whether he was out of work for his own personal reasons, holidays, sick time or vacation time or to care for his daughter. When Mr. Richards took FMLA time off, he took it and recorded the time off as personal time, vacation time or holiday time so that his pay would not get docked. (Richards 92, 95-96, 217-18) Mr. Richards did not submit any documentation to Mr. Mattocks or the Human Resources Department indicating when he took intermittent FMLA leave. (Richards 90-92, 95)

Response 17. Admitted.  Richards would make up time at the end of the day.  The balance of paragraph 17 is denied in as much as Defendant tries to draw negative inference.


18. In addition to Mr. Richards' leave, Donna Viens approved other FMLA leaves of absence, while Mr. Mattocks was employed with River Valley. (Mattocks 49)

Response 18. Denied.  Insofar as neither Mattocks nor Viens could identify any other FMLA leave that had been granted while Mattocks was employed.


19. In the late summer of 2004, Mr. Richards told Mr. Mattocks that he believed that the Day Treatment Program Supervisor, Mr. Avakian, should receive a salary increase and promotion. Mr. Richards considered Mr. Avakian to be a very valuable employee. Mr. Avakian was the only person who could fill in for Mr. Richards in his absence. Mr. Richards believed this made Mr. Avakian not only valuable as a Clinician but as a leader in the Program. Mr. Mattocks asked Mr. Richards to prepare a writing advocating why Mr. Avakian should receive a raise. Mr. Richards did so and either submitted it to Mr. Mattocks or used it as a basis for discussion with Mr. Mattocks. Mr. Mattocks initially was not in favor of raising Mr. Avakian's salary, but after he listened to or read Mr. Richards' advocacy on Mr. Avakian's behalf, Mr. Mattocks approved the increase and promotion. (Richards 100-105, 169-70)

Response 19.  Denied as incomplete and misleading.  Richards wanted Avakian to get a raise because of Avakian had to pay several thousand dollars more in health insurance.  Mattocks decided that he could best sell the raise as part of a promotion.

451042

20. By Memorandum dated September 16, 2004, Mr. Mattocks formally offered Mr. Avakian a promotion to Assistant Director of the Psychiatric Day Treatment program and a raise. (Richards 106; Exhibit 10)

Response 20.  Denied.  Insofar as Avakian did not receive a true promotion in that there was no change of duties.

21. In September or October 2004, Mr. Mattocks asked Mr. Richards if he could join certain "smaller" Executive Team Meetings, which Mr. Richards believed were going to be held about three times per week. Mr. Richards told Mr. Mattocks that he had a daily meeting of the Day Treatment Program that would overlap with the meetings Mr. Mattocks wanted him to attend. Mr. Richards asked Mr. Mattocks how he would be contributing at those meetings and what the goals of those meetings would be in comparison to other meetings he attended. Mr. Mattocks told Mr. Richards that he was still working out the purposes of the various meetings. Mr. Richards mentioned to Mr. Mattocks that it sometimes might be difficult for him to attend the meetings "due to his personal circumstances," and *might* have mentioned it was due to his daughter. Mr. Richards believes that Mr. Mattocks did not require Mr. Richards to attend the meetings because he had not determined what Mr. Richards' role would be at the meetings. He also speculates Mr. Mattocks did not require him to attend because Mr. Richards would not be able to be in regular attendance at the meetings due to his daughter. (Richards 74-75, 149-51, 222-25)

Response 21.  Admitted as essentially correct.  As stated above, Mattocks knew Richards needed to take care of his daughter due to her medical psychiatric condition and knew that he had in fact taken such time off.  See confidential portion of Mattock's Deposition filed under seal.

22. At some point in time, Mr. Mattocks commented to Mr. Richards that he believed it was difficult for him to arrange meetings with him because he "wasn't around very much" because he was at home with his ill daughter. (Richards 148)

Response 22.  Admitted.  This comment, coupled with the blunt statement of concern constitute an extraordinary admission of hostility to Richard's FMLA leave by Mattock.

23. Mr. Richards felt that his relationship with Mr. Mattocks changed in October 2004 because Mr. Mattocks left him a voicemail canceling a meeting the two had scheduled and did not drop by to speak with him as much as he had previously. (Richards 74-75, 149-151, 222-25)

451042

Response 23.  Richards stated this happened following Mattocks asking him to join the "small team" meetings.


24. Nonetheless, Mr. Richards got along well with Mr. Mattocks and saw their relationship as being in an "orientation kind of phase." Mr. Richards believed that Mr. Mattocks responded quickly to issues Mr. Richards brought to his attention, sought out Mr. Richards' opinion, and respected Mr. Richards' role in the organization. Mr. Richards thought Mr. Mattocks had a vision for growing the program and that he improved Mr. Richards' team's morale. (Richards 229-30)

Response 24.  Admitted.  It was Richards job to get along with everyone, including Mattocks.


25. Mr. Richards never complained to anyone at River Valley that he thought Mr. Mattocks was treating him differently or inappropriately. (Richards 221-22)

Response 25.  Admitted.  Simply reflects the fact that Richards is a smart and professional manager.


26. At all times during his employment as Executive Director, Mr. Mattocks attempted to find cost-saving measures for River Valley, which had been operating at a significant deficit for several years prior to his hire. (Mattocks 11-12)

Response 26.  Denied.  See the extensive discussion of this point at Statement of Fact No. 8.


27. At meetings, Mr. Mattocks told Program Directors, including Mr. Richards, that he would be speaking to people about cutting costs in programs at River Valley. (Richards 114-15)

Response 27.  Admitted, but Mattocks never required a plan for cutting costs from any Program Director or Manager.


28. Mr. Mattocks, on an on-going basis, examined all positions under his area of responsibility to assess their contributions to the organization and to determine whether there were any position redundancies. (Mattocks 11-12)

Response 28.  Denied.  Please see Issue of Fact No. 8.

29. Mr. Mattocks made efforts to save on personnel expenses by not filling positions of those who resigned or who were terminated. (Mattocks 13-14, 20) Mr. Mattocks eliminated several positions, including a Contracts Management position, two or three business office staff and Clinician positions. He also eliminated the Community-Based AIDS Education Coordinator. Two other Program Managers, too, were either eliminated or in the process of being eliminated when Mr. Mattocks left employment. (Mattocks 13-14, 18, 20-21)

Response 29.  Denied.  Please see Statement of Fact No. 8.  This paragraph is entirely misleading.

30. Prior to November 4, 2004, Mr. Mattocks estimated that River Valley could achieve a cost savings of $40,000 - $60,000 by eliminating Mr. Richards' position. (Mattocks 16-17) Mr. Mattocks therefore, decided to eliminate Mr. Richards' position. (Mattocks 11).

Response 30.  Denied.  A close look at Mattocks Deposition states that he ultimately concluded the savings were really only in the area of $20,000-$30,000.  Please see Issue of Fact No. 9 as well.  This assertion is completely unbelievable because there is no piece of paper at all.  See Statement of Fact No. 9.

31. At 8:30 a.m. on November 4, 2004, Mr. Mattocks held an Executive Team Meeting, which Mr. Richards attended. At that meeting, Mr. Mattocks informed the attendees that there were going to be changes and cuts that would be difficult for people. (Richards 122-23)

Response 31.  Admitted.  At this meeting Richards gave Mattocks financial information on the continued success of his program.

32. Mr. Richards and Mr. Mattocks had a meeting scheduled for 9:30 a.m., after the Executive Team Meeting. Ms. Viens joined their meeting. (Richards 124)

Response 32.  Admitted.

33. When the meeting began, Mr. Mattocks told Mr. Richards that it was going to be a very difficult meeting and that he had compassion for what he was about to do as he had encountered similarly disquieting discussions during his career. Mr. Mattocks then told Mr. Richards that for financial and business reasons his position would be eliminated. Mr. Mattocks told Mr. Richards that the elimination had nothing to do with his job performance. Indeed, Mr. Mattocks had no reason to have any concern about Mr. Richards' clinical skills and found no deficits or performance problems with Mr. Richards' management skills. (Mattocks 21-22)

451042

Response 33.  Denied.  Insofar as Mattocks told Richards he was being fired and Mattocks did not say it was going to be "a very difficult meeting."


34. Mr. Mattocks told Mr. Richards that Mr. Richards' clinical responsibilities would be assigned to the Clinical Director, Mr. Kassis, and day-to-day operations would be assigned to Assistant Program Director, Mr. Avakian. (Mattocks 29-30, 44-45; Richards 125-130; Viens 23-29) Mr. Richards believes that Mr. Mattocks in fact did believe that by terminating him he could save money in terms of Mr. Richards' salary. (Richards 183-84)

Response 34.  Admitted.  As stated in the Plaintiff's Opposition, Facts numbered 10 and 11, this violated regulations of the Commonwealth of Massachusetts.  Mr. Richards believed that Mr. Mattocks could convince his superiors that there would be a cost savings issue.  Richards has always contended Mattocks wanted to get rid of him because he assumed he would not be available enough to him and because of his age.


35. During the termination meeting, Mr. Richards told Mr. Mattocks that he did not believe that the reorganization would be in compliance with applicable regulations. (Mattocks 31; Richards 126)

Response 35.  Admitted.


36. Mr. Mattocks did not agree with Mr. Richards' belief that the Program would be out of compliance with regulations under the restructuring. Mr. Mattocks reached the conclusion that the Program would be in compliance by telephoning the regulatory agency, reviewing the regulations himself, and consulting with Mr. Kassis and Mr. Avakian. He also had contacted a trade association of organizations offering partial hospitalization programs. That organization informed Mr. Mattocks that there was some discrepancy in the interpretation of the regulations and that after reorganizations, programs were given time to meet regulations if they were then discovered not to be in compliance. Mr. Mattocks also contacted one or two other programs that operated partial hospitalization programs and inquired about their understanding of the regulations. (Mattocks 33-36, 39-40; Kassis 55-59)

Response 36.  The Plaintiffs move to strike this paragraph as it is impermissible hearsay.  If the Court considers it, Mattocks did not call the regulatory agency and he did not consult a lawyer.  The organizations he called are charged with abiding by the regulations, not interpreting them.  Mattocks actions put the entire program's revenues at risk and provide a powerful motive for Mattocks and others to spin their testimony in a certain way favorable to the agency and themselves.

37. Toward the end of the meeting, Mr. Richards asked Mr. Mattocks if he could inform his staff that he would be voluntarily leaving the organization. Mr. Mattocks allowed him to do so. Mr. Richards informed his staff that he would be leaving to spend more time caring for his daughter. (Mattocks 20; Richards 155-58)

Response 37.  Admitted.

38. Around the time when Mr. Mattocks decided to eliminate Mr. Richards' position, Mr. Mattocks took additional steps to reduce costs at River Valley and increase its revenues. Some examples are as follows: He stopped outsourcing graphic design services and began doing the graphic design himself; he negotiated all contracts for stationery, signage, and location of outpatient offices; he sent someone to Puerto Rico for three weeks to recruit bilingual therapists in the hope of increasing the agency's revenue with the Spanish-speaking population; he negotiated with several agencies about increasing contractual involvement with River Valley; and he negotiated with the Department of Mental Health for increased revenue for services being provided. (Mattocks 55-56)

Response 38.  Denied.  Please see Statement of Facts No. 8 and 9.  Mattocks himself called many of these steps "not overly significant."  The balance of the paragraph is misleading as to terminating others.  Persons who were terminated were generally terminated because of performance issues or because the contracts which supported their positions expired.

39. Mr. Richards, whose date of birth is July 6, 1950 and who was 54 at the time of his separation from employment, believes he was terminated because of his age. (Amended Compl. ¶¶ 1, 23-26) However, Mr. Mattocks, who is slightly older than Mr. Richards, had no idea of the relative ages of Mr. Richards and Mr. Avakian. Mr. Mattocks did not even know Mr. Richards, Mr. Avakian or Mr. Kassis' ages. (Mattocks 42, 44) Prior to Mr. Richards' termination, Ms. Viens and Mr. Mattocks did not discuss anything about the ages of Mr. Richards, Mr. Avakian or Mr. Kassis. (Viens 32-33)

Response 39.  The first sentence is admitted.  The second sentence is unworthy of belief and self-serving, as is the last sentence.

40. The only factor upon which Mr. Richards bases his conclusion that he was terminated based on his age is the fact that one of the persons to whom his job duties were assigned, Mr. Avakian, is younger than he is. (Richards 175) Mr. Avakian's date of birth is October 6, 1959 and he was 45 at the time of Mr. Richards' separation. (Avakian 4) Mr. Kassis' date of birth is February 22, 1951 and he was 53 at the time of Mr. Richards' separation. Mr. Mattocks' date of birth

451042

is January 18, 1950. He was the same age as Mr. Richards when he terminated him. (*See* Defendant Mattocks' Answer to Interrogatory No. 1, a copy of which is attached hereto as Exhibit 11.)

Response 40.  Denied.  Please see the Plaintiff's Answers to Interrogatories, Exhibit 6.


41. After Mr. Richards' position elimination, Mr. Avakian's title remained Assistant Program Director; however, he assumed the additional duties of overseeing the budget and ensuring compliance with regulatory agencies. After Mr. Richards' departure, Mr. Avakian communicated many times with trade associations about the regulatory requirements for the Day Treatment Program's leadership team. He also spoke to those who ran other Day Treatment Programs to determine how they staffed their leadership, and he reviewed the applicable regulations with Mr. Kassis and Mr. Mattocks. (Avakian 19, 33-36; Kassis 55-56)

Response 41.  The Plaintiff hereby moves to strike this testimony as being impermissible hearsay.  If the Court considers it, Avakian admitted never speaking with anyone from the Commonwealth about the regulation nor did he consult counsel.


42. When Mr. Richards' position was eliminated, Mr. Kassis continued as Clinical Director at River Valley and also became the Program Director of the Day Treatment Program. As Program Director, Mr. Kassis assumed the responsibility for the quality of the clinical care and oversight of its finances. He took a more "hands on" role in operating the Program. Since he had overseen the Day Treatment Program since the 1980s, he had experience running the Program even though he had never been its Director previously. (Kassis 8-9, 15)

Response 42.  Denied.  According to the regulations, Kassis could not become the Program Director of the Day Treatment Program.  Avakian and he both had a hands on role in operating the agency.


43. During Mr. Richards' employment with River Valley, other redundant positions had been eliminated to achieve cost savings for the agency. (Richards 25)

Response 43.  Denied.  Please see Statement of Fact No. 8.


44. After Mr. Richards' separation from employment, River Valley hired a Clinician who generated revenue for the organization. Prior to his separation from employment, Mr. Richards had tried to fill this position to meet marketplace needs and bring more income into the Program. (Mattocks 17-18, 225-26)

451042

Response 44.  Richards was the best manager of any program in the agency in terms of generating revenue and profit.  See Statement of Fact No. 2, 4 and 5.  A more complete explanation of Mr. Mattock's leave of absence is contained in his confidential Deposition transcript filed under seal in this case.

45. Mr. Mattocks went on a medical leave of absence in or about April or May 2005 and resigned in or about June or July 2005 at the end of that leave. (Mattocks 10-11)

> THE PLAINTIFF
> MARK A. RICHARDS
>
>
> By */s/ John C. Sikorski*
> John C. Sikorski, Esq., of
> Robinson Donovan, P.C.
> 1500 Main Street,  Suite 1600
> Springfield, Massachusetts 01115
> Phone (413) 732-2301  Fax (413) 785-4658
> BBO No.:  461970
> jsikorski@robinson-donovan.com

## CERTIFICATE OF SERVICE

I, John C. Sikorski, Esq., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 7, 2006.

Subscribed under the penalties of perjury.

> */s/ John C. Sikorski*
> John C. Sikorski, Esq.

451042