UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Mark A. Richards<br><br>               Plaintiff,<br><br>vs.<br><br>River Valley Counseling Center, Inc., Valley Health Systems, Inc., David G. Mattocks and Dona Viens<br>               Defendants. | CIVIL ACTION NO. 05-30061-MAP |

**DEFENDANT MATTOCKS' MOTION TO STRIKE CERTAIN STATEMENTS IN PLAINTIFF'S REPLY TO MATTOCKS' STATEMENT OF FACTS AND PLAINTIFF'S STATEMENT OF MATERIAL FACT IN DISPUTE**

For the reasons set forth herein, the Defendant, David G. Mattocks, hereby requests that the Court strike in whole or in part Plaintiff's Reply to Defendant Mattocks' Statement of Material Facts As to Which there is No Genuine Issue to Be Tried ("Plaintiff's Reply to Mattocks' Facts") and his Statement of Undisputed Fact. Defendant also requests that the Court disregard such statements in Plaintiff's Opposition to Defendant's Summary Judgment Memorandum.

**A.  Unsupported Statements in Plaintiff's Reply to Mattocks' Facts Should Be Stricken.**

Plaintiff has filed a "Reply" to Mattocks' Facts and has also filed a Opposition to Motions for Summary Judgment of All Defendants, which contains a separate Statement of Material Facts in Dispute. Defendant Mattocks moves that the Court strike any and all statements in Plaintiff's Reply to Mattocks' Facts that are not supported by "affidavits, depositions and other documentation," as required by Local Rule 56.1. The unsupported statements in Plaintiff's Reply to Mattocks' Facts that do not comply with

Local Rule 56.1 and, therefore, should be stricken in their entirety. Engler v. C.R. Bard, Inc., 1997 WL 136249 (D. Mass. 1997) (Lindsay, J.). Completely unsupported statements in Plaintiff's Reply to Mattocks' Facts are as follows:

- Response 1. "…Except that the Plaintiff was the Program Director."

- Response 2. "…Except that Mr. Richards became the Program Director in 1989."

- Response 3: "…Except that Mr. Richards more correctly was known as the Clinical Director and Administrative Manager."[1]

- Response 4: "… Except that Mr. Avakian oversaw a part of the Medicare billing."

- Response 5: "… Except that Mr. Kassis was the Clinical Director of the entire agency."

- Response 6: "…Mr. Richards was a Clinical Director of the Day Treatment Program and had to be so designated under state regulations."

- Response 10: "…The memorandum expressed deep concern over Mr. Richards' upcoming FMLA leave. Mattocks had trouble grasping the billing procedure and Richards had been providing the business office with billings in a timely manner."

- Response 11: "…The Plaintiff's [sic] note that Viens sent a carbon copy of all of the correspondence relating to Richards' FMLA leave to Mattocks who admitted receiving it."

- Response 16: "…Richards let Avakian know and also kept Mr. Mattocks informed."

- Response 17: "…Richards would make up time at the end of the day."

- Response 18: "…Insofar as neither Mattocks nor Viens could identify any other FMLA leave that had been granted while Mattocks was employed."

- Response 19: "…Richards wanted Avakian to get a raise because of [sic] Avakian had to pay several thousand dollars more in health insurance." Mattocks decided that he could best sell the raise as part of a promotion."

---

[1] Defendant notes that this purported "Fact" contradicts the "Fact" set forth in responses to Paragraph 1.

- Response 20: "… Insofar as Avakian did not receive a true promotion in that there was no change in duties."

- Response 22: "…This comment, coupled with the blunt statement of concern constitute an extraordinary admission of hostility to Richard's [sic] FMLA leave by Mattocks."

- Response 23: "Richards stated this happened following Mattocks asking him to join the 'small team' meetings."

- Response 24: "…It was Richards [sic] job to get along with everyone, including Mattocks."

- Response 25: "…Simply reflects the fact that Richards is a smart and professional manager."

- Response 27: "Admitted, but Mattocks never required a plan for cutting costs from any Program Director or Manager."

- Response 31: "…At this meeting Richards gave Mattocks financial information on the continued success of the program."

- Response 33: "…Insofar as Mattocks told Richards he was being fired and Mattocks did not say it was going to be a 'very difficult meeting.'"

- Response 34: "…Mr. Richards believed that Mr. Mattocks could convince his superiors that there would be a cost savings issue. Richards has always contended Mattocks wanted to get rid of him because he assumed he would not be available enough to him and because of his age."

- Response 36: "…Mattocks did not call the regulatory agency and he did not consult a lawyer. The organizations he called are charged with abiding by the regulations, not interpreting them. Mattocks [sic] actions put the entire program's revenues at risk and provide a powerful motive for Mattocks and others to spin their testimony in a certain way favorable to the agency and themselves."

- Response 39: "…The second sentence is unworthy of belief and self-serving, as is the last sentence."

- Response 41: "…Avakian admitted never speaking with anyone from the Commonwealth about the regulation nor did he consult counsel."

- Response 42: "… According to the regulations, Kassis could not become the Program Director of the Day Treatment Program. Avakian and he both had a hands on role in operating the agency."

3

- Statement of Undisputed Fact No. 6 at p. 8 of Plaintiff's Opposition (in relevant part): "There is no doubt in [Mr. Richards'] mind that Mattocks knew because they had discussed his daughter's continuing health problems in their regular meetings. Viens and he also discussed his daughter's continuing problems. He told Veins that he just anted his daughter to have a normal senior year in high school like other children."

- Statement of Undisputed Fact No. 3 at p. 7 (final paragraph): "In Richards' mind, and everyone else in the agency, there is no doubt that Richards' daughter had a serious health condition which required Richards to help out and which had multiple components." The plaintiff and his colleagues all worked in an agency servicing persons with mental, emotional as well as physical disabilities and Richards' concerns and discussions about his daughter were obviously well understood by those persons in the agency."

- Statement of Undisputed Fact No. 4 at p. 7 (relevant portion underlined): "Mattocks told Richards he knew that Richards had been missing a lot of work to take care of his daughter. <u>Richards corrected him telling Mattocks that he had not taken a great deal of time off</u>."[2]

- Statement of Undisputed Fact No. 14 at p. 11 (in relevant part): "Avakian has been treated consistently better than Richards, including being retained, given a raise and later, after he left the Agency for a short time, he was hired back by Valley Health Systems."

- Plaintiff's Opposition at p. 18: "In this case, the defendants baldly assert that their termination of Richards was part of some overall reduction in force."[3]

- Plaintiff's Opposition at p. 18: "Yet when pressed to identify any remotely similarly situated individual selected for termination, either before or after Richards, the defendants gave one implausible and incredible explanation after another."[4]

The above "exceptions" and purported "facts," have no citation to the record whatsoever. This lack of support would require the Defendants and the Court to sift through the numerous other documents and exhibits Plaintiff filed to determine whether

---

[2]This statement is also found on p. 14 of Plaintiff's Memorandum. There is no support for this statement in the record although Plaintiff does provide a citation to Exhibit 1B, pp. 148-151 and 221-225.
[3] This is unsupported. Defendants have maintained that Mr. Richards' position was eliminated as part of cost-savings measures. See Mattocks' Facts at ¶ 30. There has been no suggestion whatsoever of an "overall reduction in force."
[4] Plaintiff has come forward with no evidence that Defendant gave any explanation for Mr. Richards' termination other than to save costs.

4

these declarations are actually supported with admissible evidence, which they are not. Local Rule 56.1 requires responsive replies to Defendant's Facts such that the Court does not have to "ferret" through filings. Accordingly, the above, unsupported statement should be stricken from the Reply and disregarded when deciding Defendant's Motion.

**B.    Plaintiff's Unsupported Contention that Mr. Mattocks Was Responsible for Approving FMLA Leave Must Be Stricken.**

Some of the "Facts" that purported to be supported by admissible evidence actually cite to non-supporting documentation and also should be stricken. For example, at Response 8, Plaintiff both admits that Ms. Viens, not Mr. Mattocks, was responsible for approving FMLA leaves *and* claims that, "The CEO, David Mattocks was responsible for granting FMLA leave." In support of this statement, Plaintiff cites his affidavit, which is at Exhibit 13, to his Opposition. There is nothing in Plaintiff's affidavit supporting this claim or explaining why he both admits and denies this fact. Additionally, Plaintiff has not set forth any foundation for his purported personal knowledge of his contention that Mr. Mattocks made decisions relative to whom would be allowed FMLA leave. Evidence that is inadmissible hearsay may not be considered on summary judgment. Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998); Fed. R. Civ. P.  56(e). The undisputed evidence cited in Defendant Mattocks' Statement of Fact demonstrates that Donna Viens, not Mr. Mattocks, was responsible for approving FMLA leaves of absence. (See Mattocks' Facts ¶ 8.) Plaintiff's personal and unsupported belief that it was Mattocks who was responsible should not be considered on summary judgment.

**C. Illogical Inferences Drawn from the Evidence Cannot be Used to Defeat Summary Judgment.**

    1.  <u>No Memorandum Expressed "Deep" or "Grave" Concern about Mr. Richards' Leave of Absence.</u>

Plaintiff's contention that Mr. Mattocks wrote a memorandum expressing "deep" or "grave" concern about his upcoming FMLA leave, is contrary to the plain language of the document at issue, a copy of which is attached as Exhibit 11 to Plaintiff's Opposition.[5]  In the document, Mr. Mattocks expressed concern *about untimely billings*, not FMLA leave, and is asked Mr. Richards to have reliable back up to ensure timely billings when he is out of work.  The mere fact that Mr. Mattocks mentions the [F]MLA when asking Mr. Richards to have reliable back up in place for billing does not turn this memorandum into the "smoking gun," that Plaintiff claims it to be.  Further, Mr. Richards' handwritten response on the memorandum indicates he understood that it was *the billing's timeliness* that Mr. Mattocks was concerned about.  Indeed, Mr. Richards' note addresses historical billing timelines.  No where within the memorandum or Mr. Richards' response thereto is there any "grave" or "deep" concern about FMLA or anything else. "While the Court must view the evidence in the light most favorable to Plaintiff, it is not required to adopt Plaintiff's characterizations of that evidence nor is it required to make illogical inferences from the evidence."  <u>Tuttle v. Lorillard Tobacco Co.</u>, 2003 WL1571584, *8 (D. Minn. 2003); <u>Colley v. Waste Management of Alabama, Inc.</u>,

---

[5] See Plaintiff's unsupported statement in his Reply to Mattocks' Facts at 10.  "The memorandum expressed deep concern over Mr. Richard's [sic] upcoming FMLA leave."  See also Plaintiff's Opposition to Motions for Summary Judgment of All Defendants, Summary of Argument at p. 1: "…Mattocks expressed his deep concern over Richards' upcoming leave in a written memo which is as close to a 'smoking gun' memo as one is likely to find in a FMLA case," and p. 7, "Mattocks indicates grave concern about Richards taking intermittent leave."

2001 WL 228058 (S.D. Ala. 2001). Accordingly, statements claiming Mattocks' memorandum some how demonstrates "deep" or "grave" concern should be stricken.

    2. <u>All Statements Pertaining to Mr. Mattocks Allegedly Engaging In "Professional Fraud" Should be Stricken.</u>[6]

There is no evidence that Mr. Mattock committed "professional fraud" by obtaining a degree from Parkwood University. Mr. Mattocks obtained a Ph.D. from Parkwood University by taking 10-12 courses online, completing an examination and by traveling to London to defend his 200-300 page thesis on the effects of managed care on behavioral health practices in front of four individuals, including the Dean of Parkwood, for approximately two hours. Mr. Mattocks took approximately 9 months to one year to obtain his degree from Parkwood, and his Parkwood education cost between $10,000 and $20,000. Mr. Mattocks testified that during and after the application process, he had no reason to believe that Parkwood was a "sham" university. However, after Mr. Richards' separation from employment, Mr. Mattocks learned, through Mr. Richards' counsel, that it had been shut down by the FCC and had no reason to disbelieve that that had occurred. (See Exhibit A) Moreover, Plaintiff fails to mention, while launching claims of professional fraud that Mr. Mattocks' position as Executive Director did <u>not</u> require a Ph.D, and Mr. Mattocks had been hired based on his management experience <u>not</u> because he did or did not have a Ph.D. (See Exhibit B) Thus, Mr. Richards' personal belief that Mr. Mattocks engaged in "professional fraud," should be stricken and not considered on summary judgment. <u>Murphy v. Ford Motor Co.</u>, 170 F.R.D. 82 (D. Mass. 1997).

---

[6] See such statements at pages 3 and 11 of Plaintiff's Memorandum.

**D. Statements Pertaining to Richards' *Personal Beliefs* Should Be Stricken.**

    1. <u>Mr. Richards' Personal Belief that Mattocks' Restructuring Violated a Regulation Should Be Stricken.</u>

Mr. Richards has come forward with no legal precedent, fine, citation or other evidence that Mr. Mattocks' distribution of Mr. Richards' former job duties to Mr. Kassis and Mr. Avakian violated any regulation whatsoever.  To the contrary, Mr. Mattocks and others have consistently testified that they had good faith beliefs, based on inquiries, that the regulation was somewhat ambiguous and the rearrangement did not violate any regulation.  (Defendant Mattocks' Facts at 36; Mattocks 33-36, 39-40; Kassis 55-59)  This purported "fact" that Mr. Mattocks' violated some regulation is based on Mr. Richards' unsupported personal belief, and, accordingly should not be considered when deciding whether to grant summary judgment for Defendant Mattocks.

    2. <u>Mr. Richards' Personal Belief as to What "Weighed" on Mr. Mattocks' Mind Must be Stricken.</u>

There is no evidence in the record other than Mr. Richards' own speculation that "[c]learly the mount of time that Richards might be taking weighed on Mattocks' mind and evidenced the kind of stereotypical thinking prohibited by the FMLA."  (See Plaintiff's Memorandum at p. 14).  This should be disregarded.  Murphy v. Ford Motor Co., 170 F.R.D. 82 (D. Mass. 1997).

                                                Respectfully Submitted,

                                                /s/ Marylou Fabbo, Esq.
                                               Marylou Fabbo, Esq.
                                               BBO #566613
                                               Counsel for Defendant Mattocks
                                               Skoler, Abbott & Presser, P.C.
                                               One Monarch Place, Suite 2000
                                               Springfield, Massachusetts  01144
Dated:  June 16, 2006                         Tel. (413) 737-4753/Fax (413) 787-1941

## COUNSEL CERTIFICATION

In accordance with Local Rule 7.1(A)(2) of the United States District Court for the District of Massachusetts, I certify that Defendant's counsel conferred with counsel for the Plaintiff on June 16, 2006 by telephone in a good-faith effort to resolve or narrow the issues presented in this Motion and was partially unsuccessful in those efforts.

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing above document was served upon the attorney of record for each other party via electronic filing on June 16, 2006.

    /s/ Marylou Fabbo, Esq.
Marylou Fabbo, Esq.

Filename:	Motion to Strike Plaintiff's Reply to Mattocks' Statement of Material Facts.doc
Directory:	F:\OFFICE DOCUMENTS\Data\River Valley\RICHARDS, MARK  (NEW)\Litigation\Summary Judgment
Template:	C:\Documents and Settings\lsanchez\Application Data\Microsoft\Templates\Normal.dot
Title:	I
Subject:	
Author:	Skoler Abbott & Presser
Keywords:	
Comments:	
Creation Date:	6/16/2006 11:10 AM
Change Number:	78
Last Saved On:	6/16/2006 3:31 PM
Last Saved By:	lsanchez
Total Editing Time:	87 Minutes
Last Printed On:	6/16/2006 3:31 PM
As of Last Complete Printing
    Number of Pages: 9
    Number of Words:	2,318 (approx.)
    Number of Characters:	12,361 (approx.)

# EXHIBIT A

Page 1

```
 1              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTTS
 2                   WESTERN DIVISION

 3                              CIVIL ACTION NO. 05-30061-MAP

 4   MARK A. RICHARDS,             )
                                   )
 5                       Plaintiff )
     vs.                           )
 6                                 )
     RIVER VALLEY COUNSELING CENTER, INC.,)
 7   VALLEY HEALTH SYSTEMS, INC.,  )
     DAVID G. MATTOCKS AND DONNA VIENS, )
 8                       Defendants )

 9


10
                  C O N F I D E N T I A L
11

12       Information contained herein is subject to a

13   Confidentiality Agreement and may be disclosed only to

14   persons authorized to have access thereto under the

15   terms of that Agreement.

16

17                  *   *   *   *   *

18

19

20

21

22

23

24

25
```

Page 14

1  Q.    And that was in London, correct?
2  A.    That's correct.
3  Q.    And did you ever attend any classes at Parkwood
4  University?
5  A.    I did, online.
6  Q.    Okay. And what did you get a degree in?
7  A.    Health services administration.
8  Q.    And what, how many courses did you take to get
9  your Ph.D. from Parkwood?
10 A.    I was granted advanced standing because I had
11 two master's degrees previously. My recollection is
12 that I took ten to twelve online courses, that I took
13 an examination. I completed a doctoral thesis and went
14 to London to defend that.
15 Q.    What was your doctoral thesis on?
16 A.    It was on the effects of managed care on
17 behavioral health practices.
18 Q.    How long was it?
19 A.    Page wise?
20 Q.    Um-hum.
21 A.    Two to three hundred pages --
22 Q.    And do you have a copy of it?
23 A.    -- estimate. Certainly.
24 Q.    Okay. And who did you defend it in front of?
25 A.    I defended it in front of two online professors,

Page 15

1  the dean of the university, and one other individual
2  who I do not recall their title.
3  Q.    So were you in a room with one person and two
4  people online, or how did that work?
5  A.    No, no. They were all in person.
6  Q.    How many times had you been in London in
7  connection with getting your Ph.D. from Parkwood
8  University?
9  A.    That was the first and last time.
10 Q.    How long did the defense last?
11 A.    With a break, probably two hours.
12 Q.    And what were the names of the people that you
13 defended in front of?
14 A.    I do not recall.
15 Q.    What was the length of time between you applying
16 for the Ph.D. and you getting the Ph.D.?
17 A.    This is a guess. Nine months to a year.
18 Q.    What was the total cost that you paid to
19 Parkwood University?
20 A.    I don't recall. It was somewhere between 10 and
21 20 thousand dollars.
22 Q.    Have you reviewed the materials that I supplied
23 to your counsel about Parkwood University?
24 A.    I have.
25 Q.    And have you reviewed the material regarding the

Page 16

1  FCC shutting down Parkwood University?
2  A.    I have.
3  Q.    And have you reviewed the allegations that it
4  was run by unscrupulous people in eastern and middle
5  eastern countries?
6  A.    I have.
7  Q.    And do you agree that it was somewhat of a sham
8  university?
9  A.    I certainly had no basis for that feeling either
10 before, during the application process or during my
11 time at the university. Do I believe the allegations
12 made in those documents you supplied me? Yes.
13 Q.    Did you see a reference to you and the Liberian
14 presidential campaign recently?
15 A.    I saw all the references you saw fit to send me.
16 Q.    But you haven't seen any since then?
17 A.    No, I have not.
18 Q.    At some point in time, did you work at a medical
19 college in the south?
20 A.    I did.
21 Q.    And where did you work?
22 A.    I was an associate professor, originally
23 assistant professor of psychiatry at the Medical
24 College of Virginia Commonwealth University and held an
25 administrative position as director of inpatient

Page 17

1  accessibility. I can't remember the specific title.
2  Q.    And how long did you hold that position?
3  A.    I would have to refer to my resume, but I would
4  say four or five years.
5  Q.    And when was the last time you had faculty
6  status at that institution?
7         ATTORNEY FABBO:  We can stop the
8  confidentiality agreement.
9         ATTORNEY SIKORSKI:  No, I want to keep
10 this, I think we ought to -- let's keep this up.
11        ATTORNEY FABBO:  Okay.
12        THE WITNESS:  I'm sorry. Can you ask the
13 question again, please?
14 BY ATTORNEY SIKORSKI:
15 Q.    When was the last time you held faculty status
16 at the Medical College of Virginia?
17 A.    I left full-time faculty status at the time of
18 my recitation from the university.
19 Q.    And when was that?
20 A.    I would have to refer to my resume.
21        ATTORNEY FABBO:  I just want to point out
22 these subjects are not subject to that confidentiality
23 agreement.
24        ATTORNEY SIKORSKI: Okay. We can start
25 again. We can stop.

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

HANK A. RICHARDS,
           Plaintiff
vs.
RIVER VALLEY COUNSELING CENTER,
INC., VALLEY HEALTH SYSTEMS, INC.,
DAVID G. MATTOCKS AND DONNA VIENS,
           Defendants

DEPOSITION OF HANK PORTER, taken before Debra Vance, Notary Public Stenographer, pursuant to the provisions of Rule 30 of the Massachusetts Rules of Civil Procedure, at the offices of ROBINSON DONOVAN, P.C., 1500 Main Street, Springfield, Massachusetts on December 9, 2005, commencing at 10:00 a.m.

APPEARANCES:  (See Page 2)

Debra A. Vance
Notary Public Stenographer

---

**2**

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts 01115
413-732-2301
   BY:  JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115
413-781-2820
   BY:  MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts 01144
413-737-4753
   BY:  MARY LOU FABBO, ESQ.

---

**3**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Hank Porten | *4 | | | |

* By Mr. Sikorski

EXHIBITS:                                    PAGE:

Exhibit 1, notice of deposition..............38
Exhibit 2, copy of protective order..........41

---

**4**

HANK PORTEN, Deponent, having been satisfactorily identified and duly sworn, deposes and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI:

Q.  Mr. Porten, could you please state your name and spell your last name for the record?

A.  Hank Porten, P-O-R-T-E-N.

Q.  And what's your residential address?

A.  23 Dicsal, D-I-C-S-A-L, Lane, Holyoke, Massachusetts 01040.

Q.  Do you know a David Mattocks?

A.  Yes, I do.

Q.  Did you have any role in hiring David Mattocks?

A.  Yes, I did.

Q.  What role did you have in hiring David Mattocks?

A.  He was presented as a recommended candidate, and I interviewed him at that time.

Q.  And for what position, sir?

A.  For the executive director of River Valley Counseling.

15

1  discussed about reducing positions, do you recall
2  if anyone else was at that meeting?
3      A.    I do not.
4          MS. KENNEDY:   Objection.
5      Q.    (By Mr. Sikorski) Would Ms. Kelleher
6  typically be involved in these discussions when
7  it involved the reduction in force?
8      A.    Not with my office.
9      Q.    What did you say to Mr. Mattocks when
10 he told you he was thinking about reducing
11 positions?
12     A.    I don't remember the exact words.
13     Q.    In general?
14     A.    In general, I would think continue to
15 do the work. We need to save expenses in this
16 organization.
17     Q.    At some point in time, did anyone
18 discuss with you offering a severance package to
19 Mr. Richards?
20         MS. KENNEDY:   Offering, is that the
21 question you asked?
22         MR. SIKORSKI:   Uh-huh.
23         THE WITNESS:   I vaguely remember a
24 discussion about being offered a severance

14

1  package for the employee or employees that
2  were being reduced.
3      Q.    (By Mr. Sikorski) What do you remember
4  about that conversation?
5      A.    Just that I said if we can work that
6  out that's acceptable to me.
7      Q.    Do you recall there being a
8  discussion about Mr. Richards getting a more
9  substantial severance package than others at his
10 level?
11     A.    I do not, no.
12     Q.    What individual in the general
13 Holyoke Hospital/Holyoke Medical Center
14 organization would have the most say about the
15 level of severance benefits provided to departing
16 employees?
17         MS. KENNEDY:   Objection to form.
18         THE WITNESS:   Well, are you asking
19 what we do at Holyoke Medical Center?
20     Q.    (By Mr. Sikorski) In all the
21 affiliated Holyoke Medical Center entities.
22     A.    I would think that Mary Kelleher
23 would be involved at some level of that
24 discussion. But I would rely pretty heavily on

15

1  the senior manager of the various affiliate to
2  concur or to disagree.
3      Q.    At some point in time, did you learn
4  that there was an allegation that Mr. Mattocks
5  had a Ph.D. from a non-accredited university?
6          MS. KENNEDY:   Objection. To the
7  extent that other than anything you've been
8  told by counsel, go ahead and answer if you
9  can.
10         THE WITNESS:   Yes, I recall a
11 conversation about the Ph.D.
12     Q.    (By Mr. Sikorski) And what
13 conversation do you recall?
14     A.    Mr. Mattocks called me and indicated
15 that there was some concern about the Ph.D.
16 credential that he had, and I asked him what that
17 was. He said it was from a non-accredited
18 organization and that he wanted me to know before
19 it became a more public issue. And my response
20 was, "I didn't hire you for a Ph.D. I hired you
21 for your management experience."
22     Q.    Did you follow up at all on this
23 allegation about a non-accredited Ph.D.?
24     A.    It was not an important issue for me.

16

1      Q.    Is credentials an important issue in
2  health care facilities in general?
3          MS. KENNEDY:   What was the question
4  again, I'm sorry?
5          (The last question was read.)
6          MS. KENNEDY:   Objection to the form.
7          THE WITNESS:   If the job requires a
8  credential, like a physician, it's very
9  important. If the job does not require a
10 credential, it is not important.
11     Q.    (By Mr. Sikorski) Did you understand
12 that Mr. Mattocks had held himself out as having
13 a Ph.D. from an accredited university?
14         MS. KENNEDY:   Objection.
15         THE WITNESS:   I never really talked
16 to him about his Ph.D. prior to the phone
17 call. If you're asking me prior to that, I
18 wouldn't even have known.
19     Q.    (By Mr. Sikorski) But after that. At
20 some point in time you learned that he had a
21 Ph.D. from a non-accredited university, correct?
22     A.    Yes.
23     Q.    Did you also learn that that was from
24 a university that was highly suspect?

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30061-MAP

MARK A. RICHARDS,                )
            Plaintiff            )
VS.                              )
                                 )
RIVER VALLEY COUNSELING CENTER,  )
INC., VALLEY HEALTH SYSTEMS, INC.,)
DAVID G. MATTOCKS AND DONNA VIENS,)
            Defendants           )

DEPOSITION OF MARY KELLEHER, taken before Debra Vance, Notary Public Stenographer, pursuant to the provisions of Rule 30 of the Massachusetts Rules of Civil Procedure, at the offices of ROBINSON DONOVAN, P.C., 1500 Main Street, Springfield, Massachusetts on January 31, 2006, commencing at 1:15 p.m.

APPEARANCES: (See Page 2)

Debra A. Vance
Notary Public Stenographer

---

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Mary Kelleher | *4 | | | |

* By Mr. Sikorski

EXHIBITS:                                           PAGE:

Exhibit 1, subpoena........................25

---

2

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, Massachusetts 01115
413-732-2301
        BY: JOHN C. SIKORSKI, ESQ.

FOR RIVER VALLEY COUNSELING CENTER:

BULKLEY, RICHARDSON AND GELINAS, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115
413-781-2820
        BY: MARY J. KENNEDY, ESQ.

FOR DAVID MATTOCKS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts 01144
413-737-4753
        BY: MARY LOU FABBO, ESQ.

---

4

STIPULATIONS

It is agreed by and between the parties that all objections, except objections as to the form of the questions, and all motions to strike unresponsive answers are reserved and may be raised at the time of trial for the first time.

It is further agreed by and between the parties that the sealing and the notification to all parties of the receipt of the original deposition transcript is hereby waived.

MARY KELLEHER, Deponent, having been satisfactorily identified and duly sworn, deposes and states as follows:

DIRECT EXAMINATION BY MR. SIKORSKI:
   Q.   Would you please state your name, spell your last name for the record, and give us your address please?
   A.   My name is Mary E. Kelleher, K-E-L-L-E-H-E-R, and my home address is 60 Lindor

```
 1        Q.    And who were those persons?
 2        A.    Hank and Tony and myself interviewed
 3   first, and I believe Maryann. Maryann
 4   interviewed with us. Maryann was the interim
 5   director of River Valley at the time. She
 6   participated. And then we had the candidates
 7   meet the management team. It's kind of the
 8   senior management team at River Valley. And that
 9   was Jeff, Brian Duke. I forget who else.
10        Q.    When you say "Hank," is that Hank
11   Porten?
12        A.    Yes.
13        Q.    And when you say "Tony," is that Tony
14   Correia?
15        A.    It is.
16        Q.    Who made the decision to hire David
17   Mattocks?
18        A.    Ultimately Hank would make that
19   decision with input from the interviewing
20   parties.
21        Q.    Including you and Tony Correia?
22        A.    Correct.
23        Q.    Did you inquire as to whether or not
24   Mr. Mattocks had ever received training in
```

```
                                                    23
 1   that he had had some financial difficulties, but
 2   I don't believe he explained that it was
 3   bankruptcy.
 4        Q.    Did he describe the personal
 5   difficulties in any way?
 6        A.    No.
 7        Q.    Did anyone in the interviewing
 8   process ever question a Ph.D. from a London
 9   university?
10        A.    I think I commented on the fact that
11   he didn't spend much time in London, because I
12   had visited there not that long before. That was
13   it.
14        Q.    What did he say?
15        A.    He got his Ph.D. from a London
16   school.
17        Q.    Is integrity in the credentialing
18   process important in the mental health field?
19        A.    Yes.
20        Q.    At some point in time, did you learn
21   that Mr. Mattocks' Ph.D. was not from an
22   accredited university?
23        A.    I did.
24        Q.    What steps did you take once you
```

```
                                                    22
 1   compliance with discrimination laws?
 2        A.    In the interview process?
 3        Q.    Yes.
 4        A.    No.
 5        Q.    Did you ever ascertain whether or not
 6   Mr. Mattocks had had training in compliance with
 7   employment laws other than discrimination laws?
 8        A.    No.
 9        Q.    Did you ever have a background check
10   done on Mr. Mattocks?
11        A.    No.
12        Q.    What did you understand were his
13   reasons for leaving the Brattleboro Retreat?
14        A.    It was a reduction in force.
15        Q.    And did you ever learn about his
16   personal bankruptcy?
17        A.    Through this process, through -- I
18   think it was something that you brought up at one
19   point.
20        Q.    But other than through this
21   litigation process, did anyone involved in the
22   screening process learn that Mr. Mattocks had
23   filed personal bankruptcy?
24        A.    I believe he indicated at one point
```

```
                                                    24
 1   learned that?
 2        A.    Asked him about it.
 3        Q.    And what did he say?
 4        A.    It was not an accredited school.
 5        Q.    What else did he say about it?
 6        A.    That he had done coursework that he
 7   had done, I believe he'd done a paper or
 8   something. I don't remember all the details. He
 9   had done work to achieve it. It was just an
10   unaccredited program.
11        Q.    Did you take any action against him
12   upon learning that?
13        A.    Action, no.
14        Q.    Did you implement any policy or
15   procedure to ensure that future candidates for
16   positions would have Ph.D.s from accredited
17   organizations?
18        A.    The position didn't require a Ph.D.
19        Q.    I understand. But did you take any
20   steps to make sure that persons claiming to have
21   Ph.D.s have them from accredited universities?
22        A.    No.
23              MR. SIKORSKI:  I'm going to have
24   this marked as Exhibit 1 in this
```